**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME V OF VII**
**(Pages A 0599 to A 0761)**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS REVISED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---


OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)


August 29, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to VII

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 Notice of Rule 30(b)(6) Deposition..................................................A 0028

April 18, 2002 Notice of Rule 30(b)(6) Deposition................................................A 0033

November 12, 2004 Notice of Rule 30(b)(6) Deposition ........................................A 0039

March 2, 2005 Notice of Rule 30(b)(6) Deposition................................................A 0043

April 19, 2007 Notice of Rule 30(b)(6) Deposition................................................A 0047

June 9, 2008 Notice of Rule 30(b)(6) Deposition....................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0052

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0065

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished) ...........................................................A 0075

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels ...........................................................A 0105

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0111

Barrett, Lake ...........................................................................................................A 0123
April 22, 2002 .......................................................................................................A 0124
April 23, 2002 .......................................................................................................A 0149
April 26, 2002 .......................................................................................................A 0173
May 8, 2002 ..........................................................................................................A 0204
May 10, 2002 ........................................................................................................A 0228
May 14, 2002 ........................................................................................................A 0252

**Volume II (continued)**

Brownstein, Alan ........................................A 0257
April 9, 2002 ........................................A 0258

**Volume III**

Brownstein, Alan (continued)........................................A 0282
April 10, 2002 ........................................A 0282
April 11, 2002 ........................................A 0308
June 14, 2002 ........................................A 0319

Cole, Billy M. ........................................A 0328
March 12, 2002 ........................................A 0329
March 13, 2002 ........................................A 0360
June 4, 2002 ........................................A 0369

Dreyfus, Daniel........................................A 0373
May 15, 2002 ........................................A 0374

Klein, Susan........................................A 0384
April 24, 2002 (Rule 30(b)(6))........................................A 0385
April 25, 2002 (Rule 30(b)(6))........................................A 0419

Kouts, Christopher........................................A 0428
January 30, 2004........................................A 0429
August 2, 2004 (in the *Yankee Atomic* Trial Transcript) ..............................A 0440

**Volume IV**

Kouts, Christopher (continued)........................................A 0445
April 11, 2005 (Rule 30(b)(6))........................................A 0445
July 12, 2005 (in the *TVA* Trial Transcript)........................................A 0459
January 16, 2007 (in the *System Fuels Mississippi* Trial Transcript) ............A 0463
April 12, 2007 (in the *System Fuels Entergy Arkansas* Trial Transcript)......A 0465
May 1, 2007 (Rule 30(b)(6))........................................A 0472
May 2, 2007 ........................................A 0484
June 12, 2008 (Rule 30(b)(6)) ........................................A 0502

Lawrence, Michael........................................A 0531
May 20, 2002 ........................................A 0532
May 21, 2002 ........................................A 0572
November 16, 2007 (in the *Carolina Power* Trial Transcript)......................A 0587

## Volume V

Milner, Ronald ....................A 0599
May 1, 2002 ....................A 0600
May 2, 2002 ....................A 0629
May 3, 2002 ....................A 0661
May 7, 2002 ....................A 0675
May 8, 2002 ....................A 0690
August 11, 2004 (in the *Yankee Atomic* Trial Transcript) ....................A 0695

Morgan, Robert ....................A 0703
March 21, 2002 ....................A 0704
March 22, 2002 ....................A 0737
June 25, 2002 ....................A 0745
August 3, 2004 (in the *Yankee Atomic* Trial Transcript) ....................A 0751
November 13, 2007 (in the *Carolina Power* Trial Transcript) ....................A 0757

## Volume VI

Pollog, Thomas ....................A 0762
April 11, 2002 (Rule 30(b)(6)) ....................A 0763
April 12, 2002 (Rule 30(b)(6)) ....................A 0799
May 15, 2002 (Rule 30(b)(6)) ....................A 0819
May 16, 2002 (Rule 30(b)(6)) ....................A 0823
August 4, 2004 (in the *Yankee Atomic* Trial Transcript) ....................A 0826
July 12, 2005 (in the *TVA* Trial Transcript) ....................A 0839
November 15, 2006 (in the *Northern States* Trial Transcript) ....................A 0846

Rosselli, Robert ....................A 0855
April 15, 2002 ....................A 0856
April 16, 2002 ....................A 0885

Rusche, Benard ....................A 0887
May 16, 2002 ....................A 0888
May 17, 2002 ....................A 0911

Slater-Thompson, Nancy ....................A 0921
April 21, 1999 ....................A 0922
April 22, 1999 ....................A 0932

## Volume VII


Slater-Thompson, Nancy (continued) .......... A 0941
June 13, 2002 .......... A 0941

Trebules, Victor .......... A 0955
April 17, 2002 .......... A 0956
April 18, 2002 (Deposition in Yankee Cases) .......... A 0982

Williams, Jeffrey .......... A 0985
June 11, 2002 .......... A 0986
January 22, 2004 .......... A 0993

Zabransky, David .......... A 1000
April 17, 2002 .......... A 1001
April 18, 2002 .......... A 1027
April 19, 2002 .......... A 1050
June 5, 2002 .......... A 1057
June 6, 2002 .......... A 1060
January 29, 2004 .......... A 1064
August 5, 2004 (in the *Yankee Atomic* Trial Transcript) .......... A 1067
March 29, 2005 (in the *SMUD* Trial Transcript) .......... A 1080
April 12, 2005 (Rule 30(b)(6)) .......... A 1083
July 12, 2005 (in the *TVA* Trial Transcript) .......... A 1092
October 27, 2005 (in the *Southern Nuclear* Trial Transcript) .......... A 1097

# MILNER

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:

CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES: (Continued)

On behalf of Plaintiff Yankee Atomic Electric Company:

PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of the Defendant:

RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| RONALD A. MILNER | PLAINTIFFS | DEFENDANT |
| By Mr. Tomaszczuk | 9 | |

Afternoon Session -- 81


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 | 45 |
| 2 | 59 |
| 3 | 61 |
| 4 | 66 |
| 5 | 74 |
| 6 | 83 |
| 7 | 90 |
| 8 | 94 |
| 9 | 100 |
| 10 | 122 |
| 11 | 131 |
| 12 | 133 |
| 13 | 142 |
| 14 | 144 |
| 15 | 152 |
| 16 | 175 |





| MILNER EXHIBIT NO. (Continued) | PAGE NO. |
|---|---|
| 17 | 186 |
| 18 | 189 |
| 19 | 194 |
| 20 | 195 |

P R O C E E D I N G S

Whereupon,

RONALD A. MILNER,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:

BY MR. TOMASZCZUK:

Q. Would state your name for the record?

A. Ronald Milner.

Q. And where are you employed, Mr. Milner?

A. U.S. Department of Energy.

Q. Mr. Milner, I'm counsel for various of the utility Plaintiffs who have pending cases at the Court of Federal Claims, and I'm going to



ask you some questions about your knowledge concerning issues which underlie those cases.

If at any time you don't understand my question, let me know, and I'll try and rephrase it so that we have a common understanding as to my question and your answer.

A. Okay.

Q. Any time you want to take a break, just say so, and we'll be happy to take a break.

I would prefer that it not be while a question is pending, but after you have answered the question, if you want to break, just speak up, and we'll be happy to accommodate that.

A. Great.

Q. There is a protective order that has been entered in these cases, and have you had occasion to read it?

A. No, I haven't.

Q. Okay. I'm going to hand you a copy and ask you to take a moment and read it. It concerns certain material which has been designated as confidential, and through the course of the examination, I may hand you some documents which fall within the scope of that protective order.



I would ask you to take a moment and read the protective order.

It basically requires that you're going to treat that information as confidential and limited to --

A. Okay.

Q. These cases, and matters relating thereto and for no other purpose, but take a moment and read it if you will.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. Mr. Milner, have you read the order?

A. Yes, I have.

Q. And do you understand it?

A. Yes.

Q. You do you agree to comply with its provisions?

A. Yes.

MR. TOMASZCZUK: All right. Counsel, any objection to proceeding on that basis?

MR. SHULTIS: No.

BY MR. TOMASZCZUK:

Q. Mr. Milner, what is your present position at DOE?

A. My present position is Chief Operating



Officer for the Civilian Radioactive Waste Program.

Q. And how long have you held that position?

A. About two and a half years.

Q. And to whom do you report?

A. Lake Barrett, who is the deputy director.

Q. And how many people report to you as the Chief Operating Officer?

A. I guess approximately 150 federal staff.

Q. Are there contractors that report to you also?

A. Not directly, but there are contractors in the organization.

Q. Can you describe for me your duties as the, what I'll refer to as the COO for OCRWM?

A. Okay. Basically it's to manage the operational aspect of the program.

Q. What do you mean by operational aspect?

Can you tell me what you mean by that term?

A. Day-to-day operations of the program,

administrative principally.
Q. All right. When you say administrative, do you mean you're primarily involved in personnel matters, or am I misunderstanding what you mean by that term?
A. Personnel matters, contractual matters.
Q. When you say contractual matters, what do you mean by that?
A. Matters relating to our support service contracts, our contract with our M&O.
Q. What is your educational background?
A. I'm a mechanical engineer by education.
Q. Okay. From what institution did you obtain a degree?
A. University of Mississippi.
Q. And that was a Bachelor of Science Degree?
A. A Bachelors and a Masters.
Q. What year did you obtain your Bachelors Degree?
A. 1966.
Q. And in what year did you obtain your Masters Degree?



A. 1967.
Q. Do you hold any professional licenses?
A. No, I don't.
Q. Can you trace for me your employment history after you obtained your Masters Degree in 1967?
A. Okay. Following college, I spent eight years as a naval officer.
Following that, I worked as a civilian for two years with the Navy, and then I joined the Department of Energy working first in the Strategic Petroleum Reserve office.
Q. Okay. And what year did you join the Department of Energy?
A. This was 1977.
Q. All right. And that was at the Strategic Petroleum Reserve --
A. Correct.
Q. Operation?
A. Um-hm.
Q. Where physically were you located?
A. In Washington.
Q. How long did you stay in that position?
A. Approximately one year.



Q. Okay. And then where did your career take you?
A. Okay. And then I went to work for the Office of Conservation and Renewable Energy within the Department of Energy.
Q. All right. And after that?
A. Okay. And after that, then I joined the Office of Civilian Radioactive Waste Management.
Q. How long were you with the Office of Conservation and Renewable Energy?
A. I guess it was approximately six years.
Q. So roughly 1978 to 1984?
A. Eighty-four, correct.
Q. And then you joined the office that I'll refer to as the OCRWM in or around 1984?
A. Correct.
Q. And have you been with OCRWM without interruption since 1984?
A. Yes.
Q. So you have been in OCRWM by my math roughly 18 years?
A. Roughly 18 years.
Q. I'm sure it's been a thrill a minute!



A. It has!
Q. Can you tell me the circumstances that caused you to take a position at OCRWM in 1984?
A. Promotion.
Q. And to what grade level were you promoted?
A. GM-15 at that time.
Q. So you took the job in 1984 and were promoted at that time to a GM-15?
A. Correct.
Q. And what is your current designation or position within the federal personnel system?
A. Currently I'm with the Senior Executive Service.
Q. And at what level?
A. Five I think.
Q. Which is the top level? Am I right about that?
A. No, it's not the top level. I believe six is.
Q. All right. What was your title when you joined OCRWM in 1984?
A. I was a branch chief, but I can't recall the exact title.
Q. What were your duties?

A. I was responsible for preparation of the total system life cycle cost analysis, fee adequacy analysis, preparation of the original Mission Plan.
Q. How long did you stay in the position of branch chief responsible for the TSLCC, the fee adequacy and the Mission Plan documents?
A. Several months.
Q. At which point your duties changed?
A. At which point my duties changed, yes.
Q. Okay. Can you describe for me how your duties changed?
A. I was placed into a division director position responsible for budget, project management activities.
Q. When you say budget, you mean you were working on the portion of the DOE budget related to OCRWM?
A. Correct.
Q. And when you used the term project management activities in your answer, what did you mean by that?
A. Essentially tracking project cost and schedule.
Q. What project costs were you tracking?



A. Well, program costs and schedule.
Q. What program costs and schedule were you tracking?
A. It related to the transportation program, the monitored retrieval storage, MRS program, as well as the repositories program.
Q. Can you tell me why your duties changed after several months in the branch chief position to the division director position, why that change occurred?
A. The division director in that position was replaced by myself.
Q. Okay. And whom did you replace as division director?
A. Jack Yanofski I believe his name was.
Q. So was that a promotion when you moved from branch chief to division director?
A. Not a great promotion, no.
Q. But it was a discernible change in duties as I understand it, is that correct?
A. Yes. Yes.
Q. How long did you stay in the position of division director?
A. I can't actually recall.
Q. One year? Two months? Six years?



Can you put some rough approximation?
A. Rough approximation would be in that particular organizational configuration, three years.
Q. Okay. So do I have it right roughly from '84 to '87 you served as division director?
A. Very roughly.
Q. Okay. And then did your duties change in some way?
A. They did. I remained a division director.
I guess it was a result of a reorganization.
Q. Okay. And how substantively did your duties change, if at all?
A. I guess I would have to say not significantly.
Q. You were still responsible for budget and project management activities?
A. Correct.
Q. That has been true of your career at DOE since '87 that you have been responsible for budget and project management activities?
A. I guess pretty much through the time I was a division director with various titles.



Q. Okay. Did there come a point in time when you left the position of division director?
A. Yes.
Q. Okay. And when was that?
A. Approximately 1990.
Q. All right. And in or about 1990, did you take a different position within OCRWM?
A. Yes, I did.
Q. Okay. And what position was that?
A. That was a position, I guess the title was manager of MRS team.
Q. Was that a promotion or a lateral move?
A. Lateral move.
Q. Okay. And how long did you stay in the position as manager of the MRS team?
A. It was probably about two years roughly.
Q. Roughly 1990 to 1992?
A. Roughly.
Q. Okay. And then at that point in time, you took another position within the organization?
A. Yes.
Q. Okay. And what position was that?

A. At that point, I was named acting director of the Office of Storage and Transportation.
Q. You assumed the position of acting director of the Office of Storage and Transportation in or about 1992?
A. Roughly.
Q. And what were your duties in that position?
A. Managed, continued to manage the storage effort, which was the MRS effort, as well as the transportation program.
Q. When you say transportation program, what do you mean?
A. The planning to prepare for waste shipment from the utilities to an MRS and subsequently repository site.
Q. By this point in time, how many direct hire government employees were reporting to you?
A. Approximately 25.
Q. How long did you remain in the position as acting director of the Office of Storage and Transportation?
A. A matter of months when I was promoted to the SES and made permanent director.



Q. Did that promotion occur in 1993?
A. Ninety-two, '93 timeframe.
Q. Okay. And how long did you stay in the position of director of the Office of Storage and Transportation?
A. Roughly two years.
Q. Okay. And then did your duties change?
A. They did.
Q. How did they change?
A. I was reassigned to, as director of the Office of Program Management and Integration.
Q. What were your duties as director of Program Management and Integration?
A. Back to being responsible for budget, regulatory interface activities, personnel, administrative, systems engineering.
Q. Okay. How long did you stay in the position of director of Program Management and Integration?
A. Approximately a year.
Q. Okay. So from 1994 to 1995?
A. Roughly.
Q. And then did your duties change again



in some way?
A. Yes.
Q. Can you tell me how?
A. I was appointed acting deputy director of the program.
Q. So roughly 1995, you were appointed acting deputy director?
A. Roughly.
Q. And when you say acting deputy director, you mean of the entire OCRWM operation?
A. Yes.
Q. And I gather that was a promotion?
A. Not grade-wise.
Q. How long did you serve as acting deputy director of OCRWM?
A. About three years.
Q. Did that position require Senate confirmation or approval?
A. No.
Q. Did your title or duties change in 1998?
A. Yeah, it did.
Q. Can you tell me how they changed?
A. I became Chief Operating Officer.



Q. And that's the position you hold today, correct?
A. Correct.
Q. With whom do you work most closely in your position as Chief Operating Officer?
A. Most closely, the director and the deputy director.
Q. And the director is Margaret Chu?
A. Correct.
Q. And the deputy director is Lake Barrett?
A. Correct.
Q. Do you work regularly with Dave Zabransky?
A. Yes, I do.
Q. Do you work regularly with Alan Brownstein?
A. I do.
Q. Do you work regularly with Susan Klein?
A. Yes.
Q. Have you been deposed before?
A. Yes, I have.
Q. How many times?
A. Once.

Q. Did you read any other documents relating to OCRWM or its programs at that time?
A. Relating to OCRWM, yes.
Q. Okay. And what were they?
A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.
Q. Why did you read those documents?
A. Those are items under my responsibility.
Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?
A. Yes.
Q. All right. I'm going to refer to that as a TSLCC report.
A. Much easier.
Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.
Had a final Mission Plan been prepared at the time you became the branch chief?
A. No, it had not.



Q. So at that time, the Mission Plan was still a draft document?
A. Correct.
Q. All right. And the fee adequacy report that you read, was that a final or a draft version of that report?
A. That was a final.
Q. Mr. Milner, do you have training in finance or accounting?
A. No, I do not.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Do you recall, Mr. Milner, what spent nuclear fuel acceptance rate was identified in the TSLCC report that you read?
A. No, I don't recall.
Q. Do you recall what spent nuclear fuel acceptance rate was contained in the final draft of the Mission Plan?
A. I don't recall.
Q. Do you recall what spent fuel acceptance rate was identified in the fee adequacy report?
A. No.



Q. Can you tell me your understanding as to the purpose of the TSLCC report?
A. One, to, estimate at that point in time, what the cost components of the entire program were.
Also it was utilized as input data to do the fee adequacy analysis.
Q. Do you know whether the TSLCC report is required by statute?
A. It is not.
Q. Do you know whether DOE has prepared a TSLCC report every year subsequent to 1984?
A. Roughly every year.
Q. And do you know for whom the report is intended?
MR. SHULTIS: Objection -- vague.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
MR. SHULTIS: Go ahead.
THE WITNESS: It's an internal document principally, although it is issued publicly.
BY MR. TOMASZCZUK:
Q. Have you had occasion to review and approve TSLCC reports prior to their issuance?



A. Yes.
Q. How often have you done that?
A. During the times when I was responsible for that activity on a roughly annual basis.
Q. Okay. And your testimony at least in my mind is a little bit unclear as to when you were responsible for that activity.
Can you tell me when you were responsible for reviewing and approving TSLCC reports in the course of your career at OCRWM?
A. I think I have given that to the best of my recollection.
Q. Okay. Well, then can you restate it for me because it's not clear from my notes? Maybe I misunderstood.
A. When I first joined the program, I was responsible for TSLCC.
As a result of reorganizations over a period of time, that activity was in and out of my area of responsibility.
I cannot recall the exact timeframes of that.
Q. Just so I'm clear, I understood that you initially became a branch chief and you had

responsibility for among other things, the TSLCC reports?
A. Correct.
Q. And then your duties changed, and I understood your testimony to be that you then no longer had that responsibility, and if I understand you correctly, at some point in time over your career at OCRWM, then you assumed that responsibility again for TSLCC reports?
A. Correct.
Q. All right. Can you state for me your understanding as to the purpose of the Mission Plan?
A. My understanding, the original Mission Plan was intended to be I guess a higher level of plan for how we would conduct the program.
Q. What do you mean by higher level as you used that term in your testimony?
A. Not a detailed step-by-step description.
Q. Would the mission plans therefore in your mind be less detailed than the TSLCC reports?
A. Yes.
Q. And for what audience was the Mission



Plan intended?
A. The general public.
Q. And could you state for me your understanding as to the purpose of the fee adequacy report?
A. To assess on a roughly annual basis whether or not the one mill fee charged the utilities would be adequate to cover the costs of the program.
Q. And for what audience was the fee adequacy report prepared?
A. Principally the Congress.
Q. And over the course of your career at OCRWM, have you had occasion to review and approve of mission plans?
A. Yes.
Q. And over the course of your career at OCRWM, have you had occasion to review and approve of the fee adequacy reports?
A. Yes.
Q. Of these three documents, which in your view is the most detailed in terms of how OCRWM is going to accomplish the spent nuclear fuel disposal program?
A. The Mission Plan would have been.



Q. Would have been the most detailed?
A. Um-hm.
Q. I thought I had understood you to say a few minutes ago that you thought the TSLCC report was more detailed than the Mission Plan.
Did I misunderstand you?
A. No, you didn't.
Q. Well, I have to admit to some confusion then.
Of the Mission Plan versus the TSLCC, which is the more detailed in terms of laying out DOE's step-by-step approach towards satisfying the program requirements?
A. The Mission Plan.
Q. The Mission Plan, all right. And as between the Mission Plan and the fee adequacy report, which is more detailed in terms of laying out DOE's step-by-step approach to, towards satisfying the requirements of the program?
A. The Mission Plan.
Q. Have you ever had occasion to testify before Congress?
A. Yes, I have.
Q. Can you tell me in what context you



have testified before Congress?
A. I have testified at a field hearing related to the MRS program and the multi-purpose canister program.
Q. Is that the only instance in which you have testified before Congress?
A. Yes.
Q. And when you say a field hearing, do you mean a hearing held away from Washington, D.C.?
A. Correct.
Q. Where was that hearing held?
A. Newport News, Virginia.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, did you have any role to play in the preparation of annual capacity reports, which I will refer to as ACRs?
A. I did.
Q. Okay. What was your role in the preparation of ACR reports?
A. One of the organizational elements under me was responsible for preparing those.
Q. And at what point in time were you

referring to?
A. Late '80s, early '90s.
Q. So you have had occasion to review and approve of ACRs?
A. Correct.
Q. What about acceptance priority rankings, what I'll refer to as APRs?
Have you also had occasion to review and approve of those?
A. Yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Do you know what spent nuclear fuel acceptance rate DOE is currently using for purposes of the geologic repository it's working on at Yucca Mountain?
A. Yes, I do.
Q. Can you tell me?
MR. SHULTIS: Objection to the degree it's seeking a legal conclusion.
BY MR. TOMASZCZUK:
Q. Can you tell me what your understanding is as to that acceptance rate?
A. The, it's a ramp-up rate. The first



year, I believe it was 400 metric tons, second year, 600 metric tons, the third year, 900 metric tons, and I believe the following year, it went up to 1200.
Q. And any understanding beyond that?
MR. SHULTIS: Same objection.
THE WITNESS: I recall that peaks at 2000.
BY MR. TOMASZCZUK:
Q. Your understanding is that it peaks at 2000, and then does it stay at 2000 for a number of years?
A. I believe so.
MR. SHULTIS: Same objection.
THE WITNESS: I believe so.
BY MR. TOMASZCZUK:
Q. Do you know if that understanding is reflected in any documents?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I believe it is.
BY MR. TOMASZCZUK:
Q. Okay. Can you identify for me the documents -- when I say documents, I'm referring to DOE or OCRWM documents -- can you identify for me the documents that reflect the acceptance



rates you just referred to?
A. I don't know that I can recall all of the documents that's reflected in.
Q. Any of them?
A. It's reflected in the ACR. It's reflected in the program plan.
Q. And in what year was the ACR that you just referred to in your last answer published, do you know?
A. I don't recall.
Q. Do you know when the last ACR was published by OCRWM?
A. No, I don't.
Q. If I said 1995, would that sound about right to you?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Roughly.
BY MR. TOMASZCZUK:
Q. With what, with which support contractors do you work most closely now in your role as COO?
A. Booz Allen Hamilton.
Q. Over the course of your career at OCRWM, have there been any personnel employed by



contractors with whom you have worked particularly closely?
A. Yes.
Q. Can you state for me their names?
A. Not all of them.
Q. Okay. Those that come to mind?
A. Charles Metzger.
Q. Metzger you say?
A. Metzger; Richard Goffi, Robert Bauer, probably those would be the closest.
Q. Are those individuals employed by Booz Allen?
A. Robert Bauer is not.
Q. But Mr. Goffi and Mr. Metzger are?
A. Correct.
Q. And who is Mr. Bauer's employer?
A. He was employed by the former support service contractor at OCRWM -- Weston.
Q. Did you ever have occasion to work with a support contractor that I'll refer to as PNL?
A. Yes.
Q. And when was that?
A. That would have been in mid-'80s.
Q. Did you ever have occasion to work

with or speak with Pat McDuffie?
A. No. I don't recall that name.
Q. What role have you had in DOE's administration or implementation of the standard contract?
MR. SHULTIS: Objection -- vague.
THE WITNESS: A variety of roles.
BY MR. TOMASZCZUK:
Q. Okay. Can you explain that for me or detail that for me?
A. At various positions or during various positions that I held, administration of the standard contract again was done by an element under my supervision.
Q. Is that one of your roles or duties today?
A. In a very rough sense, yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. When is the last time you had occasion to read the standard contract?
A. It's probably been several years since I have read it in its entirety.
Q. And when you last read it in its



entirety, what was the circumstance or circumstances that caused you to read it at that time?
A. I don't recall.
Q. You don't recall why you read it at that time?
A. No, I don't.
Q. Do you know whether the standard contract contains a spent nuclear fuel acceptance rate?
MR. SHULTIS: Objection. Asks for a legal conclusion.
THE WITNESS: I don't believe it does.
BY MR. TOMASZCZUK:
Q. Have you discussed that subject with anyone at OCRWM?
A. What subject?
Q. The subject about the, your understanding that the standard contract does not contain a spent nuclear fuel acceptance rate.
MR. SHULTIS: Same objection.
THE WITNESS: I don't recall having discussed that.
BY MR. TOMASZCZUK:



Q. Do you know whether the TSLCC reports contain a spent nuclear fuel acceptance rate?
MR. SHULTIS: Objection to the degree it's calling for a legal conclusion.
THE WITNESS: I don't know.
MR. SHULTIS: Asked and answered.
BY MR. TOMASZCZUK:
Q. Do you know whether the mission plans contain a spent nuclear fuel acceptance rate?
MR. SHULTIS: Same objections.
THE WITNESS: It's my understanding that the original Mission Plan did.
BY MR. TOMASZCZUK:
Q. And the fee adequacy reports, do you know whether those contained a spent nuclear fuel acceptance rate?
MR. SHULTIS: Objection to the degree it's calling for a legal conclusion.
I think he has answered this question.
THE WITNESS: I don't believe it does.
BY MR. TOMASZCZUK:
Q. Did you or have you had occasion, Mr. Milner, to review any of the comments by the utilities on the draft version of the standard contract that DOE published?



A. No, I never did.
Q. Have you participated in any meetings with utility representatives concerning the standard contract?
A. Yes, I believe I have.
Q. And has your participation been often and frequent, or rare?
A. Which timeframe are you referring to?
Q. Well, let's break it up. Let's go back when you started back in 1984.
A. Early on, relatively frequently.
Q. And did that change over the course of the years?
A. Yes.
Q. And would I be correct in understanding that as of this point in time, you don't spend a lot of time in meetings with utilities dealing with the standard contract?
A. You would.
Q. Would that statement be true at or about the time you became COO?
A. Yes.
Q. I'm about to get into some documents. Do you want to keep going, or do you want to take a break?

MR. SHULTIS: Why don't we take a break? That would be a good idea.
(A recess was taken.)
MR. TOMASZCZUK: Ms. Reporter, I would like you to mark as Milner Exhibit 1 a series of organizational charts which were provided to us by the government.
(Milner Exhibit No. 1 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, I ask you to look at those, and I'm going to ask you some questions about them.
Just tell me whenever you're ready.
(The witness reviewed the document.)
THE WITNESS: I took a walk down memory lane.
BY MR. TOMASZCZUK:
Q. Have you reviewed Milner Deposition Exhibit No. 1?
A. Yes, I have.
Q. All right. Mr. Milner, as I understand your testimony, we should start with the second page of this document since the first



page predates your arrival at OCRWM, is that right?
A. Actually, the first page, a couple of names are different, but I think that was the rough organizational structure as best I can recall when I first joined the program.
Q. Okay. And where on this -- thank you for that.
And where on this organizational chart did your position fall?
A. Within RW-13.
Q. Under the name of Charles Reid, the acting director of operations?
A. Charles Head.
Q. Chart Head -- I'm sorry. You said you started in 1984.
What month in 1984 did you start at OCRWM, do you recall?
A. I believe it was April.
Q. Okay. Can I direct your attention to the second page?
A. Um-hm.
Q. And using this second page of Milner 1, can you identify for me where your branch chief position fell?



A. I believe at that time, I was the finance, acting finance division director.
Q. RW-10? Oh, no. I'm sorry. I misspoke.
There is a number ten next to finance division, and I thought that might be an RW designation, is that correct?
A. It's not an RW designation.
Q. Okay. Is this finance division office where you became responsible for budget and project management activities?
A. I believe at that time -- it's difficult to recall that far back.
I believe at that time, for a short period of time, it was just budget.
Q. At this point in time, July 1984, were you responsible for TSLCC reports?
A. As best I can recall, I was.
Q. Were you, at this point in time, were you responsible for fee adequacy reports?
A. As best I can recall, I was.
Q. At this point in time, were you responsible for preparation of the mission plans?
A. I believe at that time, the Mission



Plan had been issued in final, and there was no more responsibility there.
Q. But you had been responsible for the preparation and issuance of that Mission Plan, correct?
A. Correct, Although to put that in context, that was a very brief period of time.
It was just about final when I came into that job.
Q. Okay. That's fair. Could I turn your attention to page 3 of this exhibit?
A. Um-hm.
Q. And this appears to be a OCRWM organizational chart dated September 1985, correct?
A. Correct.
Q. And you're identified here as the acting director of the financial management and analytical services division?
A. Correct.
Q. At that point in time, were you responsible for the preparation of the TSLCC reports?
A. I believe I was.
Q. Were you responsible for preparation

of the fee adequacy reports?
A. I believe so.
Q. Were you responsible for preparation of the mission plans?
A. No.
Q. Another office reflected on this chart was responsible for the mission plans?
A. Again, the Mission Plan had been issued, so there was no responsibility in that regard.
Q. When you say the Mission Plan had been issued, you mean the Mission Plan that was issued in 1985?
A. Whenever the original one was issued.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. All right. Would you turn to the next page of this exhibit?
A. Um-hm.
Q. It has got a date in the lower right-hand corner that's a little hard to read.
I think it is May 19, '86, but I'm not sure.
(The witness reviewed the document.)



BY MR. TOMASZCZUK:
Q. Do you know where your position fell within this organizational chart apparently dated May of 1986?
A. I believe it was still the financial management analytical services division.
Q. Okay. And at that point in time, were you responsible for the TSLCC reports?
A. I believe I was.
Q. Were you responsible for the fee adequacy reports?
A. I believe I was.
Q. Were you responsible for the preparation of the mission plans?
A. No.
Q. And you say no because the Mission Plan had been issued, or because another office was responsible for it?
A. Because it had been issued.
Q. If I said that the Mission Plan had been issued in June 1985, would that sound about right?
A. I guess that would sound about right. My recollection, it had been earlier, but that may well be correct.



Q. All right. Well, we'll look at it later.
The next page of this exhibit, Mr. Milner, has handwritten in the lower right-hand corner 1988?
A. Um-hm.
Q. Where did your office fall on this organizational chart?
A. I think program control division.
Q. All right. At this point in time, were you still responsible for the preparation of TSLCC reports?
A. I believe I was.
Q. Were you still responsible for fee adequacy reports?
A. I believe so.
Q. And were you responsible for mission plans or Mission Plan Amendments?
A. I don't recall that I was.
Q. Was another office reflected on this chart responsible for amendments to the Mission Plan?
A. I don't believe so.
Q. So if there was a Mission Plan Amendment in progress, that would have been your



responsibility or not?
A. I don't believe so, no.
Q. Who would have been responsible for a Mission Plan Amendment?
A. I don't recall.
Q. Okay. Next page, you're identified on this page which has on it the date of April 1988 as the acting director of the program control division?
A. Correct.
Q. And at this point in time, were you still responsible for TSLCC reports?
A. I believe I was.
Q. Fee adequacy reports?
A. I think so.
Q. What about Mission Plan Amendments?
A. No. I don't recall that.
Q. Next page, you're identified as director of the program control division, right?
A. Correct.
Q. Do you recall when you became the director of this division as opposed to the acting director?
A. No, I don't.
Q. As the director of the program control

division, were you responsible for TSLCC reports?
A. Yes.
Q. Were you responsible for fee adequacy reports?
A. I believe so.
Q. Were you responsible for Mission Plan Amendments?
A. I don't believe so.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Were you responsible at this time for annual capacity reports?
A. I believe I was.
Q. All right. Could you turn to the next page?
The next page of this Exhibit No. 1 identifies you as the associate director of storage and transportation?
A. Correct.
Q. It appears to have on it a date of, if I'm understanding this designation, of 1991?
A. That would probably be correct.
Q. Okay.



A. It's hard to tell.
Q. At this point in time, were you responsible for TSLCC reports?
A. I don't believe I was.
Q. At this point in time, were you responsible for fee adequacy reports?
A. I don't believe so.
Q. At this point in time, were you responsible for any amendments to any mission plans?
A. I don't believe so.
Q. Do you know who would have had responsibility for Mission Plan Amendments?
A. No, I don't.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. So am I right, Mr. Milner, in understanding that from when you joined OCRWM in '84 until some time in, in or about 1991 when you became the director of storage and transportation, you were responsible for TSLCC and fee adequacy reports, correct?
A. I believe that's correct.
Q. While you served at the Office of



Storage and Transportation, did you have any responsible, any responsibility for either TSLCC or fee adequacy reports?
A. I don't believe so.
Q. Okay. While you served within the Office of Storage and Transportation, did you have responsibility for ACRs or APRs?
A. I believe I did.
Q. Mr. Milner, can I direct your attention to the page of this exhibit, it's got printed in the, what I'm looking at, the lower right-hand corner, the date of 5/19/94.
Do you see that? And it has the heading proposed realignment?
A. Um-hm.
Q. Looking at this proposed realignment chart, can you tell me where your office appeared?
A. I believe it was Program Management and Integration.
Q. So at this point in time, you would have moved from your role in the Office of Storage and Transportation to Program Management and Integration?
A. I believe that's correct.



Q. All right. As the -- were you the director of the Office of Program Management and Integration?
A. I believe I was at that time.
Q. Okay. And in that role, were you responsible for TSLCC reports?
A. Yes, I would have been.
Q. Were you responsible for fee adequacy reports?
A. Yes.
Q. Would you have been responsible for any Mission Plan Amendments?
A. Not that I can recall.
Q. Would you have been responsible for APRs or ACRs?
A. No.
Q. Okay. Can I get you to turn to the next page of this exhibit?
I see your name here under the Office of Waste Acceptance, Storage and Transportation?
A. Correct.
Q. So do I understand this right that you went back to that office from Program Management and Integration?
A. Yes, I believe so -- musical chairs.

Q. And do you recall when you left the Program Management and Integration Office and went back to Waste Acceptance, Storage and Transportation?
A. No, I don't.
Q. Would it be fair to say that you were in Program Management and Integration from roughly '94 to '96?
A. Roughly, yes.
Q. And then back to Waste Acceptance, Storage and Transportation?
A. Correct.
Q. At Waste Acceptance, Storage and Transportation, did you have responsibility for TSLCC reports or fee adequacy reports?
A. No.
Q. Did you have responsibility for ACRs or APRs?
A. Yes.
Q. I thought I understood your testimony, Mr. Milner, to be that in or about 1995, you became acting deputy director of OCRWM?
A. I don't recall the timeframe exactly.
Q. Okay.
A. I guess it would have been later.



Q. May have been a little later than '95?
A. Right.
Q. All right. I think we can probably skip the next page and go to the page which follows which has the date of July 31, 1998, printed on it, and this shows that you were acting office deputy director as of July 31, 1998?
A. Correct.
Q. In that capacity, were you responsible for TSLCC reports?
A. Yes.
Q. Were you responsible for fee adequacy reports?
A. Yes.
Q. Were you responsible for Mission Plan Amendments, if any?
A. No.
Q. Would somebody else have been responsible for those?
A. No.
Q. And why is that?
A. There were no Mission Plan Amendments at that point.
Q. Do you know when the last Mission Plan



Amendment was issued?
A. I can't recall.
Q. Can I direct your attention to the last page of this exhibit, Mr. Milner?
This has printed on it the date of 8/10/99 in the lower right-hand corner.
As of that date, what was your position on this organization chart?
(The witness reviewed the document.)
THE WITNESS: I believe it was acting deputy director.
I can't recall exactly when I became Chief Operating Officer.
MR. TOMASZCZUK: Ms. Reporter, I would like marked as Milner Exhibit No. 2 a one-page document which we have downloaded from the DOE Web site, and it is entitled Appendix C, organization chart, Office of Civilian Radioactive Waste Management.
(Milner Exhibit No. 2 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?



A. Yes.
Q. All right. And does it accurately depict OCRWM's current organization?
A. Yes, it does.
Q. And you're serving as Chief Operating Officer, correct?
A. Correct.
Q. This organization chart shows that everybody reports up to you, is that fair?
A. Correct.
Q. And in that capacity, you're responsible for all of OCRWM's publications?
A. Yes.
Q. Including but not limited to the TSLCC reports and the fee adequacy reports, right?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. I understand that Mr. Barrett is going to retire.
Is that your understanding?
A. That's correct.
Q. Do you know who is going to replace him?

A. No, I don't yet.
Q. Are you a candidate for that position?
A. I don't know.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like marked as Milner Exhibit No. 3 a Federal Register notice dated April 18, 1983, and represent that it, I believe it contains the text of the standard contract.
(Milner Exhibit No. 3 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. Yes.
Q. Okay. Is this the document that you read shortly after you became an employee of OCRWM?
A. Yes.
Q. Did you have any discussions with anyone at OCRWM at that time about the standard contract?
A. Yes.



Q. And with whom did you have such discussions?
A. There would have been a variety of people; certainly the people listed in here -- J.W. Winnech, Office of General Counsel, James Cavanagh, Procurement Office, Robert Roselli; probably others that I can't recall.
Q. And what, if anything, do you recall about those discussions?
MR. SHULTIS: Objection to the degree it calls for a privileged conversation. Mr. Winnech is an attorney.
THE WITNESS: I can't recall.
BY MR. TOMASZCZUK:
Q. You can't recall any of the discussions you had with any of those individuals?
A. No.
Q. You didn't have any role to play, did you, Mr. Milner, in the preparation of this document, correct?
A. Correct.
Q. At or about the time you read it, was there anything in it that you disagreed with or didn't understand?



MR. SHULTIS: Objection to the degree it calls for a legal conclusion.
THE WITNESS: There was probably a great many things I didn't understand initially.
BY MR. TOMASZCZUK:
Q. Any that you can recall today?
A. Not that I can recall.
Q. Are there any aspects of the standard contract that you don't understand today?
MR. SHULTIS: Same objection.
THE WITNESS: I don't believe so.
BY MR. TOMASZCZUK:
Q. And I direct your attention to the Federal Register notice page 16598. It's at Bates page number ADM-001-0657, and if I can direct your attention, Mr. Milner, to the first paragraph that appears on this page, starting with the word similarly, do you see that?
A. Um-hm.
Q. Take a minute and read that paragraph.
(The witness reviewed the document.)
THE WITNESS: Get that section in context.
MR. TOMASZCZUK: Sure.
(The witness reviewed the document.)



THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Okay. Did you read the Nuclear Waste Policy Act at or about the time you became an OCRWM employee?
A. Yes.
Q. Okay. Prior to becoming an OCRWM employee, had you had any familiarity with the Nuclear Waste Policy Act?
A. No, I had not.
Q. In pertinent part, this language states that, quote, the 1998 date is called for in the Act, and we believe it to be a realistic date?
A. Correct.
Q. At or about the time you became an OCRWM employee, did you believe that the 1998 date was a realistic date?
MR. SHULTIS: Objection to the degree it calls for a legal conclusion.
THE WITNESS: Yes, I believed it was a realistic date.
As a new employee, I probably wasn't qualified to judge that, though.
BY MR. TOMASZCZUK:

Q. Did you have any discussions with Mr. Roselli or Mr. Cavanagh about that date?
A. Not that I can specifically recall.
Q. This reference goes on to state, quote, our performance will be judged by meeting this date, quote close.
Did you understand that OCRWM's performance at the time you became an employee in 1984 was going to be judged by meeting the January 31, 1998 date?
MR. SHULTIS: Objection to the degree it calls for a legal conclusion.
THE WITNESS: My personal opinion was yes.
BY MR. TOMASZCZUK:
Q. Now that date has not been met, correct?
A. That's correct.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like to mark as Milner Exhibit 4 the draft Mission Plan overview dated December 20, 1983, and this is an excerpt from that document in the interest of killing a few less trees.



(Milner Exhibit No. 4 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. Very vaguely. This would appear, judging by the date, to be an early draft.
Q. Early draft of a Mission Plan?
A. Yes.
Q. And is this a document that you read at or about the time you became an employee of OCRWM?
A. I don't believe I would have reviewed this draft.
Q. You would have reviewed another draft?
A. Subsequent draft.
Q. A later draft do you think? And why do you say that?
A. Only judging by the date; I'm assuming that drafts would have occurred between December '83 and April of '84.
Q. And why do you make that assumption?
A. Typically over that intervening period, the document would have been refined and



further drafts produced.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. At the time you became an OCRWM employee, was it a goal of OCRWM to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?
A. I don't recall that being a goal.
Q. Could I direct your attention to page 2-1 of the document under the heading program strategy?
A. Oh, 2-1.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of the first paragraph on page 2-1?
A. Yes.
Q. It states in part the waste materials would be accepted in accordance with the waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?



A. Um-hm.
Q. And you disagree that that was an intention of DOE at or about this time?
MR. SHULTIS: Objection. Mischaracterizes the prior testimony.
Calls for calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I didn't mean to mischaracterize your testimony.
I understood it to be that you did not agree with that statement.
A. I did not recall that that was a goal at that time.
Q. Okay. Having read it, do you now recall that that was a goal?
A. I don't recall whether that language was in the final Mission Plan.
Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: I don't recall it.
BY MR. TOMASZCZUK:
Q. The text of this paragraph goes on to

AFTERNOON SESSION
(1:09 p.m.)
Whereupon,
RONALD L. MILNER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Back on the record?
A. All set.
Q. Good afternoon, Mr. Milner. The same ground rules apply as this morning, and you're still under oath.
A. Okay.
Q. What was your role in the preparation of the Mission Plan which we have marked as



Milner Exhibit 5?
A. The original Mission Plan, an entity, I hesitate to call it a organizational entity, several people under me prepared it, so essentially, since it was very near completion when I took the job, it was pretty perfunctory in terms of final approval I guess, but it was really more of a production issue at that point.
Q. You came on board in 1984, and it was published in final form in June 1985, right?
A. I guess so, yeah.
Q. Using Milner Exhibit 1, the organizational chart, can you identify which of the pages of Milner No. 1 would reflect the organization responsible for the preparation of the Mission Plan?
A. On page 1, RW-13; beyond that, I really don't recall the transitional entity.
As I say, my recollections have been that the Mission Plan was earlier than that, but obviously it was not.
Q. Who were the people that were under you that were responsible for the preparation of the Mission Plan?
A. I can only recall one name -- Victor



Trebules.
Q. Did DOE make an annual determination regarding the need to revise the Mission Plan?
A. There has not necessarily been an annual determination.
I believe there had been one Mission Plan Amendment.
I can't actually recall the timeframe of that.
Q. Did you participate in any annual reviews conducted by OCRWM of the need to revise the Mission Plan?
A. I'm sure I must have, but I don't recall specifically.
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner Exhibit 6 the Table of Contents to the June 1985 Mission Plan which I had alluded to in one of my questions this morning, but it was not contained in the copy that I provided you?
(Milner Exhibit No. 6 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And my question to you, Mr. Milner, is



looking at the Table of Contents, are you able to identify any of the section of the Mission Plan that you have drafted, if any?
A. I did not draft any sections of it.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. You reviewed the entire document prior to its issuance, correct?
A. I'm sure I did, yes.
Q. Were there sections of the Mission Plan that you spent more time on or devoted more attention to than others that you can recall?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Not that I can recall.
BY MR. TOMASZCZUK:
Q. Can I direct your attention to the page 29 of the June '85 Mission Plan?
A. Page 29?
Q. Page 29 should be the last page.
A. Um-hm.
Q. Of this excerpt.
A. Um-hm.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:

Q. This page 29 appears to identify for DOE objectives for a waste acceptance system, and it lists them one, two, three, four?
A. Um-hm.
Q. Right?
A. Correct.
Q. And the first states accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants, recognizing that the oldest spent fuel will have the highest priority for acceptance consistent with the DOE's current contracts with the waste generators?
A. Yes.
Q. All right? What is your understanding of the phrase in that quote that will allow the utilities to maintain orderly operations of their nuclear power plants?
A. My personal opinion of that was that given the limitations of the spent fuel pools of various utilities, that in essence we would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down.
Q. The next objective, No. 2, states



accept the current planning base spent fuel inventory of 130,000 metric tons consistent with the objective of cost effective operations while providing tangible evidence that the DOE fully intended to dispose of spent fuel in a timely manner.
Do you have an understanding of the phrase while providing tangible evidence that the DOE fully intended to dispose of spent fuel in a timely manner?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I guess my personal opinion on that one would have been that the program through whatever manner was showing progress in reaching its objective.
BY MR. TOMASZCZUK:
Q. Did DOE have an intention at or about the time it issued this Mission Plan as to how long it was going to take to accomplish this second goal?
MS. HERRMANN: Objection -- foundation.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I'm not sure I



understand the question.
MR. TOMASZCZUK: Okay. Could you read it back for him?
THE REPORTER: Question: "Did DOE have an intention at or about the time it issued this Mission Plan as to how long it was going to take to accomplish this second goal?"
MS. HERRMANN: Same objection.
THE WITNESS: Oh, I heard the question.
I didn't understand it.
BY MR. TOMASZCZUK:
Q. What about it don't you understand?
A. I'm not sure what, what, how long it would take to reach that objective, the objective being what?
Q. The objective of cost effective operations while providing tangible evidence that the DOE fully intends to dispose of spent fuel in a timely manner.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. As stated here.
A. Well, I guess my understanding of that would be upon reading it now, that the plan



would have been without specific timeframes.
You're trying to demonstrate progress. I don't know that there was any specific timeframes other than the '98 date.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Assuming that DOE began performance in 1998, do you have an understanding as to how long it would take for DOE to complete its performance?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: Performance in terms of?
BY MR. TOMASZCZUK:
Q. Compliance with the Nuclear Waste Policy Act and the contract.
MS. HERRMANN: Same objection.
THE WITNESS: Well, at that point in time, the compliance would have begun with waste acceptance in 1998.
BY MR. TOMASZCZUK:
Q. Right. And I'm trying to inquire as to your understanding at or about this time, assuming that they began performance in 1998,

Q. And do you have some recollection of having done that?
A. Not specifically, no.
Q. It's fair to say that PNL would not have developed these receipt rates on their own?
They would have come from DOE in the first instance?
A. Personal opinion, that would have been correct, yes.
Q. And do you know who at DOE would have provided that?
A. My office would have provided the data to PNL.
My office did not generate the data.
Q. Okay. And do you know --
A. And I don't recall who generated the data.
Q. And you don't recall who provided it, either, correct, to PNL?
A. Specific person, no.
Q. Do you know what you or individuals in your office did with this report after it was generated?
MS. HERRMANN: Objection -- speculation.



THE WITNESS: Relative to the department, the department submitted it to Congress and published it.
BY MR. TOMASZCZUK:
Q. When you say the department submitted it to Congress, you mean the department submitted final fee adequacy report?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter would you mark as Milner Exhibit 8 a document entitled nuclear waste fund fee adequacy and assessment dated February 1985?
(Milner Exhibit No. 8 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Mr. Milner, is this the first fee adequacy report that was published subsequent to your going, becoming an OCRWM employee?
A. It would appear that this would be the second.
Q. There was one published prior to this when you were an OCRWM employee?
A. Yes.



Q. And how do you know that?
A. Simply by timeframe.
Q. Do you recall the date of that fee adequacy report that would have been published under your watch so to speak?
A. September 1984.
Q. And you recall that September 1984 fee adequacy report?
A. From the extent that we were just discussing it, yes.
Q. Were we just discussing it? I'm sorry.
A. I believe we were.
Q. Were you referring to Milner Exhibit 7?
A. Yes.
Q. I understood that to be a document prepared by PNL for use by DOE and not to be a fee adequacy report itself.
A. Okay. I may be mistaken. That may have been the input.
Q. You can correct me if I'm wrong. I'm just trying to understand your answers.
A. Well, since I don't, I don't specifically recall all of the different fee



adequacy reports, I'm going by dates and timeframes. I didn't notice the differentiation.
Yes, this probably was the report that PNL prepared for the department which ultimately became a fee adequacy report.
Whether there was one prior to February '85, I am not sure I guess.
Q. Well, I think there was an initial fee adequacy report which is referred to in Milner 8 which was prepared in July of '84.
My presumption based on your testimony is that you had little, if anything, to do with that initial fee adequacy report, but maybe that's an incorrect assumption.
A. That would certainly have been the case, yeah.
Q. And given your arrival upon the scene, I would have thought that this would have been the first fee adequacy report for which you or your office were responsible.
A. I think that's correct.
Q. All right. Looking at Milner 8, did you draft this document do you know?
A. Did I personally draft the document?

Q. Yes.
A. No, I did not.
Q. And when you say no, you did not, you did not draft any sections of it that you recall?
A. Correct.
Q. And do you know who did?
A. I cannot recall, no.
Q. Would I be correct in understanding that Milner Exhibit 7, the document that PNL prepared for DOE, was used in the preparation of the final fee adequacy report reflected in Milner 8?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: It would appear so.
BY MR. TOMASZCZUK:
Q. This 1985, February 1985 fee adequacy report concluded that the disposal fee should remain at one mill per kilowatt hour for 1985, correct?
A. Correct.
Q. Do you know whether that recommendation changed in subsequent fee adequacy reports?



A. Yes, I do. I don't believe it ever changed.
Q. And is it your view that the one mill per kilowatt hour fee remains adequate up to this point in time?
A. My personal opinion is it does.
Q. Have you done any studies or analyses to support that opinion?
A. Personally?
Q. Yes.
A. No, I have not.
Q. But you've seen studies and --
A. Yes.
Q. And you share in their findings?
A. Yes.
Q. Can I direct your attention to page 3 of Milner Exhibit 8?
This page, if I understand it correctly, appears to reflect the principal, the principal assumptions underlying the analysis in the report.
Is that fair?
A. Correct.
Q. And one of those assumptions is a repository design capacity of 70,000 metric tons



for each of two repositories?
A. Correct.
Q. And there are rates, waste acceptance rates which are assumed for the first and second repositories, right?
A. Correct.
Q. And in each instance, those ramp up to 3,000 MTU after five years?
A. Correct.
Q. And this document indicates that that rate was to remain constant for a Year 6 and beyond?
A. Correct.
Q. Did you have any input in the development of those receipt rates?
A. No, I did not.
Q. Do you know who at DOE was responsible for them?
A. I don't recall who did it.
Q. Do you agree that these rates reflect DOE's intentions at the time with respect to spent nuclear fuel acceptance?
MS. HERRMANN: Objection -- foundation.
Mr. Milner is not a 30(b)(6) witness.



THE WITNESS: On the basis that it was contained in the fee adequacy report, it would be, would have been DOE's plans at the time.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: We get into the big gorillas!
Ms. Reporter, would you mark as Milner Exhibit 9 a document entitled analysis of the total system life cycle cost for the Civilian Radioactive Waste Management Program dated April 1985?
(Milner Exhibit No. 9 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, have you seen this document before today?
A. I don't specifically recall it, but I must have.
Q. You and others in your office were responsible for the issuance of this report?
A. Correct.
Q. Did I understand your testimony to be that this document was used as an input into the

fee adequacy report that we just saw?
A. That's correct.
Q. Just so I understand the timing of these documents correctly, the fee adequacy report that I asked you about a few moments ago was dated February of 1985, and this document Milner 9 is dated April 1985?
A. Um-hm.
Q. The, the analysis contained in the TSLCC report, would that have been used to prepare next year's fee adequacy report?
A. I believe that would be the case, yeah.
Q. So a fee adequacy report would be issued using the previous TSLCC, and once that fee adequacy report was completed, then you would turn to preparing the next TSLCC for use in preparing the following year's fee adequacy report?
A. Correct.
Q. Can you walk me through this document since you and those in your office were responsible for it?
Give me an overview section by section.



MS. HERRMANN: Objection -- vague.
THE WITNESS: I would start with the Table of Contents, go through.
BY MR. TOMASZCZUK:
Q. Okay. You can take the binder clip off if it helps.
A. Okay. Introduction and summary as it indicates in the Table of Contents would have given a summary of the cost findings in the report, the program strategy.
Without reading it, I assume that includes the program assumptions, how that compared with the previous year's TSLCC.
Second chapter was a little bit about the methodology that was used in developing the cost and so forth.
The next several sections got into more detail in terms of the cost estimates.
There are several categories of cost estimate in the TSLCC -- the cost of the transportation program, repository costs, the cost of the potential MRS -- and the section on development and evaluation costs was essentially all other costs of the program.
Q. Do you -- I'm sorry. I didn't mean to



interrupt you.
A. No. No.
Q. Were you finished with your answer?
A. I was.
Q. Do you know how many people worked on the preparation of this report?
A. In total, no, I don't.
Q. Is this the first TSLCC report that you would have worked on or issued?
A. Probably was. I don't recall specifically.
Q. Did the preparation of the report consume most of your time while it was underway, or was this something that you were less personally involved in and left to others primarily?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Less personally involved in.
BY MR. TOMASZCZUK:
Q. Do you know the names of any DOE personnel who would have been involved in the preparation of this TSLCC?
A. I can't recall.
Q. Is the purpose of the document to



estimate life cycle costs for the then currently planned system plus a number of alternatives?
A. That's correct.
Q. And the objective of the TSLCC report was to make cost estimates that reflect as closely as possible the most current DOE program strategy for meeting legislative milestones?
A. That's correct.
Q. Could I direct your attention to page 2-12 of this exhibit?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. This table, if I understand it correctly, indicates an initial receipt rate commencing, initial spent nuclear fuel receipt rate commencing 1998 of 400 metric tons?
A. That would be my understanding as well.
Q. Do you know why the mathematics are reflected differently on this table than they are in others?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: No, I don't.
BY MR. TOMASZCZUK:

I reviewed it upon issuance.
BY MR. TOMASZCZUK:
Q. And for what purpose is the program plan prepared?
A. It's intended to be a five-year look at the operation, how we would operate the program, what our plans are over that period of time.
That certainly looks to 2010, but there is more detail than the five years.
Q. And the last program plan was prepared in roughly 2000?
Do I have that right?
A. Roughly; I don't recall specifically when it was issued.
Q. And that program plan looks at the Years 2000 through 2005 in some detail?
A. In some detail, yes; farther out, in much less detail.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Did there come a time, Mr. Milner, when the spent nuclear fuel acceptance rates as reflected in this Exhibit Milner 9 that we just



looked at in Table 2-4, did those change?
A. Yes, they did.
Q. And do you know when that occurred?
A. Early '90s timeframe; I can't recall specifically.
Q. And do you know why they were changed?
A. I don't recall specifically.
Q. Do you recall generally?
A. In very general terms, there was a limitation at that point in time, there was an anticipation that there would be an MRS in the system.
Under law, the limitation on an MRS was I believe 10,000 metric tons. No more than 10,000 metric tons could be stored at that facility until a repository began operation. That factored into it.
I can't recall the specifics.
Q. DOE has no current plans to site an MRS, is that right?
A. That's correct.
Q. And when did DOE essentially give up on plans to site an MRS?
MS. HERRMANN: Objection -- foundation.



Mr. Milner is not a 30(b)(6) witness; and vague.
THE WITNESS: Mid-'90s, '94 timeframe maybe.
BY MR. TOMASZCZUK:
Q. And do you know what caused DOE to give up on attempting to site an MRS?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Prior to cancelling the MRS effort, there had been an Office of the Nuclear Waste Negotiator that was established, official title appointed by the President to attempt to find a volunteer MRS site.
That effort was unsuccessful. Under the Nuclear Waste Policy Act, an MRS can't be cited unless it was through the volunteer effort.
Until the repository site was selected with the failure of the nuclear waste negotiator to find a volunteer, it made no sense to pursue an MRS.
BY MR. TOMASZCZUK:
Q. If I understood your testimony this morning, you spent a couple of years at OCRWM



working on the MRS effort, was that right?
A. That's correct.
Q. That was roughly between 1990 and 1992?
A. Correct, yeah.
Q. And when you stopped working on the MRS effort, was that, did that occur I should say at the same time that DOE gave up on its efforts to site an MRS?
A. It did. It did.
Q. So do I understand that that effort stopped in 1992, is that right?
A. I can't recall; '92 to '94 timeframe.
Q. Would any of the organizational charts at Brownstein -- I'm sorry -- at Milner -- also happened to be an exhibit for your colleague, Mr. Brownstein -- at Milner Exhibit 1 help you pin that timeframe down?
A. It probably would.
Q. Would you take a moment and look at those and attempt to do that?
(The witness reviewed the document.)
THE WITNESS: Okay. Between, it would have been somewhere between '91 and '94.
BY MR. TOMASZCZUK:

Q. And what pages of Milner Exhibit 1 did you use to help you in that answer?
A. Okay. Well, I don't have page numbers on mine.
Q. I'm sorry. You have got to use dates on the documents or captions as best you can.
A. Okay. Looking at one that has I guess some machine printed date of 91040, which we took earlier to be '91.
MS. HERRMANN: Looking at the left margin?
THE WITNESS: Correct, the left margin, yeah.
BY MR. TOMASZCZUK:
Q. All right.
A. And the subsequent page which was dated 3/2/94.
Q. So would I be correct in understanding that at least as of March 2, 1994, DOE's efforts to site an MRS had died?
A. I can't recall specifically that that would have been true.
It was roughly that timeframe.
(There was a pause in the proceedings.)



BY MR. TOMASZCZUK:
Q. Mr. Milner, can you tell me what you did, what your activities were with respect to attempting to site an MRS?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Very general terms, we, my office supported the Office of the Nuclear Waste Negotiator.
Some of the things that constituted that support were discussing what an MRS facility might look like to entities that expressed an interest.
Certainly we did preliminary designs of an MRS.
BY MR. TOMASZCZUK:
Q. When you said my office or your office, what was the name of that office again?
I'm sorry.
A. Storage and transportation or transport, whatever it was -- transportation.
Q. And within that office, how many people worked on the effort to site an MRS, if you know?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Roughly about five or



six people.
BY MR. TOMASZCZUK:
Q. And within your office, you were leading that effort, do I understand that correctly?
A. That's correct.
Q. Were you disappointed that the efforts to site an MRS did not succeed?
A. Personally I was, yes.
Q. Why?
A. Okay. My opinion, to have such a facility in the system would have been beneficial, certainly offered a better opportunity to reach a program objective of waste acceptance in '98.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Do you know what construction period for a geologic repository is embodied in Milner Exhibit 9, the 1985 TSLCC report?
A. I don't recall, no.
Q. If you looked at the document, would that refresh your recollection?
A. It may.



MS. HERRMANN: Do you have a section you want to point out or --
MR. TOMASZCZUK: Well, I'll let him look, and if he can't find it, then I'll be happy to try and --
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you want to look at Figure C3 at page C-4.
I think it's an appendix actually.
Just a minute.
A. Okay. From this, it appears that construction was estimated to be roughly two and a half years.
Q. And on what do you base that?
A. A schedule chart that -- I'm sorry.
I'm incorrect there.
It looks like it was estimated to be four and a half years of construction.
Q. And you base that on the bullet for construction authorization by, approved by NRC in August of '93, and then the commencement of facility operations in January '98?
A. Correct.
Q. All right. So that shows roughly four

understanding.
BY MR. TOMASZCZUK:
Q. And is your understanding today?
A. Yes.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.
(Milner Exhibit No. 12 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.
Were there any minutes of the meetings of that committee do you know?
MS. HERRMANN: Objection -- foundation, speculation.
THE WITNESS: None that I can recall. I simply don't know on that one actually.
BY MR. TOMASZCZUK:
Q. Do you know insofar as the meetings



that you attended whether anyone took notes?
A. Not that I can recall.
Q. Were any decisions reached as a result of the OCRWM Executive Committee meetings?
MS. HERRMANN: Objection -- foundation, speculation, vague.
THE WITNESS: Well, I don't know.
BY MR. TOMASZCZUK:
Q. Have you seen any reports or documents summarizing decisions reached at any meetings of the OCRWM Executive Committee?
A. No.
Q. Okay. Now I'm going to ask you some questions about the ACR.
Have you seen this document before today?
A. I must have. I don't specifically recall, though.
Q. Were you responsible for its preparation?
A. I don't recall whether I was the first one or not.
Q. If you were not, do you know who would have been?
A. No, I don't.



Q. Would the organizational charts in Exhibit 1 help you answer that question?
A. Perhaps.
(The witness reviewed the document.)
THE WITNESS: I don't believe I was responsible for this one.
BY MR. TOMASZCZUK:
Q. And why do you say that?
A. I believe at the timeframe I was in a position which wasn't responsible for that.
Q. And which position are you referring to in your answer?
A. That was financial management and analytical services.
Q. So at the point in time that this was prepared, you were working on fee adequacy reports, TSLCC reports, but not the ACR?
A. Correct.
Q. Did you see the ACR at or about the time it was issued?
A. I don't specifically recall, but I likely would have.
Q. Is it fair to assume that you would have reviewed it before it was released to the public?



A. Likely I would have, yes.
Q. If I could direct your attention to the summary, which is, it's the fourth page of the document. It's got small Roman Numeral Five there.
This first paragraph appears to indicate that this report is required by the standard contract, correct?
A. Correct.
Q. For planning purposes, that is also embodied in the first sentence, right?
A. Correct.
Q. And the ACR will set forth the projected annual receiving capacity of the waste management system for ten years following the expected commencement of facility operations, right?
A. Correct.
MS. HERRMANN: Objection. The document speaks for itself.
BY MR. TOMASZCZUK:
Q. And the report is the first in a series to be published by DOE?
A. That's correct.
Q. Okay. And the next sentence and the

first sentence of the second paragraph on this page indicates that the system configuration used as the basis for the report is defined in the Mission Plan Amendment?

MS. HERRMANN: Objection. The document speaks for itself.

BY MR. TOMASZCZUK:

Q. Correct?

A. Correct.

Q. And that's the Mission Plan Amendment that you presumably were working on, right?

A. Presumably, yeah.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Now do you know the date of that Mission Plan Amendment that's referred to here?

A. I don't recall.

Q. Let's look at page 7 of this document, and the first sentence on this page states that the waste acceptance schedule in this ACR is consistent with the schedule from the Mission Plan Amendment, correct?

A. That's correct.

Q. All right. And the Mission Plan



Amendment itself is referred to underneath Table 2.1 here, right?

A. Correct.

Q. And it appears to be a, the June 1987 Mission Plan Amendment?

A. Correct.

Q. And that's a document that you worked on?

A. I believe I did, yes.

Q. And that is the source for the acceptance rates that are reflected on this Table 2.1?

A. Yes. That's what is indicated here.

Q. And this table shows a, an initial rate of 1200 metric tons in 1998?

A. Yes, it does.

Q. And then ramping up in the fifth year or sixth year, correct me, to 2,000 metric tons?

A. Correct.

Q. And then increasing to 2,650 metric tons thereafter?

A. Correct.

Q. Do you know how those rates were derived?

A. No, I don't.



Q. Do you know on what they're based?

A. No, I don't.

Q. Who would know?

A. I don't know.

Q. Is there any basis for them?

MS. HERRMANN: Objection -- vague.

THE WITNESS: I don't know what they're based on.

I don't know.

BY MR. TOMASZCZUK:

Q. Do you know what a utility was to do with this information when it received it from DOE in or about June of 1987?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: I think the purpose was to provide some information for planning purposes.

BY MR. TOMASZCZUK:

Q. Now the rates were not binding on DOE, is that right?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: That would be my understanding.



BY MR. TOMASZCZUK:

Q. Were they binding on the purchasers?

MS. HERRMANN: Same objection.

THE WITNESS: I'm not sure I understand that question.

BY MR. TOMASZCZUK:

Q. You understand my question that they were not binding on DOE, but you don't understand my question, which is the same question, as to whether or not they were binding on the purchasers?

A. That's correct.

MS. HERRMANN: Objection -- vague.

BY MR. TOMASZCZUK:

Q. What about it don't you understand?

A. I don't know how a receipt rate would be binding on a utility since this is an aggregate rate.

Q. Would the receipt rate be binding in the aggregate on nuclear utilities?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: I don't believe it would.

(There was a pause in the

BY MR. TOMASZCZUK:
Q. Do you know whether the utilities had any reaction that was communicated to you with respect to the Mission Plan Amendment issued in June 1987?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't recall them expressing any reaction to me, no.
BY MR. TOMASZCZUK:
Q. At or about this time, 1985, 1986, 1987, that timeframe, did you have discussions with any utilities as to the acceptance rates contained in the Mission Plan or the Mission Plan Amendment?
A. I don't recall any discussions on acceptance rates.
Q. Have you had any discussions that you can recall at any time with any utilities regarding acceptance rates published by DOE?
A. I recall discussions with industry representatives.
I couldn't recall specific utilities. It may have been NEI or its predecessor EEI.
I guess the discussions were more in terms of their stating that their preference



would be that the quicker, the better.
Q. Do you know why they would state that preference?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: My personal opinion would be they would state that because the storage costs at the utility, the quicker they no longer had to store fuel, the less their cost, their storage cost.
MR. TOMASZCZUK: Can we take a short break?
MS. HERRMANN: Sure.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, can I get you to look at the Mission Plan Amendment June '87 and that Table F-1?
And as I understand this table for the first repository, it shows a receipt rate in the first year on this table that's 2003, 400 metric tons, correct?
A. Yes. It appears to be.
Q. And that 400 metric ton figure stays



at that rate for a total of three years.
Then this ramps up to 900, then 1800, and then to 3,000 metric tons in the, would be the sixth year of operations, correct?
A. Correct.
Q. And it stays at the 3,000 metric ton rate for a period which I believe to be 20 years?
A. Yes.
Q. And then could I direct your attention back to the Annual Capacity Report for 1987? I believe it's Milner Exhibit 12, and what I was going to ask you to do was to look at page 7 of the Annual Capacity Report, and do I understand this correctly that these figures that appear at page 7 of the ACR at Table 2.1 adopt the Mission Plan spent nuclear fuel acceptance rates assuming operation of an MRS facility?
A. It appears to be, yes.
Q. And that MRS facility, as I believe you have testified earlier today, was never established, right?
A. Correct.
MR. TOMASZCZUK: Let's mark as Milner 15 a memorandum from Ron Milner to Lake Barrett



dated September 9, 1987, proposed assumption and case list for 1988 TSLCC.
(Milner Exhibit No. 15 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. That's your signature on this document?
A. It is.
Q. And why did you prepare this memorandum?
A. Typically when we began to prepare a TSLCC analysis, we did get the concurrence of the rest of the organizational elements on what the assumptions were, and it was also a way of informing other elements of assumptions prepared by different elements.
Q. When you say elements, you mean different offices within OCRWM?
A. Different branches, divisions, whatever, yeah.
Q. Mr. Barrett at this time was your supervisor?
A. No, he was not.

Q. And so why were you sending this memo to Mr. Barrett as opposed to sending it to someone else?
A. Without looking at the organizational chart, I believe Lake at that time was the director of the Transportation and Systems Engineering Division, so I would have been asking his agreement with the assumptions relative to transportation, and also as a way of informing him of assumptions that would have been relative to the repository, for example.
Q. Did you prepare this memorandum?
A. I probably did not personally prepare it.
Probably was prepared by a member of my staff.
I don't recall specifically.
Q. The second paragraph reflects that the assumptions were prepared by Weston in consultation with headquarters staff and others.
Weston was a contractor at this time?
A. Correct.
Q. Do you know who at Weston prepared these assumptions?
A. I don't recall.



Q. There is a gentleman referenced at the second page.
Do you have a second page that shows a list of cc's?
A. Oh, okay. Yes.
Q. And at the bottom of this list of individuals who, to whom copies were directed appears a name A. Leiter, comma, Weston?
A. Yes.
Q. Do you know whether Mr. Leiter prepared the assumptions?
A. I don't recall for sure, but it could well have been.
Q. Did Weston consult with you regarding the assumptions?
A. Yeah, they probably would have.
Q. You don't recall sitting here today the details of any such consultations?
A. No, I don't.
Q. The third paragraph of your memo states, quote, it is essential that the TSLCC assumptions be consistent with the current planning of the individual projects, current OCRWM policies, and the overall integration of the waste management system.



Why was that essential?
A. Well, in, in the sense that TSLCC was intended to be as accurate as possible or reflection of the estimated system cost, you needed to ensure that system that you were estimating was in fact what the different elements were planning to at that point in time.
Q. Would it be fair to say that at this time, the various OCRWM offices and divisions were working on a coordinated effort with respect to a waste acceptance system?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I would hope it would have been, yes.
BY MR. TOMASZCZUK:
Q. Is it fair to say that one of the purposes that you circulated this memorandum was to make sure that everybody was on board so to speak with the assumptions attached to the memo?
A. Well, that everybody was utilizing the same assumptions, yes.
Q. And indeed was everybody utilizing the same assumptions?
A. My recollection is they were.
Q. And why was that important?



A. By? I don't --
Q. Why was utilizing the same assumptions among the various OCRWM offices, why was that important?
A. Oh, for purposes of the TSLCC; if different offices were using different assumptions, you wouldn't get an accurate cost estimate.
Q. Were there reasons other than the need for accuracy in the TSLCC that it was important that the various OCRWM offices and divisions and branches were utilizing the same assumptions?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, my opinion was that certainly you wanted everybody, for different programmatic reasons, you wanted everybody utilizing the same assumptions and working the same planning base.
At that time, I was looking at it from a fairly narrow perspective of the TSLCC.
BY MR. TOMASZCZUK:
Q. When you say the same planning base, what do you mean by that?
A. Well, in the gross sense, you would hope that the transportation division I guess it

document speaks for itself.
THE WITNESS: It appears to be, yeah.
BY MR. TOMASZCZUK:
Q. Do you know, Mr. Milner, whether utilities were relying on the information that DOE published in the, for example, Mission Plan Amendment for purposes of planning their own spent nuclear fuel system needs?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: No. I don't know what the utilities were planning on.
BY MR. TOMASZCZUK:
Q. Would it have been fair for them to rely upon this information?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Our purpose in publishing this information was for them to utilize it for planning purposes.
BY MR. TOMASZCZUK:
Q. What does that mean to a utility, for planning purposes?
A. I don't know what it meant to the utility.



Q. Well, what do you mean by that term?
A. It meant that it was our best estimate at the time.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Did you review the attachments to Milner Exhibit 15?
A. I believe I probably did. I don't specifically recall.
Q. Could I direct your attention to page 9 of the attachment?
MS. HERRMANN: My copy is missing page 9.
BY MR. TOMASZCZUK:
Q. Do you have a page 9, Mr. Milner?
A. Yes, I do.
MR. TOMASZCZUK: Well, let's correct that.
Page 9, you have no page 9 to the attachment?
MS. HERRMANN: No page 9 -- oh, they're just backwards.
It's okay. Eight and nine are reversed.



Everybody is fine.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. There is a section here repository design receipt rates.
Do you see that?
A. Yes.
Q. And under this heading authorized system, as I understand it, in both circumstances, A and B, which are described here, there's an initial rate which ramps up to 3,000 MTU per year thereafter to closure.
Is that your understanding?
A. That's my understanding, yes.
Q. And those ramp-up rates to 3,000 MTU per year appear to apply with or without an MRS?
A. I believe that's the case.
Q. And would I be correct in understanding that you agreed with those assumptions at the time that this memorandum was sent?
A. Well, first, it wouldn't have been my place to agree or disagree, but yes, I did agree with them.
Q. In your cover memo, you were asking



Mr. Barrett to review the assumptions and ensure that the assumptions were appropriate for the 1988 TSLCC analysis and fee adequacy assessment, right?
A. Correct.
Q. And so in making that statement to Mr. Barrett, it would be fair to assume that you agreed with the assumptions as stated herein?
MS. HERRMANN: Objection -- asked and answered.
THE WITNESS: No, it would not be fair to assume from the memo that I agreed with those.
I in fact did, but --
BY MR. TOMASZCZUK:
Q. Would I be correct in understanding that if you disagreed with them, you would have mentioned that somewhere to Mr. Barrett in the memo?
A. Probably I would have.
Q. This design receipt rate that's reflected in this document ramping up to 3,000 MTU and then maintaining at that rate to closure, that's the rate that DOE is currently using, is it not, for purposes of the geologic

Q. If you used Milner Exhibit 1, would that help you?
A. I might be able to make a better guess.
Q. Okay.
MS. HERRMANN: I'll just go ahead and object to speculation now.
(The witness reviewed the document.)
THE WITNESS: I would guess that it was somewhere within the Office of External Relations and Policy.
BY MR. TOMASZCZUK:
Q. And do you know who is heading that office at this time?
A. I don't recall.
BY MR. TOMASZCZUK: Let's mark as 18 a draft 1988 Mission Plan Amendment dated June 1988.
(Milner Exhibit No. 18 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. I vaguely recall it, yes.



Q. What is this document, do you know?
A. It's the draft Mission Plan Amendment.
Q. Do you know why it was released in draft form?
A. I think typically, continues to this day really, the majority of our documents are issued in draft for public review, comment, so I would assume that that was the purpose of this one.
Q. Do you know whether it was ever issued in final?
A. I don't believe it was.
Q. Do you know why not?
A. I don't recall.
Q. Was there something peculiar about this document that caused it not to be issued as a final document?
A. I don't recall, no.
Q. Can I direct your attention to page 19?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And on this page is another table depicting waste acceptance schedules?
A. Correct.



Q. Do you know who prepared this table?
A. No, I don't.
Q. And this table shows a, an MRS facility waste acceptance schedule of 1200 MTU commencing in 2003?
A. It does.
Q. And it also depicts spent nuclear fuel acceptance schedule commencing in 2003 at a first repository at a 400 MTU rate?
A. It does.
Q. And that repository rate ramps up to 3,000 MTU in the sixth year of operations?
A. It does.
Q. And stays current for approximately 20 years?
A. It does.
Q. Was the development of these rates reflected in these tables important to OCRWM?
A. Yeah, I think it would have been.
Q. Did you often discuss them with other OCRWM personnel?
A. I can't say that I did, no.
Q. Are you familiar, Mr. Milner, with the amendments to the Nuclear Waste Policy Act that were made in 1987?



A. I believe I am.
Q. Did the concept of linkages derive from those amendments?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Concept of -- I don't understand the question.
BY MR. TOMASZCZUK:
Q. Okay. Do you have an understanding of the term linkages?
A. In general, yes.
Q. Yes. Can you state for me your understanding of that term?
A. The term linkage as a mechanical engineer would link two components together.
Q. Do you know whether the NWPA amendments established any linkages between the operation of a repository and the siting of a geologic repository?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I believe it did.
BY MR. TOMASZCZUK:
Q. Okay. And what is your understanding as to those linkages or linkage?
MS. HERRMANN: Same objection.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:

SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:

CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES: (Continued)

On behalf of Plaintiff Yankee Atomic Electric Company:

PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of the Defendant:

RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| RONALD A. MILNER | | |
| By Mr. Tomaszczuk | 205 | |

Afternoon Session -- 272


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 21 | 206 |
| 22 | 209 |
| 23 | 211 |
| 24 | 214 |
| 25 | 218 |
| 26 | 220 |
| 27 | 224 |
| 28 | 254 |
| 29 | 258 |
| 30 | 261 |
| 31 | 274 |
| 32 | 279 |
| 33 | 279 |
| 34 | 287 |
| 35 | 292 |
| 36 | 293 |





| MILNER EXHIBIT NO. (Continued) | PAGE NO. |
|---|---|
| 37 | 300 |
| 38 | 306 |
| 39 | 306 |
| 40 | 314 |
| 41 | 325 |
| 42 | 328 |
| 43 | 335 |
| 44 | 338 |
| 45 | 342 |
| 46 | 350 |
| 47 | 354 |
| 48 | 356 |
| 49 | 375 |
| 50 | 380 |
| 51 | 389 |

P R O C E E D I N G S
MR. TOMASZCZUK: Back on the record.
Whereupon,
RONALD A. MILNER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Good morning, Mr. Milner.
A. Good morning.
Q. The same ground rules apply as yesterday, and you're still under oath?
A. Okay.
Q. Between when we adjourned yesterday and this morning, did you discuss your deposition testimony with anyone?



A. I did not.
Q. Prior to the commencement of your deposition yesterday, did you review any deposition transcripts?
A. No.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 21 the Mission Plan, draft Mission Plan, the draft Mission Plan dated April 1984?
(Milner Exhibit No. 21 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Just so the record is clear, Mr. Milner, this is an excerpt of Volume 1.
A. Okay.
Q. As opposed to the entire document, which is a voluminous document.
A. Yes, it was.
Q. Mr. Milner, is this the, an excerpt of the Mission Plan that you reviewed when you became an OCRWM employee in 1984?
A. It's unlikely I would have reviewed this particular draft since it was basically at the time I came on board with the program.



Q. You think there is another draft that you reviewed?
A. There probably was a subsequent one, but I'm not certain.
Q. Well, let me just represent that this is the only draft of the Mission Plan of which I'm aware.
A. Okay.
Q. Of which I believe we have possession.
A. I'm not aware of another, but --
Q. Could I direct your attention to page 2-2 in the upper right-hand corner?
This, on this page appears a table entitled waste acceptance schedule?
A. Correct.
Q. And it appears to contemplate two repositories?
A. It appears to, yes, that's correct.
Q. And the first repository has a spent nuclear fuel acceptance rate starting at 400 metric tons in 1998?
A. Yes.
Q. And ramps up to 3,000 metric tons in the sixth year of operation?
A. Correct.



Q. And then stays at that steady-state figure of 3,000 metric tons until 2025 I believe?
A. Appears to, yes.
Q. And does this chart reflect in your view, DOE's intentions at the time with respect to the acceptance of spent nuclear fuel at a geologic repository?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Judging by the fact that it's contained in the draft of the Mission Plan Amendment, I would assume that that was the department's plan at that time.
BY MR. TOMASZCZUK:
Q. Now I believe you testified yesterday that you joined OCRWM at or about the time that this Mission Plan was issued, right, April of 1984?
A. Correct.
Q. And as I think we saw yesterday, the final version of the Mission Plan was issued in June of 1985, right?
A. I believe that was correct, yes.

different repository receipt rates initially for the first and second repository, right?
A. It does, correct.
Q. But in both instances, those receipt rates hit 3,000 metric tons per year in the sixth year of operations?
A. That's correct.
Q. And it's indicated here that that receipt rate will remain at 3,000 metric tons for a period of time thereafter?
A. Yes, it's indicated here.
Q. Do the receipt rates on page 4 of this document accurately reflect DOE's intentions at the time with respect to repository receipt rates for spent nuclear fuel?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Again, it was listed as a, an assumption underlying this report, so that would have been a reflection of DOE's goal at the time.
BY MR. TOMASZCZUK:
Q. Are you aware as of this point in time, March of 1986, of any other documents



published by OCRWM which would have stated or suggested different repository receipt rates?
A. At that point in time, not that I can recall.
Q. Is it fair to assume that if there were such accounts, you would have known about them?
A. Yes. I think that would be true.
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner 24 the Volume 1 of the TSLCC analysis dated April 1986?
(Milner Exhibit No. 24 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this exhibit Milner No. 24?
A. I believe I would have been, yes.
Q. And did you have a role in the preparation of this document?
A. Likely I would have.
Q. And can you state for me what that role would have been?
A. Again, it would have been a review and approval.



Q. You would have reviewed it, edited drafts, and approved the final version?
A. Correct.
Q. I have to say with the benefit of hindsight sitting here sixteen years later that these reports suggest to me that they were prepared with a great deal of thought and care.
Is that a sort of a fair characterization do you think?
A. We certainly attempted to do that at that time.
Q. And they also reflect in my layman's view a substantial amount of detail about the costs and anticipated costs of the system?
A. Correct.
Q. Can I direct your attention to page 14.
And this table at page 14, Table 2-2, identifies key assumptions for the TSLCC analysis, right?
A. Correct.
Q. And directing your attention to the repository design receipt rate there in the middle of the page?
A. Um-hm. Yes.



Q. This would appear to indicate to me that the repository design receipt rate that DOE intended at the time was 3,000 metric tons per year of spent fuel and 400 metric tons equivalent per year of defense high-level waste?
A. That's correct. It does indicate that it would begin, Phase 1 facility of the repository would begin at a rate of 400, but steady state to 3,000.
Q. And does the text here accurately reflect DOE's intentions at the time with respect to repository design receipt rate?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Again, judging that it was, by the fact that it was listed as an assumption, that would have been the program's goal at that time.
BY MR. TOMASZCZUK:
Q. Are you aware of any other documents published in or about April of 1986 when this report was issued that would indicate a different intention by DOE with respect to repository design receipt rates?

MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: At this point in time, I don't recall any I was aware of at that point in time.
BY MR. TOMASZCZUK:
Q. Isn't it true, Mr. Milner, that the DOE's intentions with respect to repository design receipt rates have stayed constant over the years at 3,000 metric tons?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: It indicates that the steady-state rate stayed at 3,000, yes.
BY MR. TOMASZCZUK:
Q. And that hasn't changed really in 16 years, has it?
MR. SHULTIS: The same objection.
THE WITNESS: Would appear not to have.
MR. TOMASZCZUK: Give me just one second.
THE WITNESS: Sure.



(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner Exhibit 25 the fee adequacy report dated June 1987?
(Milner Exhibit No. 25 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. Yes, I probably was.
Q. Did you have a role in its preparation?
A. Likely I did.
Q. And would your role have been reviewing drafts, making editorial comments, and approving the final?
A. It would have been.
Q. Could I direct your attention to pages 4 and 5 of the document?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Here also we see a listing in bullet point format of principal assumptions which



underlie the fee adequacy report?
A. Correct.
Q. I don't see a bullet assumption, at least one stated on these two pages for repository receipt rates as we saw on the March 1986 fee adequacy assessment report, Milner Exhibit 23.
A. I don't, either.
Q. Do you know why that is?
A. No, I don't.
Q. Do you have any understanding sitting here today as to the repository receipt rate assumption which was the basis for this report?
A. I don't recall, no.
Q. Do you have any reason to believe that it would have been different in any way from the assumptions identified in the 1986 fee adequacy report?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Not that I can recall.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner 26 the June 1987 TSLCC analysis?



(Milner Exhibit No. 26 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, are you familiar with this document?
A. Likely I was, yes. I don't recall specifically.
Q. Did you have a role to play in its preparation?
A. Probably I did.
Q. And that role was similar to your role with respect to the other TSLCC reports and fee adequacy reports I have asked you about?
A. Correct.
Q. Could I direct your attention, sir, to pages 23 and 24 of the document?
And on these pages, we have a listing of key assumptions which underlie the TSLCC analysis?
A. Yes.
Q. And at the bottom of 23 and the top of 24, there is a discussion regarding repository design receipt rate, correct?
A. That's correct.

Q. And at the end of that discussion, it's indicated that -- I'm sorry. Strike that.
This discussion appears at this point in time still to contemplate two repositories, is that right?
A. It appears to, yes.
Q. And the spent nuclear fuel design receipt rate for both of those ramps up to 3,000 MTU and then maintains that at a steady state for a period of years, is that correct?
A. That's correct.
Q. And does or do those design receipt rates accurately reflect DOE's intentions at the time with respect to repository design receipt rates?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: As an assumption in this report, that would have indicated the program's goal, yes.
BY MR. TOMASZCZUK:
Q. As of this point in time, June of 1987, are you aware of any other documents published by DOE which would indicate or suggest



a different intention with respect to repository design receipt rates?
A. Not that I can recall.
MR. SHULTIS: Same objections.
BY MR. TOMASZCZUK:
Q. And if there were such documents, it would be probably fair for me to assume you would know about them?
A. I would have hoped so.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. I meant to ask you, Mr. Milner, with respect to these two previous exhibits, the TSLCC reports and fee adequacy report for 1987, they were both published in June of that year?
At least that's what is indicated on the cover page of both documents.
Look at the last two exhibits.
A. Yes. Um-hm.
Q. And was there an intention at this time to issue these reports at or about the same point in time do you know?
MR. SHULTIS: Objection as to intention.



BY MR. TOMASZCZUK:
Q. That's a very inartfully phrased question.
Did you have an understanding that these reports ought to go out at the same point in time?
A. I don't recall any specific intention to time the reports exactly, no.
The TSLCC, as I had indicated, is input data to the fee adequacy.
Beyond that, should get wrapped up into the departmental publication schedules, and sometimes the TSLCC will actually be published first, the fee adequacy a month or so later.
I guess in this case, they came out at the same time.
I noticed in the previous case, the TSLCC actually came out a month after.
Q. And I was simply trying to find out why those publications' schedules were what they were, and I noticed here they came out at the same point in time.
A. Yeah -- not that I can recall any particular reason other than when it gets into the publication line.



Q. Vagaries of dealing with the printer I gather?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 27 the TSLCC report for May 1989?
(Milner Exhibit No. 27 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, have you seen this document before today?
A. I don't recall specifically, but I'm certain I did.
Q. And would your role with respect to this document have been the same as you previously testified for previous TSLCC and fee adequacy reports?
A. I believe so.
Q. Reviewed it, made editorial comments on drafts, and approved the final?
A. I believe so.
Q. Can I direct your attention to page 2-14 of the document?
(The witness reviewed the document.)

BY MR. TOMASZCZUK:
Q. And at the bottom of this page, there is a Table 2-4, which appears under the general category of assumptions about the repositories, correct?
A. Correct.
Q. And this table graphically depicts ramp-up rates for the spent nuclear fuel storage facilities?
A. That's correct.
Q. And in all instances, it appears that the facilities ramp up to 3,000 metric tons by the sixth year of their respective operations, correct?
A. It appears to be, yes, correct.
Q. Mr. Milner, this chart at page 2-14, as I understand it, is just the depiction of what was expected to happen through the first six years of operations?
A. That appears to be the case, yes.
Q. And it suggests that there are more complete acceptance schedules in Appendix A, right?
Do you see that?
MR. SHULTIS: Objection. The document



speaks for itself.
BY MR. TOMASZCZUK:
Q. I was referring to the text at, which immediately precedes Table 2-4.
A. Yes, that's what it says here.
Q. Could I ask you to look at Appendix A, which is three quarters of the way through the document?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you -- strike that. Are you able to explain to me, Mr. Milner, these tables which appear at Appendix A under the heading waste acceptance tables?
A. I believe I can.
Q. Okay. Can you walk me through these Tables A1 through Tables A5 and explain to me your understanding of the information conveyed by these tables?
A. Okay. I believe this particular document looked at several different cases as to how a system would operate.
It looked at different EIA cases as far as the projections of spent fuel discharge, so the first table indicates that it was based



on the EIA no new orders case, assuming all that the fuel disposed of was in-tact assemblies.
Q. And that -- I'm sorry. Go ahead.
A. Table A2 --
Q. Can I ask you about Table A1 before you move on?
A. Certainly.
Q. What do you mean by no new orders, or what is meant by no new orders?
A. At the time, the Energy Information Administration published projections of spent fuel discharges on an annual cumulative basis.
Because it estimated the number of reactors that would be operating at any given time, which was a future projection, they projected a series of cases.
I don't recall all the exact number of cases or what the names were, but one assumed a number of new plants would be ordered and come on line, and another case or two assumed lesser amount of new reactors would be ordered and brought on line.
And the no new orders case assumed that there were no new reactors that came on line from that point forward.



Q. All right. And the reference here to end of reactor life case, can you explain that for me?
A. End of reactor life, I believe that was the terminology used for the assumption that once a reactor reached its, the end of its original licensing date, which I think was typically 40 years, that that reactor would shut down rather than attempt to renew and extend its license.
Q. And finally, you referred to in-tact fuel disposal.
What is meant by that?
A. Okay. Spent fuel assembly contains obviously the spent fuel rods as well as hardware in a certain spacing, so in-tact fuel disposal would assume that you took that assembly as it came out of the reactor and disposed of it as it was.
Q. Is dealing with an in-tact fuel assembly more efficient and economical than a non-in-tact fuel assembly?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I would say that both modes, both in tact and consolidated, which

would be the other, they're pros and cons.
In terms of the overall number of fuel canisters that you would ultimately have to deal with, you would certainly have more if you disposed of it in tact.
BY MR. TOMASZCZUK:
Q. And this table considered in the aggregate appears to reflect an acceptance rate which ramps up to 3,000 and then maintains that steady-state acceptance rate for a number of years, is that fair?
A. That's correct, yes.
Q. All right. Let's go to Table A-2, please.
A. Um-hm.
Q. Is this the same as Table A-1 except it assumes consolidated fuel disposal instead of in-tact fuel disposal?
A. That's correct.
Q. Here also it appears to me that the ramp-up rates in each instance go to -- there is a ramp-up period, and then the acceptance rate goes to 3,000 in each instance and maintains it at that steady-state figure of 3,000 for a number of years?



A. That's correct.
Q. And can you explain to me your understanding of Table A-3?
A. Table A-3 I guess differs from Table A-1 in that it has assumes a two repository system versus a one repository system.
Q. Here again, it appears that the table in the aggregate reflects for the systems referenced on it a ramp-up period getting to 3,000 metric tons and then staying at 3,000 metric tons as a steady-state acceptance rate figure for a number of years, correct?
A. That's correct.
Q. What about Table A-4?
A. I guess same assumptions as Table A-3 except consolidated fuel.
Q. All right. And here again, the table appears to indicate a ramp-up period, then the spent nuclear fuel acceptance rate of 3,000 metric tons per year for a number of years?
A. That's correct.
Q. And then that brings us to Table A-5. Can you explain to me your understanding of this table?
A. Table A-5 I guess is similar to Table



A-4 except that it utilizes EIA upper reference case projections for spent fuel discharge.
Q. Okay. And can you explain to me the difference between the upper reference case and the no new orders case?
A. Well, in very general terms, the upper reference case would have assumed that there are new reactors ordered and on line from that point some time in the future, but I don't recall numbers.
Q. And this table also shows a ramp-up to a 3,000 though metric ton, right, and that maintaining at a steady-state figure for a number of years, right?
A. Correct.
Q. Mr. Milner, did you prepare these tables?
A. No, I did not.
Q. Do you know who did?
A. No, I don't.
Q. Do these tables accurately reflect DOE's intentions at the time with respect to spent nuclear fuel waste acceptance schedules?
MR. SHULTIS: Objection. Calls for a legal conclusion.



Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, again, given that they are assumptions for different cases, depending on which case was assumed, yes, it would have reflected DOE's goal.
BY MR. TOMASZCZUK:
Q. At or about this point in time, May 1989, are you aware of any documents published by DOE which would have indicated a design rate other than 3,000 metric tons for the steady-state operation?
A. No, not that I can recall.
Q. And would I be fair in assuming that if there were such documents, you would be aware of them?
A. I certainly would have hoped so.
MR. TOMASZCZUK: This could be off the record.
(A discussion was held off the record.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, I would now like you to get in front of you Exhibit 20, which was the last exhibit that we marked yesterday, but we adjourned and I didn't ask you any questions

233

about it.
And this was the November 1989 report to Congress on reassessment of the Civilian Radioactive Waste Management Program.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this report?
A. Yes, I am.
Q. Did you prepare it?
A. I did not.
Q. Did you prepare any portions of it?
A. No, I did not prepare any portions of it.
Q. Okay. Do you know why the report was prepared?
A. I do. Actually it indicated in here the report, well, appropriations for that year I guess.
Appropriations Act for 1990 I believe directed us to submit this report.
Q. The report indicates that Congress asked for this I gather because of its concerns about endemic schedule slips, problems in management structure, and lack of integrated

234

contractor efforts?
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. TOMASZCZUK:
Q. Were you aware at this time, Mr. Milner, of Congress' concerns about these issues?
A. Yes, I was.
Q. And in your view, were these concerns fairly stated here on this page iii in the forward?
A. My understanding, Congress' concerns are adequately or accurately depicted here.
Q. Did you have occasion to discuss this report with other OCRWM employees at or about the time it was prepared?
A. I don't specifically recall, but I, likely I did, yes.
Q. I'm sorry if I asked you think. I didn't think I did, but do you know who prepared this report?
A. No, I don't. I don't recall.
Q. Could I direct your attention to the Executive Summary?
It starts at Roman Numeral page 7.

235

(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And directing your attention to the second paragraph?
A. Um-hm.
Q. At or about this time, had the Secretary of Energy completed an extensive review of the OCRWM program?
A. Yes, he had.
Q. And do you know what that review entailed or how it was conducted?
A. Very vaguely, I recall staff of the Secretary's office working with staff of the program office and reviewing the program situation.
Q. When you say staff of the program office --
A. Staff of OCRWM.
Q. Staff of OCRWM -- and which staff of OCRWM were you referring to in your answer?
A. I don't recall specific names. A number of people were involved.
Q. Were you involved?
A. I was involved.
Q. Did you have meetings with staff of

236

the Secretary's office concerning the Secretary's review of OCRWM?
A. As I recall, at the time, I met more with our senior OCRWM staff, not the Secretary's office staff.
Q. And who did you meet with?
A. Let's see. I recall meeting with Lake Barrett.
I'm not talking one-on-one meetings. I'm talking group meetings -- Lake Barrett.
Certainly there would have been the director of the Office of Program Management, whatever it was called at that time, the Geologic Repository Office, Storage and Transportation Office.
I can't recall who they were at that point in time offhand.
Q. If we looked at the organizational chart, would that help you identify who was --
A. It would.
Q. Participating in these discussions?
A. It would.
(The witness reviewed the document.)
THE WITNESS: Okay. It would have been directors of the four offices that existed

245

been provided to us. At least I'm not aware of it.
I would ask if it has not been provided to us that we be given a copy promptly, or if it has been provided, if you could tell me where it is in the document production, that would be appreciated.
Do you want to take a short break? I have got a few more questions on this document.
Do you want me to finish with the, with the document?
THE WITNESS: Either way.
MR. TOMASZCZUK: Why don't we take a break?
MR. SHULTIS: Okay.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, I was asking you about Milner Exhibit 20 at the break, and I have a few more questions on that document.
A. Okay.
Q. Still in the Executive Summary, on the first page of the Executive Summary, in the fourth paragraph --

246

A. Um-hm.
Q. There is a sentence that states for the first time since the passage of the Nuclear Waste Policy Act, the program has put together a schedule based on a realistic assessment of technology durations and past experience.
That suggests to me that the previous schedules were not based on a realistic assessment of activity durations and past experience.
Do you agree with that?
MR. SHULTIS: Objection. That's a characterization.
(The witness reviewed the document.)
THE WITNESS: I guess I would agree with that.
BY MR. TOMASZCZUK:
Q. That the previous schedules were not realistic, were not a realistic assessment of activity durations and past experience?
A. Well, I believe that some of the earlier schedules were endeavoring to meet the 1998 date, subsequently 2003 date, and I think probably assumed some activities could be done in a shorter time than realism would indicate.

247

Q. This paragraph, the next sentence of this paragraph goes on to state that this schedule shows a significant slip for the expected start of repository operations from the Year 2003 to approximately 2010, correct?
A. Correct. It does.
Q. And did you agree with this change in the schedule and slippage of the expected start of repository operations from 2003 to approximately 2010?
A. Personally I did, yes.
Q. Do you believe today that repository operations will start in 2010?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: At this point in time, I believe that's a realistic goal, yes.
BY MR. TOMASZCZUK:
Q. Continuing on in the Executive Summary, there's a reference at Roman Numerals Nine and Ten to monitored retrievable storage.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And my question to you is was it true at the time that the linkages between the

248

repository and the MRS program made it impossible for DOE to accept waste at an MRS facility on its schedule that was independent from that of the repository?
A. That's correct.
Q. Was it at or about this time, Mr. Milner, that you began working or were detailed to work on the MRS siting effort?
A. Roughly that time; I believe it might have been slightly afterward.
Q. Within several months of this report do you think?
A. I don't recall. Certainly within a year or so.
Q. Were you involved in the DOE's efforts to work with the Congress to modify the linkages between the repository and the MRS facility?
A. I was not.
Q. Did you believe at the time that if the linkage were modified, that waste acceptance at an MRS facility could begin by 1998?
A. My personal opinion was yes.
Q. Was it also your opinion that if the linkages were not modified, that waste acceptance could not begin at an MRS facility by

1998?
A. Correct.
Q. Can I direct your attention to page 5 of the document, Mr. Milner?
This Section 2.5 deals with contractor support, and near the bottom of the page, it is suggested that the number of contractors was reduced from 13 to 8?
A. It states that, yes.
Q. Right. And how many contractors are involved now on OCRWM's part?
A. I don't know the exact number. We have two principal contractors, Booz Allen Hamilton, who is our support services contractor, Bechtel SAIC, who is our M&O contractor.
I believe there are several smaller contracts.
There is a contract in the QA area. Beyond that, there's several. I don't recall the number of small contracts at Yucca Mountain.
Q. The number of eight contractors, is that roughly accurate with respect to today's operations or not?
A. I can't say for sure. I believe it



would be a smaller number if you consider even the contractor that provides the Don Johns at the site.
Q. Can I direct your attention to page 8 of this document?
In the second paragraph, it is indicated in the, that DOE proposed in the draft Mission Plan Amendment that the start of repository operations would be delayed by five years until 2003, right?
A. That's correct.
Q. And now in this document, we see a further delay from 2003 to 2010?
A. That's correct.
Q. Can I direct your attention to page 12, actually the bottom of page 11 and the top of 12, schedule for the MRS facility?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Near the end of this heading on the, under schedule for the MRS facility, it's stated if the current linkages to the repository are maintained, additional delay of five years would result with start-up estimated at 2007 for the basic MRS facility.



Do you know, Mr. Milner, how that 2007 date was derived?
A. Given the linkages that were in place and still are in place, an MRS facility could not be sited until the repository site was selected, so I believe that date would have been arrived at by determining a date for repository site approval.
At that point, an MRS site could be approved and then design and construction of the MRS.
I don't recall the durations. That would have been the basis for that date.
Q. What date was assumed for repository site approval for purposes of deriving this 2007 date?
A. I don't recall. It is likely listed in the schedule somewhere.
Q. Can I direct your attention to the chart on page 10, the previous page 10?
A. Um-hm.
Q. Using that chart, are you able to identify the date for repository site approval that was used in estimating 2007 for start-up of the basic MRS facility?



A. This schedule indicates the site recommendation submittal to the president in April of 01.
Q. This schedule of activities that appears at page 10, was it in your view accurate at the time it was published?
A. That was certainly the program's goal at that point in time.
Q. I appreciate that answer. I'm not quite sure it was responsive to my question.
Could you reread the question and answer back?
THE REPORTER: Question: "This schedule of activities that appears at page 10, was it in your view accurate at the time it was published?"
Answer: "That was certainly the program's goal at that point in time."
MR. SHULTIS: I think it's responsive.
MR. TOMASZCZUK: I'm sorry. I just didn't hear what you said.
MR. SHULTIS: I think his answer was responsive.
BY MR. TOMASZCZUK:
Q. You believe that the schedule

BY MR. TOMASZCZUK:
Q. Did you discuss that with Mr. Danker or Mr. Beeman?
A. Not with Mr. Beeman. I don't recall discussing it with Mr. Danger, but it's possible that I did.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 30 a draft OCRWM program change control board document, change proposal, and I thought it was dated, and I can't find the date at this moment, but it may be embodied in the document somewhere.
(Milner Exhibit No. 30 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. I don't recall it offhand.
Q. You're identified in the lower left-hand corner as the originator, is that right?
A. That's correct.
Q. And were you indeed the originator?
A. Apparently I was.



Q. Do you know why this document was prepared?
A. Well, again, I don't recall the document specifically, but from reading through it, it indicates that we were establishing waste acceptance schedule according to this had been for a period of time briefly TBD.
Q. I'm sorry. What do you mean by TBD?
A. To be determined.
Q. And on what basis do you give that testimony?
A. I thought I saw that indicated in here.
Q. Okay. Well, if you could point me to where that's indicated?
A. In first page, block 8, change description and justification description of the change states that change the waste acceptance schedule table from TBD status to a numerical table for use in design studies.
Q. Did you prepare this document?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Not that I can recall.
BY MR. TOMASZCZUK:



Q. Are you aware of someone else who might have prepared it?
MR. SHULTIS: Same objection.
THE WITNESS: No, I'm not.
BY MR. TOMASZCZUK:
Q. Do you know why you're identified as the originator?
A. Probably would have been prepared under my direction.
Q. But you can't recall who did it?
A. But I don't recall the document, so I don't recall who did it.
Q. Do you know when it was prepared?
A. No, I don't. I cannot find a date.
Q. If I said it was prepared in 1990, would that sound right to you?
MR. SHULTIS: Objection. Calls for speculation, asked and answered.
THE WITNESS: I could only guess that that would be a rough timeframe.
BY MR. TOMASZCZUK:
Q. There is a reference here at the top of the first page to waste management system requirements, WMSR.
What is or are the waste management



system requirements?
A. It's an upper level, upper level in terms of not great detail, laying down the requirements for waste management system.
It's in essence a document that other documents would flow from in more detail, which would ultimately be used by designers of the system or components of the system.
Q. Is it the same as a system requirements document?
A. I believe the current name for that document is systems requirement document.
Q. So your understanding is that the WMSR preceded the SRD?
A. That's my understanding, yeah.
Q. Do you know when the change was made from referring to the document as a WMSR to begin to refer to it as an SRD?
A. No, I don't.
Q. Attachment 1 contains a table of spent nuclear fuel acceptance rates and appears to be roughly consistent with those in previous documents that we have seen, correct?
A. That's correct.
Q. And in particular, it depicts a, the

potentially significant technical impact associated with discussing policy position with utilities related to waste acceptance basis, paren, i.e., spillover priority basis versus oldest fuel first priority basis.
Can you tell me, sir, what that means?
A. No, I can't. Parenthetical, I believe there were discussions at the time should priority be given to reactors that were running out of pool storage space versus what had been in the contract I believe as the oldest fuel first priority.
Q. The next item states a positive schedule impact by allowing design requirements and related documents to proceed.
That seems to me to be related to the first point above, right?
A. That would be my interpretation of that, yes.
Q. And then finally, quote, relatively minor cost and schedule impacts associated with modifying the other program documents affected by new waste acceptance schedule.
And do you know what other program documents are being referred to in this item?



MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: No. I can't recall specifically.
There's a hierarchy of program documents.
Certainly the waste management system requirements and now the systems requirements document is more on the upper level.
There is various lower-level documents that I can't recall the names.
BY MR. TOMASZCZUK:
Q. Would a TSLCC report be a lower-level document in this hierarchy?
A. No. No.
Q. Well, would it be an upper-level document in the hierarchy?
A. No.
Q. It's not in the hierarchy at all?
A. It's not in the control document hierarchy, that's correct.
Q. I see. Can you identify for me any of the documents in the control document hierarchy as you use that term?
A. Systems requirements document.



Q. And that's it?
A. I believe there is a document entitled waste acceptance systems requirement document.
My recollection is that that sets down more waste form, waste characteristic requirements for acceptance.
I cannot recall others offhand.
Q. Was it important to try and ensure that the waste acceptance schedules that were being used in the various OCRWM documents were consistent?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I believe so, yes.
MR. TOMASZCZUK: Do you want to take a lunch break?
MR. SHULTIS: Sure.
(Whereupon, at 12:02 p.m., the deposition was recessed, to reconvene at 1:00 p.m. the same day.)



AFTERNOON SESSION
(1:08 p.m.)
MR. TOMASZCZUK: Back on the record.
Whereupon,
RONALD A. MILNER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Good afternoon, Mr. Milner.
A. Good afternoon.
Q. Still the same ground rules in effect?
A. Okay.
Q. At the break, we were looking at Milner Exhibit 30, and I just have a couple of follow-up questions on that.

A. Okay.
Q. Before we move on -- can I ask you to look at Attachment 2?
A. Um-hm.
Q. And the second item there is a reference to an MRS strategy paper.
Do you see that?
A. I do, yes.
Q. Do you know what MRS strategy paper is being referred to there?
A. I don't recall that, no.
Q. Do you know whether the MRS team on which you worked prepared such a strategy paper?
A. I don't believe so.
Q. The proposed waste acceptance schedule embodied in this document indicates that one of its objectives as reflected in this second item is to substantially reduce the need for utilities to add new storage capacity after 1998 and to initiate the orderly decommissioning of reactor.
Do you know why that was an objective?
A. Specifically, I don't, but I think it had been long a goal of the program to do that, to try to reduce the amount of storage that



would be needed, certainly ultimately to decommission a reactor.
MS. HERRMANN: Alex, before you go on to the next document, just for the record, you were referring to the program plan before he took a lunch break.
It looks like you may have found it, but we wanted to let you know that it is on the Web.
MR. TOMASZCZUK: Thank you. We had some difficulty apparently getting it off the Web, but we have found it, and I'm going to ask the witness about it a little later.
MS. HERRMANN: Okay. Great.
MR. TOMASZCZUK: Thank you. Ms. Reporter, could you mark as Milner Exhibit 31 a memorandum dated October 5, 1990?
Preliminary draft of the 1990 Annual Capacity Report is the subject.
It's a memo drafted by Alan Brownstein.
(Milner Exhibit No. 31 was marked for identification.)
BY MR. TOMASZCZUK:



Q. Mr. Milner, you're shown as receiving a copy of this document on the distribution list which appears at the second page.
A. Um-hm. Yes.
Q. Do you remember receiving a copy of this document in or about October 1990?
A. I don't specifically recall that, no.
Q. Do you recall the subjects which are addressed in Mr. Brownstein's cover memorandum?
A. Vaguely, I do, yes.
Q. It indicates the 1989 ACR, among other things, was not published because it was determined that publishing the ACR prior to developing revised waste acceptance schedules based on the reassessment would not be useful for planning purposes, right?
A. Um-hm.
Q. I think yesterday I showed you the draft 1989 ACR?
A. I believe so.
Q. Right. And does this refresh your recollection as to whether or not a final ACR was published in 1989?
A. Apparently it was not, yeah.
Q. And further on in this paragraph, Mr.



Brownstein indicates that it's important that the department issue another ACR since we need to meet contract deliverable deadlines to the extent possible, and the contract requires the priority ranking information to be converted into a binding document on April 1, 1991?
A. Um-hm.
Q. Did you view the ACR as a contract deliverable?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: In my opinion, the ACR was called for in the standard contract.
BY MR. TOMASZCZUK:
Q. So the answer to my question is yes?
A. Yes.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. And do you understand that the contract requires the priority ranking information to be converted into a binding document on April 1, 1991?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes, in my opinion.

BY MR. TOMASZCZUK:
Q. Did you discuss these issues with Mr. Brownstein at any time?
A. I'm certain I must have. I don't recall.
Q. You don't recall any discussions with him about these subjects?
A. Not specifically.
Q. End of the second paragraph, it goes on to state therefore, this report utilizes two bounding cases to reflect a reasonable range of acceptance rates wherein the adopted rate is likely to fall.
Are you familiar with this concept of two bounding cases?
A. Well, in general terms, concept of bounding cases, yes.
Q. What is your understanding of those terms or that term?
A. You would have a higher and a lower case, and likely would be somewhere in the middle, somewhere in between at least.
Q. And why did OCRWM develop a higher and lower bounding case?
MS. HERRMANN: Objection --



foundation.
BY MR. TOMASZCZUK:
Q. Or upper and lower bounding case?
A. I don't recall at the time.
Q. Do you recall now?
A. I don't recall now.
Q. Did you play any role in the development of the upper and lower bounding cases?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't recall having that, no.
BY MR. TOMASZCZUK:
Q. Do you know who did develop the upper and lower bounding cases?
A. Not specifically, no. It certainly was under Mr. Brownstein's direction, but I don't know specifically who.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 32 an action memorandum dated December 21, 1990, approval for publication of the 1990 Annual Capacity Report, authored by Ronald A. Milner?



And while we're at it, why don't we mark as Milner 33 the Annual Capacity Report dated December 1990.
(Milner Exhibits Nos. 32 & 33 were marked for identification.)
BY MR. TOMASZCZUK:
Q. Did you draft the memorandum that we have marked as Milner Exhibit 32?
A. I don't recall having drafted it, no.
Q. Did somebody else draft it?
A. Somebody else probably drafted it.
Q. You reviewed it and approved it?
A. Correct.
Q. Do you know who drafted it?
A. I don't know for certain, although my copy appears to be a copy of the yellow concurrence chain for a letter, and that would indicate Mr. Pollog drafted it.
Q. He reported to you at this time?
A. Correct.
Q. Did you understand that the information in the ACR was for planning purposes only?
A. Yes.



Q. And was scheduled to be replaced by a contractually binding annual Acceptance Priority Ranking report on April 1991?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes. Yes.
BY MR. TOMASZCZUK:
Q. The first sentence of the second paragraph under the heading discussion states since the last waste acceptance schedule has not yet been approved, and this is the last opportunity -- I'm sorry. I think I read that inaccurately. Let me try again.
Since the waste acceptance schedule has not yet been approved and this is the last opportunity according to the terms of the contract for an ACR to be issued, upper and lower bounding waste acceptance rates were used to provide the required information.
Can you explain that sentence to me?
MS. HERRMANN: Objection -- foundation.
BY MR. TOMASZCZUK:
Q. Or for me?
A. Well, apparently at this point in

Suggest using 1,000 2,000, 3,000, 4,000, 5,000 and 6,000.
So do I understand that your concern was with the use of numbers and increments other than hundreds?
A. Well, I think my concern at that point was that using a number like 1430 for a projection into the future indicated far more precision than was actually in that number.
Q. Was one of your roles at this time to ensure that the spent nuclear fuel acceptance rates that were being used in various OCRWM documents were consistent?
A. No, that was not my, one of my roles at that time.
Q. Was that one of your concerns?
A. Yes, that would be fair to say.
Q. That was something you were trying to keep an eye on so to speak?
A. Yes.
Q. And that was a concern because you believed that OCRWM ought to speak with uniformity on those questions?
A. From a corporate sense, I believe that the program should, all elements of the program



should work off the same assumptions.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 40 a memorandum dated December 20, 1991, authored by Mr. Milner?
And it's an action memorandum approval for publication of the 1991 ACR.
(Milner Exhibit No. 40 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. I don't specifically, no.
Q. Did you prepare it?
A. It's unlikely that I would have prepared it.
Q. Somebody prepared it for you and you viewed it and approved it?
A. That's correct.
Q. Do you know who prepared it?
A. No, I don't.
Q. As of this point in time, December 20, 1991, did you still believe that a MRS facility



could be cited?
A. Yes, I did.
Q. Was the MRS team still working at this time?
A. I don't believe it was, no.
Q. Who was working on siting an MRS at this point?
A. My organization.
Q. And when you say your organization, you mean the Office of Storage and Transportation?
A. That's correct.
Q. I may have misunderstood, but -- and if I did, correct me -- I thought I heard you say yesterday that when the MRS team was disbanded, that that effectively ended DOE's plans to site an MRS.
Did I misunderstand that?
MS. HERRMANN: Objection to the extent that it mischaracterizes prior testimony.
BY MR. TOMASZCZUK:
Q. I don't want to mischaracterize what you said.
I want to understand it correctly.
A. If, if I said or alluded to that, I



was in error.
The MRS team was disbanded I guess essentially at the time that I became the acting associate director for storage and transportation.
I don't recall specifically. That may have been incident to organizational change, but nonetheless, the Storage and Transportation Office subsumed the duties of the MRS team, and volunteer MRS siting effort continued at that time.
Q. And that effort was ongoing as of December 20, 1991?
A. I believe it was, yes.
Q. Who in your office was working on that issue?
A. I believe Victor Trebules was, Jeffrey Williams.
Offhand I don't recall the rest of the employees there.
Q. Were you working that issue as well?
A. I was.
Q. How much of your time were you spending on DOE's efforts to site an MRS?
MS. HERRMANN: Objection -- vague.

MR. TOMASZCZUK: I'm sorry. Could you read that back?
THE REPORTER: Answer: "I would assume that the projection of fuel discharges versus what could be stored in the pool versus what would have had to have been put into dry storage, the amount that would have had to go, projected to be placed in dry storage was less than 400 MTUs."
BY MR. TOMASZCZUK:
Q. I'm not sure I understood your answer, so let me ask some follow-up.
Are you saying that the 400 figure represents the amount, the amount of spent nuclear fuel considering all the nuclear industry that would have had to have been placed in dry storage in fiscal or in Year 1998?
A. The number would have had to have been less than the 400, yes.
Q. 399 or less?
A. Or less, yes.
Q. So this Table 2.1 assumes that utilities would have been placing fuel in their spent fuel pools, correct?
A. That's correct.



Q. And the same question with respect to 1999 -- the number 600 represents the amount of spent nuclear fuel in the aggregate that would have been or would have had to have been placed in dry storage?
A. No. The number would have been less than 600.
Q. 599 or less?
A. I don't recall what the projections were.
Q. Do you know whether this table is based on any assumptions with respect to reracking?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No, I don't know.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Can I ask you to look at the ACR, the summary page, Mr. Milner?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. The end of the first paragraph indicates that the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR,



resulting in individual purchaser allocations, right?
A. Correct.
Q. And then further down this paragraph, or in the next paragraph about three quarters of the way down it's stated the annual acceptance rates provide an approximation of the system through-put and are subject to change as the program progresses, correct?
A. Correct.
Q. So that seems to be saying that the rates in the ACR are subject to change?
A. It would seem to say that, yes.
Q. And if that is so, would that not impact the APR?
A. I don't believe it would impact the APR since that was simply a priority ranking.
Q. Well, isn't the 1991 ACR used to develop the allocations in the APR?
A. The allocations I believe to be used for DCS.
Q. Well, I'm sorry. Go back and look at the sentence at the bottom of the first paragraph starting the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991



APR.
A. Um-hm.
Q. Resulting in individual purchaser allocations -- what do you understand that sentence to be, to mean?
A. I understand that to mean that it takes the, the priority ranking which is contained in the APR and blends that with the capacity rates contained in the ACR to come up with a priority ranking that does have annual capacities by utility.
Q. All right.
A. Annual acceptance rates by utility.
Q. And if the rates in the ACR change, doesn't that necessarily mean that the APR is subject to change also?
MS. HERRMANN: Objection -- asked and answered.
MR. TOMASZCZUK: Well, it's been asked. I'm not sure it's been answered.
THE WITNESS: Priority doesn't change even if the acceptance rate changes.
Utility that's first in line is still first in line even if the rates change.
BY MR. TOMASZCZUK:

Q. But the individual allocations for the utilities would change, would they not?
A. Absolutely, yes.
Q. Were you responsible, Mr. Milner, for the development of the instructions for the Delivery Commitment Schedules?
A. I would have been I believe, yes.
Q. And did your office play a role in the review of Delivery Commitment Schedules?
A. It did.
Q. And it was your understanding that beginning in January of 1992, the purchasers, the utilities could submit Delivery Commitment Schedules?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That was my belief, yes.
BY MR. TOMASZCZUK:
Q. Can I ask you to look at page 4 of the ACR?
And I direct your attention to the second paragraph.
At the end of the second paragraph, the sentence reads, quote, if the current linkages between MRS facility construction and



repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007?
A. Correct.
Q. Was that a true statement?
A. That was the best projection at the time, yes.
Q. You believed it to be true?
A. Yes, I did, at that time.
Q. I have to make a quick phone call. Can we take a five-minute break?
Is that okay? Do you want longer? Do you want ten? Want to take a ten-minute break?
A. That sounds good.
Q. Fine.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, the rates contained at page 5 of the 1991 ACR, Milner Exhibit 42, those rates are based on use of an MRS, correct?
A. That's correct.
Q. And that MRS, one of the assumptions is that MRS also has placed on it certain



statutory linkages or restrictions?
A. That's correct.
Q. At the time that this document was prepared, December 1991, OCRWM had other documents reflecting the design capacity of the geologic repository, is that right?
A. Correct. I believe so.
Q. And those documents reflected a steady-state spent nuclear fuel acceptance schedule of 3,000 MTU?
A. I believe that's correct, yeah.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Could we mark as Milner Exhibit 43 the general instructions issued by the Department of Energy for completing DCS forms?
(Milner Exhibit No. 43 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with these instructions, Mr. Milner?
A. In general terms, yes.
Q. Your office was responsible for



preparing them?
A. I believe that is correct.
Q. Do you know who in your office actually did that work?
A. Specifically who prepared it, I don't recall.
Q. Did you review and approve these instructions prior to their issuance?
A. I don't recall having done that, but it's most likely that I did.
Q. The second paragraph of the instructions indicates that the DCS should be submitted by all purchasers with allocations in the 1991 ACR or subsequent ACRs as appropriate, right?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. And there is a reference to Article V.B of the standard contract after that direction, correct?
A. Correct.
Q. And that's the section that we looked at earlier I believe, right?

A. I believe so, yes.
Q. And that's entitled Delivery Commitment Schedule, that section Article V.B?
Does that sound right? If you can get it in front of you, that's fine.
It would be Milner Exhibit 3.
(The witness reviewed the document.)
THE WITNESS: That's correct.
BY MR. TOMASZCZUK:
Q. Okay, but there is, as you previously testified, no reference, at least none that you could identify, to ACRs in Article V.B, right?
A. That's correct.
Q. Were you aware of that fact at the time these instructions were issued?
A. I probably was, yes.
Q. Did you have any discussions with anyone at OCRWM about that?
A. I don't recall that, no.
Q. At or about the time that these instructions were issued and the 1991 ACR was issued, did you have any discussions with any utilities concerning the information contained in those documents?
MS. HERRMANN: Objection -- vague.



THE WITNESS: I don't recall specifically.
It's likely I did. It's likely I had discussions with industry representatives.
Whether they were utility representatives or association representatives, I don't know.
BY MR. TOMASZCZUK:
Q. You think it's likely you had such discussions, but you can't recall any of the details about them?
A. That's correct.
MR. TOMASZCZUK: Let's mark as Milner 44 an action memorandum from Mr. Milner requesting approval of the publication of the 1992 APR and 1992 ACR.
(Milner Exhibit No. 44 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. Not specifically, I don't, no.
Q. Do you know who the director of the office of, who the director of OCRWM was at this



point in time?
A. I don't recall. I see no date in this.
Q. Well, there are various dates in the approval boxes.
Let me ask you do you think, was Mr. Barrett acting as the OCRWM director as of this point in time.
A. Okay. It appears that he may have been, yes.
This would have been right about the point in time where the political appointee would have departed, so yes, potentially he was the --
Q. There would have been a Presidential election in the fall of '92?
A. Right.
Q. And change of administration would have triggered a new appointment for the position of director of OCRWM?
A. That certainly would have triggered a departure of the previous director.
Oftentimes there were some time delay in a new director coming on board.
Q. That's fair. And Mr. Barrett appears



to be signing for this in the right-hand corner of page 2 as RW-1?
A. Okay. And I see the February date, so yes, it was likely he was the acting director at that point.
Q. Okay. So do I understand your testimony that you gave previously to be as of this point in time, the efforts to site an MRS facility were dead?
A. I don't believe that was the case at this point in time.
Q. It was still kicking?
A. I believe so, yes.
Q. And why do you say that?
A. My recollection was that we continued the effort for some period of time after the change of administration, and roughly that was a six-month period, but I don't recall with any precision.
Q. All right. This document reflects that there is no significant difference between the APR published in 1991 and the APR published in 1992.
Do you see that?
A. Yes, I do. That appears to be what is

indicated.
Q. But the ACR differs because since it is being published separately from the APR, there is no longer a need for an appendix to the ACR?
A. Yes. That's what it states here.
Q. There is a reference here at the bottom of this memo to purchaser, some purchasers expressing a concern about slippages in the waste acceptance schedule beyond 1998, right?
A. Correct.
Q. As of about this point in time, were you concerned that the utilities might bring litigation against the department for these slippages in the waste acceptance schedule?
A. I was not personally concerned, no.
Q. That issue hadn't come up on your radar screen so to speak?
A. No.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 45 a memorandum dated February 23, 1993, from Ronald Milner to Chris



Kouts, subject, back-up material for new RW initiatives?
(Milner Exhibit No. 45 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this memorandum?
A. I do, yes.
Q. What do you recall about it?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I recall I was out the day it got signed.
At this point in time, and it is indicated in there, the nuclear waste negotiator was not having any success in securing a volunteer site.
The program had begun looking at possible alternatives, things that could be done.
We began looking at the potential for doing a federal siting initiative for a volunteer MRS host location.
I guess that had come about to some extent from interactions with some of the



potential interested host locations during nuclear waste negotiator phase, that they may be interested in dealing directly with the federal government.
We began discussing the possibility of federal government rather than the nuclear waste, the Department of Energy actually other than the nuclear waste negotiator attempting to negotiate a volunteer site.
At that time, the department had underway as indicated here a multi-purpose canister program which was attempting to develop a system wherein the, a utility could load fuel in a canister which would then be placed in a storage overpack at the reactor or at a storage facility, federal storage facility.
Could be removed from that storage overpack, placed into a transport overpack, shipped, ultimately placed into a disposal overpack, the idea being you would never have to open it again.
I don't recall what private opportunities refers to, nor the utility compensation initiative, reading further.
BY MR. TOMASZCZUK:



Q. Okay. The federal negotiated siting effort that you described, that was separate and distinct from the MRS siting efforts, is that correct?
A. Well, it was, it was aimed at siting an MRS.
It was separate and distinct from the nuclear waste negotiator efforts. Would have been.
I don't -- the Secretary of Energy ultimately never approved that initiative.
Q. The Secretary of Energy did not approve the federal siting initiative that's referenced here?
A. Yes. That's, the best of my recollection, that's correct.
Q. And do you know when that decision was made?
A. No, I don't.
Q. Some time in 1993 do you think?
A. That would be roughly the correct timeframe.
Q. And as of this point in time, it looked like the nuclear waste negotiator was not going to be successful?

A. Certainly had not been successful to that point.
Q. Why were you sending this memo to Mr. Kouts?
A. I don't specifically recall. He probably was preparing some information for the director.
Q. What was Mr. Kouts' role at this point in time, do you know?
A. He was a -- I'm not sure what his title would have been, but in essence he would have been a special assistant, program front office, the director's office.
Q. Did the multi-canister initiative bear fruit?
A. In my personal opinion, it did because I think some private efforts picked up on that concept.
It never bore fruit in the sense that I don't believe there is a current package that can do all three -- storage, transport and disposal.
Certainly there are packages that can do storage and transport.
I don't recall which appropriations



act, but again, the department was directed to terminate the NPC program.
Q. Was DOE at that time considering compensating for utilities, compensating utilities in the event of a delay in waste acceptance?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I didn't recall that was the case.
I think the compensation that was referred to here related -- I'm guessing.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. I'm referring to the last page of this memo.
A. Correct.
(The witness reviewed the document.)
THE WITNESS: It would appear that we were.
I certainly recall discussions of providing multi-purpose canisters if they had been developed to utilities as a form of compensation.
BY MR. TOMASZCZUK:



Q. All right. That's the second option that was being considered at the time.
The first option was providing direct financial compensation, correct?
A. That's correct. As stated here, yes.
Q. Do you know why DOE was considering these options?
MS. HERRMANN: Objection -- foundation.
(The witness reviewed the document.)
MS. HERRMANN: Speculation.
THE WITNESS: I can only go by what is stated here, which is that the contingency in the event that we did not make the '98 date.
BY MR. TOMASZCZUK:
Q. I presume DOE would not have embarked upon this consideration unless someone had a concern that they weren't going to make 1998?
MS. HERRMANN: Objection -- foundation.
BY MR. TOMASZCZUK:
Q. Is that fair?
MS. HERRMANN: Speculation.
THE WITNESS: I think it's fair to say that prudency required you to do contingency



planning.
BY MR. TOMASZCZUK:
Q. You mean you had doubts about making 1998 at this point in time, didn't you?
A. I guess at that point in time, I was becoming concerned that we may not be able to site an MRS, which would then not have permitted a '98 acceptance date.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. It was DOE's position at this time that it did not have an unconditional obligation to accept spent nuclear fuel by January 31, 1998, correct?
MS. HERRMANN: Objection. Mr. Milner is not a 30(b)(6) witness, and calls for a legal conclusion.
THE WITNESS: I believe that that's correct.
BY MR. TOMASZCZUK:
Q. Do you know whether the courts have subsequently rejected that position?
A. I do.
Q. Of DOE?

proceedings.)
BY MR. TOMASZCZUK:
Q. In the section on discussion, it's stated in part that the department may have created an expectation that it would begin accepting spent fuel in 1998 through its implementation of the standard contract.
Did you agree with that statement?
A. That we may have created an expectation, yes.
Q. Yes. The text of the discussion section of the memo goes on to state that you, the Secretary of Energy, as I understand it, directed the program to explore with utilities and other interested parties options for offsetting a portion of the financial burden associated with the costs incurred through continued on-site storage resulting from delays in currently projected waste acceptance schedules.
It was well recognized within your office that a delay in meeting the 1998 date would cause the utilities to incur additional nuclear fuel storage costs?
A. That's correct.



(There was a pause in the proceedings.)
MR. TOMASZCZUK: Can we mark as Milner Exhibit 47 a Federal Register notice dated May 25th, 1994, published by OCRWM?
(Milner Exhibit No. 47 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this notice, Mr. Milner?
A. I do, yes.
Q. Did you draft it?
A. I did not draft it.
Q. Did you review it and approve it as it worked its way through OCRWM?
A. I certainly reviewed it. Approval authority was not mine for this.
Q. In the Federal Register, the second page of the document, the middle column, starting with respect to, do you see that?
A. Yes.
Q. There is a discussion about DOE's efforts to site an MRS, right?
(The witness reviewed the document.)
THE WITNESS: Yes.



BY MR. TOMASZCZUK:
Q. And the notice in part says that there is significant challenges associated with siting any facility of this type. Thus far neither the efforts of the department nor any other organization, including the Office of the Nuclear Waste Negotiator, have achieved the level of success needed to realize significant progress in locating and developing a site by 1998, right?
A. Correct.
Q. So it is fair to say that at least as of this point in time, the MRS efforts were, had proven unsuccessful?
A. That's correct.
Q. And there was no reason for optimism that an MRS would be cited by 1998?
A. Well, there could be an operation by 1998 certainly.
Q. It could be?
A. No. I say that there was no reason for optimism that an MRS could be operational by 1998.
Q. And the notice deals with other subjects, but it also addresses the subject of



interim storage, right?
A. Correct.
Q. And I gather that interim storage was a concept that was being considered in lieu of an MRS, is that right?
A. An MRS in essence was interim storage.
Q. When you use those two terms, you think of them as being the same thing basically?
A. I do, yes.
Q. Would you like to take a little break?
A. Fine with me.
(A recess was taken.)
MR. TOMASZCZUK: Ms. Reporter, could we have marked as Milner Exhibit 48 a set of briefing charts entitled interim storage options presented by R.A. Milner originally I gather on February 8, 1994, and then revised on March 8, 1994?
(Milner Exhibit No. 48 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this document?
A. I do, um-hm.

Q. Is this something that you prepared?
A. I don't believe I prepared it, no.
Q. Someone prepared it for you?
A. Yes.
Q. This appears to be a briefing to Mr. Dreyfus, who was then the director of OCRWM?
A. Correct.
Q. Do you know when he assumed the position of director?
A. I don't recall exactly, no.
Q. Summer of 1993 sound about right?
A. That would sound about right somewhere, somewhere, yeah.
Q. Okay. And this was a briefing that you presented to him orally?
A. Correct.
Q. Using an overhead projector?
A. Probably; I don't recall.
Q. Do you -- and the briefing took place on February 8, 1994?
A. Presume it did. I don't recall specifically.
Q. Do you know why, or was it revised then on March 8, 1994?
A. I don't recall.



Q. You don't recall any revisions that were made to the briefing after you gave it initially?
A. Not offhand, I don't, no.
Q. Okay. And the briefing was to address options for interim storage?
A. Correct.
Q. And do you know why you were giving this briefing?
A. My recollection was that I wanted to essentially provide him with information on state-by-state projected discharges, essentially the storage situation at the different reactors, and explore ways on how we might move forward or if we should move forward with interim storage.
Q. The third page of the document contains a listing of topics to be covered?
A. Um-hm.
Q. And there is a summary of issues followed by current status of at-reactor storage?
A. Um-hm.
Q. And then the third bullet, at-reactor storage requirements without MRS in system, and why was that topic being covered at this point



in time?
A. To provide him with information on how much fuel would be in storage at the different reactors if we did not begin accepting an MRS.
Q. So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
A. We were certainly doing contingency planning for that, yes.
Q. And the fifth bullet states impacts of no MRS?
A. Yes.
Q. Can I get you to look at the summary of issues, next page?
Can you explain the first bullet for me?
A. Besides having lousy grammar, it says that at-reactor dry storage will increase significantly by 2010.
Q. And when you say, there is a phrase be required in 32 states, do you mean that -- what do you mean by that?
A. I think the projection at this time was that there would be reactors in 32 different states that would require some sort of dry



storage by the Year 2010.
Q. Because their spent fuel pools could not handle the anticipated spent nuclear fuel discharges as of that point in time?
A. Correct.
Q. And the next bullet says utilities having to deploy at-reactor storage of spent nuclear fuel will incur significant non-reimbursable costs while still being burdened with the responsibility of maintaining the storage.
True statement at the time you wrote it?
A. Yes.
Q. And then the third issue was Congressional action is necessary to site a federal interim storage facility as soon as possible, correct?
A. Correct.
Q. What type of Congressional action was envisioned?
A. Well, legislation, authorization to federally site it in a storage facility.
Somewhat prior to this, as we had talked earlier, we had begun to explore federal

initiatives for siting an MRS or interim storage facility under the belief that the department had the authority under the current act to do that.

I believe that the department's general counsel subsequently determined that the department did not have that authority, additional legislation was required.

Q. So as of this point in time, a federal interim storage facility could not be sited without Congressional authorization?

A. That was the position of the general counsel I believe.

Q. Did you agree or disagree with that position?

MR. SHULTIS: Objection. Calls for a legal conclusion. Also might be privileged.

So you're asking his opinion of what the general counsel's office told him to do?

MR. TOMASZCZUK: I asked him whether he agreed or disagreed.

MR. SHULTIS: His personal opinion?

MR. TOMASZCZUK: Yes.

MR. SHULTIS: Okay. You can answer.

THE WITNESS: My personal opinion is I



agreed with that.

BY MR. TOMASZCZUK:

Q. The document then has a whole series of charts depicting the situation as I understand it in various states, right, with respect to spent nuclear fuel storage?

A. Correct.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Were some states in worse or in worse positions than others with respect to their need for spent nuclear fuel storage facilities?

A. I think some, certainly some reactors were, then were in worse shape than others.

Q. Do you have some recollection here today as to which reactors were in the worst shape so to speak?

A. Well, certainly Oconee had dry storage at the time, or was in the process of planning at least.

I don't recall actually when it went into operation. Oconee was; Surrey Nuclear Power at that time.

Those are two that come to mind at



that time.

Q. Is Oconee operated by Duke?

A. Correct.

Q. And Surrey's operated by Virginia Power?

A. Virginia Power.

Q. Can I direct your attention back to page 51 of this document?

This is the identification as I understand it of the consequences, potential consequences of no MRS?

A. Yes.

Q. First is the fuel stays where it is until repository commences operation, currently scheduled for 2010?

A. Correct.

Q. All right. Utilities may sue DOE for failure to perform according to standard contract, no waste acceptance in 1998.

So at least as of this point in time, isn't it true, Mr. Milner, that you were aware of that possibility that utilities could bring suit against the department for its failure to perform according to the standard contract?

MR. SHULTIS: Objection. Calls for



speculation.

THE WITNESS: Apparently so.

MR. TOMASZCZUK: I just want to note for the record I don't know what about that question asked the witness to speculate.

MR. SHULTIS: You're asking him to speculate about what utilities would do as far as bringing a lawsuit.

MR. TOMASZCZUK: Can you read the question back?

THE REPORTER: Question: "All right. Utilities may sue DOE for failure to perform according to standard contract, no waste acceptance in 1998.

"So at least as of this point in time, isn't it true, Mr. Milner, that you were aware of that possibility that utilities could bring suit against the department for its failure to perform according to the standard contract?"

BY MR. TOMASZCZUK:

Q. My question, Mr. Milner, was not asking you to speculate as to what the utilities might do.

I was asking about your understanding as to whether at this point in time, there was a

risk that utilities would sue DOE for failure to perform according to the standard contract.
MR. SHULTIS: The same objection.
THE WITNESS: In my opinion, there was that possibility.
BY MR. TOMASZCZUK:
Q. All right. That's why you wrote this bullet, right?
A. That's correct.
Q. As risk storage pools are filled, utilities must resort to additional at-reactor storage.
I think that's another consequence?
A. Correct.
Q. This next one, venders provide and continue to develop at-reactor dry storage technology, technologies that may prove incompatible with the repository.
Was that a concern of yours at this time?
A. It was, yes.
Q. Next potential consequence, loss of system flexibility. MRS provides storage buffer preceding repository and allows for truck only reactor sites to ship their fuel.



I'm not sure I understand that one.
Can you explain it?
A. Storage buffer, I guess I would think of that as almost a surge tank in the system where you're shipping fuel from reactors, from multi-reactors ultimately to a repository which must receive it, repackage it, and place it in a repository, and my opinion, MRS provided a buffer or a surge tank to the system that if something were to occur at the repository that necessitated, for example, slowdown briefly of acceptance, you have a buffer.
Truck only reactor sites refers to some reactor sites that don't have rail capability.
Q. Okay. Next consequence, shutdown reactors must maintain their spent fuel pools or dry storage facilities for a longer time, causing utility costs to increase.
Was that a true statement?
A. I believe so, yes.
Q. Are there costs associated with requiring shutdown reactors to maintain their spent nuclear fuels, spent fuel pools or dry storage facilities for a longer time?



A. There are costs associated with that, yes.
Q. Next consequence, reopening of 10 CFR Part 50 license for some sites deploying dry storage may create other licensing problems, resulting in earlier shutdown of reactor.
I'm not sure I understand this potential consequence.
Can you explain it for me?
A. Well, Part 50 license, of course, being the operating, NRC's operating license which it issues to the reactor.
I think that, that at that time, there was some concern that certain instances, and I can't recall the specifics, or particular reactors, but certain instances, there was the potential that Part 50 license might have to be reopened which interventions and so forth could have caused reactor shutdowns.
Q. Yet another page of potential consequences from no MRS, TSLCC, paren, plus utility, close paren, costs increase by about one billion without MRS if repository starts operation in 2010.
Can you explain what was meant by



that?
A. I believe that statement was looking at not only the federal costs, but the costs of utility storage, and the estimate at that time was that considering both of those costs, increase was a billion dollars for that delay.
Q. And those costs would increase by about 2.5 billion if the repository did not open until 2020?
A. That's what it states here, yes.
Q. I think I understand the last consequence that's stated here.
Did Mr. Dreyfus have any reaction to these consequences when you presented them to him?
A. The only reaction I seem to recall is that he felt it was unlikely we would get legislation, the authority to site a federal interim storage facility.
Q. Did he explain to you why he felt that way?
A. I don't recall that he did, no.
Q. Did you share his pessimism as to that subject?
A. I did.

Q. And then on the following pages, as I understand this document, Mr. Milner, there are options for interim storage which you summarize and then review, is that right?
A. Yes.
Q. And there are, as I understand it, four options which were, which are considered in this paper?
A. Appears to be, yes.
Q. Did you, in making the presentation, favor one option over the others?
A. I don't recall that I did, no.
Q. There is a chart entitled summary of analysis at page 57.
Do you see that?
A. Yes.
Q. And the first option, at-reactor storage, right?
A. Correct.
Q. And in the cost column, it appears to indicate that this would have the highest total system life cycle cost?
A. It does.
Q. Of the four options, this would be the most expensive?



A. Yes, according to this.
Q. Second bullet under that column says no benefit payments.
Do you know what that refers to?
A. I believe there is either a provision in the act, or I can't be certain that it's in the act, but there certainly was discussion on the part of Congress that the government might provide benefit payments to an entity that signed an agreement to host the repository site, and I believe the same is true for an MRS in differing amounts.
Q. If you found a volunteer so to speak, then the, there might be payments that would have to be made to that volunteer?
A. Correct. Correct.
Q. And indeed volunteer is the next option that's identified.
Is that the, the MRS system that we have been discussing in some of the previous documents.
A. Yes, I believe so.
Q. And then the third option is federal, and that is the federal interim storage option?
A. I believe so, yeah.



Q. Which I believe you indicated in your testimony a few moments ago that concluded that would require legislation?
A. Correct.
Q. Last then, the last storage option is Congressionally directed, and I'm not sure I understand this option.
What was meant by that?
A. I think that the thought there was the Congress simply designated a site.
Q. Of these options, the lowest cost that would also require legislation?
A. Yes.
Q. I suppose that's implicit in the term Congressionally directed?
A. True.
Q. And then you list assumptions. Then you go through each of these options I gather in a little more detail.
Look at the page 59, please.
A. Um-hm.
Q. And this option is at-reactor/ISFSI sites.
I mean this option is basically where we are today, is it not?



A. That's correct.
Q. Now MRS in-system utilities are responsible for spent fuel storage. Fuel could be stored on site, transshipped or private ISFSIs developed to meet needs. May or may not include compensation.
Costs, lower NWF, I presume that's nuclear waste fund?
A. Correct.
Q. Costs since the MRS is not built and no benefit payments are made, utilities will optimize individual solutions to minimize their costs. Compensation will increase nuclear waste fund costs.
And by that, I presume you meant compensation to the utilities?
A. Correct.
Q. Longer at-reactor storage time results in high TSLCC.
And it is true, is it not, Mr. Milner, that longer at-reactor storage time results in high TSLCC?
A. I believe it does, yes.
Q. Continuing on to the next page, page 60, schedule, it states here that this scenario

373

is the default case.
What was meant by that?
A. Default case, if none of the other options were viable, that was the default. That was essentially a no federal action case.
Q. All right. And that's sort of where we are today, right?
A. That's correct.
Q. And then institutional, continued at-reactor storage will lead to local and state discontent.
Were you aware of such discontent at or about this time?
A. I think at about that time, there was the beginnings of some concern on the parts of states and local governments of not removing the spent fuel, in addition to the utilities' concerns.
Q. However, at-reactor storage eliminates MRS siting problems. At-reactor storage could be contested, resulting in inability to move spent fuel from reactor pool, eventually causing early reactor shutdown.
At this time, were you concerned that the inability to move spent fuel from the

374

reactor pool might cause some reactors to shut down early.
A. Yes.
Q. Is that still a concern today?
A. No.
Q. Why not?
A. Reactors seem to have been able to get licenses or license amendments to construct dry storage, and it has not seemed to be as problematic as was feared at the time.
Q. Do you know whether that's true in Minnesota?
A. There are exceptions.
Q. Failure of DOE to perform according to standard contract may lead to litigation after 1998.
And that was a concern of yours at this time, right?
A. Yes.
Q. Did you discuss that concern about DOE's failure to perform might lead to litigation with others at OCRWM?
A. Not that I specifically recall.
Q. Did Mr. Dreyfus have any reaction to that statement when you presented it in February

375

of '94?
A. Very general terms, I think he thought that almost anything could lead to litigation at any time.
Q. And then finally, compensation to utilities for at-reactor storage may make this option more acceptable.
Was that discussed at this briefing in February of '94?
A. I believe it was.
Q. Do you know what was said about that?
A. Other than the statement, no, I don't recall.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Deposition Exhibit 49 a memorandum dated November 28, 1994, from Ron Milner, subject, draft TSLCC assumption package?
And I omitted 1995 draft TSLCC 1995 assumption package.
(Milner Exhibit No. 49 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this document?

376

A. In general terms, I do, yes.
Q. Okay. Now you have signed this cover memo as the acting director, Office of Program Management and Integration, right?
A. Correct.
Q. So as of this point in time, you left the position of director of Office of Storage and Transportation?
A. That's correct.
Q. And as acting director of this office, you're then back involved in the TSLCC review, editing and approval process I gather?
A. That's correct.
Q. And I'm sure you were delighted to be back in it!
A. Absolutely.
Q. Do you know, Mr. Milner, whose handwriting appears on this first page of Milner 49?
A. No, I don't.
Q. It's not your writing?
A. It's not my writing, no.
Q. Except for the signature, it's not your writing?
A. Except for the signature, except for

the signature.
Q. Did Carl Connor and George Reiling work for you?
A. They did at this point in time, yes.
Q. They were assigned to the Office of Program Management and Integration?
A. I believe that's correct, yeah.
Q. Can I ask you, Mr. Milner, to look at page 14 of the document?
And the table at page 14 appears to reflect a delivery spent nuclear fuel ramp-up rate?
A. It does.
Q. And it appears to show an initial receipt of spent nuclear fuel at a rate of 300 metric tons?
A. That's correct.
Q. And then ramps up to 3,000 metric tons in the fifth year of operation?
A. That's what is indicated, yes.
Q. And as of this point in time, there was still a second repository on the table being considered?
A. There was a possibility of a second repository.



One was not actively under consideration.
Q. All right. The reason I asked the question is because Section 6.2 on the following page has ramp-up rates for a second repository?
A. Yes.
Q. And then finally, we have Section 6.3, which is the repository in a single repository system, and a listing of waste acceptance ramp-up rates in that table, right?
A. Correct.
Q. And that table shows a, an initial acceptance rate of 300 metric tons and then ramping up to 3,000 metric tons in 2014, correct?
A. Correct.
Q. And then staying at that steady-state 3,000 metric ton rate for a period of 25 years?
A. Correct.
Q. Am I correct in understanding that at least as of November of '94, if not sooner, the MRS siting effort was dead?
A. We no longer assumed an MRS in the system, that's true, and for all intents and purposes, yes, it was dead.



Q. Give me just one second.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Am I correct in understanding, Mr. Milner, that you were circulating this draft assumptions package to the various recipients of your memo to ensure that those affected offices within OCRWM would have the chance to review the data and concur in it?
A. Correct.
Q. And you were doing that, among other reasons, for purposes of trying to develop consistency in the OCRWM documents?
A. Correct.
Q. Do you recall whether any of the recipients of the memo provided comments to you or your office on --
A. I don't recall, no.
Q. Now these ramp-up rates are substantially different from those in the 1991 ACR, is that right?
A. They are different, yes.
Q. So at least insofar as the ACR was concerned, and the other documents, they were



using different rates?
A. I thought you referenced the 1991.
Q. Yes, I did. I'm sorry.
A. Yeah, the rate was different in this 1994 assumption than it was in the 1991 ACR.
Q. The rates in the 1991 ACR assumed an MRS, right?
A. I believe it did.
Q. And these rates do not?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Deposition Exhibit 50 the Civilian Radioactive Waste Management Program Plan, Volume 1, Program Overview?
The date is December 19th, 1994. You have to go to the second page to tell that.
(Milner Exhibit No. 50 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. I am.
Q. Did you have a role to play in its preparation?

Q. Is he still with the department?
A. No, he is not.
Q. Is he retired?
A. Yes, he has.
Q. Do you know where he is today?
A. I believe he lives in Springfield, Virginia.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 51 the March 1995 APR ACR?
(Milner Exhibit No. 51 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. In general terms, yes.
Q. Did your office prepare the document?
A. It did not.
Q. Do you know which office within OCRWM did prepare it?
A. I believe this was still being prepared at that time in the Office of Storage and Transportation.
Q. So Mister, this would have been Mr.



Shelor's office that prepared it?
A. I believe so.
Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for



the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.
Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?
A. That was my opinion, yes.
Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations



as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?

MR. SHULTIS: Calls for speculation.
THE WITNESS: If I were a utility fuel manager, I would have.
BY MR. TOMASZCZUK:
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be



re-evaluated by DOE and the purchasers.
What was meant by that?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: Well, the program and the department position had always been that acceptance of spent fuel was conditioned upon having the facility available to accept it, and if those conditions changed, DCSs would have to be re-evaluated in terms of start of acceptance.
BY MR. TOMASZCZUK:
Q. So if circumstances changed, the DCSs wouldn't be binding?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: If there was no facility available to accept the fuel in 1998, which ultimately there was not, then yes, they would have to be re-evaluated.
BY MR. TOMASZCZUK:
Q. Do you know whether the Delivery Commitment Schedules once approved were subject to adjustment plus or minus 20 percent in final delivery schedules?
A. I don't recall that. I simply don't



know.
Q. Does that sound correct or incorrect to you?
A. I have no recollection of a 20 percent.
BY MR. TOMASZCZUK:
Q. Are you looking at the contract?
A. Yes, I am.
Q. If you would direct your attention to Article V.B.2?
A. Okay -- 20 percent.
Q. It seems to indicate that the quantities of spent nuclear fuel and high-level waste can be adjusted plus or minus 20 percent, right?
A. That does say that, yes.
Q. So the DCSs could change if circumstances changed, right?
A. That's correct.
Q. And they, and the amounts of fuel in the DCSs could be adjusted plus or minus 20 percent per the contract?
MR. SHULTIS: Objection. Calls for a legal conclusion unless you're just asking him to read the contract.



BY MR. TOMASZCZUK:
Q. I'll delete the reference to the contract in my question.
The DCS spent nuclear fuel information could be adjusted plus or minus 20 percent, right.
A. This is what I read in the contract, that's correct.
Q. Fine. Mr. Milner, were you surprised to see that reference in the contract?
A. That I did not recall it, yes.
Q. Does it change your view about the binding commitment reflected in the DCS?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: I guess in my interpretation of a commitment, not necessarily.
I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay -- just the purchaser can adjust it up or down, so it's his option.
I guess I would interpret that to mean

it's less binding on the utility than it was on the department.
BY MR. TOMASZCZUK:
Q. There is a discussion, Mr. Milner, at the second page of the '95 APR and ACR which I want to direct your attention to.
And in particular, ask you to look at the paragraph that begins at the bottom of page 2, and it would appear to suggest that there was a delay in issuing the '93 ACR and APR, right?
A. Apparently so.
Q. And were you, do you have any knowledge as to why that '93 ACR and APR was delayed?
A. No, I don't.
Q. But in any event, the text goes on to indicate that that information was, is combined with this '95 APR/ACR, right?
A. That's correct.
Q. And it goes on to state that the department has decided to, in the interests of easing its administrative burdens, it has decided to issue a consolidated APR/ACR report for '94 and subsequent years?
A. Correct.



Q. And do you know, Mr. Milner, whether this was the, this document that has been marked as Milner Exhibit 51 was the last APR/ACR issued by the department?
A. I believe it was.
Q. Do you know why no APRs/ACRs have been issued after March of '95?
A. I don't offhand recall, no. I would presume nothing has changed, so it wasn't reissued.
Q. Now as of, certainly as of this point in time, March of '95, the department's efforts to site an MRS had stopped, right?
A. Basically, yes.
Q. Do you know whether the acceptance rates reflected in Table 1 at page 4 of this document assume an MRS or not?
A. I believe they do not.
Q. And what is the basis for that belief?
A. Just my general recollection at the time that we did not assume an MRS facility in the system.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:



Q. These rates are identical, are they not, to those contained at Table 2.1 in the 1991 ACR?
MR. SHULTIS: What exhibit is that?
MR. TOMASZCZUK: Exhibit 42.
(The witness reviewed the document.)
THE WITNESS: I'm sorry. What was the table number?
BY MR. TOMASZCZUK:
Q. The Table 2.1 in the '91 ACR at page 5.
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Yes, they are the same.
BY MR. TOMASZCZUK:
Q. And indeed the text under Section 1.2 at page 3 of the '95 ACR/APR?
A. I'm sorry. Page what?
Q. Page 3, I'm at page 3 of Milner Exhibit 51, under Section 1.2.
A. Um-hm.
Q. And it says in the previous ACR in pertinent part the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored



retrievable storage facility prior to repository operations?
A. Correct.
Q. So they're saying the previous ACR had the rates based on an MRS, right?
A. That's correct.
Q. And the next sentence goes on to say due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years.
And we can see that if you compare the '91 ACR with the '95 ACR?
A. Correct.
Q. Right?
A. Correct.
Q. But isn't it true, Mr. Milner, that the '95 APR/ACR continued the practice of the previous ACR indeed going back to 1991 of basing a rate with an assumption that an MRS would be operating prior to repository operations?
MR. SHULTIS: Objection -- asked and answered.

THE WITNESS: I don't know if the rates are the same, but I'm not sure what the question really is.

MR. TOMASZCZUK: Can you read my question back?

THE REPORTER: Question: "But isn't it true, Mr. Milner, that the '95 APR/ACR continued the practice of the previous ACR indeed going back to 1991 of basing a rate with an assumption that an MRS would be operating prior to repository operations?"

MR. SHULTIS: Same objection; the document speaks for itself.

THE WITNESS: The rates are the same. The '95 document does not assume an MRS in the system.

MR. TOMASZCZUK: I'm sorry. Could you read that back for me?

THE REPORTER: Answer: "The rates are the same. The '95 document does not assume an MRS in the system."

BY MR. TOMASZCZUK:

Q. Can I direct your attention to the text at the top of page 4 of the '95 ACR/APR?

A. I stand corrected. It appears that it



does.

Q. It appears that these rates are based on the existence of an MRS?

A. Apparently so.

MR. TOMASZCZUK: It's 6:20.

(Whereupon, at 6:20 p.m., the deposition was recessed, to reconvene at 9:00 a.m. May 3, 2002.)

---------------------------

RONALD A. MILNER

SUBSCRIBED AND SWORN to before me this----------

day of-------------------------------, 20------.

---------------------------

NOTARY PUBLIC

My commission expires:



CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages through , do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, : (98-126C)
CONNECTICUT YANKEE ATOMIC POWER COMPANY : (98-154C)
MAINE YANKEE ATOMIC POWER COMPANY : (98-474C)
FLORIDA POWER & LIGHT COMPANY : (98-483C)
NORTHERN STATES POWER COMPANY : (98-484C)
DUKE POWER, A Division of DUKE : ENERGY CORP. (98-485C)
INDIANA MICHIGAN POWER COMPANY : (98-486C)
SACRAMENTO MUNICIPAL UTILITY DISTRICT : (98-488C)
SOUTHERN NUCLEAR OPERATING COMPANY, : et al., (98-614C)
COMMONWEALTH EDISON COMPANY : (98-621C)
BOSTON EDISON COMPANY : (99-447C) :
GPU NUCLEAR, INCORPORATED : (00-440C)
WISCONSIN ELECTRIC POWER COMPANY, : (00-697C)
POWER AUTHORITY OF THE STATE OF : NEW YORK (00-703C)
OMAHA PUBLIC POWER DISTRICT : (01-115C)
NEBRASKA PUBLIC POWER DISTRICT : (01-116C)
TENNESSEE VALLEY AUTHORITY : (01-249C)
Plaintiffs, : v. :
UNITED STATES OF AMERICA, : Defendant. :
- - - - - - - - - - - - - - - - - - - - X Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for



Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:

PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821



APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth
Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561



C O N T E N T S


WITNESS EXAMINATION BY COUNSEL FOR
RONALD MILNER PLAINTIFFS FLORIDA POWER &
LIGHT COMPANY, ET AL.
By Mr. Tomaszczuk 410

EXAMINATION BY COUNSEL FOR
PLAINTIFF SACRAMENTO
MUNICIPAL UTILITY DISTRICT
By Mr. Neslin 415

EXAMINATION BY COUNSEL FOR
PLAINTIFF COMMONWEALTH EDISON
Mr. Tompkins 524

Afternoon Session - Page 524


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 52 | 427 |
| 53 | 440 |
| 54 | 449 |
| 55 | 455 |
| 56 | 460 |
| 57 | 470 |




E X H I B I T S (Continued)


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 58 | 472 |
| 59 | 477 |
| 60 | 480 |
| 61 | 491 |
| 62 | 497 |
| 63 | 505 |
| 64 | 510 |
| 65 | 515 |
| 66 | 526 |
| 67 | 530 |
| 68 | 532 |
| 69 | 535 |
| 70 | 541 |
| 71 | 548 |
| 72 | 552 |
| 73 | 570 |
| 74 | 577 |


* All exhibits retained by counsel.



P R O C E E D I N G S

Whereupon,
RONALD MILNER,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified further as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS
FLORIDA POWER & LIGHT COMPANY, ET AL.
BY MR. TOMASZCZUK:
Q. Mr. Milner, good morning.
A. Good morning.
Q. Same ground rules as applied to the previous day's deposition.
A. Correct. Okay.
Q. And I have just a few follow-up questions on the document that we were reviewing yesterday, the 1995 APR/ACR and I intend to ask you those questions and then I'm going to adjourn my questions and allow one of the other counsel, two of the other counsel who have travel commitments later today to proceed with their questions of you. And then after they've completed their questioning, then I will pick back up again and try and finish your deposition.
And because that is a slight variant from the procedures in the case, I would just ask counsel

for the government to indicate their consent to that, and let me also add that we appreciate the courtesy in that slight variant from the standard procedures.

MR. SHULTIS: You're very welcome and we have no problem with the change in the procedures.

BY MR. TOMASZCZUK:

Q. Mr. Milner, you recall, we had the March 1995, APR, ACR out late in the day yesterday?

A. I do.

Q. And if I could direct your attention to page 4 in the document. This is the table with the projected acceptance rate for spent nuclear fuel?

A. Correct.

Q. Do you know what that term nominal means in the title of this table?

A. I don't know for certain. I believe nominal refers to, in essence the number being a rounded number. You would intend to pick up a cask load from a particular utility rather than one assembly or two assemblies perhaps. You could easily, with that kind of a philosophy, end up with an odd number, 401.2 kind of number. So I think that nominal refers to simply a rounded number. I'm not certain of that but that's my understanding.

Q. This -- I'm sorry. Were you finished with



your answer?

A. Yes.

Q. This table as I understood your testimony yesterday reflects the, and adopts the MRS capacity limits, correct?

A. I believe it does, yes.

Q. And those MRS capacity limits are essentially imposed on the geologic repository here, is that right?

MR. SHULTIS: Objection as to characterization.

THE WITNESS: I can't answer -- I don't know.

BY MR. TOMASZCZUK:

Q. I mean, we know as of this point in time there was no MRS in the works, correct?

A. I believe we had determined yesterday that this particular APR ACR did assume an MRS.

Q. But did we also not determine that as of this point in time all work at DOE on an MRS siting had stopped?

A. That's correct.

Q. And isn't it true that as of this point in time the only work for a spent nuclear fuel storage facility was for a geologic repository?



A. On the part of the government -- on the part of DOE, that's correct.

Q. So doesn't this document reflect DOE's decision to impose the MRS capacity limits on its plans for a geologic repository?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I don't know.

BY MR. TOMASZCZUK:

Q. You don't know?

A. I don't know.

Q. Does that seem a fair inference from reading the document and understanding what was happening at the time?

MR. SHULTIS: Same objection.

THE WITNESS: To the best of my recollection there were discussions on pending legislation occurring at this time in the Congress relative to interim storage and I think this document attempted to reflect a potential for interim storage facility.

BY MR. TOMASZCZUK:

Q. An interim storage facility as reflected in your testimony yesterday would have required legislation as I understood it, right?



A. Correct.

Q. Do you know whether this document refers to such interim storage anywhere?

A. Well, if I recall correctly you had pointed me to some language that indicated it did. I believe that's page 3 and the top of page 4.

Q. And I'm sorry, what language were you referring to there, Mr. Milner? I didn't see a reference to interim storage but maybe I'm missing it.

A. I think the reference cites monitored retrievable storage.

Q. And in your view those concepts were the same, interim and monitored retrieval storage?

A. Yes.

Q. But interim storage would have required additional legislation whereas there was already legislation on the books with respect to an MRS, correct?

A. To site an MRS facility would have required additional legislation if it were to be sited prior to site approval of a repository.

Q. That would have required an amendment to the Nuclear Waste Policy Act amendments?

A. Correct.

of spent fuel from other sites?
A. I believe it would. If over some period of time the Department were to -- according to the priority ranking, the ACR of 1995, since that combined both, one utility would expect to have X number of MTUs removed from their reactor within some specified time period. So if a portion of that allocation was given to another reactor, it would not be as timely.
Q. But would a portion of that allocation have to be given to another reactor if in fact the receipt rate exceeded the discharge rate?
A. Certainly.
Q. Why do you say that?
A. Any time there's a finite amount of fuel being accepted, and that finite amount of fuel is allocated amongst the utilities in the queue, whatever that number may be, if you reallocate that, a portion of that, to other utilities farther down in the queue, you're certainly impacting that.
Q. Would you disagree with criterion 3 here that granting priority can be shown to avoid the establishment of an otherwise unneeded reactor site storage facility?
A. I don't completely agree with that.



Q. And how do you disagree with it?
A. If a reactor is shutting down, presumably it has all of its spent fuel stored on site either in the pool or dry storage or a combination thereof. That storage exists when the reactor shuts down. Since no more fuel is being generated by the reactor I'm not sure what additional storage would be established.
Q. Would you agree that it would avoid the need to continue an otherwise unneeded reactor site storage facility?
A. I would.
Q. And the next item states that granting priority can be shown to be clearly cost effective for consumers from the standpoint of timely decommissioning?
A. I would agree with that.
Q. And the last item is that granting priority can be shown to support the national policy of efficient operation of the country's waste management system.
A. I can neither agree or disagree with that. I'm not quite sure what that means.
Q. You don't understand --
A. Correct.



Q. -- the criteria?
A. Correct.
Q. Do you know whether you or Mr. Barrett responded to this letter by Mr. Grube?
A. I don't recall for certain, I don't believe we did.
Q. Do you know whether the Department has ever adopted any criteria for making decisions on shutdown reactors?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't recall. I don't believe.
BY MR. NESLIN:
Q. You're not aware of it?
MR. SHULTIS: Same objection.
THE WITNESS: I'm not aware of it, no.
BY MR. NESLIN:
Q. Do you believe you would have been aware of it if such criteria had been developed?
A. I think I would have.
(Milner Exhibit No. 62 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, Exhibit 62 is a letter from



you to Dr. Andrew Kadak dated June 16th, 1994. Are you familiar with this letter?
A. I vaguely remember this letter, yes.
Q. Did you draft this letter?
A. I don't believe I did.
Q. But you would have reviewed and approved it?
A. Certainly.
Q. And the purpose of this letter was to respond to certain questions that Yankee Atomic had raised with the Department?
A. Apparently so, yes.
Q. Is that your recollection?
A. Yes.
Q. In the second paragraph of the first page, the first sentence reads that, "In designing the waste management system, the Department and the nuclear utilities share mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible and accommodating economic and physical situations confronting utilities such as yours."
What did you mean by mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible?
A. I think both the Federal Government, the

program and the utilities had a goal of taking fuel off the sites as soon as possible, to begin to take fuel off the sites as soon as possible.
Q. And what did you mean by accommodating economic and physical situations confronting utilities such as yours?
A. I think there was a goal to at least mitigate the economic situation relative to cost of storage, but I don't know what physical situation meant.
Q. What was meant by utilities such as yours? Were you referring to shutdown, utilities with shutdown reactors?
A. I don't recall. Likely that would have been the case.
Q. So you've testified that Department had an interest in mitigating the economic situation confronting such utilities. What do you mean by mitigating the economic situation for them?
A. Well, I don't know that -- hypothetically I don't know whether the condition of the economic situation could be totally alleviated, but potentially at least you could mitigate it.
Q. How?
A. Well, I guess one example I might think of



was that the Department entered into a cooperative program with the Rancho Seco reactor to demonstrate dry storage on site and assist that utility in off-loading at least a portion of its pool and storing it in multi-purpose canisters or what was hoped to be multi-purpose canisters on site. Potentially allowing the utility to decommission the pool.
Q. And how did the Department cooperate with Rancho Seco?
A. Providing funding.
Q. Do you recall what portion of the funding was provided for that project?
A. I don't recall. I believe the Department paid for two or three of the storage canisters and casks but I don't recall.
Q. And you say this would potentially allow the utility to decommission the fuel on site?
A. If you stored enough of the fuel, yeah.
Q. Was that an objective the Department had?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I think the Department desired to mitigate to the extent we could, you know.
BY MR. NESLIN:



Q. By mitigate do you mean allow timely decommissioning of these pools to the extent you could?
A. If that were possible, yes. I believe the Department was given specific authority to do that for SMUD. I believe the opinion of the Department's counsel was we did not have the authority to do that on a general basis.
Q. When you say the Department was given authority, what do you mean by that?
A. Legislation.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. NESLIN:
Q. You used the Rancho Seco as an example of how the Department might mitigate these effects, are there other examples that comes to mind here?
A. That was the only example because that one we were given authority to do.
Q. If I could ask you to turn to the first page of the attachment, Mr. Milner.
You see at the bottom half of this page, the top of the following page, you respond to a question which asks how are you going to grant priority acceptance of spent fuel from permanently



shutdown plants as permitted in our contract? Could you review what your response was?
A. Sure.
Q. Mr. Milner, the end of this response notes that article Roman V.E of the standard contract includes a provision allowing utilities to adjust their positions in the acceptance queue by exchanging acceptance allocations among themselves?
A. That's correct.
Q. And it then goes on to say that, "The Department encourages Yankee Atomic Electric Company to exercise their contractual right to exchange allocations with other interactive utilities." What did you mean by that?
A. What it says. We encouraged the Yankee Rowe or Yankee Atomic to exercise their rights under contract to enter into an exchange agreement with another utility.
Q. That was something that could address the problems facing a shutdown reactor?
A. Certainly.
Q. That by exchanging their place in the queue they could move up in the queue through the exchange provision?
A. Correct.

to reserve my right to reopen the deposition pending the resolution of certain outstanding discovery issues between the plaintiffs and the government regarding the government's obligation to produce additional documents in this case. So subject to that reservation, I'm done.

MR. SHULTIS: Thank you. Of course we oppose that. Thanks very much.

(Whereupon, at 1:00 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 2:00 p.m., this same day.)



AFTERNOON SESSION

(2:00 p.m.)

Whereupon,

RONALD MILNER,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

EXAMINATION BY COUNSEL

FOR PLAINTIFF COMMONWEALTH EDISON

BY MR. TOMPKINS:

Q. Good afternoon, Mr. Milner. My name is Chris Tompkins. I'm from the law firm of Jenner & Block. We represent Commonwealth Edison. Before I start, I just wanted to state the same ground rules as before should apply, if you have any questions about any of my questions, something you don't understand, let me know.

And like I said, I'm hoping to keep this within two hours or so, so hopefully we can move along pretty quickly. You are currently the COO of OCWRM?

A. Correct.

Q. In that position, do you have a fairly good handle on the current state of the Nuclear Waste Fund?



A. I think I do.

Q. Okay. Just a ballpark estimate, could you tell me how much money utilities have paid into the fund since 1982?

A. Just as a ballpark, I think it's something in the neighborhood of 10, 11 billion.

Q. 10, 11 billion. Now, all these utilities paid this money to OCWRM on the expectation that they would receive a service, is that your perception?

A. That's my perception, yes.

Q. And that they would receive the service of removal of waste from their reactor sites?

A. Correct.

Q. Now, is it reasonable to assume that these utilities upon paying this fee have some sort of expectation that this waste will be taken away in a timely manner, and they won't have to expend further money to deal with this waste in addition to what they've already paid to the Federal Government?

A. I think they certainly had an expectation that the waste would be removed in a timely manner. I think some utilities would have had to assume that they would continue to pay storage costs in some form or another.

Q. Sure. But I mean in general, utilities



didn't enter into this thing expecting to have to spend additional billions to store waste that they're already paying the government to take away?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: Yeah, I don't know what the utilities may have anticipated in terms of how much they would have to spend. They certainly prudently indicated they would spend some expenditures,.

BY MR. TOMPKINS:

Q. Well, they had to continue to store the waste through 1998, at the very least?

A. At the very least.

Q. I'd like to show you what we are marking Milner Exhibit 66.

(Milner Exhibit No. 66 was marked for identification.)

BY MR. TOMPKINS:

Q. Do you recognize this document?

A. Yes.

Q. Is this a statement that you prepared to the Minnesota State Legislature, back in 1994?

A. Without reading through it entirely --

Q. Sure.

A. -- just judging by the cover I think it

527

was probably a statement that I presented to them.
Q. Okay. So someone else would have prepared your remarks and then you would have gone out there and given them?
A. Correct.
Q. But they do represent your viewpoints at that time?
A. If it's in fact the statement that I presented, yes, it would have.
Q. Okay. I'd like to call your attention to the first page and the second paragraph of the first page, in fact the last sentence which reads, "The Secretary of Energy has stated the Department has at least a moral obligation to meet the 1998 waste acceptance date specified in the act." Did you deliver this statement to the Minnesota State Legislature?
A. I believe I did.
Q. Was this the Secretary of Energy's view of the Department's obligation at that time?
MR. SHULTIS: Objection, document speaks for itself.
THE WITNESS: I believe the Secretary at that time had made that statement.
BY MR. TOMPKINS:

528

Q. Had made that statement. Do you know what sort of discussion there had been within OCWRM about the Secretary's statement of the Department's moral obligation?
A. No, I don't recall.
Q. Did you share the view of the Secretary that the Department had a moral obligation to accept waste?
A. I did.
Q. You did, okay. Why at this time was this termed as a moral obligation versus a legal obligation?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: My opinion was that as was held by, I think, the program and I believe the Department that the Department's obligation under the contract was to begin accepting waste in 1998 conditioned upon the availability of a facility. But certainly given past program schedules and documents, I think we felt it was a moral obligation at least.
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you joined the Department in around April of '84?
A. I joined the program.

529

Q. The program.
A. In April of '84.
Q. April of '84. At that time, were you aware of any efforts to modify the standard contract?
A. Yes, when I came on board there was a proposed modification of the standard contract.
Q. And do you know what that modification consisted of?
A. I don't recall, no.
Q. Don't recall. Do you know who was in charge of making the modification within the program?
MR. SHULTIS: Objection, assumes facts not in evidence.
THE WITNESS: Well, I believe there was a group involved in drafting the modification.
BY MR. TOMPKINS:
Q. Do you recall any of the individuals who were members of that group?
A. Let's see, from the program, I believe there was an individual by the name of George Chaconas.
Q. And what was his position at the time?
A. I don't recall what his title was but he was in essence the one managing -- although that's not a good turn, the standard contract at that time.

530

There was an individual from the procurement office, J. Cavanaugh. There was an individual from the office of general counsel, Elliot Winnick. And I believe there might have been an individual or two from the Energy Information Administration since they provided the data for the program.
Q. Do you recall who initiated this development of modifications, whether it was the utility industry or if it was the Department or the program?
A. That amendment had been initiated before I joined and no, I don't recall.
Q. Okay. I would like to show you what's being marked Milner Exhibit 67.
(Milner Exhibit No. 67 was marked for identification.)
MR. TOMPKINS: It was previously marked as an exhibit in Robert Morgan's deposition so just for consistency's sake we're using the same letter.
MR. SHULTIS: Okay.
BY MR. TOMPKINS:
Q. I'd like to give you a chance to read over the letter before I ask any questions on it.
Now, in the second paragraph, about halfway through, there's a sentence that says, "To

551

rate modifications which were being discussed at the time?
MR. SHULTIS: Objection, calls for speculation. Assumes facts not in evidence.
THE WITNESS: I don't know.
BY MR. TOMPKINS:
Q. You don't know. Certainly this does indicate that someone within the program was looking at that issue, though?
MR. SHULTIS: Objection, mischaracterizes the document. Calls for speculation.
THE WITNESS: To me it also indicates whoever M.R. Shay was wrote that.
BY MR. TOMPKINS:
Q. I'd like to talk to you about page 030-0039 and the following pages. Do you have any understanding of what they're referring to when M.R. Shay states, Preclude tran shipments between reactors?
A. To me the term tran shipment between reactors means just that, that one reactor may ship some of its spent fuel to the storage pool at another one of its reactors.
Q. Do you know what the reference is to 1/4 core and 1/3 core, would that be a reference to full

552

core reserve capacity in the pool, or --
A. I don't know.
Q. We previously marked -- I believe it was Wednesday we previously marked the 1987 mission plan amendment or actually one of the appendixes to it. This is also an excerpt of that same mission plan amendment. It's just a portion of the text rather than the appendix we looked at previously.
(Milner Exhibit No. 72 was marked for identification.)
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you had some involvement in preparing this mission plan amendment?
A. I believe I would have, yeah.
Q. Okay. I'd like to call your attention to page 6 of this excerpt. The third full paragraph under extension of the schedule for the first repository, this indicates that at this time the program in OCWRM was projecting a delay in start of repository operations from 1998 to 2003; is that correct?
A. That's what's indicated here, yes.
Q. Okay. It indicates that this five-year extension is necessary for technical planning in the

553

program?
A. I don't see where it refers to technical planning.
Q. Okay.
A. It seems to indicate that the schedule was certainly due to budget reductions.
Q. Are you aware of any other reasons why the schedule would have slipped at this point?
MR. SHULTIS: Objection, mischaracterizes the document.
THE WITNESS: No, not offhand, I don't recall.
BY MR. TOMPKINS:
Q. Also in this same paragraph this amendment indicates as explained later, the DOE could nonetheless start accepting waste in 1998 in an MRS facility. Was this consistent with DOE planning at the time in 1987?
A. I believe it was.
Q. So they were going to operate an MRS from 1998 until about 2003 when a repository opened?
A. I think the intention was that the MRS would continue operating beyond 2003.
Q. In fact the MRS was intended to be an integral part of the whole waste acceptance system?

554

A. Yes.
Q. It wasn't intended to operate alone or as a permanent place for storage in disposal?
A. No.
Q. I'd like to talk to you about page 12 now, in particular the last full paragraph or actually the last paragraph which goes on to the next page under the heading MRS facility. It stays that on March 31st, 1987 the DOE submitted to Congress a proposal for construction of an MRS facility. To allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority, DOE asked Congress to limit the MRS storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until a construction authorization for the repository has been received from the Nuclear Regulatory Commission.
Is this an accurate statement that the DOE was the organization that requested the linkages between the repository and the MRS?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Certainly the DOE was the entity that requested Congress, my recollection of

the origins of those linkages were at that time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.
BY MR. TOMPKINS:
Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
A. I believe that was the request or recommendation of the local community at the time.
Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?
A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.



15,000, I believe, was the limit wherein the capacity could never exceed that of the MRS.
Q. However, if divided over the course of five years, this capacity doesn't exceed amounts that the DOE had previously projected that it was going to be receiving on an annual basis?
A. That's correct.
Q. In fact that would equal exactly 3,000 metric tons a year which had previously been the steady state operation under previous projections?
A. That's correct. Whether that was a mathematical coincidence, I don't know.
Q. You don't know. If you could, I'd like you to look again at Milner Exhibit 20, which is the 1989 reassessment.
I'd like to talk about pages romanette viii and x, under the heading Monitor Retrievable Storage.
Now this reassessment states that the primary objective is still to develop a licensed geological repository for permanent disposal. Is that correct?
A. That's correct.
Q. So the repository was still central in OCWRM's planning and still was not intending to use



an MRS as a location for permanent disposal?
A. That's correct.
Q. Moving from the bottom of page 9 to 10 it says that "the DOE cannot meet the anticipated schedule set forth in the act for repository by 1998. Furthermore the current linkages between the repository and the MRS program make it impossible for the DOE to accept waste in an MRS facility on a schedule that is independent from that of the repository. Therefore, the DOE plans to work with Congress to modify the current linkages between the repository and the MRS facility, to embark on aggressive program, develop an integrated MRS facility for spent fuel."
The Department was now proposing to modify half of the linkages between the repository and the MRS, is that what this is indicating?
A. That's what it's indicating, yes.
Q. Okay. Was actually changing the construction part of the schedule, so that construction and siting of an MRS could happen independent of the repository licensing and construction?
A. Correct. That was what was being indicated here.



Q. Turning to page 11 and 12, in particular the first full paragraph in the top of page 12, this indicates that the linkages weren't changed. The repository wouldn't open until, rather the MRS, I'm sorry I misspoke, would not be able to open until 2007, three years prior to the start of operations of a repository.
Is that true?
A. That's what's stated here, yes.
Q. And you agree with that, that without modifications of the linkages the MRS couldn't open until 2007?
A. Yeah, I would have agreed that that was pretty unlikely.
Q. So the Department's plan at this time was to accept waste in 1998 through operation of an MRS, but it would expand the schedule over which the MRS would operate from the five years before the repository started operation it was projected in 1987 to 12 years at this time?
A. Yeah, it would have been 12 years if an MRS had started operation in '98.
Q. And it would continue to operate obviously with the repository after that?
A. Yeah.

559

Q. I'd like to look back at Milner Exhibit 42. And the acceptance rates that are in table 2.1.
A. Do you have a page number?
Q. Yeah, it's on page 5, sorry.
Now, this rate is significantly different than prior projections that you've looked at over the course of this deposition in the last two days?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: Significantly different to some, identical to others.
BY MR. TOMPKINS:
Q. Well, the previous rates that were in various documents showed steady state operation upwards of 3,000 metric tons a year?
MR. SHULTIS: Objection, vague.
BY MR. TOMPKINS:
Q. Is that correct?
A. I believe most previous documents, all previous documents, I guess, showed a steady state of 3,000.
Q. And this rate is?
A. I don't know that this table indicates what the steady state was, I don't know if it carries through to steady state.

560

Q. Over the course of this roughly 10-year period however, it only ramps up to 900 metric tons?
A. That's correct.
Q. Are you aware of the basis for this rate?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No.
BY MR. TOMPKINS:
Q. Are you aware of whether or not the only reason for the ramp-up at this rate is the capacity restrictions on the MRS in the 1987 amendments to the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm aware that the capacity limitations on the MRS were certainly a factor.
BY MR. TOMPKINS:
Q. Is there any other reason why the MRS would have to operate at a rate as low as 900 metric tons?
MR. SHULTIS: Objection, calls for speculation. Asked and answered.
THE WITNESS: No, I don't know of any other reason.
BY MR. TOMPKINS:
Q. I'd like to go back to Milner Exhibit 34,

561

which is the December 1990 preliminary estimates for the total system costs of the restructured program. In particular, I'd like to talk to you about page 10. I'm correct that you previously testified that you would have been involved in development of this report, at least in a supervisory level?
MR. SHULTIS: I'm sorry, could you --
THE REPORTER: "Question: I'd like to go back to Milner Exhibit 34, which is the December 1990 preliminary estimates for the total system costs of the restructured program. In particular, I'd like to talk to you about page 10. I'm correct that you previously testified that you would have been involved in development of this report, at least in a supervisory level?"
THE WITNESS: I believe that's true.
BY MR. TOMPKINS:
Q. The last sentence of the second to last paragraph here states, "This analysis continues to assume, however, that the capacity limits on the MRS facility of 10,000 metric tons prior to the start of operations at the repository and 15,000 metric tons hereafter" or actually "thereafter," I'm sorry -- "as imposed by the amendments act remain in effect."
These are the same limits that we had

562

previously been talking about in the amendments act?
A. Yes.
Q. Okay. In the next paragraph, it stays that due to the fact that the spent fuel acceptance at the MRS facility begins 12 years earlier than the repository, the MRS facility is forced to operate below its design acceptance rate until the repository has ramped up to its full design acceptance rate in order to remain within the capacity limits imposed by the amendment act.
Does this indicate that the MRS facility was actually designed to have a higher capacity than it could accept based on the amendments act?
A. In my opinion, that's what it indicates.
Q. So in reality the amendments are the sole reason for having a lower rate during this 12-year period accepted at an MRS?
MR. SHULTIS: Objection, mischaracterizes -- assumes facts not in evidence and I think mischaracterizes prior testimony.
THE WITNESS: I can't think of other reasons offhand.
MR. TOMPKINS: We've been going a little bit more than an hour. Why don't we take a 10-minute break or so.

(Recess.)
BY MR. TOMPKINS:
Q. Mr. Milner, welcome back from the break. Just one final question on this total system cost document, I'd like to look at appendix A, table A-1.
MR. SHULTIS: This is number 34.
MR. TOMPKINS: Yes, Milner Exhibit 34.
BY MR. TOMPKINS:
Q. I noticed that the acceptance schedule here continues beyond 2010 and then ramps up to approximately 3,000 by -- 3,000 MTU by 2015?
A. Correct.
Q. Am I correct in assuming that the Department of Energy was not intending to accept waste until only 2010 and then reconfigure their program somehow and not accept waste after that?
A. I'm not sure I understand that question.
Q. Well, even under these rates which are projected in this document and which show up in some of the annual capacity reports in the mid '90s, the Department wasn't intending to start acceptance in 1998 and accept only for 10 years, was it?
A. In total?
Q. Yes, in total?
A. No.



Q. In fact, under its plans in the early '90s, it planned on continuing to accept waste subsequent to 2010 and beyond and at that time have a repository in place to accept waste?
A. Correct.
Q. And in fact once the repository was operating in addition to the MRS, the rates would increase even further beyond the 900 rate which was in place during the 1998 to 2009 period but ramp up to 3,000 MTU a year?
A. That's correct.
Q. Okay, thank you. Mr. Milner, I know you moved from transportation into the budget related offices back and forth a little bit during the '90s, but are you aware of whether or not utilities have submitted DCS forms during the '90s and those have been approved?
A. I'm aware that they did and some were approved, yes.
Q. Some were approved. All those DCS submissions were approved under the assumption that we were operating under a schedule where waste acceptance would start in 1998, is that correct?
MR. SHULTIS: Objection, calls for speculation and probably a legal conclusion.



THE WITNESS: I believe that they assumed an MRS would begin operation in '98.
BY MR. TOMPKINS:
Q. Now, it's not. OCWRM and the Department isn't anticipating any acceptance will begin until at least 2010, is that correct?
A. That's correct.
Q. And at that time it's going to be in a repository and there's no MRS that's part of a system?
A. At the current time, that's correct.
Q. At the current time. Do you know what's going to happen to the DCS forms that have already been approved?
MR. SHULTIS: Objection, calls for a legal conclusion. Speculation.
THE WITNESS: I don't understand what you mean by what will happen to.
BY MR. TOMPKINS:
Q. Well, if a utility submitted its first DCS form in 1992 it would have submitted it on the basis of an allocation that they were expecting in 1998; isn't that correct?
A. That's correct.
MR. SHULTIS: Objection, calls for



speculation.
BY MR. TOMPKINS:
Q. And that would have been at this 900 rate that was anticipated for the MRS constrained operations?
MR. SHULTIS: Same objection.
THE WITNESS: I believe in the first year the rate was 400.
BY MR. TOMPKINS:
Q. 400. So any utilities allocations will necessarily have changed for the year 2010, when the repository operations commence. Or many of them will have. I should rephrase, let me not say all, because first of all the rate will be higher at the repository and the acceptance schedules have changed?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I don't understand the question.
BY MR. TOMPKINS:
Q. I don't think I understand it myself so I'll rephrase it a little bit.
If a utility such as Commonwealth Edison had an allocation under 400 metric ton rate for 1998, under the planning for the MRS operation in 1998,

would that allocation be different for operations that begin in 2010 but at a 1,200 rate?
MR. SHULTIS: Objection, calls for a legal conclusion. Speculation.
THE WITNESS: I'm still not following the question. If you're asking if a utility had an allocation in year one of operation, and that allocation was based on year one being 1998, and the year 2010 being year 12, currently 2010 would be year one and it would be the allocation that would have existed for 1998.
BY MR. TOMPKINS:
Q. I'm actually more interested in the fact that the rate would have changed in between those two periods and that there would have been a 400 rate under the planning that was anticipated for 1998 and that the rate would be somewhere around 1,200 for the year 2010. So the fact that the rate was higher would mean all the utilities' allocations would change?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
THE WITNESS: If I'm understanding the question correctly, the allocation in 2010 which currently is year one of operation would be different



than the allocation for 2010 that would have existed for a 1989 year one start of operation.
BY MR. TOMPKINS:
Q. And that's because the program would be accepting more waste in year one under one plan than versus the other?
MR. SHULTIS: Same objections.
THE WITNESS: I don't --
BY MR. TOMPKINS:
Q. It's been a long couple days, I think.
A. I believe year one in 1990, that year one was 400 MTUs, and currently year one is 400 MTUs.
Q. You mean under planning for 2010 year one's still going to be 400 MTUs?
A. Yes.
Q. It is. I stand corrected. But over the course of later years the current projections call for a ramp-up to 3,000 metric tons versus just 900 over the first five years of the program?
A. Yes.
MR. SHULTIS: Objection.
THE WITNESS: This schedules call for a ramp-up to a steady state of 3,000 MTUs.
BY MR. TOMPKINS:
Q. So in the later years, under prior



planning which was occurring in 1992 when the rate was 900, the rate would be 3,000 in actuality under current OCWRM plans for acceptance?
MR. SHULTIS: Objection, vague.
THE WITNESS: And not understandable. I'm sorry.
BY MR. TOMPKINS:
Q. Well, you testified that under current planning by 2014, which would be the fourth year of the repository, the rate will ramp up to 3,000 metric tons.
A. Yes, that's what's indicated here.
Q. Okay?
MR. SHULTIS: I'm sorry, were you asking about current planning?
MR. TOMPKINS: Yes.
THE WITNESS: Oh.
MR. SHULTIS: Okay. Do you want to answer again? Do you want to ask that question again, Chris? Because when Mr. Milner was responding he was looking at the 1990 TSLCC.
MR. TOMPKINS: Okay. I actually, just to make this easier.
THE WITNESS: I was -- you were asking me in the previous question a question on this document.



MR. TOMPKINS: No, no, I'm sorry. Well, that explains all the confusion because it really has been a long week. I'd like to mark this as Milner Exhibit 73.
(Milner Exhibit No. 73 was marked for identification.)
BY MR. TOMPKINS:
Q. This is the total system life cycle cost report which was issued in May of 2001, is that correct?
A. Correct.
Q. Would you have been involved in preparing this report or overseeing its preparation?
A. I would have -- no, I would have concurred in it before it was finally released.
Q. This is the most recent Total System Life Cycle Cost. I understand there was a letter update in 2002, but for the actual Fuller report this is the last one that's been issued by the Department?
A. I believe that's true.
Q. I'd like to refer your attention to page 4-14. Table 4-1 represents some acceptance rates. Are these the acceptance rates that the Department is currently forecasting for waste acceptance beginning in 2010?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I believe these are the Department's current goals for waste acceptance.
BY MR. TOMPKINS:
Q. Under this plan, the Department will be accepting 3,000 metric tons of waste per year beginning in 2014, am I reading the chart correctly?
A. That's certainly what's indicated, yes.
Q. And that would be the fourth year of operation of the program?
A. Yes. That would be the fourth year of the operation of the repository, not the program, yeah. Actually it is the fifth year.
Q. Fifth year, okay.
A. Engineers can't do math.
Q. Lawyers can't either. If you look back at the prior exhibit, Milner Exhibit 34, we were just discussing, this is the acceptance schedule that was being anticipated when the Department thought that they were going to have an MRS in place by 1998?
MR. SHULTIS: Objection to characterization. Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I believe that's the case.
BY MR. TOMPKINS:



Q. Okay. In this schedule, the fifth year of operation which would be 2003, it projects 900 metric tons would be accepted in that year?
A. That's correct.
Q. That's correct, okay. And utilities in the early '90s, when they submitted DCS forms, submitted forms based on this schedule, or one roughly like it?
A. I believe that's correct.
Q. Okay. And so they would have submitted DCS forms for the fifth year assuming a 900 metric ton rate?
A. That's correct.
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: So now in actuality, if current projections hold, instead of -- instead of receiving only 900 metric tons the Department will be receiving 3,000 metric tons.
MR. SHULTIS: Objection. I'm sorry; go ahead.
THE WITNESS: State that again. Or ask that again.
BY MR. TOMPKINS:
Q. Sure, under prior planning with the MRS



facility that started in 1998, a utility would have submitted a DCS form assuming a 900 ton metric rate?
A. For the fifth year of operation.
Q. For the fifth year of operations, right?
A. Correct.
Q. Now, in reality, there's actually going to be, in the fifth year of actual operations as currently projected, beginning in 2010 there's going to be 3,000 metric tons that are accepted.
MR. SHULTIS: Objection, mischaracter -- assumes facts not in evidence and Chris, I'm having a hard time with your question insofar as you're asking about in reality and about projections. They're two different things. Can you help me out there?
BY MR. TOMPKINS:
Q. Sure. Current projections for forecasts and what utilities are planning, or rather, the Department is currently planning on receiving in the year 2010 is 3,000 metric tons for the fifth year of operation of the repository. This 3,000 metric tons is higher in the fifth year of operations than under prior plans?
A. Correct.
Q. So because of this difference, when the



Department goes and prepares an APR, all the allocations for the fifth year will be different than they were originally in the '90s?
A. Yes, okay.
Q. Okay. So a utility that submitted a DCS for an allocation based on the rates in the early '90s may have a different allocation under current forecasts?
MR. SHULTIS: Calls for speculation.
THE WITNESS: I would assume, yes.
BY MR. TOMPKINS:
Q. Okay. Do you know what the Department is, or the program OCWRM is currently planning on doing about the fact that the allocations may be different with the DCS forms? Are they going to go back and have utilities prepare a new DCS form based on these rates?
A. Actually we've not addressed that yet.
MR. SHULTIS: Objection.
BY MR. TOMPKINS:
Q. Haven't addressed it. Would it be reasonable to assume that utilities will have that option?
MR. SHULTIS: Objection, calls for speculation. Mr. Milner's not a 30(b)(6) witness.

THE WITNESS: The Department simply has not addressed that yet. We decided we should probably focus our efforts on getting a site first and then work out the details.

BY MR. TOMPKINS:

Q. I'd like to turn your attention back to Milner Exhibit 43 which are the DCS instructions.

Under the general instructions which start on page one and go on page two, item 7C, we had discussed this yesterday but I just want to now apply this to the situation we've just been talking about. It states that in the event that such circumstances change, all DCS's previously approved by DOE may need to be reevaluated by DOE and the purchaser.

Would this type of change of allocation be the type of event that may implicate this instruction?

MR. SHULTIS: Objection, calls for a legal conclusion and also speculation.

THE WITNESS: In my opinion it would.

BY MR. TOMPKINS:

Q. One final question on this DCS form and I believe you testified about this earlier too. Instruction 7B states that once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against the allocation. Is



that saying that a utility does not have to deliver the fuel that its allocation was based on?

MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.

THE WITNESS: In my opinion that's stating that it does not have to deliver the fuel that gave it its place in the queue.

BY MR. TOMPKINS:

Q. Now once it allocates fuel on a DCS form or a range of fuel, as the case may be, what's your understanding of which fuel it has to actually deliver after the DCS form has been approved?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Yeah. I don't think it specifies what fuel, as long as it's over five years old.

BY MR. TOMPKINS:

Q. Okay. Thank you. So a utility could deliver any fuel over five years when it came to actually accepting that fuel, even if it designated different fuel on the DCS?

A. That's my understanding.

Q. That's your understanding. If that's the case, I think I only have one last exhibit to go over with you, Mr. Milner.



I'd like to mark this document as Milner Exhibit 74.

(Milner Exhibit No. 74 was marked for identification.)

BY MR. TOMPKINS:

Q. This is a letter by Robert Bauer, is this the same Robert Bauer we've been discussing earlier?

A. Yes.

Q. Were you involved in the preparation of this letter or had you seen it before?

A. I don't recall.

Q. The last sentence of the second paragraph states that, "Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel." Is Mr. Bauer saying in this letter that once a failed fuel, once a failed fuel assembly is placed in an approved container, it will be treated just like standard fuel?

MR. SHULTIS: Objection, calls for a legal conclusion, also asks for speculation.

THE WITNESS: Let me read the context here.

MR. TOMPKINS: Sure.

THE WITNESS: It appears that it does, however I seem to recall a provision in the contract



that failed fuel was considered nonstandard fuel which may have a different scheduling.

BY MR. TOMPKINS:

Q. Do you have any knowledge of whether this statement is consistent with current OCWRM planning?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I don't recall any current discussions about failed fuel treatment.

MR. TOMPKINS: I think that's all I have, subject to the right to continue the deposition with Mr. Milner pending resolution of discovery issues.

MR. SHULTIS: Sure. We continue to object to those. I think we're done then for the day.

(Whereupon, at 4:00 p.m., the taking of the instant deposition ceased.)

______________________________

Signature of the Witness

SUBSCRIBED AND SWORN to before me this _______ day of _______________, 20_____.

______________________________

Notary Public

My Commission Expires:________________

579

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER ) Volume IV
COMPANY ) Washington, D.C.
(98-154C)(Merow, S.J.) ) Tuesday
MAINE YANKEE ATOMIC POWER COMPANY) May 7, 2002
(98-474C)(Merow, S.J.), et al., )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.



APPEARANCES:

On behalf of Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

On behalf of Plaintiffs Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company:

PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821



APPEARANCES CONTINUED:

On behalf of Plaintiff Sacramento Municipal Utility District:

TIMOTHY R. MacDONALD, ESQ.
(Appearing in the AM session only.)
ARNOLD & PORTER
370 17th Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334

On behalf of Plaintiff Southern Nuclear Operating Company, et al.:

RONALD A. SCHECHTER, ESQ.
ARNOLD & PORTER
555 12th Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000



APPEARANCES CONTINUED:

On behalf of Plaintiff Wisconsin Electric Power Company:

SUZETTE W. DERREVERE, ESQ.
(Appearing in the AM session only.)
JENNIFER MacLEAN, ESQ.
(Appearing in the PM session only.)
PERKINS COIE LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1690

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

CONTENTS

WITNESS EXAMINATION PAGE NO.
RONALD A. MILNER
By Mr. Tomaszczuk 586
By Mr. Schecter 689
Afternoon Session 654

EXHIBITS

MILNER EXHIBIT NO. PAGE NO.
75 Memorandum, Nos. DB0000124-125 587
76 Letter, and attachments, Nos. 0379-399 590
77 Letter, and attachments, Nos. 0292317 602
78 Federal Register, pages 21793-21798 604
79 Other Wastes/Nuclear Materials: A. General Overview, Nos. YMP-012-1493-494 610
80 Memorandum, and attachments, Nos. HQR-057-1493-569 616
81 Analysis of the Total System Life Cycle Cost of the



EXHIBITS CONTINUED

MILNER EXHIBIT NO. PAGE NO.
Civilian Radioactive Waste Management Program, Nos. HQR-025-5075-139 628
82 Nuclear Waste Fund Fee Adequacy, Nos. PA-176267-282 634
83 1996 Acceptance Priority Ranking and Annual Capacity Report, September 1997, Nos. CTR-027-0001-085 638
84 Program Plan, Revision 2, July 1998, Nos. YMP-001-0885-945 641
85 Civilian Radioactive Waste Management System Total System Description, Revision 01, October 1998, Nos. PA-206300-335 646
86 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, December 1998, Nos. HQR-036-0006-086 651
87 Nuclear Waste Fund Fee Adequacy: An Assessment, December 1998, Nos. PA-195781-821 654



EXHIBITS CONTINUED

MILNER EXHIBIT NO. PAGE NO.
88 Program Plan, Revision 3, February 2000, Nos. HQR-043-3798-882 658
89 Nuclear Waste Fund Fee Adequacy: An Assessment, May 2001 666
90 Nuclear Waste, Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project 670
91 Total System Life Cycle Cost for Site Recommendation Letter Report, February 2002 674
92 Letter, 2-14-02
93 Statement of Lake H. Barrett, 3-14-02 678
94 Certification of Ronald Milner, 4-18-02, and attachment 681
95 Independent Cost Estimate (ICE) Review, January 2001 683



PROCEEDINGS

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWEI COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY FOR THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT, AND PSEG NUCLEAR L.L.C.

BY MR. TOMASZCZUK:

Q. Mr. Milner, good morning.
A. Good morning.
Q. Nice to see you begin. Thanks for coming back.
A. You too.
Q. I have some additional questions to ask you. I would expect to get through those this morning. I have some additional documents I want to ask you about.
Same ground rules as applied to the other day's questioning. If you have any questions or

don't understand my question, let me know.
A. Okay.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner 75 a memorandum for director, RW 1, from Samuel Russo, subject, approve for publication the attached 1994 APR and ACR.
(Milner Exhibit No. 75 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, do you recall this document?
A. Not specifically, I don't, no.
Q. Do you see your -- what appear to be your initials and your name in the column on the second page?
A. Right, concurrence chain.
Q. Right, concurrence chain. Thank you.
This appears to be a memorandum which sought approval from the director for publication of the APR/ACR; is that right?
A. Yes, m-hm.
Q. And I believe that it had attached to it some version of the APR/ACR, which was ultimately published in March of 1995?



A. Apparently so, yeah.
Q. And I believe that was Milner Exhibit 51. You can get that in front of you if you'd like.
And let me just say for the record, we're in a different locale this morning, but I believe all of the exhibits that have been previously marked are here and are present and available if you may need to refer to them in any of your testimony today.
My question to you is, there appears to be the notation handwritten next to your name, with comment.
Do you see that?
A. I do, yeah.
Q. Is that your handwriting, sir?
A. Actually very difficult to tell. I would assume so, but it doesn't look exactly like mine.
(Mr. MacDonald entered the room.)
BY MR. TOMASZCZUK:
Q. Do you know what comment you made on a draft of the APR/ACR that was appended to this document?
A. I have no idea.
Q. You agree that this notation appears to reflect that you had some comment on the draft?
A. I think it does, yes.



Q. But no present recollection as to what you had to say?
A. I don't recall. It could have been very minor. I don't know.
Q. Would there be some written record of what your comment was?
A. Typically the way the process works is, when the document is circulated and there's a comment, it's unlikely that that comment had been retained in the handwritten form, but I don't know for sure.
Q. Did Mr. Zabransky work for you at this point in time?
A. He did not, no.
Q. Do you recall, Mr. Milner, what your position was at or about the time you would have commented on this draft APR/ACR?
A. Judging by the code indication there, I -- it's likely I would have been director of the office of program management integration.
Q. And that's suggested to you by the designation, RW 30?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 76 a series of DCS forms and



related correspondence between the department of energy and Northern States Power Company.
BY MR. TOMASZCZUK:
Q. And I can represent that these documents were appended to one of the government's motions for summary judgment in this case, and I've put them together as one document just for purposes of facilitating your review. I have some questions for you about this packet.
(Milner Exhibit No. 76 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall seeing any of these documents before today?
A. I've certainly seen the DCSs before, and I don't recall these specific ones.
Q. You've certainly seen the generic DCS form but don't recall seeing the specific Northern States DCS forms?
A. Correct.
Q. Would you have seen these at or about the time they were submitted by Northern States Power Company?
A. Likely I would not have, no.

know the person.
Q. Is it fair to say, Mr. Milner, that confusion exists today even with DOE as to what constitutes GTCC and how to deal with it?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't know -- well, I specifically don't know, but my belief is that GTCC is defined by NRC regulations depending on radioactivity level. The department may not have fully characterized all of its waste to determine what is and what isn't GTCC within the definitions provided by the NRC.
BY MR. TOMASZCZUK:
Q. And that circumstance causes confusion about what to do with GTCC and where to put it.
Is that fair?
MR. SHULTIS: Same objections.
A. No, I don't know that that creates confusion as to where to put it.
BY MR. TOMASZCZUK:
Q. It's clear in your mind?
A. As to where to put it?
No, it's not. That has not been decided to the best of my knowledge.
MR. TOMASZCZUK: Do you want to take five?



Take a short break?
THE WITNESS: Doesn't matter to me.
MR. TOMASZCZUK: Let's take a short break. Sure. We've been going about an hour. Take ten minutes.
(Recess.)
MR. TOMASZCZUK: Back on the record.
Ms. Reporter, could we mark as Milner Exhibit 80 a memorandum from Mr. Milner, subject, total system life cycle cost, 1995 assumptions package, with an attachment.
(Milner Exhibit No. 80 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, let me represent to you that this is similar to Exhibit -- I believe Exhibit 49, which I previously asked you about. Exhibit 49, I believe, was a draft of this document, which appears to be a final assumptions package. And you're welcome to get both of them in front of you if you'd like to.
Mr. Milner, have you seen this Exhibit Milner 80 prior to today?
A. I don't recall seeing it, no.



Q. That's your name that appears on the cover. Right?
A. That's my typed name on the cover, yes.
Q. Do you know whether you approved the issuance of this memorandum and the accompanying TSLCC '95 assumptions package?
A. I don't recall whether or not I did. And in simply looking at the concurrence chain, there's no indication that I initialed off on that. I don't recall.
Q. Do you have some reason to believe that you did not approve this -- the issuance of this memo and the attached assumptions?
A. I don't recall either approving or disapproving the issuance.
Q. The issuance of TSLCC reports was now within your area of responsibility as director of the office of program management and integration. Right?
A. It would have been.
Q. Right. Did Mr. Riling whose name is referenced on the second page of this document work for you?
A. He did.
Q. And this would appear to indicate that this memo was initially prepared by him in February



of '95?
A. It would appear so, m-hm.
Q. February 16, 1995, to be specific. Right?
A. It would appear so, yes.
Q. Could I direct your attention to the tables which appear at pages 14 and 15 of the attachment, and what is your understanding, Mr. Milner, of what these tables on these pages represent?
A. It appears that the tables show a delivery rate for a first repository, a second repository, and a single repository system.
Q. And the first table at 6.1 shows the spent nuclear fuel acceptance rates for a first repository and a two repository system?
A. I believe that's the case, yes.
Q. And it shows the repository beginning to accept spent nuclear fuel in 2010, and then ramping up to 3,000 MTU in the sixth year of operations -- fifth year of operations?
A. It does.
Q. And then maintaining that 3,000 MTU rate for a period of slightly less than 20 years, it looks like?
A. Through the year 2032, apparently, yes.

Q. Starting at a 3,000 rate in 2014 and then
staying at that rate until 2032?
A. Yes, that's what's shown here.
Q. And then the second table, 6.2, is for a
second repository and a two repository system.
Right?
A. Correct.
Q. And then the third table, which is
introduced at the bottom of page 14 and then actually
appears on page 15, is a single repository and a
single repository system?
A. Correct.
Q. And this shows a rampup rate starting at
300 metric tons in 2010. Correct?
A. Yes.
Q. And then going to 3,000 metric tons in
2014, the projected fifth year of operations?
A. Correct.
Q. And then staying at that steady state,
3,000 metric-ton figure, for 24 years, approximately.
Right?
A. 2039, yes.
Q. Now, these tables were prepared assuming
no MRS system; is that right?
A. I believe that's the case.



Q. Can I direct your attention to page 3,
section 5, and in particular, section 5.2.
A. Okay. That would indicate no MRS was
assumed.
Q. Right. You're referring to the
parenthetical, no MRS system, which appears at 5.2?
A. Correct.
Q. Now, going back to the cover memo, this
memo says that, attached is the final TSLCC
assumptions package. Right?
A. It does.
Q. And it indicates that the major
assumptions were reviewed with you, I presume the
recipients of the package, in December of 1994.
Correct?
A. It does.
Q. And am I correct in understanding that
that would appear to be a reference to Milner Exhibit
49, which I had previously asked you about?
A. It would appear so.
Q. So the draft TSLCC assumptions were
circulated by you in or about December of 1994.
Correct?
A. Correct.
Q. And then you got comments back?



A. Presumably, m-hm.
Q. Well, this says that, and their comments
have been incorporated as appropriate. Right?
You see that on the cover memo?
A. M-hm.
Q. So you received comments back and then
circulated a final TSLCC assumptions package?
A. I don't know I can infer that from this
since there's no indication of a date or an approval
on it.
Q. Well, there is indication of a date on the
second page, February 16, '95. Right?
A. When Mr. Riling would have prepared it,
yes. Whether or not I actually sent this memo, I
just don't recall.
Q. Well, this is the only version that I
have.
And you have no reason to believe you
didn't send it, do you?
A. I can recall no reason why I did not.
Q. And it's fair to assume, is it not, given
that this had gone through some drafts, that at least
as of February 1995, OCRWM was not expecting to site
an MRS system?
MR. SHULTIS: Objection. Mr. Milner is



not a 30(b)(6) witness, calls for speculation, the
document speaks for itself.
A. Certainly this package did not assume an
MRS in the system.
BY MR. TOMASZCZUK:
Q. And do you know why the package did not
assume an MRS system?
A. No, I don't.
MR. SHULTIS: Same objection.
BY MR. TOMASZCZUK:
Q. Was it because as of this point in time,
OCRWM had essentially concluded an MRS was not going
to be sited?
MR. SHULTIS: Same objection, asked and
answered.
A. I don't know that OCRWM had concluded one
was not going to be sited. I think at that point in
time, OCRWM concluded we didn't have any authority to
site one without being tied to a repository schedule.
BY MR. TOMASZCZUK:
Q. The rates that I asked about at --
reflected in the tables at 14 and 15, those are
consistent with rates we've seen in other
OCRWM-published documents, such as previous TSLCC
reports and fee adequacy reports. Right?

A. They look roughly the same.
Q. And in particular the rampup to 3,000 and then maintaining a 3,000 MTU steady state acceptance rate, certainly that figure has been used in previous documents?
A. Certainly the 3,000 has been used. Yes, it's a steady state.
Q. Fairly consistently.
Isn't that true?
A. Yes.
Q. Can I ask you to look at Exhibit 51, Mr. Milner. This is the March 1995 APR/ACR.
A. Yes.
Q. Now, this document appears to have been issued roughly one month after the TSLCC assumptions package was circulated. Right?
A. It was issued a few months after the draft was circulated. I don't know when the final was actually circulated.
Q. But at least the draft reflected in Milner Exhibit 80 appears to have been circulated or at least prepared in February of '95. Right?
A. All's I can infer from here is that it was prepared in February of '95.
Q. And it reflects a revised draft from one



which had been previously circulated in December of '94. Correct?
A. Yes.
Q. And the attachment to Exhibit 80, as you've testified, was based on the assumption of no MRS system and either a single or dual geologic repository. Right?
A. I'm sorry. Can you repeat that question?
MR. TOMASZCZUK: Could you read it back.
(The reporter read the last question.)
A. Yeah. The previous one was no MRS.
BY MR. TOMASZCZUK:
Q. So is it fair looking now with the benefit of this Exhibit 80 to conclude that the acceptance rates reflected on Milner 51 dated March of 1995 are based on a no MRS system?
A. I guess you could assume that.
Q. And what is being done in Milner 51 is taking the statutory restrictions on an MRS and applying those restrictions to a geologic repository, which is all that OCRWM was really considering at the time?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and Mr. Milner is



not a 30(b)(6) witness. He's testified that he did not put the document -- Exhibit 51 together, so it calls for speculation.
A. The acceptance rates are similar.
BY MR. TOMASZCZUK:
Q. They are?
A. Similar.
Q. In what respect?
A. Let's see, one has delivery rate in the single repository system in the first year of operation of 300. The other has 400. The second year 600. The other one has 600.
Q. The rampup rates are remarkably different, aren't they?
A. They are different.
MR. TOMASZCZUK: Could you read my question two questions ago, because I don't think I got a responsive answer.
(The reporter read the record as follows:
"Question: And what is being done in Milner 51 is taking the statutory restrictions on an MRS and applying those restrictions to a geologic repository, which is all that OCRWM



was really considering at the time?")
MR. SHULTIS: Same objections.
A. In reading further on Exhibit 51, apparently at that point in time, there was some pending Congressional action on the conditions for siting, constructing, operating an MRS or interim storage facility -- use those terms interchangeably -- so I can only infer from that that under the potential of some Congressional action for siting a facility, those same rates were used.
BY MR. TOMASZCZUK:
Q. Mr. Milner, you testified I believe on several occasions that one of your concerns was to try and maintain some uniformity as I understood your testimony with respect to the various spent nuclear fuel acceptance rates embodied in OCRWM documents. Right?
A. Well, certainly one of my concerns was to try to ensure that the program was using the same set of assumptions, the program was consistently using the same numbers, if you will.
Q. And is it not true that the spent nuclear fuel steady state rates in these two documents prepared at roughly the same periods of time --

during the same periods of time are quite inconsistent. Right?
A. Steady state rates?
MR. SHULTIS: Objection.
BY MR. TOMASZCZUK:
Q. Do you understand what I mean by that term?
A. I know what you mean by, steady state rate, yeah.
Q. And is it not true that the -- that those steady state rates in these two documents prepared roughly within one month of each other are quite different?
A. Well, Exhibit 51 goes through ten years of operation. I can't tell whether that was the steady state rate at that point or not.
Q. Do I understand table one in the 1995 APR/ACR to show a rampup in year three to 900 metric tons and then to remain constant through the next seven years?
A. That's what's indicated in table one, yes.
Q. And the tables which appear on Milner 80 show in each instance rampups to 3,000 metric tons and then staying at that rate for at least 15 if not more years?



A. Correct.
Q. And aren't those quite dissimilar rampup rates or steady state rates?
A. 900 and 3,000 are certainly different numbers. I can't infer from ten years of operation whether that was intended to show a steady state of operation. I do not believe it was.
Q. So if this chart had been projected onward at Milner 51, higher numbers would have appeared for years 11 and beyond?
MR. SHULTIS: Calls for speculation.
A. In my opinion, higher numbers would have shown up in later years. Whether it's year 11, I don't recall.
BY MR. TOMASZCZUK:
Q. And why is that your view, sir?
MR. SHULTIS: Objection, calls for speculation.
A. Well, my recollection is that in most scenarios, steady state operation was going to be 3,000.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 81 the 19- -- September 1995 TSLCC analysis.
(Milner Exhibit No. 81



was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, you're welcome to take as much time as you want to review it. Just let me know when you're ready.
A. Okay.
Q. Would your office have been responsible for the preparation and issuance of this report in or about September of 1995?
A. I believe it would have.
Q. As of that moment, you were still the director of program management and integration?
A. I believe that was the case.
Q. And that office was responsible for issuance of the TSLCC reports as I understood your testimony?
A. Yes.
Q. And this appears to be now the final TSLCC report; is that right?
A. It looks to be, yes.
Q. For 1995.
Could I direct your attention, Mr. Milner, to page 7 at the bottom of the page?
A. M-hm.



Q. And do you want to just read to yourself the last paragraph there at the bottom of page 7.
A. Okay.
Q. Why was the decision made in this report not to include MRS or interim storage facility costs in the TSLCC analysis as reflected in this paragraph?
A. In my recollection, there was nothing definitive for an MRS at that point in time, so we simply didn't include it.
Q. And nor were any interim storage facility costs included. Right?
A. Correct.
Q. For the same reason?
A. Yes.
Q. That nothing was definitive at that point in time?
A. Right.
Q. Could I direct your attention, Mr. Milner, on the next page.
And this table appears to depict spent nuclear fuel acceptance rates, as I understand it?
A. It does.
Q. And indeed it depicts the rates which underlie this TSLCC report. Correct?
A. Yes.

Q. And the repository as reflected in this table is expected to start operation in 2010 and to take 3,000 metric tons of spent nuclear fuel in that year?
A. In the year 2010, I think it's expected to take 300.
Q. Did I say 3,000?
A. Yes.
Q. I misspoke. I meant 300. Thank you.
And 600 metric tons in 2011?
A. Yes.
Q. 1200 in 2012?
A. Correct.
Q. 2,000 in 2013?
A. Correct.
Q. And then 3,000 in 2014, the fifth year of operations. Right?
A. Right.
Q. And that 3,000 metric-ton rate is to be maintained for 22 years, approximately?
A. Through the year 2039.
Q. From 2015 through 2039?
A. Correct.
Q. Do you know why these rates are reflected on this table in this document?



A. They were the receipt rates that were assumed for purposes of costing at that point in time, costing out the system.
Q. And those rates are consistent with those we've seen in previous TSLCC and fee adequacy reports. Right?
A. I believe they were.
Q. And these rates accurately reflect, do they not, DOE's system design plans?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. Well, they certainly reflect the assumptions that underlie this TSLCC, which I would assume were the department's goals at the time.
BY MR. TOMASZCZUK:
Q. And these rates are fairly consistent, are they not, with DOE's current design for a geologic repository at Yucca Mountain?
A. I believe they are.
Q. This table starts in year 2010 and goes to year 2040 as I understand it. Right?
A. Correct.
Q. So it depicts 30 years of operation of a geologic repository?
A. Apparently so, yes.



Q. And do you know why that period is reflected in this table, that is, the 30-year period?
A. My recollection is that at that point in time -- I'd have to check the math to see -- that that was probably the time at which we would have accepted 20,000 metric tons -- I'm sorry -- 70,000 metric tons into the repository.
Q. It was never DOE's intention to operate a repository for only ten years, was it?
MR. SHULTIS: Objection.
A. For only ten years?
BY MR. TOMASZCZUK:
Q. Yes.
MR. SHULTIS: Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I'm sorry. You said no?
A. No, no.
Q. It has been DOE's intentions to operate a repository from anywhere between 30 and 100 years; is that right?
MR. SHULTIS: Objection, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess if you mean by the term operating in the process of accepting waste, approximately 30



years. If you mean by operating the repository until it was actually finally closed, that's certainly a longer period of time.
BY MR. TOMASZCZUK:
Q. Thank you for that refinement of a not very artful question.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 82 the fee adequacy assessment dated October 1996.
(Milner Exhibit No. 82 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this fee adequacy assessment dated October 1996?
A. I don't specifically, no.
Q. Did you or your office have any role to play in its preparation?
A. I believe I did not.
Q. It's a good thing we have these organizational charts. Right?
A. Yes.
Q. And why do you say that, Mr. Milner?
A. Because from Exhibit 1, in September of 1996, I had changed positions, the office of waste

Q. The next milestone that's identified here is, submit license application amendment to receive and possess waste FY 2008?
A. Correct.
Q. And do you expect that to be accomplished in FY 2008?
A. No, I don't.
Q. And has that milestone slipped?
A. It has.
Q. To what -- by what date do you expect that milestone to be accomplished?
A. I guess best of my recollection we're looking at late 2009.
Q. And the final milestone that's identified here in this section is, commence waste acceptance and emplacement. It has the parenthetical after that heading, FY 2010.
Do you expect that to be accomplished in fiscal year 2010?
A. I do.
Q. And that's your expectation even though every other milestone that we've just identified has slipped by at least a year or more?
A. That's correct.
Q. And how is it that that milestone will be



met even though these other milestones are already behind schedule in your view?
A. I think in recent years our planning in terms of how to construct the repository, how to initiate operation of the repository have been further developed, further refined. I think older schedules assumed a somewhat lengthy in essence training phase before you actually began receiving waste. Once the repository was constructed but before you actually began receiving waste, it would be in essence a lengthy training period for operators.
I think we determined that that can be done in a shorter period of time. There were quite a number of the various construction activities which had originally been planned to be accomplished sequentially. I believe now we can accomplish a number of those in parallel, reducing construction time. We're continually at this point in time looking at ways where we could further shorten the period.
Q. This program plan that we were just looking at basically envisions a five-year period for construction through the commencement of spent nuclear fuel in the repository?



A. I think it envisions a three-year construction period.
Q. It says -- if you look at page 12, start repository construction in 2005.
A. I'm sorry. I'm sorry. I'm thinking current schedule versus -- yes, five years.
Q. Are there plans to amend this program plan, revision three, dated February 2000?
A. Yes.
Q. Is a draft revision in the works?
A. Draft has not yet been prepared, but that will begin shortly.
Q. And would I be correct in understanding that that draft will indicate a shorter time frame for repository construction?
A. That would be my thought at the time, yes, at this time.
Q. And it will shorten the time for repository construction by about half.
Did I understand that?
A. From five years, to, yeah, two and a half, three years.
Q. Have any studies been prepared assessing the feasibility of shortening the construction time from five years to two and a half years?



A. I don't know that there's any published documents that -- a study per se. I don't know that there's any published documents. Certainly that's been looked at and continues to be looked at as part of the design process.
Q. Has the DOE selected a contractor for -- to construct the repository at Yucca Mountain?
A. No.
Q. Do you know whether that contract would be awarded through competition or otherwise?
A. Well, the final contracting strategy hasn't been decided upon yet.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 89 the May 2001 fee adequacy assessment.
(Milner Exhibit No. 89 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, could you also look at what I understand has been marked as Milner Exhibit 73, which is the May 2001 TSLCC analysis, Milner 73.
Let me just ask you with respect to Milner Exhibit 73, is this the last TSLCC report that's been prepared, Mr. Milner?

Do you know?
A. It probably is, yes.
Q. And you would have reviewed, commented on drafts, and then approved the final?
A. Yes.
Q. All right. Can I ask you to look at page 4, dash, 14?
MR. SHULTIS: On 73?
MR. TOMASZCZUK: Yes, of Milner Exhibit 73.
A. M-hm.
BY MR. TOMASZCZUK:
Q. And this table 4. -- 4, dash, 1 depicts acceptance rates for commercial spent nuclear fuel. Correct?
A. Correct.
Q. And we see rates on this table similar to those in various other TSLCC fee adequacy and other reports. Right?
A. Correct.
Q. Showing an initial emplacement rate of 400 metric tons in 2010. Correct?
A. Correct.
Q. And then ramping up to 3,000 metric tons in 2014?



A. Correct.
Q. And then staying at that rate -- that 3,000 metric-ton steady state rate through 2039 per this table?
A. Correct.
Q. There's a note which appears under this table.
Do you know who drafted that note?
A. No, I don't.
Q. Do you know why that note was put in under this table?
A. No, I don't.
Q. Do you know whether this note was placed in here as a result of direction by Mr. Barrett that any rates beyond those reflected in the May -- or the March 1995 APR/ACR had had this language --
MR. SHULTIS: Objection, asked and answered.
BY MR. TOMASZCZUK:
Q. -- accompanying it?
A. I don't know.
Q. The rates reflected on this table 4, dash, 1 were used for purposes of preparing the accompanying fee adequacy report issued in May of 2001; is that right?



A. I believe that would be correct.
Q. And indeed, the fee adequacy report, Milner 89, references the TSLCC report, Milner 73, at page 1. Right?
A. Yes.
Q. And the conclusion of this fee adequacy report is that the 1 mil per kilowatt hour fee is adequate?
A. Correct, at that point in time, m-hm.
Q. Mr. Milner, is work being done now on a TSLCC report for 2002?
A. It's in the very early stages, yes.
Q. And same question with respect to a fee adequacy report for 2002?
A. Well, that would follow the work on the TSLCC.
Q. Generally, as I understand it, the work on the TSLCC is done, and then that is used to prepare the fee adequacy report?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 90 a GAO report dated December 2001 entitled, nuclear waste, technical schedule and cost uncertainties of the Yucca Mountain repository project.



(Milner Exhibit No. 90 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this GAO report which I've had marked as Milner Exhibit 90?
A. I am.
Q. And I gather you've read the report?
A. Yes.
Q. And did you provide comments back to GAO on the report?
A. I think I was involved in at least the reviewing, comments back on it.
Q. I'm sorry. You were involved in OCRWM's comments back to GAO?
A. Correct.
Q. And approving the release of those comments back to GAO?
A. Correct.
Q. Can I refer you back to the heading on page 2, results in brief. And as I understand the narrative which accompanies these results in brief, the GAO indicates some substantial skepticism with respect to DOE's ability to meet the schedule that it has laid out in other documents for siting a

Q. Did you participate in drafting any of it?
A. I did not.
Q. Did you review and approve it prior to its transmission to the president?
A. I did not.
Q. Did you see it before it went to the president?
A. I did not.
Q. And at this time, you're the -- in February, you were the chief operating officer. Correct?
A. That's correct.
Q. I gather that you saw other documents that accompanied this letter when it was transmitted?
A. Yes.
Q. But not this letter itself?
A. That's correct.
Q. Did you see it at any time prior to today?
A. Yes.
Q. So you saw it after it was sent and before today, just so I'm clear?
A. Yes, that's correct.
Q. Did somebody give you a copy of it after it was sent?
A. Yes.



Q. And who gave you a copy?
A. I guess it was Mr. Barrett.
Q. What did he say to you when he gave it to you?
A. This is a copy of the letter the secretary sent to the president.
Q. Nothing more colorful than that?
A. Nothing more colorful than that.
Q. Can I direct your attention to page 4. The very last paragraph on this page as I understand the letter is the formal recommendation of the secretary of energy to the president recommending Yucca Mountain. Right?
A. Correct.
Q. Can I direct your attention to the sentence which precedes that, starting with, not.
Do you see that?
A. Yes.
Q. Read that to yourself.
A. Yes.
Q. And this sentence states, quotes: Not completing the site designation process and moving forward to licensing the development of a repository as Congress mandated almost 20 years ago would be an irresponsible dereliction of duty.



Do you agree with that statement?
A. Yes, I do.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 93 a statement of Lake Barrett to the -- strike that -- a statement of Lake Barrett dated March 14, 2002, presented to an FY 2003 appropriations hearing, committee of the Congress.
(Milner Exhibit No. 93 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this statement prior to today?
A. Yes, I have.
Q. Did you assist in its preparation?
A. I reviewed it.
Q. You reviewed it, provided comments, and approved its issuance?
A. Well, provided comments.
Q. But you didn't approve its issuance?
A. No. Approval was the person delivering the statement.
Q. Did you provide any comments on a draft of the document?
A. I believe I did.



Q. Do you recall what those comments were?
A. No, I don't. I do recall they were not substantive in nature.
Q. Do I understand that Mr. Barrett made an oral presentation which accompanied this written statement on or about March 14th?
A. Yes.
Q. Did you accompany him when he was appearing before the Congress on March 14th?
A. I believe I did.
Q. He had you with him during the testimony he gave?
A. Yeah, in the audience.
Q. All right. Do you recall whether Mr. Barrett said anything to the Congress about spent nuclear fuel acceptance rates for the repository that the department is planning to construct at Yucca Mountain?
A. I recall some discussion back and forth between Mr. Barrett and one of the members regarding acceptance.
Q. And what do you recall about the nature of that back and forth?
A. It's -- my recollection was that there was some discussion in terms of how long it would take to

empty the spent fuel from all the reactor sites at various acceptance rates.
Q. And what did Mr. Barrett say in response to that question?
A. I think there was a variety of questions and a variety of responses.
Q. Did he indicate during his discussion that DOE expected to use a 3,000 metric-ton steady state rate for spent nuclear fuel at the repository?
A. I believe he did.
Q. And that would have been consistent with the rate we've seen for steady state acceptance of spent nuclear fuel in any number of other documents. Correct?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 94 a certification signed by Mr. Milner dated April 18th, 2002, which accompanied certain interrogatory responses, which were transmitted on or about April 16th of 2002 in connection with these spent nuclear fuel cases pending at the Court of Federal Claims.
(Milner Exhibit No. 94 was marked for identification.)



BY MR. TOMASZCZUK:
Q. Mr. Milner, that's your signature that appears underneath this certification. Right?
A. That's correct.
Q. And did you review the responses to interrogatories 81, 88, and 97 at or about the time you signed this certification?
A. I did.
Q. Did you have occasion to read Mr. Morgan's deposition transcript prior to signing the certification?
A. I did not.
Q. There's a reference here in the response to interrogatory 81 at the bottom of the page in a sentence which starts, as Mr. Morgan explained at his deposition.
Do you see that?
A. Yes.
Q. Do I gather that someone else told you about what Mr. Morgan stated at his deposition for purposes of enabling you to sign the certification?
A. That's my recollection, at least that portion.
Q. Because you weren't there and you haven't read the transcript. Right?



A. Correct.
Q. Can I direct your attention, Mr. Milner, to this last interrogatory, 97. There's a reference here to a task force assembled for purposes of reviewing the acceptance rate term of the standard contract.
Do you see that in the interrogatory itself?
A. Yeah, in the interrogatory, yes.
Q. All right. And then in the answer, it's stated that -- there's an identification of individuals that may have been members of a group that examined the acceptance rate term of the standard contract. Right?
A. Yes.
Q. And you are one of those individuals.
Indeed, you're the first one mentioned?
A. Correct.
Q. Can you tell me when this group examined the acceptance rate term of the standard contract?
When was this group performing its work?
A. This particular group would have been in the late '84, early '85 time frame, I guess.
Q. This would have been shortly after you arrived at OCRWM. Right?



A. That's correct.
Q. And why was this group conducting this examination of the acceptance rate term of the standard contract?
A. Well, at that particular point in time, I'm not even sure what acceptance rate term means here. There was a task force that we discussed earlier in these proceedings that were looking at a variety of contractual issues.
I don't recall there being any acceptance rate in the term that we're currently using it. I don't know what acceptance rate term means.
Q. Well, that language appears in the answer, so --
A. Yes, it does.
Q. At the time you reviewed the answer and signed the certification, what did you understand acceptance rate term to mean?
MR. SHULTIS: Objection. The interrogatory also says, we objected to that term in our response.
MR. TOMASZCZUK: I won't agree with many of your other objections, counsel, but I'll note that that objection was stated in the interrogatory response.

been responsible for the receive rates in these documents?
A. I don't recall, no.
Q. Would it have been Mr. Tribulis (phonetic)?
A. He would have prepared the mission plan, but he would not have prepared the receipt rates.
Q. And you have no idea anyone who worked on -- who would have been responsible for this?
A. I can't recall, no.
Q. Okay. I think we're done with these two. A couple more.
26 and 27, please. And if you could -- when you get --
(Discussion off the record.)
BY MR. SCHECHTER:
Q. You got 26 and 27?
A. Yes.
Q. Could you flip to page 24 in Exhibit 26, and just for the record, Exhibit 26 is the June '87 TSLCC report, and 27 is May '89. Okay?
A. Correct.
Q. Okay. I'm just making the record clear.
Do you have that page?
A. 24?



Q. Yes. And in 27, could you flip to schedule A 1, which is after page 9.7 -- 9, dash, 7. Excuse me.
Now, if you look on page 24 of Exhibit 26, it reflects an MRS startup date of 1998, does it not?
A. I'm sorry. In which one now?
Q. Exhibit 26, page 24.
A. M-hm.
Q. Third item from the bottom, MRS startup date, 1998.
A. Okay.
Q. Were you involved in the MRS activities at this point in time?
A. Not at that point in time, no.
Q. Not in 1987?
A. Correct.
Q. You see that reflects a startup date for the MRS of 1998. If you look at Exhibit 27, at pages A 1 and A 2, it reflects MRS startup dates of 2000 and 2003.
Can you explain why the MRS startup dates first of all changed from 1987 to 1989?
A. No.
Q. Do you recall anything in the program --
A. No.



Q. -- that might have done that?
A. No.
Q. The Nuclear Waste Policy Act amendments wouldn't have affected the projections on when the MRS would start?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. Not that I can recall.
BY MR. SCHECHTER:
Q. Okay. And can you explain why the May 1989 TSLCC report has two different startup dates for the MRS facility?
A. No, I can't.
Q. Okay. Ask you a few questions, Mr. Milner, about what happened in the MRS world in the mid-1990s.
You were involved at that point in time, were you not?
A. In the mid-1990s, yeah, I guess I still was.
Q. Okay. In the budget cycle for fiscal year 1994, Congress eliminated funding for the proposal -- next round of proposals for the MRS volunteer sites, did they not?
A. It sounds like the right time frame for



it. I don't recall the exact year.
Q. If Mr. Barrett testified that that was the case, you wouldn't disagree with him on that, would you?
A. No.
Q. Okay. And if he testified that because of that that was the end of 1998 from a practical sense, and he says, achieving the date January 31, 1998, was not very practicable after the final decision of the fiscal 1994 budget.
Do you have any reason to disagree with that?
MR. SHULTIS: Objection, vague, calls for speculation.
A. I guess if I could characterize more the optimism or lack thereof of the program, certainly after that, we were not as optimis- -- at least I was not as optimistic about an MRS.
BY MR. SCHECHTER:
Q. There were two Indian tribes that were at least working their way through the process at that point; isn't that correct?
A. There were two Indian tribes, and there was also one county. I don't recall time frames, whether the county had dropped out at that point or

not.
Q. And the effect of the Congressional action at that time was to end the activities of those two or three possible sites?
MR. SHULTIS: Objection, calls for speculation.
A. It certainly cut off the funding.
BY MR. SCHECHTER:
Q. Would you agree with Mr. Barrett if he testified at page 653 of his deposition that the voluntary MRS was basically doomed in 1994?
MR. SHULTIS: Objection, asked and answered.
A. Again, I think it's a matter of various people's opinions and optimism. It certainly looked more dismal than it did before then.
BY MR. SCHECHTER:
Q. You were less optimistic?
A. I was less optimistic, but perhaps more optimistic --
Q. -- than Mr. Barrett.
What happened to the nuclear waste negotiator?
Do you know?
What happened to that position?



A. It eventually -- I can't recall -- I guess that had a sunset provision to it if I'm remembering correctly, but I don't recall for sure. It certainly went away.
Q. Let me see if Exhibit 84 can help you here. Exhibit 84 is the July 1998 program plan, and if you would flip to page 2 and look at the second-to-last sentence above, program organization, and I'll read that: The negotiator was unable to secure a volunteer host for a repository storage facility before the office's authority expired in January 1995.
Does that refresh your recollection?
A. Yep.
Q. He was out of business in January of 1995; is that correct?
A. Yeah.
Q. And prior to that time, was the department engaged in any siting activities independent of a negotiator?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
BY MR. SCHECHTER:
Q. If you know.
A. Simultaneously with the negotiator?



Q. Yes.
A. No.
Q. Well, now, in terms of efforts going forward for an MRS or interim storage, there was a change of administrations January 20th, 1993. Correct?
A. Sounds right.
Q. When the Clinton administration came in, they were opposed to interim storage, were they not?
MR. SHULTIS: Objection, calls for speculation.
A. I had never had a member of the administration state that to me.
BY MR. SCHECHTER:
Q. Take a look at page 12, please, and look at the second and third sentences in the paragraph under, waste acceptance storage and transportation project.
I'll read them into the record: Since the 1996 revised program plan was issued, bills were passed in the Senate and the House of Representatives that would authorize the siting and construction of an interim storage facility to receive waste prior to 2010. The administration opposed such legislation.
Does that refresh your recollection on



what the administration's position was?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. My recollection --
MR. SHULTIS: The document speaks for itself.
MR. SCHECTER: I'm asking if it refreshes his recollection on something he didn't recall.
A. My recollection was that the administration's stated position was that they opposed siting an interim storage facility until they -- whatever the exact words were, but more progress was made on the repository.
BY MR. SCHECHTER:
Q. But there was no interim storage facility authorized at that time?
MR. SHULTIS: Same objection,.
BY MR. SCHECHTER:
Q. There was no site for an interim?
A. There was no site for an interim, correct.
Q. And the negotiator was out of business?
A. Correct.
Q. And the folks who were proposing to be volunteers weren't funded?
A. Correct.

Q. Okay. Now, we've talked about the volume limitations so to speak, that were in the NWPA amendments, 10,000 and 15,000 tied to two different circumstances. Correct?
A. Correct.
Q. And those were volunteer limitations that related solely to the MRS?
A. Correct.
Q. There was no volume -- there was a 70,000 MTU volume limitation on the repository?
A. Correct.
Q. Can you think of any programmatic reason that one would apply the MRS volunteer limitations to the repository?
MR. SHULTIS: Objection, vague.
BY MR. SCHECHTER:
Q. For any reasons.
A. No, not that I can think of.
Q. In fact, the TSLCCs don't apply those limitations?
They have the rampup to 3,000?
A. M-hm.
Q. Okay. Sitting here today, you can't think of any particular reasons that you'd do that?
A. Which number are you speaking of?



Q. I'm sorry.
Any reason to apply for example a 10,000 MTU or a 15,000 MTU limit to the permanent repository.
A. In terms of total capacity?
Q. Yes.
A. No.
Q. Or capacity over a period of time.
A. No.
Q. Okay. I want to turn back just for a minute to Milner 88.
You got it?
A. Yep.
Q. And I want to ask you a couple of questions on pages 11 and 12, if I may. And I want to -- was it your testimony that the activity -- last activity on page 11, developments of middle license application FY 2002 would be done in FY 2004?
A. In the year 2004.
Q. So it might be calendar year 2004, which is actually fiscal year 2005. Correct?
A. The latter part, yeah.
Q. In fact, the report that went to the president said that the license application would be submitted at the end of 2004?



A. Correct.
Q. So it's really fiscal year 2005. Okay. I just wanted to clarify that.
Turn to page 12 for a minute, if you would. Now, as I understand it, this page shows at least two activities that have to be completed before the last activity, commence waste acceptance and emplacement can begin.
One is construction has got to be completed. Correct?
A. Correct.
Q. And the other is that you've got to have a license application amendment granted by the NRC or approved?
A. Correct.
Q. Okay. And I believe your testimony was that the present plan was to submit the license application amendment in late 2009.
Now, is that fiscal or calendar?
A. Well, I was I think characterizing that as the best of my recollection, because I could not really recall what our current schedule is for the amendment, so I -- later in '09, I don't know whether that would cross over into a different fiscal year or not.



Q. Thank you.
Now, under the schedule that's shown here, February 2000 schedule, the plan is to give the NRC two years to review and approve that proposal. Correct -- that amendment?
A. That's the time there. I don't recall whether we assumed that they would take the whole two years or not, because as best I can recall, we would build into this schedule a somewhat lengthy training phase, if you will, before we actually began receipt.
Q. Has the department advised the NRC that that application is going to be submitted in late 2009, presuming that's the date to the best of your recollection rather than fiscal year 2008?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
A. I don't know whether we've advised them on that date or not.
BY MR. SCHECHTER:
Q. And you described in your testimony that you thought it was realistic to cut the construction period considerably, whatever the number was, from five years to two and a half years.
Is that roughly right?
A. Correct.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.



APPEARANCES:

On behalf of Plaintiffs:

PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561



C O N T E N T S


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| RONALD A. MILNER | |
| By Mr. Skalaban | 51 |
| Afternoon Session | 159 |


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 1992 Annual Capacity Report, Nos. HQ002314-352 | 61 |
| 97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 | 68 |
| 98 Letter, 4-20-94, No. YDK-005-0417 | 120 |
| 99 Letter, 9-29-92, and attachments, various MOF and MPA numbers | 160 |
| 100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers | 166 |
| 101 10 CFR 61.55, Waste | |




E X H I B I T S C O N T I N U E D


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| Classification | 186 |
| 102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 | 216 |
| 103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 | 221 |
| 104 Memorandum, Nos. HQR-058-0330-331 | 223 |
| 105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C | 226 |
| 106 Letter, 7-15-98, Nos. HQR-041-0600-601 | 276 |
| 107 Memorandum, Nos. EL-115711-713 | 277 |
| 108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 | 283 |

P R O C E E D I N G S

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SKALABAN:

Q. Okay. Hello, Mr. Milner. How are you today?

A. Morning. Fine.

How are you?

Q. And just before we begin this morning, the same ground rules that we discussed apply.

Is that okay?

A. Fine with me.

Q. I wanted to cover something about failed fuel we were talking about at the end of yesterday's session. And I asked you if there was an NRC-licensed container for failed fuel with the department then accepted upon the currently agreed schedule, and your answer was, as I understand your answer, in your opinion you thought yes.

I mean, do you recall that exchange?

A. Yeah. My recollection was that



certainly -- well, overall, we're going to accept failed fuel, so ultimately there will have to be a certified container to move it in. And then I think you just have to deal on a case-by-case basis, what's the nature of the failure, what's it look like, and what kind of handling will it require, and at what point do you do that.

Q. If I understand your testimony from yesterday, in the failed fuel, if there was an NRC-licensed transportation cask -- I'm sorry -- canister system available for it, it would be taken on the same waste acceptance schedule?

A. Well, again, I think -- at least I intended to characterize that that you almost have to look at it on a case by case, what's the nature of the fuel, how badly is it failed, what does it look like, and what kind of handling will that require at the repository receipt facility.

And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put it farther back in the queue.



It's hypothetical. I don't know. You'd have to know what the situation was to say what you do.

Q. But if there was an NRC canister system that was fully licensed to transport that failed fuel, you would still anticipate that there be could a problem with accepting the waste on an agreed-upon schedule?

A. I think there's a potential of that, yes, again, depending on the nature of the failure, what it looks like.

Q. And that's based on disposal problems?

A. Well, it's based on the ability to move that fuel from the transport pack -- transport cask to a waste package and then place it. You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.

Q. How likely do you think that kind of a situation may arise, that you would have a failed fuel assembly that the NRC has blessed in effect for transportation in a licensed canister that you would be technically unable to dispose of it in a repository?



MR. SHULTIS: Objection, calls for speculation.

A. I don't think I said that we were technically unable to dispose of it. It was a question of, do you handle that in the normal queue, or do you have to make provision for special handling of it.

To me it's not a question of whether you're disposing of it. It's just a question of, you have to delay receipt of that until you make special arrangements to handle it.

BY MR. SKALABAN:

Q. Is the department making any plans at the current time to handle failed fuel at the disposal facility?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, calls for -- I think it also calls for a legal conclusion.

A. Again, I guess in my opinion, if you had failed fuel that was not badly failed -- not a very good term of art -- but it probably would not require heroic special handling, and if you do, then I think you're going to have to be able to deal with that on a case by case. Certainly it would be sufficient for handling that, but again depending on the nature of

Thank you for clarifying.
But there's nothing in this provision B 1 that references an annual capacity report. It does talk about a priority ranking, but there's nothing about the annual capacity report in the DCS provision.
MR. SHULTIS: Objection. The document speaks for itself, asked and answered.
A. Unless I'm totally remembering wrong, I believe the contract does reference annual capacity reports and annual priority rankings.
BY MR. SKALABAN:
Q. I'm just talking about this provision B 1.
MR. SHULTIS: Same objections.
A. I believe I've responded to that already.
BY MR. SKALABAN:
Q. Okay. So it's your view that this provision that purchasers shall submit to DOE the delivery commitment schedules which identify all SNF that they wish to deliver is tied to the annual capacity report?
A. That's my view.
Q. And in your view, it's not susceptible to another interpretation?
MR. SHULTIS: Same objection, asked and



answered, mischaracterizes prior testimony.
A. In my view, no.
MR. SKALABAN: I'd like to mark as Exhibit I believe it's 102 --
(Milner Exhibit No. 102 was marked for identification.)
MR. SKALABAN: This is a document entitled, U.S. Department of Energy, Office of Civilian Radioactive Waste Management, nuclear waste technical review board, full board meeting, subject, update on the multipurpose canister concept, presenter, Ronald A. Milner, and it's dated July 11th, 1994.
MR. SHULTIS: Actually -- I'm sorry. It says, January 11th.
MR. SKALABAN: Thank you. January 11th, 1994.
BY MR. SKALABAN:
Q. Do you remember giving this presentation?
A. Vaguely, I do, yeah.
Q. Can you tell me about what the purpose of the presentation was?
A. No. My recollection, it was just what the subject says, to update the TRB on the multipurpose



canister concept at that time.
Q. And who is the nuclear waste technical review board?
A. The nuclear waste technical review board is a body which as I recall was established -- the body in general was established by the Nuclear Waste Policy Amendments Act. They are a body of essentially 11 members which are nominated I believe by the National Academy of Sciences and appointed by the president to oversee the technical aspects of the OCRWM program, and they provide reports to the Congress.
Q. Are you a member of the board?
A. Oh, no. They are an independent body independent from the department.
Q. Now, at this presentation, would this be open to the public?
A. Yes, I believe virtually all of the board meetings are open to the public.
Q. And what's the purpose of the review board?
I think you just said they report to Congress.
A. I don't recall the exact wording from the act -- I believe it was the amendments act -- it



essentially created an oversight body over the program, and they are to in essence review and provide recommendations on various technical aspects of the program to the Congress.
Q. I'd like to call your attention to page 19. I'm hoping you can explain for me some of the bullet points that are there. That page is entitled, programmatic risks and contingency analysis.
A. M-hm.
Q. And it references contingencies evaluated for the MPC system.
Can you tell me what this is about, what contingencies were evaluated for MPC?
A. My recollection of that, which is very vague, but looking at some of the different contingencies there, probably related to the numbers of canisters that had to be dealt with, but I don't really recall.
Q. Do you know what was being referred to here with -- under the, dash, impact of transportation after storage uncertainty, what that contingency was?
A. My recollection of that, that it -- at this point in time, I don't believe NRC had certified any canister for transport subsequent to extended

storage. In other words, if a canister was loaded at the reactor site and stored for some period of time, I think at that point, there was no canister that was certified by the NRC that could subsequently be transported.
Q. I see. And that has changed, hasn't it?
A. It has now, yes.
Q. The canisters have been licensed for transportation?
A. Correct.
Q. And so when you're talking about programmatic risk measured as economic impact, there's a bullet point there for MPC not transportable after storage.
That's the concern you were just talking about?
A. Yes.
Q. And on the next page, page 20, in this first bullet point, it lists some concept benefits.
What does that mean, sited as motivation for work?
I don't understand that.
A. Well, at this point in time, I'm not sure I do either, but I would infer that these were reviewed as some potential system benefits which,



therefore, would provide some impetus or motivation for the department or others to develop an MPC system.
Q. And so these listed under that bullet point -- these are advantages of an MPC system, whether it's developed by the department or by others?
A. Yes.
Q. And you agree that these are advantages of the system, of an MPC canister system?
A. My personal opinion -- well, I didn't read all of them, but, yeah, I would agree those are advantages.
Q. Are there any major disadvantages of canisters, of using canisters in the program that you're aware of?
A. Certainly a disadvantage that it -- I could see would be that if ultimately no canister could be simply placed in a waste package and in the repository, then the department would have to open those canisters and repackage that fuel, which would probably to some degree increase the handling on DOE's part that would be required.
Certainly if there were widespread use of a canister system that ultimately could not be used



for disposal, you've created a fairly large secondary waste stream to deal with canisters.
Q. Any other disadvantages that you can think of?
A. Not offhand, no.
Q. And at this point, if I understand -- again I don't want to -- I want to make sure I'm correctly testifying -- or correctly representing your prior testimony -- at least currently the department's plans are to accept canister systems and to dispose of them if possible?
A. Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously, we would prefer not to have to open them and create another waste stream.
MR. SKALABAN: Let me go ahead and mark this. I believe we're on Exhibit 102; is that correct?
MR. SHULTIS: 103.
MR. SKALABAN: Thanks.
(Milner Exhibit No. 103 was marked for identification.)
BY MR. SKALABAN:



Q. 103 is a memo from Mr. Ronald Milner dated March 8, 1994, to a series of people listed on a distribution list, and it contains an attachment. And the subject of the memo is, modification of the CRWMS program baseline to a multipurpose canister-based system.
Are you familiar with this document, Mr. Milner?
A. I am, yes.
Q. What was the purpose of this document?
A. Essentially, as it's stated here, that this was advising staff within the program that the director of the program had approved a change to the baseline to incorporate multipurpose canisters into the baseline.
Q. And what does that mean, to be incorporated into the baseline?
A. That means that essentially that we expect and would accept canisters into the system. That was part of the operation that we envisioned.
Q. Was the intent of this at this time to actually furnish multipurpose canisters to all of the utilities?
A. To the best of my recollection, time frames are unclear. Certainly at one point, which

would be this approximate time frame, the department gave consideration to furnishing multipurpose canisters to utilities as a potential means to mitigate any delays. Whether it was actually this exact time frame, I can't recall.

Certainly what this baseline change is dealing with is not the provision of canisters to anyone. It's simply a change in the baseline so that as part of the design process, designers will begin to take into account multipurpose canisters in the design of the system.

Q. And is that baseline still in effect?

A. I believe it is.

MR. SKALABAN: If I could mark now as Exhibit 104.

(Milner Exhibit No. 104 was marked for identification.)

BY MR. SKALABAN:

Q. Can you tell me what this -- and just for the record, 104 is a memo, although I will indicate there's no approval signature on the memo, but it appears to be a memo from Mr. Milner to Daniel Dreyfus, the director of OCRWM.

Do you recall this memo?



A. I do vaguely, yes.

Q. Did you send it Mr. Dreyfus?

A. My recollection is that I did.

Q. And what was the purpose of the memo?

A. Essentially to get the formal approval of the director to terminate funding for the MPC development program.

Q. And was this in response to Congressional appropriations?

A. It was.

Q. So the effect of this memorandum is that the department was no longer going to directly fund the development of MPCs?

A. Correct.

Q. Now, the second page, it says that the -- at the top: The technical and operational objectives and advantages of standard canistered SNF defined in the attached MPC approval memo are still applicable.

Recognizing that I don't have the attached memo, but at that time, do you agree with that statement that the general -- or do you agree with that generally that technical and operational objectives and advantages of standard canister SNF would still be applicable?

A. Yeah, I do.



Q. And it says at the very bottom: The program will continue actions that are necessary to encourage private industry development and utilization of casks, slash, canister technologies that provide the technical and operational objectives and advantages that were anticipated with the MPC.

Do you see that?

A. Yes.

Q. And that was your understanding of the program -- of a program goal at that time?

A. Yes.

Q. And to this day, does the program -- is -- are -- excuse me. Scratch that.

To this date, is the department still encouraging the development and utilization of cask/canister technologies?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.

A. I believe it is. I guess I would add that at least in my opinion the work that DOE had done on MPC technology development I think provided the seed and the impetus which ultimately resulted in at least a couple of canister systems being so far certified for storage and transportation.

BY MR. SKALABAN:



Q. Such as some of the NAC systems?

A. Yeah.

Q. And that's a positive development?

A. It is.

MR. SKALABAN: I'd like to mark defendant's proposed stipulation of fact as Exhibit 105.

(Milner Exhibit No. 105 was marked for identification.)

BY MR. SKALABAN:

Q. I'm going to represent to you, Mr. Milner, that this is the government's proposed statements of fact in the Yankee Atomic litigation.

Do you -- have you ever reviewed or seen this document?

A. I don't recall that I did, no.

Q. Do you recall or have you reviewed any pleadings in this litigation or filings in this litigation other than interrogatories that we talked about yesterday?

A. I have not.

Q. And I'm sorry. Let me clarify my question also a little bit: What I'm saying, in this litigation, I'm not limiting it just to Yankee

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos.
COMPANY, CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
(202) 305-7562

*** Index appears at end of transcript ***



P R O C E E D I N G S

_ _ _ _ _

JUDGE MEROW: Ms. Herrmann?
MS. HERRMANN: Ready to continue with Mr. Buchheit, Your Honor?
MR. STOUCK: I've got a couple of preliminary points if I could mention it, Your Honor.
JUDGE MEROW: Sure.
MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit, but either between witnesses or at the end of the day.
JUDGE MEROW: Fine.
MR. STOUCK: That's number one. Number two, also, I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.
Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues, I noticed that little colloquy and I just didn't want there to be any remaining



misunderstanding. We certainly have worked well, you know, for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.
There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and, you know, unless we get some different direction, we're not intending to do that, and I just don't want to be vilified again if that comes up, because I think it might.
JUDGE MEROW: Okay.
MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.
We identified our exhibits, and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

memo to which the plaintiffs have referred that Mr. Rusch had -- that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch -- anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break



for lunch. And what time?

MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN: Government's ready to call its next witness.

JUDGE MEROW: Fine.

MS. SULLIVAN: We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor.

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.
A Good afternoon.
Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?



A Yes, I am.
Q What is your current position?
A Chief operating officer.
Q What are your responsibilities as chief operating officer?
A I assist the deputy director for strategy and program development in the day-to-day management of that office.
Q And do you report to the deputy director?
A Yes, I do.
Q And who is the department director?
A Ted Gerrish.
Q Does anybody report to you?
A Not directly.
Q How long have you served as chief operating officer?
A In total, about four years.
Q When did you first join the Office of Civilian Radioactive Waste Management?
A I believe it was April of '84.
Q What was your first position? And I'm going to refer to it as RW, if that's all right.
A Okay.
Q What was your first position with RW?
A I was the branch chief of the



organization.
Q What were your responsibilities in that position?
A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.
Q What position did you next hold in RW?
A I was a division director.
Q And what were your responsibilities in that position?
A Budget, human resources, total system life cycle costs, fee adequacy analyses.
Q And what position did you next hold in RW?
A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.
Q And do you remember when you became acting director of the Office of Storage and Transportation?
A Roughly 1990.
Q And how long did you serve as director of the Office of Storage and Transportation?
A About four years.
Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?
A Management of the MRS monitor to treatable

as the various TSLCCs progressed over the years, no, certainly the assumptions changed depending on the circumstances.
Q No, not the same -- not to be consistent across all the TSLCCs, but at any one time, the department's documents, the -- the program plan, the TSLCC, the fee adequacy report, they would all have the same set of assumptions?
A We would hope so.
Q And you thought it was important that all of the -- the OCRWM entities be using the same assumptions with respect to the acceptance rate for spent nuclear fuel, right?
A Yes, yes.
Q In fact, when you reviewed and approved some of these documents that you discussed, one of the purposes for your review was to ensure that the documents accurately reflected what you understood to be the Department of Energy's position at the time with respect to issues such as the acceptance rate, correct?
A Correct.
Q Now, at the time you joined Office of Civilian Radioactive Waste Management, it was your understanding that the intent of the department was to



work off the backlog of spent nuclear fuel stored in utilities. True?
A Well, at the time I joined the department, since -- again, very early stages of the program, we were in the very early stages of planning the program, trying to identify potential sites and so forth. I don't know that we -- we had evolved to talking about working off the backlog at that point. Obviously, at some point in time you would hope that you would work off the backlog.
Q But at the time you joined the program, your understanding was the intent was to work off the backlog?
A Well, the intent was ultimately to accept all spent fuel from the utilities.
Q Do you recall having your deposition taken over a number of days?
A Oh, yes.
Q One of those was back on May 1st of 2002, a little more than two years ago.
A Two and a half years ago, roughly, uh-huh.
Q I'm sure you endeavored to testify accurately.
A Yes.
Q Truthfully.



A Yes.
Q I want to ask you about a question and answer that you gave at that time, reading on May 1st, page 73.
MS. SULLIVAN: Could the witness be provided a copy of the deposition?
MR. SHAPIRO: If he needs one. I'm trying to be quick about it.
THE WITNESS: Given that it was approximately two and a half years ago, I probably wouldn't know the context in which the question and answer were given.
BY MR. SHAPIRO:
Q Would you like to see a copy?
A Yes.
Q Sure enough.
As it turns out, May 1st is the first tab in your binder. Page 73, if you look, there are four pages per page the way it's printed out. Are you on page 73 Mr. Milner?
A Yes, uh-huh.
Q I'm going to start reading at line 10, and my question is, were you not asked the following question and give the following answer?
Question: And was that a fair statement



of DOE's intentions at or about the time to work off the backlog of spent nuclear fuel that utilities were storing?
There was an objection by Mr. Shultis.
You answered: Well, at this specific point in time, I don't know what the department's intent was. At the point I joined the program, my understanding of the intent was to work off the backlog.
That was your testimony, Mr. Milner?
A Yes, if I could have a moment to look at the -- the context.
Q I'm just asking about your testimony. And that was your -- your honest testimony?
A Yes.
Q Now, it's true that the Department of Energy's intentions with respect to the repository design receipt rates had stayed constant pretty much to the present day, 3,000 MTU per year?
A I'm sorry, would you repeat that?
Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?
A Yes, uh-huh.

Q And that -- that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?
A As far as the steady-state rate, yes.
Q And that's a reasonable rate?
A Yes, I think so.
Q Now, you testified, I believe it was about Defendant's Exhibit 23, the memorandum for approval of the 1991 annual capacity report.
A Uh-huh.
Q And there's one little aspect I wanted to ask you about that. Part of that annual capacity report -- we have copies of that available if you need to review that. Part of that had a slow acceptance rate because of some of the limitations that were imposed by the alternative set. Do you recall that?
A Correct.
Q But you were asked to read part of that memorandum that said: Nonetheless, that lower rate was theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in -- in 1998.
A Uh-huh.
Q Could you explain for us how -- how that analysis was done, how you reached that conclusion?



A Well, if -- if you took each utility, what its -- its projected spent fuel discharges were, what its pool capacity was, its remaining pool capacity when it would run out of capacity and -- and you did that for each utility, then you took the overflow, if I can call it that, from pool storage, in the aggregate, that would be the amount of -- of dry storage that would be needed across the industry and our rate would have in the aggregate prevented the need for additional storage.
However, that -- that didn't address the fact that -- that where the utility that was running out of storage in the queue and at what time their -- their waste would be accepted.
Q So that analysis ignored the oldest rule first priority scheme?
A No, it didn't ignore the oldest fuel first.
Q Well, how did it -- I thought you just said that it didn't take into account where the utility was in the queue.
A Where the utility that was running out of the storage was in the queue.
Q So how would that acceptance rate be sufficient to help that utility that was running out



of space?
A I think I said that in the aggregate, it would prevent additional at-reactor storage but not necessarily for each specific utility and in fact, that was not the case.
Q So there -- there would be utilities that would have to add additional at-reactor storage?
A Yes.
Q What about shutdown reactors? Would that lower rate contemplated in the 1991 annual capacity report do anything for shutdown reactors?
MS. SULLIVAN: Objection, vague.
BY MR. SHAPIRO:
Q Do you understand the question, Mr. Milner?
A No, I'm sorry. Repeat the question.
Q Would the lower rate contemplated in the 1991 annual capacity report, would that be sufficient to handle the spent fuel removal needs of shutdown reactors?
A Well, I'm not -- I'm not sure in what sense you mean that, because we did base everything on oldest fuel first if -- if a shutdown reactor had the oldest fuel, I suppose it could have handled it, but I don't suppose that was the case in all situations.



Q So with the lower acceptance rate in the 1991 annual capacity report, a shutdown reactor might -- might still have to store spent fuel for an extended period of time?
A Yes.
Q So that annual -- that lower rate in the 1991 annual capacity report would not have been sufficient to handle the needs of shutdown reactors?
A Again, in the aggregate it would have been sufficient. Looking at each utility, no.
Q I'd like to ask you a few questions about monitor retrieval storage. You testified about that a little bit. We discussed also some of these limitations in Department of Energy's ability to accept spent fuel in light of the amendments passed in 1987 that provided linkages between monitored retrievable storage and progress in repository. Are you aware of that?
A Right.
Q It's the Department of Energy that requested those -- that those linkages be put into the amendment set, correct?
A Well, no. I believe -- as I recall, earlier in the program, the -- the department was attempting to develop a -- a MRS facility at a site in

Tennessee, the -- the former Clinch River breeder reactor site. As I recall, discussions and negotiations with the host community at that time gave rise to those linkages, and Congress simply chose to carry forward those linkages when it authorized an MRS in the amendment side.

Q It wasn't the Department of Energy that requested those linkages?

A I don't recall that to be the case.

Q Let's go back to your -- your deposition. I want to ask you about May -- a statement you made at May 3rd. Do you want to follow along in your binder? Tab 3. If you could turn to page 554, and were you not asked the following question and gave the following answer starting on line 5? It's a little bit long.

I'd like to talk to you about page 12 now, in particular the last full paragraph, or actually the last paragraph which goes on to the next page under the heading MRS facilities. It says that on March 31, 1987, the DOE submitted to Congress the proposal for construction of an MRS facility to allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority. DOE asked Congress to limit the MRS



storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until the construction authorization for the repository has been received from the Nuclear Regulatory Commission.

Is this an accurate statement, that the DOE was the organization that requested the linkages between the repository and the MRS?

And there was an objection and you answered: Certainly, the DOE was the entity that requested Congress. My recollection of the origins of those linkages were at the time DOE was developing a site-specific proposal for an MRS facility, actually, the old Clinch River breeder reactor site in Oak Ridge, and I believe the local community had requested the department insert those linkages.

MS. SULLIVAN: Objection. The statement that's just been read into the record isn't inconsistent with what Mr. Milner testified to.

MR. SHAPIRO: That can be brought out in redirect. I certainly believe that he denied that it was the department that asked for those linkages.

THE WITNESS: If I could clarify.

JUDGE MEROW: Yes.

A I misunderstood your statement because I



thought you asked me if the department had requested those linkages be placed in the legislation. We had requested those linkages when we submitted an MRS proposal for the Clinch River breeder reactor site not to be placed in the amendment set.

Q Nevertheless, it was the Department of Energy that requested it.

A In its proposal for the Clinch River site.

JUDGE MEROW: Is that to satisfy community?

THE WITNESS: That was to satisfy community concerns, yes.

BY MR. SHAPIRO:

Q We're going back, Mr. Milner, to this 1987 time frame. It was the Department of Energy's plan to start accepting waste at a monitored retrievable storage facility in 1998 and to open a repository in 2003?

A In the '87 time frame, I believe that was correct.

Q And the MRS was intended to be an integral part of the whole waste acceptance system, correct?

A Yes, I believe so.

Q It wasn't intended to be a -- a -- a standalone system or as a permanent replacement for



storage and disposal?

A Correct.

Q And fast-forward a little bit to June of '88. By that time, the Department of Energy believed that the linkages between the -- the schedule and the key milestones in siting the construction of an MRS facility made it unlikely that the department would be able to start accepting waste significantly before 2003, isn't that correct?

A At a -- at a repository?

Q At any facility.

A At any facility?

Q Linkages.

A Yes, I believe that was the case.

Q And as of November 1989 -- and that was the time that report to Congress on reassessment of the program -- it was the Department of Energy's position that a repository would not be available until 2010, correct?

A Correct.

Q It was also the Department of Energy's view at that time that if the statutory linkages remained in place, that the MRS operations would not begin until 2007, correct?

A Correct.

Q And that's because that -- that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes.
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS



might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question: So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,



Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that -- the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.
Q Do you believe that -- that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?
A Yes, I do.
Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?
A Well, I certainly recall discussions as to what would -- what would happen in that case and yeah,



I think we would have certainly had to reevaluate what would have occurred.
Q So the delivery commitment schedules could change if circumstances change?
A Potentially, that would have to be evaluated, yes.
Q If circumstances change, the DCSs could change. True?
A I'd have to know what the circumstances were before I knew whether they would change or not.
Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?
A No, I viewed the DCSs as a binding commitment.
Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?
A Yes, I have.
Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?
Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.

Your answer: I guess in my terms of a commitment, not necessarily. I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay, just the purchaser can adjust it up or down, so it's his option. I guess I would interpret that to mean it's less binding on the utility than it was on the department.

That was your truthful testimony, Mr. Milner?

A Yes, it was.

MS. SULLIVAN: Objection. It's taking the statement out of context, but I'll address that on redirect.

BY MR. SHAPIRO:

Q It's your opinion, Mr. Milner, that it's not appropriate to approve -- not appropriate for the department to approve delivery commitment schedule forms until the department has a site for a repository approved, correct?

A I'm sorry, repeat that question.

Q It's your opinion that it's not appropriate for the Department of Energy to approve



delivery commitment schedule forms until the department has a site for a repository approved. True?

A No, no.

Q Let's go back to your deposition once again, this time May 7th and tab 4. There are two tabs. Page 598.

A I can't find the page.

Q Are you in tab 4, Mr. Milner?

A Thought I was. Okay.

Q I'm going to start on line 7, and my question for you is, were you asked the following question and gave the following answer?

Question: So is it your view that the DCSs forms can be approved now or not?

And your answer: My personal opinion is that it's not appropriate to include them until we have at least a site for a repository approved.

That was your answer?

A Correct.

Q And that was your -- your correct answer?

A In -- in looking earlier in the testimony, I think the context at that time was at that particular point in time, we had suspended processing of -- of the DCSs, and I believe the questions at that



time were going to should we restart processing the DCSs, and at that time, two and a half years ago, my answer was no.

Q Because you thought that was inappropriate because the department didn't have a site approved for a repository. True?

A Because the schedules were indefinite, yes, we had -- we had already approved DCSs for the first ten years of operation and we -- we in my opinion at that time, given that context, should wait until our schedules firmed up a bit more before we processed additional ones.

Q Once site approval occurs, you expect the department to begin approving delivery commitment schedule forms once again, don't you?

A Yes, uh-huh.

Q I want to ask you about those delivery commitment schedule forms that you said were approved following the publication of the 1991 annual capacity report.

A Uh-huh.

Q Now, those -- the DCSs that were submitted after the 1991 annual capacity report, they were based on waste acceptance schedule that was inconsistent with the Nuclear Waste Policy Act schedule linkages as



they existed at the time they were submitted for approval, weren't they?

MS. SULLIVAN: Objection, calls for a legal conclusion as to the terms of the NWPA.

MR. SHAPIRO: I'd like to get Mr. Milner's understanding.

JUDGE MEROW: I'll overrule the objection. You may answer the question if you have -- you have the background, I think, to do it, so --

THE WITNESS: I'm sorry, repeat the question, inconsistent with --

BY MR. SHAPIRO:

Q The -- the DCSs submitted after the 1991 annual capacity report, they were based upon a waste acceptance schedule that was inconsistent with the Nuclear Waste Policy Amendment Act's schedule linkages as they existed at that time, the -- at the time those -- those forms were submitted, weren't they?

A No, I don't believe they were.

JUDGE MEROW: I guess the question is you couldn't accept quantities until you had an approved repository.

THE WITNESS: Repository.

JUDGE MEROW: The schedule showed quantities, you know, without taking that into

interest in the timely decommissioning of shutdown reactors. True?
A Yes, uh-huh.
Q And allowing shutdown reactors to decommission in a timely manner has been an objective of the department's. True?
A I wouldn't say so much an objective, but certainly an interest of the department.
Q But what's the distinction there that you're drawing between objective and interest?
A Objective would be something we would vigorously pursue, and interest is something that we would support if -- if it was consistent with the program planning.
Q Didn't the department have an objective of allowing shutdown reactors to decommission in a timely manner?
A The program did not have an objective in that definition of -- of allowing them to shut down, timely manner. Certainly an interest in doing so.
Q Well, let's go back to your deposition, Mr. Milner, this time on May 3rd, which is tab 3 of your binder. And I'm looking at page 419 within that tab. Have you found that page, Mr. Milner?
A Yes, uh-huh.



Q I'm going to start on line 15 and ask you were you asked the following question and gave the following answer.
Question: My question isn't about asking granting priority, my question is simply did the department have an objective of allowing shutdown reactors to decommission in a timely manner?
Objection by Mr. Shultis.
Your answer: It did, yes.
Then one more question: And would that remain an objective of the department's today?
And your answer: I believe so.
That was your truthful testimony, Mr. Milner?
A Yes, it was, as was also my earlier truthful testimony where I indicated it was not so much an objective as a case where the department preferred not to preclude that ability.
Q Okay. It's been a goal of the department's to minimize storage cost of all reactors including shutdowns. True, Mr. Milner?
A Yes, certainly a consideration that we would like to have seen.
Q Are you drawing a distinction between consideration and a goal?



A Yes, yes.
Q Has it been a goal of the department's to minimize storage costs for all reactors, including shutdowns?
A I guess in that sense, yes. Yes, we would certainly do what we could to minimize storage costs.
Q In fact, you believe it's long been a goal of the program to try to reduce the amount of storage that would be needed and ultimately to decommission reactors. True?
A Yes, uh-huh.
Q The water program and utilities have a goal of taking fuel off sites as soon as possible. True?
A Yes.
Q In fact, going back to the MRS for a moment, you were specifically concerned about the effects of not having an MRS facility on shutdown reactors, weren't you?
A I'm sorry?
Q You were concerned about the effects of not having an MRS facility on shutdown reactors, weren't you?
A I was certainly concerned about the effects on -- on all reactors of not having an MRS and



delaying the start of waste acceptance.
Q Including the effect on shutdown reactors?
A Yes, yes.
Q And others at the department shared that concern?
A I believe so.
Q Because of the department's not having -- not beginning to accept waste -- excuse me, let me restart that.
Because of the department's not having an MRS facility, that would force shutdown reactors to maintain their spent fuel pools or storage facilities for a longer time period. You understood that?
A Yes, uh-huh.
Q Your recollection is that as of 1990, the department had not yet determined whether priority would be accorded shutdown reactors or, if priority is granted, under what specific -- specific circumstances it would be?
A I believe at that time, we -- we had not completed what we called the issue resolution process and so I -- I think that's correct, yes, we had not made a final determination.
Q And, in fact, there has been no final decision on whether or not priority for shutdown

# MORGAN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 1, Pgs. 1 - 212



Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON



A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)



A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

A P P E A R A N C E S

For the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:
ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983



I N D E X


| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 1 Organizational charts | 25/25,64,79,311 |
| 2 Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 Report on Financing | 93/93,102,104 |


(continued)



I N D E X

EXHIBITS:


| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 6 3/4/93 letter from Alabama Power | 106/106 |
| 7 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 Mission Plan, Volumes I and II | 159/159,162 |
| 12 U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |


(continued)



I N D E X

EXHIBITS:


| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 18 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 Remarks before IAEA, 10/12/83 | 230/231 |
| 20 Letter to Governor Alexander | 275/275,279 |
| 21 Draft letter to Governor Bryan | 278/278 |
| 22 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 2/8/83 comments from Duke Power Company | 282/283 |


INSTRUCTIONS NOT TO ANSWER:


Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

ROBERT L. MORGAN,
as a witness on behalf of Plaintiffs Southern Nuclear Operating Company, et al., having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MR. BLANTON:
Q. Mr. Morgan, we met off the record. My name is Stan Blanton. I am a lawyer representing Alabama Power Company, Georgia Power Company, and Southern Nuclear Operating Company in litigation pending in the United States Court of Federal Claims styled Yankee Atomic Electric Company, et al., v. United States. We're in a consolidated discovery proceeding, and your deposition is being taken in that proceeding.
MR. HIRSCH: You mean "coordinated"?
MR. BLANTON: Coordinated. Whatever. What did I say? Consolidated? Strike "consolidated." Coordinated.
BY MR. BLANTON:



Q. I understand you are being represented today by Mr. Banes and the other Government lawyers. Is that correct?
A. That's correct.
Q. In the course of your deposition today, you'll most likely be shown documents that are subject to a protective order jointly entered by the parties in this litigation restricting the disclosure of the contents of material that's been marked confidential.
I understand that you have not had an opportunity to review that order, so what I'm going to do now is hand you the pleading titled Joint Motion for Entry of Agreement and Protective Order. Attached to that as Exhibit A is an agreement and protective order, and I specifically direct your attention to page 3, paragraph 5, of the order and ask if you would review that, please, sir.
A. All right.
Q. All right, sir. Have you read the order?
A. Yes, I have.
Q. Have you got any questions about it?
A. None.



Q. Do you agree to maintain the confidentiality of any documents you are shown today?
A. Yes.
Q. Have you ever had your deposition taken before today?
A. Yes.
Q. So you know that the court reporter here is going to take down your answers. And you need to answer my questions verbally. She can't take down nods or shakes of the head.
A. I understand.
Q. Do you also understand that if I ask you a question that you either don't understand or that you think in some way mischaracterizes something you have said previously, you have the right to stop me, make me restate my question until you have one you understand and can answer correctly?
A. I understand.
Q. Any time you want to take a break today, as long as there's not a pending question, just let me know and we can take a break.
A. Fine.



Q. Are you currently employed, Mr. Morgan?
A. No.
Q. Are you retired?
A. Yes.
Q. How long have you been retired?
A. I retired from the Government in 1988, worked for a small 8(a) company in Washington, D.C., for five years after that, and have consulted with several people and companies up until last year.
Q. Let's go backwards. Who have you consulted for since you worked for the 8(a) company? Let me ask you a different way since that rocked you back in your chair.
A. There are numerous companies and corporations.
Q. On what subjects have you consulted?
A. Mainly defense program activities within the Department of Energy.
Q. Have you consulted for any electric utilities that you know of?
A. Yes.
Q. Who are they?
A. It was the V.G. Sumner plant in

South Caroline when they were proposing to use their reactor for tritium production.
Q. All right, sir. Anybody else?
A. Any other utilities?
Q. Yes, sir.
A. None.
Q. Have you consulted at all with the United States Department of Energy?
A. Indirectly for their contractors.
Q. For which DOE contractors have you consulted?
A. Kaiser in Los Alamos. Sandia in Albuquerque. I can't recall of any other directly for Department of Energy.
Q. Since you left the 8(a) company, have you consulted with any entity on issues that involve the management, storage, or disposal of spent nuclear fuel?
A. I have not.
Q. What was the 8(a) company that you worked for?
A. Meta, M-e-t-a.
Q. What business is it in?
A. We were doing environmental assessments for the Department of Energy.



Q. And the years you worked for Meta, that was 1988 through 1993? Is my math right?
A. I think there was a year in between -- or two years that I consulted. I started working for them in 1990 and ended in 1995.
Q. Did any of your work for Meta involve spent nuclear fuel in any way?
A. It did not.
Q. Is there a two-year period between '88 and '90 when you also consulted? Did I understand that correctly?
A. Yes. That's correct.
Q. Did any of your consulting work during that period involve spent nuclear fuel?
A. No.
Q. Did any of that work -- was any of that work for electric utilities during that period of time?
A. I think it was that period of time that I did the consulting at the V.G. Sumner plant.
Q. On tritium production?
A. Yes. I'm not sure of the dates.
Q. Does that take us back to the date of your retirement from the Government?



A. Yes.
Q. What was your position when you retired from the Government?
A. Manager, the Savannah River Operations Office in Aiken, South Carolina.
Q. What does the Savannah River site -- What is the Savannah River site?
A. What is it?
Q. Yes, sir. What is it?
A. It's basically a material production site for the production of plutonium and tritium for nuclear weapons. It ran four production reactors, two separation canyons, waste tank area, and tritium loading facilities.
Q. Are there other resource and development activities that go on at Savannah River other than weapons production?
A. No.
Q. How long were you in that job?
A. Seven years.
Q. So that takes us back to 1981?
A. That's correct. No. Excuse me. Eight years. Eight years as manager, then seven years as deputy manager. So I was at Savannah River for 15 years.



During that period I had various details to Washington, D.C., where I commuted.
Q. Describe for me, if you would, what a "detail" is in U.S. Government parlance?
A. A detail is an assignment to a specific job at another location.
Q. Check my math, but in some form or fashion you were at Savannah River either as manager or deputy manager from 1973 to 1988. Is that accurate?
A. '73 to '88. Yes. Yes, that's correct.
Q. What details were you assigned to during that 15-year period away from Savannah River?
A. Acting Assistant Secretary for Defense Programs on two occasions.
Q. Do you remember the dates?
A. No, I don't.
Q. All right, sir.
A. I think I can construct that for you. The first time was in February after the inauguration of President Reagan. And I held that job for about six months until a political appointment was made.

Then was detailed to Washington just after the passage of the Nuclear Waste Policy Act from February -- I guess it was 1983 -- through the about one-year period.

I was again detailed as Acting Assistant Secretary for Defense Programs, again awaiting a new appointee in that position, and that lasted for approximately six months.

Q. What was the scope of your authority as Acting Assistant Secretary for Defense Programs? What does that include?

A. The entire weapons complex, which included the laboratories -- Sandia, Livermore, Los Alamos -- and all the weapon production facilities, which included Savannah River; Rocky Flats; Richland; Oak Ridge, Tennessee. And that's all I can -- oh, Pantex plant in Amarillo and Bendix plant in Kansas City. Approximately about a $5 billion operation.

Q. After your detail to -- your second detail as Acting Assistant Secretary for Defense Programs, did you return to Savannah River?

A. Yes, I did.

Q. And did you stay at Savannah River until your retirement?



A. That's correct.

Q. There were no further details after that?

A. No.

Q. As Acting Assistant Secretary for Defense Programs, were you involved at all in the issues of spent nuclear fuel management or storage?

A. Only the spent nuclear fuel from the defense program activities. Nothing to do with commercial fuel.

Q. All right. At that time was defense spent fuel intended to be part of the DOE program that was initiated under the Nuclear Waste Policy Act?

A. During the last detail, that's correct.

Q. That would have been from the first quarter of '84 until --

A. Mid -- until mid --

Q. I didn't get how long that lasted.

A. I think that one was about six months.

Q. As manager of the Savannah River site, did you also have some involvement with



spent fuel produced in weapons production?

A. Yes.

Q. In that job did you have any involvement in the DOE spent fuel program at all?

A. The commercial spent --

Q. Yes, sir.

A. None.

Q. All right. Prior to Savannah River, just briefly describe your career for me, prior to 1973.

A. I had graduated from the Military Academy in 1952, was commissioned, spent 13 years in the Army Corps of Engineers.

First assignment was the Korean War; second in Japan; third, 82nd Airborne at Fort Bragg; fourth was a year in Indonesia as a special assistant to the Ambassador for Civic Action; and then resigned my commission in 1965 and went to work for the DOE -- or the Atomic Energy Commission at that time.

Q. What was your job at the AEC?

A. Director of the heavy water organic tool reactor program at Savannah River for one year from '65 to '66.



1966, I joined the reactor development program, Canoga Park, California, and stayed there seven years.

And then in '73 went to work for Savannah River.

Q. Are you an engineer by training?

A. Yes. The Army Corps of Engineers sent me to MIT for two years, and I have a master's in civil and a master's in nuclear.

MR. OHLER: What was that last master's in, sir?

THE WITNESS: Nuclear engineering.

BY MR. BLANTON:

Q. During your time in the Service, were you involved in nuclear weapons issues?

MR. BANES: Objection. Irrelevant.

A. I was not. I had a detail of four years to the Atomic Energy Commission in Idaho Falls in reactor development for Army reactor programs.

BY MR. BLANTON:

Q. Mr. Morgan, have you talked to anybody other than your attorneys today to

prepare for this deposition?
A. I made a call -- After I first got a call from someone that said some lawyers were looking for me and that I should call a lawyer in Washington before I call that lawyer -- all he knew was about the Nuclear Waste Policy Act.
I called Mike Lawrence, and he told me there was litigation and he had a deposition. And that was the extent of that discussion.
Q. I'm sorry. I didn't understand what Mike Lawrence said about a deposition.
A. He said he had been deposed regarding a lawsuit and that it was regarding the Nuclear Waste Policy Act. No further details were discussed.
Q. When was that conversation, if you recall?
A. Prior to my call to the lawyers in Washington, DOE.
Q. Weeks? Months? Or how long ago was it, do you think?
A. I have no idea. Probably three months, four months, something like that.
Q. Did Mr. Lawrence tell you anything about the issues --



A. No.
Q. -- in the case?
A. No.
Q. Did he tell you anything about -- Did he say that he had been deposed?
A. Yes.
Q. Did he tell you what he had been asked?
A. No.
Q. Have you looked at any documents in preparation for your deposition today?
A. Yes.
Q. What documents have you looked at?
A. The documents given to me by counsel.
Q. You recall what they were?
A. I have them with me.
Q. Okay.
A. Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12th through 15th, dated February 1984.
December 20 memorandum of 1991, Approval of Publication of the 1991 Annual Capacity Report.



A compilation of comments from various utilities relative to the contract with the utilities.
And then the last item was the Federal Register of Monday, April 18th, 1983, Part II, Department of Energy.
And I happened to find in my files the old Public Law 97-425, January 7, 1983.
Q. Is that the Nuclear Waste Policy Act?
A. Yes.
Q. Do you have any other personal files that involve the Nuclear Waste Policy Act other than just the old copy of the Act?
A. That's it.
Q. Do you recall having seen any of these other documents before preparing for your deposition today? Do you recall seeing them at the time they were published?
A. I did review them during the time that I was acting as director.
Q. How about -- I think you mentioned the 1991 cover letter to the ACR.
A. Yes.
Q. Did you mention that?



A. December 20th, 1991?
Q. Yes, sir.
A. Had I seen this?
Q. Had you seen that before preparing for your deposition?
A. No. No.
Q. Have you told me now about all the documents you've looked at?
A. Yes.
Q. Mr. Morgan, at the time you were detailed to DOE just after the passage of the Nuclear Waste Policy Act, what was your title?
A. Director, Nuclear Waste Project Office, as I recall.
Q. What were your duties?
A. Implementation of the Nuclear Waste Policy Act within DOE.
Q. At some point in time did the name of the office become Office of Civilian Radioactive Waste Management?
A. Yes. That was when the political appointee was confirmed by the Senate. So it was after -- it was -- when I left, the name changed.
Q. Do you recall who the political

appointee was?
A. Ben Rusche.
(Deposition Exhibit No. 1 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I've handed you a document that's been marked Exhibit 1 to your deposition. And it's a five-page document, I believe, and the first page of it is titled Office of Civilian Radioactive Waste Management, and has a box -- an organizational chart on the first page.
And the top box says Director of Office of Civilian Radioactive Waste Management, and by the side it has R.L. Morgan (A). Do you see that?
A. Yes.
Q. Do you recall at what point in time this -- Do you recall whether this organizational chart was ever correct? Was there an organization that that accurately reflects?
A. It was my impression that I was there during the time it was the Nuclear Waste Project Office. But evidently I am incorrect



because this shows it as the Office of Civilian Radioactive Waste Management, which I know it changed into. But I thought it was after I left.
Q. Regardless of what they called -- what the name of the office was, does that organization look like the one that was there when you were acting director?
A. Absolutely.
Q. Mr. Morgan, who would have been in the box just above you on this org chart? Who did you report to during the time you were acting director of OCRWM?
A. Secretary of Energy, Donald Hodel.
Q. Do you recall whether you had some sort of delegation of authority from Secretary Hodel, formal delegation of authority with respect to the program?
A. I don't understand the question.
Q. Was there a piece of paper saying this is what your authority is within the Department of Energy signed by the Secretary of Energy?
A. I don't recall.
Q. What did you understand your scope



of responsibilities and authority to be?
A. The entire Nuclear Waste Policy Act activities within the department.
Q. Did you have decision-making authority?
A. Yes.
Q. Mr. Morgan, let me get you to look at the page of Exhibit 1 which is marked -- you see these numbers in the top right-hand corner that have SN on them?
A. Yes.
Q. Let me get you to turn to SN010809, which has Office of Management at the top of it.
A. Yes.
Q. You see that? You see all those? At the top of the document it has Associate Director, and it has R.M. Rosselli by the side of it, and then his deputy is H.F. Perry, and then a Finance Division, Operation Division, and Management Division with what appear to be acting heads in each one of those boxes. Is that correct?
A. Yes. Yes.
Q. Below that there are a series of bullets that are below each one of the



divisions. Is that right?
A. Yes.
Q. And, for instance, under Operations Division, there is a bullet on the top that says "Coordinate OCRWM Mission Plan."
A. Yes.
Q. My question is: Are there names of people that are associated with each one of those bullets, people who were in charge of each one of these items that are listed as bullets on this organizational chart during the time you were there?
A. I didn't go down to that level below the division level.
Looking at the assignments, I'm sure in some cases there was a collaborative effort and in some cases people had a lead on it.
But I looked to the division directors.
Q. All right, sir. Did all of those functions eventually report up through Mr. Rosselli and eventually to you while you were there?
A. That's correct.
Q. Were there -- still focusing on the

can't recall whether I had unanimity in certain things, but I would say that not everyone felt the same way about every part of the Act.

So I was ultimately responsible for the definition of what was in there.

BY MR. BLANTON:

Q. What did you decide it meant?

A. Pardon?

Q. What did you decide that the Act meant?

MR. BANES: Objection. Vague. Compound.

A. I really don't understand the question. In other words, the Act as written is what we tried to implement. And there were some interpretations, and we interpreted it a given way.

BY MR. BLANTON:

Q. What problem did you determine that the Act was attempting to solve?

A. What problem?

Q. What problem? Or was there a problem that the Act was trying to solve?

A. Yes, the storage of the nuclear waste from the commercial establishment. That's



what the whole act was about.

(Deposition Exhibit No. 2 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, I've handed you a document marked Exhibit 2 to your deposition, the first page of which is titled Proceedings of the 1983 Civilian Radioactive Waste Information Management Meeting, December 12 through 15, 1983, Washington, D.C., and then it has February 1984 below that.

And then following that we've included the forward and table of contents but we've not included all the papers listed in the table of contents. But we have included the last two pages titled Program Overview. Do you see that in the document?

A. Yes.

Q. First of all, when we -- In reviewing the cover of the document, there are two dates on it. One is December 12 through 15 of '83, and one is February of 1984. Do you know what those two dates refer to?

A. The February 1984 is the date it was published.



Q. And December of '83?

A. The December 12 through 15 of '83 was the time that the meeting took place.

Q. Do you recall this meeting?

A. Yes.

Q. Did you go? Were you there?

A. Yes.

Q. What was the purpose of the meeting?

A. It was basically, as I recall, an information as to what we were doing within DOE and what were some of the issues that we were looking at. And it was basically an overview for those that had interest, including the utilities.

Q. All right, sir. Now, at the time of this meeting, what had happened in the program since the passage of the Act? What progress had you made toward implementing the Act at this point?

A. Okay. The first -- within the first month there were letters that I had the Secretary sign to all the governors as to the process we were about.

We had completed the draft contract as required with the utilities.



Then we had resolved those issues and the Federal Register notice that I referred to before.

And the rest of it was just getting a mission plan outlined as to what our goals were and how we intended to get there.

That was the purpose of this meeting, an information meeting.

Q. And for context, the Act was signed by the President in January of '83. Is that right?

A. That's correct.

Q. So you had -- at the time of this meeting, you had been in your job in the Office of Civilian Radioactive Waste Management -- or Nuclear Waste Office or whatever it was -- basically a year?

A. Just about. It was February that I -- that I recall being asked to take the job. I don't have the dates. Close to a year.

Q. Turning to the page of the exhibit that's marked SN069599, it has the title Program Overview, and then under that it has Robert Morgan, Acting Director of Civilian Radioactive Waste Management. Was that you?

A. Yes.
Q. Did you write this paper?
A. I gave the first initial outline, it was filled in, and then I reviewed it.
Q. Who filled it in for you?
A. As I recall, it was Mike Lawrence and other people on the staff.
Q. Did they produce drafts and then bring the draft back to you and you would edit it and give it back to them?
A. I think it was just the one sequence that we used. I'm not sure. But I think I outlined it. We gave it to the people. They sent in the information. I reviewed it and edited it and presented it.
Q. So do I understand correctly that you actually addressed the group verbally and said what's in this paper?
A. That's my recollection.
Q. Who were the attendees at this meeting?
A. I have no idea.
Q. In general. Was it open to the public?
A. Utilities. Utilities, people from



the Hill, staffers. It was an open meeting.
Q. Let me direct your attention, Mr. Morgan, to the seventh paragraph. That paragraph starts, "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do." Do you see that?
A. Yes.
Q. I'm going to give you a chance to read that whole paragraph before I ask you any questions about it.
(Pause.)
A. All right.
Q. The fourth and fifth sentences of that paragraph say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
My question is: With respect to what DOE was required to do in January of 1998, what did you believe at this time was the intent of the Act?
A. We put a mission plan together to where hopefully -- again, this was in the



mission plan. I think it's summarized in the last paragraph of the statement on the next page.
Q. What was the source of your understanding of what the intent of the Act was?
A. I don't recall.
Q. The last two sentences of the -- what did I say that was, the seventh paragraph? -- states that, "The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
Do you see that sentence?
A. Yes.
Q. How did that basic strategy come about?
A. That was my input.
Q. Why did you decide that that was the strategy?
A. That's what I felt was the intent of the Congress. And I think listening to some of the staffers is how I got to that conclusion. But it was my conclusion.
Q. And did the drafts or the outline of the mission plan -- Strike that. Do I



understand you correct that the mission plan, in the state it was when you left, was designed to implement that strategy?
A. That's correct.
Q. So in your view as director of the program, was the mission plan -- Strike that.
Did the mission plan, when you left as director, effectuate the intent of Congress as expressed in the Nuclear Waste Policy Act in your view?
A. I believe so.
Could I add a couple of things to the answer of "I believe so"? There was not uananimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill -- or the House and the Senate.
And I felt that as long as we are getting stoned from both directions that we were about in the right place.
So I don't think that I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, monitored

retrievable storage, because they felt a repository would not be approved by 1998, whereas other people said, "Don't go with the MRS. Put all your effort onto the repository program."

So there was a balancing act that we -- we made compromises as to what was in that mission plan to hit the middle of the road, I guess is the best way to describe it. And I don't think that it really had a full consensus by the House and Senate as to what their intent was.

Do you understand what I'm saying?

Q. Let me ask you a question and I'll see. You can answer my question, and I'll figure that out.

You got conflicting statements from members of Congress --

A. Yes.

Q. -- based on the tactics, for lack of a better word, outlined in the mission plan for meeting the goal.

A. Yes.

Q. Not on the goal.

MR. BANES: Objection. Vague.



A. Well, the goal -- I think that there was -- you know, our goal was to get a repository in by 1998. And there were some members of Congress that said, "Put all the emphasis on an MRS" so that there was a conflict in the goals.

BY MR. BLANTON:

Q. All right, sir. Did the people who said, "Focus on an MRS," was their purpose that you won't be able to get a repository done, so you won't be able to move fuel by '98?

MR. BANES: Objection. Lack of foundation.

A. I cannot -- I cannot, you know, attribute any background or what they felt about it. I just don't know.

BY MR. BLANTON:

Q. As the head of the -- or the acting director of the Civilian Radioactive Waste Management Program, you determined that, as far as your office was concerned, the mission plan at the time you left was the proper way to accomplish the goals?

A. Yes.

(A discussion was had off the



record.)

BY MR. BLANTON:

Q. Back on the record. Mr. Morgan, still looking at Morgan Exhibit 2 and still looking at the seventh paragraph of your Program Overview, the last sentence says, "During the first year of operation" -- the last sentence of the seventh paragraph says, "During the first year of operation of the repository, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."

At this point in time, did you know what that rate was in terms of what quantity of fuel in a year?

MR. BANES: Objection. Calls for a legal conclusion. Go ahead.

A. As I recall, we generally knew the discharge rates from the reactors. There was information available to us. And I recall that there was a company in Atlanta -- and I can't remember the company -- that provided that information. They had it in their database.

BY MR. BLANTON:

Q. Not NAC, is it?



A. Could have been.

Q. So as far as you were concerned, was the rate that was sufficient such that no utility would have to add further storage facilities either on site or at another location, was that rate equivalent to the discharge rate?

A. You notice the next paragraph?

Q. Yes, sir.

A. It says, "So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being . . . ."

Q. Right?

A. So there was a time from '98 to 2001, and in '98 the utilities would be making commitments or possibly commitments for dry storage that would be delivered in the 2000, 2001, but that they wouldn't have to make new commitments for ordering, in that time lag, of commitment to additional storage and then actually having that storage.

So we're talking about hopefully -- In other words, when you start receiving fuel in '98, we're not going to be at full run. There's a start-up lag time. So we felt by the year

2000 or 2001 that we would be meeting the discharge rate.

Q. During your meeting with Congressional staffers when you first received this detail, did the subject of what the rate under the Act should be come up?

MR. BANES: Objection. Irrelevant.

A. I don't recall.

BY MR. BLANTON:

Q. Do you recall what process you went through at DOE internally in arriving at the plan that during the first year of operation we should be -- of the repository in 1998 we should be receiving fuel at a rate so that no utility would have to add any further storage facilities?

Do you recall what the process in DOE was to arrive at that?

A. That was debated and discussed within my staff there. And that was my conclusion.

Q. Okay. Who worked on that issue beside yourself?

A. I would say all the first level



people. I believe in a -- what you would call a collaborative approach to management. I like to have the input discussed before I make a decision.

Q. And by first level people, you are referring to the people who were your direct reports on that organizational chart?

A. Yes, plus Mike Lawrence and McElvey.

Q. Where is Mike Lawrence now? Do you know where he lives?

A. In Richland, Washington.

Q. Does he still work for the Department of Energy as far as you know?

A. No.

Q. Is he retired?

A. No.

Q. Do you know who he worked works for?

A. PNL.

MR. BLANTON: Off the record.

(A discussion was had off the record.)

BY MR. BLANTON:

Q. Do you recall how far in advance of this meeting on December 12 through 15th that DOE arrived -- and really you arrived at this



strategy of picking up fuel at a rate such that utilities would not have to add storage space after 1998?

A. Do I recall?

Q. How far in advance of this December 12 through 15 meeting.

A. I think it was quite some time.

Q. Was it something that evolved over time from the time you got there?

A. Yes.

Q. If I could, let me back up for a second and ask you: Did formal notices go out to various stakeholders about this meeting? Do you recall how it was advertised?

A. There's a certain requirement that I can't recall which says all the stakeholders -- the states, utilities -- had to be involved in a notice. And I believe -- well, I believe that that was accomplished.

Q. All right, sir. It says it was sponsored by the U.S. Department of Energy. Did the Department of Energy fund the meeting?

A. Yes.

Q. Do you recall where it was held? Was it at DOE headquarters, or was it at



someplace else?

A. It was someplace else, as I recall.

Q. Do you know whether you ever discussed the issues that are set out in this Program Overview and specifically the issues discussed in paragraphs seven and eight of the Program Overview?

A. Issues?

Q. Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraph of this Program Overview regarding the intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?

A. Oh, yes.

Q. Did you review this paper with him before you presented it at these proceedings?

A. I had reviewed the initial schedule, a layout of the program, with him in order to get from Point A to 1998.

And in that discussion I do recall saying that this was extremely optimistic, as stated on the next page, that there were many things that were impediments to getting there -- NRC licensing, siting, the siting criteria,

litigation. We had, as I recall, three lawsuits in the period of time that I was acting director -- some of which could cause delays.

The fact that we were dealing with three different media -- basalt, tuff, and salt. Excavation in salt is a lot quicker and easier than excavation in basalt.

So that the characterization by 1987 we thought was an extremely difficult milestone to meet. So there were many uncertainties that we had to face. And we tried to put a schedule together balancing all those and saying, yeah, if it works, this is how you are going to do it.

Q. When you say the schedule, do you mean the schedule for the development of the various facilities described in the Act?

A. The schedule to accept fuel in 1998 I considered extremely optimistic.

Q. Did you ever discuss with him your characterization of the intent of the Nuclear Waste Policy Act?

A. In an overall basis, but not specifics. You know, in other words, we are going to accept fuel in 1998. That was the goal.



Q. All right, sir.

A. And I discussed with him the schedule, all the items that had to be implemented and laid out in a PERT network in order to get there. You had to do A before you do B. And sometimes B defines back to A, so that you do a logic network to get there. And that was discussed with him.

Q. Did you discuss with him your strategy that beginning in 1998 utilities would not have to provide any additional storage facilities on site?

A. I don't recall.

Q. Based on your conversations with the Secretary of Energy at the time, did you feel that the Program Overview as you gave it in these proceedings in December of 1983 were consistent with his views of the Nuclear Waste Policy Act?

MR. BANES: Objection. Lack of foundation.

A. That's presumption on my part, you know. But overall, trying to accept fuel in 1998, that was discussed with him. But again, I described that as a very optimistic schedule.



BY MR. BLANTON:

Q. But he agreed with it?

A. He didn't object to it, to me.

Q. How did DOE go about developing the standard contract?

A. That was a consensus between my office, contracts, and legal.

Q. Was there a team that did the drafting? Do you recall who the specific individuals were?

A. I believe Rosselli was one of the members, but I don't think he was the only one.

Q. Can you describe how the process worked? Would somebody generate a draft and then circulate it and take comments, or what happened?

A. Yes.

MR. BANES: Objection as to form. Go ahead.

A. There were several discussions that we had in resolution of some of the items.

BY MR. BLANTON:

Q. Do you recall any specific items that were discussed?

A. Oh, boy.



MR. BANES: Objection to the extent it requests discussions with counsel. Don't answer those questions, sir.

THE WITNESS: Pardon?

MR. BANES: Don't answer it insofar as it requests discussions with counsel.

A. I know that we discussed the -- how to deal with the fuel that was already discharged as to the fact that some of it was low exposure fuel and some was high exposure fuel, that we had to charge an average of one mill per kilowatt for that.

But we felt that those people that had failed fuel elements that we would have to insert in the repository required a greater amount of effort on our part than those that had high exposure.

In other words, digging the hole, encasing it in the repository, took X amount of dollars to do that. So the only thing that you can do is --

Basically, a repository is heat-loaded limited so that you could put the less exposed fuel closer together. But you still had to excavate and drill for those as you

would any of the high-use fuel.
That was -- that was litigated after the final rule by General Electric. And my recollection is that we prevailed and the judge decided in our favor. That was one of the items discussed.
The other item discussed was the rate of acceptance, whether we should have a rate of acceptance or not. And it was decided that we would not put in a rate of acceptance in the contract.
Those are two areas that I recall specifically at this time. I think there were others.
BY MR. BLANTON:
Q. What do you recall about the discussions regarding putting in a rate of acceptance, other than it was -- what the decision was?
A. Well, with the uncertainties and the optimistic schedule that we were looking at, we felt it was inappropriate to commit to a rate at this time in a contract.
Q. Did you view the contract as a mechanism for implementing the intent of



Congress?
A. Absolutely. That was specified in the Act.
Q. Do you recall any other issues, other than the issue on -- that was litigated with GE and the rate of acceptance?
MR. BANES: Objection. Compound.
A. The gross versus net charged to the utility.
BY MR. BLANTON:
Q. Let me ask you another question. We may be able to short-circuit this. Are all the issues that -- do you recall discussing any issues internally in DOE during the contract formation that are not addressed in the notice of rulemaking on the standard contract?
A. No. We only dealt with the comments that we received and resolved. We didn't have any further discussion.
Q. At the time the contract was executed, was your view regarding the intent of Congress in enacting the Nuclear Waste Policy Act the same as it was when you addressed that issue in the Program Overview?
A. One is a contract; the other is a



mission plan. Two different entities. And a mission plan is laying out how to get there.
With the uncertainties that we had facing us in the program, I didn't think it was realistic to include a rate. And there was no objection to that that I know of.
Q. Let me ask the question in a slightly different way. I understand your testimony to be -- and correct me if I'm wrong -- that at the time you gave the Program Overview statement in December of 1983, that it was your view that the intent of Congress in passing the Act was that beginning in 1998 utilities would not have to provide any additional storage facilities on site.
A. No. That wasn't -- The intent was clearly -- you know, they said to accept fuel in 1998. And there was no rate specified.
Q. What was -- so what was the source of your plan to -- as expressed in the Program Overview that beginning in 1998 utilities will not have to provide any additional storage facilities? Why did you say that?
A. Because I thought it made sense. And this is one of the things that was not



defined by Congress in a conference report, which I don't think I could have gotten consensus as to putting a rate in that Congress would agree to.
Q. Was eliminating the need for utilities to add storage facilities on site beginning in 1998 DOE's purpose in drafting the contract the way it drafted it?
A. There was no mention of rate in the contract, no acceptance rate.
And again, I'll say that it was an optimistic schedule presented in the mission plan. And your reference to accepting rate or no new facilities for on-site storage -- again, I'd like to call attention to the fact that in that same testimony I talked about the 2000, 2001, rather than 1998, of matching the discharge so that commitments would be made in '97, '98 for additional storage that would come on line in the 2000 and 2001 period.
Q. I'm still not sure I understand that.
MR. BANES: Objection. Vague.
BY MR. BLANTON:
Q. What's the difference between --

Mr. Rosselli, has "Coordinate OCRWM mission plan." Is that wrong?
A. No. That's correct. But Bennett had all the information that -- or most of the information that goes into it. They had the MRS activity, which was not under Bennett, also going into it so that the Operation Division got this input and put it together.
In other words, it says "coordinate." It doesn't say, "You are responsible for preparing every part of it."
Q. I understand. How did the drafts of the mission plan come to you? Did they come to you through Mr. Bennett or through Mr. Rosselli?
A. The document, you know, the preparation, the final preparation after discussion came from the Operations Division. The discussions included the entire top level staff.
Q. All right, sir. Which division had the responsibility for the contract as far as OCRWM was concerned?
A. My recollection was it was under Rosselli.
Q. And it appears to be Operations --



next-to-the-last bullet under Operations?
A. Right.
Q. So both the mission plan and the contract came through Operations, through Mr. Rosselli, to you? Am I understanding that correctly? Understanding that other people had input into the mission plan.
A. Yes.
Q. Who is Mr. Head, Mr. C.R. Head? What is his name, first name?
A. I don't recall.
Q. Do you know where he is now?
A. No, I don't.
Q. At the time the standard contract was drafted, did you know what the discharge rate of spent nuclear fuel was going to be in 1998?
A. We had an idea, yes.
Q. What factors was it dependent on, the rate of spent nuclear fuel discharge? What was that dependent on?
A. Experience from the reactors in previous years.
Q. Did it depend on the growth rate in new reactors?



A. There were no new reactors planned. There were some coming on line, as I recall, but nothing new had been ordered, as I recall.
Q. Do you recall an upper-bound case, a mid-level case, and a no-growth case being reviewed by DOE in terms of projecting what the quantities of spent nuclear fuel would be in 1998 and forward?
A. I think that NAC had those numbers. I just don't recall.
(Deposition Exhibit No. 3 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, the court reporter has marked as Exhibit 3 to your deposition a February 4, 1983 Federal Register notice titled Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste. And the action under the title says "Notice of proposed rulemaking."
Have you seen that document before?
A. I'm sure that I saw it at the time it went out.
Q. This is not one of the documents you reviewed in preparation for your deposition. Is



that correct?
A. That's correct.
Q. You reviewed the final contract rule.
A. I don't know and I cannot say whether I reviewed the final rulemaking in the process of preparing the testimony or discussion that we had on December 12 through 14th or whatever it was.
Q. I didn't make my question clear. In preparation for your deposition today, you have not reviewed this proposed rulemaking?
A. That is correct.
Q. But you did review the final rulemaking in preparation for your deposition today?
A. Yes.
Q. This document has several sections under a heading marked Supplementary Information. Do you see that on the first page, top of the first page of text?
A. Right.
Q. It would be page ADM-001-0669 in the stamp at the bottom of the page.
A. Right.

answered.
BY MR. BLANTON:
Q. Did the utilities have a right to expect anything?
MR. BANES: Objection. Argumentative, asked and answered.
A. He objected. Do I still answer it?
BY MR. BLANTON:
Q. I would appreciate it if you would.
MR. BANES: I wouldn't answer that.
BY MR. BLANTON:
Q. So you are not going to answer that question on the advice of your counsel?
MR. BANES: You just asked him whether they could expect anything. He has already answered: The rights and obligations are defined by the contract.
Let's look at the contract if you want to ask him specific questions about it.
MR. BLANTON: I just want to make it clear on the record, I've asked the question and you are telling him not to answer. That's all I'm asking. Is that where we are?
MR. BANES: That's not what



you're asking.
MR. BLANTON: Well, the record will reflect what the question is.
MR. BANES: Let's move on.
A. What's the question again? What rights do the utilities expect from the contract?
BY MR. BLANTON:
Q. What do the utilities have a right to expect from the contract?
MR. BANES: That wasn't the question. That's a new question.
MR. BLANTON: Okay. I'll ask that one.
MR. BANES: Asked and answered.
A. By signing the contract, they were allowed to continue operation.
BY MR. BLANTON:
Q. How so?
A. NRC. They were required to sign it for continuation of the license, in my understanding. And I don't know what else is specifically in the contract.
BY MR. BLANTON:
Q. On the second page of the notice of



proposed rulemaking, which is page -0670, there's a reference in the last paragraph before the heading that says II, Proposed Rule. It says, "DOE determined that it would be most appropriate to develop the proposed . . . contract through rulemaking" --
Do you see that?
A. Yes, I see that.
Q. It says, "DOE determined that it would be most appropriate to develop the proposed standard contract through rulemaking because the process presents the best opportunity for interested persons, particularly the affected parties, to participate in developing the standard contract which will be used in DOE's nuclear waste disposal activities."
Was there any other reason other than that to do it as a rulemaking?
A. I don't believe I participated in this. I think you should ask the people that prepared this what the intent was.
Q. Do you recall being involved in any discussions with respect -- in response to the comments about whether or not rulemaking was the



appropriate mechanism for doing the contract?
A. That was already in process. It had already been done, and I was dealing with the comments that came in on the rulemaking.
Do you understand what I'm saying? I don't think I can address anything in this -- this Part IV that you've handed me as R. Morgan Exhibit No. 3.
Q. All right, sir. Well, let's get out the final rule, then. Okay.
(Deposition Exhibit No. 4 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, you have before you Exhibit 4 to your deposition, which is a Federal Register notice dated Monday April 18, 1983, titled Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. Do you recognize that document?
A. Yes.
Q. This is the document that you reviewed in preparation for your deposition. Is that right?
A. Yes. I had a copy of this prior to

the deposition.
Q. Do you recall what the process was for the preparation of this document? Who participated?
A. Specifically, there are three people: Rosselli, Cavanagh, and Winnick. They are specifically listed for further information contact. They had the lead of putting together the response.
Q. Mr. Rosselli reported to you. Did either of the other two people report to you?
A. No, they did not.
Q. Did you participate in any discussions with either of the other two -- without talking to me about what you talked about with --
A. I'm sure I did.
Q. -- Mr. Winnick.
A. I'm sure we had resolution meetings when not only these people were present but others.
Q. What other people would be present during resolution meetings?
A. Oh, boy. Mike Lawrence. And then I -- the one that reports to Rosselli that had the



lead for that which you have in the organization chart listing responsibilities, the division director.
Q. Mr. Head?
A. Yes.
Q. Let me make sure my memory is right. Mr. Head, C.R. Head?
A. That's correct.
Q. And just describe for the record, if you would, how resolution meetings would come about.
A. They would review the comment that came in against the paragraph, and then the proposed response or resolution of that comment in the final rule.
Q. All right, sir. Were these regular meetings that were held at a particular time every week, or were they ad hoc, or how would they come about?
A. Basically they were ad hoc. There was not a time -- time to review that. When various sections were prepared, they were reviewed.
Q. Were the people involved ad hoc as well?



A. In some cases, yes. Like a Bennett would be involved on some issues and not on others.
Q. Were different contract issues assigned to different people?
A. I think they were referred to various people that fed back in to Head.
Q. What was the basis for the referral to a particular person?
A. The organizational responsibilities, as defined in the org chart.
I would like to add that there is not a date on that organization chart that you have showed me as --
Q. No, sir. There's not.
A. -- Exhibit 1. So I'm not sure just, you know, the date of when things happened and when people were on board.
I know that Bob Bauer, as a for instance, was not there during the early formation of the program. I brought him in from the Chicago office at a later point in time, but I don't remember that exact date.
But I do know that Mr. Head was there during this process, as was Rosselli,



Bennett, and Lawrence.
But I would -- I just -- I'm cautious as to did this person have that responsibility at the time we're talking about. I just don't have an organization chart with me for that date.
Q. I understand. Does the fact that Mr. Bauer is shown as Associate Director, Storage and Systems Development, indicate to you that this org chart was later in your tenure as acting director than earlier?
A. Yes. I do not believe that he was there in this process to the best of my recollection. I just have a problem being specific to that organization chart when it doesn't have a date.
Q. I understand. Let me ask you a question this way. Other than Mr. Bauer, are you confident that the other individuals listed on the first page of this org chart that's marked as Exhibit 1 to your deposition were there throughout your tenure as director?
A. Yes.
Q. And were they there in the jobs shown on the organizational chart?

what the life cycle cost of the system was?
A. No. It was not a consideration.
(Deposition Exhibit No. 5 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I've handed you a document marked Exhibit 5 to your deposition. And it's titled Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste, and it's dated July 1983. And it appears to be a United States Department of Energy document.
And it's -- At the top of it, it says Office of the Secretary of Nuclear Waste Policy Act Project Office. Was that your office before the name changed?
A. Yes.
Q. And in July of '83 you were acting director. Is that correct?
A. Yes.
Q. Do you recall having seen this document before?
A. I do not recall.
Q. Let me refer you to page 1 of the document. And first of all, take as long as you



want to. Don't let me rush you. Take as long as you want to to look at it. Tell me when you are ready for me to ask you a question.
A. Go ahead.
Q. All right. On page 1 of the document under Section 1, Introduction and Summary, 1.1 Background, the last sentence of the paragraph says, "This report evaluates whether collection of the fee will provide sufficient revenues to offset the costs of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste produced from reprocessing such fuel."
Do you see that?
A. Yes.
Q. Was that one of the requirements of the Nuclear Waste Policy Act, that DOE evaluate the fee from time to time to see if it was sufficient to cover the costs of the program?
A. Yes.
Q. Let me get you to refer to page 9, which has Table 3-1, Key Reference Case Assumptions is its title.
(Conference between Mr. Blanton and Mr. Hirsch out of the hearing of the reporter.)



BY MR. BLANTON:
Q. I skipped ahead of where I should have skipped. Let me get you to go back to page 8.
A. Page 8?
Q. Yes, sir.
A. All right.
Q. Under Reference Case and Assumptions, Section 3.1.
MR. BANES: You are not limited to reading just that if you need further context.
BY MR. BLANTON:
Q. Yeah. Read whatever you want to.
(Pause.)
A. Okay.
Q. The first paragraph on page 8 says, "The key assumptions used to estimate and project life-cycle program costs under the reference case are listed in Table 3-1."
And then the next paragraph -- Do you see that, that I just read?
A. Yes.



Q. And then the next -- the second paragraph under Section 3.2 on the same page says, "It is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002 respectively. Each repository has a design receipt rate of 3,000 metric tons a year, although a receiving rate of 1,800 metric tons annually is assumed for the first five years."
Do you see where I read that from?
A. Yes.
Q. The question is: What relevance do those assumptions have to the total life-cycle costs of the system?
MR. BANES: Objection. Vague.
A. I do not understand your question.
BY MR. BLANTON:
Q. Do you know what "reference case" refers to as used in this report?
MR. BANES: Objection. Lack of foundation.
A. I don't understand that question.
BY MR. BLANTON:
Q. All right. Let me ask you this

question, then. Do you know how the total life-cycle costs of the DOE waste management system were estimated for the purposes of determining whether the fee was adequate to cover them?

A. I don't know. I don't recall.

Q. Does it appear to you from reading this that the receipt rate, the projected receipt rate, was a factor in calculating or projecting that cost?

MR. BANES: Objection. Calls for speculation and lack of foundation.

A. I would conclude from reading this that that is the case.

BY MR. BLANTON:

Q. Do you ever recall being involved in a decision while you were director of the Nuclear Waste Policy Act Project Office or the Office of Civilian Radioactive Waste Management about what receipt rates should be included in any estimates of life-cycle costs?

A. I do not recall any specific discussions regarding what was to be used in this cost estimation. That's all I can say.

Q. All right. Do you have an



understanding as we sit here today of how the nuclear waste fee was supposed to work?

A. The fee of one mill per kilowatt was a number given to us by Congress and that we were required to forecast whether that was adequate or not.

The conclusion that I participated in was that it was adequate at the time I was there.

Q. Was that decision based on some estimate of the costs of the program that somebody presented?

A. It was primarily reviewed for our current and projected years, not through the life-cycle costs, from my standpoint. I was looking at the near-term requirements. That was my concern.

I was very bluntly told by Congress not to try to get any modification or change anything in the first year.

Q. Who told you that?

A. One of the Congressional staffers. If I changed anything or opened it up, it would -- they felt would substantially hurt the program because of the divergence of opinion as



to what was to be covered in the Act legally.

Q. Did the Act provide for adjustments both up and down in the fee?

A. In my mind, they did.

Q. What would cause a downward adjustment in the fee?

MR. BANES: Objection. Calls for speculation. Go ahead. It's also outside the scope of the schedule issues.

A. Yeah. When I look at this, I have reviewed exposition salt mines in Germany as to how they were excavated versus some of the tunneling in granite in Sweden and what we expected in the basalt excavations. And the prices were extremely wide.

If we went into a salt dome, I believe there may have been a reduction. I don't know. But it would cost less for the Government to open a salt repository than a basalt or tuff repository.

BY MR. BLANTON:

Q. Would the cost of operating the repository change with the quantity of fuel you received at it each year?

MR. BANES: Objection. Calls for



speculation.

A. In my opinion, you would have potentially, you know, to excavate and mine and deposit fuel in a salt mine, you could work several drifts at the same time. So it would not change the cost of the down- -- down-hole activities.

It would increase the elevator cycles. And as to whether, you know, you could handle that with the -- with one lift versus two, that was yet to be decided. And I think that the number of elements going in per day, I think you could handle it with one lift.

Q. How about such things as transportation costs and other operating costs as opposed to construction costs? Would those vary?

A. You would probably have to have --

MR. BANES: Objection. Relevance.

A. You would have to have a larger inventory of casks to move more fuel. But the actual expense of the transportation of that would be the same. In other words, after the initial investment of casks, that would be the

only difference in my mind.
BY MR. BLANTON:
Q. How about the amount of time that the repository stayed open before it was closed? Would that affect the life-cycle cost of it?
A. It's potential.
Q. Does that -- does the amount of time that the repository stayed open relate to the receipt rate?
A. Of course.
Q. How so?
A. Well, if you receive more -- You are going to -- you are limited by the number of metric tons you can have in the first and second repository. If you bring it in quicker, you can close it up quicker.
Q. Which would retire -- Excuse me.
A. That's obvious.
Q. And that, in turn, would affect the cost?
MR. BANES: Objection. Calls for speculation. Irrelevant.
A. It has the potential in my mind of affecting the cost. But that could be up or down.



BY MR. BLANTON:
Q. Is that the reason -- all of these issues we've been talking about, is that the reason a Reference Case Material Flows such as shown in Table 11 (sic) was included in this report, marked Exhibit 5?
MR. BANES: Objection. Lack of foundation. Calls for speculation.
A. Please repeat the question. I'm sorry.
BY MR. BLANTON:
Q. Is the effect of the receipt rate at the repository or in the system -- Strike that.
Is the effect of the receipt rate on cost of the system the reason a table such as 3-3 would be in your report on financing the disposal of commercial spent nuclear fuel?
MR. BANES: Same objection.
A. I think this was the case. I don't recall whether it has alternates or, in other words, sensitivity analysis whether this rate goes up or not. I don't know if that's in this report or not. I do not recall that.
BY MR. BLANTON:
Q. But would that be the reason it's in



the report, because receipt rate has an effect on cost?
MR. BANES: Objection. Lack of foundation.
A. This was a case based on these numbers. I don't know if there was sensitivity analysis made relative to whether those -- if the rate changed, what that would do to the cost.
This was a -- what I'm looking at right now is a one-case basis.
BY MR. BLANTON:
Q. What other reason would there be for including the Reference Case Material Flows table in this report, other than to make some assumptions about the cost of the system?
MR. BANES: Objection as to form. Lack of foundation.
A. This was an estimate of cost that reviewed the life-cycle costs under given conditions.
I did not focus on this report because of a preconception that I was not going to change the one mill per kilowatt rate during the first year.



BY MR. BLANTON:
Q. I think the question was, though: Is there any other reason, other than a projection of cost, for these numbers to be in the document?
A. That's the basis that they used for calculating the cost. I don't know if a sensitivity analysis was done relative to changing those numbers.
Q. All right, sir. Are you aware of whether in July of '83, when this report that's marked Exhibit 5 to your deposition was produced, whether there was within the Department of Energy any reference case other than the one shown in Table 3-3?
MR. BANES: Objection. Irrelevant.
A. I have no recollection.
BY MR. BLANTON:
Q. Was there any consideration in July of '83 within the Department of Energy regarding the acceptance of less than the amounts shown in Table 3-3?
MR. BANES: Objection. Asked and answered.

A. I have no recollection.
BY MR. BLANTON:
Q. Let me refer you back to Exhibit 4 now, which is the final rulemaking, and get you to look with me at the second page of that document. It's got page 16591 up in the upper right-hand corner.
A. Yes.
Q. In the second full paragraph in the far left-hand column, there's a paragraph that says, "A new second 'Whereas' clause relating to the responsibility of DOE to take title to SNF or HLW 'as expeditiously as practicable,' has been added to the following language of the Act." And then in a parenthetical it has a citation of the Nuclear Waste Policy Act.
Do you see that?
A. Yes.
Q. Do you recall any of the discussions that led to the inclusion of the second "Whereas" clause that that refers to?
A. This is what the mission plan was trying to do; in other words, get to the acceptance. That was a goal established. And this was part of that goal.



Q. Do you recall whether any of the commenters suggested inclusion of that clause?
A. In order for it to be changed, there would have to be a comment.
Q. Okay. So you --
A. I don't think there were any changes made that had not been commented on either in the written or the oral comment period.
Q. So if there is a change from the proposed contract to the standard contract, that tells us there was a comment on that change. Is that right?
A. That would be my assumption.
Q. DOE did not change anything just of its own volition?
A. Not to my knowledge.
(Deposition Exhibit No. 6 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, the court reporter has handed you a document marked Exhibit 6 to your deposition, which is a letter dated March 4, 1983, from F. L. Clayton, Senior Vice President, Alabama Power Company, I presume to you, Robert Morgan, Project Director, Nuclear Waste Policy



Act.
A. Yes.
Q. Take your time, review that letter, and let me know when you're ready for me to ask you a question.
(Pause.)
A. All right.
Q. All right, sir. On the numbered page 8 of that letter --
A. Yes?
Q. -- there's a paragraph 7 that says Spent Fuel Receipt Rate at DOE Facility.
A. Yes, I've read that.
Q. Do you recall receiving comments -- either this comment or comments like it in the comment process on the contract?
A. There were many comments, as you know. And we collectively reviewed those comments.
And I can see from paragraph 7 that "as expeditiously as practicable" is in this paragraph. And that was -- and the contract was modified to make that statement.
Q. All right, sir.
A. I mean this is -- Never mind.



Q. Go ahead.
A. Never mind.
Q. You see the sentence in paragraph 7 that says, "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible."
A. Yes.
Q. "Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner."
Did the sentence that says "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible" -- was that the goal of DOE in implementing the

program?
MR. BANES: Objection. Vague.
A. That was basically in my statement of December which said we'd like to catch up with the generating rate in the 2001 period or that time frame.
BY MR. BLANTON:
Q. All right.
A. So that's -- The design of the facility is to accommodate that. It doesn't say when. We would like to have that -- the repository not only take the generating rate but, more than that, to get rid of the backlog. That was the intent of sizing the facility. And that hasn't changed.
Q. Let me get you to take a look at Defendant's Exhibit 4, again, and get you to refer to page 16598.
A. Yes.
Q. If you would just read to yourself the paragraph that says, "Similarly, seven commenters addressed the DOE performance standards . . . ."
(Pause.)
A. Yes.



Q. At the seventh line from the bottom of that paragraph, it says, "The 1998 date is called for in the Act, and we believe it to be a realistic date." Do you see that?
A. Yes.
Q. Was that a true statement at the time that the final contract was issued?
A. That's, again, what I testified in December, that it was an optimistic date but that we believed that we could meet it barring intervention and all the other uncertainties that the Act had.
Q. But at this particular time, DOE believed it was realistic?
A. Optimistically realistic.
Q. I don't see "optimistic" in the sentence. Do you?
MR. BANES: Objection. Argumentative.
A. That's in my statement of December 12.
BY MR. BLANTON:
Q. The next sentence says, "Our performance will be judged by meeting this date." Could you elaborate on that, what that



means?
A. Exactly what it says.
Q. What, in your view, was DOE's performance?
A. Meeting that date.
Q. By doing what?
A. Accepting spent fuel in 1998.
Q. What quantity of spent fuel in 1998 would have satisfied DOE's obligation as stated in that?
MR. BANES: Objection. Calls for a legal conclusion.
A. As I said in the December 12th, that if we accepted one spent fuel element in 1998, we would have met the requirements of the Act as specified, but we did not think that was the intent of the Act.
So the answer to the question, one spent fuel element.
BY MR. BLANTON:
Q. What did you think the intent of the Act was?
MR. BANES: Objection. Irrelevant. Calls for a legal conclusion.
A. I have no idea. That's drawing a



conclusion. I didn't participate in the preparation of that Act.
BY MR. BLANTON:
Q. Well, as the director of the program, was the intent of Congress a factor in what you did?
A. Absolutely.
Q. And what was your working definition of what the intent of Congress was as to the quantity of spent fuel that should be accepted?
MR. BANES: Objection. Calls for a legal conclusion. Irrelevant.
A. Yeah. I can only read intent as to what the words required in the Act, which required the acceptance in 1988 of -- or 1998 of spent fuel.
And as I said on the 12th, to meet that, those words, would be one spent fuel element. That was my comment then. It's the same.
BY MR. BLANTON:
Q. I don't want to argue with you about it, but you said in the next sentence that was not the intent of Congress. And my question is directed to what was your understanding what the

113

intent of Congress was.
MR. BANES: Objection. Lack of foundation. Irrelevant. Calls for a legal conclusion. Asked and answered.
A. I have no idea, because I could get different answers by talking to different people in Congress. And that was part of my problem.
BY MR. BLANTON:
Q. How is it, then, that your performance would have been judged?
A. By meeting the date of 1998 in accepting a fuel element in 1998.
Q. Not withstanding that that didn't meet the intent of Congress?
A. I don't know if it did or not.
MR. BANES: Objection. Mischaracterizing prior testimony.
A. Excuse me.
BY MR. BLANTON:
Q. Let's stay on this paragraph for a minute, the one I just had you on.
A. We're back on 4?
Q. Yes, sir. Page 16598.
A. Okay.
Q. The previous part of that paragraph

114

refers to performance standards and the commenters addressing the question of DOE performance standards and remedies with respect to performance. Do you see that?
MR. BANES: Objection. Misleading.
A. Where are we?
BY MR. BLANTON:
Q. The paragraph that says, "Similarly, seven commenters addressed the question of DOE performance standards . . . ."
A. Right.
Q. The last sentence in that paragraph says, "If the intent of the Act was to have intermediate performance standards or dates, they could have been specified in the Act."
What did you mean by "intermediate performance standards"?
A. Intermediate milestones.
Q. Can you give me an example of what something like that would be?
A. When we would break ground, when we would complete performance evaluation of a given site, when we would select a site. Those are interim performance standards or milestones in

115

my mind.
Q. Is that --
A. Specific items that they wanted us to do by a given date.
Q. I apologize for interrupting you.
Is that what you understood the commenters who addressed the question of DOE performance standards would be talking about?
A. That's my understanding.
Q. Anything else? Any of the performance standards comments relate to anything else?
MR. BANES: Objection. Asked and answered.
A. I have no recollection.
MR. BANES: Is this a good place for a break?
MR. BLANTON: Yeah. That's fine.
(A recess was taken.)
BY MR. BLANTON:
Q. Mr. Morgan, why did your office --
And when I say "your office," can we agree that's either OCRWM or the Nuclear Waste Policy Act Project Office, whichever it was at the time?

116

A. Yes.
Q. Why did your office adopt a strategy of trying to eliminate or remove spent fuel from reactor sites such that utilities wouldn't have to add any storage facilities after 1998?
MR. BANES: Objection. Vague.
A. We wanted to establish in the mission plan -- and as covered here, the comments by many of the utilities were made regarding the acceptance rate. And we put that in the mission plan but did not include that in the contract.
BY MR. BLANTON:
Q. But my question is: Why was that your goal?
A. That's what the utilities wanted.
Q. Is that what you thought Congress wanted, too?
MR. BANES: Objection. Lacks foundation. Asked and answered.
A. I cannot, you know, be specific as to what the intent of Congress was. What we were doing was complying with the Act.
I don't think there was a consensus in Congress as to the rate of acceptance,

period.
BY MR. BLANTON:
Q. Do you think your strategy was consistent with the Act, though?
MR. BANES: Objection. Calls for a legal conclusion. Go ahead.
A. The Act specified that I accept spent fuel in 1998. Regarding that, yes, it was consistent with that.
BY MR. BLANTON:
Q. How about the goal of utilities not having to add storage facilities after 1998? Was that consistent with the Act?
A. I don't think it specifies that. The Act doesn't specify that.
Q. Did you think it was inconsistent with the Act?
A. I did not think it was inconsistent with the Act. But the Act didn't require it.
(Deposition Exhibit No. 7 marked for identification.)
BY MR. BLANTON:
Q. We've marked as Exhibit 7 to your deposition a memorandum dated April 8, 1983. It has as the subject, Action Memorandum, Final



Rulemaking on Standard Contract for Nuclear Waste Disposal, the second page of which has a signature line, Robert L. Morgan, Project Director, Nuclear Waste Policy Act Project Office.
Do you recognize that?
A. Yes, sir.
Q. Did you draft that memorandum?
A. I signed that memorandum.
Q. Did somebody draft it for you? Or do you know?
A. I don't recall.
Q. Attached to it are three tabs, Tab A, Tab B, Tab C, and Tab D. Do you see those?
A. Yes.
Q. Do you recall how those tabs would have been produced during the time that you were at the Department of Energy -- excuse me -- during the time that you were at the Nuclear Waste Project Office?
A. Do I recall how?
Q. How they -- the process for producing these descriptions of the contract.
MR. BANES: Objection. Compound.
A. The process is -- My recollection



would be that it came from Rosselli's office for my approval.
BY MR. BLANTON:
Q. Let me just back up and ask you: What was the purpose of this memorandum to the Secretary?
A. The purpose of this memorandum was to get approval from the Secretary in order to publish the final rulemaking. That's what I wanted.
Q. And the tabs, the purpose of the tabs are to describe the contract to the Secretary? Is that correct?
A. I think it really gives him background of what was happening in defining what was in the contract. Tab B covers those. Tab C is the time sequence of events in the process.
Q. What is Tab A? What is that intended to do?
A. That says Disposal Fund Contract.
Q. I guess my question is: What is the difference between Tab A and Tab B, which is Section by Section Contract Analysis?
A. Tab A is a summary. And then Tab B



is the section by section contract analysis. That's what it reads.
Q. Looking at Tab B, Section by Section Contract Analysis, there's a section that is titled Scope of the Contract. Do you see that?
A. Yes.
Q. The last sentence of that section says, "The contract services shall commence not later than January 31, 1998, and continue until disposal of all SNF and/or HLW accepted by DOE hereunder." Do you see where I just read?
A. Yes.
Q. Now, you told us a minute ago what you thought "disposal services" meant. Does "contract services" mean the same thing to you as used in that contract? Does "contract services" mean acceptance of spent fuel from utilities?
A. Yes.
Q. What does the phrase "continue until disposal of all SNF and/or HLW accepted by DOE hereunder" mean? What does that mean?
A. That this continues until all the spent fuel is removed from the commercial reactors and from DOE, high-level waste.
Q. Does that mean that DOE would not

have any knowledge or thought at the time what would cause you not to approve it?

A. No. We had no idea.

Q. Does this indicate that Secretary Hodel approved the publication of the standard contract?

MR. BANES: Objection.

A. I beg your pardon?

BY MR. BLANTON:

Q. Does it indicate that Secretary Hodel approved the publication of the standard contract as a final rule?

A. Of course. That's the approval signature on page 2 of my memorandum. I asked him to approve it, and he did.

Q. Did you have any conversation with him about it, or did you just send this memorandum to him and he approved it?

A. I don't recall. But I had several conversations with the Secretary, and I think this is one significant enough that I would have. But I don't specifically recall it. I'm sorry.

Q. Now, Tab D lists eight policy issues that were addressed. Is that all the policy



issues that were addressed during the comment period?

A. These are the ones that we considered significant that the Secretary should be aware of.

Q. Do you recall any insignificant ones? Anytime you say "significant" to a lawyer, you are going to get asked what's insignificant.

A. Well, I think there was one relative to the last item we covered from Alabama, was it not? "As expeditiously as practicable," that was a change that was made, and I don't see that referenced here. I think that's an example of what I would consider insignificant.

Q. Why did you consider that insignificant?

A. Because it wasn't -- I don't believe that the Secretary wants to see everything. And those things that are important I should call to his attention. That's what I've done in this memorandum.

Q. How did you determine, though, what was insignificant and what wasn't?

A. Policy issues. That's what I have



in here. Policy issues. "As expeditiously as practicable" is not a policy issue in my humble opinion.

Q. You are going to have to help me with that one. Why? Why is that not a policy issue?

A. Because it's a given in my mind. We're going to do it as fast as we can in any event. And he was aware of that.

Q. Is the fact that it conformed the contract to the language of the Act a factor in whether it was significant or insignificant?

A. Wait a minute. Excuse me. Everything is consistent with the Act. Everything in here is consistent with the Act or it wouldn't -- wouldn't have gone out of the final rulemaking. We wouldn't put anything in the rulemaking that was inconsistent with it in our opinion.

Q. Okay. Does that go for the mission plan, too? Would you put anything in the mission plan that you thought was inconsistent with the Act?

A. No.

Q. Would you put anything in the



mission plan that you thought was inconsistent with the contract?

A. In the mission plan we established rates. In the contract -- rates of acceptance. In the contract we did not.

Q. But in your view, were the rates in the mission plan inconsistent with the contract?

MR. BANES: Objection. Calls for a legal conclusion.

BY MR. BLANTON:

Q. Let me rephrase my question.

MR. BANES: Also, I'd point out this line of questioning has already been asked and answered.

BY MR. BLANTON:

Q. Were the rates in the mission plan the way DOE intended to perform its obligations under the contract?

MR. BANES: Objection. Vague as to time.

BY MR. BLANTON:

Q. At the time you were there.

A. The mission plan was a plan; the contract was a contract. They were both consistent with the Nuclear Waste Policy Act.

repository.
BY MR. BLANTON:
Q. The provision of the proposed rule you just referred to a minute ago under Article II, Scope, on page 5459 of Defendant's -- excuse me -- of Plaintiffs' Exhibit 3 says, "In exchange for these services, Purchasers will pay fees established in the contract."
My question is: At the time you were director of the program, did you view the fees being paid by the utilities as being in exchange for the services being provided under the contract?
A. Yes.
Q. And what were the services that the utilities were paying for?
MR. BANES: Objection. Asked and answered. Calls for a legal conclusion.
A. The scope -- the scope says we will accept spent fuel for -- from the commercial reactors and put it in the repository. And it would be on a full cost recovery basis. And if it cost more than the 1 mill per kilowatt, we would have to adjust the fees.
BY MR. BLANTON:



Q. What did the utilities get?
MR. BANES: Objection. Asked and answered.
A. Disposal of commercial spent fuel.
BY MR. BLANTON:
Q. When?
A. Beg your pardon?
Q. When?
MR. BANES: Objection.
A. Beginning January 31st, 1998.
THE WITNESS: Excuse me.
MR. BANES: Sorry.
BY MR. BLANTON:
Q. And continuing as expeditiously as possible?
MR. BANES: Objection. Misleading. Calls for a legal conclusion.
A. I think that that is stated in the contract, "as expeditiously as possible." I recall that was someplace.
BY MR. BLANTON:
Q. All right, sir. Let me get you to look at the next page of the final rule and the standard contract. I guess it's your Exhibit 4.
A. Right. Page?



Q. 16592.
A. 16592.
Q. Up there in the upper left-hand corner.
A. Okay.
Q. Down at the next-to-the-last paragraph on the far left-hand column, it says, "In addition, at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes . . . setting forth the projected annual receiving capacity for the DOE facility.'" Do you see that?
A. Yes.
Q. Why was a report like that not in the proposed rule? Do you know?
A. This was added, it says, at the request of a substantial number of commenters as a new provision. In other words, this was -- this was in response to comments we had received.
We could not commit to a rate in the contract, but we would establish an annual report for planning purposes so that people



would know what to plan on.
Q. Okay.
A. The utilities would know what to plan on.
Q. Is this the Annual Capacity Report? Is that what that ended up being called?
A. Yes. Yes.
Q. Was that document included in the contract for any purpose other than planning?
A. No.
Q. In the discussions about whether to include that provision in the contract dealing with the Annual Capacity Report, was there any discussion within your office about whether that report was necessary other than because the utilities asked for it?
MR. BANES: Objection as to form. Vague.
A. There were discussions, as I recall, that in the response to the commenters we felt that they should have as much notice as possible as to when we knew what we would accept and when, for their planning purposes, so they knew what they had to provide for on-site storage.
In other words, this is a heads-up

document to where they can properly plan their activities until we get the repository going.
That was the whole intent of this change, as I recall.
Q. All right, sir. Staying on that same page, there is a -- down at the bottom there's a reference to the lack of definition of the term "emergency delivery." Do you see that?
A. Yes, I see that.
Q. And then the next sentence after that says, "One situation which would receive consideration is one in which a delivery is needed to permit licensed reactor operations to continue." Do you see that?
A. Yes.
Q. What was the basis for DOE's thinking about why that particular situation would satisfy the emergency -- might satisfy the emergency delivery definition?
MR. BANES: Objection. Calls for speculation.
BY MR. BLANTON:
Q. Well, to the extent you know.
A. Well, I think that -- You know, I don't recall specific discussions on this, but



sitting here today, it makes sense that we wanted to keep reactors operating and that that would be considered an emergency situation.
In other words, if they had to discharge fuel from a core and they didn't have a full core reserve, that we would maybe accept fuel from -- as an emergency basis from that reactor so they could continue with a full core reserve capacity.
It makes sense to me sitting here today.
BY MR. BLANTON:
Q. Was an emergency delivery an exception to the normal priority --
A. Yes.
Q. -- rights under the contract?
A. Yes.
Q. Was keeping reactors from having to shut down because of lack of storage space for spent fuel a purpose of the contract -- of the whole contract?
MR. BANES: Objection. Calls for a legal conclusion.
A. I don't think anywhere in the Nuclear Waste Policy Act is there any statement



regarding continued operation of commercial reactors.
BY MR. BLANTON:
Q. My question was: Was that a purpose of the contract? Was that one of your purposes as director of DOE Office of --
A. As I recall, the purpose of the contract was to comply with the Nuclear Waste Policy Act.
Q. Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?
MR. BANES: Objection. Asked and answered. Don't answer that.
MR. BLANTON (to the Reporter): Would you index for me the questions that didn't get answered?
MR. BANES: That question has already been answered. I've been very, very lenient on that, but I'm not going to be lenient on it anymore. We have a limited amount of time here.
Let's take a break.
MR. BLANTON: Okay.



(A recess was taken.)
BY MR. BLANTON:
Q. Mr. Morgan, during your tenure as director -- or acting director of the Nuclear Waste Project Office, was there consideration of amending the standard contract to include a waste acceptance schedule?
A. No. I do not recall it. There were discussions on that because of the requests and the comments we'd received.
Q. Were you involved -- Let me just show you this letter, the Hodel letter from Senator Johnston.
(Deposition Exhibit No. 8 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I have marked as Exhibit 8 to your deposition a letter dated September 7, 1984, from Donald Paul Hodel to J. Bennett Johnston.
And my question is: Do you recall having been involved in an exchange of letters from Johnston and Secretary Hodel relating to the Nuclear Waste Policy Act?
A. This is dated after I had left, so I

A. I have no recollection.
BY MR. BLANTON:
Q. Are you aware of any analysis by DOE of the cost of storing fuel at the reactor site if the repository was delayed?
MR. BANES: Objection. Irrelevant. Beyond the schedule issues.
A. I don't recall.
BY MR. BLANTON:
Q. Do you recall what stage the mission plan was in at the time you left?
A. I believe it was in draft.
Q. There are several drafts. Do you remember which draft was being worked on?
A. I have no idea.
Q. I'm going to show one to you.
(Deposition Exhibit Nos. 9 and 10 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, we've handed you a document marked Exhibit 9, which is a cover letter dated December 20, 1983, to Russell Stanford, who is identified as the Program Manager, Utility Nuclear Waste Management Group,



and signed by you.
And it says it's enclosing the draft -- most recent working draft of the mission plan that's being prepared. And it's dated December 20, 1983.
And then Exhibit 10 is a document titled Civilian Radioactive Waste Management Program Mission Plan, Volume One, Overview and Program Plans, also dated December 20, 1983.
Do you see those?
A. Yes.
Q. Was this cover letter the cover letter for this version of the mission plan, as far as you can tell?
A. Yes. As far as I can tell.
Q. Was this, this 1983 draft, was it the first draft of the mission plan that you are aware of? Or was there one previous to this?
A. I just don't know.
Q. Okay.
A. I believe this is the first one that was disseminated outside of DOE. Whether there were earlier drafts -- I assume there may have been, but not distributed. You understand what I'm saying?



Q. There might have been working drafts of this document, but this is the first one circulated to the public?
A. That's my feeling regarding it.
Q. What was your involvement in the production of this document?
A. Review. My responsibility to send it out, so I have to accept what's in it.
Q. I think you mentioned earlier in your deposition who all was involved in preparation of the mission plan. Would that have applied to this document?
A. Yes.
Q. Was there any approval authority above you for the mission plan? Did the Secretary have to approve it?
A. No. I think I advised him that I was sending it out as a matter of information. He did not review it.
Q. Did you advise him of -- in general of the contents of it, what was said?
A. I don't believe I did.
Q. What is meant by "firm schedule" in the third paragraph of page 1-1?
A. That would be an acceptance



schedule.
Q. Do you recall who within your office would have been responsible for writing the introduction to this?
A. I have no idea. Probably Head. Head probably.
Q. Mr. Head, the division director?
A. Yes. He's the one that was responsible for putting it together. And he is referenced on page 2 of my cover letter.
Q. The second paragraph or -- Excuse me. Go to page 2-1. Beg your pardon. Page 2-1.
A. Yes.
Q. If it helps, it's -45172 of the stamped number.
A. Got it.
Q. The second paragraph of that Program Strategy says, "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by January 1998."
What went into that decision?
A. The MRS.
Q. Is there a difference in the term "delay" or "postpone" in that sentence? Do

those mean the same thing, or do they mean different things, "delay" and "postpone"?
A. My answer to that would only be speculation. I'm sorry.
Q. Was that an accurate statement of what the Department's intention was?
MR. BANES: Objection. Vague as to time.
BY MR. BLANTON:
Q. At the time you were there.
A. We had an MRS program while I was there. And we would accept fuel in the MRS program by January 19 -- or January 31st, 1998, if we didn't have a repository. That was our plan. That was our goal.
Q. Take a look at Table II-1, Waste Acceptance Schedule.
A. Yes.
Q. Do you recall who developed that schedule?
A. No, I don't. I think this is the same schedule we talked about before.
Q. In the financing document?
A. Yes.
Q. Did you approve that schedule going



into the mission plan?
A. Yes.
Q. Do you recall having any conversations with anybody about it?
A. I'm sure we had discussions about it, but I can't recall any because this was one of the things we put in there based, you know, on the financial thing and the goal of the mission plan.
Q. Was there any discussion about whether this schedule or a different one should go into the mission plan, that you recall?
A. We had several discussions on what to put in the mission plan. And I don't recall, you know, other numbers. But there were discussions regarding this type of table.
Q. Referring back to this page 2-1, which is stamped SN045172 --
A. Right.
Q. -- the last sentence of that document -- of that page says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the Federal Interim Storage Program." Do you see



that?
A. Yes.
Q. Is there an Interim Storage Program provided for in the Nuclear Waste Policy Act?
A. I don't recall.
Q. Was it your understanding that after 1998 utilities were not responsible for providing their own additional on-site interim storage?
MR. BANES: Objection. Calls for a legal conclusion.
A. Discussions were that until we took possession of the fuel FOB at the reactors, that they were responsible for storage on site.
BY MR. BLANTON:
Q. Did you understand that was to occur in 1998?
MR. BANES: Objection. Asked and answered.
A. We discussed earlier that -- in my discussion, the presentation in December, that it would be about 2001 when we would match that rate.
We go back to this discussion of they did not have to order new things in '98,



but they would -- we would not match the discharge rate until 2000, 2001.
So there is an inference, clearly, that they may have commitments and there would be delivery of reactor storage in 2000, 2001 that had been ordered in '98, the same issue we talked about earlier.
Q. Right. What I'm trying to understand is what this last sentence of this page means, then.
A. Again, this is the mission plan. And what we were trying to do, our goal, was to accept fuel from the reactors in 1998, and by 2001 we would match the discharge rate. That's what the goal was.
Q. Did you approve this sentence that says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage"?
A. I approved the document -- as a planning document.
Q. Let me get you to look at page 2-2. And really, from the bottom of that page and the paragraph that starts, "While the Department's acceptance rate in the initial five

BY MR. HIRSCH:
Q. You're not sure?
A. No. I'm making an assumption.
Q. You know that this paper, Exhibit 12, was submitted to the Department of Energy. Correct?
A. I don't know that, but I assume that it was.
Q. That's fine.
A. I'm sorry.
Q. After you submitted the paper, did you receive any follow-up or feedback in terms of additional work?
MR. BANES: Objection. Irrelevant. Beyond the scope of the schedule issues.
A. I don't recall. Okay. If you look at page -0962, "The Administration submitted such legislation in February" --
BY MR. HIRSCH:
Q. I'm sorry. Where are you looking?
A. Under Legislative Status, fifth line down: "The Administration submitted such legislation in February 1979" -- da-da, da-da -- and then talks about the Senate bill and the



96th Congress. So definitely it was after '79. Right? One could make that assumption. I'm trying to put a date on this.
Q. I appreciate that. Based on that reference, it looks like this document, Exhibit 12, was submitted sometime after February 1979.
A. That's correct. And I don't know how it was used, if at all.
(Deposition Exhibit No. 13 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition 13 which is a United States Department of Energy memorandum dated January 28th, 1983. It's got Bates label EDB-003-0855 through -0856.
Is this a memo that you sent out as the Project Director to all Nuclear Waste Policy Act Project Office personnel?
A. Can I read it first?
Q. Please do.
(Pause.)
A. What's the question?
(The question appearing on page 194, lines 17 - 19, was read as follows:



QUESTION: Is this a memo that you sent out as the Project Director to all Nuclear Waste Policy Act Project Office personnel?)
A. Yes. Yes.
BY MR. HIRSCH:
Q. And would that have been basically everybody who was working in the project office?
A. In looking at the date and the time, it appears that I arrived on or close or about the 28th of January, because this is the basic organizational letter establishing this Nuclear Waste Project Office under the Secretary and the transfer of people from Shelby Brewer to the Nuclear Waste Policy Act office.
Q. So this memo, Exhibit 13, was something that you sent out after you assumed your position as the project director?
A. Probably the day that I assumed. This would be initial agreement with the Secretary that I would be able to select from the existing organization within Shelby Brewer's organization those that I wanted working for me in the Nuclear Waste Policy Act Office.
I did not accept all the people that



were in that organization at the time.
Q. I think you referred to this earlier. When you were asked to be the head of this program office --
A. Yes.
Q. -- you said that you went and talked to people about the organization of the office. Do you recall that?
A. Yes.
Q. Is it fair to say that one of the things or -- Strike that.
Did you talk to Secretary Hodel about the organization of the office?
A. I talked to Earl Geldea, who was Special Assistant or -- I'd say Special Assistant to the Secretary. And he is the one that I discussed conditions that I would like to have before the Secretary announced it on the following Monday.
Q. I take it that one of the conditions that you requested was that you got to pick the people who you wanted in the office who previously worked --
A. Yes.
Q. -- under the Assistant Secretary.

Is that correct?
A. Yes. And that the office would be removed from -- out from under Shelby Brewer.
Q. So let me restate that. So another condition that you requested and that was accepted was that your office would be removed out from under Mr. Brewer and would be a direct report to Secretary Hodel. Is that correct?
A. That's correct.
Q. And is it fair to characterize Exhibit 13 as what amounted to marching orders to the people in your new project office?
A. Basically, yes.
Q. Do you see in the last line of the memo on page 2 you say, "I solicit your full support and cooperation so that the major national objectives of the Nuclear Waste Policy Act of 1982 can be implemented effectively and on time"?
What did you consider the major national objectives of the Nuclear Waste Policy Act to be?
A. To accept the nuclear fuel from commercial reactors, to eliminate the problem of any regulatory shutdown.



Q. Well, when you say an objective was to accept commercial -- spent nuclear fuel from commercial nuclear reactors, was the objective to begin that waste acceptance from utilities in January 1998 as provided in the Nuclear Waste Policy Act?
A. Yes.
MR. BANES: Objection. Calls for a legal conclusion. Asked and answered.
BY MR. HIRSCH:
Q. You answered my question yes?
A. Yes.
Q. You also mentioned a major objective as eliminating regulatory shutdowns.
A. Yeah.
Q. What do you mean by "regulatory shutdown"?
A. When people ran out of full core reserve, they wouldn't be licensed.
Q. So we're all on the same page, can you explain what you mean by "full core reserve"?
MR. BANES: Asked and answered.
A. My understanding of full core reserve is that the reactor basins could accept



a full core unloading from the reactor core into the storage area. That's my understanding of full core reserve.
(Deposition Exhibit No. 14 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 14. It's a document titled Testimony of Robert L. Morgan, Project Director, Nuclear Waste Policy Act Project Office, U.S. Department of Energy, before the Subcommittee on Energy and Water Development, Senate Committee on Appropriation, March 1st, 1983. And it contains Bates labels EDB-002-0324 through -0345.
Do you recognize Morgan Deposition Exhibit 14 as written testimony you provided to the Senate Committee on Appropriation -- excuse me -- before the Subcommittee on Energy and Water Development of the Senate Committee on Appropriation on March 1st, 1983?
A. Yes.
Q. Did you prepare this testimony?
A. I outlined it. It was prepared. I reviewed it. I modified it, and then submitted



it.
Q. Do you know who prepared the draft after they got your outline?
A. No. But I'll say that it was reviewed by all the senior staff.
Q. When you say "the senior staff," you mean the direct reports on the organizational chart that we looked at earlier. Is that correct?
A. Yes. That's correct.
Q. Do you know if Secretary Hodel would have looked or did look at this testimony?
A. There is a process by which all written testimony is reviewed within the Department prior to submittal to Congress. I don't know if Secretary Hodel actually reviewed this or not.
These are submitted, in my recollection, to the Office of Congressional Affairs. And they do the vetting, if you will, or they send it to who they believe should see it.
Q. You see on page -- starting on page 4 or page -0329 at the bottom there's a discussion that begins, "Regarding the Nuclear

Waste Policy Act of 1982"?
A. Yes.
Q. And then you see at the bottom of page -0330, that's page 5 of the testimony, there's a bulleted statement that reads, "In return for payment of fees, DOE will dispose of nuclear waste beginning no later than January 1998." Do you see that?
A. Yes.
Q. At the time that you submitted this testimony to Congress, was that statement a correct reflection of what you believed the Nuclear Waste Policy Act required?
A. Yes.
MR. BANES: Objection. Asked and answered.
(Deposition Exhibit Nos. 15 and 16 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition 15, which is a letter dated May 20th, 1983, to you from John Kearney, Senior Vice President of Edison Electric Institute.



A. Yes.
Q. Do you recall seeing this letter at or about the time it was sent?
A. I don't recall, but I'm sure I did because I responded to it.
Q. All right. Did you know Mr. Kearney?
A. Not personally.
Q. Had you had any discussions with Mr. Kearney regarding the standard contract before you got this letter?
A. I don't recall.
Q. All right. Well, let's look at your response. Morgan Deposition Exhibit 16 is a letter dated June 17th, 1983, to Mr. Kearney from yourself. It's got the Bates label ZAB-001-1462.
A. Yes.
Q. Exhibit 16 is your letter in response to Mr. Kearney's letter, which is Exhibit 15. Is that correct?
A. Yes.
Q. Did you prepare the letter, or did someone prepare it for you?
A. I don't know if I outlined this one.



But most letters were prepared for me, and I reviewed and signed. I accept fully what's in the letter as my position.
Q. You see there's a reference in the second paragraph of your letter to the issues raised in Mr. Kearney's letter including the lack of standards for the Department of Energy's performance. You see that reference?
A. Yes.
Q. And then you say, I believe in the next full sentence, "We believe that we adequately addressed all the industry concerns in the rule at that time."
What did you mean by "adequately addressed" the industry's concerns in the rule?
A. We considered every comment and addressed those comments as to whether we accepted or rejected the comments. And that, to me, means adequately addressed.
Q. The next paragraph down you say, at the beginning, "Recognizing the stringent time constraints the Act has imposed on the Department, we clearly cannot reexamine any issue of concern to the utilities prior to the June 30th, 1983 deadline."



A. Yes.
MR. BANES: Objection. Misleading.
MR. HIRSCH: All right. Well, I don't want to be misleading. Let me restate the question.
BY MR. HIRSCH:
Q. You see the reference in the first sentence in the first paragraph there, Mr. Morgan?
A. Yes.
Q. What did you mean by "stringent time constraints in the Act"?
A. Well, in this case, all the contracts had to be signed by June 30th. That was specified in the Act.
And here we're dealing with a letter that was received May 20th and responded to on June 17th.
Q. And as I think you mentioned earlier, basically, the utilities, if they wanted to continue operating, had to sign the contract. Is that correct?
A. That's what's in the Act.
(Deposition Exhibit No. 17

marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 17, which is a document with Bates label PNL-021-0234 through -0268.
And it's titled FY -- I take it that means fiscal year -- 1984 Program Guidance for NWF Evaluations.
Why don't you take a minute to look at the document.
(Pause.)
A. Okay.
Q. Do you recognize Morgan Deposition Exhibit 17?
A. What do you mean by "recognize"?
Q. All right. Is this a document -- Strike that. Do you recall seeing this document at or about the time it was submitted?
A. I don't recall --
MR. BANES: Objection. Assumes facts not in evidence.
A. -- seeing this specific document, but I understand what it is.
BY MR. HIRSCH:



Q. What is your understanding of what this document is?
A. This is program guidance relative to the adequacy of the one mill per kilowatt hour fee, and it's directed to Pacific Northwest Laboratories.
Q. So is it correct --
A. This is what we wanted them to do in FY '84.
Q. Is it correct that this document basically was the marching orders to PNL to evaluate the fee adequacy issue?
A. That's my understanding in looking at this document.
Q. And you see the first page, at the bottom there's a reference to -- well, it says WMD:Mel Shupe.
A. Yes.
Q. Who is Mel Shupe? Do you remember?
A. I really don't recall.
Q. Do you know what the reference to WMD is?
A. No.
Q. Will you turn to the second page of the document, page -0235, titled Detailed



Analysis Plan for the Fee Adequacy Report. It says at the top, "This is a draft plan for the financial analysis that will be performed by PNL for preparation of the annual Fee Adequacy Report. This analysis will rely heavily on cost estimates provided by Roy F. Weston Company and on interactions with DOE/HQ." I assume that means headquarters.
A. Yes.
Q. And what role had Roy Weston played --
A. Roy Weston --
Q. Let me finish. -- in the process up to this point?
A. Excuse me.
Q. Thank you.
A. Roy F. Weston Company was selected by the Nuclear Waste Project Office to be the support contractor for the office.
Q. What does it mean to be the support contractor for the office?
A. To provide technical help, assistance, et cetera, for the implementation of the Nuclear Waste Policy Act.
Support contractors are commonly



used by headquarters and some of the field offices to perform tasks as designated.
Q. Would PNL also have been a support contractor, or did they have a different role?
A. They had a different role, but they provided technical support also for the office but from the field location at Richland.
Q. You see in the second paragraph it says -- of the page -0235, "The Fee Adequacy Report will present an analysis of projected performance of the Nuclear Waste Fund. It will make a recommendation concerning the adequacy of the one mill per kilowatt hour disposal fee."
A. Right.
Q. That task was something that the DOE had been charged by Congress to do under the Nuclear Waste Policy Act. Is that correct?
A. Yes.
MR. BANES: Objection. Asked and answered.
BY MR. HIRSCH:
Q. You see, then, at the beginning of the third paragraph it says, "The planning base used for this analysis is consistent with the draft DOE Civilian Waste Management Program

Mission Plan. The underlying premise is that DOE will accept waste in 1998 at a rate sufficient so no additional utility-owned storage capacity is required during the first five years. Therefore, the acceptance rate will be at least equal the utility spent fuel discharge rate." You see that statement?
A. Yes.
Q. And that premise was the premise that PNL was given to make this determination regarding fee adequacy. Is that correct?
A. Yes.
Q. And, in fact, that premise was the DOE's policy at the time. Isn't that correct?
MR. BANES: Objection.
A. It was the mission plan goal, planning document. I don't think it was policy. Okay? There's a difference in my mind between planning and policy.
MR. BANES: He has explained that difference about four times now.
MR. HIRSCH: Did I ask him a question?
MR. BANES: I mean, we are getting dangerously close -- I'm just going to



state for the record my objection, if you don't mind.
MR. HIRSCH: Fine.
MR. BANES: If we are going to go over the same language in different documents, I consider that the same question.
BY MR. HIRSCH:
Q. Do you see -- Why don't you look at page -0238 of this document, Mr. Morgan.
A. Got it.
Q. You see there's a heading there, Repository Deployment Variations?
A. Yes.
Q. Why don't you read those two paragraphs to yourself for a minute.
(Pause.)
A. Yes.
Q. Did you see the statement, "To meet the planed DOE waste acceptance schedule, the MRS must have the same receiving rate as the replaced repository or repositories, i.e., 3,000 MTU maximum receipt rate if the delay is longer than five years, and a total capacity of 3,000 metric tons for each year of delay."
Did you read that statement to



indicate that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year --
A. I think the --
MR. BANES: Objection.
THE REPORTER: I can only take one at a time.
BY MR. HIRSCH:
Q. I have to finish the question, and then Mr. Banes can object, and then you can answer. I apologize, but otherwise she's got three people talking.
A. All right.
Q. Did you understand the statement that I just read from this document to mean that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year by the sixth year after the repository opened and 3,000 tons per year after that?
MR. BANES: Objection. Asked and answered.
You don't have to answer it if you don't want to. You've answered it several times.
MR. HIRSCH: He has not answered



this question.
A. I'll say it again. This is consistent with what we have already discussed relative to the mission plan. So that's correct. It was in the plan. It was in the mission plan. This is definitely consistent with the mission plan.
BY MR. HIRSCH:
Q. So the rate that's described on page -238 is the same rate that was identified in the mission plan. Is that correct?
A. Yes. That's my understanding. We've been through that.
Q. All right. We won't do it anymore.
A. Thank you. I'm sorry.
MR. HIRSCH: Why don't we take a break here.
(The deposition was adjourned at 5:30 p.m. and resumed at 8:00 a.m. on Friday, March 22, 2002. The transcript of proceedings is continued in Volume 2.)

213

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 2, Pg 213 - 330

214

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

215

A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

216

A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

A P P E A R A N C E S

For the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:
ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983



I N D E X


| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 1 Organizational charts | 25/25,64,79,311 |
| 2 Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 Report on Financing | 93/93,102,104 |


(continued)



I N D E X

EXHIBITS:


| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 6 3/4/93 letter from Alabama Power | 106/106 |
| 7 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 Mission Plan, Volumes I and II | 159/159,162 |
| 12 U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |


(continued)



I N D E X

EXHIBITS:


| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 18 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 Remarks before IAEA, 10/12/83 | 230/231 |
| 20 Letter to Governor Alexander | 275/275,279 |
| 21 Draft letter to Governor Bryan | 278/278 |
| 22 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 2/8/83 comments from Duke Power Company | 282/283 |


INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

(The deposition was resumed
on Friday, March 22, 2002,
at 8:00 a.m. as follows:)

MR. BANES: We've had an opportunity to review the excerpts of the testimony.

While we think that the question concerning Table II-1 is just the same question that's been asked before in a different context regarding acceptance rate, we will allow the question at this time, although we would caution the Plaintiffs' counsel that there was an agreement not to be repetitive in this case, and we will enforce that agreement. Thank you.

E X A M I N A T I O N

BY MR. HIRSCH:

Q. Okay. Mr. Morgan, do you recall that we were talking about Morgan Deposition Exhibit 10, the December 20th, 1983 draft mission plan, yesterday?

A. Yes.

Q. Can you refer to Table II-1, the Waste Acceptance Table -- or Schedule in that document. Do you see that table?



A. Yes.

Q. Was Table II-1 in Exhibit 10 the schedule of the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after January '98.

MR. BANES: Objection. Calls for speculation. You can answer, sir.

A. When I look at the table -- you see the backlog, the far column on the right?

The backlog does increase through the year -- up until 2003, so that it would be speculative on my part to say specifically there would be no requirement for any reactor to have additional storage.

Do you understand my answer?

Q. Well, I'm not sure I do, Mr. Morgan. You are saying that because there is an increasing backlog for some period you are not sure whether --

A. That's correct.

Q. -- utilities wouldn't have to provide additional storage?

A. That's correct. Specific.

Q. I'm sorry. Specific? What do you



mean?

A. A specific utility, a specific reactor. It would be speculation on my part whether any one of them would need additional on-site storage.

Q. All right. Recognizing that there might be an individual utility that might need on-site storage, is it true that Table II-1 was the acceptance rate that DOE had generally determined was sufficient to prevent the utilities from having to provide additional on-site storage after January of 1998?

MR. BANES: Objection. Calls for speculation.

A. You know, clearly this says that initially the first repository acceptance is at a low rate for the first five years and then jumps up to 3,000. Those are numbers that were used in planning.

Certainly the first year of operation would have much less than that number, and there would be a gradual growth in my mind.

This was used as a mission plan that we were shooting for in the Nuclear Waste Policy Act. And there is an increase in the backlog



through the year -- through the year 2003.

BY MR. HIRSCH:

Q. When you said -- I think you said, at some point, a low rate. Does this show that in the -- does the table show that in the first five years the rate is 1800 metric tons per year?

A. That's what it says.

Q. Would you look back at page 1-1 -- excuse me -- at page 2-1 of the document, Exhibit 10.

A. Got it.

Q. You see in the first paragraph there is this statement, next-to-last sentence, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31st, 1998"?

A. That's what it says.

Q. All right. Will you look on the next page, 2-2.

A. Yes.

Q. At the top it says, "Based on the

criteria described above, the Department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear wastes that the program will accept beginning in 1998. This schedule is presented in Table II-1."
Do you see that statement?
A. Yes, I see that.
Q. Isn't one of the criteria identified, in fact, on the previous page that the waste materials would be accepted in accordance with a schedule designed to provide an acceptance rate such --
A. Yes.
Q. Let me just finish. -- such that no utility would have to provide additional storage after January 1998?
A. That's what the document says.
Q. Well, one of the criteria that the department used in preparing Table II-1 was that generally no utility would have to provide on-site storage after January '98. Isn't that correct?
A. That's correct.
MR. BANES: Objection.



BY MR. HIRSCH:
Q. All right. Mr. Morgan, you also were asked some questions -- or I asked you some questions, to be more specific, about Morgan Deposition Exhibit 17. Can you pull that document?
A. Yes.
Q. Do you recall we were discussing yesterday that this document was generally intended to provide marching orders to PNL regarding preparation of a fee adequacy study?
MR. BANES: Objection. Lack of foundation.
A. Yes.
BY MR. HIRSCH:
Q. Is it correct that the guidance that DOE provided to PNL directed them to evaluate the one mill per kilowatt hour charged under the contract based on the goal of the mission plan that DOE would accept waste at a rate sufficient so that the utilities would not have to provide additional storage after January of '98?
MR. BANES: Objection as to form. Lack of foundation. Calls for speculation.
BY MR. HIRSCH:



Q. You can answer.
A. Repeat the question, please.
(The question appearing at page 226, lines 16 - 22, was read as follows:)
QUESTION: Is it correct that the guidance that DOE provided to PNL directed them to evaluate the one mill per kilowatt hour charged under the contract based on the goal of the mission plan that DOE would accept waste at a rate sufficient so that the utilities would not have to provide additional storage after January of '98?)
MR. BANES: Same objection.
A. Yes.
BY MR. HIRSCH:
Q. Mr. Morgan, will you look at Morgan Deposition Exhibit 13.
A. Yes.
Q. I just want to refer you to the date here. This was a memo we were looking at yesterday that you sent out on January 28, 1983. And I believe you testified yesterday that you assumed that you had assumed or taken the



position as the head of the project office for spent fuel by this date, January 28th.
A. That's correct.
Q. Now, I don't know -- maybe we need to get out the document -- but if you look at Exhibit 3, you'll see that the notice of proposed rulemaking for the standard contract was dated February 4th, 1983.
A. Yes.
Q. Do those two documents indicate to you that you would have seen the notice of proposed rulemaking on the standard contract before it was sent out?
MR. BANES: Objection. Asked and answered.
A. I don't recall. There is a process time of sending or submitting something to the Federal Register for publication, and that's normally -- I don't know what that delay is, but in my recollection, it's something like a week that when a document leaves the Department there's a delay before the publication.
And that was published on that date, but I do not recall seeing that before it left the office -- while I was in the office.

BY MR. HIRSCH:
Q. All right. Assuming that you were in the office, the head of the office by January 28th, 1983, do you think it's likely that someone who worked for you at that point would have shown you the notice of proposed rulemaking before February 4th, 1983?
MR. BANES: Objection. Asked and answered. He has already testified he didn't see it.
A. I don't recall seeing it.
(Deposition Exhibit No. 18 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 18, which is a two-page memo dated June 21st, 1983, along with some attachments. And it has Bates label PNL-001-1524 through -1549.
A. Yes.
Q. Is that your signature at the bottom of the second page of this document?
A. Yes.
Q. So this would have been a memo that you sent to the Secretary of Energy on or about



this date?
A. Yes.
Q. And the memo related to the proposal for a monitored retrievable storage system. Is that correct?
A. That's correct.
Q. If you look at the bottom of the second page of the document, I think you'll see a reference that says prepared by S-10:JHCarlson. And it's got some numbers after that. Do you see that?
A. Yes, I see that.
Q. Is that James Carlson?
A. I have no recollection.
Q. Do you know whether an individual named James Carlson or Jim Carlson worked in your department?
A. The symbol S-10 would tell me they would not be working for me.
Q. What does that indicate?
A. I believe it's a person in the Secretary's office. That was a symbol, as I recall, for people that were assigned to the Secretary's office.
Q. Do you know a Jim Carlson who worked



on spent fuel issues?
A. I don't recall.
(Deposition Exhibit No. 19 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 19, which is a document titled Remarks by Robert L. Morgan, Acting Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, Before the International Atomic Energy Agency, Vienna, Austria, October 12th, 1983. And the Bates label is EDB-003-1642 through -1650.
Mr. Morgan, is this the text of some prepared remarks that you presented to the International Atomic Energy Agency --
A. I believe that.
Q. Let me finish. -- on or about October 12th, 1983?
A. I believe that's correct.
Q. Do you recall how it was that you were invited to this conference?
A. I accompanied Secretary Hodel to this conference at his request.



Q. And why -- Did he indicate why he wanted you to come along with him?
A. I don't recall.
Q. At the time in 1983, to the best of your recollection, was the International Atomic Energy Agency addressing issues regarding what to do with spent fuel?
A. I think this was to provide information to the IAEA of what our mission plan and program was about.
Q. When you say "our," you mean the DOE mission plan program?
A. Yes.
Q. Did the IAEA meet on a regular basis?
A. Annually.
Q. Did you attend any meetings besides the one that's identified in this document?
A. Meetings of the IAEA?
Q. Yes.
A. This is the only meeting of the IAEA that I attended.
Q. In your subsequent positions with the Government, did you go to any IAEA meetings?
A. Not that I recall.

Q. Do they usually meet in Vienna, Austria?
A. Yes.
Q. Did Secretary Hodel make a presentation at that meeting, to the best of your recollection?
A. I believe that he did, but I'm not sure.
Q. Who, generally, would attend the meetings of the International Atomic Energy Agency?
A. The Secretary of Energy.
Q. I mean, who would be the attendees from other countries?
A. The head of their atomic energy activities. It was a high-level meeting of all the member states, if you will, of the IAEA.
Q. In this set of remarks, did you accurately attempt to describe what the DOE policy was regarding spent fuel at that time?
MR. BANES: Objection. Have you had time to look at the document, sir?
THE WITNESS: I don't know what's in the document.
BY MR. HIRSCH:



Q. Please take a look at the document.
(Pause.)
THE WITNESS: Can I go off the record for just a moment?
MR. HIRSCH: Sure.
(A discussion was had off the record.)
BY MR. HIRSCH:
Q. Mr. Morgan, in an effort to get you out of here and speed things along, let me just ask you some specific questions of the document, if that's all right with you.
A. Fine.
Q. Will you look at page -1644 of the document, first full -- second full paragraph.
A. -1644?
Q. That's the little page at the bottom --
A. Yes.
Q. -- page number. You see there's a reference in the middle to studies and explorations in the different media? And then there's a sentence that says, "However, while the responsibility for permanent disposal of this waste has rested with our Federal



Government since the Atomic Energy Act of 1954 was enacted, until recently, major obstacles have existed in the United States which have impeded the successful disposal of nuclear waste."
Is it correct that the U.S. Government had the responsibility for the permanent disposal of spent nuclear fuel since the Atomic Energy Act of 1954 was enacted?
MR. BANES: Objection. Calls for a legal conclusion and irrelevant.
A. I'd have to read the Atomic Energy Act of 1954 to -- otherwise it would be speculation. I'm sorry.
But these are the words that I used.
BY MR. HIRSCH:
Q. You made that statement to the leaders or the high-level people present at the International Atomic Energy Agency meeting. Is that correct?
A. Yes, that is correct.
Q. And presumably you wouldn't have made that statement if you didn't think it was correct. Right?
A. That's correct.



Q. Then you say at the bottom of the same page, reading from the last sentence, ". . . late last year, the United States Congress passed legislation to bring to an end years of indecision on how to solve the problem." Do you see that statement?
A. Yes.
Q. And the problem was the problem of disposing of spent fuel. Correct?
A. Yes.
Q. And was it your view at the time that the Nuclear Waste Policy Act was intended to end years of indecision --
A. That's correct.
Q. -- on how to solve the problem of disposal of spent fuel?
A. Yes. That's correct.
Q. Will you look at page -1646 at the bottom.
A. Yes.
Q. Do you see at the top of that page it says, "The Department of Energy has the responsibility to provide for the permanent disposal of high-level radioactive waste such as spent nuclear fuel or reprocessed spent nuclear

fuel"?
A. Yes.
Q. "The Act strengthened this responsibility and confirmed the nation's commitment to nuclear waste disposal and to the role of the states and the public in the process leading to permanent disposal."
A. Yes.
Q. What did you mean that the Nuclear Waste Policy Act had strengthened the responsibility for disposal of spent fuel?
A. It clearly set out goals and a requirement for the Department of Energy. The Nuclear Waste Policy Act set out the processes and timetable and commitments, which we didn't have before that.
Q. Will you look at page -1647.
A. Yes.
Q. You see the third paragraph on that page, second sentence, that says, "The Commission has three to four years to approve the application, and once we receive the construction license, construction will begin with the mandated target to begin accepting waste by 1999"?



A. Yes.
Q. And that's -- when it talks about the application and the construction license, that's referring to the geologic repository. Is that correct?
A. Yes.
MR. BANES: Objection. Irrelevant.
BY MR. HIRSCH:
Q. And the mandated target to begin accepting waste by 1998 was the target mandated by the Nuclear Waste Policy Act. Is that correct?
A. That's correct.
MR. BANES: Objection. Calls for a legal conclusion.
BY MR. HIRSCH:
Q. Mr. Morgan, is the Government or -- Strike that. Mr. Morgan, are the Government lawyers present today representing you in this deposition?
A. Yes.
MR. BANES: Objection. Asked and answered.
BY MR. HIRSCH:



Q. Did you meet with them before the deposition?
A. I had a telephone call from them, and then I met with them for dinner night before last.
Q. So that would have been Wednesday night?
A. Wednesday evening.
Q. You recall yesterday morning we had about -- I think about an hour when we started the deposition at 9:30 and then we took a break?
A. Yes.
Q. Do you recall that?
A. Yes.
Q. Did you speak with the lawyers for the Government during that break between the first hour and when we resumed?
A. I'm sure I did.
Q. Did you talk about Exhibit 2 to the deposition?
MR. BANES: Objection. I'm not going to let him answer that.
MR. HIRSCH: I'm not going to ask him any other questions.
MR. BANES: Okay.



A. I don't recall.
BY MR. HIRSCH:
Q. But you are fairly certain that you did have a discussion with the Government attorneys during that break yesterday morning?
A. I have met with them at every break.
Q. All right.
A. But I cannot say that in any one there were specific items covered.
MR. HIRSCH: All right. At this point, I don't have any additional questions for Mr. Morgan.
However, there are outstanding issues in this case relating to the privilege log that the Government provided and other documents that the utilities have requested from the Government. So I am reserving my right to ask additional questions at a later time.
MR. BANES: Okay.
MR. HIRSCH: Thank you, Mr. Morgan.
MR. BANES: I have a few questions. And we would reserve the right to reopen the deposition depending upon what additional matters you want to address, whether

A. Yes.
Q. Do you recall, sitting here today, other members of your staff who were involved in --
A. Bennett.
MR. BANES: Objection. Irrelevant.
BY MR. NESLIN:
Q. Anyone else?
A. McElvey and Morgan.
Q. Mr. Bennett, would his participation have been directed at particular issues?
A. Yes. He was responsible for the geologic repository, so that anything mentioning the repository, he participated in.
Q. And Mr. McElvey?
A. Overall. Total.
Q. If we could return to page 16593 of Exhibit 4, sir, the same paragraph we were discussing --
A. 16593?
Q. 16593, first full paragraph, first column.
A. Right.
Q. This states that priority for



shutdown reactors "is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity."
Does that -- Would you agree with that? Did you agree with that at the time?
A. Yes.
Q. What did you mean, "necessary to prevent them from waiting 20 to 30 years"?
A. We didn't want to hold up D and D of a reactor site.
Q. "D and D" referring to?
A. Decommissioning and -- what's the -- I don't remember the acronym. Shutting down the reactor.
Q. Was that one of your objectives, to avoid --
MR. BANES: Objection. Vague.
BY MR. NESLIN:
Q. -- to avoid holding up --
A. A utility from D and D?
Q. Yes.
A. Decommissioning. We didn't want to do that.
Q. That was an objective of yours?



A. Yes.
Q. Not to. Now if we could turn to page 16602.
A. Yes.
Q. The bottom of the first column, Article VI.B.1(b). Do you see that at the bottom of the page?
A. Yes.
Q. This is the provision that allows a priority for shutdown reactors. Correct?
MR. BANES: Objection. Calls for a legal conclusion.
A. I believe that's correct.
BY MR. NESLIN:
Q. Did you have -- Strike that. How did you expect the Department of Energy to apply this provision?
MR. BANES: Objection. Calls for speculation.
BY MR. NESLIN:
Q. Do you understand my question?
A. Unless faced with the issue, I can't tell you how we would resolve it.
Q. Did you have any criteria in mind for when priority would have been accorded to a



shutdown reactor?
A. No. I think that would have been speculative to do that.
Q. Did you have any expectation as to under what circumstances a shutdown reactor might be accorded priority?
MR. BANES: Objection. Calls for speculation.
A. Yeah. No. Not that I recall.
BY MR. NESLIN:
Q. Mr. Morgan, you decided to retain this provision over the opposition of several commenters?
A. I believe it was four. Four. I think that's what's in the statement.
Q. Would that mean that you would not have believed it was appropriate to deny a priority request simply because certain utilities might have opposed it?
MR. BANES: Objection. Calls for speculation.
A. I don't understand.
BY MR. NESLIN:
Q. Do you understand my question?
A. I don't understand.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------------------X
YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY,:
Plaintiffs, :
v. : No. 98-126C
UNITED STATES OF AMERICA, : 98-154C
Defendant. : 98-474C
----------------------------X
Eugene, Oregon
Monday, June 25, 2002

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DEBORAH SOLHEIM, Oregon Certified Shorthand Reporter, at 9:25 a.m., June 25, 2002, and the proceedings taken down by DEBORAH SOLHEIM, CRR, with computer-aided transcription and prepared under her direction.



APPEARANCES:

On behalf of the Plaintiffs
JERRY STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D.C. 20005-3305
(202) 898-5800

On behalf of the Defendant:
R. ALAN MILLER, ESQ.
United States Department of Justice
Civil Division
1100 L. Street, N.W.
Washington, D.C. 20530
(202) 305-7594



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| ROBERT L. MORGAN | |
| By Mr. Stouck | Page 5 |

Afternoon Session - Page 91


EXHIBITS


| EXHIBIT | | PAGE |
|---|---|---|
| 24 | Organization Chart, DB 100228 | 16 |
| 25 | 1-24-83 Eileen Peerless memo, TV 1226-1235 | 47 |
| 26 | 1-21-83 letter to Dillon from Hobart, SP 109687-701 | 47 |
| 27 | 5-3-83 DOE hearing transcript, DC 107987-108041 | 52 |
| 28 | 4-29-83 letter to Yankee Atomic Electric from Keefe, RA 103094-96 | 63 |
| 29 | 5-27-83 letter to Yankee Atomic Electric from Keefe, RA 103207-210 | 63 |
| 30 | 1-28-83 DOE memorandum, DE 106951-55 | 80 |
| 31 | 8-19-83 DOE memorandum, DE 106917-919 | 80 |
| 32 | 5-21-84 DOE letter to Senator Johnston, from Rabben, DE 105113-123 | 80 |
| 33 | 3-4-83 letter to Morgan from Soucy, PA 189728-732 | 102 |





| | | |
|---|---|---|
| 34 | 3-3-83 letter to Morgan from Erk, CDB 021 0180-0184 | 105 |
| 35 | 5-23-78 letter to Holloway and Askew from Morgan, DE 104744-746 | 106 |
| 36 | 8-19-83 letter to Yankee Atomic Electric from Morgan, YDK 026 102921-924 | 111 |
| 37 | 10-26-83 letter to Morgan from Davis, DER 002 2095-97 | 116 |
| 38 | 5-13-83 statement of Robert L. Morgan, DE 100456-474 | 121 |
| 39 | Defendant's witness list | 125 |
| 40 | 9-15-83 DOE memorandum from Williamson, PNL 173 1282-1288 | 147 |
| 41 | 12-22-83 DOE memorandum from Charles Head, HQZ 19870304.0814.0001-02; EDB 004 1963-1969 | 160 |
| 42 | 4-9-84 letter to Frei from Bates, ZAB 001 1304-1308 | 163 |

A. Yes.
Q. It says, "After I first got a call from someone that said some lawyers were looking for me and that I should call a lawyer in Washington" -- do you see that?
A. Yes.
Q. -- "before I called that lawyer."
It was just unclear to me. Was that a suggestion that you call the Department of Justice lawyers?
A. No, it was a Department of Energy lawyer that was looking for me. And I think that name is listed somewhere in the deposition.
Q. Okay. So that was just part of the process of finding you.
A. Yes.
Q. Okay. I wasn't clear if there was a suggestion that you contact your own lawyer.
A. No.
Q. Okay.
A. They gave me the name, or the name of the person that was looking for me, and I called that person.
Q. Fine. Thank you.
You were questioned, I think rather



extensively in the prior sessions, about acceptance rates in the contract.
A. Yes.
Q. Do you recall that?
A. Yes.
Q. And as I said, I do not intend to go over the same ground again. But there were a couple of questions in that area that were not answered, at least to my satisfaction, by the transcript.
So if I could direct your attention to page 57. And actually, the question, I believe, begins way back on page 55 at the very bottom. And you can look back at the reference. But line 23 of page 55 says, "Do you recall any specific items that were discussed," and this is in the context of developing a standard contract.
And then on page 57.
A. Right.
Q. Are you there?
A. Yeah.
Q. Let me show you what I'm interested in, and you can look at whatever you like.
A. What line, please?
Q. Seven?
A. Okay.



Q. "The other time discussed was the rate of acceptance, whether we should have a rate of acceptance or not. And it was decided that we would not put in a rate of acceptance in the contract."
Do you see that?
A. Yes.
Q. Okay. And there's a couple of references to this. I'm going to point your attention to them and then ask my follow-up question.
On page 130 --
A. 130?
Q. 130. On line 4, this is in the context of discussing comments that you got from various utilities on the notice of proposed rulemaking for the standard contract. Your answer here was, "We had those comments from the utilities."
And you can look back and see it was a reference to comments about acceptance rates and what not.
"We had those comments from the utilities and chose not to accept and put in the contract a given rate."
Do you see that?
A. Yes.
Q. And there are other references in this



transcript.
My question for you is, why at that time in early 1984 when you were developing the standard contract, why did the department decide not to put into the standard contract a specific provision or a specific rate, you know, specify a rate of acceptance in the contract?
A. Okay. It was not required by the Nuclear Waste Policy Act. And we felt that there were uncertainties as to the schedule, potential litigation, the site selection of the repository, not knowing what media it would be in. Certainly excavation in granite is going to take longer than excavation in salt. And there were uncertainties relative to NRC licensing.
And we felt it was inappropriate at that time, because of the uncertainties in meeting the schedule when we had no designs of a facility, that there's no way that I could commit to an acceptance rate.
Q. Okay. When you say uncertainties as to schedule in your answer --
A. Yes.
Q. -- you're referring to uncertainties as to the schedule for developing the repository or other facilities?
A. Yes.

Q. Okay. Did you anticipate at that time that there would come a time when the department would be in a position to commit to a specific rate?
A. Yes.
Q. Okay. And when would that time come? I mean, not the date, but what would have to occur for that time to arrive when a schedule could be committed to?
A. I think when the licensing requirements were established, when a specific site was selected, one could then consider an acceptance rate.
Q. Okay. And that, as far as you were concerned in 1983, was at some indefinite point in the future?
A. It was several years off, in my mind.
Q. Okay. Thank you.
And this was -- what you've just told me, were these considerations discussed at that time in connection with this question of should we put a specific rate in the contract?
A. Yes.
Q. Okay. Within DOE and those that were working with on you developing this contract.
A. Yes.
Q. Okay.
A. That's my understanding.
Q. Okay.



A. My recollection.
Q. Thank you.
You referred -- and I'm not sure we need to actually refer to the transcript here. But you testified in several places -- I can show you some, but let me just mention the subject -- about the role that Mr. Head -- Charlie Head, I think his first name was, Charles or Charlie.
A. Right. Yes.
Q. The role that he played in the development of the standard contract.
For whatever reasons, when we took Mr. Head's deposition subsequent to your last deposition sessions, his testimony -- I was not there, but I'm told by one of my colleagues that his testimony was that to the best of his recollection, he was not involved at all in the development of the standard contract.
And so I just wanted to mention that to you. It's 20 years ago. And recollections are sometimes different. But in light of that testimony that I'm telling you that he gave, is it possible that the role that you recall Mr. Head playing in the development of this contract was instead played by one of these other individuals on the Exhibit 1 organization chart, or someone else involved?



MR. MILLER: Objection to the extent that it mischaracterizes his prior testimony or that of Mr. Head.
Go ahead.
THE WITNESS: I don't have the organization chart in front of me.
BY MR. STOUCK:
Q. Okay. I can get that for you.
One of the perks in my job, in flying around and taking depositionis, is I get to carry a lot of documents around with me. I wish I were a larger stockholder in Federal Express than I am.
MR. MILLER: This is Exhibit 1 from his prior deposition.
MR. STOUCK: Thank you.
THE WITNESS: There is not a date on this organization chart. I believe this organization chart came later than the time that we were preparing the initial contract for the utilities.
BY MR. STOUCK:
Q. All right.
A. You know, if he said he did not, then I would assume he did not.
Q. Well, okay. It could be recollections.
But that doesn't refresh -- the fact that he



testified that he did not, or I'm reporting that to you, that doesn't refresh your recollection at all about whether there's some other person you might have been referring to?
A. Oh. There was no question that Rosselli, Yanoski, Mike Lawrence, John McElvey, and Bill Bennett were all -- participated in the initial contract.
Q. Okay. I apologize that I've only got one copy of this. But let's go ahead and mark this as No. 24.
This is an organization chart that is dated May 23, 1983. So that's roughly contemporaneous. The final rule was dated April 18. So it's about six weeks later.
Let's go ahead and mark this. I'm sorry that I've only got one copy. I have multiple copies of most everything else with me. We'll just have to work with that.
(Morgan Exhibit No. 24 was marked for identification.)
BY MR. STOUCK:
Q. That's been marked Exhibit No. 24.
A. Under the business operations waste fund, Bob Rosselli, I do not see a breakdown of that organization. And there is not, that I see, any mention of Mr. Head's name in the organization. I don't see it.

process for setting a schedule worked; is that right?
You knew it was in the future, but did you have an understanding of how the process was going to work when it did kick in?
A. I didn't deal with it.
Q. Okay.
A. I just didn't deal with it. That was not a focus of my attention.
Q. Okay. Did you -- can you identify for me someone on Exhibit 1 or elsewhere who at that time in 1983 and '84 did deal with it?
A. No.
Q. Was there anyone who was dealing with it at that time?
A. I don't know.
Q. Okay. But if there was, you don't know who they are.
A. That's right. That was not on my scope.
Q. All righty. Take a look at -- do you have Exhibit 4?
A. Yes.
Q. This is the final rulemaking.
A. Yes.
Q. Actually -- yeah, let's take a look at Exhibit 4, which is the final rulemaking.



If you turn to page -- I'm looking at the numbers on the bottom now. Let's see here.
Okay. It's COF 0011078. Are you there?
A. Yes.
Q. Okay. This is actually the part of the Federal Register notice where the actual text of the contract is included. That starts on 1072. That's where the beginning of the text is. And here we are on 1078. It's part of the text of the contract. At the top it says appendix C, delivery commitment schedule.
A. Yes.
Q. Okay. And I asked you just a couple of minutes ago if you knew what a delivery commitment schedule was.
This is a form that's attached as appendix C to the standard contract in the Federal Register. And remember, there was a question before about -- there was a change to this. They added a proposed delivery date. Do you remember that in one of the letters that I showed you?
A. Yes.
Q. Okay. Looking at this now, do you know what function this delivery commitment schedule served in the course of implementing the contracts?
MR. MILLER: Calls for a legal conclusion.



But go ahead.
THE WITNESS: This was a delivery commitment schedule that was provided by the utilities. It did not commit acceptance by DOE.
BY MR. STOUCK:
Q. Okay. And why is it that the Department of Energy was interested in a delivery commitment by the utilities?
A. They wanted to know what was out there that we had to deal with.
Q. And when, I guess.
A. Yes.
Q. And why did DOE want to know that?
A. For background information.
Q. Okay. Are you familiar with contracts for reprocessing, the way they work? When Savannah River would enter into a contract with somebody to reprocess something, are you familiar with generally the way those contracts work?
A. Yes.
Q. Okay. In those reprocessing contracts, do you know whether there is typically a provision for the owner of the fuel to commit to deliveries of the fuel at specified times to the reprocessor?
A. What we reprocessed at Savannah River was fuel



that was owned by the government on loan of the Atoms for Peace program Eisenhower initiated. And that we demanded a schedule to fit in with our reprocessing at Savannah River that would allow us to stage that in to where it would not interfere with our defense program requirements for reprocessing.
Q. Okay. And I think the net of that -- don't let me mischaracterize, but I think the net of that is that yes, you were interested in getting a commitment from the deliverer of the fuel to deliver it at a time that would be convenient or workable for the reprocessor. Do you understand my question? Let me start over.
What I'm trying to find out is whether you know whether in contracts for reprocessing services there are typically included -- whether you know this or not. If you don't know, just tell me you don't know.
But do you know whether or not there are typically included, in contracts for reprocessing services, provisions by which the person who is providing the fuel for reprocessing commits to provide that fuel on a certain schedule so that the reprocessor can plan its reprocessing operations?
MR. MILLER: Calls for a legal conclusion and speculation.

THE WITNESS: Well, yeah. But -- you know what it's going to be designed to do. And it will have a different rate based on the design of it.

BY MR. STOUCK:

Q. Okay. There were parameters that had to be understood about the program before this scheduling process could begin.

A. Yes.

Q. Such as the capacity of the --

A. Yeah. And you can't -- you can't predict that without a design.

Q. Okay. And do you know whether in 1992 there was a design that DOE had for the repository?

A. I have no idea. I have not been following the program.

Q. Okay. Let me just take a look at these exhibits. I would like to turn now to some questions generally about the mission plan.

We looked at some exhibits earlier today that indicated -- well, there was the one about the letters out to the states that was dated January 28. Do you remember that? The letter to the states about site identification?

A. Right.

Q. And I think you told me that it was



important -- there was some urgency to getting that out at the time that you first became director. That was Exhibit No. 30.

A. Yes.

Q. Okay. And then we looked at an exhibit about transportation cask planning or certification.

A. Yes.

Q. Something was underway at the time you were there with regard to that subject.

A. Yes.

Q. And, of course, the contract was published as a final rule in April. That's Exhibit No. 4. And those contracts were signed in or about June of 1993.

A. Yes.

Q. Okay. With that context, do you recall at what point in time generally, not the date, but generally at what point in time in the course of your tenure did work commence on the mission plan?

A. It was early on. And in my previous testimony, we did cover specifically the draft mission plan that was submitted while I was there.

Q. Right.

A. So, you know, it was prior to that submission date that we were working on it. You know, I --

Q. I'm just trying to place it in time. For



example, the contracts were in process when you got there; right?

A. Yes.

Q. Somebody had drafted them already.

A. (Nods head.)

Q. Well, was work on the mission plan already in process when you got there?

A. I'm not sure.

Q. Okay.

A. But the first draft was sent out while I was acting.

Q. Yes. Do you know whether work on the mission plan, work in the sense of preliminary drafting and planning and outlining, do you know whether preliminary work on the mission plan was in process prior to the time that your contract was finalized, the standard contract in April?

A. I don't recall.

Q. Okay. You don't recall whether it was before or after?

A. I don't recall.

Q. Okay. Let's go ahead and mark this one that I previously indicated as a different number.

(Morgan Exhibit No. 40
was marked for identification.)



BY MR. STOUCK:

Q. Okay. Mr. Morgan, this is a memorandum on United States Department of Energy memorandum letterhead. Date, September 15, 1993; to a distribution list that includes you at the bottom there of the first page, and a number of others. Subject, mission plan strategy.

Do you see that?

A. Yes.

Q. And it's signed by Richard H. Williamson.

A. Yes.

Q. And it's a one-page memo with an attachment of several pages. Looks like six pages. And the title of the attachment is Nuclear Waste Strategy, an Overview Proposal.

A. Yes.

Q. Okay. Who was -- do you recall this?

A. No.

Q. Not specifically.

A. Not specifically.

Q. Not generally? I mean, at all do you recall this?

A. I know that we had comments from policy and everybody else in the department on the draft mission plan.

Q. Okay.
A. And this was one of the inputs.
Q. Okay. Who was Mr. Williamson?
A. I believe that he was in the Office of Policy within DOE.
Q. Was he involved in the development of the draft mission plan that you issued?
A. No.
Q. Okay. Do you know what role he played at all? I mean, do you know why he wrote this memo?
A. Well, the Office of Policy reviewed program activities. And as a part of this overview, he would be responsible for reviewing it.
Q. Okay. So the Office of Policy reviewed policies in a lot of different programs.
A. Oh, yeah.
Q. I see.
A. Across the board. The S-10 stands for policy being in the Office of the Secretary.
Q. Okay. Is that where Mr. Williamson worked?
A. Yes.
Q. Okay.
A. In reply to the attention of S-10, up in the upper left-hand corner.
Q. Okay. And just the text of this, the first



sentence or two says, "Attached is a revised mission plan strategy overview based on the discussions in our last planning session."
That's the first sentence. Do you see that? Do you see that in the first sentence?
A. Yes, I see that.
Q. Do you recall there being periodic planning sessions for the draft mission plan?
A. No.
Q. Okay. If there were such planning sessions, would you expect that you would have participated in those, you yourself?
A. I did participate in several discussions on the mission plan.
Q. Okay. And that was --
A. I signed it. It was mine. I owned it.
Q. But that was prior -- when you refer to mission plan, you're talking about the draft that was marked as an exhibit to your deposition.
A. That's correct.
Q. Previously.
A. And this is after that.
Q. Exhibit 10 -- let's find out if that's right.
A. What is the date on the draft mission plan?
Q. The date on the draft is December 20th, 1983.



A. September 20th?
Q. December 20th. So your recollection is correct. The date on this is after. The date on the Exhibit is March 20, 1984.
A. '84.
Q. I'm sorry. Look at the date at the top. That's the confusion. There's two dates. I'm confused.
The date that's typed on this document is September 15, 1983.
A. Right.
Q. And the date of Exhibit 10, the draft mission plan, is December 20, 1983; is that right? I just handed you a copy.
A. All right.
Q. Okay. So this memo, then, was prior to the date on the draft mission plan that was issued while you were there.
A. Right.
Q. Okay. It looks like there's a received stamp by a Mr. Woods, 1984. But that was the source of my confusion.
Okay. Let me ask a couple questions about this, on the attachment that's entitled Nuclear Waste Strategy and Overview Proposal.
A. All right.



Q. The first line there says, "Central focus of waste management strategy: DOE will begin accepting spent fuel in significant quantities in 1998."
Do you see that?
A. Yes.
Q. Is that consistent with your understanding at that time?
A. Relative to the mission plan, yes.
Q. Okay. And a few lines down from that under some subpoints it says, "the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel."
A. Yes.
Q. Okay. And that's consistent with your understanding at that time?
A. Yes.
Q. Okay. And the next tick, "this posture is designed to ensure that all utilities will have firm planning schedules for the disposition of the nuclear wastes sufficiently early to determine their on-site interim storage needs during the 1990s."
That's consistent with your understanding at that time?
A. Yes.
Q. Okay. Now, the next heading there says, waste

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____________________________________

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

_____________________________________

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.

THE COURT: Go ahead, whenever you're ready.

Whereupon--

ROBERT MORGAN

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. MILLER:

Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?
A. Yes.
Q. And you recall this document, do you not?
A. Yes.
Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?
A. Yes.

the program be pursued through contracts, you understand that?
A. Yes, yes.
Q. But you don't know why that provision was put into the Nuclear Waste Policy Act?
A. No.
Q. And I think you mentioned this in direct, but, again, I just want to make sure I have this clarified. You were not involved in the development of the one mill per kilowatt-hour fee, were you?
A. I was not.
Q. And you don't know how that fee was established for disposal services under the contract?
A. I was not.
Q. Yet, as acting director of the program, you were the one who had full authority and responsibility to implement the Act?
A. That's correct.
Q. And since the Act left any number of areas to be defined later, you were the one, as acting director, who had the final say in the ultimate responsibility for the definition of what was going to be in the Act?
A. No, what I did is interpret the Act and tried to conform to what was in the Act.



Q. So you were the one who was ultimately responsible though for what was going to be in there, in terms of the program though, weren't you?
A. I was responsible for establishing a program to meet the requirements of the Act.
Q. And you had decision-making authority, correct?
A. Yes, I did.
Q. I want to go back over a couple of those documents that Mr. Miller walked you through yesterday. I have just a few issues that I want to ask you about regarding those. You had testified yesterday that you thought that, at the time of, that the contracts were entered into in June of 1983, that it was too early to be talking about specific acceptance rates. Do you recall that testimony that you gave?
A. Yes.
Q. But at the same time, in June of 1983, didn't you publish the report on financing disposal of commercial spent nuclear fuel, that's Plaintiffs' Exhibit 978 that you discussed yesterday. Do you recall that document?
A. I'd like to see the document, if I can, please.



Q. Do you still have that in front of you, or do you need another copy? We can get you another copy. Mr. Morgan, do you recall testifying about this document yesterday, Plaintiff's Exhibit 978, the report on financing?
MR. MILLER: I don't believe that, on direct testimony, I asked Mr. Morgan about this document.
THE WITNESS: I did not see this document yesterday.
BY MR. SHAPIRO:
Q. I could check the transcript, but I'm pretty sure we talked about the same document. We may have a different cover page on it, but if you turn -- from the copying service, but I believe it's the same document. Nevertheless, if I could ask you a few questions about it, Mr. Morgan?
If you turn the, from the cover, from the copying service, you see that this is a report on financing, the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you see that, Mr. Morgan?
A. Yes.
Q. And in the upper left-hand corner, it says it was published in June 1983 of that same cover.



A. Yes.
Q. And you were acting director of the program at that time?
A. Yes.
Q. And if you'd turn past the table of contents to the first page, at the top, it says, "Introductory Summary."
A. Yes.
Q. And if you look at the first paragraph there, and I'll read to you the second sentence just to put in context this document, it says, "This report evaluates whether collection of the fee will provide sufficient revenues to offset the cost of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste produced from reprocessing such fuel." Do you recall that?
A. I see that.
Q. Do you recall the need to put together a report like this when you were acting director?
A. This was required after a year of operation of the Nuclear Waste Policy Act, and I don't believe this was published or transmitted beyond, I did not sign this, this is from Bill Sprecher and Robert Benning, and I don't know where this was distributed and how.

Q. But nevertheless, Mr. Morgan, the subject to make sure that the fee will provide sufficient revenues to cover the program, that was important, wasn't it?
A. Yes.
Q. And that was something that would have concerned you when you were acting director of the program?
A. It was required by the Act to assess the one mill per kilowatt after a year.
Q. Well, this document actually came out in June 1983, closer to six months, didn't it?
A. That's what it says. I don't know if it was published at that point in time or if it was published later.
Q. And this document was prepared after extensive analyses, wasn't it?
MR. MILLER: Objection, Your Honor, foundation, the witness said he hadn't seen the document.
BY MR. SHAPIRO:
Q. You were director of the program, weren't you?
A. Yes.
Q. Well, if I could turn your attention to the



third paragraph on the first page, the same page we're looking at, I'll read that first sentence of that paragraph to you. "This report presents the results of extensive analyses that explore the cost of implementing a nuclear waste disposal program."
A. Yes.
Q. Do you recall such analyses?
A. I don't recall such analyses. This was not required by the Act until one year after the Act was enacted.
Q. But it was important, whenever the timing was, to make sure you got the analysis right to make sure the fee covered the cost of the program, wasn't it?
A. That's correct.
Q. If I could ask you to turn your attention to page 11 of this document, do you see that, Mr. Morgan?
A. Yes.
Q. And on this page, in fact, there is a reference case for receipt of spent nuclear fuel by the government. It's shown there in that, in this table?
A. That's correct.
Q. And this was part of the analysis that



determined whether or not that fee was going to be adequate?
A. I testified regarding this table, which is, I believe, the exact same numbers that were in the mission plan, and that's what I testified to yesterday.
Q. And you thought that these numbers were reasonable for purposes of the analysis of making sure that the fee was adequate?
A. At this time, it was.
Q. And other than the acceptance rate shown on this table on page 11 of Plaintiff's Exhibit 971, there is not another reference case for waste acceptance, other than this one, when you were acting director, was there?
A. This table was published in the mission plan that came out in December 1983.
Q. And this was, and the acceptance rate that's shown here, roughly 1,800 MTU per year for the first five years and then 3,000 MTU thereafter, that was really the only acceptance reference piece --
A. That was a reference case we were using at the time.
Q. You certainly weren't looking at any reference case that would accept lesser amounts of



spent fuel, were you, than what's indicated here in 978?
A. No, but I do recall that the mission plan that was finally submitted the following year by Mike Lawrence had reduced numbers in it.
Q. Well, I suspect we'll get to that mission plan when we get to Mr. Lawrence or even Mr. Rusche following your testimony, Mr. Morgan.
A. Fine.
Q. I appreciate your help with that document. I want to turn now to a slightly different subject. Actually, it really concerns the document that Mr. Miller just asked you about, but let me ask you a few questions before we turn to that document.
It was your belief, when you were acting director, that the Department of Energy should adopt a strategy such that no utility would have to plan or construct additional at-reactor storage after 1998, isn't that correct?
A. That's correct. Let me just add that there would, there might have to have been contracts by the utilities entered into prior to January 1998 where construction would be going on after that date, so that there would be no new contracts required by the utilities. That was our intent.

Q. Okay. Let me ask you, you had testified yesterday that you wouldn't make private or public statements about an appropriate rate of acceptance. Do you recall that testimony?
A. Yes, I do.
Q. But if you recall, and I'm referring now again to Plaintiff's Exhibit 678 that Mr. Miller just asked you about and you testified about quite a bit yesterday, this document, program overview, is in fact a written version of a public statement talking about appropriate amount of waste acceptance, isn't it?
A. That was our goal and the intent of trying to be responsive to the Nuclear Waste Policy Act.
Q. And so in this document, you told utilities that, in 1998, DOE would be receiving spent fuel at a rate such that no utility would have to add any storage after that time, correct?
A. That was our goal. That was not a commitment. The mission plan, which I was referencing, is an informational document, not a contract document.
Q. But you wouldn't have made these statements in this program overview on Plaintiff's Exhibit 678 if you didn't think it was appropriate to do so, did



you?
A. Of course not.
Q. And it was your conclusion that the Department should take spent fuel that fast from utilities because you understood that to be the intent of Congress in the Nuclear Waste Policy Act?
A. That was my understanding.
Q. And not only did you think that was the intent of Congress, but you expressed the plan to accept waste from utilities fast enough by 1998 that the utilities would not have to provide any additional storage facilities because you, yourself, thought it made sense, didn't you?
A. That's correct. And you will note that in the mission plan, there is an increase of a backlog during the first few years. If you want to raise that table from the mission plan, I can show you.
Q. We're going to get to that. I appreciate your offer to do that, Mr. Morgan. And I want to ask you about that backlog issue as well. But I want to ask just one or two more questions about your conclusion that you should accept spent fuel from utilities fast enough for them to avoid adding additional at-reactor storage.
That in addition to believing that this



made sense, you reached that conclusion, even though that wasn't something that was defined by Congress in a conference report, did you?
A. It was not defined by conference -- by the Congress.
Q. And you also, you reached that conclusion, you were in charge of the program, and you reached that conclusion yourself, but you did that along with consultation with the Secretary of Energy, didn't you?
A. No, I reached that conclusion by myself.
Q. Do you recall testifying about this issue at your deposition, Mr. Morgan?
A. Yes.
Q. And you had your deposition taken on, it was back more than two years ago now, March 21st, 2002.
A. I believe that's correct.
Q. Let me read a question and answer from that deposition and see if that refreshes your recollection on this issue, reading from page 52 from that transcript. There's a question:
"Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraphs in this program overview regarding the



intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?
"Answer: Oh, yes."
Do you recall that testimony --
MR. MILLER: Your Honor, could the witness have the deposition transcript that's being quoted to him, so he can have an opportunity to review it?
BY MR. SHAPIRO:
Q. Do you need a copy of that?
A. No, I don't. You asked me if the Secretary approved it?
Q. No, I just asked if you consulted with the Secretary.
A. I consulted with the Secretary relative to the overall program that we were defining. As to whether he specifically approved anything, that was, I was responsible for that, and my discussions with the Secretary were for information. I was responsible.
Q. Now, yesterday, Mr. Morgan, you testified that it would have been inappropriate for utilities, and specifically Mr. Loring Mills. Do you recall testifying about your conversations with Mr. Mills?
A. Yes, I recall.

Q. And you testified that Mr. Mills wanted to have involvement in the development of the program, but you thought it was inappropriate for Mr. Mills and the industry to have that involvement, didn't you?
A. That's correct.
Q. But you included the goal in your program overview of removing spent fuel from utilities fast enough so that they wouldn't have to add additional storage, in part because it was your understanding that at that time that's what utilities wanted out of the contract, isn't that true?
A. Yes.
Q. And you testified that you never told Mr. Mills or anyone that DOE should accept waste fast enough to meet the discharge rate coming out of reactors and then ultimately to work off the backlog. Do you recall that testimony?
A. Yes.
Q. I want to turn your attention back to this program overview, Plaintiff's 678, and I think much of the relevant language has been read, but I want to ask you to consider one other paragraph in the document that I don't think has been read so far and see if that refreshes your recollection on this



issue. Do you still have that document in front of you, Mr. Morgan?
A. Which document is that?
Q. It's the --
A. This report?
Q. The proceedings, it has a sticker, Plaintiff's Exhibit 678.
A. No, I don't have that document.
Q. If you could turn to page 11 of that document, please, Mr. Morgan?
A. Yes.
Q. And I'll read it for you. I'm going to start reading the last paragraph that starts at the bottom of the second column there, but you can follow along with me. Do you see that paragraph?
A. Yes.
Q. "After the initial operation of the repository through the first few years, we would" --
A. Wait, wait, hold it, which paragraph is that on page 11?
Q. The last one on the bottom of the second --
A. Oh, okay.
Q. -- column. "We would anticipate that the rate of acceptance of fuel should be the rate of discharge from the reactors that are in operation at



the time, so by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors."
A. Yes.
Q. "It is anticipated that, at that point, it would look at bringing home the second repository. According to the Act, the second repository follows the first repository by four or five years. We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel."
A. That's correct, and that's what's shown in the mission plan, on table 2.
Q. So you did think it appropriate to have enough waste acceptance capability to meet the backlog from, meet the discharge rate from utilities?
A. Of course.
Q. And work off the backlog?
A. Yes.
Q. You've mentioned the mission plan a couple times, Mr. Morgan. I want to get to that issue now. And you referred to this, but I just want to confirm, the final mission plan came out after you left?
A. That's correct. I was responsible for the preparation and distribution of the draft.



Q. And when you were acting director, you determined that the contents of the mission plan, that that was the proper way to accomplish the goals of the Nuclear Waste Policy Act, correct?
A. Correct.
Q. And you wouldn't have put anything in the mission plan that you thought was inconsistent with the Act, correct?
A. Correct.
Q. You were responsible for every word in the mission plan at some level?
A. Correct.
Q. And the mission plan was the primary planning document for the program, correct?
A. Correct.
Q. In fact, as far as acceptance rate is concerned, which is what we've been spending a lot of time on the last couple days, you viewed the rates set out in the mission plan as the ideal goal of what DOE wanted to meet in accepting spent fuel from contract holders, correct?
A. I believe that's correct. I don't have a copy of the mission plan in front of me.
Q. We'll get that in front of you if we get to that, Mr. Morgan, don't worry about that. Why don't

we get to that now since you've asked for it? I don't want to deny you the document. As you'll see, this one is marked Plaintiff's Exhibit 636.
A. Correct.
Q. And we were starting to talk about the acceptance rates, which you spoke about to some extent yesterday, and those were on a table on page 2-3. Do you see that table?
A. Yes.
Q. And do you see the acceptance rate that's indicated there, again, it's 1,800 MTU for five years and then 3,000 MTU thereafter?
A. Yes.
Q. And you thought that was a reasonable acceptance rate for the program, correct?
A. At that time, yes.
Q. And this acceptance rate, again, the 1,800 MTU for five years and 3,000 MTU thereafter, this acceptance rate in the draft mission plan was intended to be enough, as you indicated earlier, to avoid the need for additional at-reactor storage after January 31, 1998, correct?
MR. MILLER: Objection, asked and answered numerous times.
THE COURT: Well, one more time won't hurt.



I'm going to overrule the objection. If you will answer?
THE WITNESS: Again, you will note that when the first repository opens in 1998, there is still, on the right-hand column, an increase in the backlog, and that, when I testified earlier, I believe said that there would be no need for additional commitments for construction of on-site storage facilities, but that there would be some commitments that would be in construction during that time, after 1998.
BY MR. SHAPIRO:
Q. You couldn't solve all of the problems that utilities would have in storing spent fuel, but you could solve a lot of them, is that what you're saying?
A. That was our attempt.
Q. The bottom line is that, in your opinion, DOE should perform the removal of spent nuclear fuel as fast as it reasonably could, didn't you?
A. I believe that was the intent of Congress and the Act.
Q. I want to switch subjects just a little bit to the kinds of things that the program was intended to accept. I want to focus on high-level waste. Was



your understanding that the standard contract's definition of high-level waste covered waste from utilities that they had taken from the core of their reactors that the NRC considered high-level waste, correct?
A. The Act says that, if the NRC defines core components as high-level waste, they will be accepted in the repository. They have to be defined as high-level waste by NRC.
Q. I want to get to your understanding, Mr. Morgan.
A. That was my understanding of what was in the Act.
Q. Let me ask you just a couple more questions. Wasn't it your understanding that this high-level waste included material that utilities had taken from their core, including shrouds, holders, end caps?
A. At that time, there had not been a definition by NRC that this was to be considered high-level waste, so I did not consider it. I believe it was still GTCC.
Q. I'm going to turn back to your deposition again, and this is on a different day. And here, I have a question and answer that's a little bit longer



than the last one. Maybe it would make sense to put that in front of you, so we can make sure we're all on the same page, June 25th of 2002. Mr. Morgan, I'm going to refer you to page 24.
A. At which tab?
Q. The June 25th tab, the last one.
A. What page, please?
Q. 24.
A. Yes.
Q. And I'll read it for you. It's a little bit long. I'm going to start on line 13 where a question begins. It starts:
"Okay. And then starting on line 11, your next answer, you said this, 'This to me deals with some of the high-level waste that some of the utilities had taken from their core that the Nuclear Regulatory Commission considered defined as high-level waste' or maybe defining, it might be a transcription error."
"My question is, Can you tell me just a little bit more about what you had in mind with this phrase 'high-level waste' that some of the utilities had taken from their core? What materials are we talking about?"
And your answer, "Some of the material that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :
-----------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, November 13, 2007
Volume 6

The parties met, pursuant to the notice of the Judge at 9:31 a.m.

BEFORE THE HONORABLE THOMAS C. WHEELER



APPEARANCES:
ON BEHALF OF PLAINTIFFS:
Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

ON BEHALF OF THE DEFENDANT:
Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE
U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

(Index appears at end of transcript)



P R O C E E D I N G S
(9:31 a.m.)

THE COURT: We're on the record this morning for day number 6 in the trial of Carolina Power, et al. versus United States. Mr. Fagg, who's up next this morning?

MR. FAGG: We have no preliminaries and we would call to the stand, Your Honor, Robert Morgan.

THE COURT: All right. Please come forward, sir.

Whereupon--
ROBERT L. MORGAN
a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. FAGG:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. Can you see and hear me okay?
A. Yes.
Q. Mr. Morgan, you and I had never met before about 15 minutes ago; is that correct?
A. Correct.
Q. I'd like you to introduce yourself, if



you could, to the Court. Could you spell your name for the record?
A. Robert L. Morgan, R-O-B-E-R-T, L, M-O-R-G-A-N.
Q. And are you currently employed, Mr. Morgan?
A. No.
Q. Could you -- retired?
A. Yes.
Q. Could you briefly walk through your professional career, if you could, starting after college?
A. I graduated from the Military Academy in 1952. Entered the Army Corps of Engineers. First assignment was in Fort Lewis. Then in Korea. Came back to the 82nd Airborne Division after Korea. I resigned my commission in 1965 and joined Atomic Energy Commission, started there in Savannah River operations office as a division director for the heavy water organic cooled reactor program.

Transferred to Southern California at the liquid metal engineering center in 1966, stayed there until 1973. 1973, I was selected as deputy manager of Savannah River operations

office, and then promoted to manager in 1980. And I had retired from the Department of Energy at that time in 1988.

I -- during the time I was manager, I had several details in Washington, D.C.

Q. Okay. And one of those details, and the reason you keep getting called back to the stand, is it not, was your role as a director of what became the Office of Civilian Radioactive Waste Management; is that correct?

A. Correct.

Q. When were you in that position, Mr. Morgan?

A. January 1983 until, I believe it was January 1984.

Q. And after January of 1984, did you continue to have any direct involvement in the DOE's program of civilian radioactive waste management?

A. No, I was transferred or had another detail as Acting Assistant Secretary for Defense Programs after I finished my job in OCRWM.

Q. OCRWM, and just for the clarity of the record and the judge, OCRWM is OCRM, Office of



Civilian Radioactive Waste Management?

A. That's correct.

Q. I think I missed one word in there, but that's what we're talking about?

A. Correct, yes.

Q. And just again, to be clear, you were not around and involved at the time of the 1987 amendments to the Nuclear Waste Policy Act, correct?

A. That's correct.

Q. And you were not involved in how those amendments were interpreted or applied by the Department of Energy, correct?

A. That's correct.

Q. And you were not around at the time the Department of Energy began to issue delivery commitment schedules, correct?

A. Correct.

Q. And you were not around at the time the Department of Energy began to issue either acceptance capacity reports or acceptance priority rankings, correct?

A. Correct.

Q. And you're represented by the U.S. Department of Justice today, correct?



A. Yes.

Q. Are you being compensated by the Department of Justice for your time today?

A. I'm compensated for the $40 a day for the witness.

Q. But you're no longer being paid by the hour to review your testimony or otherwise prepare?

A. I'm paid for preparation of testimony.

Q. Okay. $125 an hour, correct?

A. That's correct.

Q. And when you prepare for that testimony, you look at documents or look at your prior testimony?

A. Yes.

Q. Okay. Mr. Morgan, I'd like to talk with you some about some documents, most of which I'm certain you've seen before.

MR. FAGG: Permission to approach, Your Honor?

THE COURT: Yes.

BY MR. FAGG:

Q. And we'll be going to Plaintiffs' Exhibit 19. Mr. Morgan, I've handed you what's been marked as Plaintiffs' Exhibit 19, you've



seen this document before, correct?

A. Yes.

Q. Okay. And this document is an excerpt from a much larger document containing speeches and presentations presented at a conference in Washington, D.C. in December of 1983, correct?

A. Correct.

Q. And you were one of the presenters at that conference, correct?

A. Yes.

Q. And the excerpt that I've handed you is a written statement of remarks that you gave at that conference?

A. Yes.

Q. Correct?

A. Yes.

MR. FAGG: Your Honor, we would move Plaintiffs' Exhibit 19.

MS. SULLIVAN: Good morning, Your Honor.

THE COURT: Good morning.

MS. SULLIVAN: We had objected to Plaintiffs' Exhibit 19 because it, in fact, is not complete. The complete transcript of the proceedings is found at DX-41, and we would ask

that the Court admit DX-41 instead of PX-19.
THE COURT: Mr. Fagg.
MR. FAGG: It's a phone book sized document, Your Honor, and this is the only piece we're going to talk about. We have no objection if the Court wants to have the larger document in the record. I don't think it's necessary.
THE COURT: Well, I think what I may do is to admit both documents into evidence, Plaintiffs' Exhibit 19 and Defendant's Exhibit 41, those exhibits are admitted.
(Plaintiffs' Exhibit Number PX-19 was received in evidence.)
(Defendant's Exhibit Number DX-41 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: And either side may refer to either one as they wish.
MR. FAGG: Thank you, Your Honor.
BY MR. FAGG:
Q. Back to our proceedings in December 1983, Mr. Morgan, this was an open forum; is that correct?
A. Correct.



Q. Utilities were there, correct?
A. I believe they were.
Q. Okay. And after the forum, this document or the excerpt that I've shown you was published and distributed; is that correct?
A. Correct.
Q. Okay. I'd like to turn to, I guess it's page 11 of the excerpt that I've given you. And there's a Bates number, and I'm sure you've become familiar with Bates numbers by this point, but 599 at the lower corner. And the upper page, it says, program overview, and it has your name there, Robert Morgan. Are you with me, sir?
A. Yes.
Q. And again, just for the record, this page and the following page are essentially the written version of the statements you gave orally in December 1983, correct?
A. Correct.
Q. Okay. I'd like to direct your attention, if we could, to the second column on that page, and the sort of fourth full paragraph in that column. And I'm going to read a portion of that into the record, and



then ask you some questions about it.
"I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend," it doesn't say to, but I presume to "do. I think most of you know that the Act requires that we receive waste from the utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
Let's stop right there, if we could, Mr. Morgan. First question, does that fairly characterize the remarks you gave in December of 1983?
A. Yes, it does.
Q. And those were true statements to the best of your knowledge at the time you gave them, correct?
A. Yes.
Q. Okay. And you believed that it made sense that Congress didn't intend for you to



only take one assembly starting in 1998, correct?
A. Correct.
Q. Okay. I mean, common sense tells us that, doesn't it, Mr. Morgan?
A. Well, looking at the intent of the entire Act, it was to dispose of all the spent fuel from the commercial reactors. That was the intent clearly stated in the Act. With accepting one fuel element, one could not reach that goal.
Q. And you thought these statements were appropriate at the time you gave them, correct, Mr. Morgan?
A. Correct.
Q. Let's move on to the balance of that paragraph. It goes on to say, "the basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site during the first year of operation of the repository. In 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another

right?
A. Yes.
Q. And then they had to be signed in June, right?
A. Correct.
Q. Okay.
A. So after April, we were not working in parallel on the contract and the mission plan, that was what I was trying to clarify earlier.
Q. And that wasn't really clear from what we just read, was it? I'll withdraw the question.
Let's move on, Mr. Morgan. I'd like to go back now to what you have in front of you as Plaintiffs' Exhibit 17, do you have that document?
A. Yes.
Q. Okay. Again, back to the draft mission plan from 1983, are you with me?
A. Yes.
Q. Okay. And the purpose of this document was to outline the plan that the DOE was going to proceed on to try to accomplish the intent of the Nuclear Waste Policy Act, correct?



A. What we felt was the intent of the Nuclear Waste Policy Act.
Q. And you view this --
A. I cannot attribute intent to Congress.
Q. Well, you've testified and you've stated on multiple occasions, haven't you, Mr. Morgan, what you believe the intent to be?
A. What I believe the intent to be, but I don't know that that was clearly an intent of Congress.
Q. And I'm just asking about what you know, Mr. Morgan, do you understand that?
A. Yes, sir.
Q. Okay. You viewed this document as a proper way to accomplish the goals of the Nuclear Waste Policy Act, correct?
A. The goals or strategy that we were attempting to comply with.
Q. Okay. You were responsible for this document, correct?
A. Yes, sir.
Q. You owned this document, correct?
A. Yes, sir.
Q. And in some sense, every word in this document is your responsibility, correct?



A. Yes.
Q. All right. You wouldn't put anything in here that was inconsistent with the Nuclear Waste Policy Act, would you?
A. Not to my knowledge.
Q. You don't know that you did, do you?
A. I don't believe that I did.
Q. Let's look at a couple of provisions in this document, if we could, Mr. Morgan. And let's go to what was Bates-labeled 172. And at the end of the first paragraph, under program strategy, are you with me, Mr. Morgan?
A. Page 172.
Q. There's a lot of numbers on this document. One of them is 172, 45172?
A. Yes, I'm on that page.
Q. Thank you. I'd like to read into the record the last two sentences, I guess, of the first paragraph. It says, "the waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31st, 1998. Subsequently, the acceptance rate will be equal



to or greater than the actual discharge rate of spent fuel each year."
And that was a true statement of your intent at the time this document was issued in December of 1983, correct?
A. Correct.
Q. And the waste acceptance schedule, do you see that reference with all initial caps, initial capital letters, waste acceptance schedule?
A. Yes.
Q. Okay. That's referring, is it not, to the schedule that appears two pages further on in the draft, 174, right?
A. Yes. I might add that if you look at this table, we tried -- the strategy was to accept fuel at the discharge rate in 1998. We were unable to do that. And you will note in the remaining backlog actually increases from 1998 until 2003, when we start working down the backlog. So there was -- we were trying to get to the strategy, but the plan did not meet that total strategy.
Q. Okay. But after 2003, you do start working off the backlog?

A. Yes, sir.
Q. And that -- working off the backlog means you're accepting more fuel than the industry is discharging, correct?
A. Yes, sir.
Q. And your point, as I take it, is that didn't happen in this schedule until about 2003?
A. That's correct.
Q. But again, do you view that as inconsistent with the statement we just read into the record?
A. It was a strategy which we read in, which was read into the record which says, accept fuel at the discharge rate of the reactors in 1998. Clearly this acceptance schedule does not meet that requirement, so the plan did not meet the strategy that we had stated earlier.
Q. Okay. Mr. Morgan, let's ask you a couple of questions about that. What was the discharge rate of utilities -- well, let me back up. The rates reflected on this table -- and I'm at page 174, are you with me?
A. Yes.



Q. Okay. The discharge rates from utilities are based upon data that your office, or its predecessors, had acquired from utilities, correct?
A. Yes.
Q. And it was based upon projections of future activities, new plants, if you will, if they came on line, correct?
A. I believe it included -- I don't know if there were any other reactors coming on line after that date, but if there were, they would have been included.
Q. Okay. And looking down at the annual spent fuel generation, the first column of that table, it starts, the first item appears in column, for 1998, it says, "2739." Do you see that?
A. Yes.
Q. Okay. And the cumulative acceptance during 1998 is 1800, do you see that?
A. Yes.
Q. And so the point of your testimony a moment ago is that 1800 is less than 2700, correct?
A. That's correct.



Q. But moving on down, the next year, it's 2865 for spent fuel generation, correct?
A. Yes.
Q. Okay. And again, the first repository acceptance is 1800, correct?
A. Correct.
Q. But if we keep on going down to 2003, the annual spent fuel generation is again about 2700, correct?
A. Correct.
Q. And the first repository acceptance rate is 3000, correct?
A. Correct.
Q. And from that point on, the plan reflected in this document is accepting more spent nuclear fuel than is being generated by the industry, correct?
A. That is correct.
Q. Thank you, Mr. Morgan. The rates here, you thought these to be reasonable at the time, correct?
MS. SULLIVAN: Objection, vague.
THE COURT: Can you rephrase, counsel?
BY MR. FAGG:
Q. Certainly. The rates that were



developed on this chart that we were looking at, were developed under your direction, correct?
A. Yes.
Q. And you thought these rates to be reasonable at the time you published this in December of 1983, correct?
A. Correct.
Q. And looking at the steady state acceptance rate of a first repository, which after the ramp-up gets to 3000 MTUs per year, that rate is based upon discharge rates of reactors plus what a repository could handle, correct?
A. I don't understand that question.
Q. Let me try to rephrase it. I'm asking about the 3000 rate for the first repository?
A. Yes.
Q. Are you with me? And my question is, to your understanding, the development of that 3000 number depended upon at least two things, right? It depended upon discharge rates of the industry and an assessment of what a repository could handle, correct?
A. It was based on what the repository