**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME VI OF VII**
**(Pages A 0762 to A 0940)**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS REVISED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

August 29, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to VII

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 Notice of Rule 30(b)(6) Deposition..................................................A 0028

April 18, 2002 Notice of Rule 30(b)(6) Deposition................................................A 0033

November 12, 2004 Notice of Rule 30(b)(6) Deposition ........................................A 0039

March 2, 2005 Notice of Rule 30(b)(6) Deposition................................................A 0043

April 19, 2007 Notice of Rule 30(b)(6) Deposition................................................A 0047

June 9, 2008 Notice of Rule 30(b)(6) Deposition....................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)..........................................................A 0052

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)..........................................................A 0065

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)..........................................................A 0075

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels..........................................................A 0105

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations.............A 0111

Barrett, Lake ..........................................................................................................A 0123
April 22, 2002 ......................................................................................................A 0124
April 23, 2002 ......................................................................................................A 0149
April 26, 2002 ......................................................................................................A 0173
May 8, 2002 ..........................................................................................................A 0204
May 10, 2002 ........................................................................................................A 0228
May 14, 2002 ........................................................................................................A 0252

## Volume II (continued)

Brownstein, Alan ........................................................................................A 0257
April 9, 2002 .......................................................................................A 0258

## Volume III

Brownstein, Alan (continued)......................................................................A 0282
April 10, 2002 .....................................................................................A 0282
April 11, 2002 .....................................................................................A 0308
June 14, 2002 ......................................................................................A 0319

Cole, Billy M. ..............................................................................................A 0328
March 12, 2002 ...................................................................................A 0329
March 13, 2002 ...................................................................................A 0360
June 4, 2002 ........................................................................................A 0369

Dreyfus, Daniel............................................................................................A 0373
May 15, 2002 ......................................................................................A 0374

Klein, Susan ................................................................................................A 0384
April 24, 2002 (Rule 30(b)(6))..............................................................A 0385
April 25, 2002 (Rule 30(b)(6))..............................................................A 0419

Kouts, Christopher .......................................................................................A 0428
January 30, 2004 .................................................................................A 0429
August 2, 2004 (in the *Yankee Atomic* Trial Transcript) ..............................A 0440

## Volume IV

Kouts, Christopher (continued).....................................................................A 0445
April 11, 2005 (Rule 30(b)(6))..............................................................A 0445
July 12, 2005 (in the *TVA* Trial Transcript).............................................A 0459
January 16, 2007 (in the *System Fuels Mississippi* Trial Transcript) ............A 0463
April 12, 2007 (in the *System Fuels Entergy Arkansas* Trial Transcript)......A 0465
May 1, 2007 (Rule 30(b)(6)).................................................................A 0472
May 2, 2007 ........................................................................................A 0484
June 12, 2008 (Rule 30(b)(6)) ..............................................................A 0502

Lawrence, Michael.........................................................................................A 0531
May 20, 2002 ......................................................................................A 0532
May 21, 2002 ......................................................................................A 0572
November 16, 2007 (in the *Carolina Power* Trial Transcript)......................A 0587

## Volume V


Milner, Ronald ........ A 0599
May 1, 2002 ........ A 0600
May 2, 2002 ........ A 0629
May 3, 2002 ........ A 0661
May 7, 2002 ........ A 0675
May 8, 2002 ........ A 0690
August 11, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0695

Morgan, Robert ........ A 0703
March 21, 2002 ........ A 0704
March 22, 2002 ........ A 0737
June 25, 2002 ........ A 0745
August 3, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0751
November 13, 2007 (in the *Carolina Power* Trial Transcript) ........ A 0757


## Volume VI


Pollog, Thomas ........ A 0762
April 11, 2002 (Rule 30(b)(6)) ........ A 0763
April 12, 2002 (Rule 30(b)(6)) ........ A 0799
May 15, 2002 (Rule 30(b)(6)) ........ A 0819
May 16, 2002 (Rule 30(b)(6)) ........ A 0823
August 4, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0826
July 12, 2005 (in the *TVA* Trial Transcript) ........ A 0839
November 15, 2006 (in the *Northern States* Trial Transcript) ........ A 0846

Rosselli, Robert ........ A 0855
April 15, 2002 ........ A 0856
April 16, 2002 ........ A 0885

Rusche, Benard ........ A 0887
May 16, 2002 ........ A 0888
May 17, 2002 ........ A 0911

Slater-Thompson, Nancy ........ A 0921
April 21, 1999 ........ A 0922
April 22, 1999 ........ A 0932

## Volume VII

Slater-Thompson, Nancy (continued) .......... A 0941
June 13, 2002 .......... A 0941

Trebules, Victor .......... A 0955
April 17, 2002 .......... A 0956
April 18, 2002 (Deposition in Yankee Cases) .......... A 0982

Williams, Jeffrey .......... A 0985
June 11, 2002 .......... A 0986
January 22, 2004 .......... A 0993

Zabransky, David .......... A 1000
April 17, 2002 .......... A 1001
April 18, 2002 .......... A 1027
April 19, 2002 .......... A 1050
June 5, 2002 .......... A 1057
June 6, 2002 .......... A 1060
January 29, 2004 .......... A 1064
August 5, 2004 (in the *Yankee Atomic* Trial Transcript) .......... A 1067
March 29, 2005 (in the *SMUD* Trial Transcript) .......... A 1080
April 12, 2005 (Rule 30(b)(6)) .......... A 1083
July 12, 2005 (in the *TVA* Trial Transcript) .......... A 1092
October 27, 2005 (in the *Southern Nuclear* Trial Transcript) .......... A 1097

# POLLOG

IN THE UNITED STATES COURT OF FEDERAL CLAIMS - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY : (98-126c) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER : COMPANY, (98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY : (98-483C) (WILSON, J.) :
NORTHERN STATES POWER COMPANY : (98-484c (Wiese, J.) :
DUKE POWER, A Division of DUKE : ENERGY CORP. (98-485C) (Sypolt, J.):
INDIANA MICHIGAN POWER COMPANY : (98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY : DISTRICT (98-488c) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY : et. al. (98-488c) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY : (98-621c) (Hewitt, J.) :
BOSTON EDISON COMPANY : (99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED : (00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : (00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF : NEW YORK (00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT : (01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT : (01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY : (01-249C) (Bruggink, J.) :
Plaintiff, : :
vs : :
THE UNITED STATES, : Defendant. :
- - - - - - - - - - - - - - - - - -x
McLean, Virginia Thursday, April 11, 2002

Deposition of:

THOMAS POLLOG,

the witness, called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 10:10 a.m., at the offices of Shaw, Pittman, 1650 Tysons Boulevard, McLean, Virginia, before Linda C. Marshall, RPR, a Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, Nebraska Public Power District: DEVON E. HEWITT, ESQUIRE

JACK CHEW, ESQUIRE Shaw, Pittman, LLP

1650 Tysons Boulevard McLean, Virginia 22102-4859

703-770-7962

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power: KRISTI L. REMINGTON, ESQUIRE

Balch & Bingham, LLP Tenth Floor,

1275 Pennsylvania Avenue, N.W. Washington, D.C. 20004

202-347-6000

APPEARANCES CONT'D:

On behalf of Plaintiff Commonwealth Edison Company:

THEODORE T. EIDUKAS, ESQUIRE Jenner & Block, LLC

One IBM Plaza Chicago, Illinois 50511-7603

312-222-9350

On behalf of Plaintiff SAcramento Municipal Utility District:

TIMOTHY R. MACDONALD, ESQUIRE Arnold & Porter

Suite 4500 370 Seventeenth Street

Denver, CO 80202-1370

On behalf of Plaintiff Wisconsin Electric Power Company:

SUZETTE W. DERREVERE, ESQUIRE Perkins Coie, LLP

607 14th Street, N.W. Washington, D.C. 20005-2011

202-434-1675

On behalf of the Defendant: MARIAN SULLIVAN, ESQUIRE

ERIN POWELL, ESQUIRE U.S. Department of Justice

Civil Division 1100 L Street, N.W.

Washington, D.C. 202-514-7300

I-N-D-E-X


| Witness: | Page |
|---|---|
| Thomas Pollog | |
| Examination by Ms. Hewitt | 5 |


E-X-H-I-B-I-T-S


| | Page |
|---|---|
| No. 1 - | 20 |
| No. 2 - | 28 |
| No. 3 - | 44 |
| No. 4 - | 71 |
| No. 5 - | 103 |
| No. 6 - | 112 |
| No. 7 - | 122 |
| No. 9 - | 164 |

Q What is his current position?
A I don't know.
Q What was he doing for DOE when he worked on this illustrative waste acceptance schedule?
A He was working for a company called Weston and I don't know specifically what he was doing at that time.
Q Did Weston participate in the drafting of the 1985 Mission Plan?
A According to what Mike told me, yes.
Q Mr. Pollog, when did you start working at DOE?
A November of 1988.
Q What was your appointment previous to that?
A I was in graduate school.
Q Was working at DOE your first job out of graduate school?
A Out of graduate school, yes.
Q And what position did you have with DOE when you started in 1988?
A I believe the position description was either general engineer or nuclear engineer.
Q And in what division of DOE or



department?
A It was in the systems development branch of the RW, Office of Radioactive Device Management.
Q And who did you report to in that position?
A Charles Head.
Q And what were your duties generally in that position?
A We were tasked with developing dry storage for spent fuel.
Q Does that have to do with canisters?
A A canister can be part of a dry storage system, yes.
Q How long did you have this position?
A Approximately six months.
Q And what position did you have after that?
A After that I was assigned to the systems integration branch.
Q And who did you report to in that position?
A William Danker.
Q What position did you hold in the systems integration branch?



A It was either general engineer or nuclear engineer. I forget the specific job description.
Q And what were your duties in that position?
A To develop the technical baseline for the RW program. I use RW to indicate the Office of Radioactive Device Management.
Q And what do you mean by the term technical baseline?
A The technical requirement is part of the baseline. Develop the appropriate requirements, functional responsibilities and organizations needed to incorporate these requirements in the design of our waste management system.
Q Did that include developing technical requirements for the repository?
A We did not develop the requirements. We would just identify the requirements that the specific part of the program had to meet and we would assign them to specific organizations.
Q Can you give me an example, because I don't think I quite understand?
A For example, the transportation part of



the group, we would go through a 10 CFR 71 and say, okay, this part of 10 CFR 71, which are transportation requirements by the NRC, you need to incorporate in the design of our system.
Q And how long were you in this position?
A Approximately a year.
Q So, I think that brings us almost to 1990?
A Yes.
Q Is that about right? What did you do after that?
A I was assigned to, I believe, the utility interface and logistics branch.
Q And what did you do in this capacity?
A We were basically implementing the standard contract for DOE.
Q And who did you report to?
A Alan Brownstein.
Q Who else was on your -- in that branch or team?
A When I first joined it? When I left it. At what point in time?
Q When you first joined it.
A Alan was the branch chief, Mary Lee Payton, myself, and Eric Swenson.

Q What was Mary Lee Payton's role?
A I believe she dealt with the fee collection, fee verification issues.
Q And you mentioned Eric Swenson?
A Yes.
Q Can you spell his last name?
A S W E N S O N.
Q And what was his role?
A He did the -- he was doing the FICA reports, FICA initiative, facility interface capability assessment.
Q What were your duties in this position or in this branch?
A They were assigned to me by Mr. Brownstein as needed to support him on any contractual issues related to dealing with the utilities on the -- that were contained in this standard contract, other than what Miss Payton or Mr. Swenson were doing.
Q And how long were you working for this branch or Mr. Brownstein?
A I worked from approximately 1990 to the end of '91, early '92.
Q When you left, were there different individuals in this branch?



A I don't think so.
Q And what happened in 1992?
A I took a three-year leave of absence.
Q And I understand you went to Austria; is that right?
A That's correct.
Q That's a wonderful place.
Did you return to DOE then in 1995?
A Yes.
Q And what division or department of DOE did you return to?
A It was still RW. I worked for the engineering division.
Q And who did you report to?
A Jeffrey Williams.
Q And what were your duties in that position?
A We were managing the MPC, Multi Purpose Canister Program and the GA, General Thomas Cast Development Program, were the major responsibilities. There were other minor ones, but they were the two major initiatives I was involved with at that time.
Q And how long did you hold this position?



A Until the fall of '96.
Q And did you take on a new position?
A Yes.
Q And what was that?
A I was assigned to the waste acceptance team.
Q And who comprised that team?
A When?
Q When you joined in '96?
A That would have been Mr. Zabransky, who was the team leader, myself, William Floyd and Mary Lee Payton.
Q What were your duties on the team?
A To support Mr. Zabransky in any of the contract issues that were ongoing, other than what Mr. Floyd and Ms. Payton were doing.
Q Did Mr. Floyd have any specific responsibilities?
A Yes.
Q And what were they?
A He was our safeguards expert.
Q Safeguards?
A Yes.
Q What are safeguards?
A Safeguards for nuclear material,



preventing theft and diversion for parties we're not favorable to.
Q And Ms. Payton, what were her responsibilities?
A The same. Yet, she was still working on the fee verification issues, collection.
Q How long did you hold this position?
A Until now.
Q And you currently hold that position today?
A Yes.
Q Mr. Pollog, did you have any personal role in drafting the standard contract?
A No.
Q Did you have any personal role in drafting or participating in the ACRs? Are you familiar with the term ACR?
A Which ACRs?
Q Any of them.
A I believe I was involved in production of the 1991 ACRs.
Q Any other ACRs?
A I don't believe so.
Q And what did you do with regard to the 1991 ACRs?

A Basically, review the draft we had to received from our contractors.
Q What contractor was that?
A I believe it would have been -- I forget if it was either P&L or TRW at that time.
Q And what was your role in reviewing the document?
A Read it, made suggestions, corrections, anything that I felt was appropriate. Direct my comments to our contractor at the time, resolve my comments.
Q Do you recall whether you made any comment or raised any questions with regard to the acceptance rates in regard to the 1991 ACR?
A I don't recall.
Q You passed your comments back to the contractor? Is that what your testimony was?
A Yes.
Q Did you relay any comments to anybody else at DOE?
A I probably went over it with Mr. Brownstein. I don't recall specifically, but that would have been how I would have done things normally.
Q Did you have any role in drafting any



of the instructions given to purchasers of the standard contract with regard to the delivery commitment schedules?
A It would have been the same as for the '91 ACRs. I probably would have reviewed them, commented on them, given comments back to the contractor, discussed any comments with Mr. Brownstein.
Q Do you have any immediate recollection of having done that with regard to the delivery?
A No.
Q Did you have any role drafting or participating in production of the 1985 Mission Plan?
A No.
Q Did you have any role in drafting or participating in production of the 1987 Mission Plan Amendment?
A No.
Q Did you have a role in drafting or did you participate in the production of the MRS submission to Congress?
A No.
Q Did you have a role in drafting or participate in the production of the RFP that was



issued by DOE for transportation and waste?
A No.
Q Did you have a role in drafting or participate in the production of any of the, what I call, TSLCC documents? Are you familiar with that acronym?
A I am familiar with the acronym?
Q And did you have a role in drafting or participate in production of those documents?
A No.
Q Did you have a role in drafting any aspect of the fee adequacy reports?
A No.
Q Did you participate at all in their production?
A I believe I may have been asked to comment on one of the reports when it was going through the draft preparation stage.
Q And why would you have been asked to comment on one of the reports?
A Typically, how we work is when a document is getting ready -- prior to being produced, it will be sent to effective organizations within the RW program for comments. And I believe I was asked to comment on one of



them during this period prior to it being submitted for concurrence and approval.
Q Do you remember which one?
A No.
Q Do you remember the nature of your comments?
A No.
Q Probably should have done this earlier, but for the record, you're appearing here today pursuant to Notice of Deposition, and you're appearing as a representative designated by the Government with respect to certain topics; isn't that correct?
A Yes.
Q And I'm going to -- hopefully, I have with me copies of the 30(b)6 deposition notice that we provided.
Why don't you take a look at that. Hopefully, it should be the correct one.
(Discussion held off the record.)
(Whereupon, Pollog Deposition Exhibit No. 1 was marked for identification.)
BY MS. HEWITT:
Q Here is the 30(B)6 notice that the court reporter has identified now as Exhibit 1 to

your deposition. And I just want to confirm that that's the one the DOE provided and those are the topics that you're prepared to speak about today?
A Yes.
Q You can keep that for a second.
Back to a former question. Did you have any role in drafting any of the specifications or design requirement documents for the repository?
A I don't believe so.
Q I'm going to ask you some questions about the acceptance rates in the standard contract and then going forward, which really starts with topic number six on the list. Sort of working backwards.
Does the standard contract specify the rate at which DOE would take SNF and/HLW from utilities when it began to take spent nuclear fuel or high level waste from utilities?
A No.
Q Why was an acceptance rate not included in the standard contract?
A I don't know.
Q Was that topic raised when the standard contract was being negotiated?



A I don't know.
Q What was DOE's intent with regard to the rate it would take spent nuclear fuel and/or high level waste from utilities when it began to actually take it from utilities pursuant to the standard contract?
MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q What was DOE's intent at the time it executed the contract as to what the acceptance rate would be or how fast it would take SNF from utilities when it began to implement the program?

A Can you repeat that for me just one more time? I'm sorry.
MS. HEWITT: Why don't we have the court reporter read the question back.
Maybe I'll read it back.
BY MS. HEWITT:
Q What was DOE's intent at the time it executed the standard contract with regard to the rate of acceptance it would implement once it began the program it started taking spent nuclear fuel from utilities?
A What was DOE's intent at the time the



standard contract was enacted?
I don't know what their intent was at the time the standard contract was enacted.
Q Did there come a time where DOE developed some sort of plan about how fast it would take spent nuclear fuel from utilities once it implemented the program?
A DOE published many documents that included acceptance rates in them that were used for illustrative purposes only. If that's what you mean by their intent, then yes, there were documents produced after the standard contract was enacted that would contain illustrative potential acceptance rates.
Q When DOE executed the standard contract, did it have a plan with regard to how fast it would take spent nuclear fuel from utilities when it began to actually do so?
A When -- I don't know what DOE's intent was as it enacted the standard contract.
Q When DOE enacted the standard contract, was there a plan to develop an acceptance rate?
A I don't know when DOE enacted the standard contract or if it had a plan in mind to develop acceptance rates. The contract had



certain requirements on it to do certain actions. I don't know if it calls for them to do that, but I'd have to look at the contract to see what the exact wording is in the contract.
Q Are you familiar with the Nuclear Waste Policy Act?
A Yes.
Q What's the purpose of the Nuclear Waste Policy Act?
MS. SULLIVAN: Objection, calls for conclusions as to statutory intent.
You can answer the question, if you know.
THE WITNESS: It would take me quite a while to answer. Essentially, to set up the Office of Radioactive Waste Management and a program for dealing with spent nuclear fuel.
BY MS. HEWITT:
Q And why was a program needed to deal with spent nuclear fuel?
A Why was a program -- I'm just speculating here. What the government's and Congress', and the president's intent was in 1983. If you want to speculate on what the president and Congress' intent was, I can.

Q Do you have any knowledge as to what the purpose or intent was behind the Act?
MS. SULLIVAN: Same objection.
THE WITNESS: I have no personal knowledge of what Congress intended or the president intended.
BY MS. HEWITT:
Q Have you discussed possibly the purposes of the Nuclear Waste Policy Act in doing your duties, particularly in regard to implementing the standard contract?
A Yes.
Q And in that capacity, what is your knowledge of the -- what the purpose of the Nuclear Waste Policy Act is?
A Can you repeat that again for me? I'm a little confused. I'm sorry.
Q Well, I think you answered that you did have occasion to discuss the purposes of the Nuclear Waste Policy Act in performing your duties when implementing the standard contract.
A Mm-hmm.
Q In that regard my question is, what are the purposes you understood the Nuclear Waste Policy Act were in performing your duties?



A My best recollection is the Nuclear Waste Policy Act told the department to develop a standard contract for the utilities. And that's where the requirement for the -- for us actually having a standard contract came from.
So, it basically was a driving force or the reason why we had the standard contract.
Q Do you know when the first acceptance rate was published after the standard contract was executed?
A The first one after it was executed? I don't know which one was the first one that was published after the standard contract was executed.
Q What was the first one that you recall perhaps?
A The first that I can recall, I believe, is a draft -- let's see. Probably would be the Mission Plan. If you --
Now, when you say standard contract, what was your term, executed?
Q Yes.
A What do you mean by that?
Q Signed by parties.
A Okay. That's a different date than



when it was published in the public register.
Q That's right. It was signed at various dates, but I think they all had to be signed by June, 1983, I think, around that time.
Does the difference -- does that make a difference in one of your prior answers?
A No. Prior answer? No. That's why I'm hesitating. I'm trying to keep the dates straight in my mind.
The first thing I can recall that was done after the standard contracts were actually signed by the utilities, and if that was June, approximately of 1983, the first I can remember would be a draft December, 1983 Mission Plan.
Q December, 1983.
A I believe that's the correct date.
Q Were there acceptance rates published before that time?
A By whom?
Q By DOE?
A I believe so.
Q In what kind of document, do you recall?
A I think there is one -- the report on financing for disposing of commercial spent full,



processed high level waste, high radioactive waste.
Q Do you recall whether there was an acceptance rate published before this particular document in 1983 by DOE?
A I don't recall.
Q Were there acceptance rates published in documents produced by contractors for DOE?
A I know of no specific ones.
Q I'm going to give you a copy of the standard contract, Mr. Pollog. Actually, this is my copy.
MS. SULLIVAN: Are you making this an exhibit?
MS. HEWITT: I'm going to wait and see. Probably not, but let him use it if he wants.
MS. SULLIVAN: Are you going to ask him questions about it?
MS. HEWITT: Yes.
MS. SULLIVAN: Can we mark it then so --
MS. HEWITT: Sure.
(Whereupon, Pollog Deposition Exhibit No. 2 was marked for identification.)
BY MS. HEWITT:

BY MS. HEWITT:
Q Further down in Article 5, there's a section addressing delivery commitment schedules. Are you familiar with that term?
A Yes.
Q What is a delivery commitment schedule?
A That is Appendix C to the standard contract.
Q And can you describe it?
A I can read it for you if you like.
Q Can you describe in your own words what it is?
A Let me look at it first.
Q Certainly.
A Delivery commitment schedule is a commitment on both the purchasers' and DOE's, when they're both signed, part to commit parties to delivering a range of spent fuel in a year from a specific site.
Q When did the delivery commitment schedules have to be submitted to DOE by the purchasers?
A That would depend upon where their allocation is.
Q How would that influence when they



needed to submit their delivery commitment schedules?
A Because the delivery commitment schedules are to be submitted 63 months prior to the year of delivery.
Q Why 63 months?
A I don't know.
Q And when you made reference to the term, year of delivery, are you referring to a calendar year of delivery?
A Yes. Not specifically any, you know, year, but a 12-month period corresponds to something from January to December. Not specifically any specific year, but a 12-month period.
Q Let me ask you the question then. They would have to know what the calendar year is in order to be able to back out 63 months, right? It would have to be, for example, year 2000?
A Yes.
Q It would have to be a calendar, a number of years?
A Yes.
Q Because you're aware, obviously, that DOE had at one point published ACRs in calendar



years which were not used?
A Yes.
Q Once a delivery commitment schedule was submitted to DOE, what was DOE's role in reviewing them?
A They would be reviewed to see if they had the proper information on them.
Q What do you mean by proper information?
A They identified a location that the purchaser actually owned or had a site at; if the amount of fuel identified in that schedule, the MTU's would correspond to an actual allocation they had. If it was the right type of fuel, for example, BWR or PWR fuel they owned.
Q Anything else?
A Nothing that comes to mind.
Q When you answered that it had to correspond to an allocation that they had, what are you referring to?
A The amount of fuel in the DCS that they were submitting it for had to correspond to an allocation in the ACR. Not just the '88 ACR, but the '91 ACR.
Q Did that requirement come from the contract, the standard contract?



MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q Did the requirements that the DCS correspond to an allocation in the ACR come from the standard contract?
A I'd have to read through the standard contract and see.
Q Why don't you take a look at the standard contract.
A I believe so.
Q And what in the standard contract makes you say so?
A Well, the standard contract sets up a process for both parties to follow. And if you follow through the process, the only thing we can use to really compare if the allocation is correct is the process sets up the requirements for us to compare if the allocation is correct from what they submit and what the ACR says.
Q I'm not sure that's responsive to my earlier question. Does the standard contract require offerors to deliver commitment schedules based on the allocations identified in the ACR?
A Okay. Now, I think what you said now may be a little different. I interpret it

1987.
Q Right, okay. But that's not under the delivery commitment schedule process?
A True.
Q Okay. I guess we'll have to go over this testimony a little bit. You said in delivery commitment schedules, the purchasers would include proper information, which included identified location of the fuels and corresponding to the allocations in the ACR?
A Yes.
Q And you mentioned the right kind of fuel?
A Yes.
Q And you said PWR versus?
A BWR.
Q And that is boiled water reactor versus?
A Pressurized water reactor versus boiling water --
Q And did they also have to include the quantity of fuel they're going to deliver?
A I believe so.
Let's look at the -- they would identify the metric tons of uranium initial and



number of assemblies.
Q Why did DOE need this information?
A We would use that information to try and develop a transportation program.
Q And when you said transportation program, what are you referring to specifically?
A A group of hardware essentially; casks, whatever associated with equipment, yokes, lifting equipment, transporters, receipt facilities to transport spent fuel from purchasers to a DOE facility. Whatever is included with that regarding hardware; and also, planning systems.
Q What do you mean by planning systems?
A Well, you have X amount of casks and you try and maximize your fleet. So you don't want to have ten purchasers needing the same cask at the same day. So you prefer to have, you know, the minimum number of casks as possible, so you try to plan most efficiently to use your system.
Q Now, did DOE have the ability to reject DCSs that were submitted by purchasers?
A Yes.
Q And on what basis could they reject



them?
A If they believed there's information that was incorrect on them.
Q And how would they determine that?
A Oh, you would compare the allocation that the utilities put down on their DCS to see if it was correct in comparison with what was in the ACR, '91 ACR.
We could see if they put down a facility that they didn't own. If they put down a pressurized water fuel and this utility only owned boiling water reactor fuel.
If they put down a range of discharge dates that don't correspond to any fuel they have range of discharge dates within.
Q What happened after DOE rejected a delivery commitment schedule submitted by a purchaser?
A They would return it to the purchaser.
Q And what is the purchaser supposed to do at that point?
A Re-submit the DCS.
Q With what -- why would they have to re-submit the DCS?
A If they wanted to have it approved,



they would have to re-submit it.
Q Was there a point in time in which the DOE and the purchaser would negotiate mutually acceptable delivery commitment schedules?
A Yes.
Q And what time would that occur?
A Let me read the process here to refresh my memory.
That would come after, providing there was a second disapproval.
Q And what would the negotiations entail? How would that work?
A The parties would come together and try and sit down and discuss the issues and reach an agreement.
Q And if they couldn't reach an agreement, what would happen?
A Speculative. I don't know of any case of that happening.
Q I'm going to hand you a copy of the DCS instructions that were distributed by DOE to offerors. We'll make this Exhibit 3 to the deposition.
(Whereupon, Pollog Deposition Exhibit No. 3 was marked for identification.)

BY MS. HEWITT:
Q Have you ever seen this document before, Mr. Pollog?
A Yes.
Q Did you have any role in drafting the document?
A Can you explain for me by drafting, you mean actual writing? You mean any part in the eventual development?
Q Why don't we say the latter.
A Yes.
Q What was your role in the development of this document?
A I believe I've seen draft versions submitted by DOE to contractors and provided comments.
Q Do you remember what kind of comments you provided?
A No.
Q Was this document distributed to purchasers in preparation for them submitting their DCSs?
A Yes.
Q And it was distributed by DOE, correct?
A Yes.



Q If you'd take a look at page two, background information, in particular paragraph 7C.
A Did you say 7C?
Q Yes. The paragraph starts, annual acceptance rate since the ACR --
A Mm-hmm.
Q There's reference there to FWMS, that acronym.
A Federal Waste Management System.
Q And what does that refer to?
A That is the entire waste management system; the transportation, any storage system that would be part of the system and their repository.
Q What does the term, acceptance capacity mean in that sentence?
A That would be the capacity or the amount of spent fuel that would flow through the system in any given year.
Q Does the term capacity mean the physical limitations of the system to take spent nuclear fuel?
A Can you explain that for me a little better?



Q I don't think I can explain it any better than that. I mean, what's your confusion?
A You mean maximum physical limitations?
Q Yes, I mean capacity.
A Yes, I would say, yes.
Q The outermost ability to, you know, handle something. So, yes, the maximum limitations.
A Yes.
Q Okay. It was a physical constraint is what I'm trying to determine.
A I would say so.
Q Yes. The second sentence in that paragraph says, The process described herein, and I take by that it means the DCS process, assumes that the FWMS system will be able to accept the SNF beginning in 1998.
Why is that assumption important to these instructions?
A Because the contract requires the purchasers to start submitting DCS forms 63 months prior to delivery year. And you needed to know what your delivery year is. You just subtract 63 months prior to your delivery year so you had to know when the process started.



Q And if the process did not begin in 1998, what would be the significance then of the DCS process?
A The significance? I think it would be -- the significance is the same either way, if it starts in '98 or not.
Q Well, this sentence indicates that this process, the DCS process, depends on it starting in 1998?
A Yes.
Q What would happen if delivery or acceptance of spent nuclear fuel did not happen in 1998? What would happen to the process?
A Process, I'm going say, just for the sake -- assume later than that, the DCS process would start later than that.
Q What if there's no date given for when it would start?
A Let me read the contract.
Theoretically it could start --
Q What could start?
A The DCS process.
Q Even if there was no date for when DOE would come to actually take spent nuclear fuel?
A Yes.

Q How would that be?
A Purchaser has a right to start filling out DCSs in 1992.
Q Even if they don't get a date for allocation?
A If they want to submit a DCS, they could have done that. We would have disapproved it most likely, but --
Q So that process would have more than likely been futile?
A Yes. Or DCSs may have needed to be re-evaluated at a later time.
Q Yes. I note that your counsel pointed that paragraph out to you, that sentence.
What does that mean, they would be re-evaluated by DOE?
A If they had submitted them and they were correct, we could have went from where they were. I mean, started with that as a DCS, that is correct. It would not have needed to be modified.
If it's something that would be incorrect on it, then we would have to -- we could not start at that point in time.
Q Incorrect. That means if DOE changed



its mind as to when it would actually come and get the fuel, then those DCSs would be modified?
A Yes.
Q So if a DCS was approved by DOE, that didn't mean it was binding on DOE?
A We thought it was our -- it was binding.
Q Why would it be binding?
A We signed a delivery commitment schedule to provide such a service in such a year. Purchaser signed a DCS to offer certain fuel in a certain year, and we signed that we would provide a service to pick up that fuel in that year. Signed by the contracting officer for the department.
Q But if DOE decided to change the year in which it would come and get the fuel, it could go back and re-evaluate the DCSs; isn't that right?
A Yes.
Q So therefore, it wasn't a final binding statement?
A We believe it was our binding responsibility.
Q Notwithstanding the fact that you could



go back and change it afterwards?
A Yes.
Q Could you in a final delivery schedule change the location of where you would deliver your fuel from to DOE?
MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q Are you familiar with the term final delivery schedule?
A Yes.
Q And what is a final delivery schedule?
A That is appendix --
Let me see what the contract says. Appendix D to the standard contract.
Q And what's the purpose of the final delivery schedule?
A It was where the purchasers would designate a specific time frame 12 months prior to actual date of delivery.
Q In the final delivery schedule, did you have to reflect the same location from where the spent nuclear fuel would be delivered to the DOE, as you specified in your delivery commitment schedule?
MS. SULLIVAN: Objection, vague.



MS. HEWITT: Did you understand the question?
THE WITNESS: Yes.
We never developed instructions for submitting DCSs, so that's speculative at this time.
BY MS. HEWITT:
Q I'm talking about final delivery schedule, not DCSs?
A I understand the question.
MS. SULLIVAN: I believe you misspoke. You said DCSs.
THE WITNESS: I'm sorry. We never developed instructions or any review criteria for an FDS, so any response would be speculative.
BY MS. HEWITT:
Q Did the standard contract contemplate that the final delivery schedules would take precedence over delivery schedules?
MS. SULLIVAN: Objection, calls for legal conclusion.
You can answer, if you know.
THE WITNESS: I have to read through the final delivery schedule provision of the contract.

deponent.
MS. HEWITT: Well, I think this comes within the DCS process.
MS. SULLIVAN: Topic 3, DOE's responses to DCS form submitted by utility plaintiffs, including DOE's decision to stop approving such DCS forms.
I read that question as being within Topic 3 and Mr. Pollog is not prepared to answer that question today. It will be answered by another deponent.
BY MS. HEWITT:
Q Do you have any personal knowledge about disapproval of the DCS process? For DCSs submitted by offerors, by purchasers?
A I know we stopped submitting them.
Q Why did DOE stop submitting them?
MS. SULLIVAN: Objection. That's another Rule 30(b)6 witness --
MS. HEWITT: I can ask about his personal knowledge.
MS. SULLIVAN: It's beyond the scope of the Rule 30(b)6 deposition.
MS. HEWITT: I don't think it is, and I think I can ask about his personal knowledge.



He's here and you can ask a 30(B)6 witness about their personal knowledge on topics that are relavant to the 30(B)6 topics. This is a DCS process.
MS. SULLIVAN: We need to stop. I need to call Harv and see if we're going to let this continue.
MS. HEWITT: Okay.
(Brief recess.)
MS. SULLIVAN: We will allow this line of questioning to proceed, but with the objection that this is beyond the topics Mr. Pollog is prepared to discuss and he's answering only as to his personal knowledge.
BY MS. HEWITT:
Q Okay. Mr. Pollog, I believe you testified that you -- that DOE stopped approving or disapproving DCSs submitted by purchasers. And I had asked you -- the question pending was, why?
A Why did we stop approving DCSs?
Q Yes.
A We did it on instructions from the Department of Energy's general counsel.
Q Did you discuss the substance of this



answer with your counsel after you left this room?
A No.
Q And you don't know why the -- those instructions were given?
A No, I do not.
Q Okay. I'm going to ask you some questions now after the APRs and ACRs that were issued by DOE. But first I want to take a look at the 1987 ACR. I'm going to ask questions about all these documents.
Do you want them all to be exhibits? I think we'll be on Exhibit Number 4.
(Whereupon, Pollog Deposition Exhibit No. 4 was marked for identification.)
BY MS. HEWITT:
Q Are you familiar with this document?
A Yes.
Q Did you participate in any way in the production of this document by DOE?
A No.
Q I'd like to turn your attention to the Table 2.1 on page seven of this exhibit. And in particular, with regard to the system receipt rate that's used in that table. Do you see that



term?
A Yes.
Q What does the term, system receipt rate mean?
A In general? You're asking what the term system receipt rate means or as applies to this document?
Q As it applies to this document?
A As applies to this document is an approximation of how -- I'll use the term we used earlier, FWMS, Federal Waste Management System, may operate. Recognizing there are uncertainties that would allow -- may not be the one that's actually used.
Q Is there a difference between a receipt rate and acceptance rate?
A I don't believe so.
Q And does the receipt rate here reflect the maximum physical capacity of the system?
A It would reflect potentially a system capacity, design capacity that would be operating at its maximum.
Q And as the term receipt rate is used in this document, your testimony is that it refers to the system, including transportation and the

repository or the final facility in which SNF would be in place?
A I would say the entire system; the transportation, potentially storage. That's what we're looking at here, because we're looking at MRS activities at that time and potentially, repository, but the full system and not any one aspect of it.
Q How were these figures developed? And by figures, I refer to the 1200 and 2000, 2650 figures on the right hand side of Table 2.1.
A They were taken from the 1987 Mission Plan.
Q Okay. Can I ask what you're referring to?
A I'm referring to several pages of notes in my possession.
Q And what are those notes from?
A In preparation for this deposition, I reviewed documents listed in item one. I can state them, if you want or just --
Q No, I'm familiar with item one.
A And I made several notes on those documents.
Q Okay. We'd like to get a copy of those



notes, please.
A Sure, sure.
Q But I don't need them right now.
A Okay.
Q And why were they extracted from the Mission Plan? Did you say Mission Plan or Mission Plan Amendment?
A I said 1987 Mission Plan, but I meant Mission Plan Amendment.
Q I wanted to clarify that. Why were they taken from that document?
A When ACRs are put together, they were generally never meant to be lead for system return receipt rates. We always took receipt rates from other published documents that were --
The DOE hopes and goals were included in the 1987 Mission Plan, and we took it from there and placed into the ACR. Excuse me, the 1987 ACR.
Q And how were the numbers developed in the 1987 Mission Plan Amendment?
A Well, they were just to show an illustrative schedule as consistent with contract requirement for after commencement of facility operations not later than January 31st, 1998.



And they reflect DOE's current plans for development of an improved performance waste management system.
MS. HEWITT: Let the record reflect the witness is reading from his notes.
BY MS. HEWITT:
Q And those notes were taken from what document?
A The 1987 Mission Plan Amendment.
Q Why were those numbers chosen?
A I believe for several reasons. This is based upon the improved performance waste management system, which is a system including acceptance at an MRS.
And I believe it's still incorporated with two repositories at that time. We were looking at 140,000 MTUs of spent fuel to be generated for the history of nuclear power. The total amount of generation was anticipated to be approximately 140,000 MTUs.
Q What time period is that over?
A Forever.
Q Forever? How can you know there's going to be 140,000?
A The DOE Office of Energy Information



Administration makes projections about this.
Q Okay.
A There were two repositories to be developed at this time. So the decision was to basically -- 70,000 metric tons of uranium in each repository.
So we looked at basically a 20, 25 year lifetime for equipment; casks, hardware needed to operate at these facilities. And we took 70,000 and divided it by 20, 25 years to come up with approximately 3,000. That's for the steady state rate of the 2650.
The 2650 comes from -- it comes to 3,000, but at this instance we're looking at an MRS. The MRS at this time was anticipated --
We were looking at a site in Tennessee that would be an eastern MRS. So the Eastern sites would be shipping to an MRS. The western sites would be shipping straight from the reactor to repository.
If you look in the mix in the generation rates of where reactors are and how they would come in, approximately 2650 would be mostly the eastern --
Where the reactors are, how the fuel is

characterizing in Nevada.
Q And the other legal constraints that you were referring to in your earlier answer?
A At this point in time, I don't think there were any other legal constraints.
Q What about financial constraints?
A Budget, what budget we could get from Congress, and what the cost of the program would be.
Q In coming up with these acceptance rates included in the Mission Plan Amendment and also in Table 2.1, did DOE consider the storage capabilities or capacities that purchasers had on site for spent nuclear fuel?
A Yes.
Q And how did they take that consideration into account?
A DOE in its entirety -- I'm not sure if this was done by RW or Energy Information Administration -- projected the annual discharge rate at reactors in aggregate.
And they also knew what the in-pool storage capacity was for those reactors. And we were able to determine how much SNF in excess of that would be needed; how much excess storage



would be needed in an approximate, very approximate manner.
Q Do you know where the information regarding projected annual discharge rate of utilities was collected or reflected?
A Yes.
Q What document or what study or --
A The collection, I believe, would have been done through what we've referred to in DOE as the RWA 59 Form. I believe the official title, I'm not positive about this, is the Nuclear Fuel Data Form. I could be wrong, but it's something like that.
Q And were there any other documents published or produced by DOE or a DOE contractor that took that information and catalogued it or otherwise produced it in another fashion?
A There was at certain times in the program.
Q What was the title of that document or what were those documents?
A I don't recall the exact title. There was a spent fuel storage requirements document.
Q And who published that, do you recall?
A I believe EIA did publish one, although



there may have been more, but I think EIA published one. I'm not sure if that was the title of theirs.
Q And were there separate documents published or produced reflecting in-pool storage capacity or was that also in these documents that you talked about earlier?
A I believe it was in separate document.
Q And what document or documents would reflect in-pool storage?
A I believe it would be the in-pool spent fuel storage document. There was one document. I'm not sure. May have been a second one. I don't recall. One was entitled -- at least one was called spent fuel storage requirements.
Q Okay. From these documents I think you testified that DOE could determine the excess storage that was needed for SNF by utilities; is that right?
A I would say DOE was able to approximate how much out of pool -- what the excess would have been.
Q And so --
A Excess of what a utility could store in their pool.



Q And so how was that information used by DOE?
A It had various uses, I would guess, over periods of time. When?
Q How was it used, for example, in regards to developing an acceptance rate?
A There were points in time that one of the goals of the program was to develop a system where the acceptance rates would account -- would alleviate the purchasers' need to have storage outside of their pools.
Q And what point in time was this the goal of the program?
A I believe in the mid-eighties.
Q Mid-eighties?
A Yeah.
Q Was there a different goal before the mid-eighties?
A I don't know.
Q Was this DOE's goal when it signed the standard contract?
A I don't know.
Q Was there a different goal after the mid-eighties?
A I would say so, yes.

Q And what was that goal after the mid-eighties?
A Well, essentially, what happened was these acceptance rates that were generated in mid-eighties were based on several goals.
One was to alleviate the need for excessive storage capacity for utilities. Also, we looked at the, as I described earlier, the 70,000 metric tons at a reactor and divided it by what we thought was the anticipated lifetime of the facility and come up with the 3,000. They were fairly approximate for a while.
After the mid-eighties, these 3,000 MTU rates sort of became our design objectives. So I'm not saying our goal changed per se, but we didn't reflect it as a goal of the program anymore.
Q Was there a new goal for the program?
A Regarding?
Q The acceptance rate.
A Eventually, there was, yes.
Q What was that goal?
A Well, that would have been we had new constraints put on us regarding the Nuclear Waste Policy Amendments Act. I will refer to it as the



NWPAA for future discussion, if that's okay.
Q And how did that affect, I guess, goal of the acceptance rates?
A Eventually, it would reduce it significantly.
Q Is there a -- is it your testimony that although the acceptance rates were reduced that the 3,000 MTU remained the design objective?
A Yes.
Q I thought that's what I heard you say. And when you refer to design objective, are you talking about design of the repository?
A Design of the full system.
Q And the 3,000 MTU on an annual basis remained the design objective for the full system because it reflected the two goals that you talked about earlier; the goal of the 70,000 divided by 20 or 25 years ameliorating the need for on-site storage by utilities.
A Can you repeat that again? I want to make sure I heard what you said.
Q It was a long sentence, but I'll try to get it exactly right.
You mentioned that the design objective for the fuel system remained 3,000 MTU on an



annual basis. And my question was, did it remain the design objective for the full system because of the goals that were articulated earlier as the basis for the 3,000 MTU?
A I don't know why it remained.
Q With regard to the acceptance rates that are included in Table 2.1, did these acceptance rates reflect the goal, the goals you articulated earlier; one of which was trying to ameliorate the need for additional storage on site for bigger utilities?
A Yes.
Q And how exactly did the acceptance rates address that?
A It was -- if you looked at what the anticipated generation rate was and the excess storage needs that there would be, it was thought to essentially approximate each other. They weren't exact, but they were in the approximate.
Q Okay. You used two terms here, the excess needs and then the generation?
A Yeah.
Q I'm sorry. What does that term mean?
A Generation would be the amount of spent fuel generated. I'll use rate in a given year, X



MTUs of spent fuel generated in any year.
Q And that combined with the excess need is the other term you used?
A Right.
Q And the excess needs, could you define that as you used the term?
A Needs would be in -- when a utility's spent nuclear fuel pool filled up and they needed to start going to additional storage measures outside of traditional spent fuel storage in the pool.
Q So it's your testimony that those needs, plus the generation rate on an annual basis, came up with a rate that approximated these rates included in Table 2.1?
A Yes.
Q Would that be the case for every year or just the latter years or?
A The latter years.
Q Do you know what the excess needs, plus the generation rate figure is, approximately?
A Not off the top of my head.
Q I don't know it either. How would one figure that out?
A We had, as I said, spent fuel storage

requirements that were being generated throughout the history of the program and they were included in those documents.

Q But you would try to take those two figures, add those up and come up with an approximate rate per year; is that right? Is that how you would do it?

A Yes, yes.

Q And is it your testimony that you believe or do you believe that it approximated the latter years, the 2650?

A In a general range, yes.

Q In the general range, okay.

Do you know whether or not in order to alleviate concerns with additional storage capacity by purchasers, whether they would have to exchange delivery commitment schedules under this acceptance rate, the 2650, in order to make sure every purchaser's storage needs were met? Do you understand my question?

A Oh, I understand it.

Q It was complicated, but I thought I made it pretty specific.

A No, I understand what you're saying.

I believe there was some consideration



given towards that.

Q And do you know whether or not that -- whether or not exchanges would have had to occur in order to satisfy each purchaser's storage needs under this acceptance rate, 2650?

A I believe so.

MS. HEWITT: I think this might be a good time to break, if that's okay with you guys.

(Whereupon, at 12:20 p.m. a recess was taken, and the proceedings resumed at 1:20 p.m.)

AFTERNOON SESSION

BY MS. HEWITT:

Q Good afternoon, Mr. Pollog. We'll continue and move hopefully quickly through the rest of this deposition.

I'm going to go back and take a more chronological approach because it appears a lot of these are building blocks for one another.

I'm going to ask you first about the -- what's been titled, Proceedings of the 1983 Civilian Radioactive Waste Management Meeting, dated December, 1983.

And in particular, I'm going to give you an excerpt from the written documents related to that meeting.



And in particular, this excerpt is entitled, Program Fuel Review, by Robert Morgan, who was then the acting director of Civilian Radioactive Waste Management. And we'll mark this Exhibit Number 5.

(Whereupon, Pollog Deposition Exhibit No. 5 was marked for identification.)

BY MS. HEWITT:

Q Take a look at that document. Are you familiar with this document? Have you had occasion to look at it before, Mr. Pollog?

A Yes.

Q And as you can see, there is obviously a section here that's highlighted. Unfortunately, it's the only copy we had last night when I was trying to prepare for this deposition.

If you want to just review that paragraph, it talks about, quote unquote, basic strategy in which -- we, we on behalf of Mr. Morgan and I imagine he means the DOE, has outlined an admission plan.

Would you take a look at that and I'll ask you about that paragraph?

A Yes.



MS. POWELL: That's on page 11, right?

MS. HEWITT: Yes, page 11.

BY MS. HEWITT:

Q Have you had chance to look that over?

A Yes.

Q There's a reference in this paragraph to a Mission Plan?

A Yes.

Q What's the Mission Plan that's being referred to in that paragraph?

A I don't know which specific one he's referring to since I don't see a date on the paper.

Q Was there a Mission Plan issued around this time, 1983?

A The earliest known Mission Plan that I am familiar with is a draft Mission Plan that is dated, I believe, December. I believe it was the 20th, but I'm not positive that's the exact date, December, 1983.

Q Do you know whether or not the Mission Plan he's referring to here is referring to that draft Mission Plan?

A No, I do not.

Q The strategy that is described herein

talks about utilities not having to supply any additional storage facilities on site. Was that DOE's strategy or goal of the program at this time?
A I believe that was an objective of the program.
Q Do you know whether that was an objective of the program at the time the Nuclear Waste Policy Act was enacted?
A I do not know what the objective of the program was when the Nuclear Waste Policy Act was enacted.
Q And do you know whether or not this was the same objective of the program at the time the standard contracts were executed?
A I don't know what the objective of the program was at the time the standard contracts were enacted.
Q Now, the first element of this goal as mentioned in that paragraph is that they -- that DOE should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location. Do you see that?
A Yes.



Q And how would DOE determine what that rate would be?
A I would guess that they would again use the 859 data, which I believe was being collected at that point in time and look at what the generation of spent fuel was, the projections based on what was also in the 859 dated, and the EIA projections for nuclear energy, electricity generated from nuclear power plants for the future.
Q And the next paragraph it says that the -- it says, actually, that the rate of acceptance of fuel -- I think it's supposed to read, rate of acceptance of fuel would be the rate of discharge of reactors in action at that time.
Is that rate going to be different than the rate made reference to in the prior sentence? I'm just trying to understand all the different rates.
A I'm not sure of the exact rate, what was expected in 1983, if that was the time frame this document was published. But I would suspect, yes, it probably is the same.
Q Let me ask the question again, because I don't think that's right, but maybe I'm wrong.



The rate that is sufficient to make sure that utilities don't have to add further storage facilities, is that rate the same thing as a discharge rate?
A No.
Q Okay. That's what I thought. Now, what is the difference between the two?
A Okay. Discharge rate is just what is removed from all of reactors on a yearly basis.
Q And the other rate, there's not a nice little term for it, but the rate that would insure that no utility would have to add any further storage facilities, how is that rate determined?
A You would look at what the on-site storage capacity in-pool is of each reactor. You would see what the -- how much fuel is in storage in that reactor. You would take what's discharged from that reactor. And then you would see if there is -- if it can still fit in the pool. Then it would be zero for that facility.
If the pool is full, then excess of fuel capacity would have to go in some other type of storage.
Eventually, they may equal if all pools



were ever filled. Everything that would be discharged would have to go into dry storage.
Q I understand. Thanks. Makes it a little clearer for me.
The reference there is made to further storage facilities either on-site or at another location. What was in DOE's mind in terms of what types of further storage or sometimes you see the term additional storage capability. What were they thinking in terms of what other storage facilities would be available to utilities?
A You're referring to the last sentence of the paragraph that's highlighted.
Q Yes.
A No utility would have to add further storage facilities either on-site or at another location?
Q Yes.
A I guess that would mean that some utilities have -- a utility may have more than one reactor, so they may want to ship from one reactor to another reactor.
Q And would that be considered further storage?
A Could be.

Q What about re-racking? Are you familiar with that term?
A Yes.
Q Is re-racking additional storage or further storage as contemplated herein?
A I would not consider it.
Q What did DOE consider it?
A I would say DOE would not consider that additional storage at another location. I would not consider it, nor would DOE consider it storage at another location.
Q What about further storage on-site?
A I would think it's also not included, further storage on-site.
Q Do you know whether DOE ever considered this aspect of what was considered further storage or additional storage?
A I'm not sure what you mean DOE considered.
Q I mean, did DOE ever state this, define further storage or additional storage?
MS. POWELL: I'll object to beyond the scope, but if you know the answer.
THE WITNESS: I don't know if they ever officially examined what was meant by the last



part of the last sentence in this paper, further storage locations either on-site or at another location.
BY MS. HEWITT:
Q And it says in almost the very last sentence on that page 11 that DOE anticipated by the year 2000 or 2001 that they would be accepting fuel in an amount equal to the discharge rate; is that right?
A Yes.
Q And so is it fair to say that they anticipated, DOE anticipated that they would ramp-up to a rate equal that would the discharge rate within a few years, 1998 to 2001, being three years?
A Yes.
Q Okay. Do you know how long Robert Morgan held this position?
A Approximately.
Q How long?
A I believe one year.
Q One year. And during his tenure, was there a actual director of the Civilian Radioactive Waste Management Program?
MS. POWELL: Object again to being



beyond the scope.
If you know the answer.
THE WITNESS: I'm not sure what you're asking.
BY MS. HEWITT:
Q Well, at the top of this document, it says that he was acting director of Civilian Radioactive Waste Management. I was wondering whether there was a director, I guess.
I guess there wasn't a director if he was acting director at that time, but was there a director before him?
A He was acting director at that time, so there was no director at the same time he was acting director.
Q Okay.
A Prior to his taking that position, there -- he was there at the origin of the program and there was no Office of Civilian Radioactive Waste Management prior to the Nuclear Waste Policy Act. And it took a period of time to actually be an Office of Civilian Radioactive Waste Management.
Q Okay. Why don't we take a look at the report on financing of spent nuclear fuel and



high level waste disposal.
We'll mark this as Exhibit 6.
(Whereupon, Pollog Deposition Exhibit No. 6 was marked for identification.)
BY MS. HEWITT:
Q Are you familiar with this document, Mr. Pollog?
A Yes.
Q What was the purpose of this document?
A I believe it was an analysis determining how to finance the Office of Radioactive Waste Management.
Q And did the acceptance rate as we used the term during the deposition, did that factor into the analysis?
A I believe so.
Q I think if you'd take a look at Table 3.1, it talks about key reference case assumptions. You see that table?
A Yes, I do.
Q You see number three which talks about the repository design receipts rates?
A Yes, I do.
Q Okay. Following Table 3.1 there's Table 3.2, which is entitled Nuclear Electric

Forecast and then Table 3.3, which is the reference case material flows. See those two tables?
A Yes, I do.
Q Can you explain to me how these all work together? I think you've addressed some of these figures before and I'm hoping they'll all come together now.
A The three tables?
Q Yeah, 3.1, 3.2 and 3.3. I believe they are related, but you can tell me if they're not. In particular, I'm referring to the design receipt rates.
A You're referring to the design receipt rates on Table 1, Number 3.
Q Table 3-1.
A Table 3-1.
Q Right.
A Number three.
Q Yes, I'm sorry.
Let me ask you a preliminary question. Is there any relationship between the design receipt rate identified in Table 3-1 and Tables 3-2 and Table 3-3?
A Yes, there is a relationship between



Table 3-1, number three and Table 3-3.
Q And what is the relationship?
A If you look at number three, Table 3-1, it states repository design receipt rates, first five years at 1800 MT per year. Next 21 years at 3,000 MT per year.
That would be the same as the second column in Table 3-3 under repository one.
Q Okay. How were these numbers derived, the 1800 and the 3,000 numbers?
A I believe they were derived similar to discussion we had earlier this morning. That is, you looked at the Table 3-1, number two, repository design capacity. 72,000 metric tons, that would be for each facility.
If you look at Table 3-3, repository one and two, they both operate for approximately 25 years. If you look at -- if you divide 72,000 metric tons by approximately three -- 25 years, you get approximately 3,000 metric tons per year.
Q Why was 72,000 chosen as the repository design capacity limit?
A I would believe that if you go to Table 3-2 --
Q Yes.



A Fourth column.
Q Okay.
A The very bottom.
Q Yes. Is the column you're referring to entitled cumulative spent fuel discharge?
A Correct. And it says 144,000.
Q Is this the figure that you were -- similar to the 140,000 figure you were referring to earlier this morning?
A Yes.
Q And the time period that you were referring to in which you didn't really know the end date, is it fair to say the end date being used is 2014?
A For this analysis here, yes.
Q You don't know if a different end date was used for the 1987 ACR we were talking about this morning?
A I would expect they would use the later end dates because the forecast done by EIA was done for 20 years.
Q And so, I think my pending question was, how was 70,000 or 72,000, why was that used as the capacity limit for the repository? And you were pointing out this column.



A I don't know where that number 72,000 came from at this point in time. The only recollection I have is that I believe the Nuclear Waste Policy Act, which was enacted already had a 70,000 metric ton limit for the first repository.
Q So, does the fourth column on Table 3.2 have anything to do with the 72,000 metric ton limit on the repository design?
A I believe if you divide it by two for two repositories, you will get 72,000 metric tons per repository.
Q And you testified you thought it had a limit of 70,000?
A Yes.
Q And do you have any reason or basis to understand why repository limit in these two documents was 72 versus 70,000?
MS. POWELL: Calls for a legal, but --
THE WITNESS: No.
BY MS. HEWITT:
Q What does column three on Table 3.3 depict?
A Annual spent fuel discharges, I believe, from commercial nuclear reactors.
Q And this is the same as the discharge

117

rate we were talking about earlier?
A I believe so.
Q And when we were talking about the 1987 ACR, I believe you testified that one of the objectives in the acceptance rates that were put in that particular document was to cover the discharge or encompass the discharge rate of utilities; is that right?
A Yes.
Q And if we were to compare those acceptance rates, when we compare them to this column, would that be the right figure to look at?
A Yes. Actually, discharges plus excess capacity needed in addition to the other pool storage is on hand.
Q So it would be a number that would be in excess of those listed here in this column?
A Less than what's listed here.
Q Okay. Explain that for me. I'm not understanding.
A Again, you would take the capacity of the spent fuel pools and you would subtract that from that column. And what's in excess of that pool would be going into dry storage.

118

Q Thank you for explaining to me. So it would be incorrect to take just a blank comparison between this column and the acceptance rates in the 1987 ACR to compare whether or not you're actually covering the spent fuel storage needs of the utilities?
A The excess spent fuel -- it's the spent fuel storage needs in excess of their pool storage.
Q You need to know what their pool storage is and work that number in this column before you come up with an accurate comparison number; is that right?
A Yes.
Q Thank you. It's coming much clearer to me.
In using these acceptance rates in this particular document, was a concern or an objective of the acceptance rates herein to meet the needs of utilities to avoid additional on-site storage?
A At what point in time?
Q At the point in time this document was issued.
A I believe so.

119

Q And that would be consistent with what you said one of the objectives was of the 1987 ACR?
A I believe so.
Q You flipped through this document to a table on page 35, Table 6-2, comparison of key parameters. There is a reference to a 1978 preliminary estimate of the charge for spent fuel storage and disposal services. The receipt rate included in that study, apparently, starts at 1800, but then ramp up to 5,000 metric tons. Do you know why 5,000 was used in that study?
A No, I don't.
Q And then there's a reference to another report that's dated 1980, another report on the fee for spent nuclear fuel storage. Do you know whether DOE issued this report, the 1980 report?
A I would guess so since the reference is DOE slash SR-0006, which would indicate to me it's probably a DOE report.
Q Do you know what SR-0006 refers to?
A I believe SR refers to Savannah River and I do not know what 0006 refers to.
Q What about the 1977 document, the ET designation, do you know what that might refer

120

to?
A No, I don't.
Q In the 1980 report, the receipt rate that's indicated in that report apparently is 6,000 metric tons per year. Do you know on what basis that number was used?
A No, I do not.
Q In this particular document, if you go back to Table 3.3, I think, there is a ramp-up from 1800 to 3,000 reflected for both the repository one and repository two on Table 3.3; is that correct?
A Yes.
Q And I know you testified earlier about the ramp-up that was indicated in the 1987 APR -- I mean, ACR rather. Do you have any knowledge about why 1800 was chosen as the ramp-up level here in this particular document?
A Only that it's approximately one half of the steady state system capacity. Other than that, that's the only knowledge I have.
Q On Table 3.1, instead of using the term acceptance rate, which we have used today, there's another term used called repository design receipt rate. What is the difference

between repository design receipt rate and a system receipt rate, which we've seen the term used in the 1987 ACR?
A System could encompass receipt at an MRS. Repository encompass receipt only at the repository.
Q And system receipt rate, I think you testified, also encompasses transportation aspect of the waste management system as well; is that correct?
A Yes.
Q And a repository design receipt rate would not take that into account?
A Yes, it would take it into account.
Q It would take that into account?
A You have to transport it from reactor to get it to repository.
Q So the only difference between repository design receipt rate and a system design receipt rate would be the role of the MRS. Is that what you're saying?
A For the most part.
Q Is there some other difference I'm not picking up on?
A There could be a minor difference.



When you say repository receipt rate, there could be two receipt rates at a repository. One is a receipt that's coming through the door and the second could be an in-placement rate.
It could be storage at the repository itself. And the difference between what's taken and put into placement right away, it may be a difference between what is accepted at the gate at the repository and what's actually been placed underground. That difference would be lag storage as we referred to at the repository that is separate from an MRS.
Q And when we use the term acceptance rate or when the DOE uses the term acceptance rate, what does it mean? Does it mean the repository receipt rate or a system design receipt rate? What does it mean?
A System.
Q System design receipt rate. Thank you. No more question on this document.
This will be Exhibit Number 7.
(Whereupon, Pollog Deposition Exhibit No. 7 was marked for identification.)
BY MS. HEWITT:
Q Are you familiar with this document,



Mr. Pollog?
A Yes.
Q You had a chance to read it before this deposition?
A Yes.
Q Why don't we look at page one in the upper right hand corner and in the section titled introduction.
The last paragraph of that page indicates that the --
MS. POWELL: Can we wait a second until he's there.
MS. HEWITT: I'm sorry.
BY MS. HEWITT:
Q The last paragraph on that page talks about the one fundamental objective of the activities of the Mission Plan. And that is as set forth in the underlined portion, To accept commercial high level radioactive waste for safe management, storage and permanent disposal on a firm schedule beginning not later than January 31st, 1998. Do you see that provision?
A Yes, I do.
Q What does the term, firm schedule, mean as used in that phrase?



A I would say it refers to a real schedule.
Q What do you mean by real?
A A real one that purchasers could expect to see DOE operating to.
Q Does that definition also include a schedule that utilities could rely on?
A To the extent considering the legal, technical and financial considerations, it was one they could use to plan upon.
Q The term used in here, the firm schedule from -- indicates that that is different from some other type of schedule. What other kind of schedule would you implement if it's not a firm schedule?
A I don't know.
Q Do you have any knowledge about why the term, firm, was included in this document to describe the schedule?
A No, I do not.
Q In the next sentence it indicated that the schedule -- I guess, another objective of the schedule would be to preclude need for additional reactor storage after January 31st, 1998 and ultimately remove from reactor storage all waste

more than five years old. Do you see that phrase?
A Yes.
Q Is that consistent with what you have testified to be objective in the mid-eighties of the Nuclear Waste Management Program?
A Yes. Actually, that's one of the objectives.
Q And is it fair to say that this was a objective of DOE at the time this Mission Plan was -- this draft of the Mission Plan was produced?
A Yes.
Q There's reference in this sentence to, remove from reactor storage all fuel more than five years old. That's a little different specification than what we talked about earlier. What is that in reference to?
A I believe that that refers to standard fuel that is defined in the standard contract.
Q And that definition includes a time limit on it or --
A The standard contract designates standard fuel amongst other things as being older than five years old.



Q If you flip to program strategy section of this document found on page 2-1, in the latter half of the first paragraph, again it talks about the waste acceptance schedule and the way it was designed.
The last sentence indicates the acceptance rate will be equal to or greater than actual discharge rate of spent fuel each year. Do you see that sentence?
A Yes, I do.
Q Is that similar to the discharges rate we've been talking about with regard to the previous acceptance rates in the previous documents?
A Yes, that's true.
Q My goal here is to just try to make sure we're talking about the same thing in every document because I'm not as familiar with the definition as I think you are.
If you could turn next to page 2.2, 2-2 rather, bottom of the page. The paragraph starts at the bottom of the page with while -- there's a discussion in there that the acceptance rates in the aggregate avoids the need for utilities to provide additional on-site storage after 1998.



But then the paragraph goes on to explain why that might not be the case for each individual utility. Can you explain that for me? I think we touched on it before, but I want to make sure I understand it.
A Yes, I can.
Q Go ahead.
A If you look at the nuclear industry in total and you add up all the spent fuel from all reactors, what was going to be disposed of in -- discharged in a year and you add up the total pool storage capacity. Not the individual, the total in the aggregate, I think is what we're talking here, the objective was to accept more spent fuel than what the aggregate delta was between what was being generated and what was going to need to go into some type of out of pool storage.
So if the industry in total, the amount that was needed was 3,000, for example, metric tons of uranium in any given year --
For example, say, 2003. If the discharge rate at the utilities would exceed what their pool storage capacity was by 3,000, we wanted to be able to accept that difference.



Q Okay.
A Considering the industry, any aggregate as a whole industry. Not looking at specific purchaser versus purchaser versus purchaser.
Q Now, wasn't DOE concerned that a individual purchaser would run out of storage room though and may have to shut down?
A I can't say what DOE was concerned about in 1983.
Q But they didn't take that consideration into account?
A I believe it says here that individual utilities who actually realized this need -- excuse me. Find the right --
It is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. So it did state there that an individual utility may face expanded storage.
Q And how is a utility suppose to address that?
A That would have been for the utility to decide.
Q But the document goes on to talk about exchanges. Do you have any knowledge of that,

how the exchange process would work to help out utilities?
MS. POWELL: Objection. This is beyond the scope. We'll have somebody else testify to this, but if you're asking about this personal knowledge --
MS. HEWITT: I'm asking about how the acceptance rate would address needs of utilities to address on-site storage. I believe this document states it would be addressed through exchanges. I don't know, but that's seems to be within the idea of the acceptance rate.
But do you have any knowledge on this? Apparently not.
A Yes.
Q You do? Okay. What is your knowledge on the issue of exchanges and how this would meet the individual utility needs?
A If an individual utility had an allocation, allocation wasn't sufficient for their dry storage need, they could seek to trade a future allocation that they had for a current one someone else had to alleviate their dry storage need.
Q Is there any other way that utilities



could address their on-site storage needs that wouldn't warrant address by the acceptance rate?
A Yes.
Q How?
A They can re-rack. They can trans-ship.
Q Anything else?
A They could do -- although it's not feasible currently, at this time it was being looked at -- rod consolidation.
Q And is it your testimony that that would not constitute additional storage requirements as that term has been used in these documents?
MS. POWELL: That's beyond the scope, but if you can answer.
THE WITNESS: Repeat that again for me. Because of her objection, I'm a little confused.
BY MS. HEWITT:
Q The documents say that the acceptance rate was implemented in part to avoid the need for utilities to make additional plans for additional on-site storage.
The way -- the method you talked about them avoiding, you know, shut down, would those be considered additional methods for on-site



storage?
A They would be methods that utilities would not need to build dry on-site storage for.
Q But it would be in addition to what they would have in their spent fuel pools?
A It would be utilizing your spent fuel pools in different ways.
Q On page 2-6, in the middle of the first paragraph, there is a discussion about the second repository and the purpose of it. There's an indication that one of the purposes was to allow the backlog of spent fuel to be more rapidly eliminated. What does the term backlog of spent fuel refer to in that sentence?
A That would be -- refer to, I believe, spent fuel that may have to go into dry storage.
Q So, does that term mean that, that it has to be a dry storage in order to be considered a backlog?
MS. POWELL: Objection, vague.
BY MS. HEWITT:
Q I don't think I understood your first answer. Is your answer that backlog refers to fuel that's in dry storage?
A Yes.



Q Take a look at Table 2, Roman Numeral II-1, on page 2-3. This is a table entitled, waste acceptance schedule. Take a look at this table.
A Yes.
Q There is a column entitled first repository acceptance rate. And it starts with 1800 in 1998 and ramps up to 3,000, I believe, in year 2003. What is the basis of this acceptance rate used in this document?
A I believe it is the same two reasons that we discussed earlier. Number one being looking at the total amount of fuel that would go to any one repository and the operating lifetime.
And number two being trying to match it with the annual spent fuel generated and/or need for dry storage rates.
Q I'd like to go over these columns once again. Some seem familiar to me, but some of them are not.
After the year column, the first column is the annual spent fuel generation rate. Is that similar to the columns that we've seen before entitled, spent fuel generation?
A If I might look at Exhibit 6.

Q What does that figure represent?
A The cumulative spent fuel generated, period, dry or wet storage, irregardless of storage technique.
Q So in the last column where it's titled remaining backlog and you got the same figure, 40,809, is that the amount of fuel in dry storage or in wet storage as well?
A That would be in any type of storage.
Q Any type of storage.
Okay. Why is the term backlog used there different than the way you defined backlog before?
A Most likely because I was in error when I defined it before.
Q Again, I'm just trying to understand the terms. So can you now having seen this re-evaluate for me what backlog was used by DOE?
A I would say for purposes of this report and this table, and the text we've examined, it means spent fuel that is in storage regardless of storage technique.
Q There is a note on this table, note number two. The bottom says, waste accepted during 1998 through 2002 will come, quote,



preferentially from most reactors which would otherwise have insufficient on-site storage.
What does that mean?
A That means ideally we prefer to reduce the need for on-site storage other than in-pool and we prefer to take fuel from those reactors that have reached their limit for in-pool storage.
Q But wasn't your testimony earlier that utilities had to abide by their allocations and annual priority ranking of utilities in submitting DCSs for spent nuclear fuel?
A Yes.
Q And that priority ranking and allocations reflected in ACR did not necessarily reflect utilities that didn't have on-site storage being earlier in the queue than later?
A Correct.
Q So, although this indicates that DOE preferred to have from reactors that otherwise have insufficient storage, the ACR and APR didn't reflect that; is that right?
A Yes.
Q Was there a -- what's the next draft of the 1985 Mission Plan you're aware of after 1983?



A I believe there was an April, 1984 version.
Q We have seen reference to, I believe, a January, 1984 draft of the Mission Plan. Are you aware of such a draft existing?
A I'm aware of a document that's dated -- when I searched for that document on our RIS (ph) web, it came up with a February 10, 1984 Mission Plan, which was essentially a compilation of comments and questions about the Mission Plan or response to the Mission Plan. It wasn't -- I don't call it a draft Mission Plan. I think the document was entitled, responses to Mission Plan, 1983 Mission Plan.
Q Okay.
A It was, I think, a question and answer format.
Q All right. I just wanted to clear that up because we couldn't find a draft of the Mission Plan being entitled -- you know, as a whole Mission Plan, and I was wondering if there was one out there we missed.
Let's take a look at the 1984 draft that you referenced and that we have. We'll mark this as Exhibit 8. Are you familiar with this



document, Mr. Pollog?
A Yes.
Q I'd like to ask you some questions about the acceptance rates here. Let me first ask you a question about the introduction, page 1-1 in particular regarding the program objectives that are listed. The third program objective --
MS. POWELL: Would you wait until he gets there one second.
THE WITNESS: I don't have a 1-1.
MS. SULLIVAN: It's on the back.
BY MS. HEWITT:
Q You see the section entitled, program objectives?
A Yes, I do.
Q And the third program objective refers to acceptance of waste for disposal by January 31st, 1998, in accordance with the schedule provided for in the department's disposal contracts.
What does that term, acceptance schedule, refer to? Is there a acceptance schedule in the disposal contracts?
A No.

Q We can flip next to page 2.1, which is the next page over. First paragraph, the -- I don't know, maybe fourth sentence, six lines down says, Acceptance rate is based on the in-placement capacity currently projected for the two plan geologic repositories.
My question is -- again, I want to make sure the term in-placement capacity, is that different than system design capacity that we've seen referenced in earlier documents?
A The term can be different in the sense that, as I described earlier, you can receive it as the repository and not necessarily in place underground at the same time.
However, I believe the way it's used here in this sentence to be the same as repository receipt rate. But you may see other places in other documents problematically that have different in-placement rates and receipt rates at a repository.
Q And to that extent then, is the manner in which the acceptance rate was designated on this document similar to the way the acceptance rates were developed for the prior documents we've talked about?



A I believe so.
Q Okay. And the next paragraph in that introductory section under program strategy, it discusses the approach. And the approach here is said to insure that all the owners and generators of spent nuclear fuel and high level waste will be able to establish firm planning schedules for the disposition of their radioactive waste sufficiently early to determine their on-site in term storage needs.
My question is, is this the same objective that was referred to when the terms, firm schedule, was used in the prior iteration of this document?
A I believe so.
Q And what is the term, sufficiently early to determine their on-site in term storage needs? What is that addressing or reflecting?
A I would say that means that they wouldn't have to wait until the very last minute when their pool is filled to determine whether they need to build dry storage, re-rack their pool, trans-ship pool or make any other spent fuel management decisions.
Q And why was timeliness relevant or



important in this context?
A The department's objective was to let the utilities know early enough so they wouldn't be in a situation where their pool is full and they had to make a decision.
Q Take a look at Table 2. I think it's one, but I'm not exactly clear. The Xerox copy is not very clear. It's entitled waste acceptance schedule. It looks very similar to the one we just talked about in the earlier draft of the Mission Plan, but I want to make sure that it is similar and that the columns represent the same sort of columns we were talking about earlier.
Can you let me know whether the same definitions and terms we've used with respect to the earlier table in the 1983 draft of this document, whether these are the same terms that are used in this table?
A I believe they are.
Q And included in two of these columns are repository acceptance rates. The term repository acceptance rates used in these columns, is that equal to what's called the in-placement rate in the earlier pages of this



document?
A I believe so.
Q In this case there's a ramp-up rate of 400 MTUs on an annual basis, to 900 MTUs, then to 1800, and then to 3,000. This is different than we've seen in some of the earlier documents. What accounts for the difference?
A I believe what happened was when we issued the draft December, 1983 Mission Plan, we received comments from interested parties. And I believe the interested parties commented that our ramp-up rate was too ambitious and would not be easily achievable. And in response to those comments, I think they decided to decrease acceptance in the first few years.
Q Okay. Other than that, the -- is the reasons for using 1800 and 3,000 as the ultimate acceptance rate the same as the reasons that we've discussed for the use of these rates in earlier documents?
A Yes.
Q And just so the record is clear, can you tell me again what those reasons are?
A Number one reason being, if you'll look at the capacity for both repositories and the

total amount of spent fuel that would need to be disposed of, you look at the total amount, 140, the capacity for each repository would be approximately 70,000.
You look at the operating lifetime of each repository being approximately 25 years, including the ramp-up rate. If you divide 70,000 by 25, you come to approximately 3,000 metric tons.
The second reason would be it was the objective for the department to alleviate or lessen any need for out of pool storage for the utilities, but considering the challenges that the program had to meet from the financial, legal and technical perspectives.
Q Take a look at page -- I think it's, it's 10-8 at the bottom. I don't know if this is chapter ten, but it's fairly far back in the document. It talks about the cost estimation?
A Ten slash.
Q Ten hyphen eight. It talks about the cost estimating assumptions used in this Mission Plan. And about the, I don't know, seventh bullet down or sixth bullet down says annual waste acceptance rate for each repository is 1800



MTUs for the first five years and 3,000 MTUs thereafter.
Do you know why those figures are different than figures used earlier in the document, which reflect the ramp-up of rate 1800?
A I'm not sure, but I would speculate that change wasn't made in this document. Somebody just didn't catch this in the editing part.
Q All right. That's all I have on this document.
(Brief recess.)
BY MS. HEWITT:
Q I'm going to ask you some questions about the Mission Plan Amendment, which was referred to in the 1987 ACR. Not one of the documents spelled out, but at least I had some trouble understanding some of the things you were talking about in the ACR, so I went and got the Mission Plan Amendment.
I'm not giving you the whole thing. I'm giving you actually what's called, part one, which is entitled, Mission Plan Amendment.
Part two is, the record of responses to comments on the draft Mission Plan Amendment. So



rather than copy the whole thing, I just copied part one. And I think this is Exhibit Number 8, 9.
(Whereupon, Pollog Deposition Exhibit No. 9 was marked for identification.)
BY MS. HEWITT:
Q Have you had the opportunity to review this document before, Mr. Pollog?
A I believe some time in the past I have looked at this. Not recently, but --
Q I think you testified earlier that the acceptance rates used in the 1987 ACR came from the acceptance rates used in the Mission Plan Amendment; is that correct?
A Yes.
Q I looked through this document and I believe that the schedule and acceptance rates are addressed in Appendix F to this document, and starts at page 60 at the bottom of the page toward the end of the document. In particular, you can take a look at Table F-1?
A Yes.
Q You probably have the 1987 Annual Capacity Report there in front of you. It's One of the exhibits. Can you take a look and see,



point out to me what columns the numbers are taken from in the '87 ACR.
A Exhibit 4.
Q Is there a correlation between the system receipt rate identified in Table 2.1 of the ACR, 1987 ACR and any of the columns listed here on Table F-1?
A Yes.
Q And where is the correlations? Can you point that out for me please?
A Yes. If you'll look at, I believe it's the ninth column under total system acceptance, first part says -- there's two columns under total system acceptance.
First one is spent fuel and it goes 1200, 1200, 1200 all the way down to 2650 in year 2007. And I believe it's the same as in Table 2.1 in the 1987 ACR.
Q Okay. Can you explain the numbers in the earlier columns, particularly with regard to MRS facility, first repository and second repository?
A I believe so.
Q Why don't we start with the first column after the calendar years. Spent fuel

A Pardon.
Q Are you familiar with this document?
A Yes, I am.
Q Would you take a look at Table 2.1 on page five. It contains an acceptance rate or something called an illustrative waste acceptance schedule. Are you there?
A Yes.
Q What is the basis for the acceptance rates included in this table?
A 1988 Mission Plan Amendment.
Q And do you know how the numbers were derived to be included in the draft 1998 Mission Plan Amendments?
A I have not reviewed the '88 Mission Plan Amendment.
Q Do you know how this plan derived, this acceptance plan in this table 1988?
A The numbers included came from the '88 Mission Plan Amendment. I didn't look to see how the numbers in the amendment were derived.
Q So you don't know how these numbers were derived by the Department of Energy?
A That's correct.
Q This acceptance rate schedule included



in table 2.1 starts in the year 2003 whereas the previous acceptance capacity report included a schedule started in 1998. What was the reasons for shifting from 1998 to 2003 as a start date for acceptance?
A I believe it was the start of the repository was delayed. Official announcement for the start of repository shifting from 1998 to 2003 had been announced.
Q Were the acceptance rates included in 2.1 reflective of the receipt rate at the repository or at an MRS?
A I would have to see what the draft 1988 Mission Plan stated regarding what is the basis of those rates.
Q I'm going to hand you Annual Capacity Report dated 1990.
MS. POWELL: Off the record.
(Discussion held off the record.)
BY MS. HEWITT:
Q Are you familiar with this document, Mr. Pollog?
A Yes.
Q I think you've already turned to page seven, which includes two tables. One is a -- is



entitled, projected waste acceptance rate for spent nuclear fuel for the, quote unquote, upper bounding case.
And then a projected waste acceptance rate for spent nuclear fuel for the, quote unquote, lower bounding case.
The first question I want to ask with regard to these two tables is, in this table or these two tables, the date of acceptance begins in year 1998, which is the departure from what we saw in the earlier ACR where the date of acceptance began, I think, in year 2003.
Why is the date back to 1998 in this ACR?
A I would assume because this included an MRS in the waste -- the Federal Waste Management System, the system itself.
Q Do you know or are you assuming?
A I believe so.
Q Why were there two, quote unquote, cases presented in this ACR, which is a departure from the way the acceptance rate has been published in the earlier ACRs?
A The 1987 Nuclear Waste Policy Amendments Act put new restrictions on the



program. That is a 10,000 metric ton uranium unit for MRS prior to repository operations.
This required us to start envisioning different scenarios. This was to incorporate restrictions placed upon -- the legal restrictions placed upon us by Nuclear Waste Policy Amendments Act of 1987.
Q Do they both of them reflect legal restrictions, both of them on page seven?
A Table 2.2 does reflect the restrictions. Table 2.1 reflects that the 10,000 metric ton uranium limit or linkage, because the MRS or repository operations is removed.
Q And why did DOE include two versions as opposed to just including one that reflected the legal restrictions?
A To inform purchasers that if we were to proceed along operating under a system with an MRS and operating under the existing systems placed upon us by the Nuclear Waste Policy Act, here is the scenario that might occur.
If we were successful or if there was an MRS, and we were able to remove those restrictions, here is another scenario you might be able to see. This may happen.

Q Was DOE trying to remove those restrictions, legal restrictions?
A No.
Q The legal restrictions that you're referring to, is it correct to say that those restrictions referred to the linkage between MRS operation and having a construction permit for the repository?
A That's part of it.
Q What other legal restrictions are there?
A I believe there is a capacity limit for an MRS of 10,000 MTUs prior to operations at a repository.
Q Do you know what the basis of the numbers included in 2.1, the acceptance rate numbers included in 2.1, what the basis is of those numbers?
A The draft Mission Plan Amendment. And I don't -- have not reviewed the draft Mission Plan Amendment dated June, 1998 recently.
Q So you have no information on how these numbers were derived for inclusion in Table 2.1 either?
A No other than coming from the draft



Mission Plan.
Q And is it your testimony that the numbers included under SNF -- under the SNF column of Table 2.2, those reflect the legal restrictions imposed by the Nuclear Waste Policy Act Amendments of 1987?
A Yes.
Q And exactly how did those legal restrictions impact these numbers?
A Well, we had a 10,000-ton limit. We were looking at start-up of a repository at this time around 2010. So, we basically did the math. You can operate for ten years, 12 years prior to operation.
You divide 10,000 by ten, it's a little bit more 11 or 12, and you come up with basically a rate of around 900 with a ramp-up rate.
Q Did the numbers or the acceptance rate numbers included in Table 2.2, did they address the needs of utilities to avoid additional on-site storage after January 31st, 1998?
A No.
Q Who at DOE would have the responsibility for approving the final acceptance rate numbers included in the ACRs?



A Do you want everybody or --
Q Is there -- to use a term, where does the buck stop? I mean, who is the ultimate approver or most senior person to approve acceptance rates?
MS. POWELL: Objection, vague as to time frame.
BY MS. HEWITT:
Q Well, for example, with regard to this particular annual capacity report, who would be the DOE official who would have ultimate responsibility of approval over acceptance rates in this document?
A I could only tell you who in the Office of Radioactive Waste Management. I do not know if it went beyond the head, the director of the Office of Radioactive Waste Management. It may have, but I don't recall.
Q Would it have gone up to the radioactive -- head of Radioactive Waste Management office?
A I believe so.
Q Would that have been the procedure for the prior acceptance rate for 1987 and 1988 Annual Capacity Reports?



A I believe so.
Q And was that the procedure as far as you know following with all the other Annual Capacity Reports issued by DOE?
A I believe that's true.
Q Going to hand you Annual Capacity Report dated December, 1991, and I'll have it marked for the record first.
(Whereupon, Pollog Deposition Exhibit No. 9 was marked for identification.)
BY MS. HEWITT:
Q Have you had an opportunity to look at this document?
A I have.
Q Have you seen it before?
A I have.
Q I'd like you to turn to page five, which I believe you already turned to, and Table 2.1, titled Projected Waste Acceptance Rates for spent nuclear fuel. What was the basis for the rates included in this ACR?
A It is prior year's ACR just rounded.
Q Why did DOE round -- first of all, what do you mean by rounding?
A Eight seventy-five was rounded to nine

with the operation of the repository or the construction of the repository?
A The operation of the repository.
Q Operation of the repository. And does this sentence on page three indicate otherwise?
A There are linkages in addition to the one I've stated about the 10,000 MTU limit that reflect into when the MRS becomes operational and excepting it. So it does not reflect all of the linkages in the Amendments Act of '87.
Q Which doesn't it -- does it reflect?
A It reflects the 10,000 MTU capacity limit prior to repository operations. In addition to that limit -- in addition to that linkage, there are additional linkages also in the Amendments Act that it does not reflect.
Q Now, going back through -- because I don't think that was clear with regard to some of the other capacity reports. Would that be true of the prior version '92 Annual Capacity Report, which includes the exact same numbers on page 4, Table 2.1?
A Yes, that would be true of the Exhibit 13.
Q Okay. And if we go back then to 1991



and in particular I'm referring to page five?
A That would be true also of Exhibit 12.
Q Okay. Is that 1991?
A That is December, 1991 Annual Capacity Report.
Q And then let's look at December, 1990. And this is on page seven and there's an upper bounding case and a lower bounding case.
I think you testified that you did not know how the numbers were derived for the upper binding case, but with regard to the lower bounding case which linkages were reflected in those numbers, if any?
A It would also be true for Exhibit 11.
Q So -- and that's 1990?
A That's December, 1990.
Q So, if Table 2.2 only reflects the capacity limitations on the MRS and none of the other linkages that were found in the Nuclear Waste Policy Amendments Act of 1987?
A Yes.
Q I'm going to hand you the ACR Combined Report for 1995, which we'll also mark as an exhibit. I'm pretty sure you're familiar with this document as well.



And I believe the -- are you familiar with this document?
A Yes, I am.
Q And I believe the table that includes projected waste acceptance rates is on page four of the document.
First question I have for you is, the numbers for the acceptance rate for SNF located on Table 1, how were those numbers developed?
A Talking about Table 1 of page four?
Q Yes.
A They were taken from prior years or the prior ACR.
Q And so they reflected the capacity limitation on the MRS that were imposed by Nuclear Waste Policy Amendments Act of 1987; is that correct?
A That's correct.
Q In the year column for the first time, there is not a calendar year designated, but rather a year with a sequential numbers in between from one to ten. Why was this change made in this ACR from prior ACRs?
A A decision was made to change. I don't recall the exact reason or know the exact reason,



but someone in the process of developing said, let's change this from year one -- 1998 to year one, year two, et cetera.
Q Based upon these designations, was a utility able to submit a delivery commitment schedule based on these designations in the ACR?
A The utility was able to submit a delivery commitment schedule based on prior ACRs. Based on this ACR, no, they would not be able to.
Q At the point that this ACR was issued by DOE, was or did DOE know whether an MRS would be up and running in 1998?
A I believe by this time no official statement had been made regarding whether an MRS would be up and running by 1998. We did not officially say it would not or would not be.
Q But did DOE know whether an MRS would be viable by 1998, by the time it issued this ACR?
A I don't think any final decision had been made regarding whether an MRS would be up and viable by 1998, by the time this ACR was issued.
Q That wasn't my question. My question is did people at DOE know whether an MRS would be

up and available by 1998?
A I don't think they knew if one would be available or not at that point in time.
Q Do you know what is involved in getting an MRS up and running, available to take fuel?
A Yes.
Q What sort of preliminary actions are needed to do that?
A Finding a site.
MS. POWELL: I'll object to beyond the scope.
But if you can answer from your personal knowledge.
MS. HEWITT: I'll just also mention that the MRS submission to Congress, the MRS proposal is one of the documents that he's supposed to talk about and obviously encompasses the MRS plan.
THE WITNESS: Finding a site, designing it, building it, licensing it, many other -- you know, purchasing transportation program, designing a transportation program.
BY MS. HEWITT:
Q And did DOE have any estimate about how long that process would take?



A I believe they did.
Q And what was the estimate?
A If I remember correctly, the last estimate I saw was approximately five years, seven years.
Q Pardon me?
A Five to seven years.
Q And had -- what was the first step in that process of getting an MRS ready, up and running?
A Finding a site.
Q And had DOE found a site by December, 1995 or by the time this ACR was issued in 1995?
A No.
Q Had DOE found a site by the time the APR was issued in 1993?
A APR or ACR?
Q ACR, I'm sorry. You're absolutely right?
A No.
Q And had DOE found a site by the time the APR was issued in 1991.
A APR or ACR?
Q Did I say APR? I meant ACR, but they were both issued in 1991?



A Yes, they were issued in 1991.
No, there was no site designated or found by -- in 1991.
Q So in other words, to have an MRS up and running using the shorter time frame, five years, from 1998, then DOE would have had to have a site by at least 1993; is that correct?
A Partially.
Q Why is that partially correct?
A There were certain options being examined. We could fast track licensing process, do a modular design, except in dual purpose systems where we wouldn't have to have storage systems actually built on-site that would reduce the time needed for developing a full MRS, including all the things you would need if you were not using dual purpose systems and you did not need to get licensing from NRC.
Q And that would reduce the time from seven years to five, or from five years to something less than five years.
A If I remember correctly, I think the fastest I saw for an expedited process with modular design, which is basically accepting a dual purpose system such that would be stored



on-site. I think I saw somewhere where they were able to do it in about three years.
Q So by 1995 then, if that process hadn't been started, then it was very unlikely that an MRS would be up and running by 1998?
MS. POWELL: Again, I'll object. You can answer as to your personal knowledge, but this is way beyond the scope of what you've been asking.
The documents referred to in your exhibit is marked 1987, and you're only talking about acceptance rates.
He can answer as to his personal knowledge, but --
BY MS. HEWITT:
Q Well, acceptance rates included in the 1995 ACR APR assume an MRS in operation in 1998. So to the extent that that's an assumption that was faulty --
MS. POWELL: I'm not stopping him from answering the question. My objection is it's beyond the scope.
MS. HEWITT: Okay.
BY MS. HEWITT:
Q Why don't we take a look at the 19 MRS

Submission to Congress. Actually, let's take a look at the fee adequacy report. I'm going to hand you a document entitled Nuclear Waste Funds Fee Adequacy dated March, 1986. Have you seen this document before, Mr. Pollog?
A Yes.
Q Can you just summarize what the purpose of this document is?
A The standard contract required utilities to pay a ongoing fee of one mil per kilowatt hour of electricity generated and sold.
I believe the Nuclear Waste Policy Act requires the secretary to make evaluation as to whether that fee is adequate. This reflects one of those valuations.
Q Did the acceptance rate factor into this evaluation?
A Yes.
Q And how did the acceptance rate factor into the evaluation?
A As part of developing what the cost of the program would be, you would need to determine what the cost of your transportation program is, how many cast you would need. And that's directly related to what your acceptance rate is



going to be.
How big of a handling facility you would need at a repository or MRS is directly related or proportional to the acceptance rate.
So purchasing of equipment, how much and when would relate to determining whether a fee was adequate or not.
Q And would this report be submitted to purchasers, or was there another audience?
A It was not required by the contract, I don't believe. I think it was required by the Nuclear Waste Policy Act.
So, I believe it was generally distributed to any interested parties which could -- probably did, but I don't know as a fact, did include distribution to purchasers. But there was a regular distribution for program documents like this that probably, but I'm not 100 percent sure, included purchasers.
Q Would this document have been submitted to Congress?
A Possibly.
Q In page four of this document, there are assumptions identified that were relied on for this assessment. And particularly on the top



of page four, there are receipt rates identified for a first repository and then a second repository. Do you see those receipt rates?
A Yes, I do.
Q What was the basis for these receipt rates that are included in this document?
A I believe they were the 1985 Mission Plan.
Q And again, to make the record clear with respect to this document, those rates reflected, if I recall correctly, dual objectives by DOE?
A Yes.
Q And one of those objectives was insuring that the amount of spent nuclear fuel discharged, aggregate utilities was ultimately disposed of in a repository.
A I don't believe so.
Q Why don't use your words. Explain those dual objectives again.
A I believe it was to eliminate the need or potentially eliminate the need for additional on-site storage capacity. That was one.
The second was the -- looking at the 70,000 MTUs per repository and the operational



period of approximately 25 years. You divide 70,000 by 25 comes to 3,000.
Q There was a latter one I was describing which was not accurate, but appreciate your clarifying that.
At the bottom of the first sentence on the second paragraph on that page.
A Say that again.
Q Yes, the first sentence in the second paragraph on that page 4. It says that the ongoing fee revenue of spent fuel projections used in this analysis were derived from estimates of net electricity generation and spent fuel discharges prepared in 1985 by a EIA.
Would that be the same sort of numbers we talked about with respect to spent fuel discharges and electricity generation when we were talking about the 1985 Mission Plan?
A They are related.
Q Would they have been different?
A They are related. I mean, one is proportional to the other.
Q When you're talking about they're related, what two are related?
A The spent fuel projections and

One of the references identified, I think it's the fifth reference, is the standard contract for disposal of spent nuclear fuel. What we've been referring to as the standard contract. Did the standard contract require that a fund fee adequacy assessment be issued, do you know?
A I don't believe so.
Q Okay. We've already got this exhibit marked. I'm handing you the monitored retrievable storage submission to Congress dated 1987. And actually handing you volume one, which is entitled proposal. Have you had occasion to look at this document before, Mr. Pollog?
A Yes.
Q Take a look at page one, the executive overview. I have just a question. I don't know if you know what the reference means here, but the last sentence says, Facility recommended in this proposal would be capable of performing all the functions specified by the Act. And then they designate a section.
Do you know what functions are specified in that section of the Act?
A No, I don't.
Q On page three of this document, they --



the document identifies the advantages of the MRS facility and sets them out in specific paragraphs.
The first paragraph talks about improvement of system development. And at the end of that paragraph, there's a statement that the early accomplishment of these separable steps of waste management process would significantly enhance accomplishment in the operation of the total system.
The reference to enhance confidence, what does that mean?
A I believe that approximately at this time, which we were considering or may have already made an announcement concerning delaying the schedule for start-up of the repository, pushing it back from 1998 to 2003.
So, if there were an MRS in this system, there would be more confidence that we could start accepting waste in 1998.
Q On page five, which I think is still part of the general executive overview in the second full paragraph on that page in the middle, part of this proposal is that Congress link the start-up of the MRS facility to the schedule of



the repository.
And in particular, that no waste may be accepted at the MRS facility until construction authorization or the first repository is received from the NRC.
Is it fair to say from this statement that it was DOE that actually proposed the linkage that served as the legal restriction on the acceptance rates that were used and published after the Nuclear Waste Policy Amendments Act of 1987.
A You just said too much for me there. Can you repeat it or --
(Whereupon, the last question was read by the court reporter as requested.)
THE WITNESS: Yes, I would say that's a fair statement.
BY MS. HEWITT:
Q If you take a look at page 20 under the section called 3.3.1, Waste Acceptance, it says here that -- in the first paragraph that full scale operation of an MRS at a rate of about 2500 to 3,000 MTU per year would be achieved by 2004. Do you see that statement?
A Yes.



Q Is that consistent with the MRS projections that were include in the 1985 Mission Plan?
A I'd have to look at the Mission Plan, 1985 Mission Plan to be certain. This is the '84 draft. Are you using the '84 draft or '85 Mission Plan for your question.
Q I was using the April draft of the '85 Mission Plan. There's only two drafts of it.
A There was an '83 draft, an '84 draft and an '85 Mission Plan.
Q Well, I was actually looking in the 1984 draft, but that doesn't include the MRS.
Let me think for a second where I found those. Well, I'll come back to that. I had the wrong document in mind, but I won't waste your time. I'll do that at a break.
Later in that paragraph it says that, however, spent fuel from western reactors could be shipped to MRS facility if necessary to meet contractual obligations.
What does that reference mean in that paragraph?
A Reference to what?
Q Contractual obligations?

A The 1998. January 31st, 1998 dates.
Q And was that a concern because western reactors weren't being proposed to have their fuel shipped prior to 1998?
A Well, as part of the MRS system as we discussed earlier that the plan was to serve service just eastern reactors. So, yes, I would believe that would be to address the concerns of the western reactors.
Q Page 22, a section called, accelerated waste acceptance from utilities. In this section, right in the first sentence it says, The MRS facility since it began operations in 1998, the rate acceptance rate of the waste management system would start exceeding reactor discharge rates eight years earlier than would otherwise be possible. And it goes on to say, Without a MRS facility up to 13,500 MTU temporary storage capacity would be needed and about 45 reactors by the year 2000 when the repository would start operating?
MS. POWELL: I think you misread that second --
MS. HEWITT: What did I say?
MS. POWELL: Two thousand.



MS. HEWITT: I'm sorry. I meant to say 2003.
BY MS. HEWITT:
Q With respect to the first sentence, it's the specific conclusion that it's hard for my mind to get to immediately.
Why would the waste acceptance rates of the waste system exceed reactor discharge earlier than otherwise would be possible?
A Give me a second to read this again myself.
Okay. I understand.
Q Hopefully you can explain to me, because I don't understand.
A Yeah. I believe it means that if you look at a system without repository. And you looked at a system with an MRS -- a system with only a repository, and you looked at a system with an MRS and a repository, we could be accepting at a rate eight years earlier where we actually have a rate higher than what the discharge rates are.
Q Is because the repository is not operating until 12 years after the MRS?
A It's because of the timing of the



opening of an MRS and a repository.
Q How do you come up with the eight year figure?
A I don't know for sure. I would have to look at the specific rates of generation, rates needed for dry storage, rates of acceptance at an MRS and rates of acceptance at a repository.
Q Could you explain in more detail how the analysis would go, because we can look at those numbers and say, but how did you come up with this specific conclusion. What are components of the analysis?
A You would take, first of all, the rates of generation at the utilities. And you would also try and determine from that the on-site dry storage needs we talked about earlier.
Q Right.
A And you would get a number. And you would get -- that's the number you have to take out, take away. And here is your capacity for taking it away.
You can except it as MRS, you can accept it as a repository. With an MRS in the system, we could be at acceptance rate. Eight years earlier than it would be if we just had



repository only to start receiving reactor discharges.
Q Is that because the MRS would be up and running eight years before a repository?
A However many years. But just with a MRS in this system as they propose it right here and with the schedule for the repository.
By including the MRS in the system, you can reach a point where waste management acceptance rate is greater than the discharge rates eight years earlier.
Q And then the next sentence says that you would need 13,500 MTUs of new storage capacity of 45 reactors by year 2000.
From that statement is 13,500 aggregate for the 45 reactors. Do you understand that?
A Yes, I believe I understand it.
Q And would that be storage capacity in excess of what's available on their spent nuclear fuel pools?
A That would be my interpretation.
Q Okay. Take a look at page 27 under section entitled, Proceed with potential problematic impact.
On the second paragraph in the middle

of the page, it talks about the 15,000 MTU capacity of the MRS facility, the proposed limitation of 15,000 MTU.

It says, this capacity is sufficient to offset potential storage short falls at reactors for possibly five years. But it is less than one-third of the spent fuel inventory expected by year 2000.

Unfortunately this sentence is a little above my head as well. So I was wondering if you can explain what it means. And I can break it down if you like, but if you could explain it more detail?

A By the year 2,000, at this point in time which is 1986 or '87.

Q Eighty-seven.

A Its was projected that there would be a total of approximately 45,000 MTUs of spent fuel generated. So if we have a limit of 15,000, that's the one-third -- that's less than one-third of the spent fuel inventory expected by year 2000.

Q What about this first part of the sentence?

A Which parts are you referring to



specifically?

Q The offset of -- that occurs for approximately five years?

A Okay. I believe that would be referring to the additional need for storage in addition to what can be stored at the pools.

Q Okay.

A So for five years they believe they can reduce their limit for additional at reactor dry storage.

Q Okay. And if you divide 15,000 by five that's 3,000 on an annual basis, right?

A Yeah, but I'm not sure that that's related.

Q Okay. That's what I'm asking, are they related? Because if, if this -- if 15,000 per five years at 3,000 a year, and is it suffice it to say that that's enough to offset potential storage shortfalls at reactors? That's what it appears to say, but I'm trying to understand if that's what is means?

A I would agree with that.

Q Okay. I'm going give you the second volume of this MRS submission to Congress. And the second volume is the environmental assessment



and it's actually a very large document.

I've only excerpted, I think, the first couple of chapters and some appendices. So not all the pages are included, but it was a very voluminous document.

Have you looked at the document?

A Yes, I have.

Q Are you familiar with the document?

A Yes, I am.

Q On page 1.3 and page numbers appear in the middle of the bottom of the page, top of that page. 1.3, and they do flip over, some of them.

It talks about determining what the appropriate overall quantity spent fuel to accept each year at the MRS. And they talk about short term and long term objectives in this paragraph.

The short term objective that's identified is to provide relief to utilities with potential at reactor storage problems.

And then the long term objective is implementing an acceptance rate that should be sufficient to deplete the backlog of spent fuel at reactors.

Are these the same objectives that DOE had with regard to implementing the acceptance



rates that were in the 1987 ACR, for example --

A Yes.

Q On page 1.7, this proposal talks about, under a title called waste acceptance, it says the waste acceptance rate would be closely coupled to the rate that the repository can place the waste.

Again, I want to ask you about whether there's a difference, at least, with regard to this document between acceptance rates and in-placement rates.

In some context, I think you testified they were the same. I'm just wondering in this context whether there's a difference here.

A There is a difference here.

Q And what's the difference here that may not have been in prior documents?

A This talks about actual, I believe placement of waster under ground.

Q Take a look at page 2.7 and this is a section entitled, Development of Spent Fuel Acceptance Capabilities.

A Page 2.7?

Q Yes. I'm actually looking at the third paragraph. The first sentence in the third

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(98-477C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(98-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - X
Discovery Judge (Judge Sypolt)
McLean, Virginia
Friday, April 12, 2002
VOLUME II

Continued deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Shaw



Pittman, 1650 Tysons Boulevard, 14th Floor, McLean, Virginia, at 9:00 a.m., Friday, April 2, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiff Northern States Power:
DEVON HEWITT, ESQ.
JACK Y. CHU, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
703-770-7901

On behalf of Plaintiff Commonwealth Edison:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
312-923-2829



APPEARANCES: (Continued)

On behalf of Plaintiff Wisconsin Electric:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
202-434-1609

On behalf of Southern Nuclear Operating Company:
KRISTI L. REMINGTON, ESQ.
Balch & Bingham, LLP
Tenth Floor
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000

On behalf of Sacramento Municipal Utility District:
TIMOTHY P. MACDONALD, ESQ.,
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

APPEARANCES (Continued)

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-514-7300



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| THOMAS POLLOG | NORTHERN STATES POWER | |
| By Ms. Hewitt | | 8 |
| | COMMONWEALTH EDISON | |
| By Mr. Eidukas | | 18 |
| | SACRAMENTO MUNICIPAL UTILITY DISTRICT | |
| By Mr. Macdonald | | 33 |
| | DEFENDANT UNITED STATES | |
| By Ms. Sullivan | | 160 |
| | SOUTHERN NUCLEAR OPERATING CO. | |
| By Ms. Remington | | 162 |

Afternoon Session - Page 115


E X H I B I T S


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 19 - 1985 Mission Plan | 10 |
| 20 - 1984 Mission Plan | 32 |
| 21 - Mission Plan Strategy Memo, 9/15/83 | 60 |
| 22 - Excerpt of Government's Brief | 87 |
| 23 - DOE Notice, 5/25/94 | 100 |
| 24 - DOE Notice, 5/3/95 | 105 |
| 25 - 1988 Draft Mission Plan Amendment | 128 |
| 26 - Analysis of TSLCC of CRWMP | 146 |




E X H I B I T S (Continued)


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 27 - 1995 APR ACR | 154 |
| 28 - 1996 APR ACR | 157 |
| 29 - Georgia Power Letter to Robert Morgan | 163 |
| 30 - Protest of 1998 Mission Plan & ACR | 168 |
| 31 - Letter, Certified Mail, 9/9/88 | 173 |
| 32 - Handwritten Notes | 173 |




P R O C E E D I N G S

Whereupon,

THOMAS POLLOG,

was called as a witness by counsel for Plaintiff, and having been previously sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
NORTHERN STATES POWER
BY MS. HEWITT:

Q. Morning, Mr. Pollog. We're going to continue my portion of your questioning. As I mentioned yesterday, I apologize, but we didn't have one of the documents available that was identified on your list, and I do want to ask you about that, but hopefully it won't take very long?

MS. SULLIVAN: Before you do that, Mr. Pollog would like to clarify something from his testimony yesterday. Is that all right?

MS. HEWITT: Okay.

THE WITNESS: Yes. I want to clarify concerning the relationship and the importance and the differences between the DCS and the FDS process. Okay, the DCSs and FDSs are of approximately the same influence in a multi-step process that was looked upon going forward for waste acceptance. The

difference between the DCS and FDS, there's only two. The DCS, the purchasers and DOE agreed to delivery on a specific year, a calendar year.

Whereas in the FDS the purchaser would identify a range of dates within that year as wide as they want to, could be days or weeks, and DCS if the Department would agree that they would be committing to a specific range of day. So it would narrow down from a full calendar year to a lesser range of dates within that year will be the one difference.

And the second difference where the DCSs are potential low changeable or exchangeable where other utilities, whereas an FDS is not exchangeable.

BY MS. HEWITT:

Q. Is your testimony otherwise that all the information -- if you didn't exchange your DCS. All the information that you included in the DCS had to be the same information in the FDS?

A. That's not my testimony.

Q. Do you know the answer to that?

A. The answer to that is the Department had never decided if everything in a DCS had to be included in an FDS.

Q. Okay. I'm going to ask you about the 1985



mission plan. I'll mark it.

(Pollog Exhibit No. 19 was marked for identification.)

MS. SULLIVAN: Is this an excerpt or volume 1?

MS. HEWITT: No. This is volume 1. And actually it's only chapter -- I guess it's only volume 1. I didn't have everything.

MS. SULLIVAN: That's fine.

MS. HEWITT: Actually, I think it's just chapters 1 and 2.

MS. SULLIVAN: Good.

BY MS. HEWITT:

Q. But what I handed you is pages 1 through 29, so make sure you have 29 pages.

(Witness reviewing document)

A. Actually there seems to be --

Q. There's some on your right there?

A. Yeah. These come at the end. Actually page 14 seems to be missing. Let me check one more time.

Q. Okay.

(Witness reviewing document)

MS. SULLIVAN: Yeah.

MS. HEWITT: Page 14's missing?



MS. SULLIVAN: That's fine. We can change that later, just note it right now.

MS. HEWITT: Well, yes, page 14 is missing from mine as well.

MS. SULLIVAN: Did you have questions about it.

MS. HEWITT: No. I don't have questions from page 14, but I don't know why -- it might be in the actual original document. In any event, we don't have any questions about page 14. And I apologize. Here's the stapler. Other than that, we are a very sophisticated law firm. We provide extensive resources for our clients.

BY MS. HEWITT:

Q. Anyway, what I'd like to ask you about is the waste acceptance schedules that are included in this document.

Have you had a chance to look at this document before, Mr. Pollog?

A. Yes, I have.

Q. In particular, I think there's a table at the very end on page 26. Have you found that table? It's Table 2-2.

A. Yes, I have.

Q. Set forth here are acceptance rates for



repository, first repository and second repository. In particular, I'd like you to look at the spent fuel column under the first repository.

Do you know the basis for the acceptance rate figures listed therein?

A. Are you referring to the section under first repository, spent fuel starting with No. 400 in 1998.

Q. Yes, I am.

A. Yes, I am.

Q. And what is the basis of those acceptance rates?

A. The basis would be twofold, or two parts. One would be, again, we anticipated two repositories of total amount of spent fuel approximately 130 to 140,000 MTUs with equal amounts in both repositories and that number being approximately 70,000 dividing the operational life of approximately 25 years, you get approximately 3000 per year as a steady state rate with a several-year ramp up rate in the early years. It would be part 1.

The second reason for that would be again to try and keep up with spent fuel discharges and the need for alleviating the need for additional on-site dry storage at the purchaser sites.

Q. And these were the same reasons for the acceptance rates that were included in prior drafts of the mission, this mission plan, is that correct?
A. I believe so.
Q. And we may have discussed this yesterday with regard to the drafts, but the ramp-up rates from 400 in the first three years to 900 and then 1800, why were the numbers segregated that way for the ramp-up years?
A. Can you explain for me what you mean by segregated?
Q. Yes. Why was 400 chosen for the first three years and then 900 for the fourth year and then 1800 for the fifth year?
A. Okay. Originally we had suggested an earlier drafted mission plan, 1800 metric tons per year for the ramp-up period. I believe we received public comments, the document mission plan itself, including the schedules and one of the comments or several, I'm not sure how many, stated that they thought that would be an overly ambitious ramp up rate to go from zero to 1800 in your first year and suggested scaling back which way were initial ramp up would be.
In response to those comments, I think the



decision was made to reduce the ramp up the numbers in the early years in order to get the system going from basically zero up to the 3000.
Q. Do you know why it was broken down to 400 and then 900 and then 1800? There seems to be a relationship between those numbers but I would rather not guess.
A. I think they were just approximately doubling every -- you do a couple of years at 400 and you double that and get comfortable with that and you double that again until you reach your essential steady state rate.
Q. Okay. If you take a look at the next chart that follows that on page 27, Table 2-3, have you located that chart?
A. Yes.
Q. What is the difference between this chart and the prior chart that we just were discussing?
A. This chart is for improved performance system which includes an MRS in the waste management system.
Q. Okay. And is the idea that the waste would be transferred first to an MRS before going to a repository? Is that what this chart reflects?
A. Let me examine it for a second.



(Witness reviewing document)
MS. HEWITT: Can we go off the record for a second?
(Discussion off the record)
THE WITNESS: I believe this chart includes a system where waste would first go in the first, from pre-'98 through 2005, if I'm reading this across correctly. To an MRS and then to the first repository and then starting I believe in 2006, waste would still be going to an MRS to a first repository and some of it would be going straight to a second repository. Some would be going to an MRS and some would be going to a second repository, starting in I believe if I'm reading this chart correctly, 2006. Yeah, I believe 2006.
MS. SULLIVAN: Are --
BY MS. HEWITT:
Q. What is the basis for the acceptance rates that are listed here for the MRS?
A. I believe the basis is the 3000 again comes from the two objectives we had discussed just a few minutes ago, the first one being looking at how much was going to eventually, to the first repository being the 70,000 MTUs, taking that number and looking at the lifetime -- anticipated lifetime for the MRS



repository for approximately 25 years dividing 75,000 by 25 and reaching an approximate number of 3000 per year in steady state and the second being the goal to alleviate the additional need for dry storage or out of full storage at a facility, at a purchaser's facility.
Q. How come there's not a ramp up rate for the MRS acceptance?
A. Well, I believe there is. If you look at the pre-'98, it doesn't give specific years. It just says pre-'98. So I believe that includes more than one year, the 2200 number.
Q. I see. And do you know when this assumes the MRS would be operational or able to take spent nuclear fuel?
A. I believe it was based on starting in 1996.
Q. I don't think I have any more questions for you Mr. Pollog. I will turn it over to my colleagues. I will note for the record that you did yesterday not know some basis for some of the rates in the ACRs which was supposed to be part of your responsibility, so I'm not going to end my questioning and just keep it open. And I don't know whether they're going to bring you back to speak on

I believe you characterized as the first objective being the -- I can have you say that again, but let me see if I understand it.

You believe that each repository would accept up to approximately 70,000 MTU of spent fuel, and then you took the -- you also anticipated that there would be approximately 25-year operational life? And I'm not sure if operational life is the word you've used, and then I'll let you correct me. Operational period or operational life of the facility or the program and by taking and dividing 25 into 70,000, you got approximately a steady rate of 3000.

Is that an accurate paraphrasing of what you've testified or perhaps if you want to --

A. I would say that's close enough.

Q. Close enough, Okay. The 25 years for the anticipated operational life of the facility, could you just clarify again what that 25 years represents?

A. I believe it represents what was anticipated in normal lifetime of the equipment that would be used in one of these facilities such as transportation casks, handling equipment, any type of hardware that was going to need to be purchased to operate the facility was thought to have about an



operational life before you would need to basically just get rid of it and buy new stuff of 25 years.

Q. So the 3000, or the rate that was generated by looking at that, the rate was based on the calculation or the estimation that the life of this equipment would be about 25 years, not vice versa? I sense by your expression they were as clear as mud?

A. The vice versa, I wasn't sure.

Q. Sorry. In other words, as I understand it, the DOE in developing this acceptance schedule or this acceptance rate didn't approach it in the manner of we want a rate of 3000 and then let's calculate what the life of this equipment would be.

Rather, they took the 70,000 MTU limit or what they felt would be the limit on the acceptance, what the repository would accept and then looked at the life of the equipment, what they expected the life of the equipment would be and took those numbers and then came up with the 3000, not the other way around.

A. We looked at what the life of the equipment was and not -- and then divided the total anticipated capacity to determine the rate. We didn't look at the rate first. We did not look at



the rate first and then back calculate what the life of the equipment would be.

Q. Okay. I think that expressed what I was trying to say. Was there any expectation by the DOE that the program would last longer than this 25 years? In other words, that they would have to go out and buy a new set of this equipment?

A. Well, if you look at the early documents, it actually includes two repositories. So the first one would be operating for approximately 25 years and then the second one coming on line or starting several years, I'm thinking -- it varied at different points of permanence, but I'm going to say approximately 10 years after the first one so that would be 25 years past, so you're talking approximately 35 years or so.

Q. At each repository, was there any expectation that at each of the repository there would be a replacement of the equipment so that each repository would be operating for more than 25 years?

A. I don't believe so. Well, let me just clarify that. When you say operation, you mean you're still going to be done after no more fuels come in after the repository. The acceptance part of files coming into the gate was expected to last 25



years.

There are additional requirements such as everything would not necessarily be in place within that 25 year period of time. It would take a little bit longer to work off the backlog, and I believe the nuclear policy act specifies we have to provide a 50-year retreatability, capability at the repository. So there would be certain activities going on to fulfill those statutory requirements. But regarding I think accepting fuels through the front gate and doing what we need to do to get into placement would last 25 years plus a few additional years to work off any lag fuel storage.

Q. I think with that clarification we're still on the same page as far as what I meant by operational life and what you said in your earlier testimony -- just to clarify, when you were talking about operational life of the equipment, you've been referring to the operation life of the acceptance equipment?

A. For the most part, yes.

Q. Briefly look at the 1997 annual capacity report. And again, it should be one of the middle -- or early documents, No. 4.

A. Okay.

contract which is Exhibit 2 there you base your personal opinion on, your personal opinion that the DOE accepting one spent fuel element in 1998 would comply with its obligations under that contract.

MS. SULLIVAN: Objection. Calls for a legal conclusion. You can answer as to your own personal opinion.

THE WITNESS: Just give me a few minutes here to look through this.

MR. EIDUKAS: Sure.

(Witness reviewing document.)

THE WITNESS: Okay, I'm ready. I would refer to two parts, I believe. One is in subpart B 96111 on page 521 of Exhibit 2. The whereas section, it's last full paragraph in 9611, "Whereas DOE has responsibility following commencement of operation of a repository to take title to spent fuel of highly radioactive waste as expeditiously as possible upon request of the generator owner of such waste or spent nuclear fuel."

And I would also look at article 2, scope, on page 523 and 524. I would look at the top of page 524 which starts with the first full sentence, "The service provided by DOE under its contract should begin after commencement of facility operations not



later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from a civilian nuclear power reactor specified in appendix A annexed hereto and made a part here of has been disposed of."

BY MR. EIDUKAS:

Q. And just to clarify, is there anything else in the standard contract itself upon which you base your opinion that accepting only one spent fuel element in 1998 would comply with it?

MS. SULLIVAN: Same objection.

THE WITNESS: Nothing I can find right now or what's in there.

BY MR. EIDUKAS:

Q. I know you testified you didn't have any specific conversation. A specific conversation about this opinion you had over the course of 14 years.

Do you recall anyone disagrees with this opinion of yours?

A. I do not recall at this time what the response was to my stating that.

Q. Do you have an opinion as to whether or not accepting only one spent fuel element in 1998 would be consistent with the intent of the Nuclear Waste Policy Act?

MS. SULLIVAN: Objection to the extent it



calls for a legal conclusion regarding the intent of the act. You can answer as to your own personal opinion.

THE WITNESS: I don't have an opinion on that.

BY MR. EIDUKAS:

Q. Do you have an opinion as to whether or not the DOE accepting only one spent fuel element in 1998 would be consistent with the intention of the parties to the standard contract?

MS. SULLIVAN: Same objection. You can answer.

THE WITNESS: Can you define for me intention of the parties of standard contract? What you mean by that?

BY MR. EIDUKAS:

Q. What the parties -- what the DOE as one party and the purchasers as the other parties when they sign a contract, what they expected the DOE's performance would be in terms of acceptance of spent fuel beginning in 1998.

MS. SULLIVAN: Objection to the extent it calls for legal conclusion regarding the intent of the standard contract. You can answer.

THE WITNESS: I believe that was



inconsistent with the intention of the parties to the standard contract.

BY MR. EIDUKAS:

Q. So did you say inconsistent?

A. Inconsistent.

MR. EIDUKAS: Let's go off the record for a second.

(Discussion off the record)

(Pollog Exhibit No. 20 was marked for identification.)

BY MR. EIDUKAS:

Q. Mr. Pollog, I've had marked and handed to you as Exhibit 20. It's certain pages from the April 1984 draft of the volume 1 of the mission plan. And you'll notice it's only certain pages there, but they're in the order that was produced to us from this litigation and you'll notice that there's some handwriting in the margin and some underlining.

My question to you is whether or not you know whose handwriting that is on that document.

A. I do not recognize the handwriting. I'm trying to recall if I recognize any participator in the program with the initials EBM and --

Q. And sorry to interrupt you because on the first page in the upper right-hand corner, there's a

conversation with outside of counsel was Mike Conroy.
BY MR. MACDONALD:
Q. So at these discussions that you may have had with certain of the people we just described where this principle was discussed, counsel was present at all those discussions?
A. All discussions except for the one that I had with Mike Conroy.
Q. And to your knowledge, there are no documents that you reviewed that reflect this principle?
A. Correct.
Q. Do you know if there are any documents that DOE produced in this litigation that reflect this principle?
A. I don't know.
Q. When did DOE determine that it would not begin accepting SNF in 1998 at a permanent repository roughly?
A. I believe the first time we published that that we wouldn't be receiving SNF at a permanent repository in 1998 was either -- I believe it was the '87 mission plan amendment but it also could have been the '88 draft amendment. It was either one of those two.



Q. So by either 1987 or 1988, DOE had determined that it wouldn't begin accepting SNF at the repository in 1998?
A. Yes.
Q. Prior to that time, were there any DOE studies suggesting an acceptance rate of 900 MTU?
MS. SULLIVAN: Objection. Vague. 1900 MTU, what time period?
MR. MACDONALD: Did you understand the question?
THE WITNESS: Are you saying 1900 MTUs per year?
MR. MACDONALD: I'm sorry. I thought I said 900 MTUs.
THE WITNESS: 900 MTUs on a yearly basis?
MR. MACDONALD: Yes.
THE WITNESS: On a steady state basis not just given any year?
MR. MACDONALD: That's right. With a reasonable ramp-up period.
THE WITNESS: Steady state acceptance rate of 900 MTUs. I don't know of any.
BY MR. MACDONALD:
Q. You don't know of any DOE studies before 1998 in which DOE intended to operate its facilities



with a steady state acceptance rate of 900 MTU per year?
A. I'm sorry. Maybe you misspoke or maybe I misheard you. You say before 1998?
Q. I may have said that. If I did, I apologize. I'm trying in my head to refer to 1988.
A. Okay. If you're asking me do I know of any studies that were prior to 1998 that this steady --
Q. 1988.
A. 1988, excuse me, with steady state acceptance rate of 900 MTUs, I do not recall any.
Q. Are you aware of any studies where DOE planned on accepting fuel at a repository at less than a 3000 MTU per year steady state rate?
MS. SULLIVAN: Objection, vague.
MS HEWLITT: Before 1998?
MR. MACDONALD: At any time.
THE WITNESS: I am not aware of any studies that stated that the steady state acceptance rate at a repository would be less than -- other than in the ramp-up period, less than 3000 MTUs per year.
BY MR. MACDONALD:
Q. And the question is sort of convoluted, so I apologize. Another way of putting that is assuming



the operation of a repository DOE planned on a 3000 MTU per year steady state rate, is that correct?
MS. SULLIVAN: Objection, vague.
THE WITNESS: No. I would say that's not correct.
BY MR. MACDONALD:
Q. Okay. In what way is it not correct?
A. I think if you look at documents such as the 91 ACR, 95 ACR, we looked at steady state rates of 900.
Q. Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?
MS. SULLIVAN: Objection, vague.
THE WITNESS: Can you restate that for me?
MR. MACDONALD: Could you read the question back?
THE REPORTER: "Question: Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?"
THE WITNESS: I don't believe so.
BY MR. MACDONALD:
Q. Maybe my earlier question was inartful, then. Assuming an operation at a repository, not an

MRS, did DOE plan to use a 3000 MTU acceptance rate once it ramped up to a steady state?
A. I believe so.
MS. SULLIVAN: Can I have a --
(Counsel conferring with witness)
BY MR. MACDONALD:
Q. Mr. Pollog, I'd like to ask you a couple of questions about the '83 draft mission plan which you have looked at previously and it should be Exhibit 7. I'd like you to turn to page 2-3.
For the record, this is a table that Ms. Hewett asked you about yesterday entitled Waste Acceptance Schedule, is that right?
A. I believe so.
Q. One of the questions that Ms. Hewett asked you before about -- she asked about this third column discharge from decommisioned reactors, and I believe your testimony was you didn't think this had or was related to the acceptance rate in any way?
A. Correct.
Q. Do you know why this table includes information about the discharge rate from decommissioned reactors?
MS. SULLIVAN: Objection. Asked and answered. You can answer it again if you remember.



THE WITNESS: No, I don't.
BY MR. MACDONALD:
Q. Are you aware of a provision in the standard contract that provides authority to DOE to give shutdown reactors a priority in the acceptance of SNF?
A. I'm aware of a provision that DOE may provide priority for shutdown reactors.
Q. Do you know why that provision was put in the standard contract?
A. No, I do not.
Q. Would you turn to page 2-5?
A. The same document?
Q. Same document. The first full paragraph on page 2-5 begins, "The main plan and primary effort is to have an operating geologic repository in 1998."
Do you see that?
A. Yes.
Q. As of December 20, 1983, the date of this document, was it DOE's main plan and primary effort to have a repository?
MS. SULLIVAN: Objection. Beyond the scope. You can answer if you know.
THE WITNESS: I believe it was the objective of the Department to have a repository



operating by 1998.
BY MR. MACDONALD:
Q. Would you turn to page 3-B-12. It's a ways in the back.
A. 3-B-12?
Q. Yes. And in particular, if you would look at the paragraph B entitled Licensing.
A. Yes. I'm there.
Q. I had some questions about this which maybe you will be able to explain. This paragraph states that, "It has been estimated that the Nuclear Regulatory Commission would require two-and-a-half years to review and monitor retrievable storage facility licensing application."
Can you explain to me what would go into that estimate of why it would take two-and-a-half years for the NRC to review an NRS licensing application?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I must admit I'm not that familiar with NRC licensing regarding a facility, so I can't explain to you why it would take two-and-a-half years to do that.
BY MR. MACDONALD:



Q. Is the 2.5 year time period consistent with your current understanding of how long the NRC would take to license an MRS?
MS. SULLIVAN: Same objection.
THE WITNESS: My current understanding is based on work that was done I believe a CISF, centralized interim storage facility submittal we sent to NRC in the late 1990s, and I believe the licensing time approximates that.
BY MR. MACDONALD:
Q. And what was again the CISF proposal that you're talking about?
MS. SULLIVAN: Same.
THE WITNESS: Centralized interim storage facility.
BY MR. MACDONALD:
Q. And you worked on that proposal in what period of time?
A. I did not work on that proposal.
Q. When was that proposal sent in?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe in the late '90s, mid to late '90s.
BY MR. MACDONALD:
Q. If you didn't work on it, how are you

aware of the time that the study estimated for NRC approval of an MRS license?
A. I believe I picked a copy up just for some general light reading one afternoon.
Q. You're an engineer at heart. Do you know who did work on that?
MS. SULLIVAN: Same objection.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Who was that?
MS. SULLIVAN: Same objection.
THE WITNESS: Dan Kane, K-a-n-e.
BY MR. MACDONALD:
Q. In 1983, did DOE anticipate that utilities would have to build additional on-site storage facilities?
A. I believe so, yes.
Q. Did DOE anticipate the utilities would have to about the additional on-site storage facilities after 1998?
A. I believe so.
Q. Why do you believe so?
A. Because we believe utilities would need to build additional on-site storage facilities by the mid-'90s.



Q. Would they -- I think my question may have been poorly worded. DOE anticipated that the utilities would have to build storage in the mid-'90s.
Did DOE anticipate that utilities would have to build storage after January 31, 1998?
MS. SULLIVAN: I'm going to object to this as beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: You're talking about 1983?
MR. MACDONALD: Correct.
THE WITNESS: I think DOE anticipated at that time that it was possible that utilities would need to build additional on-site storage after 1998. If DOE did not start accepting fuel by that date, by that time frame. DOE believed it was also possible but difficult to speculate that far even if we did accept fuel starting in 1998, if utilities would need to build additional on-site storage because we hoped to take rates who reduced the need, but that would be in a perfect world with perfect trading and one could not speculate how an exchange process would work 20 years in the future.
BY MR. MACDONALD:
Q. But the waste acceptance schedule in 1983



was designed so that no utility would have to provide additional on-site storage after January 31, 1998?
MS. SULLIVAN: Objection, vague. It was designed as I've testified, two things in mind. One thing was to hopefully reduce or if in a perfect world eliminate the need for additional on-site storage, and it was also designed with the objectives we talked about earlier, and that is a 70,000 MTU limit at a repository divided by 25 years and you come to the number of approximately 3000. It had two objectives I think regarding -- or two reasons why that rate was chosen.
BY MR. MACDONALD:
Q. Would you turn to page 2.1 of the same document, the 1983 draft mission plan?
A. You said 2.1?
Q. Yeah, 2-1. And in the first paragraph, this document states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."
So my question is was the waste acceptance schedule "Designed to provide an acceptance rate in



the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?"
A. Yes.
Q. Do you know why this document doesn't discuss or mention the second objective that you had talked about, the 25-year life of the operations?
A. No, I do not.
Q. I'd like to talk briefly about the 1984 draft mission plan which should be Exhibit 8. Conveniently, I'd like you to turn also to page 2-1 of this document, the 1984 draft mission plan. And in particular I wanted to ask a few questions about the language that Ms. Hewett identified yesterday for you in the second paragraph. In specific, the first sentence which talks about providing owners and generators of SNF with planning schedules sufficiently early to determine their on-site interim storage needs.
What's your understanding of what "sufficiently early" in that sentence means?
MS. SULLIVAN: Objection. Asked and answered. You can answer again if you recall your answer.
THE WITNESS: I'm having trouble finding

sufficiently early. Can you point it out to me?

MR. MACDONALD: It's the second paragraph, the fourth line.

THE WITNESS: Oh, I'm sorry. I'm looking under A. I believe that would mean they would not have to be in a situation where their spent fuel pool was full before they had to make a decision about what they were going to do next.

BY MR. MACDONALD:

Q. And we talked a little bit about this yesterday, but I just want to clarify it. The reason the utilities need advanced notice is because if DOE was not going to pick up fuel starting in 1998, the utilities would need to make arrangements for storage on their own, is that correct?

MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal knowledge.

THE WITNESS: They would have to make arrangements.

BY MR. MACDONALD:

Q. Would those arrangements potentially entail building additional dry storage facilities?

MS. SULLIVAN: Same objection.

THE WITNESS: It could.

BY MR. MACDONALD:



Q. And how long would it take a utility, the process, to construct additional on-site dry storage facilities?

MS. SULLIVAN: Same objection.

THE WITNESS: What point in time are you talking about? In 19 --

MR. MACDONALD: 1995.

THE WITNESS: Currently?

MR. MACDONALD: Let's start with 1995.

THE WITNESS: I would guess around five years.

BY MR. MACDONALD:

Q. It would take a utility in 1995 approximately five years beginning to end for the process of constructing licensing additional on-site dry storage facilities?

MS. SULLIVAN: Same objection.

THE WITNESS: No. I wouldn't say that what you said.

BY MR. MACDONALD:

Q. I'm sorry, I'm not an engineer. Maybe you can describe to me what the five-year estimate was based on?

MS. SULLIVAN: Same objection.

THE WITNESS: From the time they decide



we're going to need to pursue that approach to the time they have a loaded system -- dry system in their facility.

BY MR. MACDONALD:

Q. That was the five-year period?

A. Yes.

Q. Do you know if utilities in 1995 in fact made the decision to construct -- whether some utilities made the decision to construct additional on-site dry storage?

MS. SULLIVAN: Objection. Beyond the scope. You can answer to your personal knowledge.

THE WITNESS: I don't recall if any utilities made a decision in 1995 to proceed with dry on-site storage. There may have been, but I have not committed to memory the actions of the approximate 100 different contracts that are controlled by 70 different contract holders at this time.

BY MR. MACDONALD:

Q. Do you know if some utilities have now constructed today or in the process of constructing additional on-site dry storage facilities at their site?

MS. SULLIVAN: Same objection.

THE WITNESS: Yes.



BY MR. MACDONALD:

Q. If you turn to page 2-2 on that same document, the 1984 draft mission plan, the acceptance rate in Table 2-2 or on page 2-2, again, is a 400, 900, 1800, 3000 ramp-up to a steady state of 3000 in 2003, is that correct?

A. Yes.

Q. Would you turn to page 9-6? I'm sorry, you can turn to page 9-5. I don't mean to be repetitive, but just to clarify, this is another table with the waste acceptance schedule that has the same 400, 900, 1800, 3000 ramp-up, is that correct?

A. Yes.

Q. And at the time in 1984 it was DOE's plan to use these acceptance rates if it could operate, open the repository in 1998?

MS. SULLIVAN: Objection. Asked and answered. Objection, compound. You can answer it.

THE WITNESS: It was DOE's objective to operate under acceptance rates in this table considering the challenges that lay ahead of us financially, technically, legally.

BY MR. MACDONALD:

Q. What would have happened -- in 1984, what was DOE's plan if it did not meet this schedule set

out in table 9-2?
MS. SULLIVAN: Objection. Beyond the scope. You can answer if you know.
THE WITNESS: I don't know if there was a plan in 1994 or what would happen --
MR. MACDONALD: 1984.
THE WITNESS: I'm sorry, 1984, if DOE did not meet this schedule.
BY MR. MACDONALD:
Q. Would you turn to page 9-6. And page 9-6 says that, "Waste acceptance at the first repository scheduled to start in 1998. The waste acceptance schedule for the first and second repositories is given in table 9-2," is what we just talked about.
The following sentence says, "The reactor storage capacity required by this waste acceptance schedule will have to be provided by the electrical utilities that own the spent fuel, and then the next sentence says, However, if the Department fails to meet the schedule shown in table 9-2, then the additional storage capacity needed to accommodate the delay in schedule will be provided by the Department possibly at reactor sites."
MS. SULLIVAN: Before you ask a question, do you have a question about the document?



THE WITNESS: No.
MS. SULLIVAN: Okay. Sorry.
BY MR. MACDONALD:
Q. Does that final sentence which states that the Department would provide storage if they didn't meet the rates we just talked about refresh your recollection as to DOE's plans or intentions if it couldn't meet the schedule?
A. Yes, it does.
Q. And how does it refresh your recollection?
A. I do recall now some verbiage, and I'm not sure how early it appeared in any of the mission plans or other like documents that DOE had suggested a possibility of acceptance at the reactor sites.
Q. And describe for me what that means, acceptance at the reactor sites.
MS. SULLIVAN: Objection. Beyond the scope. You can answer to your personal knowledge.
THE WITNESS: The utility would transfer title to their spent fuel to the Department of Energy at the sites and the spent fuel would not leave that site. It would essentially become DOE owned or DOE titled spent fuel inside the boundaries of that reactor site.
BY MR. MACDONALD:



Q. And so DOE would be paying for the cost of that storage?
MS. SULLIVAN: Same objection.
I don't know if they ever considered who would be paying the bill at that point in time. It was one of the possibilities considered.
BY MR. MACDONALD:
Q. This sentence appears to say that the additional storage capacity "will be provided by the Department." Presumably, at least the literal language of this, would you agree, suggests that it would be DOE's responsibility?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I guess one could interpret it that way, yes. If I remember, I think one of the thing that was mentioned in documents of this time period was possibly providing them a canister or cask-based system for them to use on their site provided by DOE.
BY MR. MACDONALD:
Q. And would one of the reasons for this for possibly doing that, providing utilities canisters or storage casks to accomplish the first goal or what we have talked about as the first, one of the two goals,



the first goal being so that no utility has to build additional on-site storage after 1998?
MS. SULLIVAN: Same objection.
THE WITNESS: I'm not sure if it's necessarily related to that or if it's related to just not meeting the '98 date.
BY MR. MACDONALD:
Q. Explain the difference between those.
MS. SULLIVAN: Same objection.
THE WITNESS: Okay. You can have a situation where utility even if we came on the schedule we proposed still may have needed and we didn't meet our responsibility that was -- we didn't meet our objectives. A specific utility may still have needed to have dry on-site storage.
BY MR. MACDONALD:
Q. And you started to say responsibility that DOE didn't meet its responsibility?
A. I don't know.
MR. MACDONALD: I'd like to have this document marked as Exhibit 21.
(Pollog Exhibit No. 21 was marked for identification.)
BY MR. MACDONALD:
Q. For the record, I'm handing you a document

dated September 15, 1983 titled Mission Plan Strategy. And it's a memo from Richard Williamson to a collection of people at DOE, including Robert Morgan, who at the time would have been acting director of RW, is that right?
A. I believe it would have been either Robert Morgan or Mike Lawrence, but I'm not positive which one.
Q. Mike Lawrence is also listed on the distribution of receiving this memo?
A. Yes.
Q. Do you know who Richard H. Williamson, the author of the memo is?
A. No.
MS. SULLIVAN: Do you need an opportunity to look at this document for a minute?
MR. MACDONALD: Yeah. I'm going to ask you some questions on it. Take as much time as you need to look at it.
(Witness reviewing document)
BY MR. MACDONALD:
Q. Have you reviewed the document?
A. Yes.
Q. If you would turn to the second page first to clarify. After reviewing this, does this appear



to be an internal DOE memo discussing the strategy for the 1983 draft mission plan?
A. It is a -- it appears to be an internal DOE memo with I would say recommendations for the mission plan.
Q. And this is based on the date, the 1983 mission plan, which came out in December of 1983?
A. I would guess so.
Q. The second page midway down has the heading Waste Acceptance Schedule. Do you see that?
A. Yes.
Q. And the first bullet under there says "as an initial planning base, DOE will accept spent fuel and the quantities indicated in table" and then there's a blank. "Shipment allocations will be made on a quarterly basis."
It then continues, "The central criteria for this schedule is: An acceptance rate during the first time five years such that no utility would have to build additional storage facilities. After 1998, the second bullet is an acceptance rate after the first five years equivalent to the actual rate of utility discharge rate of spent fuel each year."
What is meant by the term central criteria?



A. I would say main criteria.
Q. So the main criteria for the schedule are two points listed here: An acceptancy rate such that no utility would have to build additional storage, that's in the first five years after 1998? Sorry. That was very inartful. Strike that. An acceptance rate during the first time years so that no utility would have to build additional storage.
That's the first main criteria, and the second main criteria is an acceptance rate after the first five years equivalent to the utility discharge rate, is that correct?
A. That's what's stated here.
Q. Do you know why there's no mention of the principle that we've discussed for the last day and a half that the acceptance rate would be based on this 25-year notion, the operating life of the equipment?
A. No, I don't.
Q. Based on this document in 1983, does it appear that that was a main criteria for developing the acceptance rate?
A. What was a main criteria?
Q. This principle that the rate was developed based on the estimated 25-year operating life of the facilities.



A. I'm not following you fully here. Let me ask, try and clarify. Are you asking me did DOE use the principle of 70,000 divided by 25 years as one of the main criteria for developing the 3000 MTU steady state acceptance rate? Is that what you're saying?
Q. I am.
A. I believe, yes, it still was.
Q. Why does this document suggest that the central criteria which you described meant main criteria not list that principle?
A. This was a suggestion from an individual who I don't even believe was associated with the RW program.
Q. What was the suggestion?
A. The central criteria stated here you just spoke of.
Q. So you're suggesting that Richard Williamson who wrote this memo was not connected to the RW program at the time that he wrote this?
A. There was no RW program at the time he wrote this. All right? It didn't come into being until I believe 1994. The precursor organization to the RW program at that point in time I believe was called Nuclear Waste Act -- Nuclear Waste Policy Act program office. I do not believe -- I've never seen

and also object that the document speaks for itself.
THE WITNESS: It seems to represent the guidance of the latest planning session, whatever that means. And I don't know who was involved in it. And I don't know if anyone on the distribution list was involved in it.
BY MR. MACDONALD:
Q. Would you look at page 3 of the document which has a page number notation 2 on the top, second page of the memo. And look at the bottom last bullet that says, "If by 1984, it is known that the federal repository will be delayed, but by an expected period of less than two years, then DOE will take either or both of those two actions to be able to accept fuel in 1998: And the first action is design the size of the buffer storage to accommodate spent fuel accepted from the utilities and the second option is DOE will take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks on site at the reactor."
You testified previously that you had some recollection of discussions or some understanding that DOE considered providing storage at the utility sites if it did not meet the 1998 date, is that correct?



A. Yes.
MS. SULLIVAN: Objection beyond the scope. Can you answer to your personal knowledge. Also objection mischaracterizes his previous testimony.
BY MR. MACDONALD:
Q. And when we discussed that, no that DOE would provide, I think as you said, casks or containers to the utilities, I ask you whether or not there were discussions about who would pay for that.
Do you remember those discussions?
MS. SULLIVAN: Same objection.
THE WITNESS: I remember your stating that.
BY MR. MACDONALD:
Q. Maybe my recollection is not right. I thought you told me that there were -- you remember potential plans of DOE providing casks or containers to utilities for storage at the reactor sites.
A. Something to that effect.
Q. This last option here suggests that DOE considered paying a rental fee to the utility to store the casks on site at the reactor.
Do you have any recollection of that potential?
MS. SULLIVAN: Objection. Beyond the



scope. You can answer as to your personal knowledge.
THE WITNESS: I don't recall in I had seen anywhere if DOE considered paying any rental fees for the utility. It is possible I may have but I don't recall those specific words.
BY MR. MACDONALD:
Q. Beyond the specific words, do you remember the general concept?
MS. SULLIVAN: Same objection.
THE WITNESS: Yeah. The general concept I recall was providing purchasers casks or on-site storage systems for their usage.
BY MR. MACDONALD:
Q. And if DOE was providing them, DOE was paying for purchasing providing those casks or containers to the utilities?
MS. SULLIVAN: Same objection. And also objection, vague.
THE WITNESS: That was considered in the discussion of this. It wasn't a verbal discussion; a written discussion.
BY MR. MACDONALD:
Q. Where would this written discussion be?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe I saw in early



drafts of the mission plan, actually.
BY MR. MACDONALD:
Q. Early drafts of which mission plan?
A. The ones already discussed here.
Q. The 1983 mission plan, the 1984 draft mission plan?
A. Or '85 or -- yes.
Q. Would you look at page 3 of this memo and it's a little bit hard to tell, but look at the second bullet that says, "The current best schedule estimate of first repository operation is 2002, four years later than the initial fuel acceptance date."
Do you know whether as of September 15, 1983, the date of this memo, DOE was already planning for a four-year slippage in the repository?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I do not know.
MR. MACDONALD: I think we're done with that.
BY MR. MACDONALD:
Q. The acceptance rate at an MRS facility, is there any reason that rate couldn't be 3000 MTU per year from a technical standpoint?
MS. SULLIVAN: Objection, vague.

THE WITNESS: Probably not. As long as you're talking about steady state right now.
BY MR. MACDONALD:
Q. In the 1987 ACR which you can grab out, it's Exhibit 4, had an acceptance rate of ramping up to 2650, is that correct?
MS. SULLIVAN: Objection. Are you referring to the acceptance rate on page 7 of this document?
MR. MACDONALD: I am.
MS. SULLIVAN: Okay.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q. And this 2650 acceptance rate was based on acceptance at an MRS, is that correct?
MS. SULLIVAN: Objection. Asked and answered. You can answer.
THE WITNESS: The basis for getting this rate into this document was the OCRWM mission plan and I would have to review the 1987 mission plan to tell you what the basis those for numbers are.
BY MR. MACDONALD:
Q. All right. I thought we did that yesterday. If you would look at Exhibit 9, my question was, what was the basis for the 2650



acceptance rate in the 1987 ACR, and you said in order to understand or answer that question you needed to look at the 1987 mission plan.
So looking at the 1987 mission plan --
MS. SULLIVAN: Objection. I think your question was whether or not that rate was based on acceptance in an MRS, and Mr. Pollog said he would have to review the mission plan amendment to determine the answer.
BY MR. MACDONALD:
Q. I'm not sure if there was a question pending, but I will restate either one of the two questions. Which is, first, what is the basis for the acceptance rate in the 1987 ACR?
MS. SULLIVAN: Objection. Asked and answered. You can answer it again.
THE WITNESS: The Table 2-1 in the 1987 ACR was taken from the OCRWM mission plan amendment 1987. Now, the schedule in table F1 of that mission plan amendment is, if you start with the far left column and you look at 1998 and go to all the receipts at the MRS facility, first repository, second repository, is based upon inclusion of an MRS in the system.
BY MR. MACDONALD:



Q. In 1998 under the 1987 ACR, where would the first 1200 MTU of fuel go?
A. Can you repeat? Because there was a 1988 -- I want to make sure I have the right dates you were asking for.
Q. I just want to clarify, we're still talking about the 1987 ACR and under that ACR what was the plan for acceptance for the fuel in 1998. Where would it go? What was the plan for where it would go?
A. In 1998? Or '88?
Q. 1998 because I don't think there was a plan for accepting fuel until 1998.
A. Okay. I understand what you're saying. I wasn't quite understanding. Are you asking me how we would allocate acceptance capacity -- how did we allocate acceptance capacity in the 1987 ACR for acceptance capacity to be started in 1998?
Q. Yes.
A. Okay. It was based upon -- well, it would have been based upon allocating oldest fuel first is how we allocate acceptance capacity.
MS. SULLIVAN: I think he's asking you a different question.
MR. MACDONALD: I'll try to rephrase it.



THE WITNESS: All right.
BY MR. MACDONALD:
Q. Physically where would the fuel go this first year of acceptance? Was it planned to go to a repository? Was it planned to go to an MRS?
A. I don't think it states in the ACR where it was planned to go at that time.
Q. Does it state in the 1987 mission plan where it states?
A. I believe so.
Q. You testified that the rates in the ACR were based on the mission plan, is that correct?
A. I the said rates that were in the 1987 were just taken out of this document and moved into the ACR. Strictly numerical numbers. Just the numbers themselves were taken out of this document and placed into this document.
MS. SULLIVAN: Do you want to clarify which documents?
THE WITNESS: They were taken out of table F1 from the draft -- not the draft. The 1987 mission plan amendment, the numbers, and they were placed into table 2-1 of the 1987 ACR.
BY MR. MACDONALD:
Q. So in the ACR you're saying there was no

A. There's nothing in this documents that suggests that we had a binding obligation to pick up spent fuel based on approved DCSs. The document does not state used DCSs. So there's nothing in here that suggests that belief.

MR. MACDONALD: I'm going to hand you Exhibit 24.

(Pollog Exhibit No. 24 was marked for identification.)

BY MR. MACDONALD:

Q. Exhibit 24, which I've just handed you is a notice from the Department of Energy or a copy of a notice from the Department of Energy dated Wednesday, May 3, 1995. The action listed in the notice states, "Department of Energy final interpretation of nuclear waste acceptance issues."

You can take as much time as you need to review this.

(Witness reviewing document)

BY MR. MACDONALD:

Q. Have you had an opportunity to fully review that document?

A. Yes.

Q. Does this document appear to be DOE's final interpretation of the preliminary notice that



we were just talking about?

A. Yes.

Q. Have you ever reviewed this document before?

A. No.

Q. Have you ever discussed this document or the principles outlined in it with anyone before?

MS. SULLIVAN: Object to these questions, beyond the scope of the deposition. You can answer as to your personal knowledge.

THE WITNESS: No.

BY MR. MACDONALD:

Q. What is DOE's conclusion in this document as of May 3, 1995 with respect to its obligation to pick up spent fuel in 1998?

MS. SULLIVAN: Objection as beyond the scope and also the document speaks for itself. You can speak to your personal knowledge.

THE WITNESS: I can read for you a summary if you like. If you want me to do that, I'd be happy to sit here and read into the record the summary.

BY MR. MACDONALD:

Q. Instead of doing that, would you turn to page 4 of the document? It's actually the third page, but listed as page 4 in the upper right-hand



corner. Right above the Roman Numeral or the letter A, the last paragraph states that, "After considering the views of the commenters, the provisions of the act, and its legislative history, and the terms and conditions of the standard contract, DOE has concluded that it does not have a legal obligation under either the act or the standard contract to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the act."

Do you see where it says that?

A. Yes.

Q. Are you aware that as of May 3, 1995, that was DOE's conclusion?

MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.

THE WITNESS: Am I aware of that now or was I aware of that in 1995? What is your question?

BY MR. MACDONALD:

Q. Were you aware of that in 1995 first?

MS. SULLIVAN: Same objection.

THE WITNESS: No.

BY MR. MACDONALD:

Q. Were you aware of that at any point before this deposition?



MS. SULLIVAN: Same objection.

THE WITNESS: I vaguely recall conversations about what we stated in the final rule. When you say aware, I recall conversations to that effect. I don't recall specifics of who they were with or when they were, but I do recall hearing what the final rule stated.

BY MR. MACDONALD:

Q. And what do you recall hearing the final rule state it?

MS. SULLIVAN: Objection. Beyond the scope. Also objection to the extent it calls for attorney-client -- disclosure of attorney-client privileged information. You can answer as to your personal knowledge.

THE WITNESS: I can reread that last paragraph of Section 3 if you like, but that's what I recall.

BY MR. MACDONALD:

Q. Okay. You do recall hearing that DOE had concluded that it does not have a legal obligation under the act or the contract to begin disposal of fuel by '98?

A. Yes.

Q. And you don't remember when you may have

BY MR. MACDONALD:
Q. Does DOE -- strike that. DOE is currently continuing plans for acceptance of waste developing program plans for acceptance of waste at Yucca Mountain beginning in 2002, is that correct?
MS. SULLIVAN: Objection. Beyond the scope. You can answer the question as to your personal knowledge.
THE WITNESS: Yes, that's correct.
BY MR. MACDONALD:
Q. In developing those plans, is DOE currently planning to use the approved DCSs for the basis of acceptance starting in 2010?
MS. SULLIVAN: Same objection.
THE WITNESS: We have not had discussions as to how we will begin acceptance in 2010, but we've always believed that the commitment -- we did have a commitment to a legal contractually binding commitment to accept the fuel that is designated on the submitted and approved DCSs.
BY MR. MACDONALD:
Q. Have you participated in any planning or conversations in which DOE discussed modifying the entire DCS and FDS process for acceptance for Yucca Mountain?



A. Yes.
Q. You have participated in discussions about modifying the DCS and FDS process?
A. Yes.
Q. Tell me generally the nature of those conversations or that plan.
A. The contract as it's written is difficult to implement because we do not get a great deal of information from utilities until the last part of the waste acceptance process starting with DCS, FCS, I believe comes in 60 days prior to delivery.
Information on the appendix F would most likely be needed by us in order to select the most appropriate transportation cask, and we would have a desire to try and get some of that information a little bit earlier than 60 days prior to delivery to allow us to operate maybe a little more efficient transportation program.
Q. Would utilities that had allocations in the first 10 years based on the '91 ACR who do not have approved DCSs, will they have acceptance rates assuming repository operation in 2010?
MS. SULLIVAN: Objection. Calls for speculation. You can answer the question.
THE WITNESS: We did not discuss that



issue.
BY MR. MACDONALD:
Q. Have you been involved with presentations, either preparing them or listening to them in which Lake Barrett discussed overhauling the DCS-FDS process?
A. I would not say it in those words, so no.
Q. Well, I apologize, I'm not trying to characterize it. What's a better way to characterize?
MS. SULLIVAN: Objection, vague.
THE WITNESS: We, the waste acceptance team, had discussions with Lake Barrett about what we think we needed for waste acceptance transportation program planning and what was supplied by the current contract. Lake didn't -- I would not say discussed anything but more but listened to what our concerns were.
BY MR. MACDONALD:
Q. Do you know in the current program plan what the rate of acceptance DOE is planning to use for the repository when it opens in 2010?
MS. SULLIVAN: Objection. Beyond the scope. That's covered in another topic, but you can answer as to your personal knowledge.



THE WITNESS: This may sound bad, but I don't usually read the program plans.
BY MR. MACDONALD:
Q. Let me ask it a different way. Do you have any knowledge as to the DOE's plan for the rate at which it will accept fuel beginning in 2010?
MS. SULLIVAN: Same objection. You may answer as to your personal knowledge.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Okay. And tell me what that rate DOE is planning to use when it begins operation in 2010.
A. I will use what I refer to and is commonly referred to in the RW program as a document called a CRD, which is I believe an acronym for Office of Civilian Radioactive Waste Management System Requirements Document.
Q. SRD then?
A. CRD. It doesn't make sense, but it's called a CRD. Stands for Civilian Requirements Document.
Q. Gotcha.
A. This is the overall systems requirements document. That document I believe specifies a design rate for the repository yucca mountain of 4, 6,

12, -- excuse me. 400, 600, 1200, 2000, 3000, starting in 2010 and 2011 being 600, 2012 being 1200, 2013 being -- you understand what I'm saying.
Q. So it's 400, 600, 1200?
A. 2000.
Q. 2000.
A. 3000.
Q. 3000 by the fifth year?
A. Yes.
Q. And then operating at a steady state 3000 going forward after that?
A. Yes.
Q. And what year is the -- what's the most recent CRD document that you're aware of?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
I believe 2001, although it could be 2000.
BY MR. MACDONALD:
Q. And if the program operated with the acceptance rates in the systems requirement document that you're referring to at 400, 600, 1200, 2000, then at 3000 steady state, the DCSs -- the approved DCSs wouldn't fit that schedule, would they?
A. I would say they would fit it very well.
Q. And why would you say that when the DCSs



were submitted based on a schedule that was 400 ramping up to a 900 steady?
A. Because in every year they're less than what the design rate of the facility would be, so they would fit very well in with the design rate of the facility.
Q. If the approved DCSs have a maximum allocation of 900 and you're suggesting the steady state receipt by the third -- oh, I'm sorry. Even by the third year, the acceptance rate would be 1200, how would DOE allocate the additional, in the third year 300, in the fourth year 1100, and by the fifth year the additional 2100 MTU above the 900 MTU on which the DCSs were?
MS. SULLIVAN: Objection. Calls for speculation. You can answer.
THE WITNESS: No decision has been made on that at this point in time.
BY MR. MACDONALD:
Q. No decision is made, but has that issue been considered, to your knowledge?
A. We have had a general discussion on how would we allocate the additional acceptance capacity. No one has recommended -- it's sort of like, we need to think about how we would do this but we have never



done it. It was an issue raised but never discussed or researched or analyzed. It's one of those things we need to do in the future.
Q. And you need to do it because the allocation under the expected planned rate exceeds the DCS -- the rates upon which DCSs were approved?
A. It would need to be looked at depending upon several factors. One of the ones you mentioned is included in that.
Q. What are the other factors?
A. Basically even though we're designing a system to a certain rate, we don't know -- or we won't know until a later point in time what rate we're actually going to be operating under because of the financial considerations that the program is always subject to. Even though we would want to design it to X, based on congressional funding, we may only get half of what we need and we may have to do it at some rate less than X.
Q. Do you have a concern that it will not -- the system will not be able to begin accepting fuel in 2010?
MS. SULLIVAN: Objection, beyond the scope. You may answer as to your personal knowledge.
THE WITNESS: Every year our budget



hearings are difficult, so when it comes to getting the budget, we need to do the job we want to do or are trying to do. It's a concern.
BY MR. MACDONALD:
Q. Do you know if DOE's currently off of its critical path plan for operating in 2010?
MS. SULLIVAN: Objection. Beyond the scope. You may answer as to your personal knowledge.
THE WITNESS: I must admit I know the term critical path, but I don't know what it is specifically.
BY MR. MACDONALD:
Q. Do you know if there have been any slippage in the milestones for accomplishing the 2010 date?
MS. SULLIVAN: Same objection.
THE WITNESS: I don't believe there have since we just issued an SR basically on time and we're moving forward with license application preparation, but I'm not the best person to talk to concerning the critical path. Because as I stated, I've heard the term, I don't know what comprises it, I don't know what the milestones are.
BY MR. MACDONALD:
Q. If DOE's obligation is to accept fuel as

for the acceptance rates contained in this document that formed the basis for the rates contained in the 1988 ACR?"

THE WITNESS: All right. The basis for the rates on page 19 Table 2-2 in the draft 1988 mission plan amendment, or bases are, it's a two-part system with an MRS and repository. Two-part maybe is a poor choice, but it's a system of two MRS and one repository only beginning acceptance in 2003 with all fuel received at the MRS facility, and then 400 MTUs being shipped from the MRS to the repository, the remainder staying in storage at the MRS facility.

It will remain this way with all fuel received at the MRS until 2008, when fuel from nearby reactors will go straight from the reactors to the repository. And then the remainder of the material will still come from the MRS facility.

BY MR. MACDONALD:

Q. Okay. The last portion of that is what I believe you talked about yesterday as the western fuel strategy?

A. Yes. I probably should have said nearby, but it's the same for the purpose I think of our discussion here.

Q. And do you know why this schedule is --



this acceptance rate schedule is based on receipt beginning in 2003?

A. Yes.

Q. Explain why.

A. Yeah. That would be the Nuclear Waste Policy Act amendments of 1987 and it posts linkages on an MRS facility to the, what's designated here or stated here as the first repository.

Q. And when you say established linkages, could you explain more specifically what the linkages are that required a start date of 2003 for the MRS?

A. Yes, I could.

Q. Great. Would you do so?

A. Yes, I will. A certain action at an MRS is linked to an action at the repository. So before one action could happen, something else had to happen. And operations and activities at the MRS were linked to actions or accomplishments at the repository.

Q. Do you remember if one of them was that construction of an MRS could not begin until the NRC had issued a license for construction of the repository?

A. I believe that's correct.

Q. In layman's terms and I'll try to state



that, and please correct me if I'm wrong, that means DOE can't begin to build the MRS until the NRC has licensed the repository, is that correct?

A. I don't think licensed is the correct word. My belief is that it's linked to a construction authorization.

Q. And when you say which is, what is linked to construction authorization --

A. Is that a question?

Q. My question is -- I didn't understand your statement, so I'm saying what is it that was linked to construction authorization?

A. I thought it was -- I would have to see what the amendment act stated to be positive, but I believe it was either acceptance or construction or some activity at the MRS itself. I can amend my answer by reading what's above section 2.4 of the draft mission plan. And it states here, "The construction of the MRS facility may not begin until NRC has issued a construction authorization for the repository."

Q. And you're reading from what page?

A. 18 No. 2.

Q. So until the NRC has issued a construction authorization, do you know if a construction



authorization is different than a construction license?

A. I don't know what a construction license is.

Q. What is a construction authorization?

A. That's a okay or authorization to go ahead to construct a facility.

Q. And that has not occurred at present, has it?

A. No, it has not.

Q. And the other restriction or one of the other restrictions in the 1987 amendments is that an MRS site may not be selected until the Secretary of Energy has recommended the approval of the repository site to the President, is that correct? I'm also reading from page 18.

A. That appears to be correct, yes.

Q. So moving back to the waste acceptance schedule on page 19 at this time, DOE -- this time being 1988 -- DOE anticipated that it could not begin receiving fuel at an MRS earlier than 2003, correct?

A. Yes.

Q. I'd like to ask some questions about the 1991 ACR. Before we go to that, let me just ask you a few questions about the 1990 ACR. There is upward

bounding case and lower bounding case. The upper bounding case has the same acceptance rate as the 1988 ACR with different beginning year of acceptance, is that correct? I'll let you grab the 1988. It should be on page 5.
A. Yes, I believe that's correct.
Q. So the ramp-up and the rate to 3000 MTU is the same in, the year in the 1988 ACR was beginning in 2003 and the year for the 1990 upper bound is beginning in 1998, is that correct?
A. Yes.
Q. Do you know why that changed?
A. Yes.
Q. Could you tell me?
A. Yes. The 1987 Nuclear Waste Policy Amendments Act.
Q. And how did that change between June of 1988 and December of 1990?
A. How did what change?
Q. Well, your testimony I believe is that the reason the dates change from the 1988 ACR to the 1990 upper bound is because of the 1987 amendments. And I thought that you had previously testified, and it would make sense, that the June 1988 ACR was developed with the knowledge and understanding that



the 1987 amendments act had already come into existence.
A. Yes. Maybe I misspoke. I might be getting my '88s and '90s ACRs mixed up here.
Q. Not a problem.
A. The '88 ACR incorporated the Nuclear Waste Policy Amendments Act provisions on an MRS. The one that's referenced in the draft of the 1988 amendments plan. Is that what you're asking?
Q. No. That's what I understood your testimony a few minutes ago, that this 1988 ACR incorporated restrictions from the 1987 amendments act. And I'm now asking why for the next ACR, December 1990, it still gives the source for the rates in the 1990 ACR as the same 1988 draft mission plan, but the year that DOE was planned to begin acceptance has changed to 1998, whereas in the 1988 ACR the beginning date was 2003. And I'm just asking -- I don't understand where that change -- why that change occurred?
A. I think it occurred simply to -- they made an assumption that some of the linkages would be removed by Congress. Or they suggested -- this is a potential rate, considering some of the linkages in place by the amendments act in '87 would be removed.



Q. Okay. So the beginning of acceptance in 1998 in the December 1998 ACR is based on the assumption that Congress would change the law, correct?
A. Yes.
Q. And if Congress didn't change the law, the 19-- if Congress didn't change the 1987 amendments act, removed the linkages, then this schedule could not be accomplished, correct?
A. Yes.
Q. Let's talk briefly about Table 2.2. This shows acceptance beginning in 1998 at a 300 MTU rate ramping up to an 875 rate, is that correct?
A. Yes.
Q. Were these rates also based on the assumption that Congress would change certain of the linkages in the 1987 amendments act?
A. Yes.
Q. So without a change in the law, the schedule in Table 2.2 of the 1990 ACR also could not be accomplished, is that correct?
A. Yes.
Q. Do you know if the 875 rate in Table 2.2 was based on any limitation imposed by the transportation aspect of the delivery of SNF?



A. I believe the 875 was as a direct result of the 10,000-MTU limit on the capacity of the MRS only.
Q. So it didn't relate to transportation concerns, to your knowledge?
A. To my knowledge, it did not relate to transportation concerns.
Q. Let's turn briefly to the 1991 ACR. Ask again, for the record, those rates reflected on page 5 are 400 MTU beginning in 1998 ramping up to a 900 MTU rate, is that correct?
A. Yes.
Q. And like the rates in the 1990 ACR this rate could not be accomplished without a change in the law, is that correct?
A. That is correct.
Q. Is it fair to say that this acceptance rate is not authorized by the statute, okay way of putting it?
MS. SULLIVAN: Objection. Calls for a legal conclusion. You may answer the question.
THE WITNESS: I am not sure I'd use those words, but I would say it's inconsistent with the Nuclear Waste Policy Act as amended in 1987.
BY MR. MACDONALD:

Q. The schedule is inconsistent with the amendments act?
A. I would say that, yes.
Q. What would a schedule that was consistent with the amendment acts have looked like at this time?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge. And objection, vague as to time frame.
THE WITNESS: That would take me a little while. I would have to go through all the specific linkages in the amendments act in 1987 and also the congressional authorization process. So it would probably take me a couple of hours to sit there to do that, and try and determine it. It would take a while. I'd have to read it and then try to understand it and then reread it and try and understand it.
BY MR. MACDONALD:
Q. When would the earliest that, assuming no changes in the law, when, at this time in 1991, what is the earliest that DOE could have begun accepting spent fuel assuming the linkages stayed the same?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal knowledge.



THE WITNESS: I can give you an answer, but it would be speculative again. Because I would have to read the law and the amendments act and the MRS process that's cited therein. There was a nuclear waste negotiator part of it, and it would take me several hours to review all those things and give you what I thought was an accurate answer.
BY MR. MACDONALD:
Q. Would you turn to page 4 of the 1991 ACR and read that middle, the last sentence of the middle paragraph that says, "If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007."
My question is, is that consistent with your understanding of the earliest that DOE could perform if the linkages remained the same?
A. That probably is.
Q. So a schedule authorized or consistent with the amendments act at this time, 1991, would have shown zero MTU in 1998, zero MTU in 1999, zero MTU all the way until 2007 at which time some amount of SNF could have been accepted, is that correct?



MS. SULLIVAN: Objection. Calls for a legal conclusion as to what's allowed by the law. You can answer as to your personal knowledge.
THE WITNESS: Were you asking me a schedule consistent with the Nuclear Waste Policy Amendments Act of 1987 or something else?
BY MR. MACDONALD:
Q. No, that's what I'm asking.
A. I would agree with what you said, then.
Q. That would be a schedule with zero acceptance until 2007, correct?
A. Yes.
Q. If that was the schedule consistent -- that would be a schedule consistent with the '87 amendments act, why didn't DOE publish that as a possible schedule?
A. I believe DOE hoped to have success in finding an MRS and accepting waste at an earlier date.
Q. And that hope was based on Congress changing the law, correct?
A. It was based on several things, amongst which would be Congress changing the law.
Q. And if it was based on, at least in part a requirement that Congress change the law, why didn't



DOE also believe that Congress would change the law to eliminate the capacity limit of the MRS?
MS. SULLIVAN: Objection, vague.
THE WITNESS: Can you say that again for me or can you read it again for me?
THE REPORTER: "Question: And if it was based on at least in part a requirement that Congress change the law, why didn't DOE also believe that Congress would change the law to eliminate the capacity limit of the MRS?"
THE WITNESS: I don't know why they didn't consider removing the -- limit the 10,000 MTU capacity limit.
BY MR. MACDONALD:
Q. In the 1990 ACR which we just talked about, the upper bounding case ramping up to a 3000 rate and beginning acceptance in 1998, that does assume changing the capacity limit and the schedule linkage, is that correct?
A. Yes.
Q. And DOE eliminated that option or that consideration of that schedule when it published the 1991 ACR, correct?
A. Yes.
Q. And you testified earlier that the DCSs

1
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - X
Discovery Judge (Judge Sypolt)
Washington, D.C.
Wednesday, May 15, 2002

Deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been duly sworn by BRYAN WAYNE, Notary Public for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, May 15, 2002, and the



proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 12128
Washington, D.C. 20530
202-305-9640



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| THOMAS POLLOG | |
| By Mr. Skalaban: | 4 |

Afternoon Session - Page 123


E X H I B I T S


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter, 3/1/99, Lester to Stock, Shapiro | 8 |
| 2 - Standard Contract | 127 |
| 3 - Government's Witness List | 167 |
| 4 - Copy of 1990 ACR | 169 |
| 5 - 1991 ACR | 171 |
| 6 - Unspecified Doc., Contains APR | 208 |
| 7 - Nancy Montgomery Document, Identifies 35 Issues With Std. Contract Needing Correction | 251 |


* All exhibits retained by counsel.



P R O C E E D I N G S

Whereupon,
THOMAS POLLOG,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:

Q. Hello, Mr. Pollog. My name is Pete Skalaban. I represent Yankee Atomic, Maine Yankee, and Connecticut Yankee in the spent fuel litigation. I understand you've been deposed twice in the litigation. Prior to that, have you ever been deposed?
A. Three times, and no, prior to that I have not been deposed.
Q. And the three times was in connection with this spent fuel litigation?
A. Yes.
Q. There was a 30(b)(6) deposition on document issues, is that correct?
A. Yes.
Q. There was a 30(b)(6) deposition on certain other issues, is that correct?

reconstituted in a different way, it may have an
effect.
Q. Assuming the failed fuels are put into reconstituted assembly such that it can be handled as any other assembly, then do you see it as a problem of being accepted on the same schedule of other standard fuel?
MR. CRAWFORD: Objection. Mischaracterizes the prior testimony.
THE WITNESS: Most likely not. I don't want see a problem with it. Other factors would have to be looked into, like when it was reconstituted, it was 20 years ago and what the shape is now, but in general I don't see any major concern.
BY MR. SKALABAN:
Q. Now, you said that you've been -- one of the other things you've looked at is failed fuel. Can you tell me about that work?
A. Yes. Standard contract also contains a category of failed fuel. Unfortunately, it doesn't contain criteria for stating whether something is failed or not failed or intact. We would like to be able to give purchasers guidance in that area for making that determination.
Q. So your work in this area is fleshing out



the existing provisions on failed fuel?
A. I would say my work in this area --
MR. CRAWFORD: Objection, vague.
THE WITNESS: I would say my work in this area is from a preliminary stage trying to determine what type of criteria we could possibly put into a contract that would allow the purchasers to make a determination for designated fuel as failed or standard.
BY MR. SKALABAN:
Q. Is any of your work designed to facilitate the acceptance of failed fuel? And you understand that I mean by that?
A. I believe so.
Q. As opposed to just identifying whether it's failed or not.
A. I guess one could argue theoretically if it's easier to identify, it's easier to eventually accept it. So from that perspective, I guess yes it would probably be true.
Q. What are the Department's current plans for accepting failed fuel?
A. Failed fuel will be accepted.
Q. Do you expect it will be accepted on the same schedule as other fuel?



A. Possibly.
Q. And why wouldn't it?
A. If that would present some type of special handling need at a repository. Again, trying to limit to the extent possible occupational exposures seen by individuals working at a receiving facility.
Q. What do you mean by special handling?
A. We will have receiving lines at a handling facility. If incoming waste could be received through one of the normal receiving facilities without any special activity needed to be done, that would be basically normal handling. If it has to be taken off the line and handled in a way other than our normal receipt lines, that would be special handling.
Q. And what is the Department's plans on when fuel that's required to undergo some special handling, when would that be accepted in the schedule?
MR. CRAWFORD: Objection, vague. Foundation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. So your work isn't involved in that in any way?



A. From a receipt at the repository -- I don't know.
Q. How about from a contractual perspective?
MR. CRAWFORD: Objection, vague.
BY MR. SKALABAN:
Q. Do you have any understanding of what happens to fuel that requires special handling under the contract?
A. Yes.
MR. CRAWFORD: Objection to the except it calls for legal conclusion.
BY MR. SKALABAN:
Q. Can you tell me what that understanding is?
A. It's subject to the late acceptance.
Q. It's subject to but not necessarily going to be under delayed acceptance?
MR. CRAWFORD: Objection. Asked and answered. Argumentative and foundation.
THE WITNESS: It's subject to delay but may not necessarily be delayed. It would be dependent upon what the receiving capabilities are at the receipt facility.
BY MR. SKALABAN:
Q. Do you have an understanding of what the

in connection with this?
A. Attending the meetings, developing DOE positions, reviewing DOE positions developed by contractors.
Q. Did you review any utility positions?
A. Yes.
Q. Who were the contractors that were involved in this?
A. Mr. Cole. Mr. Vance, I believe, I'm not positive, but I'm pretty sure. Mr. McDuffy. I believe they were the primary contractors who worked on it.
Q. And how often did you meet with the utilities?
A. Not very often. I think I may have attended three or four meetings over a period of almost two years.
Q. About how much of your time did this ACR -- working in connection with the ACR issue resolution process, how much time did that occupy of yours on a percentage basis, would you say?
MR. CRAWFORD: Objection, vague.
THE WITNESS: It would depend upon the time. When are you specifically asking me about?
BY MR. SKALABAN:



Q. Well, let's start with when you worked in the -- again, worked for Mr. Brownstein in the utility interface logistics branch in 1989.
A. I'm going to approximate 5 to 10 percent of my time on average. Some months maybe 20 percent, some months less than that.
Q. And so when you started to work for Mr. Brownstein in late '90, it was approximately 5 to 10 percent of your time?
A. On average.
Q. How about in '91?
A. Similar.
Q. How about in '92?
A. I don't think I participated in anything in '92 because I was only working for Mr. Brownstein January through March, through late March, and I don't remember participating in any activities with the ACR --
Q. Okay.
A. -- issues resolution team.
Q. That's right. Because you left -- so you think it's January to March '92 you left for Austria?
A. Correct.
Q. So 1992 it wouldn't have been a factor?
A. To the best of my recollection it was not



a factor. Almost three months.
Q. And how about when you came back -- well, actually is the waste acceptance team, is that sort of an evolutionary office to the utility interface and logistics branch?
A. Yes.
Q. So when you came to -- returned to waste acceptance in late fall of '96, there was no ACR issue resolution process ongoing, was there?
A. There was no process ongoing.
Q. So it's fair to say the extent of your involvement in the ACR issue resolution process would have been late 1990 and through 1991?
A. Yes.
Q. And do you recall during this period of late '90 through 1991 about how many meetings did you have with utility representatives?
A. I would say three or four. Could have been as many as five, but I doubt it was any more than that.
Q. Okay.
MR. SKALABAN: Let's mark as Pollog Exhibit 7.
(Pollog Exhibit No. 7 was marked for identification.)



BY MR. SKALABAN:
Q. Are you familiar with this document?
A. No.
Q. You've never seen it before?
A. I have never seen it before.
Q. Does it indicate to you that it was prepared by Nancy Montgomery who, I believe is she now Nancy Slater?
A. Yes. That's why I was chuckling because when I refer to Nancy Slater, it's Nancy Montgomery on this document.
Q. Does this indicate to you that it was prepared by her or under her direction?
A. Under her direction or prepared by her, yes.
Q. And it says here that the Department of Energy has identified 35 issues associated with the standard contract which need to be resolved to ensure that the waste management system can achieve maximum efficiency while attempting to ensure equity among the waste owners. Do you see that in the abstract beginning of this document?
A. Yes.
Q. Is that what your understanding of the permanent of the ACR issue resolution process was?

A. Basically yes.
Q. Do you disagree at all with that sentence?
MR. CRAWFORD: Objection. Best evidence.
THE WITNESS: I'm not sure how much it was to achieve maximum efficiency. It was an arbitrative, but I don't think we ever sought to achieve maximum efficiency.
BY MR. SKALABAN:
Q. Do you know why? Do you have any reason to know why that got into a DOE document?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: No, I don't.
BY MR. SKALABAN:
Q. But it was a DOE objective to achieve efficiency, at least in the '80s and perhaps early '90s?
A. Yes.
MR. CRAWFORD: Objection, vague.
BY MR. SKALABAN:
Q. And would that efficiency extend beyond just DOE's operations and also include utility needs?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Well, it would be good if we could do things that are in both parties' interest



that minimize cost for both the Department and the utilities.
BY MR. SKALABAN:
Q. And at the time of the ACR issue resolution process, or at least your involvement of it in late 1991 -- late '90 and '91 -- was it your understanding that an objective of the Department was to achieve efficiency for both the Department and its operations and in for the utilities and their on-site storage needs?
A. It was a goal that we could do things that would be beneficial to both parties.
Q. If you could look at page 2 of this document, the standard contract issues. See in the second sentence -- well, do you agree with the first sentence?
A. I believe. So I'm not positive about the six months but it sounds right. But I essentially believe it's correct.
Q. Just for the record, that reads, "Since the MWPA required that the contracting process be completed within six months, many outstanding issues still existed when these contracts were signed."
MR. CRAWFORD: Objection to the sidebar, objection to the form.



BY MR. SKALABAN:
Q. Well, do you agree with me I correctly read what the first sentence said here, Mr. Brownstein?
MR. CRAWFORD: Objection to the form of that.
MR. SKALABAN: I'm sorry; I apologize, Mr. Pollog. It's getting a little late in the day.
THE WITNESS: He's a little older than me if you ever met him.
MR. SKALABAN: I do apologize.
BY MR. SKALABAN:
Q. Do you agree with what I just read in the record is the first sentence? Did I correctly state what's here?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Now, the next sentence says, "DOE recognized that the standard contract contained insufficient detail in certain areas to effectively implement the waste acceptance process." Do you agree with that?
A. Yes.
Q. And do you agree that DOE wanted to try to



resolve the issues so the waste management system could achieve maximum efficiency while attempting to ensure equity?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I think DOE wanted to resolve a lot of these issues and be more efficient and ensure equity among the waste owners. The maximum efficiency, I never saw that as one of our overriding goals is to be maximally efficient.
BY MR. SKALABAN:
Q. But to be efficient was?
A. As far as could be achieved while maintaining or assuring equity among the waste owners.
Q. There's a list here of 35 contract-related issues which require resolution prior to waste acceptance. Are you familiar with this list? And take all the time you need to go through it.
A. Yeah. I believe I am. I in the past thought there was 34 and I'm not sure what the 35th one was here. But it's either 34 and there's an error here or they added one they were not aware of at the time. But I'm familiar with most of these issues.

0274
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, May 16, 2002

Continued deposition of THOMAS POLLOG, a 30(b)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Thursday, May 16, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.



APPEARANCES:

On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| THOMAS POLLOG | |
| By Mr. Skalaban | 277 |

Afternoon Session - Page 379


E X H I B I T S


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 8 Annual Capacity Report | 278 |
| 9 Instruction Sheet | 316 |
| 10 Memorandum w/attachment, 9/29/87 | 336 |
| 11 Letter w/attachment, 9/29/87 | 365 |
| 12 Memo, 6/28/91 | 373 |
| 13 Memo, 5/21/91 | 379 |
| 14 Letter w/attachment, 9/25/92 | 405 |
| 15 Letter w/attachment, 9/29/92 | 405 |
| 16 Letter w/attachment, 9/25/92 | 405 |
| 17 Expert Report of Edward C. Abbott | 444 |




P R O C E E D I N G S

Whereupon,
THOMAS POLLOG,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Mr. Pollog, did you have an understanding of whether or not the ACR issue resolution process which you participated in for approximately a year, year and a half, was that binding?
MR. CRAWFORD: Objection, vague. And objection to the extent it might call for a legal conclusion of some sort.
THE WITNESS: I didn't believe so.
BY MR. SKALABAN:
Q. Do you know if anyone at the Department had the opinion that the exchanges and discussions between the utility representatives and the Department representatives were any conclusions that might have been reached between those two bodies was a binding commitment?
MR. CRAWFORD: Objection, vague.

discussions on this issue that it would be inefficient to take half cask loads or partially full cask loads?

MR. CRAWFORD: Objection, vague. Objection, foundation.

THE WITNESS: Yeah, I would say so. In consideration where some other things too.

BY MR. SKALABAN:

Q. What are some of the other things?

A. The contract also allows I think purchasers -- I'll have to read close again to exactly refresh my memory -- a plus or minus 20 percent adjustment in their allocation. I think we had hoped to tie cask grounding up with a plus or minus 20 percent adjustment.

Q. Did you understand that -- was your understanding that provision of plus or minus 20 percent and -- was your understanding of that provision that purchasers had the right to do that?

MR. CRAWFORD: Objection, vague, foundation.

THE WITNESS: I would have to read what the contract exactly says, the text in that area.

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion, sorry, go ahead.



THE WITNESS: What the contract says for that. But I believe that the purchasers have the right to adjust -- and I forget what the impact term is, their allocation, their DCS allocation, or something in the process, make a 20 percent adjustment somewhere along the way.

BY MR. SKALABAN:

Q. Well, let's take out Pollog Exhibit 2 which is the standard contract. If I can refer you to article 5 B, which is entitled delivery commitment schedule.

A. Do you have the page number?

Q. And the page at the bottom is 525.

A. And it was which one again?

Q. It's Roman V B part 2.

A. Right.

Q. Okay. Now, in that part of the contract that I've just referred to says, "Purchasers shall have the right to adjust the quantities of SNF in or HLW plus or minus 20 percent." And it goes on to say until the submission of the final delivery schedule. What was your understanding of that provision?

A. Simply what it says. The purchasers have the right to adjust quantities of SNF by plus or minus 20 percent.



Q. So if a purchaser wanted to up to the point of submitting their final commitment delivery schedule, they could take a DCS and they had the right to adjust the quantity of MTU up or down 20 percent?

MR. CRAWFORD: Let me object to best evidence.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q. Now, this is phrased in terms of the purchaser's right. Did you have any understanding of whether or not DOE could veto that action by the purchaser?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

BY MR. SKALABAN:

Q. I'm asking for your understanding of the contract provision.

A. My understanding is we had no right to veto any such adjustments.

Q. And if the purchaser made that adjustment, where would that ultimately show up, in the final commitment delivery schedule?

A. That's a good question. I don't know. It may show -- it would have to show up in the final



delivery schedule. Whether they would have to identify it prior to that in a revised DCS, I don't know.

Q. Now, if we look at the final delivery schedule provision, are you familiar with that provision? And that is for the record, article Roman 5 capital C.

A. Yes.

Q. Does this provision provide for another negotiation process between DOE and the purchaser?

MR. CRAWFORD: Objection, best evidence.

THE WITNESS: What do you mean when you say negotiation?

MR. SKALABAN: A process of negotiation over a final delivery schedule. Is it your understanding that that's provided for by this provision in the contract?

MR. CRAWFORD: Same objection.

THE WITNESS: If a FDS is disapproved, there is a process for negotiation following that disapproval.

BY MR. SKALABAN:

Q. Now, is it your understanding that -- let me ask you your view. Is there anything in this article V C final delivery schedule which precludes a

the contract?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: DOE disagreed with that interpretation, yes.
BY MR. SKALABAN:
Q. Do you think that's a reasonable interpretation of the contract that those utilities held?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
MR. SKALABAN: Regarding the all SNF?
THE WITNESS: No.
BY MR. SKALABAN:
Q. And why don't you think so?
A. If every purchaser interpreted it that way, in year one every purchaser would expect us to come and we would literally go from zero to 10, 20, 30,000 MTUs in year one of the system. And it's just -- I would say it's impossible for DOE to ramp up from zero to 20,000 MTUs within one given year.
Q. Well, if a purchaser put down as much as they wished to deliver and it was more than DOE wanted to give them, couldn't they engage in a negotiation process?
A. Yes.



Q. Now, is it your understanding that the DCS instructions required that purchasers follow DOE's interpretation of this provision of the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I believe so.
BY MR. SKALABAN:
Q. And perhaps to be a little more clear, it required purchasers to use the allocation that DOE had set in the 1991 ACR for their DCS submittals?
MR. CRAWFORD: Same objection.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And if the purchasers did not follow that instruction, DOE would disapprove the DCSs?
MR. CRAWFORD: Same objection. Best evidence.
THE WITNESS: Possibly.
BY MR. SKALABAN:
Q. Were you involved in the drafting of the DCS instructions?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I believe so.
BY MR. SKALABAN:



Q. What do you recall doing?
A. Similar to what I testified yesterday for the development of the ACR. I would draft a set of instructions from the contract, I would develop them, review them, discuss them with the contractor and/or Mr. Brownstein and other waste acceptance staff and contractors, provided comments, resolved comments hopefully, and then follow a similar pattern to the ACR, production of the ACR.
Q. Do you recall having substantive input on the terms of the instructions?
A. I don't recall at this point in time what my input was to the instructions.
(Pollog Exhibit No. 9 was marked for identification.)
BY MR. SKALABAN:
Q. The court reporter has handed you Pollog Exhibit 9. Can you identify this document for the record?
A. It appears to be the instructions for completing appendix C delivery commitments schedule put out by the Department of Energy. For the purposes of this discussion I'll refer to it as the DCS instructions if everybody's agreeable to that.
Q. Please. On the DCS instructions, can you



look at page 6, and there's a section 2.7, and it refers to metric tons of Uranium. Can you take a moment to review that section?
(Witness reviewing document.)
A. Okay.
Q. Have you had an opportunity to review that section?
A. Yes.
Q. This section instructions 2.7, in your view, is it pretty clear that -- excuse me. In your view it's clear that DOE is saying that if a purchaser exceeds its allocation in the 1991 ACR, DOE is going to disapprove the DCS?
MR. CRAWFORD: Objection, vague, and objection best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And that was your understanding of what was going to happen if a purchaser submitted a DCS that exceeded the MTUs allocation in the 1991 ACR?
A. Yes.
Q. When you were formulating the instructions, do you remember any discussions about whether that was a proper instruction to give the purchasers?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, August 4, 2004
Volume 17

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY:

MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

THE COURT: Another witness today?

MR. STOUCK: Your Honor, I've got a couple of preliminary matters very briefly, if I may. Sorry to interrupt, but it's really just for the record, if I can just stay here. Mr. Lester mentioned a couple of days ago that we had filed a list of all of the documents that had been admitted -- exhibits that had been admitted by the Court, either because they were on one or the other exhibit list and not objected to and, therefore, admitted at the pretrial conference, or because they were admitted during the course of our case.

And he said that he thought the list was fine, if I recall correctly, except there were four documents on there that he, I'm not exactly sure what he said, my recollection is they may have been on the government's list and so forth, but they wanted to withdraw them, and I said I'd take a look at that.

And I just want to address that because the, I've looked at the documents, a couple of them are contracts, one is a contract between Yankee Atomic and Duke Engineering, that's Defendant's 261, one is a contract between Maine Yankee and Securitas,

I also thought, this is interesting, there were a lot of worlds in this case, a lot of scenarios, but I guess we have an additional scenario now where the government came, and we were supposed to pay, but we'll deal with it when we see the papers.

THE COURT: I did ask a couple of questions on the fee in terms of the claim because it concerned me at the time as to what to do with the situation. I didn't know whether I would have to do something sua sponte or raise it, so I'm glad someone has raised the thing formally, and we can resolve exactly what the status is.

Obviously, the issue is, if you don't come, is it an item of damage? I mean, could it be a, or the question is really in the circumstances that we have here, is it owed or isn't it, at this point. Is it an item that you offset against the damages, if there are any damages, or is it something that you could claim independently at this point?

MR. LESTER: And I think, in the motion, we'll talk about it.

THE COURT: Yeah.

MR. LESTER: But it's really the idea, you know, a damages award is to place the Plaintiff in a



position it would have been in had performance occurred. If performance had occurred, the Plaintiff would have had to pay the fee. So by retaining the fee and being able to invest it and make money off of it, it's actually in a better position than it would have been if the Court awards damages, and we compensate the Plaintiff monetarily for the delays, and they're keeping the fee, that would actually place them in a better position than they would have been, so that's the theory.

THE COURT: I take it that's only on two of the claims?

MR. LESTER: Only on two, Yankee Atomic has paid a one-time fee, so it's not an issue in that case.

THE COURT: Well, another issue.

MR. LESTER: Your Honor, I thought things were getting a little dull, and I just wanted to keep it exciting.

THE COURT: Well, I think it's good to raise the issues because, obviously, notice of appeal has been filed in Indiana Michigan, so that's going to the Circuit, and I assume that whatever we do here will end up in the Circuit, unless people decide to settle, which is always an option.



MR. LESTER: And, Your Honor, we are raising the issues in other cases where the fee has not been paid --

THE COURT: So it's a good idea -- right.

MR. LESTER: -- so for consistency's sake, I think it's also important to raise it here.

THE COURT: It's a good idea to get as many issues as we can up to the Circuit in that regard. Okay. Thank you for the information.

MS. SULLIVAN: Your Honor, the government calls its next witness, Thomas E. Pollog.

Whereupon--

THOMAS E. POLLOG

a witness, called for examination, having been duly sworn, was examined and testified as follows:

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Pollog.

A. Good morning.

Q. Mr. Pollog, are you currently employed at the Department of Energy?

A. Yes, I am.

Q. And to what office within the Department of Energy are you currently assigned?



A. I work in the Office of Civilian Radioactive Waste Management, the Office of Systems Analysis and Strategy Development.

Q. What are your current responsibilities?

A. Generally, I'm assigned to implement a standard contract between the Department of Energy and the contract holders.

Q. How long have you been in your current position?

A. Approximately eight years.

Q. So when did you join the Office?

A. The Office I'm currently in? That Office was formed in October of 2002, but my responsibilities were the same in the prior organization.

Q. And when did you join the prior organization?

A. September of 1996.

Q. Prior to September of 1996, did you serve in the Office that had responsibility for the waste acceptance function at DOE?

A. Yes, I did. In 1990, '91 and early '92, I was in the Office that performs the same functions.

Q. Mr. Pollog, do you also serve as the contracting officer's technical representative?

A. Yes, I do, in an unofficial capacity.
Q. When did you assume the responsibilities of the contracting officer's technical representation?
A. When Mr. Zabransky assumed responsibilities of the contracting officer, which I believe was in the summer of 2002, I was unofficially assigned responsibilities of the contracting officer's technical representative.
Q. What are the responsibilities of the contracting officer's technical representative?
A. To provide the contracting officer with any technical expertise or guidance he needs in implementing the standard contract.
Q. To whom do you report?
A. I report to Christopher Kouts.
Q. And to whom does Mr. Kouts report?
A. Mr. Kouts reports to Theodore Garrish.
Q. To whom does Mr. Garrish report?
A. And Mr. Garrish reports to Dr. Margaret Choo, director of our program.
Q. Do you hold a Bachelor's degree?
A. Yes, I do I have a Bachelor of Science in Nuclear Engineering that I received in 1981 from Penn State University.
Q. Do you hold a Master's degree?



A. Yes, I do. I received a Master's of Science from Clemson University in Environmental Systems Engineering in 1988.
Q. Can you pull up Defendant's Exhibit 24, please?
MS. SULLIVAN: Your Honor, may I approach?
THE COURT: Yes, of course.
MS. SULLIVAN: And, Your Honor, I know you usually use the computer, but we're going to use this copy a lot, so I'd like to give copies to you and your clerk as well.
MR. STOUCK: Thank you very much.
BY MS. SULLIVAN:
Q. Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 24?
A. Yes, I do.
Q. Could you tell the Court what this document is?
A. This is the 1991 annual capacity report that was developed by the Office of Civilian Radioactive Waste Management.
Q. What is the purpose, or was the purpose of the -- sorry. And is the annual capacity report commonly referred to as the ACR?
A. Yes, that's how we commonly refer to it.



Q. What was the purpose of the 1991 ACR?
A. It was to provide the contract holders what would be the waste acceptance capacity of the Federal Waste Management System and to provide them also with the allocations that they will need for filling out their delivery commitment schedules.
Q. Were you involved in the preparation of the 1991 ACR?
A. Yes, I was.
Q. And I believe you've already said this, but which office within DOE prepared this document?
A. It was the Office of Civilian Radioactive Waste Management.
Q. Thank you. Did the contracting office have any role in the preparation of the 1991 ACR?
A. Yes, they had a minor role in the preparation of the document.
Q. And what was their minor role?
A. After we had developed a draft version of it, we sent it around to several organizations for comment, and I believe they submitted some minor comments to us on the document prior to its being finalized.
Q. Was the 1991 ACR sent out by the contracting officer?



A. Yes, it was. It was sent out to all contract holders under the signature of the contracting officer.
Q. Mr. Pollog, could I direct your attention to page five of this document, please? Mr. Pollog, what is the information set forth in table 2.1 on page five of this document?
A. These are the projected waste acceptance rates starting in 1998 and going through 2007.
Q. How were these rates developed?
A. They were based primarily on the Nuclear Waste Policy Amendments Act of 1987 and restrictions placed on a monitored retrievable storage system in that Act.
Q. Could we go to Defendant's Exhibit 23? Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 23. Do you recognize this document?
A. Yes, I do.
Q. Could you explain to the Court what it is?
A. Yeah, it's an action memo from Ronald Milner, who is the associate director for the storage and transportation division at that time, to John Bartlett, seeking his approval for the publication of the 1991 annual capacity report.

Defendant's Exhibit 544, which I believe Mr. Stouck maintains his objections, and Plaintiffs' Exhibit 92, which we pulled from the Plaintiffs' may use list.

That is the 1990 ACR. Plaintiffs' objections to Defendant's Exhibit 544 were authenticity and hearsay. I believe Mr. Pollog has authenticated the document and provided testimony as to what it constitutes.

MR. STOUCK: Your Honor, our position on that would be that the Court ought to at least reserve a ruling on admissibility until I get to question Mr. Pollog about it, and then it may be as the Court was intimating, that all this is, is a bunch of arithmetic. And if that's the case, perhaps we can get over the difficulty. But I would like to have a chance to question him before the ruling.

THE COURT: I'll reserve ruling until cross is over on 544.

MS. SULLIVAN: Okay. Do you have any objection to Plaintiffs' Exhibit 92?

MR. STOUCK: No.

THE COURT: Plaintiffs' Exhibit 92 is admitted in evidence.

(Plaintiffs' Exhibit Number PX-92 was received in evidence.)



MS. SULLIVAN: Your Honor, thank you, we have no further questions.

MR. STOUCK: Can we take a short break, Your Honor?

THE COURT: Yes.

MR. STOUCK: 10 minutes.

THE COURT: Okay. Half-past, we'll be back at half-past.

(Whereupon, a short recess was taken.)

THE COURT: Mr. Stouck, whenever you're ready.

MR. STOUCK: Thank you, Your Honor. And I guess what I'd like to propose, if I may, Mr. Pollog has been deposed many times in this case and in common proceedings and in other cases, and there's a lot of material out there, and what I'd like to do is, since he's the only witness the government has scheduled for today, is start a little bit of cross-examination, but then take a lunch break probably earlier than usual.

And if I go back, and even if we take a longer break, since the day seems to be a short one for everyone, I think if it's one of those situations where the more time I can spend organizing the balance of my questioning, I can assure you that it's



going to make it more efficient and shorter.

THE COURT: Whatever is best for your purposes is fine.

MR. STOUCK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Pollog. It's still morning. The questions about the fees which were near the end of your direct examination, I believe you testified, what did you say was the amount that Connecticut Yankee owes under the contract to DOE?

A. I believe the one-time fee, plus interest, as of June 30th, 2004, is approximately $153 million.

Q. You say, "plus interest." Does that figure you're giving include interest or not include interest?

A. It does include the interest.

Q. And interest is included in the other figure you gave for Maine Yankee?

A. That is correct.

Q. And what was that?

A. It was I believe approximately $159 million, including interest.

Q. And how does interest run?

A. I think it's based upon the 13 week T-bill



rate.

Q. From what date?

A. I believe from either when the contract was signed or when they started making their first payment.

Q. In preparing these ACR documents that you testified about, does the Department of Energy use contractors, you know, do contractors participate in the process of preparing these?

A. Yes.

Q. Is Oak Ridge National Lab a part of DOE?

A. Yes.

Q. All right. Just going through your, some of your background here, if I may, if I understood your testimony, in 1990, you were assigned to the utility interface and logistics branch, is that right?

A. Yes, that's correct.

Q. And you reported to Alan Brownstein?

A. That is correct.

Q. And I don't think you said this, but I understand that, in 1992, you took a three-year leave of absence and went to Austria?

A. That's correct, also.

Q. And did not work at all on OCRWM matters?

A. Not directly, no.
Q. And then you returned to DOE in 1995?
A. Yes, that's correct.
Q. You worked in the engineering division?
A. Yes.
Q. And in 1996, I think you did testify you were reassigned to what part of OCRWM?
A. The Waste Acceptance Group.
Q. Which is led by Mr. Zabransky?
A. In 1996, it was led by Mr. Zabransky, yes, that's correct.
Q. And does he not head that team anymore?
A. Well, we don't have teams now. Mr. Zabransky and I perform waste acceptance functions for Mr. Kouts.
Q. In 1996, what, just tell us, what did the waste acceptance team do? Were they accepting waste?
A. No, we managed and implemented the standard contract.
Q. That was the basis for all of that team?
A. Yes.
Q. You had no personal role in drafting the standard contract, of course, since you weren't there at that time, right?
A. Correct.



Q. And you've had no role in drafting or developing TSLCC documents?
A. I've had a minor role. I think I reviewed a couple of them over the years, but I never actually wrote them, but I think I did review draft TSLCCs.
Q. And you had no role in drafting or developing fee adequacy reports, is that right?
A. That is correct. I may have reviewed one or two, but I never actually wrote them, just received draft versions of them, was asked to comment on them.
Q. And you've had no role in drafting any specifications or design requirement documents for the repository?
A. That is correct.
Q. And you don't know why an acceptance rate was not included in the standard contract, isn't that also right?
A. That's correct.
Q. And you don't know whether the issue of an acceptance rate was even raised when the standard contract was negotiated, is that right?
A. I don't think so.
Q. Okay. What's wrong about that statement that I made?



A. I think I saw some correspondence from interested parties or utilities commenting on the first version of the standard contract that was published in the Federal Register, and I think one or two of those may have commented that acceptance rates should have been included.
MR. STOUCK: Actually, could I just pause for one second. I've got a question. Excuse me, Your Honor.
THE COURT: Sure.
MR. STOUCK: All this voluminous material I've been reviewing, I'm trying to boil down. I apologize, Your Honor. I'm sorry, Mr. Pollog. I'll be with you in just a moment.
BY MR. STOUCK:
Q. Let's turn to this, and, again, apologies, I just need a moment here.
MR. STOUCK: Again, Your Honor, forgive me, hold on one sec.
BY MR. STOUCK:
Q. Now, in '90 and '91, Mr. Pollog, when you were reporting to Mr. Brownstein, you had no responsibility to make any determinations about what provisions of the standard contract meant, isn't that right?



A. I didn't hear the last thing you said. Could you repeat that for me, please?
Q. You had no responsibility to make any determinations on what the provisions of the standard contract meant in that time period in '90 and '91, isn't that right?
A. I would provide advice to Mr. Brownstein on any questions he would have, or what I thought my understanding was, of provisions of the standard contract.
Q. But you were not responsible for making the determination about what it meant, isn't that right?
A. Well, the contracting officer is responsible for making the final determinations on what the contract means. Mr. Brownstein would have given advice to the contracting officer, and Mr. Brownstein, on many occasions, asked me what my understanding was of a provision or term of the contract, yes, I mean --
Q. But you were not responsible for making determinations about what the standard contract meant, isn't that right?
A. Again, I think, as I said, I think the contracting officer makes the final determination on what any provision on the standard contract says, on

that are described in the DCSes that were submitted in the '90s? Would that surprise you?
A. No, it wouldn't surprise me.
Q. Would you consider that a reevaluation of those previous DCSes?
A. No.
Q. Why not?
A. I don't.
Q. Can you explain why?
A. I just don't consider that a reevaluation of the DCSes.
Q. Suppose in compliance with these new instructions -- well, let's get them out on the table. Can I have those, so I can introduce them? I'd like to ask you about them, not to keep everybody -- the 1995 ACR is not the last ACR that DOE has published, isn't that right?
A. That is correct.
Q. Right. There's a new one dated July 2004, which just came out this week, or this month, dated this month. This is August, last month, July of 2004. Isn't that right, Mr. Pollog?
A. That's correct.
Q. Were you involved in preparing it?
A. Yes, I was.



Q. What was your involvement in preparing it?
A. I helped draft the document, helped get it through the concurrence process, mail it out to the contract holders.
Q. I've marked it Plaintiffs' 1952. Is this the, does this look like the document we're discussing?
A. Yes, it does.
Q. It's got the date on the front. Can you give us a little more specificity about exactly when this was issued?
A. I believe it was issued in July of 2004. It was sent out in the last week or two of July.
Q. And there were instructions that accompanied this?
A. A set of DCS instructions did accompany this document, that's correct.
Q. I've marked those Plaintiffs' 1953. I'd like to hand those out. Did you have a role in -- well, first of all, let's just identify for the record, Plaintiffs' 1953 is the new instruction. It's a letter addressed to Mr. Michael Thomas, vice president and treasurer of Maine Yankee Atomic Power Company, July 28th, 2004, from Dave Zabransky on DOE letterhead. Do you see that?



A. Yes, I do.
Q. These are the instructions you just mentioned?
A. That is correct. These are the instructions that were transmitted to the contract holders in late July.
Q. And if you turn to page two of this June 2004 annual acceptance rate, you'll see projected waste acceptance rates starting in 2010.
A. Can you tell me where you are again, please?
Q. Page two of the ACR.
A. Of the ACR, sorry, I was in the instructions. Yes, I'm there.
Q. And then on page, those are, what are those rates?
A. They are the projected nominal waste acceptance rates for spent fuel starting in 2010 and going through 2019.
Q. Is that what DOE actually plans to do starting in 2010, is that your understanding?
A. Yes, that is my understanding.
Q. And what's that understanding based on?
A. That's what we're currently planning to do. That's what our system is baselined to.



Q. And the next page is what, page three, what is that?
A. That is table 2, "Summary of Purchaser's Annual Allocations."
Q. Oldest Fuel First allocated in the way you testified on your direct testimony, except with a different ramp-up and acceptance rate, right?
A. And also some minor changes made to reinsertions of some reactor fuel that, in the past, may have been designated as permanently discharged and was reinserted. So there are some minor changes to the actual queue based on the reinsertions.
Q. But just to be clear, for example, if you take a look at page three, if you look at Yankee Atomic, the bottom left there, the 9.9 in 2010?
A. Yes.
Q. That's the same fuel, isn't it, that's on the first box of Yankee Atomic's allocations in the ACRs that we looked at previously?
A. The same fuel that earned the allocation in the boxes we looked at earlier earned this allocation here.
Q. Right. And the instructions that you just sent out, the Department of Energy just sent out, asks utilities -- invite utilities, let's put it that

way, to submit new DCSes, right?
A. Yes.
Q. And they are instructed similar to the '91 or '92 instructions to fill out those DCSes in accordance with the allocations shown on page three in the July 2004 ACR, right?
A. That's correct.
Q. Let's say Maine Yankee were to do that -- or Yankee Atomic's the example. Let's say Yankee Atomic were to fill out a DCS in response to your latest letter, and they write down that 9.9 MTU that's right here in this box on page three, and the Department approves it, okay. Do you think the Department would consider approving it?
A. We'll consider approving it.
Q. Okay. And let's say the Department does approve it. Are you with me?
A. Yes.
Q. Is the previous DCS, and assume there's a previous DCS, I think it's been entered into evidence that Yankee Atomic filled out for that same 9.9 allocation, would you, in my hypothetical where the new DCS is approved, you know, this month, next month, would the prior DCS still be binding, in your view?



A. The commitment the Department made, I think, is still a binding commitment.
Q. Well, why would, why are you asking Yankee Atomic to go through this exercise again?
A. Because not everybody has the same allocation every year, and Yankee's going to have different allocations in other years.
THE COURT: Well, what if they change the assemblies that they listed in the first ACR, and they change to a different 9.9 assembly structure?
THE WITNESS: The assemblies just earn you your allocation, Your Honor. The purchasers can use them as they see fit.
THE COURT: But there's a binding obligation to accept the particular assembly scheduled, in your view --
THE WITNESS: Well, see, the --
THE COURT: -- I take it.
THE WITNESS: The DCS contains a range of assemblies, so the purchasers don't commit to delivering actual assemblies until the Appendix F process, which is 60 days prior to delivery.
THE COURT: So they could switch any time prior to --
THE WITNESS: Yes.



THE COURT: -- delivery?
THE WITNESS: Yes. The Appendix F is where the purchasers actually tell us what specific assemblies they want us to come and accept on that DCS. So they identify in the DCS, here's a range we want to give you. And then they'll further narrow down that process into the Appendix F stage, which comes 60 days prior to, here are the specific assemblies we plan to give you under this allocation.
THE COURT: People testified that one reason the OFF system was used was that that would tend to lower the heat load in the repository if you had Oldest Fuel First, the implication being that the oldest fuel would be delivered first. But that isn't, according to your view, what they would necessarily do?
THE WITNESS: The contract allows the purchasers to submit any fuel or designate any fuel they own for acceptance. Now, the contract further breaks it down. There's something called standard fuel and other than standard fuel.
THE COURT: Right.
THE WITNESS: Standard fuel is fuel that is five years old, or it's older than five years old. The Department, with the contract --



THE COURT: Some of these are way older than that at this point.
THE WITNESS: That's right. Some of it's very old, Your Honor.
THE COURT: Right.
THE WITNESS: The contract gives the Department the ability to delay the acceptance of nonstandard fuel. So, I mean, it's advantageous for the Department in many instances to receive the oldest fuel. But we're designing a system basically to meet the terms and conditions of the contract, which is we may have to take some fuel that's not quite as old as we would like when it actually comes to repository and may need to get stored on-site prior to being placed inside the repository.
THE COURT: So the utilities might want to get rid of their hottest fuel first?
THE WITNESS: That's certainly a concern, Your Honor, because there are instances where they, it may be beneficial for them to get rid of the hotter stuff prior to the older stuff.
MR. STOUCK: Let me just, and, again, Your Honor, I think if I could, if we could take a lunch break, I know I could get a little better organized, but let me just finish up with one thing, and we'll

AFTERNOON SESSION
(2:04 p.m.)
MR. STOUCK: Your Honor, thank you for that. I do hope we can be a little more efficient. I'm just using the last couple minutes of break here. Finishing off the efficiency.
THE COURT: Okay, fine.
BY MR. STOUCK:
Q. Good afternoon, Mr. Pollog.
A. Good afternoon.
Q. Just one, perhaps, minor point that I wanted to clear up from this morning before we move on. You told me this morning that the contracting officer had a responsibility for making determinations about what the standard contract meant. Do you recall that?
A. Yes.
Q. You told me at your deposition, or you told us, Mr. Skalaban's here with me, at your deposition in May of 2002, that it was Mr. Brownstein who had the responsibility to make any determinations on what provisions of the contract meant. Do you recall that?
MS. SULLIVAN: Objection. Can we ask the witness be shown the statement?



MR. STOUCK: I'm asking him if he recalls it. If he recalls it and says yes, then I think we're done.
THE WITNESS: Not specifically, I don't recall that.
BY MR. STOUCK:
Q. You don't recall that testimony?
A. I don't explicitly recall making that statement in my deposition.
Q. Let's show it to you then. In fact, there might be some more testimony, so in an abundance of caution, I will hand out the whole package now. There's a number of depositions, transcripts here, Mr. Pollog. If you would take a look behind tab five -- I'm sorry, that's wrong, behind tab four, on page 63, bottom of 63, the last line of page 60. If you can let me know when you're there?
A. Can you repeat those pages for me again?
Q. Tab four, page 63.
A. Yes, I'm there.
Q. You see there are four on the page, it's actually page 17, but page 63 of the deposition, do you see that?
A. Yes.
Q. Line 25, "Was part of your function, in



working with Mr. Brownstein on these matters, was part of your function reading and trying to understand the standard contract?
"Yes.
"Did you have responsibility to issue or make any determinations on what the provision of the contract meant?"
And your answer was on line nine, "No, Mr. Brownstein may have asked my opinion, but he was the branch chief for logistics and utility interface that was responsible for making the determinations." Do you see that?
A. Yes, I do.
Q. That was your testimony?
A. Apparently so.
Q. That was your testimony then?
A. Yes, it was.
Q. Okay. Now, let's talk a little bit more about DCSes. Is it correct that DOE received some DCS and FDS submittals from utilities in the '98, '99, 2001 time frame?
A. Yes, we did.
Q. And DOE wrote back to those utilities saying it was not approving any DCSes or FDSes at that time, right?



A. Some words to that effect, yes.
Q. And you were not involved in discussions about whether to continue processing DCSes in the fall of '96 or '97?
A. No, I was not.
Q. Right. But you were involved, to some extent, your duties and responsibilities for the waste acceptance and transportation division did involve, to some extent, processing DCSes, is that right?
A. To some minor extent, yes.
Q. Okay. Do you know when the Department stopped processing or stopped reviewing and approving DCSes or FDSes?
A. I believe I do.
Q. When was that?
A. I believe it was either the end of 1996 or in the very beginning of 1997.
Q. And your understanding is that the Department of Energy stopped processing these DCS and FDS submittals to limit its contractual liability, isn't that right?
MS. SULLIVAN: Objection, legal conclusion.
THE WITNESS: I'm not sure.
THE COURT: What's the objection?

MS. SULLIVAN: It was asking for a legal conclusion.
THE COURT: Oh.
MR. STOUCK: I asked for his understanding.
THE COURT: If you have an understanding, you can answer. I'll overrule the objection.
THE WITNESS: I wasn't told that, I don't believe, by anybody, but that was my understanding of the situation.
BY MR. STOUCK:
Q. That was your understanding?
A. I believe that was.
Q. Were you told anything at the time about why the Department of Energy had decided to stop processing and approving DCSes and FDSes?
A. I believe so.
Q. Pardon me?
A. I believe so.
Q. Yeah, you were told that counsel told the Department to stop doing that, is that right?
A. I believe counsel advised the Office of Civilian Radioactive Waste Management and the contracting officer to do that, yes.
Q. Counsel told Mr. Zabransky to do that, and Mr. Zabransky told you that counsel had told him to



do that, is that right?
A. I said I believe they advised us to do it, not told us to do that.
Q. Okay. Counsel advised Mr. Zabransky to stop processing these documents, and Mr. Zabransky told you that counsel had advised him of that?
A. I don't know if counsel advised Mr. Zabransky or other program personnel in RW directly. I don't know how the conversation between counsel and the Office of Civilian Radioactive Waste Management actually occurred, but the bottom line is Mr. Zabransky told me that, on advice of counsel, we're going to stop processing them. I don't know if he was told directly by counsel or through his superiors.
Q. But in any event, the advice came from counsel?
A. Yes.
Q. And the purpose was to limit the Department's liability?
A. That was my understanding.
Q. And you have no personal view on whether stopping the DCS process was a proper thing to do under the contract, right?
A. No, I do not have any personal view.



Q. And Mr. Zabransky also told you that the Department of Energy would not publish an ACR in 1997 because it probably would never be approved by the Office of General Counsel, isn't that correct?
A. I believe that is correct.
Q. Now, we were talking about a sentence in the instructions before lunch, the business about if these circumstances changed, they could be reevaluated. Do you recall that? It's Exhibit Number 030.001, if you want to get that in front of you and take a look at it.
I want to ask you one or two more questions about that sentence. This is on page two, the last sentence of 7C, I believe. Do you recall that?
A. Yes, I recall that conversation we had this morning.
Q. Do you know what the Department of Energy was attempting to convey to contract holders through that sentence?
A. I have no specific recollection of what we were intending to convey in 1992 when we wrote that sentence, no.
Q. Do you know why the sentence was placed in the instructions?
A. I don't recall at this time why it was



placed in the instructions in 1992.
Q. Did you know in 1992?
A. I may have.
Q. But you can't tell us today?
A. I don't recall right now why we did that in 1992, no.
Q. And you didn't recall at your deposition, which was two years ago, either, right?
A. I don't recall if I recalled in my deposition two years ago or not.
Q. Well, let's find out. Take a look at tab five, page, I believe it's 328, but it might be 329, let me just take a look, 330, excuse me, line 10. Let me know when you're there behind tab five.
A. I am there.
Q. "You have no recollection of any discussions about this sentence, and why it appeared in the DCS instructions?" Do you see that?
A. Yes, I do.
Q. And your answer was, "No," correct?
A. That's correct.
Q. So you didn't recall it then, you don't recall it today?
A. That is correct.
Q. Right, thanks. This is just for the

record, this is the May 16, 2002 deposition transcript. All right.
In fact, though, you do know that the Department of Energy originally held the view that DCSes were not binding because circumstances could change with respect to the 1998 date, correct?
A. I've seen language to that extent.
Q. Seen language?
A. Yeah, I think so.
Q. Well, you testified at your deposition that you knew that was a true statement, that the Department held the view at one time that DCSes submitted by purchasers and approved by the Department of Energy based on these instructions were in fact not binding because circumstances changed with respect to the 1998 date, isn't that --
MS. SULLIVAN: Objection, Your Honor, it's unclear whether Mr. Stouck is trying to refresh the witness' recollection or trying to impeach the witness or just wants to discuss with the witness the testimony. May I ask that the witness be shown the deposition testimony that he's being asked about?
MR. STOUCK: If he remembers testifying to that effect, Your Honor, I think we can save time by not doing it. That's what I'm trying to accomplish.



If he doesn't recall, then I'm certainly going to show it to him, but I'd like to know if he recalls holding the view that, or knowing that the Department held that view that these DCSes were not binding.
THE WITNESS: As I stated that I think I've seen that language at some point in time.
BY MR. STOUCK:
Q. You know that the Department held that view at one time?
A. I think that's appeared in some document that we've published in the past.
Q. So you do know that the Department held the view at one time that these DCSes, even though approved, were not binding?
A. I think I've seen that text published in some documents in the past, yes.
Q. And that was the Department's view?
A. That was the view placed in that document, yes.
Q. Of the Department?
A. Of whatever that document was.
Q. So you don't know, as we're sitting here, whether the Department --
A. I would have to see the document to refresh my memory, I guess.



Q. Let's start with your deposition, Mr. Pollog. Again, behind -- and then we'll get to the documents. It's behind tab five again, 332, page 332. It may have bled over to 333, but let's take a look around there, bottom of page 332, line 20.
"Do you know whether the Department ever held the view that DCSes submitted by purchasers and approved by the Department based on these instructions were in fact not binding because circumstances changed with respect to the 1998 date?"
Do you see that?
A. Yes, I do.
Q. And at the top of the next page, you say, yes, you did know, and you went on to explain. But you did know at the time of this deposition that the Department held that view, correct?
A. Yes, and I think I also explained that this was something that came out of the Indiana Michigan case, where we believed that if we had not started commencement of facility operations, we were under no obligation under the contract.
Q. So necessarily, DCS -- that was the Indiana Michigan case from the D.C. Circuit, do you know?
A. I believe so.
Q. Prior to that decision, the Department had



published the view, its view that it had no obligation under the Nuclear Waste Policy Act or these contracts to the utilities in the absence of a repository, is that your understanding?
A. I believe they published something to that extent. I'm not sure of the exact words, but I think they published, we didn't have an obligation to begin in 1998, absent commencement of facility operations.
Q. And prior to the Indiana Michigan decision, that was the Department's view of its obligations?
A. Yeah, that absent the start of or commencement of facility operations, we didn't have an obligation in 1998.
Q. And so necessarily, DCSes submitted before 1996, before the Indiana Michigan decision that we're talking about now, the Department must have viewed those as also conditional in not creating any binding commitments, isn't that right?
A. I don't think so.
Q. Well, let's take a look at what you told us at the deposition.
A. Okay.
Q. Same page, 334 -- I mean, same tab, 334, bottom of page, line 20. Do you see that?
"Necessarily, the DCSes submitted and

approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations?" Do you see that question?

A. I'm sorry, can you read that for me?

Q. Bottom of page 334, line 20.

A. Yes.

Q. "Necessarily, the DCSes submitted and approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations." And then your answer at the top of page 335, "There were, I believe, people who held that view."

A. Yes, I see that.

MS. SULLIVAN: Your Honor, I'm going to interpose the same objection that's there in the transcript of the deposition, that this really goes to the legal conclusion as to discovery of the Department's obligations starting in 1998.

THE COURT: Okay.

MR. STOUCK: That's all I've got there, Your Honor. I think the testimony is fairly clear and putting it all together with the Indiana Michigan decision, but let me move on to something else. I'm happy to do that.



BY MR. STOUCK:

Q. I guess, just to be clear here, let me just ask the question, prior to that Indiana Michigan decision, was it the Department's view that DCSes that were approved were or were not conditionally binding? Were they binding, or were they only binding on the condition that you eventually have a repository?

A. I thought the Department's view was that they were binding.

Q. Can I have Defendant's Exhibit 30.018 and 30.020? Now, Defendant's Exhibit 30.018, if you would look at that one first, do you see that?

A. Which one, please?

Q. It's the one, the bottom right, there's a sticker that says 030.018.

A. 18?

Q. It's a letter from Beth Tomasoni, contracting officer, on Department of Energy letterhead, to Mr. J.M. Buchheit at Yankee Atomic, June 14, 1995. Do you see that?

A. Yes, I do.

Q. And it says, in the last sentence of the first paragraph of that letter, the following: "The proposed delivery date is dependent upon the



existence of an operational repository or an interim storage facility constructed under the Act." Do you see that?

A. Yes, I do.

Q. Was that the Department's view at the time?

A. Yes.

Q. Okay. And on the attached, if you look at the DCS, it's actually stamped on there the same language, "The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the Act."

A. Yes, I see that.

Q. And doesn't that mean that the Department at that time viewed these as conditional, not as binding, but as conditional?

A. I think --

MS. SULLIVAN: Objection, legal conclusion.

MR. STOUCK: I'm asking for his understanding, Your Honor.

THE COURT: Overruled for the understanding, if he has an understanding.

THE WITNESS: I think my understanding was they can view the date as conditional, but not the obligation to take that amount of fuel.

BY MR. STOUCK:



Q. And if you take a look at 030.020, it's got the same language, and you would say the same thing?

A. Let me read it first, okay?

Q. Sure, I'm sorry. I'll show you the language. It's the last sentence of the first paragraph and then the stamped legend on the exhibits.

A. Yes, it says the same thing.

Q. DOE received a final DCS submittal from Maine Yankee requesting that its fuel be taken in three years, faster than the allocations that were shown in the then current ACRs, isn't that right, do you recall that?

A. No, I don't recall that.

Q. You don't recall that?

A. No, I don't.

Q. Let me have 29.005. We had some testimony about something similar from Yankee Atomic, I think, but this is a letter from Mr. Michael E. Thomas, vice president, on Maine Yankee letterhead, to Ms. Beth Tomasoni, contracting officer, Department of Energy, May 11, 1998. Is that what you have before you?

A. Yes, I do.

Q. Okay. And if you look sort of at the second half of the first paragraph there, it says,

"Notwithstanding the provisions of the approved delivery commitment schedule by this letter, Maine Yankee is requesting an allocation for a larger quantity of acceptance than specified in the final delivery schedule." The phrasing is a little awkward, but the request is based on shutdown priority and so forth. Do you see that?

A. Yes, I do.

Q. Do you recall it now?

A. Vaguely, now, yeah.

Q. What do you recall about it? Do you recall that after you and Mr. Zabransky stopped laughing about this, Mr. Zabransky directed that the standard form response go out?

A. Yes.

Q. You do recall that?

A. Yes.

Q. Why were you laughing?

A. It was an issue we had discussed several times with different parties, and they keep coming back and asking us the same questions. We tell them, The answer hasn't changed from the last time you asked us, it probably won't change the next time you ask us. So our lives are a little tedious sometimes, and sometimes we look for little things like this to



make our day a little brighter.

And this served the purpose that day. It made our day a little brighter because it's a topic we opined on many times with different parties. They seemed to not like the answer and kept asking us the same question.

Q. And you thought that was funny?

A. Yeah, at times, it was humorous.

Q. And DOE did not consider at all the approval or disapproval of this final delivery schedule, isn't that right?

A. That's correct.

Q. And in 1997 or 1998, the Department sent all three Yankee facilities letters saying DOE would not consider any further DCS or FDS submissions, correct?

A. I have no specific recollection of that, but I would not be surprised if that happened.

Q. Those letters went out to many utilities?

A. Not many, but they went out to quite a few utilities.

Q. That was the Department's position at that time, was that you were not going to consider any further DCSes or FDS submissions, isn't that right?

A. That's right.



Q. Okay. And it was your view at the time -- let me ask it this way, it is your view that once DOE stopped processing DCSes, it stopped. It had no further obligations to Yankee Atomic, is that right?

A. Yes.

Q. So DOE has no obligations to Yankee Atomic, assuming there's no approved DCS in these years, in 2002, 2003, 2004?

MS. SULLIVAN: Objection, legal conclusion.

MR. STOUCK: I'm asking for his understanding.

MS. SULLIVAN: That's fine with that clarification. That wasn't in the original question.

BY MR. STOUCK:

Q. That's your understanding?

A. Yes, that is my understanding, assuming that they had indeed allocations for the years you mentioned in your question.

Q. And if DOE did not begin performing until 2025, then it's your understanding the Department would still have no obligation to Connecticut Yankee, Yankee Atomic or Maine Yankee, beyond an obligation to pick up the fuel that's described in approved delivery commitment schedules, is that right?

A. Yes, that's correct.



Q. So your view is that, by stopping the approval of the DCSes, your understanding is that the Department could unilaterally cut off its obligations to all purchasers, correct?

A. Yes.

Q. What is that based on, Mr. Pollog? Is that based on the contract instructions we've talked about or some language in the contract? Where does it say, this is my question, that the approved DCSes are the limit of DOE's obligation?

A. Can you repeat that again? Because I didn't quite catch the last part of your question, that was confusing me a little bit.

Q. As I understand what you're saying, DOE is obligated to pick up spent nuclear fuel that's described in an approved delivery commitment schedule, right?

A. I think I've testified to that, yes.

Q. And your understanding is, if there's spent fuel out there that is not described in an approved delivery commitment schedule, then DOE has no obligation to pick that up?

A. Yes, that was my belief.

Q. Skip over the first part. Let's assume you're right, that they have an obligation to pick up

Q. And you don't know why the Department of Energy did not consider the possibility that Congress might remove the capacity limitation in preparing the '91 ACR?
A. No, I do not know why Congress would or would not consider that.
Q. Just one more set of questions about this, if I could have Plaintiff's 54, please? This is the June '88 annual capacity report.
THE COURT: Do you know why DOE, in the '91 ACR, set forth a constant rate, rather than say -- I take it that the reduction in rates was because of the capacity limitation in the MRS.?
THE WITNESS: That's correct, Your Honor.
THE COURT: So why would there be a constantly lowered rate instead of just filling it up quickly and letting it sit there?
THE WITNESS: Because I believe that would just have been probably quite a bit of a waste of resources in the sense that you would move all of this fuel and have to procure all this transportation cask and transportation equipment to move a large amount early on, and then when you'd reached your 10,000 metric ton limit the materials, the casks, the equipment would all just sit idle, including handling



facilities and potentially people at the facility.
So instead of buying the lot and using it for a couple years and then letting it sit for whatever period of time it may be, try and spread out the movement of the fuel, the acceptance, over a longer period of time, so it just allows you a better use of your equipment. You don't have to buy as much stuff if you're moving a little bit every year, as opposed to a lot earlier and then letting it sit.
THE COURT: All right.
BY MR. STOUCK:
Q. This is Plaintiff's Exhibit 54. But just in further response, or relevant to, I think, the Court's questions, Mr. Pollog, the Department could not, the Department in 1998 could not have picked up 400 tons under the linkages that were then part of the Amendments Act, isn't that right?
A. Yes, that is correct. With the, if we maintain, or if Congress maintained the current linkages that were in the Nuclear Waste Policy Amendments Act of 1987, we could not have picked up the 400 tons in 1998.
Q. And probably could not have picked it up until three years before 2010 or thereabouts?
A. Or thereabouts, yes, without any



Congressional relief.
Q. Do you recognize this document that's been marked as Plaintiff's 54?
A. Yes, I do. It's the 1988 annual capacity report produced by the Office of Civilian Radioactive Waste Management.
Q. And June '88 is after the enactment of the '87 Amendments Act, right?
A. I believe so.
Q. So those linkages we talked about were in force when this document was issued?
A. Yes, I believe so.
Q. Take a look at page five, please. There's a table 2.1, illustrative waste acceptance schedule. Do you see that?
A. Yes, I do.
Q. And it shows 2003, 1,200 MTU; 2004, 1,200 MTU; 2005, 2,000 MTU; 2006, 2,000 MTU; 2007, 2,700 MTU; and 2008, 3,000 MTU. And isn't it correct that this document reflected the Department of Energy's view of how the program was going to be implemented with an MRS and with repository and with the schedule linkages in place?
A. Can I just have a moment to read this?
Q. Sure. Please take all the time you need,



but not to, if you look at the top of the page, it may help you. The first new sentence on page five says this: "Although the draft mission plan amendment projects a five-year delay in WMS operation, the projected waste acceptance rate has been increased because it is assumed that the MRS facility and the repository will commence operation simultaneously."
So maybe that's helpful, maybe it's not, but take whatever time you need and let me know when you're ready for a question.
A. Yes, it appears -- if you're ready.
Q. Okay. So do you remember the question?
A. I think so. This schedule assumed that both the MRS and the repository would be starting at the same time, is that correct?
Q. This, no, my question was -- well, let's have it read back, rather than trying to rephrase it. I think I --
(The reporter read the record as requested.)
THE WITNESS: I believe that's correct, yes.
BY MR. STOUCK:
Q. And so in 1990, you don't know what led the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_______________________________________

TENNESSEE VALLEY AUTHORITY, )

Plaintiff, ) Case No. 01-249C

v. )

THE UNITED STATES, )

Defendant. )

_______________________________________

Courtroom 4

National Courts Building

717 Madison Place NW

Washington, D.C.

Tuesday, July 12, 2005

Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

you.
THE COURT: Mr. Pollog, do I have your name correctly?
THE WITNESS: Yes, Your Honor.
THE COURT: Ms. Snyder, are you ready to call Mr. Pollog?
MS. SNYDER: Yes, Your Honor. The government calls Mr. Thomas Pollog.
THE COURT: Thank you. Mr. Pollog, if you would approach the bench and if you would raise your right hand to be sworn as a witness?
Whereupon--
THOMAS POLLOG
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE WITNESS: Yes, I do.
THE COURT: Please be seated in the witness stand. And, Mr. Pollog, before Ms. Snyder begins, would you please state your full name for the record?
THE WITNESS: Thomas Edward Pollog.
THE COURT: Thank you.
MS. SNYDER: Your Honor, may I approach the witness, please?
THE COURT: Yes, certainly.
MS. SNYDER: Thank you.



THE COURT: While we're getting organized, Mr. Small, Mr. Shea, whose witness is this?
MR. SMALL: I'll be handling this witness, Your Honor.
THE COURT: Thank you.
DIRECT EXAMINATION
BY MS. SNYDER:
Q. Good morning, Mr. Pollog.
A. Good morning.
Q. You've stated your full name for the record, is that right?
A. Yes.
Q. All right. Are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And what office within the Department of Energy are you currently assigned?
A. I am in the Office of Civilian Radioactive Waste Management and, within that, the Office of Systems Analysis and Strategy Development.
Q. And what are your current responsibilities?
A. I work in the waste acceptance area. I'm the contracting officer's technical representative, assisting in the implementation of the standard contract.



Q. Do you have a position title?
A. Yes, nuclear engineer.
Q. And how long have you been in that position?
A. Within the current organization, for almost three years, but performing the same function in our prior organization, which was prior to our reorganization, since 1996.
Q. So approximately eight years?
A. That's correct.
Q. And when did you join the office?
A. The Office of Civilian Radioactive Waste Management?
Q. Yes.
A. 1988.
Q. And prior to September 1996, did you serve in the office that had responsibility for waste acceptance function at DOE?
A. Yes, I had a period from 1990 to 1992, I was performing a similar role.
Q. And did you have similar responsibilities during that time period?
A. Yes, I did.
Q. And were you a nuclear engineer also?
A. Yes.



Q. And from 1992 to 1995, you took a leave of absence from DOE, is that right?
A. That's correct.
Q. And where did you go?
A. I went to the International Atomic Energy Agency in Vienna, Austria.
Q. And just briefly, what were you doing there?
A. The regulations that govern the transportation of radioactive material throughout the world are based on the IAEA recommendations. The IAEA was undergoing a major revision to the transportation regulations, and I was on a leave of absence supporting the IAEA activities in developing the new transportation of radioactive material regulations.
Q. And you returned to DOE in 1995, is that right?
A. That's correct.
Q. And you were assigned to what division when you immediately returned in 1995?
A. The engineering division.
Q. And you currently also serve as a contracting officer's technical representative, is that right?

A. That's correct.
Q. And when did you assume those responsibilities?
A. I believe it was 2002.
Q. And can you describe what responsibilities you have in that position, please?
A. I provide technical advice to the contracting officer on all issues related to the standard contract.
Q. And who do you report to directly?
A. My immediate superior is Christopher Kouts.
Q. And Mr. Kouts reports to whom?
A. I believe he reports to Mr. Paul Golan.
Q. And what is his position?
A. He is the principal deputy director for the Office of Civilian Radioactive Waste Management.
Q. And turning briefly to your educational background, do you hold a Bachelor of Science?
A. Yes, I have a Bachelor of Science in nuclear engineering from Penn State University, that I received in 1981.
Q. And do you also have a Master's degree?
A. Yes, I have a Master's of Science in environmental systems engineering, which I received from Clemson University in 1988.



Q. Any other further educational degrees?
A. No, I do not.
Q. Mr. Pollog, would you turn to Defendant's Exhibit DX-76, please? And you'll find that both in the materials that I handed you, as well as on the screen, whichever is more convenient for you. Do you recognize the document?
A. Yes, I do.
Q. What is this?
A. This is the 1991 annual capacity report.
Q. And what was the purpose of this report?
A. This document was to provide all contract holders with their allocations that they would use to begin submitting delivery commitment schedules to the Department.
Q. And were you involved in the preparation of DX-76, the 1991 annual capacity report?
A. Yes, I was.
Q. Would you please describe your involvement to the Court?
A. I had the primary responsibility for having this document completed, published, and approved within the Department.
Q. And who had final responsibility for approving the document?



A. Well, that would have been my boss at the time, Mr. Brownstein, who assigned me the task, and then ultimate responsibility would have been with our director at the time, which would have been Mr. John Bartlett.
Q. And which specific office within DOE prepared this document?
A. This was prepared by the Office of Civilian Radioactive Waste Management.
Q. And do you sometimes call that OCRWM?
A. Yes, we do.
Q. All right. So if we call the office OCRWM, you'll recognize what that means?
A. Yes, I will.
Q. All right. Thank you. What role did the contracting office have in preparing the 1991 annual capacity report?
A. They had a minor role. As part of the approval process, we sent this document out to various parts of DOE. Basically, the organizations that were affected, we sent it to them for their comments. We received comments from them and would have resolved those comments prior to its publication.
Q. And was it published as an official DOE



document?
A. Yes, it was.
Q. And was it sent to contract holders?
A. Yes, it was.
Q. And who at DOE sent out the 1991 annual capacity report to contract holders?
A. It would have been sent out under the signature of the contracting officer.
Q. Would you please go to page five of DX-76? And would you please tell the Court what information is set forth in table 2.1 on page five?
A. These are the projected waste acceptance rates that the Department planned to operate under.
Q. And how were these rates developed?
A. They were developed to be consistent with the 1987 nuclear -- the Amendments Act to the nuclear waste -- the Nuclear Waste Policy Amendments Act of 1987.
Q. And you said that they were designed to be in compliance with the Amendments Act. What do you mean by that?
A. The '87 Amendments Act had a 10,000 metric ton capacity limit on a MRS, monitored retrievable storage facility, prior to operation of the repository in it, and we intended to comply with that

THE WITNESS: Yes, Your Honor, that's fine with me.
THE COURT: All right. Thank you very much. We're in recess for one hour.
(Whereupon, at 12:32 p.m., a lunch recess was taken.)



AFTERNOON SESSION
(1:32 p.m.)
THE COURT: Mr. Small, I believe when we took our luncheon break, you were about ready to cross-examine Mr. Pollog.
MR. SMALL: That's correct, Your Honor.
THE COURT: You may proceed.
CROSS-EXAMINATION
BY MR. SMALL:
Q. Mr. Pollog, the first thing I would just like to ask a couple questions about would be the rates that appear in the 1991 annual capacity report, which was DX-76. Do you recall that document, sir?
A. Yes, I do.
Q. Okay. And the acceptance rates in that document were 400 for the first year, 600 for the second year, and then 900 for the remaining years of the first 10 years, is that correct?
A. Yes, that's correct.
Q. Now, if I understand things correctly, in your testimony, there was the '87 amendments to the Nuclear Waste Policy Act that led to those 1991 ACR rates, is that correct?
A. They led to the 1991 ACR rates, yes.
Q. Now, in 1995, DOE published a combined



acceptance priority ranking and annual capacity report, is that correct?
A. Yes.
Q. And the rates in that report were the same as the rates in the 1991 annual capacity report, correct?
A. Yes.
Q. Okay. And I believe, if I recall correctly, I made a note, your testimony was that there was no reason to change the rates?
A. I believe I said no reason or no basis to change the rates.
Q. Okay. But now, the 1991 ACR rates contemplated a system beginning with an MRS, didn't it?
A. Yes.
Q. Okay. But by 1995, hadn't the MRS concept been discarded?
THE COURT: Ms. Snyder?
MS. SNYDER: I'm sorry. Objection, foundation, assumes facts not in evidence. I'm sorry.
THE COURT: Overruled. You may answer.
THE WITNESS: Okay. Not fully, partially, but not fully.



BY MR. SMALL:
Q. There was no MRS included in the 1995 TSLCC, was there?
A. I don't know.
Q. Now, in the 1995 APR/ACR, there was some discussion about updating that document, wasn't there?
A. I believe so.
Q. I believe you read some of that discussion in your direct testimony, didn't you?
A. Yes.
Q. About how it was going to be kept updated annually through a loose-leaf publication system?
A. Yes.
Q. Was it kept updated annually through a loose-leaf publication system?
A. Annually, no.
Q. Was it ever updated at all prior to 2004?
A. We never completed another ACR in the period between '95 and 2004.
Q. And that's because your understanding that the office of general counsel probably would not approve publication of an ACR?
MS. SNYDER: Objection, Your Honor, speculation.

THE COURT: The objection is overruled, to the extent, Mr. Pollog, you can answer the question of your own personal knowledge.

THE WITNESS: That is consistent with my personal knowledge, yes.

BY MR. SMALL:

Q. That is consistent with your personal knowledge?

A. Yes.

Q. Okay. And in fact, your boss told you, your boss, Mr. Zabransky, told you that the Department of Energy would not publish an ACR in 1997 because it probably would never be approved by the general counsel, is that correct?

THE COURT: Ms. Snyder?

MS. SNYDER: Objection, assumes facts not in evidence.

THE COURT: Well, I think that's exactly the point of the question, to get some facts in evidence.

MR. SMALL: Your Honor.

THE COURT: Yes, Mr. Small, the problem is the way you framed the question. I'm not having any difficulty with Ms. Snyder's objection. I'm having difficulty with another ground for objection to the



question that is not yet stated. I hate to -- Ms. Snyder?

MS. SNYDER: Your Honor, it calls for hearsay.

THE COURT: Yes, it does. Sustained on that ground.

BY MR. SMALL:

Q. Mr. Pollog, I'd like to call your attention to an exhibit that was marked during your direct examination, Defendant's Exhibit 78. Do you have that, sir?

A. Yes, I do.

Q. Defendant's Exhibit 78 is a December 20, 1991 memorandum recommending approval for publication of the 1991 ACR?

A. Yes.

Q. Okay. And did you work on this document, Defendant's Exhibit 78?

A. I was involved in its preparation. I'm not sure exactly what I did, but I was most likely involved somehow in it or may have given an initial draft, may have reviewed an initial draft. I somehow saw this document in the preparation process.

Q. Are you familiar with it?

A. Yes.



Q. I'd like to draw your attention to page two of the document, the last sentence in the first paragraph there, the sentence reads, "While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998." Do you see that sentence, sir?

A. Yes, I do.

Q. Are you familiar with it?

A. Yes, I am.

Q. The reference to the rate being theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage, that's a reference to an important goal of the program, wasn't it?

A. At times, it was stated as one of the goals of the program. I'm not sure, at this point in time, it was one of the important goals of the program, but historically, if you look at all the documents the program produced and all the goals we had at periods of time, I think that was stated at certain points in time to be a goal of the program.

In 1991, when this was written, I wouldn't call it an important goal. It was something that



would have been good to do, but it wasn't something that we actively sought to do.

Q. Okay. Nevertheless, the memorandum though states that that rate was selected because of that purpose, isn't that correct?

A. That's what the words say, yes.

Q. Well, do you have any reason to believe that that's inaccurate?

A. No, but I believe what I testified to earlier, the primary rate the goals were selected were in compliance with the 1987 Amendments Act, and in addition to meeting the 10,000 metric ton limit, it also achieved this, the primary reason for selection was compliance with the Amendments Act of 1987.

Q. Okay. Now, this goal of eliminating additional at-reactor, out-of-pool storage starting in '98, how would that be achieved at the rates stated in the '91 ACR?

A. I'm not sure what you're asking me. Can you help me a little bit?

Q. Okay. How would that be achieved by the utilities, the meeting of that goal, no additional at-reactor out-of-pool storage beginning in '98, given the rate that was stated in the '91 ACR?

A. I believe the rates that were stated in the '91 ACR provides sufficient capacity in the aggregate for the utility industry, that they would not need to build additional at-reactor storage if they were to trade amongst themselves, so people who needed storage could have traded with people who did not need additional storage.
Q. Thank you, sir. And I take it that that analysis was performed for the first 10 years since that was the time period for those rates?
A. That is consistent with my memory.
Q. Would the 900 rate present the need for additional storage if that was the rate that continued until end of program?
A. I don't recall ever seeing an analysis of that.
Q. Well, sir, earlier, you testified, I believe, that the industry was generating -- discharging about 2,000 tons a year, is that correct?
A. Yes.
Q. So if pickups were only 900 tons a year, then the capacity that the utilities had would run out at some point in time, correct?
A. Assuming no changes to their pools, no shutdowns, no changes in spent fuel management, yes,



that's probably correct.
Q. And all of those things that you just mentioned could affect future discharges, correct?
A. I'm not sure they would affect future discharges.
Q. Those combination of things would affect the need for additional storage capacity?
A. Yes, I would agree with that.
Q. Now, in your direct testimony, I believe you stated that, in the aggregate, an acceptance rate of 2,100 tons a year would keep up with discharges, is that correct?
A. Yes, I did. Yes.
Q. Would that also eliminate the need for, in the aggregate, additional storage?
A. Theoretically, it should.
Q. Okay. Again, that would be assuming exchanges among utilities?
A. Yes.
Q. Does DOE have a preference in how the spent nuclear fuel transportation system is run?
MS. SNYDER: Your Honor, objection, outside the scope of direct.
THE COURT: Just a moment. It's not, the question is not outside the scope. I want to check



something.
MS. SNYDER: Your Honor, also calls for speculation on the part of DOE.
THE COURT: Now, that it might. Again, just let me look at something, please. Overruled. You may go ahead and answer.
THE WITNESS: I don't really do much with the transportation program right now. I haven't for several years. It is my understanding, in the past, DOE had expressed a preference for doing rail transportation, if that's what you're asking.
BY MR. SMALL:
Q. Thank you, sir. I'd like to now turn my questions to what in your direct testimony you referred to as the DOE model. Do I correctly understand that you did some DOE model runs specifically for this litigation?
A. Yes.
Q. And who were those runs done for, do you know?
A. I was directed to do them, or asked to do them by the Department of Justice.
Q. Do you know, who did you give them to once you had them done?
A. I believe Sharon Snyder.



Q. Do you know what was eventually done with those runs?
A. No, I don't.
Q. Do you know the purpose for which you were asked to do those runs?
A. Basically, yes.
Q. What was the purpose?
A. It was to evaluate when the TVA facilities would need to go to dry storage.
Q. Now, did you do those runs at any specific acceptance rate?
A. No.
Q. Okay. Let me back up, I suppose, and ask this question. When we talk about doing a run, what does the "run" consist of in terms of output information?
A. Projected future discharges of spent nuclear fuel by the utility industry.
Q. Only projected discharges?
A. For what we did involving this case for this trial, yes.
Q. Okay. Did you do two different kinds of discharges, one using what's been called TVA projections and another called DOE projections?
A. Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 15, 2006

VOLUME 12

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.
BEFORE: THE HONORABLE JOHN P. WIESE



APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD,, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
(202) 663-8063



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)



P R O C E E D I N G S
\- - - - - -
THE COURT: We can go on the record. Any preliminary matters? Mr. Tomaszczuk.
MR. TOMASZCZUK: None from the plaintiff, Your Honor. Good morning.
THE COURT: Ms. Herrmann, good morning.
MS. HERRMANN: Good morning, Your Honor. None from the Government.
THE COURT: Very well. Then we will move on with the Government's next witness. Is that right?
MS. SULLIVAN: Yes. Good morning, Your Honor.
THE COURT: Good morning.
MS. SULLIVAN: We'd like to call Mr. Thomas Pollog to the stand.
THE COURT: Mr. Pollog. Will you take the stand for us, please. And the reporter needs to know that the questioning will be by Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
Whereupon,
THOMAS E. POLLOG

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

THE COURT: Please be seated. I would like you to state your name in full, spell your last name, and give the reporter your home address.

THE WITNESS: Thomas Edward Pollog, P-O-L-L-O-G.

THE COURT: And I'm going to ask you to back away from the mic just a little bit.

THE WITNESS: My home address is 4208 40th Street North, Arlington, Virginia 22207.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Mr. Pollog, good morning. Where are you currently employed?

A I'm employed at the Department of Energy in the Office of Civilian Radioactive Waste Management.

Q And what position do you currently hold at DOE?

A I'm a nuclear engineer in the Office of Waste Management.

Q How long have you been in your current position?



A In -- as the current organization is structured, probably 6 months, but performing the same function since 1996.

Q What are your current responsibilities?

A Assist in the implementation of the Standard Contract with the utilities.

Q Do you also serve as the contracting officer's technical representative?

A Yes, I do. On an unofficial basis.

Q And when did you assume the responsibilities of the contracting officer's technical representative?

A I believe that was in 2002.

Q And what are the responsibilities of the contracting officer's technical representative?

A To provide the contracting officer technical advice concerning implementation of the terms and conditions of the contract.

Q To whom do you report?

A Christopher Kouts.

Q And would you please describe briefly your post-high school educational background.

A Yes. I received a bachelor of science degree in nuclear engineering from the Pennsylvania State University. I received a



master's of science in environmental systems engineering from Clemson University.

Q And when did you receive those degrees?

A I received my bachelor's in 1981 and my master's in 1988.

Q After graduating, receiving your master's in 1988, where were you employed?

A I accepted a position in the Office of Civilian Radioactive Waste Management.

Q And which -- was there a specific office within the Office of Civilian Radioactive Waste Management?

A Yes. I was in the systems development branch.

Q And what were the responsibilities of that office?

A To develop systems to assist the utilities in spent fuel management.

Q And how long were you in that office?

A For approximately 6 months.

Q And then where did you go?

A Then I was assigned in the systems integration branch. I was in that position for approximately about a year, year and a half. And in that position, we developed the technical



baseline for the -- our program.

Q And after you left -- and when did you leave the systems integration branch?

A In middle or latter part of 1990. And then I joined the utility interface and logistics branch, which is -- performed the waste acceptance function for the organization. So I was moving waste acceptance issues from that point on, until 1992.

Q And where did you go in 1992?

A I took a three-year leave of absence from the Department of Energy and accepted an assignment with the International Atomic Energy Agency in Vienna, Austria. And that lasted until the end of 1994.

Q And at the end of 1994, did you return to DOE?

A Yes, I did. I returned to the engineering division, which we were responsible for producing technologies for use by -- for our program. Essentially I was working on the cask development program and the MPC program.

Q And how long were you with that office?

A Approximately a year and a half.

Q And then where did you go?

A I went back to working in the waste acceptance area.

Q And is that the position that you've held to the present day?

A Yes.

Q Thank you. Mr. Pollog, I would like to hand you Plaintiff's Exhibit 56.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Yes, you may. I think we have 56 memorized. All of us do.

MS. SULLIVAN: We should. It's the contract.

And, Your Honor, 56 of course has been admitted.

BY MS. SULLIVAN:

Q Mr. Pollog, would you identify Plaintiff's Exhibit 56 for the record.

A Yeah. It is a copy of the contract for disposal of spent nuclear fuel and/or high-level radioactive waste between United States Department of Energy and Northern States Power for their Prairie Island nuclear generating plant.

Q Mr. Pollog, can I direct your attention to page 10 of the Standard Contract. And can I



ask you to read paragraphs 5(a) and 5(b) into the record?

A Beginning on April 1st, 1991, DOE shall issue an annual Acceptance Priority Ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V, and paragraph B.3 of Article VI hereof.

(b): Beginning not later than July 1st, 1987, DOE shall issue an Annual Capacity Report for planning purposes. This report shall set forth the projected annual receiving capacity for DOE facilities and the annual priority ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for 10 years following the projected commencement of the operation of the initial DOE facility.

Q Mr. Pollog, have you been involved in DOE's efforts to implement these provisions of the Standard Contract?



A Yes, I have.

Q How have you been involved?

A I was involved in producing the first APR, Acceptance Priority Ranking, and also the 1991 Annual Capacity Report, and the 2004 Annual Capacity Report.

Q And the 2004 Annual Capacity Report, was it also an Acceptance Priority Ranking?

A Yes.

Q Mr. Pollog, could I direct your attention to page 11 of the Standard Contract. Would you please read paragraph B1 into the record.

A Delivery Commitment Schedules, in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by purchaser. After DOE has issued proposed Acceptance Priority Ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1st, 1992, purchaser shall submit to DOE Delivery Commitment Schedules which shall identify all SNF and/or HLW the purchaser wishes to deliver to DOE beginning 63 months thereafter. DOE shall approve or disapprove such schedules within 3 months after



receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval.

Q Mr. Pollog, have you been involved in DOE's efforts to implement this provision of the contract?

A Yes, I have.

Q How have you been involved?

A In 1991, I was involved in developing the original DCS instructions.

In 2004 I was involved in drafting DCS instructions again. And when I returned to the waste acceptance area in the '96, '97 time period through present, I'm involved in responding to occasional requests when a DCS is submitted by purchaser.

Q Okay. Mr. Pollog, I would now like to hand you Defendant's Exhibit 108.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Yes, you may. It probably would be a good time to invoke the Gardner

page 10 of the contract. And in particular you read in 5 (a) and 5 (b), paragraphs 5 (a) and (b) on this page.
At one point in time -- maybe I misunderstood you. I thought you said something to the effect that DOE is not required to annually publish an ACR or APR. Or sometime that obligation would end. Did I misunderstand you?
A I don't think it was said about an obligation. It was more about what was necessitated by operating.
Q Okay.
A For both parties fulfilling their obligations.
Q Okay. Let me point you to some language in the contract and maybe that will clarify. The first line of 5 (a) says: Beginning on April 1, 1991, DOE shall issue an annual Acceptance Priority Ranking for receipt of SNF and/or HLW at the DOE repository.
Doesn't that indicate that it would be something that would be published annually?
A Not necessarily.
Q Not necessarily. Okay. Yet. Nevertheless, you do an APR and ACR, you have



published them since 1991; is that correct?
A Yes.
Q Okay. And when you said "not necessarily," why do you say not necessarily?
A Because the term "annual" there modifies Acceptance Priority Ranking. If it modified issue, it would be annually, adverb. It's an adjective here. It doesn't say it should be issued annually. To issue. That's why I was saying not necessarily.
Q So there's an ambiguity there.
A It could be, yeah. I've heard arguments both ways.
Q And would you say the same thing with regard to 5 (b)?
A Yes.
Q Okay. You can put that away for now.
And during your direct examination, you and Ms. Sullivan discussed the linkages from the 1987 Amendments Act. When I refer to the Amendments Act, I'm referring to the Nuclear Waste Policy Amendments Act of 1987. Do you recall that discussion?
A Yes, I do.
Q So you're familiar with those linkages



in the 1987 Amendments Act?
A Yes.
Q And it's your understanding that the rate that is in the 1991 ACR is not consistent with the schedule linkages that Congress placed in that, correct?
A That's correct.
Q Specifically, the 1991 ACR is consistent with the requirement that no more than 10,000 MTUs be placed in the facility. But it is not consistent with the requirement that the construction on the facility could not begin until the Commission issued a license. And by "the Commission," I mean the Nuclear Regulatory Commission, issued a license for the construction of a repository. Is that correct?
A That's correct.
Q And because of this inconsistency, the rate that was in the 1991 ACR could not be accomplished by the Department of Energy without a change in law; isn't that right?
A Yes.
Q When the 1991 ACR was published, is it your understanding that the Department's best estimate of the earliest time it could accept



waste at an MRS prior to the operation of the repository under the schedule linkages was 3 years ahead of waste acceptance at the repository?
A Yeah. About that.
Q You say "about that."
A Yeah. The 2007 time frame. It depends on when you start. If you're talking three and a half or in the middle of 2010 or the end of 2010. So around 3 years.
Q Roughly 3 years?
A Yes. Right.
Q So given those linkages, the earliest you could start an MRS would be 3 years before opening the repository, roughly 3 years?
A Yes.
Q And when the 1991 ACR was published, the Department projected the repository would begin operation in 2010, correct?
A Yes.
Q So if the Department expected to open the repository in 2010, and it could not accept waste at the MRS more than 3 years prior to that without a change in law removing the linkages --
THE COURT: Sir.
MR. HERZFELD: Sorry, am I going too

fast?
THE COURT: There is no way the reporter can take it down that quickly. If you are reading the question, please read it so that she can take it down.
MR. HERZFELD: Sure. I'm sorry, Your Honor. I'll start over.
BY MR. HERZFELD:
Q I think you may have answered this question but just to be sure I've got it.
So if the Department expected to open the repository in 2010, and it could not accept waste at the MRS more than 3 years prior to that without a change in the law removing the linkages, it could not have accepted waste at an MRS before 2007; is that correct, or roughly thereabouts?
A Yes.
Q And if I could have you retrieve DX-108, which is the Annual Capacity Report from 1991. And, particularly, if I could have you turn to page 4. And that's HQR -- well, there are various Bates numbers on here. I'll refer to the bottom one. HQR-002-0806.
Do you have that?
A Yes.



MR. HERZFELD: Your Honor, do you have that?
THE COURT: I will be there in a moment, Mr. Herzfeld. I am there.
MR. HERZFELD: Thank you, Your Honor.
BY MR. HERZFELD:
Q So in fact, the 1991 ACR actually says this, doesn't it? And if I could read to you from the second paragraph, the last sentence, it says: If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.
Did I read that correctly?
A I believe so.
Q And if I can have you turn to the next page. So based on your understanding of the statutory linkages that existed in 1991 between the operation of a repository and the operation of an MRS, if the 1991 ACR developed the schedule fully consistent with the 1987 amendments to the Nuclear Waste Policy Act, your understanding is the schedule would have shown zero acceptance



until 2007, correct?
MS. SULLIVAN: Objection, Your Honor. Mischaracterizes the witness' testimony.
THE COURT: Well, I'm -- I think we'll let the witness answer the question because that's certainly how I understood the testimony. And so the witness can clarify any misunderstanding that's embodied in the question.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Would you like it back again?
THE WITNESS: Yes, please, Your Honor.
MR. HERZFELD: Could I have the court reporter read it back.
(The reporter read the record as requested.)
THE COURT: Now, do you understand that question, Mr. Pollog?
THE WITNESS: Yes, I do, Your Honor.
THE COURT: All right. Can you clarify the basis for the projections as we see them in table 2.1 of Defendant's 108, on page 5?
THE WITNESS: Yes, Your Honor.
Yes. That's correct. It would have shown first acceptance starting in 2007.



BY MR. HERZFELD:
Q And each of these, for example, it would have been essentially zero running down until you get to 2007. Would that be correct?
A Well, I would say we wouldn't even show '98, '99. We would just start 2007, 2008, for 10 years down. We wouldn't have put 20 years worth of waste acceptance in this table. We only would have put 10 years, as is required by the contract. So it wouldn't show zero. It would show year. And it would be 2007, 400; 2008, 600; 2009, 900.
Q Sure. So I think you've answered my question, which is: If this is fully consistent with the linkages, then the schedule would reflect zero?
THE COURT: For 1998?
MR. HERZFELD: For 1998, '99, 2000, 2001, 2002, 2003, 2004, 2005 and 2006.
THE WITNESS: Well, again, I'll just repeat what I said. There would be no '98, '99 in there. It would start at year 2007. So there wouldn't be any '98, zero. '99, zero. There would be -- the first year under column year would be 2007 and it would show 400. The second year

would not be 1999. It would be 2008 and that would be 600.
The contract doesn't say project 20 years worth of receiving capacity. It says project 10 years. We wouldn't start projecting 10 years prior. We wouldn't project 20 years' worth if the first 10 years was zero. It would just start at 2007 with 400. There would be no '98, zero; '99, zero. It would just say 2007, 400; 2008, 600.
BY MR. HERZFELD:
Q Okay.
A Et cetera.
Q But in order for the schedule in the 1991 ACR to apply, it would have required a change in law, correct?
A Yes.
Q And was that law changed?
A Not to my knowledge.
Q And those linkages weren't, in fact, removed?
A That's correct.
Q And wouldn't you agree that, by the time the 1991 ACR was published in December 1991, it was unlikely that an MRS would be sited by 1998?



A I would disagree with that.
Q Okay. If I could have you grab binder number 55.
MS. SULLIVAN: What exhibit, counsel?
MR. HERZFELD: I'll get there. 288.
THE COURT: So I can understand the last exchange between counsel and the witness, are you saying, Mr. Pollog, that the Annual Capacity Report, in particular the schedule that we just looked at, assumes that the linkage between the repository and the MRS facility, as set forth in the amendments to the Nuclear Waste Policy Act, would be relieved or changed through later legislation?
THE WITNESS: Yes, Your Honor.
BY MR. HERZFELD:
Q And Mr. Pollog, do you have the document? Or do you have the binder. It should be to your right.
A One of these?
Q It's not the blue ones. It's the one with the white spine.
A Okay.
Q It's binder 55. Exhibit 288.
A I'm with you, Counselor.



Q Okay. If I could have you turn to page 31. First of all, let's identify this report. This is a GAO report entitled: Nuclear Waste, Operation of Monitored Retrievable Storage Facility is Unlikely By 1998.
Have I identified the document correctly?
A Yes. I believe so.
Q And if I could have you turn to page 31. Now, you had disagreed with me that an MRS was unlikely in 1991 -- or to open in 1998. Is that correct?
A Yes.
Q GAO disagreed, didn't it? And I could read -- and if I can, I could read a passage in and maybe that will help.
MS. SULLIVAN: Objection, Your Honor. I don't think he's laid a foundation as to whether this witness has even seen this document before.
THE COURT: Let's establish that, Mr. Herzfeld.
MR. HERZFELD: Your Honor, I don't know that it needs to be established. It's mainly for impeachment purposes. He has stated that it was likely in 1998. And I'm trying to establish that



it was pretty well known it was unlikely.
MS. SULLIVAN: Your Honor, I understand --
MR. HERZFELD: And it was --
THE COURT: I'm not sure the GAO's report goes beyond its conclusions, which, in turn, reflect its opinions. And I doubt very much that there was anybody at GAO who stood any closer to this program than the witness we now have on the stand.
So I would have to respect the difference of opinion. And it certainly doesn't impeach his testimony to say that GAO had a different conclusion, any more than the GAO's decisions on law are -- would be seen as violative of subsequent decisions by this Court.
So if you want to explore why he disagreed with your conclusion, that would be appropriate. This exhibit, however, is not the way to do it.
BY MR. HERZFELD:
Q Okay. Well let me first ask. Do you know if you've ever seen this report before?
A I don't believe I have until yesterday, when it was presented to Mr. Kouts in his

himself.
MR. HERZFELD: It's also -- the same identical question was asked of him and he answered it differently.
THE COURT: Yes. Ms. Sullivan is correct. So let's take it off the screen.
Mr. Pollog, would you look at the transcript page that you've been referred to and see if that leads you to a different conclusion with respect to the answer you last gave to Counsel's question.
THE WITNESS: Okay.
THE COURT: And I would suggest or ask that you go back before the immediate question to which -- to which your attention is now being addressed, read several questions prior to that. Read up to and through the....
Now, Mr. Herzfeld, your question to the witness -- I'm sorry, Mr. Pollog, have you finished?
THE WITNESS: Yes.
THE COURT: Your question to the witness was what?
BY MR. HERZFELD:
Q Was it your view that once DOE ceased



considering DCSs and no longer approved them, that DOE had no further obligations to purchasers for providing disposal services in those years?
And if I may --
THE COURT: You may.
BY MR. HERZFELD:
Q -- read into the record the top of page 4010.
MS. SULLIVAN: Excuse me, Your Honor. Is this now for impeachment? Is that the -- is he still refreshing the recollection of the witness? I don't understand what's been identified as inconsistent.
THE COURT: I think what Mr. Herzfeld means to bring out is that the witness gave a different answer to the same question in the earlier trial.
And I think perhaps to get to the end of this as quickly as possible, we should simply ask the witness whether the answer you gave at the time in the Yankee Atomic case is different from the answer you've given today?
THE WITNESS: A little bit, Your Honor, but not significantly.
THE COURT: Can you, therefore, explain



what you see is the difference?
THE WITNESS: Yeah. I said, I think, earlier, to Mr. Herzfeld's question, we had no specific obligation tied to a specific year. In general, we are still obligated eventually to take all the material that's covered by their contract. So we have this general obligation to take all material covered by the contract. But it's not tied to any specific action, any specific time. So it stopped at a specific time period.
THE COURT: What stopped? The commitment or the obligation?
THE WITNESS: The obligation to perform in a specific time period, 2003, 2004, 2007. So obligation that was tied to a specific performance in a specific year was stopped. I think that's consistent with what I said in my earlier testimony in the Yankee's case.
But what I've added on here is, generally speaking, the Department still has an obligation to take all material that's still covered by contract. I'm not saying what the time frame for that obligation will be. But we still have to eventually accept for disposal all that material.



I think the question here was talking about us trying to separate acceptance by a certain date in a certain period as different from the general obligation to fulfill our obligations under the contract eventually.
THE COURT: Does that satisfy what you need, Mr. Herzfeld?
MR. HERZFELD: I'm not sure it does, but let me -- if I can soldier on, I think I might be able to clarify what I'm getting at.
BY MR. HERZFELD:
Q Let's say, suppose that DOE is unable to begin waste acceptance until 2025 or, for that matter, 2017 as is now projected, your understanding is that DOE would have no obligation to purchasers unless they had approved DCSs; is that correct?
A Yes. Well, no obligation to perform in a specific time period, 2012 or 2017 or 2020. We have an obligation to eventually accept all of their material.
Q I'm sorry. Could you read back the answer.
(The reporter read the record as requested.)

BY MR. HERZFELD:
Q So is it your view that, by stopping the approval of DCSs, your understanding is that the Department of Energy could unilaterally cut off its obligations to all purchasers; is that correct?
A No. I don't think that's what I said. I'm trying to specify -- we've cut off our obligation to perform waste acceptance in a certain time period. All material still covered by that contract is the material we will eventually be obligated to take.
Q That's not the question I'm asking. I'm asking for the time period between now and 2025. Could you unilaterally cut off your obligations by cutting off the approval of the DCSs?
MS. SULLIVAN: Your Honor, I'm troubled by Mr. Herzfeld's question. It seems to be introducing an element of bad faith into what DOE -- what Mr. Pollog has explained why DOE did what it did with regard to the suspension of the DCS process.
THE COURT: Ms. Sullivan, I think what we're doing here is probing the legal significance of the delivery-commitment schedule process. And



what we're examining is this witness' understanding of how the fulfillment of its contract responsibilities can exist side by side with the suspension of the delivery-commitment schedule process.
MS. SULLIVAN: Understood, Your Honor. Thank you.
THE COURT: So that's where we are.
MS. SULLIVAN: That's fine, Your Honor.
MR. HERZFELD: Okay. Now I am going to hopefully introduce this into evidence because --
THE COURT: I'm not sure that we got the last question answered.
MR. HERZFELD: He did not answer. Well, then I guess I would -- if I could ask you to answer the last question. If you could read it back.
(The reporter read the record as requested.)
THE WITNESS: Well, that's what we believe we did, so yes.
BY MR. HERZFELD:
Q So the answer is, yes, that you could unilaterally cut off your obligations by no longer approving DCSs?



A That's what we try to do, yes.
Q Thank you.
THE COURT: What do you mean by obligation? What do you understand the term obligation to mean in the context of counsel's question to you?
THE WITNESS: I'm referring to a specific obligation to take a specific amount of material in a specific period. This has to be taken, these 10 metric tons of uranium in 2003 or 2007. A specific commitment to accept a specific amount of material by a specific time period. That's what I believe he's asking me.
BY MR. HERZFELD:
Q So if I understand your answer correctly, the DCS just commits you to the amount of fuel. It doesn't actually commit to the time period.
So, for example, if DOE didn't begin performing until 2025, it would have no obligation -- no contractual obligation?
A The DCS --
MS. SULLIVAN: One moment, Your Honor. Your Honor, we'll just let the question go. Thank you.



THE WITNESS: The DCS does contain a time period. It has a year on it. So it has a year and an amount.
BY MR. HERZFELD:
Q Okay. And I must have misunderstood your answer. Because I thought you said it was a definite commitment to the amount but not the year?
A No. I said year and amount because they're both clearly on the DCS form.
Q So let me shift gears just slightly and ask you, is your understanding of the purpose of DOE stopping the approval of DCSs was to limit DOE's liability?
MS. SULLIVAN: Objection to the extent it calls for legal conclusion. The question could be his understanding as to the effect or something. Your Honor, limiting liability, that's a province for the general counsel's office.
THE COURT: All right. With that modification --
MR. HERZFELD: I don't think -- I think I said, is it your understanding that the purpose of stopping the approval of DCSs was to limit DOE's liability?

THE COURT: You may answer that question. Yes.

THE WITNESS: Yes.

BY MR. HERZFELD:

Q Okay. If I could get you to turn your attention to Plaintiff's Exhibit 334, which is binder 62.

A This was 330? What was the number again?

Q Binder 62. Plaintiff's Exhibit 334.

Now, do you recognize this document?

A Yes.

Q And do you recognize it to be the 2004 DCS instructions that accompanied the 2004 APR/ACR?

A Yes.

Q And you drafted this document, correct?

A Yes.

Q And if I could direct your attention to page 2, paragraph 7 (a). And if I could have you read into the record the last two sentences of paragraph 7 (a).

MS. SULLIVAN: Your Honor, if I could just -- I understand the Court's ruling when this issue was discussed with Mr. Kouts yesterday. But



if we could just enter a standing objection for the relevance of this document, given it was 2004 and past the time of the issues that are before the Court with the damages.

I understand what the Court said yesterday about how this interplays, but we have concerns about the relevance of the 2004 ACR process.

THE COURT: Well, I think I probably said yesterday that it helps explore the nature of the commitment that DOE sees coming out of the delivery commitment -- delivery -- DCS process, yes.

If that's not what I said yesterday, that's what I should have said yesterday. But that's where we are with this.

MS. SULLIVAN: And I understand that that's why the Court allowed it yesterday and will allow it today.

THE COURT: All right.

MS. SULLIVAN: We have concerns about the relevance of the documents and the questions with regard to, specifically, the 2004 process.

THE COURT: Okay. We're not looking at 2004. We're really exploring the nature of the



legal relationship growing out of the DCS.

MS. SULLIVAN: Thank you, Your Honor.

BY MR. HERZFELD:

Q Okay. If I could have you just read in the last two sentences of paragraph 7 (a). And it's on page 2 of Plaintiff's Exhibit 334.

A DOE recognizes that many purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010.

Q And do I understand correctly, in separate correspondence, DOE also stated that the new DCSs would replace, not supplement the original DCSs that have been submitted; isn't that correct?

A Yes.

MR. HERZFELD: Now, Your Honor, it's about five till 1:00. I've probably got about 15, 20 minutes, maybe half an hour more. We can break for lunch. I can come back and finish up.

THE COURT: Let's do that. Let's come back at 10 after 2:00.



(Whereupon, at 12:57 p.m., the hearing was recessed, to be reconvened at 2:10 p.m. this same day.)

# ROSSELLI

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE A
MAINE YANKEE ATOMIC POWER COMPANY FLORIDA POWER & L
NORTHERN STATES POWER COMPANY DUKE POWER, A Division o
INDIANA MICHIGAN POWER COMPANY SACRAMENTO MUNICIPA
SOUTHERN NUCLEAR OPERATING COMPANY, et al. COMMONWEA
BOSTON EDISON COMPANY GPU NUCLEAR, INCORPORATED WIS
ELECTRIC POWER COMPANY POWER AUTHORITY OF THE STATE
OMAHA PUBLIC POWER DISTRICT NEBRASKA PUBLIC POWER DIS
TENNESSEE VALLEY AUTHORITY,
Plaintiffs, vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C 98-486C, 98-488C, 98-614
98-621C, 99-447C, 00-440C UNITED STATES,
01-116C, 01-249C DEFENDANT.
________________________

VOLUME I DEPOSITION OF ROBERT M. ROSSELLI

Taken on behalf of Sacrament Municipal Utility District April 15, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.



APPEARANCES

ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY: DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM



BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov



Also Present:
Peter J. Skalaban

in the "discovery," as I understand.
MR. LESTER: I think that's added onto the --
MR. HERZFELD: Okay.
MR. HAIRSTON: I'm K. C. Hairston with the law firm of Balch & Bingham. And I represent Alabama Power, Georgia Power, and Southern Nuclear.
MR. SKALABAN: I'm Pete Skalaban. I represent Yankee Atomic, Maine Yankee, Connecticut Yankee. We are monitoring this deposition today. We are not entering our appearance in it. We have noticed you, Mr. Rosselli, for a deposition tomorrow, which we plan to take after this is concluded.
MR. CASSLING: My name is Don Cassling with the law firm of Jenner & Block in Chicago. We represent Commonwealth Edison Company.
THE WITNESS: Thank you.
BY MR. NESLIN:
Q. Mr. Rosselli, did you do anything to prepare for this deposition?
A. Yes.
Q. What was that?



A. Read some of the material that the Justice Department gave me.
Q. What materials did the Justice Department provide to you? Did you bring the materials with you here today?
A. Yes.
Q. Did the Justice Department provide any materials to you that you did not bring with you here today?
A. No.
Q. Did you discuss your deposition with the attorneys for the Department of Justice?
A. Specifically, in what context?
Q. Did you discuss the deposition with the attorneys for the Department of Justice?
A. In terms of what it is and what's going to be expected --
Q. Yes.
A. -- of me, yes.
Q. Did you discuss the deposition with anyone at the Department of Energy?
A. No.
Q. Did you discuss the deposition with anyone else?
A. No.



Q. Could you briefly describe for me your education at the college and graduate levels, if any?
A. I have a bachelor of administration with a major in business from Baltimoreles College (Phonetic) in Brie, Ohio. And I have an MBA in management from Michigan State University.
Q. And what were the years that you graduated? That you received your degrees?
A. I got my BA in 1966, June '66, and my MBA on 12-67.
Q. Would you briefly describe your employment history following your education?
A. Basically, I have 36, 37 years with working for the United States Government, except for three years when I was in the military from '68 to '71. It's been spent with the Department of Energy or its predecessor organizations.
Q. Which branch of the military were you in?
A. I was in the United States Army in the edgemond general corps.
Q. When you left the army, you went to work for a predecessor at the Department of



Energy?
A. Really, I went to work with a predecessor of the Department of Energy before I went into the army. But then I spent eight months, was drafted, spent three years basically in the army, then had re-employment rights back to a predecessor of the Department of Energy.
Q. What was your first position at the Department of Energy, before you went into the service?
A. I was a management intern working with the space nuclear propulsion office in Cleveland, Ohio. Basically, it was a job that I was learning the administrative aspects of federal government and those particular programs -- contracts, personnel, budget, finance.
Q. And when you returned from the army, did you go back to the same position?
A. No.
Q. What position did you go to work at?
A. When I came back, I was re-employed at a predecessor of the Department of Energy in Washington, D.C. in their Germantown office.
Q. And what was your position?
A. I was a personnel specialist, I believe,

and I worked basically in three areas. I did personnel policy work. I did personnel operations work. And I did -- I guess it was personnel training and development work.
Q. And what title did you have at that point?
A. I believe it was personnel specialist.
Q. And do you recall the name of the agency that you were working for at that point?
A. It was the Atomic Energy Commission at that point.
Q. And was there a particular office or branch that you were working in?
A. It was the division of personnel.
Q. How long did you work there?
A. In that organization?
Q. Yes, sir. In the division of personnel at the Atomic Energy Commission?
A. I came back in 1971. To the best of my recollection, I left there in 1974.
Q. Where did you go then?
A. I went to the office of Magnetic Fusion Energy.
Q. And was that still within the Atomic Energy Commission?



A. Yes, it was.
Q. And what was your position at the office of Magnetic Fusion Energy?
A. I was a management specialist, and my responsibilities there included budget formulation and execution, accounting control, contract administration, organizational development and human resources management, information resource management.
Q. And how long did you work at the office of Magnetic Fusion Energy?
A. To the best of my knowledge, it was 1979.
Q. And why did you leave that position?
A. If I remember correctly, I was downgraded from a 15 to a 14, and I wanted to get my 15 back, so I moved to a higher level.
Q. Why had you been downgraded?
A. They just felt that the job wasn't supportive of the grade.
Q. So what was your next position?
A. To the best of my knowledge, my next position was a management analyst in the -- and I don't remember what exactly it was called. But it was the defense programs area. And I had



similar responsibilities as I had in magnetic fusion where I was working in the administrative side in human resources, contracts, budget, finance.
Q. And how long did you work in that position?
A. I vaguely remember maybe six months or so. And within the -- under the same general, you know, leadership, I was transferred to the nuclear reactors division, and I did the same thing in support of nuclear reactors.
Q. You did administrative work?
A. Yes.
Q. Working on --
A. Budgets --
Q. -- budgets?
A. -- finance, contracts, human resources organization development.
Q. Why were you transferred to the nuclear reactors division? Do you know?
A. Just they had an opening, and they reassigned me there, because may skills matched what they needed.
Q. And was all of this work to this point in Washington, D.C.?



A. Yes, it was. Germantown, Maryland to be specific.
Q. How long were you at the nuclear reactors division in that position?
A. I'm only going to guess. To the best of my knowledge, it was probably maybe around a year. And then I transferred, still within that same organizational component, broad organizational component, to the -- I think it was the office of civilian waste. And they did both -- at that time they did civilian waste and defense waste. And I think my title was something like executive assistant or something like that. But I did the same type of work as I previously had been doing. Just it was oriented not toward reactors. It was oriented toward waste management.
Q. Now, is this the first point at which you began working on waste management issues for the Government, or had you had certain responsibilities in that area prior to that point?
A. I think it's fair to say that this was the first time that I got substantively involved on waste management sites.

Q. And this would be sometime around 1980, 1981?
A. Yes, it was around that time. I think it was a couple of years doing that before, roughly a couple of years before the Nuclear Waste Policy Act passed.
Q. And how long were you in that position?
A. I'm going, to the best of my knowledge, say it was about a couple of years, year-and-a-half to two years.
Q. And what was your next position?
A. Director, I believe it was called the resource management division in the office of Civilian Radioactive Waste Management.
Q. And what were your responsibilities as director of that division?
A. There were organizational development, human resources management, contract administration, information resources, budget and finance.
Q. And did you have people working for you in that position?
A. Yes, I did.
Q. Approximately how many? Do you recall?
A. No, I don't.



Q. More than 10?
A. Yes.
Q. More than 20?
A. I really don't remember.
Q. How long did you hold that position?
A. Until 1984.
Q. Let me back up a step. You'd been an executive assistant in the office of civilian waste. Then, you became director of resource management division at the office of Civilian Radioactive Waste Management. Why did you take that position? What led to that change of position?
A. To the best of my recollection, sometime in the span of the -- while I was working in the waste program, initially, they had both defense and commercial waste in that same organization. Then they split out. At some point in there, they split out the defense waste, and essentially what we were working on was the civilian side. And so when the Waste Policy Act passed, they just grabbed that entity that was commercial and gave us a new name.
Q. You were doing the same work?
A. Essentially, it was the same work, yes,



it was.
Q. And you said you held that position until 1984?
A. That's right. May of '84.
Q. And what happened then?
A. I transferred to the Richland operations office here in Richland, Washington.
Q. Now, when you were working as director of the resource management division, was that in Germantown or in the Washington, D.C. area as well?
A. It was a split operation. We had some folks in both locations. I was located in Washington, D.C. in the Forrestal Building.
Q. And in May 1984, you transferred to Richland?
A. Yes.
Q. And what position did you transfer to?
A. Assistant manager for administration.
Q. Administration of what?
A. Administrative services. So I had responsibility for human resources, contract infrastructure, and information resources, budget and finance.
Q. And why did you transfer?



A. Opportunity. It was a promotion.
Q. Now, were you still at that point working in the office of Civilian Radioactive Waste Management, or was this a separate --
A. No, I transferred. I cut my ties with the Civilian Radioactive Waste Management and transferred here. Reassignment I think they called it in the personnel action.
Q. That was May of 1984?
A. Yes.
Q. And how long did you hold your position as assistant manager for administrative services in Richland?
A. Until May of 1994.
Q. And what happened then?
A. I was reassigned here locally to be assistant manager for science and technology.
Q. Is that also at the Richland facility?
A. Yes.
Q. What were your responsibilities as assistant manager of science and technology?
A. I was responsible for the contract management of the Battelle Pacific Northwest National Lab contract.
Q. And what was the reason for that change

in 1994?
A. Career broadening.
Q. And how long did you hold that position?
A. I held that position for five years until 1999. Around May 1999 roughly.
Q. And what happened then?
A. I was asked by the current manager to help him, who was a new manager, with his reorganization. And I spent about three months on that and became -- I was reassigned to be deputy manager for business services at that point, sometime in the September, October time frame.
Q. And what were your responsibilities as deputy manager for business services?
A. I had all the administrative activities -- budget, finance, human resources, procurement. I had responsibility for the infrastructure. I had responsibility for the office of special concerns. I had responsibility for, what we called, the future outcome, it's economic development aspects and how we support community economics, the development. Initially, I had responsibility for the laboratory, Pacific Northwest National Laboratory.



Q. How long were you in this position?
A. Until current.
Q. Is that your current position today?
A. Yes, it is.
Q. Mr. Rosselli, after the time that you left the office of Civilian Radioactive Waste Management, which you estimated was approximately May of 1984, in your other positions within the department, have you had any involvement in waste management issues?
A. Yes.
Q. Would you explain what that was?
A. Here at Hanford we have high-level waste, mixed waste, low-level waste that we receive, treat, and store, you know, on site. So it's part of our ongoing operation. And though I'm not, you know, directly involved, it's not within my responsibility to manage those particular activities. I, as far as my management responsibility from an administrative standpoint, support the activities that go on, whether it's giving them budget of finance support, contract support, bringing people to do the job, that kind of thing. So I provide administrative support to the waste management



operations as they are occurring on site today.
Q. And I understand that with respect to the Hanford site. Have you had any involvement or participation in the Department's spent nuclear fuel program, as it applies to various utilities?
A. Could you repeat that again for me please?
Q. Have you had any involvement or participation in the Department's spent nuclear fuel program, as it applies to the various utilities?
MR. LESTER: Objection, vague.
BY MR. NESLIN:
Q. Do you understand the question?
A. Yes.
Q. Can you answer the question?
MR. LESTER: Go ahead.
THE WITNESS: Yes. When I was assistant manager for science and technology, there was an individual on the staff that was managing some of the remaining aspects of support. We, here in the Richland office, were given to the OCRWM program. And I mean, he worked for me. The person worked for me.



Q. What support was the Richland office providing for the OCRWM program? Do you recall?
A. To the best of my knowledge, the support -- well, let me back up, because at one point in time, the Richland office was a potential site for a repository in the basalt media. And about the time I was in the program, actively in the program, they had started an exploratory shaft here on site.
So it was at that point an integral part of the office's portfolio. In addition to that, the Pacific Northwest National Laboratory, they have a lot of expertise in nuclear matters having to do -- one area having to do with spent nuclear fuel. So they were providing -- the laboratory was providing to the Washington, D.C. office of Civilian Waste Management support, technical support, as it related to spent nuclear fuel.
Q. Are you referring to Battelle, Pacific Northwest Labs?
A. Yes. Battelle is the parent company.
Q. So Pacific Northwest Labs was doing contracting work for OCRWM?
A. Um-hmm.

Q. Correct?
A. Yes. To the best of my knowledge, that is true.
Q. And that work was being supervised here in Richland?
A. I don't know. I don't know the answer to that one, and if I may explain why. Different programs do things differently in terms of management of the laboratory. Some of them, headquarters manages the investigator directly. In other cases, they'll delegate to the field office to do it. I can't honestly remember how the civilian -- you know, how it was being done and whether there was some support in Richland, or was it being done directly out of headquarters. I don't remember.
Q. Did you, yourself, have any responsibility for overseeing the work that PNL was doing here in connection with OCRWM and the OCRWM program?
A. Not directly, no.
Q. Were you familiar with it? Were you aware of it?
A. Yes, I was.
Q. The specifics? Or just the fact that



they were doing work?
A. I knew they were doing work. I couldn't tell, you know, the exact tests that were ongoing. I could tell you that, you know, they were working -- one area they were working for was in the spent nuclear fuel.
Q. I'd like to back up to your work for the office of civilian waste. You said it was approximately 1980, 1981 that you were working for them as an executive assistant. What were your responsibilities in that position?
A. The responsibilities, as I remember, had to do with budget formulation, execution, organizational development, and human resources. I guess the best thing I can remember now is answering correspondence. We used to get a lot of letters from folks where we were characterizing, and I can't remember, maybe the best example at Canyon Lands. A lot of folks would say, how could you go in and try to destroy a beautiful area like Canyon Lands? So we were responding to those letters.
Q. What were the activities at that office during that period of time? What was that office focusing on?



A. Well, the principal focus had to do with management of civilian nuclear waste. And they were working on some of the repository efforts, characterization of sites for repository. They also had activities having to do with remedial actions -- cleaning up sites where the department had used in the military production environment, old uranium, mill tailing sites, formerly utilized facilities where they had processed the ores, et cetera. And West Valley was also in the jurisdiction of that particular program and the cleanup efforts associated with West Valley.
Q. Was the office working on the legislation that became the Nuclear Waste Policy Act?
A. Yes, it was.
Q. Were you involved in that?
A. Not directly, no.
Q. You say you were not involved directly. How were you involved?
A. Just getting information on the progress that was being made toward framing the legislation.
Q. Who was overseeing the legislative effort for the office?



A. The director of the office.
Q. Who was that?
A. Mr. Frank Kaufman.
Q. Excuse me?
A. Mr. Frank Kaufman.
Q. Where there others at the office who were involved in attempting to develop that legislation?
A. Yes, there was.
Q. Do you recall who those individuals were?
A. Mr. Wade Ballard. That's the extent of my --
Q. What was Mr. Ballard's position?
A. He was the, I don't know if they called them assistant directors then or associate directors, but he reported to the director, Frank Kaufman. And he was responsible for the repository development program.
Q. What kind of work were they doing on the legislation?
A. Specifically, I don't recall. I don't really know specifically what they were doing.
Q. Did you, yourself, have any discussions of the legislation with Mr. Kaufman, or Mr.

Ballard, or others at the office?
A. Yes.
Q. Do you recall what those conversations involved?
A. More it was information -- you know, getting information from them. How's it going? You know, is it going to happen? Isn't it going to happen? That kind of thing.
Q. Were they looking for input from you on any of the issues relating to the legislation?
A. To the best of my remembrance, no.
Q. Did you have any discussions with legislative staff, congressional staff regarding the legislation?
A. To the best of my knowledge, no. But I do recall going to a meeting, you know, being involved sitting in a meeting where there was some discussion. It wasn't so much legislative staff, it was more lobbying staff, I guess.
Q. Do you recall when that meeting would have taken place?
A. No, I don't.
Q. Do you recall where it took place?
A. No, I don't.
Q. Do you recall who else was there on the



part of the Government?
A. I do recall Mr. Kaufman was there.
Q. Anyone else?
A. Not to my memory.
Q. Do you recall who was there from outside the government? You mentioned lobbyists. Do you recall anyone particularly?
A. Yes, I do.
Q. Who would that be?
A. Ed Davis from AMEC.
Q. And what is AMEC?
A. To the best of my knowledge, American Nuclear Energy Counsel, I believe.
Q. Anyone else that you recall being there?
A. Not that I recall, no.
Q. And what was discussed at the meeting?
A. The legislation and the status of the legislation. Again, what were the prospects? Was it going to pass or wasn't it going to pass?
MR. LESTER: Would you mind if we took a break for a moment, so I can get some more coffee?
MR. NESLIN: Sure. Let's take 10 minutes.
(Recess.)



(Whereupon, a document entitled Office of Civilian Radioactive Waste Management was marked Exhibit-1.)
BY MR. NESLIN:
Q. Mr. Rosselli, you're being handed what's been marked Exhibit 1 to your deposition. It's a series of organizational charts which bear Bates SN010806 through 010810. Could you review the first chart? Mr. Rosselli, would this be a chart depicting the organizational structure of the office of Civilian Radioactive Waste Management during the time that you worked within that office?
A. Yes.
Q. And during what years would that have been?
A. 1982 to 1984.
Q. And this identifies you as Associate Director, Management. You would have held that position throughout that period?
A. Yes.
Q. And it identifies certain responsibilities. The first is coordinating financial management. What did that mean?
A. First of all, it meant developing the



budget for the program, justifying the budgetary needs, and then involvement in the execution of the budget. Second part, it meant the financial control. And the third part had to do with setting up the fund.
Q. The Waste Fund?
A. The Waste Fund, yeah. And operating the Waste Fund.
Q. The second bullet refers to evaluating fee adequacy. What did that involve?
A. Well, the legislation gave a -- it set the fee at one mill per kilowatt hour. And there was a requirement in the legislation that once yearly, we would evaluate whether that was an appropriate fee.
Q. And you were responsible for overseeing that evaluation?
A. Yes.
Q. Did you conduct that evaluation yourself, or did other people conduct that at your direction?
A. It was the latter.
Q. Who undertook that work?
A. To be honest, I don't recall specifically.

Q. Do you recall that annual evaluations were performed during the period that you held this position?
A. I do recall at least one while I held that position, yes.
Q. Do you recall whether that work was done by the Department of Energy employees or by outside contractors?
A. No, I don't recall specifically.
Q. The next bullet refers to providing management support. What did that involve?
A. That involved the organizational development, putting together the organizational structure here that you see, and the functional statements that go with it. It involved human resources, recruiting, placement, promoting, you know, folks. It involved information, resource management, and the systems we would use. I'm going to put the -- in this one, the development of the contract with the utilities.
Q. Were you responsible for developing the contract?
A. Yes.
Q. And then, the last item is, coordinate the OCRWM Mission Plan. What does that refer



to?
A. There was, again, a requirement in the legislation that on a yearly basis, we would do a Mission Plan. And it encompassed the totality organization. So we had responsibility, my organization had responsibility for putting it all together, and we would work with the rest of the organizational entities in getting the information to include in there.
Q. Did you, in this position, report directly to the director of the office of Civilian Radioactive Waste Management?
A. Yes, I did.
Q. This chart identifies a J. W. Bennett as associate director for Geological Repository Deployment. Did Mr. Bennett hold that position throughout the period of time that you were employed in the office?
A. Yes, he did.
Q. And it identifies an R. H. Bauer as associate director for storage and systems development. And, again, did he hold that position during the entire time you were in the office?
A. I don't remember if he was there the



whole time.
Q. Do you recall who would have succeeded him in the position, or who he might have succeeded him, if there was another person in that position?
A. I don't remember who succeeded him.
Q. This also identifies a J. O. McElvey, as the Director of Institutional Relations Staff. Did he hold that position during the entire time that you were at the office?
A. To the best of my recollection, I believe he did, yes.
Q. And it shows R. L. Morgan as director of the office. Was Mr. Morgan the director during the entire period that you were there?
A. No, he wasn't.
Q. Who else held that position while you were in the office?
A. A gentleman by the name of Ben Rusche.
Q. Did Mr. Rusche follow or precede Mr. Morgan?
A. He followed Mr. Morgan.
Q. Do you recall about when?
A. No, I don't.
Q. And it identifies an M. J. Lawrence as



deputy director of the office. Did Mr. Lawrence hold that position throughout the entire time that you were at the office?
A. Yes, he did.
Q. Were there any other associate directors not reflected on this chart or any other subgroupings not reflected on this chart?
A. To the best of my recollection, no.
Q. If I could direct you to the next to the last page captioned Office of Management.
A. Okay.
Q. And ask you to take a look at that. Mr. Rosselli, does this chart depict the organization of the management during the period that you served as associate director?
A. To the best of my knowledge, it does.
Q. And does this reflect the division of responsibilities within the office of management?
A. To the best of my recollection, it does.
Q. Do you recall how many people were part of the office of management?
A. No, I do not.
Q. This indicates that a J. E. Yanoski was in charge of the finance division?
A. Yes, he was.

41

Q. Had he gone to work for anyone else?
A. I do not know.
Q. Do you know where Mr. Head is?
A. Yes. Mr. Head is still working in the office of Environmental Management in the Forrestal building.
Q. In Washington, D.C.?
A. Yes.
Q. And Mr. Brandt?
A. Mr. Brandt I believe retired.
Q. And do you know where he would be located today?
A. No, I don't.
Q. And in the office of management you were located back in Washington, D.C.?
A. Yes. Although the -- as I mentioned earlier, we had a split operation. And the finance division they were in Germantown.
Q. Mr. Rosselli, had you joined the office of Civilian Radioactive Waste Management before or after the NWPA was enacted?
A. Right after.
Q. And upon joining the office, what did you spend most of your time doing? What were your most important responsibilities at that

42

point?
A. To the best of my recollection, I was helping getting the organization, you know, developed and set up and getting the manpower transferred into the organization that we needed to do the job.
Secondly, the act had a couple of things that I had responsibility in that were front end loaded. That was the contract and getting the contract developed and signed by June 30 of '83.
And the third thing that went along with that was establishing the fund mechanism.
Q. How did you familiarize yourself with what the act required?
A. Well, I started by reading it.
Q. Did you do anything else?
A. Read the act. Read the legislative history to the degree it existed. And to the best of my knowledge, that's about it. And then started to live it.
Q. Had the department prepared any overviews or any briefing information that you relied upon?
A. I don't remember specifically, no.

43

Q. You mentioned that one of the things you worked on initially was the development of the standard contract. What was your role in the development of that contract?
A. I was the head of, let me call it a special project team, that had responsibility to see that the contract was developed in the time frame specified in the contract that would allow sufficient time for the utilities to, you know, be able to review and sign it.
Q. Special contract team. Who else was on that team?
A. There were two other individuals that were party to the team. Mr. Jay Cavanaugh who was from the office of procurement, and a Mr. Elliott Winneck, who was from the office of chief counsel.
Q. Who established the team?
A. I did, to what I remember.
Q. When did you begin working on the contract?
A. To the best of my knowledge, there -- well, I guess I don't remember the exact time frame we started working on it.
Q. Let me ask this. I'll represent to you

44

that the act was passed January 7th of 1983. Had you begun work on the contract prior to the time that the act passed?
A. No.
Q. So it would have been after the time that the act passed?
A. Yes.
Q. Therefore, sometime after January 7th of 1983?
A. Right.
Q. How did your team, your special contract team function?
MR. LESTER: I believe he called it a special project team.
MR. NESLIN: Sorry if I misspoke.
BY MR. NESLIN:
Q. The three-person team that you mentioned earlier, how did that function?
A. We got together, and we talked about what our objectives were. And then we would draw on various people in either the office of OCWRM -- I assume it's okay for me to say OCRWM without -- okay. The folks within OCRWM to support us and assist us. We would draw from

model?
A. I don't remember. I don't recall.
Q. Did you try to base it upon any particular documentation?
A. I do not recall.
Q. You mentioned that you received input and comment from the electric industry. Do you recall who provided that comment to you?
A. There were a number of sources. And what I do remember is that there were, you know, private utilities, and they were represented by EEI. There were public utilities, and I can't remember the APA, I think it was, but I don't want to swear to that. And there was also rural utilities. And then there were, I'll call them the public, you know, interest, you know, groups. And we received and interacted in the -- from time-to-time with all of those entities.
Q. And was that something that you decided to do, or did you receive direction to interact with these groups from your superiors?
A. I don't recall whether I was directed, or I did it myself. But I do know that we had a short time frame to get this done, and that



the legislation didn't outline everything that needed to be outlined. So we had to work together to get this thing, you know, developed. And that what we embarked upon was getting the widest amount of input we could from relevant parties.
Q. And when you say, "we had to work together to get this contract developed," are you referring to the department and the industry, utility industry?
A. Yes.
Q. Do you recall why the contract was developed as a regulation?
A. Yes. At initial point, we were looking at what we thought was a daunting task of trying to get a contract with each of the utilities, some who owned one or more reactors. And we felt it would be impossible in the time frame given to do that. So what we decided to do is go to a standardized contract and publish it in the federal register so that everybody could give comment, and we could react to it and come up with one instrument that everybody could use.
Q. Well, I understand from that answer why



you would want a standardized contract. But then why publish it as a regulation and adopt it as a regulation?
A. That I don't recall.
Q. You could have a standardized contract without it being a regulation, couldn't you?
MR. LESTER: Object --
THE WITNESS: I don't know the answer to that.
BY MR. NESLIN:
Q. Let me ask it this way. Other than helping to insure that there was simply one standardized form of contract, do you recall any other reason why the standard contract ended up being published as a regulation?
A. No.
Q. Do you recall who made the decision to publish it as a regulation?
A. No.
Q. You've mentioned time constraints in your testimony. Is it fair to say that you were operating under time pressure in developing this contract?
A. Yes.
Q. And these were time pressures created by



the legislation itself?
A. Yes.
(Whereupon, a document entitled Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste was marked Exhibit-2.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked Exhibit 2 to your deposition. It's a document entitled Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste that's stamped draft and annotated with the words, "EEI's unsolicited comments on." Do you recall receiving comments from EEI on an early draft of the contract?
A. Yes.
Q. Do you recall receiving these comments?
A. I need to look at them.
Q. Please.
A. Could you repeat your question again now?
Q. Let me ask you a new question. Ignoring the annotations, does this appear to be an early draft of the standard contract?
A. Yes.

Q. Do you recall receiving an early draft of the standard contract back from EEI with comments or annotations?
A. Yes.
Q. Is this document the annotated draft that you received back from EEI?
A. That I do not recall.
Q. But you do recall EEI providing you written documentation or comments on a written draft?
A. Yes.
Q. And did you or your office provide an early draft of the standard contract to EEI for the purpose of obtaining comments?
A. Yes.
Q. Did you provide an early draft to other representatives of the utility industry for this purpose?
A. Yes.
Q. Did you receive back comments from other utility representatives?
A. To the best of my knowledge, yes.
Q. Why did you provide these early drafts to the industry for comment?
A. To go back to an earlier statement, we



were under a tight time frame that there was -- the legislation or statute, itself, and the legislative history, itself, certainly did not provide all the answers. We were working collaboratively with all the parties to develop a contract that people could find acceptable to the Government and the utilities.
Q. So providing an early draft to the industry for comment was part of your effort to work with the industry?
A. Yes.
Q. And to work with the industry to develop a contract that would be mutually acceptable to both sides?
A. Yes.
(Whereupon, a document entitled Proposed Rules, Department of Energy was marked Exhibit-3.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's marked as Exhibit 3 to your deposition. This is an electronic version of a notice of proposed rule making that was published in the federal register on February 4th, 1983. Are you familiar with such a public notice?



A. Yes.
Q. That was a notice of the proposed contract, proposed standard contract?
A. Yes.
Q. And the purpose of that was to solicit public comment on the proposed contract?
A. Yes.
Q. And this is a process that occurred after the iterative process that we've been discussing between the department and the utility industry?
A. Yes.
Q. Pre-publication. Correct?
A. Yes.
Q. If I could ask you to turn to page 4. Well, Mr. Rosselli, the first few pages of this notice include some background information. If you look on page 3, there is a heading Roman I, Legislative Background. On page 5, there is a heading Roman II, Proposed Rule and provides some summary information on the rule. Do you recall who drafted this background information?
A. No, I do not.
Q. Do you recall who approved the publication of this proposed rule for the



department?
A. No, I don't.
Q. It would have been approved by someone at the Department senior to you, before it was published in the federal register?
A. Excuse me?
Q. Sure.
MR. LESTER: Why don't we take a break for a couple of minutes so Mr. Rosselli can ask me the question he wants to ask me.
MR. NESLIN: That's fine. Should we break for five minutes?
MR. LESTER: That's fine.
(Recess.)
MR. NESLIN: Can you read back the last question?
(Record read.)
MR. LESTER: Objection, leading.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. If I could ask you to turn to page 4. The paragraph is hard to identify here. I apologize for that. But you'll see after the number 6, the second paragraph below that begins, "The proposed standard contract." Do you see

MR. LESTER: Objection, leading.
THE WITNESS: Some, yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what was the process that you followed in attempting to develop a final contract after the publication of Exhibit 3?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, the process was, we received comments on the draft contract. We evaluated those comments. And we framed our final rule.
BY MR. NESLIN:
Q. Who evaluated the comments?
A. The team that I referred to before had the principal responsibility to review the comments.
Q. And that would be you, Mr. Cavanaugh, and Mr. Winneck?
A. Yes, sir.
Q. If I could direct you back to Exhibit 3 for a moment, Mr. Rosselli. You see on the bottom of the first page with a heading for further information contact. First page, sir. The very bottom of the page.
A. Yes.



Q. It references you at the office of terminal waste disposal and remedial action. Is that where you were working at this point in time?
A. No.
Q. Do you know why it would provide that as a reference point for you?
A. I imagine it's just an error.
Q. You were working at OCRWM at that point?
A. Yes, I was.
Q. Let's go back. And you, Mr. Cavanaugh, and Mr. Winneck had reviewed the comments that had been submitted. Correct?
A. Yes.
MR. LESTER: Objection, leading.
BY MR. NESLIN:
Q. You modified the contract in some respects in response to comments?
MR. LESTER: Objection, leading.
THE WITNESS: Yes, we did.
BY MR. NESLIN:
Q. Did you continue to meet or confer with representatives of the utility industry following the public comment period?
A. Yes, we did. To the best of my



recollection.
Q. Were you meeting with the same representatives that you identified previously?
A. Point of clarity, I didn't identify anybody specifically earlier.
Q. You mentioned that you met with or conferred with EEI. I believe one or two other entities on behalf of --
A. Okay APA and the rules, et cetera?
Q. Yes.
A. To the best of my recollection, yes.
Q. And you continued to meet with them, because you continued to seek to work with them to come up with a final standard contract that would be mutually acceptable to both sides?
MR. LESTER: Objection, leading.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Do you recall any issues where you and Mr. Cavanaugh or Mr. Winneck disagreed over how an issue should be resolved?
A. No, I don't.
Q. Your recollection is that you three were in agreement on the resolution of all of the issues raised during the public comment period?



MR. LESTER: Objection, leading. Misstates his prior testimony.
THE WITNESS: When we published the final rule, we were in agreement, yes.
(Whereupon, a document entitled U. S. Department of Energy memorandum was marked Exhibit-4.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked as Exhibit 4 to your deposition. It's a Department of Energy memorandum entitled, Action Memorandum on Final Rule Making on Standard Contract for Nuclear Waste Disposal dated April 8th of 1983. Are you familiar with this document?
A. Yes.
Q. Did you help to prepare this document?
A. The best of my knowledge, in all probability, yes.
Q. What do you mean by that?
A. I think I did have a hand in preparing this document.
Q. Do you recall who else participated in preparing this document?
A. Not specifically, no.

Q. Would Mr. Cavanaugh or Mr. Winneck have participated in this?
A. To the best of my knowledge, they probably did.
Q. If I could direct your attention to the first page Bates number ZAB-001-0893, under the heading Discussion, the last sentence states, "Eight general policy issues arose from the comments, and we appropriately resolved these issues." Do you know what's meant be, "general policy issues?"
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: Generally, yes.
BY MR. NESLIN:
Q. What's meant by the term, "general policy issues," in this document?
A. It had to do with positions the Department would take with respect to its interactions with the utility community on the contract.
Q. Were these the most important issues?
A. Yes.
Q. And you included this in the briefing memorandum to the secretary so that the secretary



would be familiar with these issues?
A. Yes.
Q. If I could ask you to turn to page ZAB-001-0899 through 0902. So those would be the last four pages of the document. Are these the general policy issues, to your recollection?
A. To the best of my recollection, they are.
Q. Now, I don't see any reference in these issues to the receipt rate at which the Department would receive spent nuclear fuel from the utilities. Do you know why that's the case?
A. To the best of my knowledge, I don't recall that being an issue from the Government's standpoint.
Q. It was not an issue from the Government's standpoint?
A. Yes.
Q. Do you recall it being an issue from the industry standpoint?
A. To my knowledge, no, I don't recall.
Q. You don't recall the issue coming up?
A. Yes. There were -- I mean, I do recall it coming up from the utility standpoint.



Q. You say it wasn't an issue from the Government's standpoint. Why was it not an issue from the Government's standpoint?
A. Because at the point in time of drafting this particular document, the Government wasn't in position to contemplate or set any type of receipt or acceptance rate.
Q. Why do you say that?
A. At this particular point in time, there wasn't a repository site that was selected. The facilities, you know, that would be needed to support the repository, you know, weren't designed or built. It was just too early. There were a lot of technical issues, you know, still on the table that had to be resolved and worked through.
Q. Did the Government have any criteria in mind for the rate at which it would receive spent nuclear fuel at this point in time?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, I do not recall.
BY MR. LESTER:
Q. So would it be your testimony, then, that the Government at this point in time did



not have a view as to the rate it would receive spent nuclear fuel from the utilities?
MR. LESTER: Objection. Vague as to the term -- not defining the word, the Government.
BY MR. NESLIN:
Q. Can you answer my question, sir?
A. Yes, we did not have a view.
Q. If you did not have a view, then, you did not have a position on the rate at which spent nuclear fuel would be received by the Government either. Is that correct?
MR. LESTER: Objection, leading.
THE WITNESS: To the best of my knowledge, that is correct.
BY MR. NESLIN:
Q. Now, one of these issues -- enumerated as issue number seven on page 0901, 0902 refers to utilities' rights to audit the waste disposal fund. Do you want to review that paragraph, sir? Mr. Rosselli, by audit is this issue referring to a financial audit of the fund?
A. It's broader than a financial audit.
Q. What else was encompassed by this issue?
A. It was a management audit.

Q. Let me back up then. What was the importance of the 1998 date for you as you understood it?
MR. MILLER: Objection, vague. And I believe asked and answered. Go ahead.
THE WITNESS: That was the date specified in the statute that the Government would have a repository available to accept spent nuclear fuel or high-level waste.
BY MR. NESLIN:
Q. Did that date enable utilities to plan for the disposal of their spent nuclear fuel?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know.
MR. LESTER: Lacks foundation.
THE WITNESS: I don't know the answer to that from a utility perspective.
BY MR. NESLIN:
Q. You don't know whether having a specific date by which the Department would begin accepting spent nuclear fuel would allow utilities to make plans regarding the disposal of their fuel?
MR. MILLER: Same objections.



THE WITNESS: Having a repository available on January 1st, 1998 was only one step having to do with delivery of it. You had to have a rank ordering. You had to, you know, develop a delivery commitment schedule. All things that would occur after or just before. I guess, there was a timetable when they would first do it, so much better planning would come subsequent, you know, to this contract signing.
BY MR. NESLIN:
Q. There would be additional planning?
A. Right.
Q. But was it still intended in developing this contract, did you anticipate that the Department would begin receiving spent nuclear fuel from the utilities in January of 1998?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
MR. NESLIN: You may answer.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And isn't that, in fact, what the utilities were receiving in return for the fees



they were paying to the Department?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And they were paying hundreds of millions of dollars to the Department. Correct?
A. Yes.
Q. And in return, the Department was to begin picking up their spent nuclear fuel January of 1998. Correct?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
(Whereupon, a document entitled Department of Energy and signed by Rovert M. Rosselli was marked Exhibit-7.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's marked as Exhibit 7 to your deposition. It's a cover letter from you, and attached to it is a report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you recall this document?
A. Yes.



Q. Was this document prepared as part of the fee-adequacy assessment?
A. I don't recall.
Q. Do you recall why it was prepared?
A. Yes.
Q. Why was it prepared?
A. To evaluate the income that would be received into the fund from the utilities for the amount of spent nuclear fuel or high-level waste that was generated based on the amount of electricity that was produced against the estimated programmatic cost to characterize, design and build the repository associated facilities, waste forms, et cetera.
Q. How did that differ from the fee-adequacy assessment process?
A. I don't recall if there was much difference. I really don't.
Q. If I could direct your attention to Bates numbered page PNL02802022. Do you generally recall the process that was followed in this document in estimating the cost of operating the waste management system programmatically?
A. Do I recall?
Q. Generally, the process that was followed?

A. No, I don't.
Q. Do you recall, was it based upon a reference case? A set of assumptions regarding how the waste management system would operate?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. Well, let me direct your attention to Bates PNL-028-2022. This is a table "3-1, Key Reference Case Assumptions. Item one. Number of geological repositories - 2." Would that refer to the number of geological repositories that were anticipated be part of the program?
MR. MILLER: Objection. Calls for a legal conclusion. Document speaks for itself.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. At that time, did you anticipate that there would be two geological repositories as part of the program?
A. No.
Q. What was your expectation regarding the number of geological repositories that would be



part of the program?
A. At the time, there definitely would be one.
Q. Why does this document use two as it's key reference case assumptions?
A. Because at the time, there were two site characterization efforts going on in the totality. One had to do with a first repository. And that was looking at the media of salt, both dome imbedded, tough and basalt.
And then, there was a fledgling second repository program that was particularly looking at granite as the median in multiple states. But it was a smaller program at that particular point in time. And there was no real assurances whether it was going to go forward or not.
Q. Item three here says that the repository design receipt rates for the first five years is at 1,800 metric tons per year. And the next 21 years of 3,000 metric tons per year. Do you see that?
A. Yes.
Q. Was that the Department's projected repository design receipt rates at the time this



report was prepared?
A. Based on the assumptions of this case, yes.
Q. Do you know where those -- well, I guess -- okay. I ask you to turn to page 2024 table 3.3. This is table 3.3 Reference Case Material Flows. And you'll see various columns. Repository 1, Repository 2, Total to the Government, Cumulative. Was this reference case used in estimating the cost of the program?
A. I don't specifically remember.
Q. Do you know who prepared this projection of material flows at the two repositories?
A. This was done by Pacific Northwest National Laboratory.
Q. Do you know who at Pacific Northwest?
A. I do not recall.
Q. Do you know what the basis of these numbers in this table are? By numbers, I'm referring to the receipt rates of 1,800 for a five-year period and then 3,000 thereafter?
A. Specifically, no. The difference in the totals was that you had a start-up cost. That's why it was less than what you got. Once 2003 came, you were at full production



capability.
Q. Was this work that was done under your supervision?
A. Yes.
Q. Did you review this report, before it was circulated for comment?
A. Yes.
Q. Did you agree with these numbers?
A. I don't recall.
Q. Did you consider these numbers to be reasonable at the time?
A. I don't recall.
Q. Did you consider them to be achievable at the time?
A. I don't recall.
Q. Do you recall the Department using other receipt rates for purpose of calculating the programmatic costs?
A. No, I don't.
Q. Would these numbers reflect your office's best estimate at that point in time, as to the rates at which SNF would be received by the Department?
A. I don't recall.
Q. Would it have been -- I appreciate that

A. Yes, he would.
Q. Can you think of anyone else, sitting here today, at the Department who would have been involved in the fee adequacy analysis process?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Do you recall any of the Department's contractors being involved in that process?
A. Yes. Pacific Northwest National Lab was involved in that process.
Q. Who at Pacific Northwest National Lab would have been involved?
A. I don't recall the specific individuals.
(Whereupon, a document entitled Business Operations and Waste Fund (BOWF) Steering Committee was marked Exhibit-11.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 11 which is a memorandum from you to Mike Lawrence, William Bennett and Ed Hanrahan dated July 15th, 1983, with various attachments. Could you read the memorandum? You don't need to



read the attachments at this point.
A. Okay.
Q. Mr. Rosselli, do you remember what the purpose of this memorandum was?
A. No, I don't.
Q. You appear to be setting up a management system for your -- or a business operations and waste fund steering committee. Do you recall that?
A. No, I don't.
Q. You don't recall developing such a committee?
A. No, I don't.
Q. The last paragraph of this cover memo states that -- the second sentence, "It is clearly time to instill a degree of coordination in our various activities, and it can only be done with your help." Were you concerned in July of 1983 that the offices activities were not coordinated?
A. I don't recall.
Q. Let me ask you to turn to page PNL-021-0219. There is several pages of handwritten information here. Do you recognize the handwriting?



A. No, I don't.
Q. Is that your handwriting?
A. No, it isn't.
Q. Let me direct you to PNL-021-0223. This is a handwritten chart. Do you recognize this handwriting?
A. No, I don't.
Q. It's not your handwriting?
A. No, it's not.
Q. You earlier testified that you participated in developing the Mission Plan?
A. Yes.
Q. What was your role in the development of the Mission Plan?
A. To see that a product was prepared.
Q. Were you in charge of the Mission Plan preparation?
A. Yes.
Q. During what period, did you work on the Mission Plan?
A. Well, based on my recollection, it was in the latter part of my tenure in the office.
Q. Do you recall working on the Mission Plan at the same time you were working on the standard contract?



A. No, I don't recall.
Q. You just don't recall one way or the other?
A. I don't recall one way or the other. As far as I can remember from a priority standpoint, we set up the organization. We worked on the fund mechanism and the contract about the same time. And I believe fee adequacy stuff and Mission Plan, kind of, followed. But if there was overlap and how much overlap, I can't recall.
Q. Who else worked on the Mission Plan development?
A. Well, certainly Mr. Head, but beyond that, I just couldn't tell you.
Q. Do you recall whether Mr. Yanoski worked on it?
A. I don't remember.
Q. Mr. Perry?
A. I don't remember.
Q. Do you recall whether people in other branches such as Mr. Bennett, or Mr. Bauer, or Mr. McElvey worked on it?
MR. LESTER: Objection. Asked and answered.

keeping with the Department of Energy's continuing commitment to inform public utility companies and other interested parties of all aspects of DOE's civilian radioactive waste management program."

Was this letter and the attached report, in fact, forwarded to utility companies?

A. To the best of my knowledge, it was.

Q. And was it sent for the purpose of informing them of all aspects of DOE civilian radioactive waste management programs?

MR. MILLER: Objection -- withdrawn.

THE WITNESS: That was the stated intent, yes.

BY MR. NESLIN:

Q. Is that your recollection?

A. That was my recollection, yes.

Q. If we could go back to Exhibit 12, the cover memo from Mr. Williamson. The first sentence states that, "Attached is a revised Mission Plan strategy overview based on the discussions in our last planning session."

Do you recall whether you and others in the Department had planning sessions to



work on the Mission Plan or the Mission Plan strategy?

A. I do not recall.

Q. Do you recall meeting with the individuals listed, under distribution on this memo, with respect to the Mission Plan strategy?

A. I do not recall.

Q. Assuming that planning sessions were held regarding the Mission Plan strategy, would it have been your practice or the Department's practice to prepare minutes of those planning sessions?

A. Based on my personal experience, you know, normally, you don't have minutes of meetings that you hold, no.

Q. Would there have been any documentation prepared regarding such meetings?

A. I don't recall.

(Whereupon, a document entitled Civilian Radioactive Waste Management Program Mission Plan was marked Exhibit-13.)

BY MR. NESLIN:

Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management



Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?

A. Yes, I was.

Q. Do you recall a draft of the Mission Plan being produced on or about December 20th of 1983?

A. No, I don't.

Q. Do you recall when the first draft of the Mission Plan was prepared?

A. No, I don't.

Q. Can you think, is there any documentation that might refresh your recollection as to when the first draft of the Mission Plan was prepared?

A. Only this Exhibit 13.

Q. If you would turn to page 1-1 of the exhibit, under introduction, the third paragraph. Could you review that paragraph to yourself?

Mr. Rosselli, the first sentence states that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management,



storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

Was it your understanding that that was OCRWM's fundamental objective?

A. Yes.

Q. What do you mean by firm schedule?

MR. MILLER: Objection. Calls for speculation and a legal interpretation and legal conclusion.

MR. NESLIN: You may answer.

THE WITNESS: Oh --

MR. MILLER: Oh, I'm sorry, yes. Please. Remember you can answer, except when I tell you don't answer that.

THE WITNESS: Okay. Firm schedule, based upon my recollection, would be the delivery commitment schedules.

BY MR. NESLIN:

Q. So your recollection that the reference to "firm schedule" refers to the delivery commitment schedules?

A. That's correct.

Q. The next sentence states that, "The waste acceptance schedule will initially preclude

the need for additional at-reactor storage after January 31, 1998, and ultimately, removed from at-reactor storage all waste that is more than five years old."
Do you recall, was that one of the intended objectives of the waste acceptance schedule included in the draft Mission Plan that is, "To preclude the need for additional at-reactor storage after January 31, 1998?"
A. I don't recall.
Q. Do you recall why this language was included in the draft Mission Plan?
A. No, I don't.
Q. You were responsible for preparing the draft Mission Plan. Is that correct?
A. Yes.
Q. It was prepared under your supervision?
A. Yes.
Q. Would you have reviewed this draft of the Mission Plan?
A. Yes.
Q. Would you have approved its circulation in this form?
A. To the best of my recollection, yes.
Q. So would you have agreed with the



statement in that sentence that, "The waste acceptance schedule will initially preclude the at-reactor storage after January 31, 1998?"
A. As a planning basis, yes.
Q. What do you mean, "as a planning basis?"
A. The Mission Plan was the plan relative to how we would respond to the requirements of the Act.
Q. And what is a plan? What's the significance of describing it as a plan, sir?
A. It's a road map in terms of how you anticipate getting from point A to point B and what are assumptions you have built into that to make that plan possible.
Q. But that road map did reflect DOE's intention for how it would get from point A to point B at that point in time, didn't it?
A. That's correct.
Q. This was accurate to the best of your understanding at that point in time?
A. That is correct.
Q. You considered it to be reasonable?
A. I considered it to be accurate at that point in time, yes.
Q. If you could go to page 2-1 Program



Strategy, the next to the last sentence in the first paragraph, sir, states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first 5 years, such that no utility will or have to provide additional storage capacity after January 31, 1998." You would have reviewed that language, wouldn't you?
A. Presumably so, yes.
Q. You would have approved that at that point in time for purposes of circulation, wouldn't you?
A. Yes.
Q. You would have consider that to be accurate at that point in time?
A. Yes.
Q. The next sentence states that, "Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." And again, you would have considered that to be accurate at that point in time?
A. Yes.
Q. The last sentence on this page, page 2-1, "Until 1998, each utility will be



responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the federal interim storage program." Do you see that?
A. Yes.
Q. Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage?
A. Yes.
Q. If I could direct you to page 2-2, the last paragraph on this page which carries over to the top of page 2-4. Could you review that paragraph, sir? You've reviewed that paragraph, Mr. Rosselli?
A. Yes, I have.
Q. Does this paragraph refresh your recollection, at all, about the purpose or perceived benefits of the exchange provision in the contract?
A. Yes.
Q. How does that refresh your recollection?
A. To the point that after 1998, the utilities would not have to build on-site storage. They could rely upon the Government to

either accept the fuel for disposal or provide some other means.
Q. And exchanges would help to implement the objective?
A. Apparently, that's what it says, yes.
Q. So would it be fair to say that exchanges would help DOE to realize at least one of the objectives set forth in this Mission Plan, that is, avoiding the need for utilities to add at-reactor storage after 1998?
A. Relative to the planning basis, yes.
Q. You say, "the planning basis." But that planning basis would reflect the Department of Energy's intention at that point in time?
A. Yes.
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. If you turn back to table 2-1, preceding page. Do you see that table, sir?
A. Yes, I do.
Q. The table is captioned, Waste Acceptance Schedule. Do you see that?
A. Yes.



Q. And it, again, shows two repositories in operation. Correct?
A. Yes.
Q. First repository coming on line in 1998. Correct?
A. That's right.
Q. Second repository coming on in 2003?
A. Yes.
Q. Each repository operating or receiving waste at a rate of 1,800 MTU for a period of five years. Correct?
A. Yes.
Q. And then receiving waste at a rate of 3,000 MTU thereafter. Correct?
A. Yes.
Q. And this table indicates that those rates would be sufficient to meet the annual discharge rate from both operating reactors and also decommissioned reactors beginning in 2003. Do you see the line for 2003?
A. Yes.
Q. Would you agree with my characterization?
A. Would you say it again for me please?
Q. This table indicates that the Department's waste acceptance schedule would



receive waste -- it would meet the annual discharge rate from both operating reactors and decommissioned reactors beginning in 2003?
A. Yes. The two repositories could receive 4800. Discharge rate is something like 3500 so, yes.
Q. That's a discharge rate from both operating and decommissioned reactors?
A. That's correct.
Q. Do you recall who prepared this table?
A. No, I don't.
Q. Do you know what the basis of this table was?
A. No, I don't.
Q. But this table stated the Department's intention regarding its waste acceptance schedule as of December 1983. Correct?
MR. MILLER: Objection. Calls for speculation and a legal interpretation.
THE WITNESS: It stated the Department's plan, the intention at that time.
BY MR. NESLIN:
Q. You would agree it stated the Department's intention at that point in time?
MR. MILLER: Same objections.



THE WITNESS: The Department's plan at that point in time.
BY MR. NESLIN:
Q. Did the Department's plan reflect its intention?
A. Yes.
Q. And again, you reviewed this part of the document -- you would have reviewed this part of the document?
A. Yes.
Q. And you would have approved it for purposes of circulation?
A. I either would have approved it or recommended approval for the director of the office.
(Whereupon, a document entitled Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting was marked Exhibit-14.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 14 to your deposition. This is a document entitled Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12 through 15, 1983, Washington, D.C.

If you would turn -- and I'll represent this is not the entire document. It's an excerpt from the document. Pages 1112, which are program overview, it's a presentation given by Robert Morgan.

Do you recall Mr. Morgan giving a presentation in December 12 to 15, 1983, regarding the implementation of the Nuclear Waste Policy Act?

A. No, I don't.

Q. I'll ask you to review page SNO69599 please. Have you reviewed the first page, Mr. Rosselli?

A. Yes.

Q. Do you recall having any input into this presentation by Mr. Morgan?

A. No, I don't.

Q. Did you recall reviewing this program overview in any form?

A. I probably did.

Q. Why do you say you probably did?

A. Because the first paragraph had a lot of the accomplishments that my group was involved in.

Q. And I note that the second column talks



at some length about the draft Mission Plan. And you would have been responsible for the draft Mission Plan as well, sir?

A. Yes, that's correct.

Q. The first paragraph in the second column states that, "We've just received the preliminary draft of Volume I of the Mission Plan. And we hope to have this available to interested parties in the states and others by Christmas." Would that be referring to Exhibit 13?

A. That's my assumption, yes.

Q. Do you recall that the first draft of the Mission Plan was, in fact, circulated to interested parties, states, and others?

A. I don't recall.

Q. Do you recall whether it was circulated outside the Department?

A. I don't recall.

Q. Mr. Rosselli, I direct you to the fourth paragraph of the second column. Third sentence reads, "Technically the Act does not specify how much waste of spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did



not believe that that meets the intent of the Act." Do you see that language?

A. Yes, I do.

Q. Would you agree that accepting one spent fuel element in 1998 would not meet the intent of the Act?

A. Yes.

Q. That would not comply with the Department's obligations under the Act?

MR. MILLER: Objection. Calls for speculation and a legal conclusion.

THE WITNESS: Yeah. I don't recall the specific language in the Act.

BY MR. NESLIN:

Q. But my question was, would the Department receiving a -- with the Department accepting a single spent fuel element in 1998, would that have complied with the Department's obligations under the Act, as you understood them?

MR. MILLER: Same objections.

THE WITNESS: Well, technically, I would assume that our obligation was to start accepting spent fuel by 1998, January 1998. So if we took one, we would be meeting our



obligation under the Act.

BY MR. NESLIN:

Q. Is that all the Act required the Department to do, is to accept one spent fuel assembly, sir?

MR. MILLER: Same objection.

THE WITNESS: I do not believe that the Act was specific in terms of one or many.

BY MR. NESLIN:

Q. But I'm asking you about the intent behind the Act. You had an understanding of the intent behind the Act in preparing the contract and working on the Mission Plan, didn't you?

A. Yeah. I don't think the intent was that if we only accept one. And I think that Mr. Morgan stated that here in a public address.

Q. You would agree with what Mr. Morgan said here?

A. Yes. Yes, I would.

Q. It goes on to the say that, "The basic strategy which we've outlined in the Mission Plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site." Is that a true statement?

A. That is.
Q. And was that, in fact, what the utilities were paying for?
MR. MILLER: Objection. Calls for speculation and a legal interpretation.
BY MR. NESLIN:
Q. Do you understand my question, sir?
A. I think the utilities were paying for disposal services.
Q. And were they paying for disposal services sufficient that they would not have to add additional storage on site?
MR. MILLER: Same objections.
THE WITNESS: After 1998, yes.
BY MR. NESLIN:
Q. You would agree?
A. Yes.
Q. If I could direct you to the next paragraph, second sentence states that, "So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors." Is that a true statement, to your knowledge?
A. I don't recall.
Q. Well, he's stating that by 2000 or 2001,



you would be accepting spent nuclear fuel at the same rate as that being discharged by the reactors. Is that your understanding?
MR. MILLER: Asked and answered.
THE WITNESS: Yes, I don't recall.
BY MR. NESLIN:
Q. The next page, page SNO69600 states that, "It is anticipated that at that point it would look at bringing home the second repository." It's referring to the years 2000 and 2001. That would be the effect of the waste acceptance schedule set forth in table 2-1, Exhibit 13, wouldn't it?
MR. MILLER: Objection. Calls for a legal conclusion. Document speaks for itself.
THE WITNESS: Could you repeat your question again please.
MR. NESLIN: Could you read the question back to the witness?
(Record read.)
THE WITNESS: Well, that doesn't have the second repository -- 2-1 doesn't have the second repository receiving until 2003. So



he's off a little bit in timing, but the intent, I think, is the same.
BY MR. NESLIN:
Q. Well, if you would read the balance of that paragraph, Mr. Rosselli.
A. Okay.
Q. This indicates that by approximately 2001/2001, that time period, there may be some reactors which have reached the end of their designed life time and will have to be shutting down. And that the second repository could receive the fuel from the basins of those reactors so that they could go through the appropriate decommissioning aspects. Do you see that?
A. Yes.
Q. Does that refresh your recollection regarding the intended purpose or application of the paragraph in the final contract dealing with shutdown reactors and priority for shutdown reactors?
A. No, it doesn't.
Q. Do you recall any discussions regarding the effect of the Mission Plan schedule on shutdown reactors?



A. No, I don't.
MR. MILLER: Do you mind if we take a break now, Dave, since you're in between documents?
(Recess.)
(Whereupon, a letter from Robert Morgan to Russell Stanford of the Edison Electric Institute was marked Exhibit-15 marked.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 15 which is a December 20, 1983 letter from Robert Morgan to Russell Stanford of the Edison Electric Institute. Could you review the letter?
A. Oh, okay.
Q. Mr. Rosselli, does this document refresh your recollection regarding whether Exhibit 13, the December 20, 1983 draft Mission Plan was circulated for comment to the utilities?
A. I don't remember.
Q. If you could look at the first sentence, it states that, "The enclosure to this letter is the first volume of the most recent working draft of the Mission Plan." Do you see that?
A. Um-hmm.
Q. Does that appear to refer to Exhibit 13?

MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know the answer to your question.
BY MR. NESLIN:
Q. Do you recall there being multiple drafts of the Mission Plan in December of 1983?
A. I don't recall.
Q. Well, does this letter indicate that the Department circulated a draft of the Mission Plan on or about December 20th to Edison Electric Institute?
A. From the context of this letter, it appears that that is true.
Q. Would you have been involved in that process, sir?
A. I don't remember.
Q. And does this letter indicate that the Department would have requested comment from the Edison Electric Institute on the then current draft of the Mission Plan?
A. Based upon the last paragraph, that is correct.
Q. Does this letter also indicate that the Department would have similarly sought comment



from other federal agencies, congress, state government, Indian tribes, utilities and nuclear industries?
MR. MILLER: Document speaks for itself.
THE WITNESS: Based on the first paragraph, yes, it does.
(Whereupon, a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, was marked Exhibit-16.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 16 is a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, before the Subcommittee on Energy Conservation and Power, of the House Committee on Energy and Commerce, dated February 22, 1984.
Do you recall acting director, Lawrence, appearing before such a subcommittee on or about February 22 of 1984?
A. I don't recall, no.
Q. If you could glance at the document and tell me whether you recall reviewing this



document at any time in the past. Do you recall reviewing this testimony?
A. No, I don't.
Q. Mr. Rosselli, do you recall participating in the preparation of testimony for Mr. Lawrence at any time?
A. No, I don't.
Q. Do you recall participating in the preparation of other congressional testimony during the time that you were at OCWRM?
MR. MILLER: Objection, vague.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. If you could look at page PNL-173-0226. The first paragraph of the -- let me back up. This page is captioned, Summary of Statement by Michael J. Lawrence. First paragraph discusses the budgeting process for OCRWM. Do you see that?
A. Yes.
Q. And if you skip down to the third paragraph, it talks about various accomplishments that have occurred since the passage of the NWPA. And these include establishing a fee collection system. Do you see that, the second



bullet?
A. Yes.
Q. And contracting with the nuclear utilities is the third bullet. Do you see that?
A. Yes.
Q. And this testimony was given on February 22nd, 1984. That would have been the period at which you were still at OCRWM. Is that correct?
A. Yes.
Q. Given the fact that Mr. Lawrence was discussing the budgeting process and the fee collection process and the contracting process, do you believe that you would have reviewed this testimony before it was given?
MR. MILLER: Objection. Asked and answered.
MR. NESLIN: You may answer if you can.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Because he was discussing various facets of the program that you were in charge of?
A. Yes.

Q. If we could turn to page PNL-173-0228. If I could ask you to review the last -- point you to the last paragraph of the text of this page which states that, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule" -- well, let me back up. The preceeding sentence states that, "The programs activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982, which is: to accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

The next sentence goes on to say, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and ultimately, remove all eligible waste from at-reactor storage." Do you see that language?

A. Yes.

Q. Would you agree with that language?

A. Yes.



Q. Did that language state the Department of Energy's position in February of 1984, to your knowledge?

A. Yes.

Q. Would it be fair to say that as of February 1994, the Department believed that an appropriate waste acceptance schedule would preclude the need for additional at-reactor storage after January of 1998?

A. Yes.

Q. And would it be fair to say that the Department believed that such a schedule would reflect the intent behind the Act?

MR. MILLER: Objection. Calls for a legal conclusion, speculation.

THE WITNESS: What do you mean by the word "intent?"

BY MR. NESLIN:

Q. The intent of congress. Well, let me -- the intent of congress in enacting the Act?

MR. LESTER: Same objection.

THE WITNESS: The intent of congress was what?

BY MR. NESLIN:

Q. In enacting the Act?



A. Was what?

Q. To provide that the utilities would not need to store additional waste at reactors after January 1998? In other words, that the Department would be responsible for addressing the waste generation following January of 1998?

MR. MILLER: Same objection, vague.

THE WITNESS: I need to clarify a point on this. And maybe it extends back to some of the previous discussions we had on the Mission Plan. I think it's important to recognize it was the intent of the Mission Plan, okay? In terms of how we -- and the Mission Plan was to define how we would carry out the provisions of the Nuclear Waste Policy Act. So it was the intent of the plan that described how we were going to accommodate the needs of the utilities.

In no way, shape, or form was it a contractual intent that we would make all the things happen that was in the Mission Plan.

BY MR. NESLIN:

Q. But it reflected the Department's intent at that point in time?



MR. MILLER: Objection. Same --

BY MR. NESLIN:

Q. In administering the program?

MR. MILLER: Same objection.

THE WITNESS: Again, I have to go back, and in your definition, it was an intent of the Mission Plan, not a contractual intent. And I think we have to go back to previous questions that you asked me on this. I think the distinction is extremely important here.

BY MR. NESLIN:

Q. Let me back up. That intent reflected, whether you call it a plan or contract, it reflected what the Department intended to do as of that point in time. Do you understand my question?

MR. MILLER: Same objections.

THE WITNESS: The intent of the plan in terms of how we would carry out the Nuclear Waste Policy Act, was to have a repository in place in 1998 and begin receiving spent nuclear fuel from reactors on a schedule that would preclude -- that would match their

generation rate and, you know, which would then preclude them from having to build additional on-site storage capacity. That's different from contractual intent.

BY MR. NESLIN:

Q. What do you mean by contractual intent?

A. What do I mean by contractual intent?

Q. Yes, sir.

A. Contractual intent was, I guess, the quid pro quo between, you know, two parties that in exchange for the utilities paying us one mill per kilowatt hour, we would provide a disposal facility to receive and dispose of their spent nuclear fuel.

Q. And what's the basis of that understanding? Where does that understanding come from, sir?

A. That understanding came out of the Department and negotiation of the contract.

Q. So what was, in your mind, the contractual intent? Do you recall that issue?

MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.

BY MR. NESLIN:

Q. What were the utilities receiving in



return for paying the one mill? Making the one mill payment?

MR. MILLER: Objection. Asked and answered.

THE WITNESS: Disposal services.

BY MR. NESLIN:

Q. Disposal services beginning in January of 1998?

MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.

BY MR. NESLIN:

Q. Is that correct?

A. Yes.

Q. And disposal of substantial amounts of spent nuclear fuel?

MR. LESTER: Same objections.

THE WITNESS: That doesn't talk about the amounts at all.

BY MR. NESLIN:

Q. Well, sir, you -- if we go back to Exhibit 14, second column.

A. Page?

Q. Page SNO69599. Mr. Morgan's testifying or a portion of Mr. Morgan's presentation in which he talks about the fact that he did not



believe that accepting one spent fuel element would meet the intent of the Act. Do you see that language?

A. Yes.

Q. And you would agree with that. Correct?

A. Based upon the plan I would agree with that.

Q. Mr. Rosselli, did you discuss any of your prior testimony with your counsel during the last break?

MR. MILLER: Don't answer that. Objection. Calls for privileged communication.

MR. NESLIN: I'm not asking what was said. I'm simply asking whether he discussed his prior testimony.

MR. MILLER: The substance of our discussions with Mr. Rosselli are subject to attorney/client privilege, and don't answer that.

MR. NESLIN: You're instructing the witness not to answer?

MR. MILLER: That's correct.

(Whereupon, a document entitled Battelle, Human Affairs Research Centers was marked Exhibit-17.)

BY MR. NESLIN:



Q. Mr. Morgan, Exhibit 17 is a memorandum from Thomas Overcast and Susan Carney at Battelle to Emmett Moore?

MR. LESTER: I think it's Mr. Rosselli.

MR. MILLER: Yeah, you misspoke and said Mr. Morgan.

MR. NESLIN: Mr. Rosselli. Excuse me. I'd like to direct you to page 2 of that document. PNL-117-3152 under heading 3.0, DOE Considers Temporary At-reactor Storage. Would you read those two paragraphs please?

BY MR. NESLIN:

Q. Mr. Rosselli, in the first paragraph, it refers to you speaking at, "An Atomic Industrial Forum Conference in Atlanta." Do you see that?

A. Yes.

Q. Do you remember participating in such a conference?

A. No, I don't.

Q. Do you recall during the time that you were at OCRWM making any presentations to outside groups on the waste management program?

A. Yes, I do. I remember being in the same forum as the conference that Mr. Morgan

spoke at, I believe in Washington, D.C.
Q. That was the proceedings of the 1983 Civilian Radioactive Waste Management information meeting?
A. I believe so.
Q. In December of 1983?
A. I think so, yes.
Q. Do you recall what the subject of your participation was?
A. I vaguely remember it had to do with the Waste Fund and the operation of the Waste Fund.
Q. Did you prepare a written paper that you submitted?
A. Oh, what I remember, yes.
Q. And did you appear and actually present the paper and give a speech?
A. I gave a speech.
Q. Did you retain a copy of that paper?
A. No.
Q. Your remarks?
A. No.
Q. Do you know who might have a copy of those remarks?
A. No.



Q. You say that it addressed the Waste Fund. What aspect of the waste fund did you address?
A. I don't remember the specifics at this point.
Q. What do you remember about it?
A. Very little outside of the fact that I was on the docket to speak.
Q. Do you recall making any other presentations regarding the waste management system during the period that you were at OCRWM?
A. To the last public forum, no, I don't.
Q. And in paragraph 3.0 on page PNL-117-3152 in the second paragraph the last sentence states or attributes to you the statement that, "DOE plans to provide the capability to accept waste at the reactor site in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998." Do you see that?
A. Yes.
Q. Does that refresh your recollection at all?
A. I don't remember the speech. I do



remember internal discussions in the Department to be consistent with the Mission Plan that said, utilities would not have to, at their own cost, build additional on-site storage. That we were looking at options, should a repository be delayed beyond 1998. And these were some of the, you know, options that were under consideration.
Q. And internal discussions among who?
A. DOE, OCRWM staff. Specifically, I couldn't remember and tell you.
Q. Would it have been senior staff at your level?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And did you agree with that view that DOE should be accepting waste -- or that DOE planned to accept waste at a rate such that utilities would not be required to add storage after 1998?
A. That was consistent with, you know, the Mission Plan that we were putting together and the intent of that plan.



Q. You agree with that?
A. Yes.
Q. You say that DOE was looking at certain options. Are you referring to the options discussed in the preceeding sentences of this document?
A. Yes.
Q. That's at-reactor cask storage and a monitored retrievable storage system?
A. Yes.
Q. Were there other options that DOE was considering?
A. I honestly don't remember that.
Q. DOE would pay for the implementation of those options?
A. Yes. Let me -- yes, we would. Because we were going to build a monitor retrievable storage out of the -- yes. So whether it was casks at reactor sites or shipment to an interim storage facility, yes.
Q. And the effect of that would be that individual utilities would not have to add storage after 1998?
A. Yes.
Q. Or incur any costs associated with

additional storage needs after 1998?
A. That's the assumption, yes.
Q. Do you recall discussing those options with the utilities themselves?
A. I don't recall, no.
(Whereupon, a document entitled Program Strategy and dated February 29, 1984 was marked Exhibit-18.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed a document captioned, Program Strategy with a draft and the date of 2-29-84. And a designation RW-30 on the first page. Do you know what RW-30 refers to?
A. If I remember correctly, that was the geological repository organizational unit. Bill Bennett's unit.
Q. Mr. Bennett's unit?
A. I believe so, from my memory.
Q. Do you recognize the annotations on this document? The handwriting?
A. No, I don't recognize the handwriting.
Q. Do you recognize this document? Have you reviewed this document before? Is it familiar to you?



MR. LESTER: Objection, compound.
BY MR. NESLIN:
Q. Do you recall reviewing this document before?
A. No.
(Whereupon, a document entitled United States Government Memorandum and dated June 4, 1984 was marked Exhibit-19.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 19 is a memorandum from William Bennett to various individuals dated June 4, 1984. You see the first sentence in this document. It sates that, "An OCRWM program wide is under way to assess the existing spent fuel disposal contract?"
A. Yes.
Q. Do you recall such an effort?
A. No, I don't.
Q. Do you recall reviewing this memorandum previously? I note that you're listed as a CC.
A. No. I left in May, so I didn't get this document.
Q. The next sentence in the document states that, "As part of this effort, we have had our



technical support contractor, Weston, review the spent fuel disposal contract to determine if any additional provisions or revisions will be required to assure that it meets our program's technical acceptance requirements." Do you see that?
A. Yes.
Q. Do you recall Weston undertaking such a review?
A. No, I don't.
Q. Do you recall other reviews of the contract being undertaken after the time that it was adopted in final form and before the time that you left OCRWM?
A. No, I don't. By the way, if I could correct an earlier statement. Seeing these RW10, 20, 30's, when I say it was geologic repository RW-30, it wasn't. It was the interim storage.
Q. That was the section for --
A. Exhibit 18.
Q. -- storage and systems development?
A. Yes.
Q. Under Mr. Bauer?
A. Yes. That's RW-30.
Q. So that would indicate that Exhibit 18



draft was prepared by Mr. Bauer?
A. Or his organization. It's within his organization.
(Whereupon, a document bearing Bates SNO44976 was marked Exhibit-20.)
MR. NESLIN: Mr. Rosselli, Exhibit 20 a press release. Could you review it please.
MR. MILLER: Dave, I object to your characterization of the document, okay?
BY MR. NESLIN:
Q. Mr. Rosselli, do you recall discussions within the Department about revisions to the standard contract?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Does this document refresh your recollection about that issue in any way?
A. No.
Q. The fourth paragraph from the bottom says that, "Rusche said the primary purpose of revising the contracts was to assure utilities that they will not have to build more 'swimming

pools,' for temporarily storing the wastes beyond 1998." Do you recall any discussions with Mr. Rusche on that issue?
A. No.
Q. Do you recall seeing this document previously?
A. No.
Q. If there was an internal process to evaluate revisions to the contract during the time that you were at OCRWM, would you have been part of that process as associate director of management?
A. Yes.
Q. Sitting here today, you have no recollection that such a process was under way before you left?
MR. MILLER: Asked and answered.
THE WITNESS: No.
MR. NESLIN: Let's take a break. Five minutes.
MR. LESTER: Sure.
(Recess.)
(Whereupon, a document dated June 21, 1984 to Secretary Hodel was marked as Exhibit-21.)



BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 21 is a letter from Senator Bennett Johnston to Secretary Hodel, dated June 21st, 1984. Now, I note that this does post date the time that you've testified you left OCRWM. In looking at this, do you have any recollection of this letter?
A. No, I don't.
Q. Mr. Rosselli, the last paragraph on the first page, Senator Johnston expresses concern over the fact that the nuclear waste program is going to cost utility rate payers billions of dollars and that there was a need to provide assurance that the Department would begin -- further assurance regarding the fact that the Department would begin receiving nuclear waste on a specific schedule. Do you recall --
MR. MILLER: Objection to the characterization of that paragraph.
BY MR. NESLIN:
Q. Do you recall during your tenure at OCRWM concerns being expressed by members of the senate or congress regarding the Department's ability to perform under the contract?
MR. MILLER: Objection, vague.



THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. Do you recall any concerns being expressed by Congress regarding the implementation of the contract during your tenure at OCRWM?
A. No, I don't.
(Whereupon, a document dated September 7, 1984 was marked Exhibit-22.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 22 is a letter from Secretary Hodel back to Senator Johnston dated September 7, 1984. Would you review that letter please. Do you recall reviewing this document before?
A. No.
Q. Does this refresh your recollection in any way regarding any discussions that you may have been party to within the Department concerning changes or amendments to the standard contract?
A. No.
Q. Do you have any knowledge why the Department did not incorporate into the contract's provisions which specified the minimum amount of spent fuel and waste which the



Department will be obligated to accept not later than January 31, 1998, as Secretary Hodel suggests would occur?
A. No.
(Whereupon, a document entitled The Mission Plan: Volume I, Overview and Current Program Plans was marked Exhibit-23.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 23 is a document captioned, The Mission Plan: Volume I, Overview and Current Program Plans by Robert M. Rosselli. Four Fuel Cycle Conference '84, Atomic Industrial Forum, Inc., Westin Peachtree Plaza, Atlanta, Georgia. April 3, 1984. Could you review the first three pages?
Does this refresh your recollection, at all, regarding whether you participated at the fuel cycle conference in April 1984 in Atlanta, Georgia?
A. I must have, yes.
Q. Does it refresh your recollection? Do you have any memory of it?
A. Yes, I do.
Q. What do you remember about it, sir?
A. I gave a speech.

Q. Do you recall what the purpose of the conference or program was?
A. No, I don't.
Q. Do you recall what groups or individuals might have attended the conference?
A. No, I don't.
Q. Do you recall that your speech involved the Mission Plan?
A. Until seeing this, no, I didn't.
Q. Upon seeing it, you now recall it involved the Mission Plan?
A. Yes, I do.
Q. If I could direct you to page 5 of this document. The paragraph under program strategy. If you could review that paragraph. It carries over on to page 6.
A. Okay.
Q. Have you had a chance to review it, Mr. Rosselli?
A. Yeah. The first paragraph on page 6 through the first paragraph on page 7.
Q. Yes, under Program Strategy. The second sentence under Program Strategy states that, "Keep in mind that the fundamental objective of the program is to begin accepting civilian



radioactive waste on a firm schedule by January 31, 1998." Do you see that?
A. Yes.
Q. Those were your words, sir?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. You believe that to be true?
A. Yes.
Q. The next sentence states that, "A key point here is that the Department does not intend to delay or postpone the schedule of acceptance, even if a permanent geologic repository cannot be completed by that time." Those, too, are your words?
MR. MILLER: Same objections.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. You consider them to be true?
A. Yes.
Q. And if a permanent geologic repository could not be completed by January 1998, that was the strategy at that time, to attempt to accommodate storage needs through its federal



interim storage or a monitored retrievable storage facility?
A. It was the plan that if the repository wasn't ready, they were looking at other alternatives like at-reactor storage or a monitored retrievable storage.
Q. By the "plan," do you mean DOE's plan?
A. Yes, our Mission Plan.
Q. The top of page 6, the last sentence in the carry-over paragraph, "This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes early enough to determine their on-site interim storage needs prior to 1998." Those, too, were your words?
A. Yes.
Q. You consider those to be accurate, at the time you wrote them?
A. Yes.
Q. What did you mean by, "utilities establishing firm planning schedules?"
A. Delivery commitments.
Q. And it was your expectation that this would enable them to on-site interim storage



needs prior to 1998?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And by prior, you're referring to the period prior to 1998?
A. Yes.
Q. After 1998 the Department would either begin receiving such waste or would implement some interim measure, such as interim storage or a monitored retrievable storage facility?
MR. MILLER: Objection. Mischaracterizes the document.
MR. NESLIN: You may answer, sir.
THE WITNESS: It was in the Department's plan that after 1998 they would provide some capability, whether it was at the reactor site or some other means to store the waste.
BY MR. NESLIN:
Q. So that in any event, the utilities would not have to provide additional waste on-site after 1998?

A. Additional storage capacity on-site after 1998, yes.
Q. Do you recall what the purpose of discussing the Mission Plan at this conference was?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: The purpose was that we wanted to, as we said earlier, we wanted to be open to our constituency. And the draft had been put out. We were going to sort off the final draft, as they called it. And this was an opportunity to summarize where we were at that particular point.
Q. To provide information to the industry?
A. Yes.
Q. On the Mission Plan?
A. Yes.
Q. Do you know who else worked on this presentation? Did anyone else work on it?
A. I don't know the answer to that.
Q. Would it have been reviewed or approved by anyone else in the Department?
A. I don't remember.
Q. Do you remember any practice that



someone discussing the program at a conference of this sort would have to secure approval from anyone at the Department?
A. The normal procedure within the Department at that time was that, if given this was a major speech, it would be reviewed by some other parties.
Q. Who would those other parties have been?
A. Public affairs would be an example. Within your own internal program office, they would look at it for factual accuracies.
Q. Anyone else?
A. Not to my remembrance.
Q. Would you assume that such a review was done here?
A. Yes.
Q. What was the purpose of providing information on the draft Mission Plan to the industry?
MR. MILLER: Objection. Asked and answered at least three or four times.
THE WITNESS: To inform them of our plans?
BY MR. NESLIN:
Q. Did you intend for them to use this



information in their own planning?
A. I don't recall that being -- whether that was the intended purpose or not.
Q. You have no recollection, sitting here today?
A. No.
Q. When you refer to the Mission Plan being a planning document, are you referring to planning both by the Department and by the utilities which are contract -- parties to the contracts with the Department?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: This is a planning document that the Department was using to define how we would be carrying out the statute, the provisions of the statute.
BY MR. NESLIN:
Q. Did you anticipate that the utilities would use it as well?
MR. MILLER: Objection. Asked and answered.
BY MR. NESLIN:
Q. Or to understand how the Department would be carrying out its responsibilities?



MR. MILLER: Same objections.
THE WITNESS: I didn't anticipate one way or the other what the utilities would do.
BY MR. NESLIN:
Q. Well, if you had no expectation as to how they would use it, why did you provide it to them?
MR. MILLER: Objection. Asked and answered at least three or four or five times now.
THE WITNESS: It was a clear open policy within the office to talk about our plans. What folks did with that is out of my control.
BY MR. NESLIN:
Q. But you were providing the information to them. Is that it?
A. Yes, we were.
MR. NESLIN: Can we go off the record here?
(Discussion off the record).
(Whereupon, the deposition recessed at 5:39 p.m.)

185

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE A
MAINE YANKEE ATOMIC POWER COMPANY FLORIDA POWER & L
NORTHERN STATES POWER COMPANY DUKE POWER, A Division o
INDIANA MICHIGAN POWER COMPANY SACRAMENTO MUNICIPA
SOUTHERN NUCLEAR OPERATING COMPANY, et al. COMMONWEA
BOSTON EDISON COMPANY GPU NUCLEAR, INCORPORATED WIS
ELECTRIC POWER COMPANY POWER AUTHORITY OF THE STATE
OMAHA PUBLIC POWER DISTRICT NEBRASKA PUBLIC POWER DIS
TENNESSEE VALLEY AUTHORITY,
Plaintiffs, vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C 98-486C, 98-488C, 98-614
UNITED STATES, 98-621C, 99-447C, 00-440C 00-697C, 00-70
01-116C, 01-249C DEFENDANT.
________________________

VOLUME II DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District April 16, 2002
- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.



APPEARANCES

ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY; DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: Daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM



BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: Kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: Dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and R. ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov



Also Present:
Peter J. Skalaban, Jr.

RICHLAND, WASHINGTON,
APRIL 16, 2002,
9:07 a.m.
EXAMINATION
BY-MR.NESLIN:
Q. Mr. Rosselli, I remind you that you're still under oath from yesterday. Do you understand?
A. Yes.
Q. And we'll follow the same ground rules that we discussed in the beginning of your deposition yesterday, okay. Do you recall?
A. Yes.
Q. Have you discussed your deposition with anyone since the time that we broke yesterday and this morning?
A. No.
Q. I'd like to clarify one point that we discussed yesterday afternoon with respect to Exhibit 13, the December 20, 1983 draft of the Mission Plan. Mr. Rosselli, am I correct that this draft does reflect the intent of the Department, as you understood it at the time it was issued?
A. The intent of the Department as it



relates to its plans to fulfill the requirements of the statute, yes.
Q. It reflects how the Department expected to fulfill it's requirements under the statute?
A. Yes.
(Whereupon, a document entitled Mission Plan for the Civilian Radioactive Waste Management Program, dated April of 1984 was marked Exhibit-24.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked Exhibit 24 to your deposition. This document is entitled Mission Plan for the Civilian Radioactive Waste Management Program dated April of 1984. Would you have been responsible for the preparation of this document, sir? And let me clarify that this is not the entire document. It's simply, I believe, the first two chapters of a much lengthier document.
A. Given the fact that the Mission Plan was under my responsibility, I would conclude, yes.
Q. And you were still at OCRWM as of April 1984?
A. Yes, I was.
Q. Would you have reviewed this before it



was published in this form?
A. I don't recall.
Q. Sir, as you've testified that you would have been responsible for the preparation of the Mission Plan, apparently a Mission Plan, this April draft, was prepared, was published. Pages 1 and 2 indicate that it was circulated to various parties by the Department. Based upon that, would you believe that you would have reviewed it before it was circulated?
A. The transmittal letter on this thing is dated May 2nd, '84. And I do not recall when I started to actually disengage. If memory serves me correctly, I was here in Richland in the first part of May. And so I don't recall the extent and degree of my actual review of this before it went out.
Q. Do you recall reviewing drafts of the Mission Plan subsequent to December 20th of 1983?
A. Yes, I did. I have reviewed those documents. Those are per all your documents.
Q. And I'm talking about drafts after, that were prepared after Exhibit 13?
A. No, I don't recall that. I just don't recall.



Q. Do you recall the process that the Department followed in going from the December 20th, 1983 draft to the April 1984 draft?
A. Specifically, no, I don't recall the exact process.
Q. Do you recall anything about the process?
A. No, I don't.
Q. Do you recall who was involved in attempting to revise the plan?
A. Specifically, no.
Q. I believe you testified yesterday that the Mission Plan work was coordinated by Mr. Head in the operations division?
A. That's correct.
Q. Would Mr. Head have been involved in the preparation of the April 1984 draft?
A. Yes. I can only assume, you know, at this point in time, given the functional responsibilities of that organization and the fact that it fell under my responsibility that, you know, there was a process, and those players were involved from the initial draft to the second draft to the final.
Q. If I could direct you to page 2-1 of

# RUSCHE

UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
____________________________)
)
MAINE YANKEE ATOMIC POWER ) CA NO. 98-474C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
____________________________)
)
CONNECTICUT YANKEE ATOMIC ) CA NO. 98-154C
POWER COMPANY, )
PLAINTIFF, )
)



VS. )
)
THE UNITED STATES, )
DEFENDANT. )
____________________________)

Deposition on oral examination of BEN RUSCHE, VOLUME 1, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Thursday, May 16, 2002, at the hour of 9:20 a.m.

2 Appearances: Representing the Plaintiffs: JERRY STOUCK, ESQUIRE S



This deposition is taken in accordance with the Federal Rules of Civil Procedure.

It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.

Whereupon:

BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:

EXAMINATION



BY MR. STOUCK:
Q. Good morning, Mr. Rusche. We have met before, and we greeted briefly before the deposition started. Have you been deposed before?
A. I believe I have.
Q. Okay. Do you recall when?
A. Not for this purpose.
Q. I understand.
A. I think I had -- I was in an arbitration proceeding in the last year.
Q. Within the last year?
A. Yes. For a company which I'm associated with.
Q. Okay. Prior to that had you been deposed?
A. I don't believe so.
Q. Okay. Well, let me just briefly go over some of the ground rules. I'm going to be asking you --
A. May I have a pad in case I want to jot down something?
Q. Sure. Have you got one? Because I've got a spare.
A. I think I've got one.
Q. Okay. If you've been through it within

the last year, you're kind of an old pro, but I'm going to be asking you a series of questions. And we want your best answers.
If you don't understand one of my questions or if you need a clarification, please feel free to ask. And if you -- otherwise I'm going to assume that you understand the questions. Okay?
A. Yes.
Q. And it's very informal, as you can tell. So if you would like a break for any reason at any time, just let me know, or if there's anything else we can do for you during the course of the day, we'll try to accommodate you. Sometimes -- is Mr. Miller representing you here today?
A. He is indeed.
Q. Okay. He may object to some of my questions. And that happens from time to time, but you are obliged to answer the questions after the objection is noted, unless he instructs you not to answer. And that may happen from time to time. I don't know. If he instructs you not to answer, then fine, but if he objects, after the objection is stated, you should answer the



question. And I think that's about it. What have you done to prepare for this deposition?
A. Well, I got a copy of the subpoena about a week ago, I guess.
Q. Okay.
A. Beyond musing in my mind as to the subject matter and the circumstances, nothing.
Q. Okay. Haven't reviewed any documents?
A. I have reviewed the NWPA. I have a copy of the Act.
Q. Okay.
A. And I have reviewed a bound volume of testimony on the Amendments Act, of which I was a major participant before I left the Department.
Q. Okay. And that was testimony given to Congress?
A. Yes.
Q. Okay. Any other documents that you reviewed in preparation for today?
A. No.
Q. Okay. Did you meet with Mr. Miller?
A. Yesterday for the first time.
Q. Okay. And about how long did that meeting last?
A. Thirty minutes.



Q. Okay. And when did Mr. Miller's and the Department of Justice's representation of you as counsel begin?
A. I don't remember the exact date. I'm sure it's -- I'm sure it's in the record. I don't have it.
Q. Was it prior to the time a week ago when you got the subpoena?
A. Yes. Yes.
Q. And just tell me the circumstances of how that representation was arranged. Was there a phone call or --
A. I believe that -- I believe you called me after the original suit had been decided, and you and I had a brief conversation, which was purely social.
And sometime thereafter, I don't know -- I can't predict or can't recall exactly when, apparently a potential witness list was provided to the Department.
And it was out of that activity that I got a call from the Justice Department suggesting or telling me that my name was on the witness list and that I had the option to have a member of the Department or the Department represent me. This



is some -- certainly some weeks, if not months ago. I can't tell you --
Q. Okay. I was going to ask whether it was several years ago?
A. No. No. No. No. No. No. No.
Q. It was within the last six months, you think?
A. As best I can recall.
Q. Okay. Now, prior to that time when the government or someone from the government called you and indicated that your name had appeared on the witness list and offered you the option of representation, which apparently you took up?
A. I did. I did.
Q. Prior to that time did you have any discussions with anyone from the Department of Justice or the Department of Energy about this litigation?
A. No.
Q. Okay. All right.
A. Excuse me. I just -- I thought I -- if it's not inappropriate, you may see my face reddening. I take Niacin in copious quantities. And I take it in the morning, and I forgot to bring it for lunch, and at lunch. I'm taking

about 1,500 milligrams.
And I'm one of the people that tolerate it well, but you may see my face appear to be flaming. And if you do, it is Niacin and not your presence.
Q. Well, I'll tell you something. I appreciate that, but I'm color-blind. And so I didn't even notice it.
A. You may see the thermal aura that's around me.
Q. You look nice and tan to me, and I didn't even notice it, but thanks for pointing that out.
Is there anything about that medication or any other medication you are on that would prevent you from giving your best answers?
A. Absolutely not. It's purely my choice.
Q. All right. I would like to ask you about your professional experiences. And I happen to have --
MR. STOUCK: Well, can you mark this as, I guess, Exhibit 1 to this deposition.
(Exhibit No. 1 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you've been



handed a document that's been marked Exhibit 1. It appears to be a resume or vita for you. It's dated November 1997. Do you recognize this?
A. 19 what?
Q. It's dated at the top of the first page November 1997.
A. Yes, 1997.
Q. Do you recognize this?
A. Yes, I do.
Q. Did you prepare this?
A. Yes.
Q. Okay.
A. It is not current.
Q. Right. I understand that. Let's try to bring it current. We'll try to bring it current in the course of our discussion here, but would you -- I guess on Pages -- there's a chronological -- the first couple pages are qualitative, I'll call it, the first page and a half, but then there's a chronological listing of your positions that starts on Page 2 and continues on Page 3 and continues on Page -- over all the way almost to the very end.
Would you just take whatever time you need to look at that. And I think we can save a



lot of time here with questions if you can just tell me that that's either accurate or point out the respects in which it may not be accurate.
A. It's accurate up to the date that it includes.
Q. All right. Well, let's start there with the date that it includes is 1996 dash. It says you were president of Management & Technical Resources, Inc. Is that still your position?
A. It is one of them, yes.
Q. It's one of them. Okay. So you still hold that position. And if you were to update this -- and also it indicates here, it's still an open matter, that you are chairman Law/Spear, S-p-e-a-r, LLC. Do you still hold that position?
A. No. The LLC was closed about six months ago.
Q. All right. And the business no longer exists?
A. Correct.
Q. Okay. So do you hold any other positions besides president of Management & Technical Resources?
A. Yes.
Q. All right.



A. I'm on the board of directors of the Swedish nuclear company called STUDSVIK, S-T-U-D-S-V-I-K, Inc., which is a U.S. subsidiary of a parent corporation, STUDSVIK AB in Sweden.
I'm on the Nuclear Advisory Council for the governor of the State of South Carolina. And it is called the Nuclear Advisory Council.
Q. Okay.
A. As a -- the vehicle Management & Technical Resources, Inc. is my consulting company, and I have several contracts through MTR.
Q. All right. And what -- anything else that you can think of?
A. Let me just think a minute. I think all the other things that I'm doing, I'm doing through MTR.
Q. All right. So I think you just may have answered this question, but this Management Technical Resources you described as your consulting company, would you say generally you are employed in the consulting business?
A. Beg your pardon?
Q. Are you today generally employed in a consulting business? Is that what you do for a living?

A. On a part-time basis, yes.
Q. Part-time basis?
A. Yes. It's far from full-time.
Q. And the other part-time is what? Are you --
A. My wife's husband and my son's father and so forth.
Q. Play golf?
A. I occasionally go out, but some would argue whether I play.
Q. All right. What business is this Swedish nuclear company in? And are they -- is it a generating company?
A. No. They are a waste treatment company.
Q. Waste treatment?
A. Yes.
Q. All right. Waste meaning spent nuclear fuel?
A. No.
Q. All right. What kind of waste?
A. Primarily irradiated materials, in particular reactor effluents, resins. And in Europe -- they are probably the largest provider of such services to Europe, things like contaminated materials from construction, resins,



and such things.
Q. Low-level waste?
A. Well, some of it is greater than Class C.
Q. All right. What about high-level radioactive waste from reprocessing facilities? Is that part of -- is part of the business of the Swedish company dealing with that material?
A. So far as I know, not so.
Q. All right. And does this Swedish company have any business operations in the United States?
A. Yes.
Q. Okay. Same business?
A. Treatment of -- primarily the treatment of resins from power reactors.
Q. Nuclear power reactors?
A. Yes.
Q. All right. And so the Swedish company has customers that are domestic U.S. nuclear generating companies?
A. Absolutely.
Q. All right. Now, this Nuclear Advisory Council for the governor of the State of South Carolina, what does that Advisory Council do?



A. It meets at least at the call of the governor. And we have generally met, since it's been reconstituted, about once a quarter. It responds to requests from the governor and/or his energy office and staff to conduct appraisals, evaluations, or considerations.
And on our own initiative, that is the initiative of the Council itself, may engage in discussions or considerations which could end up with comments or recommendations to the governor based on our collective knowledge.
Q. About what kinds of matters?
A. Just about anything that has radiation attached to it or nuclear attached to it.
Q. Okay. Including disposal issues?
A. Disposal issues. Barnwell, for example, as a disposal site. Savannah River, which has been a major consideration for the last months, years, couple years -- well, I guess I've -- the Council was only recently reconstituted. And that's in the last year and a half or so.
Q. Okay.
A. Let's see. Savannah River has occupied a fair amount of the Council's time because of plutonium movements in the complex. Barnwell, the



most recent issue was the long-term care provisions for Barnwell in the Atlantic Compact now.
Q. Okay. What is the concern about the plutonium movements at Savannah River?
MR. MILLER: Objection. Vague.
Q. (Mr. Stouck) You may answer.
A. Savannah River is a very large facility, a nuclear facility in South Carolina, and thus is a major economic as well as operational factor.
The consideration that is the most current one is the -- goes to the Department's proposals and plans for addressing the whole complex and optimizing the storage and treatment of materials in the past as well as preparations for the future.
And the issue for plutonium is the interest in moving plutonium from some of the sites elsewhere in the country where they have been under -- where plutonium has been a factor and collecting plutonium in one place for further treatment.
And Savannah River is a site which has been at least suggested, if not proposed, for treating some of that plutonium in a number of

Q. Well, that may answer my next question, which is why did you leave? Because you -- the deal was you were going to come for a couple of years and start the system and then leave?
A. Correct.
Q. And you did and then you left?
A. Then I went back to DuPont.
Q. But that was the arrangement from the time you started the position?
A. From the beginning, yes.
Q. Went back to DuPont in Wilmington. And then apparently in 1978 came back to South Carolina?
A. Yes.
Q. As the executive director of the South Carolina Energy Research Institute?
A. Correct.
Q. And what is that? What was at that time that organization and what did they do? What did it do?
A. It was an organization that was formed by a group of private companies with some -- I suspect some interest, if not suggestion, by the governor, who was then Jim Edwards, that the State needed to have some activity of this sort, but not



government.
It was a purely private venture. And so a group of corporations banded together and established the Institute and invited me to become its first director.
Q. Okay. When you say activity of this sort, your resume says --
A. Everything, but nuclear. We did nothing nuclear.
Q. Okay. Research, promotion?
A. Research, industrial research for efficiency improvement, safety improvements, all uses of energy and efficiencies and such things.
Q. Okay. And then you were asked, according to your resume, to do some work at Three Mile Island?
A. Yes.
Q. All right. It says requested -- your resume says requested by industry and government?
A. Yes.
Q. To direct waste management activities. Can you specific -- tell me more specifically how it is that you came to direct the -- is it correct that you -- yeah, director. Came to direct the clean-up activities at Three Mile Island? Did you



get a phone call?
MR. MILLER: Objection. Compound.
Q. (Mr. Stouck) Did you get another phone call or how did it happen?
A. The chairman of my board of directors at the Research Institute was Bill Lee, who was also one of the leading members of the nuclear industry.
And when the event occurred I was invited, if not directed, to be ready. And within a few days I was on the site. This private institute and its directors responded to the industry's interest and need and sent me there.
Q. Okay. So it was largely -- or at least Bill Lee had a role in arranging for your directorship?
A. Absolutely. Absolutely.
Q. Okay. Now, you mentioned Jim Edwards. How did you come to know the Governor Jim Edwards?
A. Yes. The Honorable Jim Edwards.
Q. The Honorable Jim Edwards. You mentioned him in connection with your work with this South Carolina Energy Research Institute. How did you come to know Mr. Edwards?
Was it at -- let me ask another



question. I'm sorry. Was it at that time that you first came to know him in '78 to '80 or --
A. I had known him earlier. Before I went to Washington I was kept, in a very casual way some would say, involved in public service. I was school board chairman in Aiken for a number of years. And the Governor -- had occasions to get to know the Governor through that circumstance.
Q. Okay. Then after Three Mile Island what was -- after Three Mile Island you went to work at the Department of Energy in Washington, it looks like, in 1981?
A. Let me see what you're looking at here.
Q. This is on Page 3 near the bottom. I'm working my way up.
A. Yes. Again, Secretary Edwards or the Governor had been a part of the Reagan team and was appointed Secretary of Energy. And I was, I guess the right term still is, a Schedule C appointee to serve as his special assistant for policy and programs.
Q. Right. And did you have any particular duties or responsibilities there or were you just the -- I mean, were you focused on nuclear matters or was it just generally --

A. Primarily nuclear matters.
Q. Okay. Were there other special assistants that focused on other matters for him?
A. He had one -- a second special assistant who was focused on management.
Q. Okay. And now if you look at this page and go up, there are -- it's a little unclear to me exactly what happened here in the '81, '82, '83 period because there are several, I guess, jobs. There are several positions listed with concurrent and overlapping dates. Do you see that?
A. Yes.
Q. Okay. Could you just explain to me how all that worked? It looks like you were at -- if you go up to the top of Page 3, it says special assistant to the Secretary '81 to '83. And then -- but there are also some other matters you did during that period. So what was going on there? Were you -- or was there some problem with --
A. The first entry related to the transition period.
Q. By first you mean the one that's lower down the page?
A. Lower down. And the -- I think the upper entry is probably just an oversight on my



part, and it's probably a duplicative entry in that sense.
However, the NRC Task Group, which I participated in, was while I was still in the Department. And it was a group on improving cost and effective operations in the government that was chaired by Roger Milliken and a fellow who was the president of Dow Chemical, I believe. It was one of President Reagan's early attempts to try to bring industrial management considerations into the government.
Q. Okay.
A. And I was a part of the private sector survey on cost and management control related to the operations of NRC and FERC.
Q. The agencies?
A. The agencies.
Q. Okay.
A. So this group was evaluating the effectiveness of the operations. And I was engaged in that activity along with several other people.
Q. Okay. Then it looks like you consulted -- and so after the -- you were on the Reagan transition team at the Energy Department? Is



that --
A. Yes.
Q. Then you left that, it looks like, and did some consulting for a couple years?
A. Yes.
Q. Which leads us up to one of the more prominent topics for today, which is how is it that you came to be the director of the Office of Civilian Radioactive Waste Management?
A. I received a call from Don Hodel, and said he would like to discuss some matters with me. And out of that discussion, over a period of some weeks or a month or two, came to the conclusion that he wanted to recommend to the President that I be appointed. And I agreed, eventually.
Q. Okay. Were there other names that he discussed with you of other people for that position?
A. He asked for my advice, if I had any other names. And there must have been a list of a thousand names that floated around. Nobody in -- no other particular name.
Q. Okay. So you did not recommend any other name?



A. I did not.
Q. Okay. Did you recommend yourself? Is this something you wanted at that time?
A. I gave very serious consideration to it. And I -- my original intent had been to -- I was and the conclusion was I had completed my public service, but -- to some extent because when I was there with Secretary Edwards the subject had become a major subject, that is the need for some way to begin to deal with this matter.
So it was no -- it was not an unfamiliar subject. And the fact that Congress and the Department had made progress in the time that I had been gone was certainly something that I had an interest in. I would -- I didn't have an interest to the extent that I was -- that I sought the job for sure.
Q. You didn't call Secretary Hodel?
A. I did not.
Q. He called you. But it lead to -- the discussions led to you being appointed?
A. Yes.
Q. Okay. Now, let me pick up on something you just said. At the time -- I think this is what you were referring to.

When you were on this -- what I refer to as the Reagan transition team, the '81, '82 entry on Page 2 of the resume at the Department of Energy, disposal of spent nuclear fuel and high-level waste was a subject of interest to the Department at that time?
A. Sure.
Q. Okay. And that was something that you looked at or worked on or thought about in the course of these transition activities?
MR. MILLER: Objection. Compound.
THE WITNESS: Only in the most general sense. The subject -- the subject had always -- has always been an interest of mine because of my many years at Savannah River.
And waste management at Savannah River from 1953 forward was a major factor. And I had occasion and interest and participation in many of those activities. So the subject was sort of grafted in my memory.
Q. (Mr. Stouck) All right. So you were aware of it at the transition time?
A. Sure.
Q. But it was not something you actively worked on?



A. Absolutely.
Q. So, I guess, were you involved -- because in the industry at that time there was this issue of what to do with these kinds of wastes now that reprocessing was not going on in this country, right?
A. Right.
Q. So it was a big issue problem -- you know, it was a big issue in the industry and you were interested in it to that extent?
A. And aware of it.
Q. And aware of it. Okay. But you did not, or did you, work at all on any legislative activities leading to the enactment of the Nuclear Waste Policy Act?
MR. MILLER: Objection. Compound.
THE WITNESS: What does that mean?
MR. MILLER: Go ahead. Go ahead and answer.
THE WITNESS: I did not, other than being aware with the Secretary that it was a matter that needed urgent attention.
Q. (Mr. Stouck) So during '81, '82 you were aware or is it true that the legislation was being developed at that time, do you know, or --



A. I do not know, but I presume so.
Q. But you weren't working on it?
A. I was not.
Q. Directly?
A. Not directly.
Q. Or indirectly?
A. Or indirectly.
Q. Okay. Back up to you were appointed as director of OCRWM, I believe, in early 1984; is that right? Do you recall when you started?
A. When I started or when the appointment was?
Q. Well, when was the appointment? Let's start with that.
A. I think it was in January of '84 that I visited the White House. And the appointment followed thereafter.
Q. And when did you actually start working?
A. March, I believe, of '84 I was confirmed.
Q. Okay. And can you tell me generally -- we're going to come back to some of these things and go into a little more detail, but from 1984 -- when did you leave the Department? I think you said -- earlier today you said early 1988, I think



is what you said?
A. I believe -- I believe that my actual retirement date from the Department was late November of '87.
Q. Okay. Well, starting in March of 1984, you know, when you started as director can you just tell me first generally, and as I say we'll come back to some of these things in more detail, but what were your major duties? What were you working on, let's say, when you first got there? What was the task?
A. I think the most explicit statement that I could refer to would be my confirmation statement.
Q. Okay. You want to take a look at it?
A. No. I know what I said, but that is about as succinct as I -- that's what I understood and knew to be the case and that's what I gave attention to.
Q. Okay. Well, let's take a look at it anyway.
MR. STOUCK: Let's mark it as No. 2.
(Exhibit No. 2 was marked for identification.)
(Off-the-record discussion.)

Q. (Mr. Stouck) You've been handed a document, Mr. Rusche. It says Confirmation Statement, Bernard C. Rusche, May 17, 1984. It's about five pages long. Would you take a look at it. And my first question is going to be what is this? So --
A. It appears to be a copy of my confirmation statement obtained from some source.
Q. Okay. Confirmation statement meaning is this a statement that you submitted to a committee in Congress in connection with your confirmation?
A. It was my oral testimony as well as the document submitted at the hearing for my confirmation.
Q. All right. Now, excuse me for one second.
MR. STOUCK: Can we mark this as No. 3, please.
(Exhibit No. 3 was marked for identification.)
Q. (Mr. Stouck) Now you've been handed a document marked as Exhibit No. 3. It's another copy of this confirmation statement, seems to be, Mr. Rusche, but it's got some handwriting on it. Looks like it might have been a draft that



somebody was changing. Do you see that?
A. I have a piece of paper.
Q. Okay. Is that your handwriting on Exhibit No. 3?
A. Absolutely not.
Q. Okay. Do you know whose it is?
A. No, I don't know whose it is.
Q. Okay. Did you -- did you prepare your own statement? Did you prepare this yourself?
A. Yes.
Q. Okay. Did you have help? Do you recall having help?
A. Yes. I had a secretary who typed it. I had subjects that I looked at in various references and so forth to bring myself up to date between the couple of years I had been gone from the Department.
Q. Okay. But you didn't have -- but you drafted this statement yourself with no substantive assistance? Is that your recollection?
A. Substantive is a very questionable word. What do you mean by substantive?
Q. Well, do you recall getting comments from other people?



A. Sure.
Q. So this handwriting was somebody -- it's not yours. It may have been comments that somebody proposed to you. And if they are reflected --
A. If I had to guess, which I realize is a dangerous thing to do --
Q. I love it. Let's do it.
MR. MILLER: Objection. Calls for speculation.
Q. (Mr. Stouck) If you had to guess, what would you guess?
MR. MILLER: Same objection.
THE WITNESS: My guess is that this may have been a copy that someone annotated after I gave the presentation to the Committee.
Q. (Mr. Stouck) Why would somebody do it after you gave it to them?
A. To put it in the record.
Q. I see. Okay. To put it in the Congressional record?
A. I notice this is a PNL document. And PNL was active in many respects in developing records.
Q. Okay. But in any event --



A. To the best of my knowledge, I've never seen this annotated copy, but it sounds like words I might have changed to some sort verbally.
Q. Fine. Thank you. All right. Let's stick with Exhibit 2 then. And let me ask you some questions about it, if I may. Okay. On Page -- let's see. The page numbers are at the top and are kind of small, but I'm looking at Page 3.
Do you want to take a -- please take a couple minutes to review this, if you want. Or, you know, if you don't want, my question is this. It says at the bottom of Page 3, "Moving ahead is a matter of national urgency because:" Do you see that?
A. I do indeed.
Q. Okay. Take a look -- and then there's a list of Paragraphs 1 and 2?
A. Beg your pardon?
Q. After the because -- there's two becauses, and there's one and two.
A. Yes.
Q. Is that -- as you read that now, does that sort of cover it? Is there anything you would add to why you believed at that time that moving ahead with this program was a matter of

national urgency?
A. What was your question?
Q. My question is does one and two sort of cover it? Is there anything you -- does this cover the reasons why you thought at that time --
A. Yes.
Q. -- that moving ahead --
A. Yes.
Q. Anything substantial that you would add to what's written there and what you told Congress about the reasons why moving ahead with the program at that time was a matter of national urgency?
A. No.
Q. All right. Now, in No. 2 says that the federal government from the beginning of the Atomic Age has been given the -- I'm sorry. Well, I read -- the sentence says that the federal government from the beginning of the Atomic Age has been given the responsibility for eventual disposal of high-level radioactive waste and spent fuel. Do you see that?
A. I do.
Q. Okay. And this statement was given after the enactment of the Nuclear Waste Policy



Act?
A. Yes.
Q. Okay. Which was signed into law in, I believe, early January?
A. Early January, that's right.
Q. 1983. So is it your understanding that that statute carried forward this federal responsibility for eventual disposal of high-level radioactive waste and spent fuel?
MR. MILLER: Objection. Calls for a legal interpretation. Go ahead.
THE WITNESS: Yeah.
Q. (Mr. Stouck) Would you say that -- well, okay. Do you have a copy of this confirmation statement yourself? When was the last time -- when was the last time you saw this?
A. This?
Q. Yeah.
A. Oh, I guess, maybe six months or a year ago I had some occasion that I was just going through my file and saw it.
Q. So you have a copy at home?
A. I don't know that I have a copy in this exact form, but I have a form that I believe is the same as this.



Q. Okay. Do you have -- when you say in your file, do you have files in your possession that relate to your work as director of the Office of Civilian Radioactive Waste Management?
A. The only files I have are those that I referred to, which are -- is my confirmation file, which is a notebook that has the material that I amassed looking at and which gave rise to this statement.
Q. Okay. No other files about your work for the Department? You left them there?
A. Absolutely. Absolutely.
Q. All right. So this statement outlines the task at hand when you joined the Department. And what was the --
A. As I saw it.
Q. As you saw it. And what did you -- what did you actually do when you got there? I mean, what was the first thing that you recall working on?
MR. MILLER: Objection. Vague.
THE WITNESS: I smile because the first -- when I came back from the hearing there were a group of Indians waiting to speak to me. And I spoke to them, Nez Perz and somebody else from



Hanford.
Q. (Mr. Stouck) What did you speak to the Indians about?
A. They said, "We want to get to know you well and have an opportunity to work with you."
Q. Okay. Do you recall the mission plan? Does that term have meaning to you?
A. Sure.
Q. Okay. What was the mission plan?
A. The mission plan was an effort to put in place some plan or concepts that were worth pursuing as the program got going.
Q. Okay. Would you agree that the mission -- was the mission plan -- was development of the mission plan underway when you got to the office?
A. I don't know.
Q. Don't know? Don't recall or don't know?
A. Neither. Both.
Q. Okay.
A. I don't know and -- don't know now and I didn't know then as far as to that particular question.
Q. Okay. Was the mission plan something that you yourself worked on, you know, drafting? As opposed to -- well, before the mission plan was

issued I take it that you would have approved it because you were the director of the office; is that right?
A. Yes.
Q. Okay. So to that extent you worked on the mission plan, correct? You signed off on it?
A. Yes.
Q. Okay. Did you though -- beyond that did you actively work on drafting any substantive sections of the mission plan?
A. No.
Q. That was done at a staff level?
A. Yes.
Q. Okay. Did you work -- did you play any coordinating role, you know, in organizing or coordinating the various people who were working on drafting the mission plan?
A. In some very limited sense in that as director I was interested in everything that was going on in the office. And I would get a -- I'm sure there must have been occasions in which in some staff meeting or staff meetings or maybe even topical meetings that the subject was visited to keep me apprised of the fact that work was going on.



Q. Okay. Do you recall if there was an individual who was in some sense in charge of managing the work of getting the mission plan developed?
A. I'm sure there was such a person, but I don't -- I don't recall a name.
Q. Okay. Do you know if it was Victor Trebules? Does that name ring a bell?
A. Vic Trebules was certainly a member of the staff. And he well could have been that person, but I don't recall it as that.
Q. All right. What would you say the -- so the mission plan was not a major focus of your personal effort at the -- you know, your personal work at the Department when you got there did not involve a lot of your own time working on the mission plan; is that right?
A. Major has two connotations. Tell me what you mean by major.
Q. Well, time. Amount of time spent.
A. It certainly occupied some briefing time occasionally, but not -- it was not a dominant feature. There were so many things going on.
Q. Was there something -- and again I'm trying to distinguish this sort of early -- when



you first got there, first year let's say, is there something that stands out in your mind as the dominant feature of your own work? What were you primarily focused on?
A. Selection of sites.
Q. Okay. And did that remain true throughout your tenure?
A. Absolutely.
Q. Okay. That was your major focus as director of the Department?
A. Getting the work done in the field.
Q. In terms of selection of sites?
A. Well, selection and then hopefully investigation.
Q. Okay. All right. Now, do you recall that there was an amendment to the mission plan in 1987?
A. Now that you've mentioned it, I can -- I can acknowledge that there -- I would say probably.
Q. Okay. I take it from your answer that your -- the amount of personal work and time and attention that you devoted to that mission plan amendment was --
A. Secondary.



Q. Well, it was comparable to the amount of time what we just discussed for the original mission plan?
A. Yes. Yes.
Q. Okay. All right. And again we're going to come back to some of these things and maybe some things in between.
Well, what about the 1987 amendments to the Nuclear Waste Policy Act? Do you recall those?
A. I recall that they were and that they were a matter of consideration.
Q. Do you recall what the substance of those statutory amendments was?
A. In a general way.
Q. Okay. What do you recall in a general way?
A. There were several issues that had to be addressed related to siting, relating to relationships with the states, dealing with the MRS. And I believe by that time it had become quite apparent that the 1998 objective date that was in the original Act was non-functional.
Q. Okay. And --
A. Beg your pardon?

A. To the best of my recollection, he was. And Morgan was a long-time friend.
Q. Of yours?
A. Yes.
Q. Okay. What had been accomplished by that office under Bob Morgan's direction prior to your arrival in terms of implementation of the Nuclear Waste Policy Act?
A. I can't really answer that in any substantive way. Morgan and I talked a lot. I talked to other people as soon as I got there. And the best I could tell was that the beginnings had been made to starting to look at the functions and how and some organization and so forth. In fact, Morgan and I roomed together for about four or five months until I moved my family up.
Q. In Washington?
A. In Washington. So we had -- we had countless hours of which have we talked about this, that, and the other. And I just don't have a panoply of what had been done that I can lay out and say this was done and that was done.
I think Bob deserved a huge amount of credit in that transitional period. And to this day he remains one of my great friends, but also



has my admiration as a person who has done tremendous public service, as well as some other things that we're both aware of.
Q. Did he -- was there an organization -- there was an organization in place when you got there?
A. There was something there. And I don't really recall just what it was.
Q. Do you recall about how many people when you got there?
A. I have no idea right now.
Q. No idea? 10? 50? 200?
A. If I had to guess, but guessing is probably not a good thing to do.
Q. Well, do it anyway, if you can.
A. It was not a large number.
Q. What was Mike Lawrence's role at that time when you started?
A. And that I don't really recall. I recall him much more as a friend than I do the functionary, as it were.
Q. Okay. Do you recall any other people, other than Morgan or Lawrence, as being involved with the -- I think you referred -- just not to mischaracterize. I thought you said your



understanding was that Mike Lawrence was not directly involved?
A. And I don't really recall just how he was involved. I know he was related to the activity to some extent, but I don't really recall.
Q. Okay. But Morgan was involved because he was in charge?
A. Morgan was certainly involved.
Q. Right. And just for the record here, you were the first presidentially-appointed director of the office?
A. Correct.
Q. Do you recall any other individuals who were involved in the program at that time when you got there?
A. No.
Q. Okay. Do you recall a fellow named Fiore, F-i-o-r-e?
A. Yes.
Q. Okay. Who is that? What do you recall about that person?
A. All I recall about him is what he did later after I got there. I knew -- I believe it's Mark Fiore, is it not? But I'm not sure of that.



Q. I can tell you in a second.
A. Mark -- that may not be right either.
Q. James. Jim.
A. Jim Fiore, yeah. He was in -- he was in the program.
Q. What did he do later? You say you remember what he did later. Later at OCRWM?
A. Yes.
Q. Okay. What do you recall that he did at OCRWM?
A. I don't recall his exact title.
Q. But you --
A. I believe he was in one of the three or four sections that we had.
Q. All right. That's all you recall about him? I thought you said something about you recalled him from what he did later?
A. Just that he was there later.
Q. Oh, I see. You don't know if he was there right at the beginning when you got there?
A. I don't really recall that.
Q. Okay. What about a fellow named Winnick? Winnick?
A. I have no recollection of that name.
Q. How about Shelor, S-h-e-l-o-r?

Q. Page 34. Essentially the last page -- next to the last page.
A. All right. Okay.
Q. The paragraph that begins, "In summary."
A. Yes.
Q. Do you see that? Just read that for me. Actually let me read it into the record just so we'll have --
A. All right.
Q. I'll read it out loud. "In summary, Madam Chairman" -- by the way, do you recall who the chairman of the Department was -- I mean, the chairman of the Committee at that time?
A. I would -- I can't think of -- the Congress lady from Tennessee is my recollection. I'll think of her name in a minute.
Q. Okay. Well, we can obviously find that out somewhere.
A. Yes.
Q. It says, "In summary, Madam Chairman, the FY 1986 budget request for spending authority under the Nuclear Waste Fund and for appropriations under the Civilian Radioactive Waste R&D budget are designed to carry out an integrated waste management program in an



efficient and effective manner and to achieve the 1998 mandate of the Nuclear Waste Policy Act, that is, to have in place a comprehensive and functional waste disposal system to begin receiving spent fuel." Do you see that?
A. I do.
Q. Okay. And so at the time you gave this testimony, Mr. Rusche, was it your understanding that it was the mandate -- that there was a 1998 mandate of the Nuclear Waste Policy Act and that mandate was to have in place a comprehensive and functional waste disposal system to begin receiving spent fuel?
A. In that sense, yes. The Act was unmistakable in its language. And this sentence is consistent with that.
Q. Okay. When you say the Act was unmistakable in its language --
A. That is the Act provided that the Department begin receiving waste by that time.
Q. Okay. And the -- I'm sorry. Were you finished?
A. That's it.
Q. And the budget that you presented to Congress at this time as reflected in this



testimony was designed to, as it says, carry out an integrated waste management program in an efficient and effective manner to achieve that mandate, correct?
A. Uh-huh. Yes.
Q. All right. Now, let's take a look at another document.
MR. STOUCK: Can you mark this as No. 10.
(Exhibit No. 10 was marked for identification.)
Q. (Mr. Stouck) By the way, before you look at that let me just ask you this. You were fishing for a name earlier when we were talking about the mission plan, somebody who was actively involved in preparing it. I asked you about Victor Trebules. Do you remember that?
A. Uh-huh.
Q. Was the name that you were thinking of Charlie Head as someone who was involved? No?
A. That's not the name I was trying to -- the name I was trying to think of. And I'm sorry. You may even have encountered it, but he was one of the three or four assistant directors I had.



Q. Okay. Well, maybe we'll come across it in one of these documents.
A. It wasn't Charlie Head.
Q. Do you recall Mr. Head?
A. Yes.
Q. What was his role?
A. I couldn't give you a very specific definition. He was involved in that activity.
Q. Meaning RW?
A. Yes. Yes.
Q. Okay. Take a look at what's been marked as Exhibit No. 10, please. And this is an excerpt from, as it says on the front cover, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983.
The date of the document, at least as shown on the front cover, is February 1984. It says that these proceedings were sponsored by the U.S. Department of Energy.
And then, as I indicated, it's an excerpt and would jump to Pages 11 and 12. I'm going to have a couple of questions for you. The Bates numbers are SNO 69588 and then it skips to 599 and 600. Is that the document you have?
A. No. Mine has SNO 69599.

Q. Didn't I say that? Did I misspeak?
A. You said 588.
Q. On the first page. 588 is the cover.
A. Okay.
Q. Then we skip a few pages and we get to 599.
A. Yes, that's correct. I misunderstood you then.
Q. That's quite all right. Now, on Page 599 this is a couple of pages that is titled at the top Program Overview and it indicates that this was prepared by or given by evidently at these proceedings Robert Morgan, acting director of Civilian Radioactive Waste Management. Do you see that?
A. Yes.
Q. Now, I'd like to direct your attention to -- we're still on Page 599. The right-hand column. It's the fourth new paragraph down. It says, "I would like to talk a little bit about the strategy." Do you see that?
A. Yes.
Q. "As laid out in the mission plan and what we intend to do"?
A. Yes.



Q. Okay. And then the next sentence says, "I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998." Do you see that?
A. Yes.
Q. Now, having seen the previous document and having now seen this document, has your recollection about your own understanding of the requirements of the Act and the 1998 date been refreshed or changed at all? I mean, would you -- that's the first question.
A. As to the requirements of the Act, there's no misunderstanding. The Act made an unequivocal statement to that effect.
Q. And the effect being?
A. To accept fuel in 1998.
Q. Okay. And that was your understanding when you joined RW as the director?
A. That was my understanding of what the Act said, yes.
Q. And throughout your tenure?
A. Beg your pardon?
Q. And throughout your tenure as the director that was your understanding of the Act? The Act didn't change -- well, let me ask you.



Was that your understanding throughout your tenure?
A. As to what the Act said, that is correct.
Q. Okay. Thank you. Now, let's go to the next sentence. It says, "Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time." Is that consistent with your understanding about the Act?
A. I think yes.
Q. All right.
A. It's non-specific with respect to quantity.
Q. Okay. "In fact" -- I'm reading, continuing -- "if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act." Do you know if that's true one way or the other?
A. I don't know whether it's true. I would say, just looking at the language from this distant vantage point, it would be hard to exclude that from being true. The Act doesn't say how much and how fast, so far as I can recall.
Q. But you don't know one way or the other whether technically one fuel element would be in



accordance with the Act?
A. Certainly in a legal context I don't know.
Q. All right. Now, the next sentence says this, "However, we did not believe that that meets the intent of the Act."
Is that consistent with the understanding you had in 1984 when you joined the Department, that accepting one fuel rod by 1998 would not be -- would not meet the intent of the Act?
A. I think I would agree.
Q. Okay. Let's read the next sentence. It says, "The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site."
Is that -- this sentence refers to the mission plan, but is that strategy consistent with your understanding of the strategy laid down by the statute, that beginning in 1998 utilities will not have to provide any additional storage facilities on site?
A. I could not agree with that conclusion, nor did I ever hear anybody in my -- there's

nobody in my hearing ever made that statement that -- the first statement I have heard made, that if you can take one, you have satisfied the intent of the Act.
Q. Well, it doesn't say the intent.
A. Well, satisfied the Act.
Q. Okay.
A. And I've heard that statement made more than once.
Q. Okay.
A. I can't enumerate how many and how often, but the second statement, that the thought that because of the Act utilities would not have to provide any additional storage facilities after 1998, I have never seen or heard in my recollection.
Q. Okay. And so does that mean that that was not your understanding at the time you joined the Department in 1984?
A. That there would not have to be any further storage?
Q. That that was the strategy?
A. Wait a minute. Well, strategy --
Q. See, the sentence here says, "The strategy which we've outlined in the mission plan



is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
A. I never was a party to such a statement, so far as I know. You may find something to the contrary, but I cannot -- I never recall that being the case.
Q. Okay. And you don't recall there being a strategy to facilitate utilities avoiding additional storage in 1998?
A. Certainly that was a -- that was an intent or a strategy in a sense, but strategy needs to be put in the context of some reality. And in my -- in my time and my awareness that would -- that was just a completely unreasonable expectation.
Q. Okay. When you say it was a strategy --
A. In my own mind.
Q. Fine. Thank you. You say it was a strategy in a sense. In what sense was it a strategy?
A. Because the statute said we'll begin receiving fuel in 1998. In that sense then I can't deny that.
Q. In that sense there was a strategy of



allowing utilities to avoid additional storage on site?
A. I think this statement is trying -- is attempting to say that that strategy was the one that was then being applied or being -- that was understood as the objective of the operation.
Q. Okay. And my question is simply was that your understanding at the time in 1984 that that was the strategy?
A. In 1984 in my mind?
Q. That that was the strategy?
A. Yes, I can agree that was the strategy.
Q. Okay. And what about the next sentence here, "During the first year of operation of repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location," do you agree that that or do you not agree that that was part of the strategy at the time you were there?
A. In my perception and recollection, I can never remember that being a discussed point or strategy.
Q. Okay. Well, but you do agree that the prior sentence or at least you do agree, I think,



in connection with discussion with the prior sentence that there was a strategy of -- tied to the '98 date and commencement of activities, there was a strategy of allowing utilities to avoid additional on site storage? I thought --
A. No.
Q. You didn't agree with that?
A. No. I thought I said that the strategy that I see articulated here and in the context of the Act, as I understood it, that it's not inconceivable that one would say that it was the strategy of the Department to begin receiving fuel at an unidentified rate.
And the sentence earlier on, one fuel, kind of sounds ludicrous, one fuel element, but it was clearly not -- and I cannot recall ever having a discussion that would say that the purpose of the 1998 date was to preempt the necessity for any future storage capacity in any of the utilities.
Q. That was not your understanding in 1984?
A. That's right.
Q. So avoiding some additional on site storage capacity after '98 was part of the strategy, but preempting any possible on site storage facility for utilities after 1998 was not

identification.)
Q. (Mr. Stouck) All right. Mr. Rusche, you've been handed a document which is marked Exhibit No. 11 on United States Department of Energy memorandum stationery, date October 7, 1983, subject Review of OCRWM Mission Plan Working Draft.
The copy is not very good, but I think it says to Phillip Craig, director of Commercial Spent Fuel Management Program Office. And on the back it's signed by Mike Lawrence, correct? That's the document you have?
A. Yes.
Q. And it says --
A. That's interesting. That's the first time I can recall seeing Mike's title.
Q. Acting deputy director. And this, of course, is prior to your arrival?
A. Yes. But I was not completely unaware of the fact that there was something there and that Secretary Edwards and I had been very, what shall I say, if not instrumental, at least had a strong view that this course -- that there needed an RWM or something of that sort.
Q. Right. Because, as you said before, it



was a big issue, a big problem for the industry?
A. No question about that.
Q. All right. Now, the first sentence here says, "The attachment to this memo," which, of course, is not attached. This is just the cover memo.
A. Sure.
Q. It says, "The attachment to this memo is the latest working draft of the Mission Plan for the Office of Civilian Radioactive Waste Management." Do you see that?
A. Yes.
Q. And it goes on, "This draft is far from the finished product that we will make available for public review and comment."
This indicates that the -- obviously that the mission plan drafting process was in process before you arrived?
A. Certainly.
Q. Were you aware of that?
A. Yes.
Q. Okay. When you got there you were aware that it was in process?
A. I was aware that there was an activity -- there was a document called a mission plan and



an activity associated with it.
Q. Okay. In the second paragraph this document asks the -- whoever the distributees were to review it and return comments to Mr. Head. Do you see that?
A. Yes.
Q. Does that refresh your recollection at all about what his role was?
A. Well, it doesn't refresh it so much as tell me.
Q. Okay. Okay. You don't know any more than what you see on this paper?
A. I remember his name.
Q. Okay.
A. I did not -- until I see this here, I didn't realize that's what he was doing. At least I don't recall realizing it, if I did.
Q. Okay. And then just the last sentence in that paragraph, it says, "If any areas exist in which the portions of the program discussed in the Draft Mission Plan for which you are responsible do not meet the requirements of the Act, please identify proposed corrective actions wherever possible, or provide as convincing a rationale as possible to support the action we propose to



take." Do you see that?
A. Yes.
Q. So you would agree that that suggests that there was an objective here to have the mission plan meet the requirements of the Act?
A. Yes.
Q. All right. Okay. Well, let's move forward in time a little bit and take a look at --
(Off-the-record discussion.)
(Exhibit No. 12 was marked for identification.)
Q. (Mr. Stouck) Okay. We've now handed you a document that's marked Exhibit No. 12, Mr. Rusche.
A. Yes.
Q. It's stamped Draft on the front. It says, "Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983."
A. Yes.
Q. Bates number CTR-042-1065 through 1191. Is that what you have?
A. I believe that's right.
Q. Okay. Now, this is dated a couple of months after the memorandum we just reviewed. So

170

I think it's fair to say it's unclear whether this was the draft that was forwarded with the memo, but it may not have been certainly. Probably wasn't, but may have been.
My question though is this is getting pretty close to the time -- not terribly close. If you joined RW in May '84, it's getting closer in time to your arrival, but my question is looking at this, through this, whether you believe that when you did join RW and started working you saw this draft?
A. I really -- I can't recall any specific instance in seeing it. I can't deny that I -- somebody may have showed it to me at some point, but if you'll recall, in our discussion in December of 1983 I was not either involved, nor identified for involvement.
And if indeed I saw it, it would have been maybe somebody handed me a stack of documents and said, "These are things you might ought to look at sometime."
Q. When you arrived in May?
A. When I arrived in May.
Q. Okay. But you have no recollection?
A. I don't have any recollection of it.

171

Q. Okay. Let's take a look though at the very first page of text, I think, under Introduction.
A. Okay.
Q. The last paragraph on that page. It says that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and" -- ultimately misspelled -- "utimately, remove from at-reactor storage all waste that is more than 5-years old." Do you see that?
A. I do.
Q. Okay. Seeing this in this draft mission plan, do you now recall that that was a fundamental objective of the nuclear waste program at that time?
A. I can't say with respect to the program. I can say that it seems consistent with the Act.

172

Q. Okay.
A. But I really don't have any basis for guessing whether the -- I think -- excuse me. May I answer in a slightly different way?
You say was it consistent with the -- was the program consistent with that statement, I believe is the question you asked, or would you care to rephrase that?
Q. Why don't we have it re-read just to be perfectly clear.
A. All right.
MR. STOUCK: What was my last question?
(The Court Reporter read the record as requested.)
MR. MILLER: Objection. Calls for speculation. Go ahead.
THE WITNESS: What I was going to say was that there's no question in my mind that the mention of the January 31, 1998, date is consistent with the Act.
As to whether or not it is -- the program at that moment was designed or aimed or stated to have confidence in being able to meet that, I can't really say. I have an opinion about it, but there's no point in giving you my opinion.

173

Q. (Mr. Stouck) Okay. Let's put the opinions aside at least for a moment. Maybe we'll come back to it.
But my question is this paragraph that I just read refers to the mission plan and the activities specified in the mission plan being targeted toward one fundamental objective. And then it --
A. Yes.
Q. -- describes what the objective is.
A. Yes.
Q. And then there's a further sentence also. I'm simply asking whether this paragraph refreshes your recollection about whether or not this, meaning what's stated here in this paragraph, was at that time a fundamental objective of the program?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I can only respond by saying this is what those who were there wrote.
Q. (Mr. Stouck) Okay. So beyond that, you have no answer to my question?
A. I don't know how I can answer any further.

Q. Okay. Do you have an opinion about whether -- you mentioned opinion, and I don't remember exactly in what context, but do you have an opinion about whether this was a fundamental objective to the program at the time you arrived, these sentences we just read?
A. Well, you're asking for do I have -- did I have an opinion. In the light of what I then knew about the Act and the program when I arrived, I had serious questions as to whether that statement could be justified, that is -- that is was there enough data or information that would give confidence that a statement like that was even rationale.
Q. Are you done?
A. Yes.
MR. STOUCK: Can we go off the record.
(Off-the-record discussion.)
Q. (Mr. Stouck) When you say you had series doubts or series questions about whether that statement could be justified, you're referring to whether the objective could be achieved, right?
A. Yes.
Q. Okay. But that's a -- is that -- I'm



not asking whether it could be achieved. I'm asking whether it was an objective, whether it was a fundamental objective of the program at that time, as stated here, to do these things in this paragraph; in other words, to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998. Was that a fundamental objective of the program at the time you got there, regardless of its achievability?
MR. MILLER: Asked and answered.
THE WITNESS: I would -- I would only suggest that it needs to be put alongside the verbiage in the Act itself. And I'm speaking from my memory that the statement in the Act is not nearly that expansive. I think the Act literally says begin receiving fuel in January, whatever it is, of 1998.
Q. (Mr. Stouck) Right. But you joined the Department of Energy as the head of the program office that was charged with implementing the Act, right?
A. Yes.
Q. And in the course of implementing the



Act there was -- we're going to get to the final mission plan, by the way. A mission plan was developed, which you testified was important. Whether or not it was required by the statute --
A. Yes.
Q. -- you had to have it or it was a good idea to have it in order to guide your mission?
A. Yes.
Q. Okay. So you were implementing the statute. And I'm not asking you at this point about what the statute may or may not have required as a legal matter.
What I'm asking you is whether there was an objective, a fundamental strategy -- or fundamental objective, excuse me, is the term used here.
Was there a fundamental objective of the program that included the elements that are stated here? Is it -- you know, do you recall? Is it your understanding? What can you tell me about that? Do you know? Do you not know?
MR. MILLER: Objection. Calls for speculation. Asked and answered.
THE WITNESS: I think the only thing I can say is that this statement is more expansive



than I would have guessed one would have made at that time, but I have no knowledge of it.
The Act was the piece of paper that was put in front of me when I was invited to consider taking the position.
Q. (Mr. Stouck) Okay. Just let me clarify the question. This statement, you say, is more expansive than I would have guessed. As we sit here today?
A. Yes.
Q. Okay. But you weren't at -- you weren't there at the time this was written?
A. I certainly was not.
Q. And I could probably find out more from the people who did write this?
A. That's correct. And, for that matter, this is the first time that I recall that I have seen this. It certainly preceded my then imminent arrival.
Q. Okay. Let's turn to Page -- a couple of pages. At the top it says 2-1, Program Strategy. Would you please take a couple of moments or whatever time you need to review the first -- well, to review what's on this page.
A. Okay.

Q. (Mr. Stouck) What is it?
A. My opinion is it will.
Q. Do you have -- okay.
A. By virtue of no other alternative it has that's practical or relevant.
Q. Okay. Do you have an opinion about the time frame in which that will happen?
A. I'm just not that familiar with things. Again that's real speculation.
Q. Okay.
A. I think -- if I can just add this one statement. I think if the Senate follows the House and this characterization of Yucca proceeds, I think in a year or two we'll have a much better feeling for the timing primarily from the regulatory involvement.
Q. Is it your testimony that -- I mean, to summarize some things you've said, is it your testimony that at the time you took the job at RW in your view the prospects for achieving the objective of starting fuel acceptance in 1998 were highly uncertain?
A. Highly unlikely.
Q. Highly unlikely? That was your view when you took the job?



A. Yes.
Q. And the reasons it was highly unlikely were?
A. Well, excuse me. I should re-answer that. When I took the job, the moment I got there I did not have the insight that I did after I had been there awhile. And so I really ought to put that context slightly different.
Q. What do you mean by awhile? How long did it take you to get this insight?
A. A couple years.
Q. Okay.
A. Primarily because of the relationships of the states.
Q. So after a couple of years it was your view that it was highly unlikely that the '98 date could be achieved?
A. Yes. In fact, early on it was -- it just seemed like a heroic effort to start with, but after those two years it just became, to me, fairly clear.
Q. Okay. But that was not your view at the time you took the job?
A. I did not have that experience at the time.



Q. At the time you took the job did you believe it was an achievable goal?
A. My objective was to do the best I could.
Q. Okay. Did you have any understanding about the achievability of the '98 date objective when you took the job?
A. Well, I believe so in that I placed emphasis in my testimony at the confirmation hearing that I thought an MRS was absolutely essential to have a chance to meet any of those kinds of commitments.
Q. So your view when you took the job was that with an MRS there was a chance?
A. There might be a chance.
Q. There might be a chance?
A. Yes.
Q. Okay.
A. And I can't put a probability on it.
Q. Okay. Well --
A. But it certainly enhanced the likelihood of meeting the objectives of the Act.
Q. Did it make it more likely than not?
A. Yes.
Q. If you could get an MRS?
A. Yes.



Q. And that was your view?
A. In my opinion.
Q. In your opinion at the time you took the job?
A. Yes.
Q. Okay. Did you have an opinion at the time you took the job about the likelihood of achieving the '98 date without an MRS?
A. I had an opinion. And my opinion was it was highly unlikely.
Q. Okay. And those opinions were formed from experiences obviously that you had before you took the job, just from an awareness of the industry?
A. And largely -- in large extent that's correct.
Q. Okay. Unfortunately, this is a big one, but let's mark it anyway. This is the final mission plan. We finally get to the real --
A. Which I'm sure I haven't seen. What date is that?
Q. June 1985.
A. June '85?
Q. Yeah.
A. Well, I should have seen that one.

Q. Right.
A. I probably even signed it.
Q. Let's find out.
MR. STOUCK: Why don't you mark it for me.
(Off-the-record discussion.)
(Exhibit No. 15 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you have been handed -- actually this is only Volume I of the mission -- it's titled Mission Plan for the Civilian Radioactive Waste Management Program, Volume I, which on the front cover, as it indicates, Overview and Current Program Plans.
Wait a minute. That's not right. This is -- find out what my own exhibit is. I believe this is Volume I and II. Let me just make sure that's right.
MR. MILLER: It's only Volume I.
MR. STOUCK: It's only Volume I?
Q. (Mr. Stouck) Right. Well, yeah, I remember this now. It's Parts I and II. Part II starts on DB-105450. And the title of what's labeled Part II is Information Required by the Nuclear Waste Policy Act, which on the cover --



okay. Yes, you're right. Okay. This is Volume I only.
MR. MILLER: Two parts to Volume I.
MR. STOUCK: Two parts to Volume I. Thank you.
Q. (Mr. Stouck) Mission Plan for the Civilian Radioactive Waste Management Program, Volume I, June 1995.
MR. MILLER: '85.
Q. (Mr. Stouck) '85. June 1985. And let's use actually the other numbers for identification. HQ0005264, I believe this to be consecutive, it certainly should be, through 5796. And certainly the official exhibit will indicate if it's not all the way consecutive. Is that the document that you have in front of you?
A. I believe so.
Q. Okay. Now, if you open the cover, Mr. Rusche, you will see a transmittal letter from you to members of Congress and other recipients. Do you see that?
A. I do.
Q. And is that your signature?
A. It sure is.
Q. Okay.



(Off-the-record discussion.)
THE WITNESS: That's much better. Yes. Say it again.
Q. (Mr. Stouck) Well, I just -- there's no question.
A. That is my signature, yes.
Q. All right. Now, we've been through the drafts and some of the background before you got there and it went out for public comment and we've been talking about this for awhile.
Now seeing this, can you tell me anything more about the role that you played in the preparation of this document?
And take -- it's a big document. If you want to take a few moments to review it or look through the table of contents or look at the contents itself, please take all the time you need.
A. This would make interesting bedtime reading. My recollection is that I was well aware of the obligation to prepare this version of the mission plan. And the group that worked on it were some of the people that we've seen, plus perhaps some others. And I can't really go any further with respect to naming names, but I was --



I was certainly aware of the activity that was underway.
I was impressed by the amount of effort that people put into such things as this, but this -- I believe this issue -- what was the date on this? June of '85. I had been in the office just one year.
And I was -- I was kept aware during that -- some portion of that time that such an effort was underway and that we had the obligation under the Act to provide this revision or version or whatever you want to call it.
And I had briefings from time to time on one thing or another. And my specific memory of what and when I just cannot recall. I would acknowledge at the outset that I have not read every page of it.
Q. Ever?
A. Ever.
Q. That was going to be one of my questions. Would you have read this before it was finalized?
A. I would have -- I had a -- I'm sure I had a chance to look over it. And I probably did like I did most documents that were prepared by

lifetime.
In my opinion, it was one of the -- it is one of the most challenging programs that's been undertaken in a long time in this country.
Q. Right. At the time though -- I wanted to go back to this statement that you made that even by this time, meaning June 1985, the program as outlined in the Act had been revised or redefined or consideration of change or some --
A. Features had been under consideration for sure.
Q. And some had even been changed, but there were others under consideration. There was something significant going on that was -- because it was now an anathema and it wasn't an anathema when the Act --
A. That's correct.
Q. Okay. So something had happened?
A. Well, experience.
Q. Okay. Well, what I'm asking you is at the time you joined the Department in May 1984, at that time do you believe that the program -- by that time, not necessarily that you knew it then because you had just started, but in light of what you learned in the course of your duties at RW and



in light of what you know as we sit here today, looking back on May of 1984, which was a year before this mission plan, do you believe at that time, by that time, May of 1984 when you joined RW, even by that time the program as outlined in the Act had been redefined or changed or --
A. Or was being.
Q. -- was being in a significant way?
A. It was in some sort of evolutionary process.
Q. Yes. So that's yes?
A. Yes.
Q. Okay.
A. Even then.
Q. Okay. Why?
A. Because the parties that were active in the program or active or associated with the program or to whom this program applied had such different views about the values, the circumstances, and the time. I can even recall -- and this is voluntary.
THE WITNESS: And, Mr. Advisor, if you want me to stop, tell me. But I just can't overlook the fact that even with the NRC I had -- I had countless meetings with the Commission.



And the Commission was itself continually reviewing the requirement that there had to be a reasonable expectation that there was going to be a waste treatment system in place at some reasonable time in the future.
And it would -- the state interactions particularly then, and I think from my long distant view now have continued, still make it very challenging.
Q. (Mr. Stouck) Okay. What I want to talk about now is what you mean when you talk about the program as originally outlined in the Act before experience and whatever else led to these changes, consideration of change, revision, revised, whatever. Go back to your -- I want to talk about your understanding of what the program originally outlined in the Act, what you meant when you referred to that.
Okay. Now, would you agree that the statements that we looked at in some of the prior documents about -- let me refer specifically -- the draft mission plan in December 1983 about --
A. Yes.
Q. -- an objective of -- on Page 1-1 to accept commercial -- each activity specified in



the mission plan, at least this draft, is targeted toward one fundamental objective, to achieve -- to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Further, the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31, 1998, and ultimately remove from at-reactor storage all waste that is more than five years old. You recall those kinds of statements we talked about at some length?
A. I do.
Q. Would you agree that those statements are consistent with what you referred to as the program originally outlined in the Act before these changes that we've more recently been talking about in this deposition?
A. I think some of the details are not mentioned in the Act, but I think the thrust of those discussions, those statements, to me seem to be more a statement or recitation of what the Act says than what the staff, if I can use that term, concluded ought to be done.

Q. Later?
A. Later.
Q. After these changes?
A. Or at any time. That is the Act -- the Act is not a very detailed prescription of what is to be done. There's a lot of stuff of how things have fit together and so forth, as I recall it, but the prescription in the Act, as acts, I think, generally want to be, is objective oriented, not implementation oriented.
Q. Okay. And these statements, like the one I just read to you and we discussed earlier, would you agree are consistent with the --
A. To some extent --
Q. -- objectives in it?
A. -- they are consistent with what was then visualized in the Act as important objectives.
Q. Initially?
A. Yes.
Q. Okay. But as time went on the implementation got more complicated?
A. Well, not only the implementation got more complicated, but the ability to even achieve the objectives, I think, was called into question.



Q. Even by the time you joined?
A. By the time I -- certainly by the time I had been there when this occurred.
Q. Meaning the draft mission plan?
A. Yes.
Q. Okay.
A. And this, I think, was an attempt to try to -- try to preserve as much as of the original inferences drawn from the Act as could be while further stating or giving voice to some of the exigencies that have become more evident as the program unfolded.
Q. Okay. So would you agree then with this, that if we were interested in learning or getting the best understanding that we could get of the original objectives of the Act, that we should look to documents and statements that are pretty close in time to the enactment of the Act, that is 1983, such as some of the ones that are out on the table here, and that as time went on the interpretations of the objectives of the Act got, I'll use the word, clouded by these other considerations of complexities and difficulties and eventually anathema? Would you agree with that?



A. I think I probably would agree with that statement. I might have used shaped rather than clouded.
Q. Okay.
A. But I think they carry the same connotation. In my experience in several other areas, not this particular piece of legislation, but in other pieces of legislation that I dealt with would suggest that this program created by the legislation was more susceptible to that flavor than many pieces of legislation that I have seen because of the complexity of the technical issues, the complexity of the interactive issues between the multiple parties that are involved.
Q. Any other reasons?
A. Well, those two stand out. And the technical complexity exacerbates both of those factors. That is you can't predict very well. You're looking at science and engineering that's not heretofore well practiced. And all of them just complicate the issue.
Q. What other experiences do you have, just briefly, that -- I know you've got a lot of experience, obviously as reflected on your resume, which is in the record, but can you just give me a



couple examples of other experiences that you've had that lead you to draw this conclusion about the particular susceptibility, if I'm understanding, of this program to these forces?
A. Well, I don't know of any that apply directly to this program, but I can think of analogues in other circumstances.
Q. Yeah, that's --
A. I can think of one. Waste tanks at Savannah River or at Hanford. When the AE program began, when the Act was adopted in the early '50s, it was -- at the time the work began at Hanford I was too young to even be aware of it, but I became aware of it later, and certainly at Savannah River when I went down in 1953, that dealing with waste was a very, very major technical, political, and social issue. And it is today, here more than 50 years later, at both of those sites.
By waste I mean nuclear waste, the residue from the reprocessing operations or the other waste efforts that derive from manufacture of fuel and so forth.
And I think that that experience is somewhat reflective of this kind of program in which the inability to predict an outcome with

of things.
You did not mention funding shortfalls. And I was curious about that. But I take it from the testimony you've just given, that that was also a factor? Or not? I mean, is it --
A. Yes, it was a factor. It just did not -- at the point I recall our dialogue on that subject I guess I made an inappropriate assumption that the budget and financing were not technical factors per se. And I just didn't introduce it in the discussion at that point.
Q. But it was another factor?
A. It was a factor. I can't point to a specific instance in which if we had $50 million more, we would have been a year ahead. The program was just not that -- not that explicit, from my recollection.
Q. All right. Well, from your recollection though -- strike that. Do you believe that given adequate funding, adequate funding -- I guess the question I'm about to ask is could money solve the problem?
If given adequate funding, could RW have achieved the objective of accepting -- well, whatever these original objectives were starting



by '98?
MR. MILLER: Calls for speculation. Go ahead.
THE WITNESS: I would say that the matters that were the biggest impediment and still are, and they are not amenable to -- funding is not a very effective manner for dealing with them, which is the interaction with the states, the tribes, and so forth.
Q. (Mr. Stouck) Okay. Take a look at Page 385 now, please. And I know it's getting late in the day. I'm going to try to wrap up very promptly.
A. 385?
Q. 385. Under -- there's a -- it says Chapter 10, Costs of Managing Commercial Radioactive Waste. Do you see that?
A. Yes.
Q. And there's apparently a quotation -- no. No. No. Forget the quotation. Under the Introduction, 10.1, it says, "As part of its continuing evaluation of the adequacy of the revenues raised by the Nuclear Waste Fund against the expenses of the waste-management program, the DOE maintains a cost-estimating capability.



The most recent cost estimates for the entire program are contained in a January 1985 report entitled Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program." Do you see that?
A. Yes.
Q. Do you recall, during the time you were there, these total system -- or this or any other total system life cycle cost study?
A. That there were such studies?
Q. Yes.
A. Indeed I do.
Q. You do recall those?
A. Yes. I don't recall the details of it at the moment, but I recall that they were done.
Q. Would they have come to your attention?
A. Certainly come to my attention from the standpoint of awareness that there may have been an implication of shortfall or something or other in some analysis that was done, but it was so hypothetical at the time that it was -- particularly early on, that it was not a factor that you could really deal with.
Q. Do you know why they were done?
A. For the purpose of -- my perception at



the moment was, and I think it was that then, was that it was an attempt to confirm that the mill per kilowatt hour tariff was providing enough funding for the program to proceed as best we could.
And it turns out that there were some cases of circumstances in which that -- early on that that might not have been as clear as it became, but the problem was not the funding. The problem was the appropriations.
Q. Okay. Now, on Page 396 there is a section titled Storage Costs. And it says, "This section presents the cost estimates for the storage activities required in the 5-year and 10-year repository-delay cases." Do you see that?
A. Yes.
Q. All right. Were you aware at the time that your agency, RW, was studying cost impacts on utilities of delays beyond 1998 in implementing the program? Were you aware of that at the time?
A. In a general sense, yes.
Q. Okay.
A. It was not a secret, for sure.
Q. Okay. So you were aware that RW was studying the cost impacts on utilities of delays

298

beyond '98. Okay. What was the reason for that analysis? It wasn't related to fees. What was the reason?
A. The perception was the probability of meeting the '98 date was vanishing.
Q. And so there would be cost impacts on the utilities?
A. Certainly. It's going to extend the time at which the waste acceptance activities and so forth that were programmed in the Act could be implemented.
Q. And that would have a cost impact on utilities?
A. On the whole program. Not just on the utilities, but on the whole program.
Q. Well, I'm focused on the impacts on utilities.
A. Yes. And studying the impact on utilities was an appropriate thing to look at, but that was not the only impact on that activity is the point I'm making.
Q. That is fair enough. What was the cost impact on utilities?
A. I don't remember.
Q. Not the dollar amount, but what kinds of

299

costs are we talking about?
A. You mean what produced the costs?
Q. Yes.
A. Either making modifications to fuel pools or going to dry storage or some such -- some such corrective actions to temporize the circumstance.
Q. And you were aware that that was being studied at the time you were there?
A. Yes.
Q. And what was the purpose of those studies, of, you know, the study of the cost impacts on utilities?
A. I think it was just a prudent thing to do in the whole planning cycle. It was not something that we had any -- as I recall, we had any direct mechanism for preventing or altering; that is, the cause of the circumstance that might give rise to that feature which produced the cost impact. It seemed to me like it was a prudent management tool to have in hand when I go to talk to somebody in Congress.
Q. Okay.
A. And did when and if the occasion arose.
Q. Okay. So it was useful in advancing the

300

goals of the program by pointing out to people that there would be these cost impacts and maybe they could be avoided if the program got going? Is that what you're saying?
A. That certainly would be one way to look at it, but the cost impacts from the delay were many other than just on the utilities, but I think it was important for the Department, who had the obligation under the nominal contracts, which I didn't really think of as a contract, but under the circumstance to estimate those costs.
Q. And at least one thing that you as the director did with those costs is you used them to try to encourage --
A. Move ahead.
Q. And avoiding those costs?
A. That would have certainly been one hoped for outcome.
Q. Well, that would have been one outcome if the program -- those costs would have been avoided?
A. Yes.
Q. So quantifying the costs allowed you to make a more effective statement?
A. More rationale, yes.

301

Q. On balance?
A. Yes.
Q. Quantifying those costs would allow you to make a more effective statement about the good that could be done in financial terms if the program were brought to the point where it actually started operating?
A. Correct.
MR. STOUCK: Thank you very much. Why don't we quit for the day.
Further Deponent sayeth not.
(Whereupon, the taking of the deposition adjourned at 5:17 p.m.)
Sigature of Witness _______________ Notary Public __________________

304
UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, ) PLAINTIFF, )
) VS. )
) THE UNITED STATES, )
DEFENDANT. ) ___________________________)
) MAINE YANKEE ATOMIC POWER ) CA NO. 98-474
COMPANY, ) PLAINTIFF, )
) VS. )
) THE UNITED STATES, )
DEFENDANT. ) ___________________________)
) CONNECTICUT YANKEE ATOMIC ) CA NO. 98-154
POWER COMPANY, ) PLAINTIFF, )
) VS. )
) THE UNITED STATES, )
DEFENDANT. ) ___________________________)
Deposition on oral examination of BEN RUSCHE, VOLUME 2, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Friday, May 17,



2002, at the hour of 8:28 a.m. Appearances: Representing the F

306 CONTENTS (Deposition of Ben Rusche) Page Exhibit Index
This deposition is taken in accordance with the Federal Rules of Civil Procedure.
It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.
Whereupon:
BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:
CONTINUED EXAMINATION
BY MR. STOUCK:



Q. Good morning, Mr. Rusche.
A. To you too, sir.
Q. And you understand, of course, that you are still under oath?
A. I do.
Q. Now, having thought about and talked about these things at some length yesterday, probably for the first time for you in awhile, is there anything that you've thought about overnight, any of your answers, any things that you've told me, any clarifications, supplementation that you would like to make before we get started?
A. I can't think of anything.
Q. Okay. And have you talked with anyone other than your counsel about your testimony since we last met?
A. My wife asked me whether I was involved. And I did speak to her.
Q. Okay. Other than that?
A. No.
Q. Okay. Now, I've been thinking about your testimony yesterday. And I just would like to, you know, try to summarize or at least try to get clear on exactly where we are with this whole



business about scheduling and intent and strategy.
So let me see if I understand correctly what you have told me because there's been lots of testimony about it. You understand that the Act, the Nuclear Waste Policy Act, requires the start of waste acceptance by January 31, 1998, right?
A. That's correct.
Q. That's clear?
A. Unmistakable.
Q. Okay. But regarding the intent of the Act with respect to the -- the intent of the Act with respect to the schedule for pick-up after 1998, you don't know what that intent was; is that correct?
MR. MILLER: Objection. Calls --
Q. (Mr. Stouck) The intent of the Act with respect to the schedule for pick-up after January 31, 1998?
MR. MILLER: Objection. Calls for speculation.
Q. (Mr. Stouck) Is my recollection of what you told me, that you don't know what the original intent of the Act was with respect to the schedule after they start picking up?
A. Well, I think the simple answer is, no,

these are all done on the computers.
MR. MILLER: Well, these are certainly. Actually I still have a Bates stamp in my desk at my office. I think they are still making them.
MR. STOUCK: Really?
MR. MILLER: But you're right. These were computer added.
THE WITNESS: SP has another connotation to me outside this context. And I just was -- it just tickled my memory.
Q. (Mr. Stouck) There's a code for those. I cannot tell you what SP means.
A. I'm sorry. I didn't mean to distract you.
Q. Sure. Take a look at this schedule though that's on Page 9.
A. Yes. Yes.
MR. MILLER: I thought you said Page 8?
THE WITNESS: You did say Page 8.
Q. (Mr. Stouck) I'm sorry. Eight. You know --
A. Would you rather look at 9?
Q. No. Let's look at 8. It's more interesting. It's a table that's entitled Schedule for the First Repository?



A. Yes.
Q. And you'll see, if you look down near the bottom, that the schedule that's in this plan calls for the start of construction of the first repository in 1998. Do you see that?
A. Yes.
Q. Which is five years later than in the '85 mission plan?
A. Yes.
Q. Okay. And then, likewise, the completion would be five years later, as we saw in that sentence that you called my attention to previously?
A. Yes.
Q. Okay. Do you recall what the relationship between the start of construction of the first repository and the commencement of operations of the MRS was or whether there was a relationship between that?
MR. MILLER: Asked and answered yesterday, I believe.
THE WITNESS: Whatever the case was yesterday, I guess my response to the question, the relationship was that the MRS was certainly -- it would have been possible to construct the MRS



in a more timely fashion, therefore bringing it into operation.
And, two, that its relationship to the repositories, and I believe this document, I don't know that I saw in here somewhere, but I had reached -- I, the Department, had reached an agreement with Congress, and particularly a committee in Congress, that the MRS, whose function we're talking about and for that purpose, was -- needed to have certain restrictions placed on it so that it did not become the substitute for the repository.
And therefore the capacity of the MRS was restricted purely by -- it was an arbitrary or -- a restriction to prevent this potential or possible substitutionary idea, but when -- that is that the repository would take the place -- I mean, an MRS would take the place of the repository and just allow you to keep pushing the repository off.
Q. (Mr. Stouck) Right. But as we sit here today you apparently don't -- I mean, do you or do you not recall whether there was some legal or practical or technical linkage between the start of construction of the repository on the one hand



and on the other the commencement of operations of the MRS?
MR. MILLER: Objection. Compound.
Q. (Mr. Stouck) It's a question about your recollection.
MR. MILLER: Same objection.
THE WITNESS: I seem to have a recollection that there was a relationship out of this same element in Congress, that the MRS construction could not begin until there was some -- I mean, the MRS operation, I believe it was, could not begin unless there had been a construction permit. And I can't remember whether the process started or -- I think it was granted by NRC.
So there was some coupling to again serve that objective of being an integral part of the system without becoming a substitution for -- goodness, this is so distracting. I see this head right behind yours in that mirror and it just keeps going around and --
MR. STOUCK: Let's go off the record for a second.
(Off-the-record discussion.)
(The Court Reporter read the record as

requested.)
Q. (Mr. Stouck) Substitution for?
A. For the repository. And I think that's the recollection that I now have. And I think it would -- that one was a pretty explicit set of interactions with one of the committees.
Q. Was that linkage -- let's call it a linkage.
A. In that sense, yes.
Q. Was that linkage between the repository and the MRS, do you recall, part of the same legislative package that also imposed the capacity limitation?
A. I just don't -- I don't recall that.
Q. Don't recall?
A. It could have been, but I don't recall that.
Q. Okay. But do you recall legislative discussions of both issues? You just --
A. I don't really have a clear picture of --
Q. You recall that there were legislative --
A. There were. They were very intense.
Q. Okay. So if this linkage that you just



-- what I call a linkage, that you just described between the grant of the construction permit for the repository and the commencement of operations of the MRS was, in fact, enacted, then this schedule that we're looking at on Page 8 or that we were looking at on Page 8 which shows on a modified basis in the center column that the repository would start construction in 1998 would be consistent with the commencement of a plan for the commencement of MRS operations in 1998 if construction of the repository were started and if this linkage, in fact, existed the way you --
A. I think that's right.
Q. Okay. Now, let me ask this. If it's your understanding that the '98 date was not a firm commitment -- if you're looking at something, I would be happy to wait, if you want to review this.
A. No. I just happened to see this --
Q. Please. I'll hold my question.
A. -- on the following page. On Page 10 of the text there under an MRS, I just saw this as I flipped over.
Q. Okay. What does it say?
A. It makes somewhat the same points we



just made.
Q. Well, I will tell you it's my understanding that the capacity limitation and that the link -- what I call the linkage was, in fact, enacted into law. So your recollection on those points is, I think, reasonably accurate.
A. Okay.
Q. If the '98 date was not a firm commitment, okay, which I think is what you've been telling me, in your mind it was not a firm commitment, or is that --
A. There's no question of what the Act said.
Q. Okay.
A. But I do believe that the discussions that were underway during the time I was there with Congress and with the states and with the interested parties and I'm sure with the industry, industry's primary interaction may have been more in and through the scheduling and programming for acceptance, all of those -- I think all of those parties, in my recollection, had a clear picture that the '98 date was -- though statutorily established unequivocally, was very difficult -- would be very difficult to achieve and in most



environments that I was in from a practical standpoint was unachievable because of the vagaries of the program and the interactions, notwithstanding commitments to try and do and so forth.
Q. Okay. Well, I guess then if I were -- why was the -- and the answer you just gave concerns the time period when you were at RW, right?
A. Yes. And really concerns me.
Q. Your view?
A. Yes.
Q. Ben Rusche?
A. Yes.
Q. Okay. Now, I guess, why was the Department attempting to meet the '98 date?
A. Because the Act required it.
Q. Okay.
A. Or specified it, whatever you want to --
Q. That was the source of the motivation to try?
A. Yes.
Q. You had a statutory requirement?
A. Yes.
Q. Okay. Okay.

MR. STOUCK: Let's mark this as No. 17.
(Exhibit No. 17 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you've been handed a one-page document which has Bates No. SN044976. This appears to be an AP wire story. It's not dated. I will tell you it came to me from the files of a utility company called Southern Companies. Do you know that company or have you heard of it?
A. Yeah. It's been succeeded by other companies now.
Q. Okay.
A. But yes.
Q. All right. That's where I got this. Why don't you take a moment to review it. Actually there is a date at the bottom. I apologize. June 13, 1984.
MR. STOUCK: Can we go off the record for a second.
(Off-the-record discussion.)
Q. (Mr. Stouck) Have you had an opportunity to review it?
A. Uh-huh.
Q. Okay. This date that I just mentioned,



June -- have you seen this before?
A. I don't think so, but apparently I was there.
Q. Well, do you recall a press conference -- this is about a month -- less than a month after that Congressional statement we looked at yesterday. So it's obviously shortly after you became the director, correct?
A. I had so many press conferences -- yeah, I had many press conferences, but I can't -- I don't recall this one specifically.
Q. Okay. Well, do you recall one -- was there a press conference that sort of announced you to the world?
A. I just don't remember.
Q. Don't remember. Okay. In the second paragraph there's a statement, it's not in quotations in this story, but it uses the word said. Well, let me read it.
It says, "Ben Rusche, the new director of the Energy Department's Civilian Radioactive Waste Management Office, said government contracts with owners of the nation's 80 nuclear plants are being revised to include the guarantee," reference to the guarantee mentioned in the first paragraph



to begin taking fuel by 1998. Do you see that?
A. Uh-huh.
Q. Do you recall making that statement?
A. No. But I don't doubt it.
Q. Okay. You don't doubt having made that statement?
A. I'm sure I was probably a good quote, a legitimate quote, or an actual quote maybe I should say.
Q. Well, there's an actual quote in the next paragraph.
A. Yes.
Q. It says, "'The Department is obliged to begin receiving spent fuel in 1998 whether or not a repository is in place,' Rusche told reporters Tuesday." Do you see that?
A. I do.
Q. Okay. And you have no reason to doubt that you made that statement?
A. No.
Q. Okay. And if you made that statement, I take it you believed it at the time?
A. I'm sure I did.
Q. Okay.
A. I was pretty naive though at the time.



Q. Okay.
A. I also note the following paragraph, that industry folks doubted it too.
Q. Yes. Well, the doubt there though is concerning the first repository?
A. Yes.
Q. But, as we know, repositories was not the only way to meet the '98 date?
A. Well, and I went on -- and even at this early date the picture in my mind was that down, I guess, toward the bottom where I mention --
Q. The MRS?
A. -- MRS, yes.
Q. Now, there's a reference at the bottom to Mr. Lawrence. Do you see that in the last paragraph?
A. I do.
Q. And according to this story, "Mr. Lawrence had resisted pressure from Senator Johnston and the utility industry to proceed simultaneously with both an underground dump and an above-ground facility capable of storing the wastes for 50 to 100 years."
And I understand that to be a reference to, on the one hand, the repository and, on the

other hand, the MRS. Is that reasonable?
A. I would too.
Q. Do you recall Mr. Lawrence's resistance to the simultaneous development of an MRS?
A. No. In fact, this is the first time I've ever heard such a thing attributed to Lawrence, at least in my recollection.
On the other hand, the dialogue with Bennett Johnston, whether my contact with Bennett began the day Mike walked away or not, my dialogue with Johnston was extensive. And we've touched on this in many contexts here.
Q. And what was -- do you recall what was Johnston's -- Senator Johnston's view about the MRS?
A. He was the No. 1 promoter.
Q. Okay. But you just don't recall at this point what Lawrence's views were about the MRS or do you believe this is incorrect, correct, or you just don't recall?
A. I have -- I don't recall Mike's view on the subject, nor being made -- in fact, I was not aware, at least as far as I can recall, of this. I don't think Bennett ever talked to me to that effect.



Q. Of this meaning Lawrence's resistance?
A. Yes. I never had that dialogue with Johnston. The Senator and I had many discussions soon after I was there. And in part -- and my view on the MRS is unequivocal in my confirmation statement and I think it remained consistent throughout the time I was there.
Q. Okay. And Johnston, Senator Johnston, was, you say, the No. 1 supporter?
A. Yes.
Q. And what's your understanding of why he was such a strong proponent of the MRS concept?
A. I think he was just pragmatic.
Q. Okay. Meaning?
A. Meaning that the odyssey to first identify sites and then go through the licensing process for a repository was just a very challenging task and the timing was just not very predictable.
And an MRS was a fairly standard sort of construction at a place people could see and there were circumstances which you could surround it with which were much more tolerable.
I shared that view not because of the Senator. In fact, I'm not sure I had any



discussion with the Senator on the subject before I was confirmed.
If you recall, when I was confirmed Senator McClure was still chairman of the Committee, the Energy Committee. Senator Johnston was the ranking minority member. So Senator McClure, I think I'll use the word, advisedly commanded my time of such things, but I still had interaction with Senator Johnston.
Q. And then at some point he became the chairman?
A. The next year when the Senate changed minorities -- I mean, majorities, yes.
Q. And minorities?
A. Huh?
Q. And minorities?
A. Yes. Both parties. Both segments changed.
MR. STOUCK: Okay. Let's mark this, please, as --
(Off-the-record discussion.)
Q. (Mr. Stouck) You say that you had lots of press conferences. Was there a particular individual who assisted you with press relations in RW or at the Department generally that you



recall?
A. Well, I had -- eventually there was. Early on I was sufficiently transitional in even how to do business in that environment, that it took me awhile to get a direct office staff assembled.
And we did end up with a group that I can't recall its name, but it was something like the -- I certainly can't remember the title precisely, but it was a group that reported directly to me that helped me with policy.
And it had people, I think, that -- eventually Roger Gale was the leader of that office. And it had people with press and public relations.
Ginger King became maybe after a year or two, year and a half or so, the person that was most directly helpful, but she even had a staff of several people.
Q. Okay. Here is -- we're going to mark No. 18.
(Exhibit No. 18 was marked for identification.)
Q. (Mr. Stouck) This is -- it's another statement presented to this time a Senate

better words, an administrative -- director of the administrative activities. He was not a technical guy, as I recall. And subsequently -- I mean, he was a very capable fellow. He tended to be somewhat reserved and didn't get out front a lot.
And if I'm not mistaken, and this is somewhat speculative, but I think that after I left there was a transitional period as to what to do, who and how and whatnot. And I think Sam may have even been an acting director of RW for a period, a short period of time.
Q. He stayed on after you left, anyway?
A. Yes. To the best of my knowledge, that's right.
Q. All right.
(Off-the-record discussion.)
MR. STOUCK: Let's mark this as the next, 21.
(Exhibit No. 21 was marked for identification.)
Q. (Mr. Stouck) I'm not going to go through all 100 plus sessions with Congressional committees, but here is another one for you.
A. Sure.
Q. What's been marked Exhibit No. 21 is



actually, I will say at the outset, we'll go through it, it's an incomplete copy of a statement of -- on the cover it says Statement of Ben C. Rusche, Director, and so forth --
MR. STOUCK: Off the record.
(Off-the-record discussion.)
Q. (Mr. Stouck) Before the Committee on Energy and Natural Resources, United States Senate, April 29, 1987.
And if you turn the page, it looks like the first page -- "Mr. Chairman and Members of the Committee," is the first page. Then the next page is numbered three, next page is numbered five, seven, nine.
A. Looks like half the pages are missing.
Q. 11, 13. But then we have 14. And then at the end --
A. Eighteen.
Q. -- 18 and 16. So those are sort of reversed. But if you also take a close look, you will see that the Bates numbers are consecutive.
A. All right.
Q. So I will tell you that this is the way that we got the document and it's the only version that I have, but --



A. I would like to suggest that that's not the way the testimony was presented, but that's somewhat speculative.
Q. Okay. On the first page though it says, "I appreciate" -- but do you -- you don't doubt you gave this testimony?
A. No.
Q. "I appreciate the opportunity to appear before you today to discuss the Department of Energy's proposal for Monitored Retrievable Storage." So that seems to be the subject of this testimony.
Okay. Now, and I do apologize for not having a complete document, but I just don't. On Page 7, Mr. Rusche, there's a paragraph that starts in the middle of the page. Let me read the first few sentences into the record.
"Since the MRS proposal was prepared over a year ago, the Department has revised its estimate of when the first geologic repository can be operational from 1998 to 2003, as presented in the January 1987 draft Amendment to the June 1985 Mission Plan. The MRS will allow the Department to begin receiving waste by 1998." Do you see that?



A. I do.
Q. Okay. So that's what you told Congress?
A. Yes.
Q. In April of 1987?
A. Yes.
Q. Okay. And if you would turn now to the page that's marked 13.
A. Okay.
Q. There's a paragraph that starts there a few lines down. And again let me read a few sentences into the record.
"The net cost to the total system is about $1.5 billion because of savings incurred at the repository and in the transportation system. The costs borne by the utility rate payers would be offset by savings in at-reactor storage cost; these costs would be" --
A. Could be avoided.
Q. It says would be avoided.
A. Yes.
Q. Would be avoided. "The costs borne by the utility rate payers would be offset by savings in at-reactor storage cost; these costs would be avoided because an MRS facility would allow DOE to accept spent fuel at an earlier time." Do you see

that?
A. Yes.
Q. So that was an argument in favor of proceeding with the MRS facility that you made to Congress in 1987?
A. I did.
Q. That the savings in at-reactor storage costs for utilities resulted from earlier commencement of operations of the program would offset -- largely offset the increased costs that were added by the implementation of the MRS? Yes?
A. Yes.
Q. Okay. Now, on Page 16 we see at the very bottom there's a paragraph that starts, "The NWPA."
A. Uh-huh.
Q. Do you see that?
A. Uh-huh.
Q. Let me read this one. "The NWPA finds that 'a national problem has been created by the accumulation of spent fuel from nuclear reactors' and that the 'Federal Government has the responsibility to provide for the permanent disposal'. Adding additional operator burdens and complexity at the reactor sites would be



inconsistent with these findings which serve as a basis for the NWPA." Do you see that?
A. I do.
Q. And I've read it correctly?
A. Yes.
Q. And that was your view in 1987?
A. Yes.
Q. And that was what you told Congress?
A. Yes.
Q. And is that your view today?
A. Yes.
Q. And why is it that adding additional burdens and complexity at the reactor sites would be inconsistent with those findings from the NWPA that are quoted here?
A. Well, I think the simple answer would be that the magnitude of the problem is strongly proportional to the amount of fuel.
Q. Magnitude of the problem at the sites?
A. Yes. And to the extent that the inventory of fuel at the site is reduced or maintained in a -- or prevented from growing contributes to relief on the problem.
Q. Would you agree that the burdens that are referred to here and that implicitly or



explicitly you're referring to in your testimony about this paragraph, burdens are primarily cost burdens, added cost of storage?
MR. MILLER: As referred to the previous paragraph?
THE WITNESS: Show me where you're -- let me be sure the words you're reading.
Q. (Mr. Stouck) Right here. It says, "Adding additional operator burdens and complexity at the reactor sites."
I'm asking what your understanding of the burdens and complexity at reactor sites are. You know, if there's more fuel there -- you say it's proportional to inventory. I mean, my question is are we talking primarily about the cost burden to the utility of storing that fuel?
A. Let me look at this.
Q. Sure. I'm not sure that helps, but --
A. I believe the relative statement -- relative improvement, if I read this paragraph correctly, is to suggest that the kinds of activities that would surely be done at an MRS, which is dedicated to that objective, that is consolidating fuel and so forth, is much better done at the MRS than at reactor facilities, which



are primarily equipped in general for storage of active fuel assemblies, and that the equipment that it would take to turn a spent fuel basin or a spent fuel operation into that kind of consolidation and work would be better done at a specialized facility like an MRS rather than at dozens or whatever individual facilities.
Q. Okay. There are operational burdens?
A. Operation --
Q. As well as cost burdens?
A. Yes.
Q. Okay. But what's the burden of consolidation at a utility site if it's not just added cost? I mean, are there technical burdens?
A. Well, I think, at least in my mind, it would be that the operations carried out in a spent fuel handling building of this sort are -- put it that a spent fuel handling building for any reactor that I know of now, both by space and by situation, is not nearly as well equipped as one would expect to find in an MRS.
It's both the operational effectiveness, the safety, the efficiencies that could be achieved much better at an MRS than in umpteen individual fuel handling buildings with reactors

around the complex.
Q. So you do not agree then, I take it, or do you, that the burdens to utilities of having increased inventory on site resulting from the failure of the Department of Energy to take it away is primarily a cost burden?
That's the question. Do you agree that it's primarily a cost -- there may be these -- you just referred to some other burdens. There may be yet additional burdens. My question is is the burden, in your view, primarily a cost burden or is it not primarily a cost burden?
MR. MILLER: So your question, Jerry, if I can clarify --
MR. STOUCK: Has nothing to do with --
MR. MILLER: -- is irrespective of the language --
MR. STOUCK: Has nothing --
MR. MILLER: -- in this Exhibit 21 that you were previously referring to?
MR. STOUCK: Has nothing to do with the testimony.
MR. MILLER: Okay. Objection. Calls for speculation.
THE WITNESS: If I may -- still talking



about this document?
Q. (Mr. Stouck) Sure. Okay. Please.
A. Look at the paragraph -- next to the last paragraph on Page 16.
Q. Right.
A. The last page.
Q. Yes.
A. Where the statement of finding that a national problem has been created by the accumulation of spent fuel. National problem is a very non-specific statement.
My personal view would be that the national problem that's created is perhaps of two types. One is just the fact that spent fuel basins have finite storage capacity. Re-racking and other such treatments are costly and safe obviously because they are regulated by NRC, but there is an incremental movement in the direction away from maximum safety.
Q. All right.
A. Not unacceptable, by any means. There are ways to rack and re-rack and preserve criticality margins, but it does call for and do things that basins weren't originally intended for.



Q. All right.
A. And secondarily I think this is suggesting that if indeed one has to -- gets to the place, for example, that you have to disassemble fuel elements, that you're going to, in effect, package fuel elements, that it would be much better -- that's an operation that the basins are generally not well equipped to do or to do it you would have to add cost and equipment that's not nominally there.
Q. In the last part of your answer are you referring to consolidation?
A. Yes.
Q. Rod consolidation?
A. Yes.
Q. Okay. At the time you were head of RW was it clear that rod consolidation was going to be a part of the program?
A. I don't have any recollection of that, but I think that the passage of time moved inevitably in that direction.
Q. Well, do you know whether today the plan is to consolidate rods before putting them in the repository?
A. I don't know today.



Q. Okay. Now, let's go back to this testimony, this sentence that we looked at before, "Adding additional" --
A. Which page are you on?
Q. I'm on Page 16.
A. All right.
Q. The last sentence of the last full paragraph, "Adding additional operator burdens and complexity at the reactor sites would be inconsistent with these findings," referring to the quoted findings from the NWPA, "which serve as a basis for the NWPA." Do you see that sentence?
A. I do.
Q. Okay. Now, without going back a whole couple of days of testimony, don't you agree that an objective of the program at the time you were there was to avoid adding additional -- avoid additional operator burdens and complexity at the reactor sites consistent with these findings of -- you know, that are quoted here, that that was an objective of the program, to avoid adding additional operator burdens and complexity? And how would they be avoided? Through the movement of fuel. That that was an objective?
A. Yes.

Q. Okay. And, in fact, that the objective -- the entire objective of the program was to -- strike that. Let me ask it this way. In fact, that the -- no. Just strike it.
A. Since you have raised that question, could I make a statement?
Q. Okay.
A. I think that when you talk about the objective of the whole NWPA was first to improve the safety of the system from a public health and safety standpoint.
Q. Okay.
A. When you get to talking about things like we're talking about here, these are relevant factors in what you do and how fast you move and so forth, but the objective was to move this potentially -- move the fuel which had certain safety potential, small though they be in storage, to a more safe and secure circumstance.
Q. Okay.
A. And that's clearly the first objective. The way you do it obviously calls for an attempt to optimize or be prudent in what you do. And so I think that the idea of getting the fuel out of the basins is the first objective.



What you have to do on the way to get it there, whether it's through an MRS or through repackaging in a facility, become optimization considerations to me. That is, the objective is to get that fuel out of the basins into more secure storage.
Q. That was the purpose of the NWPA in your mind?
A. Yes. Yes.
Q. As you understood it at the time you were director?
A. Yes.
Q. And that purpose included removing all of the nation's commercial spent fuel, right?
A. Eventually.
Q. Eventually. At some time. But there's no question that the purpose of the Act, in your mind, included removing all of the fuel from the commercial industry?
A. Yes. That a basin is not an appropriate permanent storage facility for an indefinite future.
Q. Okay.
(Off-the-record discussion.)
Q. (Mr. Stouck) Just from what you just



said, Mr. Rusche, I mean, you know, that's your understanding of what the purpose was, I mean, doesn't it follow -- if safety was a concern or was the concern -- is that -- I mean, you're not saying it was the only concern, but it was a primary concern? Is that --
A. Long-term safety.
Q. Okay. Right. Right. Doesn't it follow from what you just said that sooner is better than later?
I mean, I think you even referred indirectly to optimization. I mean, you know, without -- I mean, as an objective if you're trying to remove all the fuel for these good public policy purposes, I mean, do you disagree that sooner is better than later?
A. I believe that's too broad a statement because the ability to handle fuel elements just removed from the reactor for storage -- I mean, for shipping and handling is not necessarily better done at such a facility. That I think all of the experience the Commission has had, NRC has had, is that it's safe to store fuel elements in a pool for awhile.
And one of the reasons it's safe and



desirable to do this is to allow the decay and heat generation rate to fall to a level in which the more extensive handling processes that would be associated with an MRS or with a repository are reduced.
So I think that there is a mixture -- or I would tune the statement you just made that the best thing you could do would be to come directly from the discharge machine to a cask and ship it.
Q. Well, I didn't say that.
A. No, you did not.
Q. I'm asking as --
A. But that was the implication.
Q. I'm asking as a general --
A. At least that's --
Q. No, that wasn't my implication. My question is simply as a general proposition do you or do you not agree, consistent with your understanding of the purposes of the Act that you just laid out for me, do you or do you not agree that as a general proposition sooner is better than later with respect to removal of spent fuel from nuclear utility sites?
MR. MILLER: Objection. Vague.
THE WITNESS: With the added caveat that

sooner does not start the instant of discharge, that there is an attenuation period that is appropriate and better done, in fact, appropriately done in a fuel pool basin.
Q. (Mr. Stouck) Fine. Subject to that, your answer is yes?
A. Yes.
Q. Thank you. Okay. Do you have an understanding of the term --
A. Are we through with this?
Q. Yeah, we're done with that, for now anyway, maybe forever. Do you have an understanding of the -- I am going to -- I've already instructed somebody to find a complete copy of that. So if you're --
A. It would be interesting.
Q. If it's one of the documents that --
A. It may be exactly the way I presented it. I hope not.
Q. Do you have an understanding -- well, before I turn to that, during your time working at RW do you recall any personal direct dealings with Yankee Atomic Electric Company personnel?
A. With the exception of one reservation that I can't recall right now, I can't get a clear



picture, I don't recall any interaction or direct discussion with the exception of one person.
And I have a clear picture that there was a fellow up there that I came to know through some mechanism more personally than professionally, but who I came to know. And he may have visited me more than once.
Q. You don't recall that individual's name?
A. I can't recall his name. Ed something. Oh, goodness. He finally became one of the senior managers. I think I met him in the early '60s when I was still at Savannah River just about the time Part 100 was written. I participated in that to some extent. And we went up to the Yankee reactor.
Q. Okay.
A. But other than that, I don't recall any.
Q. And you say that was more personal than professional?
A. Well, it started from a personal relationship, but I think that it -- as I recall, it persisted as an acquaintance. And he probably -- and I have a recollection that he visited me when I was in RW.
I have no idea of the subject matter.



It could have been purely personal, but that's the only contact that I know that I can recall I ever had of a personal nature.
Q. Okay. And you think that person's first name was Ed?
A. I think.
Q. Okay. Okay. Do you know Andy Kadak?
A. No.
Q. Okay. Same question with respect to when you were at RW did you have any personal direct dealings with either Connecticut Yankee Atomic Power Company or Maine Yankee Atomic Power Company?
A. I do not recall any.
Q. Okay. Do you recall any personal direct dealings with any nuclear power company?
A. Any?
Q. Yeah.
A. Yes.
Q. Okay. Was it something that you did, you know, on more than an isolated basis, this something being meet with these people? You know, let's start with meet --
A. I would say it was very occasional, that the industry generally spoke to me through



EEI or whatever -- ANEC or whatever it was.
Q. But once in awhile a utility executive would either write to you or come to see you?
A. Yes.
Q. About some matter related to the program?
A. Yes.
Q. You say it was very occasional? I mean, that was your --
A. I can't be very specific. It was certainly not an anticipated weekly or monthly kind of thing.
Q. Okay. Do you have an understanding of the term greater than Class C waste?
A. I believe I do.
Q. Okay. What's your understanding?
A. Class C waste is defined in the Atomic Energy Act -- excuse me -- in NRC regulations as a particular kind of waste which meets certain -- and I don't have the numerical numbers in my head, but it's the most radioactive of those kinds of classes of waste and requires more explicit and careful storage conditions and handling conditions.
Q. That's Class C?

# SLATER-THOMPSON

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 4 |
| Afternoon session - 94 | |


E X H I B I T S


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter dated 3/1/99 | 50 |
| 2 - Letter dated 4/28/87 | 82 |
| 3 - Memo dated 6/29/87 | 95 |
| 4 - Letter dated 10/2/87 | 97 |
| 5 - Letter dated 11/10/87 | 99 |
| 6 - Standard Contract Issue Resolution Process | 122 |
| 7 - Preliminary Draft dated 12/19/92 | 152 |
| 8 - Handwritten documents dated 8/29/91 | 161 |
| 9 - Memo dated 6/18/92 | 171 |
| 10 - Preliminary Draft dated 12/22/92 | 175 |
| 11 - Preliminary Draft dated 12/19/92 | 177 |
| 12 - Fax dated 9/1/93 | 181 |
| 13 - Spent Fuel Acceptance Scenarios devoted to Shutdown Reactors dated 10/89 | 185 |
| 14 - Letter dated 1/26/93 | 191 |
| 15 - Fax dated 6/2/94 | 194 |
| 16 - Memo dated 7/25/94 | 199 |




P R O C E E D I N G S

Whereupon,

NANCY H. SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Nancy H. Slater.
Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?
A. No.
Q. Do you have some understanding of what's going to happen today?
A. Yes.
Q. What do you understand is going to happen today?
A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

waste acceptance.
Q. And let me tell you just briefly procedurally how it will work. I'll be asking you a series of questions and you will be expected to answer the questions. As we discussed even before we went on the record, the court reporter is taking everything down and we'll get a written transcript of everything that's said today. Do you understand that?
A. Yes.
Q. And it will also be helpful for the court reporter's purposes so we get a clean transcript if you will respond as you just did.
A. Verbally.
Q. A nice verbal answer, yes or no or whatever the appropriate response might be.
A. I understand.
Q. Also I would ask, if you don't understand one of my questions, you're not sure what I'm asking in one of my questions, if you would please ask me to rephrase it rather than trying to answer a question you're not sure what the question is.
A. Will do.
Q. I appreciate that. Where do you work?



A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.
Q. What's your job title there?
A. Team leader.
Q. And what are you a team leader of?
A. The entire division basically. I serve in lieu of a deputy division director. And we deal with the regulatory concerns between the program and the Nuclear Regulatory Commission, the EPA, National Academy of Science, and dealings with the Nuclear Waste Technical Review Board.
Q. When you say you deal with regulatory concerns of EPA, NRC, and the other agencies, what do you do on a day-to-day basis vis-a-vis the NRC?
A. Let's see, a typical example would be the fact that we are involved in developing safeguards and security policy guidelines for the eventual acceptance and disposal of a variety of waste forms. And those policy guidelines will be translated into actual waste acceptance criteria by another group.
And the waste owners will then have to



assure that the waste they deliver falls within the boundary parameters established by the guidelines with one exception, there will be no new requirements imposed on the utilities because the standard contract is quite clear in terms of what can be asked for and what cannot.
Q. And so you're constantly working with EPA, NRC in developing various guidelines that they're going to be using?
A. Right, reporting on progress in the program and quality assurance issues, things like that.
Q. How many people are in this division?
A. I don't know, I have to count. Six.
Q. And who heads up the division?
A. Alan Brownstein, he's the division director.
Q. And what is this the division of?
A. Regulatory Coordination.
Q. It's the Regulatory Coordination Division. Is this a division of a larger office?
A. It would be the office of -- we have reorganized, we have new names for everything. But it would be the program management and integration function.



Q. What is the program management and integration function?
A. These are in one division the budget folks, in another division the information management folks, it might be human resource folks in another division. And we are the division -- the only division within that group that has any technical or policy responsibilities. There is a separate office, there are two offices, in the other office is acceptance and transportation integration.
Q. And who heads up the program management and integration office?
A. Let's see, that would be Dwight Shelor.
Q. How long have you been a team leader in the Regulatory Coordination Division?
A. Let's see, I moved in late '95. About three and a half years, almost four years.
Q. Since that move three and a half, four years ago, have there been any other reorganizations within your office?
A. Within my particular Office of Program Management?
Q. Well, let me start with the Regulatory

Coordination Division. Has there been any
reorganization within that division?
A. Yes, because, in fact, we had a RIF last year. And we RIF'd two people out of the division, one of whom was a team leader. Our roles and responsibilities did not change.
Q. When you had two team leaders, was there any division as to what the two team leaders were leading?
A. Yes.
Q. What were the two team leaders leading at that point?
A. The other team leader was leading environmental regulatory issues and issues dealing with the Nuclear Waste Technical Review Board. And my function was primarily Nuclear Regulatory Commission interface.
Q. And now you're basically team leader for all of them?
A. Doing it all.
Q. In that same three and a half to four year time span since you've been in your current position, has there been any other reorganization at the office, the Office of Program Management and Integration?



A. Yes, as a matter of fact, up until December -- actually January 1 of this year, the two offices would have had two associate directors. One retired and so the remaining office director now manages both. That was Dwight Shelor.
Q. And who was the associate director that left?
A. Samuel Rousso.
Q. Before Mr. Rousso left, how did they have it divided up?
A. Mr. Rousso would have had program management and Mr. Shelor had acceptance and transportation. Let's see. Yes, that's right.
Q. Maybe I misunderstood. So this is within the Office of Program Management and Integration that's now headed up by Mr. Shelor?
A. There were two offices. Samuel Rousso headed the management group, basically management functions, Dwight Shelor headed the acceptance and transportation group. Samuel Rousso retired. Both offices continue to exist. But now Dwight Shelor manages both.
Q. I see. And above the office level the next thing you get to is the Office of Civilian



Radioactive Waste Management itself?
A. Is the deputy director and the director, it's the highest level.
Q. And has there been any other organizations within the -- reorganizations within the whole RW organization besides the ones that you've just mentioned in the last three and a half to four years?
A. To be honest with you, I try not to keep track of that. We play musical chairs. And I believe that the systems integration group may have moved from program management to acceptance and transportation.
Q. Three and a half years ago, when you came into your current position, what position did you have previously?
A. Prior to that I was the team leader in waste acceptance.
Q. And waste acceptance was part of what division at that time?
A. Well, it was a division, waste acceptance was a division.
Q. And who was director of the division at that time?
A. We had acting directors. I served as



acting director for awhile, Linda Desell served as acting director for a very short period because the director before that had gone to regulatory coordination, and that's Alan Brownstein.
Q. Let me make sure I understand. So your last position before taking your current position was actual acting director?
A. No. We were rotating -- after Alan left to go to regulatory coordination, we were asked if we would like to take the position. And no one was eager to take the position including me. So we were rotating acting division directors.
And I got the first shot in the barrel. And then Linda Desell got the second shot in the barrel. So, once I ceased as the acting division director, I simply devolved to my team leader position which is what I was when I left to come to regulatory coordination.
Q. How come nobody was anxious to be the boss, the division director?
A. Personally? I have no knowledge of anyone else's reasons, but my personal reasons are family considerations. My family comes

first. I'm at that time in life where I'm not sure I want to put my feet on that little treadmill.
Q. And the division director job had a lot of demands on it that would have interfered with family?
A. Yes.
Q. Do you have any idea as to why other people didn't want to be division director?
A. None.
Q. How was that position eventually filled?
A. How did they fill it. They backfilled -- and I'm not even sure exactly how it came about getting the new division director. But the current division director was an old division director from way back when, Jim Carlson.
Q. When you say they backfilled, what do you mean by backfilled?
A. Internally, they moved someone internally into the position as opposed to bringing someone in from outside the program.
Q. Do you remember roughly what years you were a team leader in the waste acceptance



division?
A. Let's see. I joined DOE in August 1991. And at that time we had branch chiefs. And Alan Brownstein was the branch chief. I honestly do not remember precisely when the department decided it would no longer have branch chiefs, it would rename them and it would create division directors and team leaders.
And I would have to guess -- I'd have to go back and look to make sure, but my recollection is it might have been around 1993, 1994.
Q. What is a team leader?
A. Team leader is responsible for individual contributions, being a subject matter expert in some areas or a particular area, responsible for managing the entire team, eliminating obstacles, giving people a fresh look by stepping outside the box they're standing in, trying to solve the problem. So they're a little bit of both, technical worker and manager.
Q. But technically a team leader is not a supervisor?
A. No, no. Unfortunately you have the responsibilities but not the privileges of



writing evaluations, signing leave slips, that kind of thing.
Q. That position is that of the division director?
A. Right.
Q. When you were team leader of waste acceptance roughly somewhere around 1993 to '95, who was on your team?
A. I have to do this by going around the room. Phil Smith, Bill Floyd, Mary Lee Payton, Kristin Svinicki, John Vlahakis, and I would consider my secretary to be part of the team as well, Deborah Evans.
Q. Were there any changes in the team during your tenure as team leader?
A. Yes. In fact, we hired Dave Zabransky. And, when Dave came into the division, we reorganized the division with two team leaders and divided the work load up.
Q. Why did that happen?
A. It was certainly a more efficient way to operate. And, to be quite frank, I was overloaded with too much work.
Q. When did that reorganization take place?



A. I don't recall precisely, I'd have to refresh my memory. I don't remember when Dave came.
Q. And, when it got divided up, how was it divided up?
A. Let's see. I know that I kept the responsibility for safeguards and security for data collection and for integration with other DOE offices. This is waste acceptance criteria type work. And the financial and contractual responsibilities went to Dave.
Q. What do you mean by financial and contractual?
A. Fees paid by the utilities into the Nuclear Waste Fund.
Q. What about issues such as like figuring out how fast DOE was going to be taking spent fuel, going to be accepting spent fuel, whose team would that kind of issue come under?
A. It was not my team and I don't know if that was Dave's team or not. But it was not my responsibility.
Q. And, as to working on issues in terms of the schedule for acceptance amongst the various utilities as to whose spent fuel will be

taken and in what order, which team would have handled that?
A. Prior to Dave's tenure, I would have. With the advent of Dave, Dave would have.
Q. Now, you mentioned a number of people on your team. These were the people on your team before Mr. Zabransky joined?
A. Right.
Q. Who was on your team after he joined?
A. Kristin Svinicki, Mary Lee Payton, and Bill Floyd. My recollection is that John Vlahakis may have floated between the two teams sort of as the overflow person.
Q. And Phil Smith then was with Mr. Zabransky?
A. Yes, and would have been responsible for the fees, and I'm not precisely sure what else Dave had assigned him.
Q. Did anyone else work with Mr. Zabransky?
A. Not to my knowledge.
Q. Who would have handled the scheduling issues that we talked about earlier?
A. In terms of acceptance rates?
Q. Right.



A. That would have been Dave Zabransky.
Q. He would have done that personally?
A. Uh-huh.
Q. You said you became a team leader roughly 1993?
A. When they renamed the branch chiefs is what happened. This was the government move to eliminate a level of management.
Q. So, prior to that time, what was your position?
A. No formal title per se. My job description I believe reads industrial specialist nuclear.
Q. And that was the title that you had when you came into DOE in 1991?
A. Right.
Q. And what branch were you in?
A. At the time I think it was called logistics and utility interface, if my memory serves me well.
Q. And the branch was part of a division?
A. Right. And I do not recall what the division would have been. I don't remember.
Q. And the division would have been part of an office?



A. An office, right.
Q. What office would it have been part of?
A. I don't know, I think they may have called it the waste acceptance storage and transportation office. But again I don't commit things like that to memory. I feel there are organization charts that I can go pull to look it up.
Q. And, between 1991 and 1993, Mr. Brownstein was the branch chief?
A. Yes.
Q. And after 1993 Mr. Brownstein became division director?
A. Director.
Q. And, between '91 and '93, do you recall who was the division director?
A. Jim Carlson.
Q. And then who was the office director above Mr. Carlson?
A. Ron Milner.
Q. What were your duties in this 1991 to 1993 period when you were an industrial specialist?
A. I was involved in the preparation of the annual capacity report, the acceptance



priority ranking, answering questions both internal and external about the terms and conditions of the contract. Let's see. And whatever else may have arisen at the time.
I know, when we came in, we were on the tail end of a rulemaking, net versus gross, as sold was that clarification. So I wrapped part of that up. I believe I terminated a couple of nonutility contracts at the contract holder's request because they either no longer had the material or had, in fact, in one case I believe sold it to the government.
Q. Do you remember any other issues you worked on during that period?
A. '91 to '93, I think we began to discuss delivery commitment schedules at that point. Would that be about right? That would be about right.
Q. That would also have included exchange of approved delivery commitment schedules?
A. Actually my recollection is that we discussed exchanges not concurrently, because there was the opportunity to do that a little later. And it was more important given the timing requirement in the contract to have that

guidance issue.
Q. And guidance as to what to do with the delivery commitment schedules themselves?
A. How to fill them out, instructions. I believe, if I'm not incorrect, that that's an OMB reviewed form. And you know that process, that takes time and there must be instructions on how to complete the form.
Q. What was the time concern?
A. I believe the contract requires delivery commitment schedules to be submitted by the purchaser 63 months in advance of the year in which they have an allocation. So back it out from 1998, and they would have been submitting in '92, late '92.
Q. Are there any other issues that you recall working on in the '91 to '93 period?
A. Let's see. I know we addressed priority for shutdown reactors. And nothing else comes to mind right now.
Q. What about the period '93 to '95, what issues did you work on?
A. During that time period, I believe I worked on delivery commitment schedule exchanges, many of the same things from '91 and '93, the



acceptance, priority ranking, the annual capacity report, DCS review and approval.
We began conversations about final delivery schedules and what would be included in those, safeguards and security, and that was policy development. I know that I worked on numerous reviews of system baseline documents, system requirements documents primarily from a waste acceptance standpoint. And I know we kept working on priority for shutdown reactors.
Q. Let me ask you to clarify what you mean by just a couple of these categories. Safeguards and security, what was involved with safeguards and security?
A. NRC regulations require that a licensee have in place a safeguards and security system. And that means physical security as in physical protection. And that physical protection is based on the attractiveness of the material, would someone want to steal it to make a bomb.
They also require as another subelement material control and accounting. That is that, if you as a utility tell me that you're giving me ten MTU, you have to provide me with some documentation to give me confidence that you are;



because, once I accept it, I'm going to have to swear and affirm to the NRC that I've got ten MTU.
And what we were working with the utilities to do, and it was an iterative process, it was lots of help and lot of involvement from the utility as well, was a process that would not impose an undo burden on them to do something that they weren't currently doing.
For example, they would address material control and accounting issues through calculation, burnup, for example, but they would not measure. And measurements would have been an operational impact. So we were looking for ways to get what we needed to accomplish without disrupting their operations. So there were lots of people talking to each other about that.
Q. You said you reviewed a number of what you called system baseline or system requirements documents. What's a system baseline document?
A. I guess the simplest way to describe it would be that these are the overall driving requirements for the design and operation of a repository. They are, in fact, obtained from legislation, regulation, and that's probably the



basis for them.
That then is expanded on in a subcure document, further expanded on eventually in specification or design drawing or something like that. So the upper level, the upper tier documents, funny you call them upper tier and you call them baseline, but same thing.
Q. And you say system requirements document, is that just another name for the same thing or is that something else?
A. No, that would be another name for the same thing.
Q. So, if I understand, from your perspective what was your involvement in looking at those documents?
A. The primary document was -- I guess they have a new acronym now. The old acronym was CRD. And it was the overarching requirements document for the entire system, regardless of whether or not that was waste acceptance, transportation, storage, or disposal.
That document was then devolved into a system requirements document, an SRD, for each of those individual elements. There would have been an SRD for waste acceptance, an SRD for

Q. Did your view get general agreement at DOE?
A. Yes.
Q. And, as far as you understand, what is the current DOE view on accepting fuel?
A. I couldn't speak for the current view.
Q. But at least, as of the time you left the waste acceptance office, that was the view of that office?
A. Yes.
Q. If I understand correctly, this is part of the issue of what is nonstandard fuel?
A. Right.
Q. Can you characterize then, at the time you were in that waste acceptance office, what was DOE's view as to what nonstandard fuel was or is?
A. You're stretching my recollection now. I don't honestly recall. I'd have to go back and look at definitions within the contract.
Q. After you got to DOE, how often do you recall there being meetings between DOE and utilities on this ACR resolution process?
A. I don't recall a number, I really don't.



Q. But they were pretty much on an ad hoc basis?
A. Yes.
Q. Just to clarify what I mean by ad hoc, you didn't have quarterly meetings?
A. Once a month or once a week, no.
Q. Just when an issue came up that was ripe for being addressed?
A. It was addressed.
(Slater Exhibit No. 6 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've just been handed what we've had marked as Slater Exhibit 6. Do you recognize this document?
A. Vaguely.
Q. Can you tell us what it is?
A. Can you give me a moment to refresh my memory.
Q. Sure.
A. Okay. Without reading through the entire paper, yes, this is a general summary of the ACR issue resolution process, the nature and scope of the issues that require interpretation, clarification, resolution, and a brief address on



certain of those issues of what that is likely to be.
Q. Did you draft this document?
A. No, I did not.
Q. Do you recall who did?
A. Yes, Dave Jones did.
Q. You would have reviewed this document?
A. Yes.
Q. And there are three names at the top of the first page of Exhibit 6. Mr. Jones, you, and Mr. Cole?
A. Billy Cole, yes.
Q. What was Mr. Jones' and Mr. Cole's roles?
A. They were consultants to the -- I guess it was logistics to our branch or our division depending on whether or not we had been renamed at that point. But yes.
Q. Exhibit 6 was a document written by Mr. Jones, the contractor, on behalf of your division?
A. No. It was a document that was authored on behalf of E.R. Johnson Associates for presentation at a conference. And in general we have a DOE author on papers like this. We then



have the right to review. And so that's the way this works. No, this was not authored at the request of DOE.
Q. Do you recall what the purpose of the conference was or the nature of the paper?
A. No, I do not.
Q. So you would have reviewed this document, Exhibit 6, as the DOE author to check for accuracy from DOE's perspective?
A. Yes.
Q. Do you see I guess at the bottom of the first page, there looks to be a page number, 757?
A. Yes.
Q. Which suggests this might have been part of a larger compilation?
A. The proceedings from the meeting perhaps.
Q. That was the question I was going to ask, do you know what this might be from a compilation of?
A. I would speculate that it is from a compilation. Which compilation I couldn't say.
Q. In your role as the reviewing author for DOE, is that a fair characterization of your role with respect to this document?

address one issue, that you would go to rulemaking to address the entire suite of issues, some of which could take longer to resolve than others. So a timing issue.

Q. The timing issue being that DOE wanted to wait before going further on this issue until other issues were more ripe?

A. Until we completed the effort, the ACR issue resolution process, and been able to go to rulemaking with a more complete set of changes.

(Slater Exhibit No. 8 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 8. Do you recognize this document?

A. No, I don't recall this. This is my handwriting. And these appear to be the meeting minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE.

And it looks like it focuses on completing DCS's. And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was



unclear.

Q. You said that Slater Exhibit 8 that you're looking at looks to be minutes of a meeting of utilities. Why would you have attended the meeting if you were already at DOE at that point?

A. You recall that we discussed instructions for completing the DCS form. Prior to formalizing the instructions for completing the DCS form, we would have met with the standard contract task force, the utilities, because we had provided them with a copy of the instructions and asked them to review it, asked them if they had any questions, and agreed to discuss the form with them so that we were not imposing something that was unclear and would not work.

And this meeting appears to have done just that, because, if I am reviewing this correctly, starting at item 4, page 3, paragraph 1, page 3 paragraph 3, page 4 at the top, these are all what appear to be pages of the procedure.

Q. Let me also confirm something that I think you said earlier, that Slater Exhibit 8, the first page of it looks to be a sign-in sheet for a meeting?



A. Yes.

Q. And the subsequent pages appear to be your own minutes or notes of that meeting?

A. My notes for suggested changes, because, in fact, if you look, it says page 4 at the top, article VB, spell it out. And what does approval mean, it has to be signed. So this is exactly what this one is. This was to receive the comments that the utilities had on the DCS procedure and the form itself and go back and review them and then incorporate them.

Q. When you say the DCS procedure, you mean the instructions given to --

A. Instructions.

Q. Given to utilities on how to complete the DCS?

A. Right.

Q. On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4. Could you tell me what the second one is talking about?

A. Let me read it for a moment.

Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,



and assumes that delivery would commence in 1998, January 31, '98.

If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.

Q. Year one of what?

A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year. So there were procedural questions about that, and that's what this issue is discussing.

Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?

A. Yes.

Q. The instructions for the delivery commitment schedules, did they require utilities to not request delivery of more spent fuel than

was provided for in their allocation in the published annual priority report?

A. Yes, that would have been the basis for rejection of the DCS.

Q. Was there any discussion of that instruction at this meeting?

A. I don't specifically recall that.

Q. You don't specifically recall that instruction being discussed at any such meetings?

A. No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to.

Q. What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?

A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in



the queue, could exchange BWR fuel for PWR fuel, could exchange ten-year-old fuel for five-year-old fuel, it could make a very great difference to how you manage your acceptance process.

The DCS was supposed to be a heads-up from the utilities about the type of fuel they would be delivering to us. The utilities didn't want to do that. They did not want to commit themselves to a specific discharge date because they were concerned that, if they did that, they would lock themselves in and there would be no opportunity to deliver anything else.

So in the end it wasn't much of a heads-up because they had tremendous ranges. In fact, there was a discussion that they would like to include in that range of discharge dates fuel that had not even been discharged at the time the form was submitted because obviously five years later, if it were four-year-old fuel, now it would be nine-year-old fuel.

So again, you know, the heads-up that it was supposed to be in the end turned out to be not much of a heads-up at all. But by completing the DCS -- you had to have a signed DCS in order



to exchange. So, by completing and filing the DCS, you were providing yourself with a future instrument to adjust your position in the queue.

Q. But, other than actually coming up with a formalized signed piece of paper, pretty much anyone looking at the process could have predicted what any given utility's DCS was going to look like?

A. I would say that I could predict looking at the APR who was going to deliver -- this is absent an exchange process. Who was going to deliver and how much they were going to deliver. I couldn't predict what they were going to deliver, the age of it, that was just not possible.

Q. As far as the age, what you're saying is most of the utilities were fairly vague as to indicating how old the fuel was that they intended to deliver anyway?

A. They provided a tremendous range so that they would have the flexibility to pick what they wanted when it came time to deliver. And for us, you know, we wanted to know because there are limits. There's the certificate of compliance for each cask and there are I believe



thermal load limits, radiation level limits. And that is dependent on the age and burnup of the fuel.

So, if you're trying to schedule acceptance of fuel, you to a certain extent arrive at the number of casks you need to deliver by the type of fuel you're going to pick up. So we had thought we would get a heads-up on what we would be picking up and that would permit the department to plan out its transportation program. It didn't quite work out that way.

Q. The DCS process would also I guess have allowed a utility to request delivery of less fuel than their allocation?

A. Yes. Let's assume that someone -- I don't believe this was the case. But let's suppose someone was permitted to discharge -- to deliver one fuel assembly in year one. Remember, every time you deliver fuel, you disrupt your operations in order to do that. So the utility would likely ask themselves is it worth it to me to deliver one assembly.

Q. Do you recall, did any utility submit proposed delivery commitment schedules requesting delivery of less than their full allocation?

A. No, I don't recall anybody doing that. And, in fact, I recall, as a member of the industry and a DOE employee, that one of the things we both recognized is that it would make no sense for a utility to ship one assembly or for DOE to send a cask for one assembly; that, in fact, it would make more sense to send the cask and permit the utility to fully load the cask and then debit their allocation for a subsequent year.

This was a plus or minus 20 percent rule. And you'll see that all through these documents there was a certain amount of give-and-take on the utility's part and on the department's part in terms of again maximizing the efficiencies of the system and of the utility's operations as well.

Q. There were a number of things in your answer. You said that utilities and DOE recognize it would be inefficient to have DOE come and, let's say, pick up one fuel rod; but, at the same time, you said you don't recall any utility not requesting their full allocation for every year even if that allocation might have only been for one fuel rod?



A. And my understanding of that is that again, in light of the DCS exchange process, that slot in the queue was worth something. If you did not submit a DCS, it was worth nothing. So, even if you had one assembly, you would submit the DCS for that assembly.

And actually it was done on an MTU basis. So you would submit for your allocation and perhaps you would elect later on to exchange places with someone else, sell your slot in the queue, there were a number of options that the utilities discussed.

Q. Were the entitlements to or the allocations for delivery in each year, were they cumulative such that, if you looked strictly at the APR and the utility, let's say, had a right to five MTU in the first year and another five in the second year, could they request nothing in the first year and ten in the second year?

A. No.

Q. So, if they didn't request the five in the first year, they lost it?

A. That's it. Remember, if I have a system capacity of X in year two, I would then have a request for capacity of X plus five. So



who would I deny in year two.

Q. And so that utility, if they didn't request it to be delivered in year one, that first five MTU, when would they ever get the opportunity to get it delivered? Or they wouldn't?

A. They just slip down the queue. The next year would roll around and they would get their allocation, and that's the way it would work. Now, conceivably -- we did not have this circumstance. But conceivably, if someone said I don't want to deliver this year, you would reapportion that capacity.

Q. But it just never came up?

A. It never came up. And I honestly cannot envision a circumstance where it would

(Slater Exhibit No. 9 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, I'm showing you what's been marked as Slater Exhibit 9. Do you recognize this document?

A. Yes, I do.

Q. Can you tell us what it is, please.

A. This is a memo from our contractor to



me that states that they have developed a proposed schedule for drafting positions on these 35 issues. And it provides me with a list of issues that they do believe are ripe for resolution at that time.

And it tells me that they're anticipating a marathon session to resolve my comments as well as those of others. And, assuming that we can resolve them, they had anticipated that we would have these issues laid to bed by July.

Q. In the middle of the page, there's a sentence or I guess an opening up of the list, it says, my understanding is that the following issues will be finalized during a certain period. What did you understand this memo to mean by finalized?

A. That we would have a path forward, for example, on DCS exchanges, that we would have conceptually agreed what an exchange was and how it might be accomplished, but the procedure to accomplish it might not necessarily be in place. So, on some of this, it's as simple as yes, I think we're going to head in that direction, but you still have to travel that path between here

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 209 |


E X H I B I T S


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |




P R O C E E D I N G S

Whereupon,
NANCY H. SLATER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF - RESUMED
BY MR. SHAPIRO:
Q. Ms. Slater, we're here for the continuation of your deposition. You understand you're still under oath?
A. Yes.
Q. Do you understand that?
A. Yes, I do.
Q. You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?
A. Yes.
Q. I want to just have a few more questions on that subject. Let me have another document marked and show it to you.
(Slater Exhibit No. 17 was marked for identification.)
BY MR. SHAPIRO:

that page on the transportation issue. Perhaps if you could take a look at that whole page and let me try to rephrase my question. What I'm trying to get at is, by the time this issue got to this level of draft, was the plan still to base the decision on whether or not to approve a proposed exchange of delivery commitment schedules on the transportation plan that would have been created based on the queue as opposed to a transportation plan based on anticipated exchanges?
A. Yes, it would have been based on approved delivery commitment schedules.
Q. Do you recall any discussions or considerations at this stage of the process on transportation plan or acceptance plan or any other plan for that matter being based upon anticipated exchanges as opposed to approved delivery commitment schedules?
A. I don't recall myself having any significant thoughts about that, because my intention was that it be based on approved DCS's. I cannot speak for the transportation people.
Q. You just don't know what was going on



with them?
A. Right.
Q. And, other than Bill Teer who you mentioned earlier, you can't tell us anyone else we might talk to who might be able to give us more information on that issue, on what was being done in the transportation area?
A. I seem to recall that Jim Carlson at DOE might have been involved.
Q. Anyone else?
A. I can't recall.
Q. Now, is your recollection that ultimately a final draft was developed of this document, evaluation of delivery commitment schedule exchange requests?
A. I believe it was.
Q. Do you have a sense of when that final document was prepared?
A. No, I really don't.
Q. This draft says it was prepared by TRW. It would have been your expectation that the final would also been prepared by TRW?
A. Yes.
Q. And the transmittal letter for that draft is from a James Blandford at TRW. Do you



recall Mr. Blandford?
A. Yes, I do.
Q. Was he directly involved in that project?
A. Not directly. He would probably have been the equivalent of Sam Rousso who was our office director. So there were probably -- there was at least one, if not two levels of supervision below Mr. Blandford.
Q. Who at TRW would have been most directly involved in putting together the final document?
A. I believe it would have been Bill Teer and Jim Clark.
Q. Let's turn to a different subject. We touched on this a little bit yesterday. You said that utilities beginning 63 months prior to January 31, 1998, had to submit their initial proposed delivery commitment schedules?
A. Yes.
Q. Do you recall that amongst those was Yankee Atomic?
A. I vaguely recall that. I don't really -- I couldn't give you the details.
Q. Do you recall that Yankee Atomic,



that's Yankee Atomic Electric Company, requested to deliver more spent fuel in the first few years of the program starting after January 31, 1998, than was provided for in their allocation in the annual priority report?
A. Yes, I do.
Q. And do you recall there was a number of pieces of correspondence back and forth between DOE and Yankee Atomic on that issue?
A. Yes.
Q. What was your role in that process?
A. I was responsible at the time for performing an initial review, higher level review of the DCS's when they came in. I would have been responsible for communicating to the utility, drafting the letter that would go back to the utility that would explain why their DCS was being rejected. A specific basis for that rejection would have been provided.
Those letters would have been reviewed by the contracting officer. And I don't recall who signed the letters.
Q. Who else would have been involved in that process?
A. Our M&O would have been involved in

that process. And, because of the changes in hats and the time frames we're talking about, I can't recall who specifically. But our M&O would have also reviewed the DCS's according to the procedure that was drafted and approved and discussed with the utilities. In addition to the contracting officer, Alan Brownstein.
Q. What would Mr. Brownstein's role have been?
A. Consistent with my role to perform the review, I would have made a recommendation and supported it to Mr. Brownstein. And he would have evaluated whether or not he thought my determination was accurate and reasonable.
Q. Anyone else involved?
A. Not that I recall.
Q. Now, you described your initial review of the submitted delivery commitment schedule, if I heard correctly, as a higher level review?
A. Right.
Q. What do you moan by higher level review?
A. To be precise, if you did not have an allocation in the year in which you submitted a DCS, that was a showstopper; if you exceeded your



allocation for that particular year, that was a showstopper; no additional review required because it was a fundamental flaw in the DCS that was submitted.
Q. What else would be involved in your review?
A. Making sure that the appropriate people who could bind the utility did, in fact, sign the DCS because, remember, it's a contract, and that basically the form was complete. If we asked for discharge date, you recall we had the discussion about specific discharge date versus range of discharge dates, at least some discharge date was included in that blank. So a very top level review.
Q. You said the M&O would also do a review. What would be involved in their review that would have been different than the review that you were doing?
A. I don't recall. I believe that, if we went back to the procedure, we could determine that precisely.
Q. When you say the procedure, you're referring to the --
A. DCS review.



Q. And that's different than the -- because we also talked about the instructions for utilities to complete the delivery commitment schedule?
A. Yes.
Q. So there was instructions for the utilities to complete the delivery commitment schedule?
A. Yes.
Q. And then there was separate document procedures for DOE and its M&O contractor to review those delivery commitment schedules once they were submitted?
A. Yes. And, because there are contractually mandated time frames for accomplishing the review and any required revisions, there was a procedure to make sure that none of us missed those dates.
Q. Did DOE always make those dates?
A. To the best of my recollection, yes.
Q. Do you recall ever missing any of those dates?
A. I don't recall.
Q. Do you recall any discussion on any difficulties making any of the required response



dates?
A. I don't recall any of those discussions either.
(Slater Exhibit No. 20 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater you've been handed what we've had marked as Slater Exhibit 20. If you'll take a look at it and tell us if you recognize it?
A. I see I was the originator as well as my concurrence initials that I would have drafted this memo. Could I have a moment to review it?
Q. Sure.
A. I remember it well.
Q. First let me ask you something that you mentioned about the document. You said that you were the originator. What on the document tells that you you're the originator?
A. If you turn to the very last page, you will see at the bottom left hand the designator RW:432 which would have been the branch number, colon, N. Slater. That indicates that I'm the originator of the document.
The DE would indicate the secretary

that typed the letter. I suspect that was probably my extension at the time, 8320, and then the date on which it was originated.
Q. While we're on that subject, you said RW-432 indicated the branch you were in at that time?
A. Right.
Q. I think I think I've also seen the number RW-44 next to your name. What did RW-44 indicate?
A. Forty-three was always I believe the utility and logistics interface bran. And 44, after the machinations we discussed about no more branch chiefs, would have been the waste acceptance division.
Q. You said you remember this memorandum well. Why do you remember it well?
A. When I got to page 2 of the letter, read that we had communicated to Yankee that their DCS's were disapproved and communicated precisely for what reason and gave them the contractually mandated period to correct their DCS's and they resubmitted precisely the same DCS's, I remembered that well. It seemed rather intransigent to me at the time.



Q. Let me ask you, at the top of that second page of Slater Exhibit 20, it says on June 4, 1993, RW-432 and PR-322 and GC-34 met with Yankee. Were you part of that meeting?
A. I believe I was.
Q. Do you recall who else was at the meeting?
A. Let me look at the date on this just to be sure.
Yes, I was part of the meeting. And I remember distinctly because my youngest was graduating from kindergarten and the meeting ran on and on and I didn't get to do kindergarten graduation.
I believe Alan Brownstein was present. I don't recall who the contracting officer was at the time. And I don't recall who was there from GC.
Q. So the PR-322, was that the contracting officer?
A. That was the contracting officer's office, right.
Q. What did PR stand for?
A. Procurement and something.
Q. And GC stood for general counsel?



A. General counsel.
Q. Thirty-four was a particular part of the general counsel's office?
A. I believe that was the section in the general counsel's office that supported the contracting officer directly.
Q. Do you recall who was there for Yankee Atomic?
A. Not specifically. I believe that Mr. Grube might have been present. I am not sure if Mr. Kadak was present or not. And Mr. Buchheit.
Q. Who was Mr. Grube?
A. Rudy Grube, I don't recall which Yankee, I don't recall.
Q. But you mentioned he was a representative for one of the Yankees?
A. I believe so.
Q. Do you recall what his role was?
A. No. It was a rather free-form discussion on the issue of granting priority for shutdown reactors.
Q. And Mr. Kadak, do you remember what his role was?
A. Same thing. A very insistent role as



you might well expect, I do remember that, very insistent.
Q. And Mr. Buchheit, do you remember his role?
A. Quite the same.
Q. All three of these gentlemen were representatives of Yankee Atomic?
A. I believe so. My recollection on that is fuzzy, but my recollection on the issue is not.
Q. I'm sure you don't remember exactly, but you said the discussion went on and on. Can you tell us generally what was discussed at length?
A. I do recall that again, as you might expect, Yankee's position was that priority for shutdown reactors should be granted. My position was that, although the contract says that we may, the contract does not specifically say that we will, and that it is an industry equity issue.
And I do specifically remember asking the Yankee representatives which specific utility they would like me to remove from the queue in the first year to accommodate them given that the capacity was fixed, particularly given that their

position was that acceptance priority for
shutdown reactors was good for the industry.
And I was rather dubious that good for
the industry would be good for those utilities
that got bumped out of the queue to accommodate
them. I do distinctly remember that portion of
the conversation. And the conversation just
continued in that same vein with no one making
any movement on the Yankee side of the table to
budge from their initial position.
Q. Did they respond to your inquiry?
A. No, they didn't. And I think, when
they continued, I do recall that, when they
continued to make the same point, that I
encouraged them to go back and come back with the
names of two utilities who would be willing to
give up their slot in the queue and not ship in
the first year or the second year or the third
year so that they could ship.
And I do recall there was some laughter
around the table because there was a recognition
that would be a very difficult thing to do. No
one in a room full of utilities was going to
raise their hand and say pick me.
I do recall that we discussed DCS



exchanges. But again, you know, that's the same
concept, you have to convince another utility to
exchange places with you.
Q. What was the nature of the discussion
on delivery commitment exchanges?
A. That they should feel free to avail
themselves of their contractually provided
option, that guidance for engaging in an exchange
was available, and that, if they needed any
additional clarification, we would be happy to
provide it.
Q. Did you have what could be termed the
lead role for DOE in these discussions?
A. I don't know that I would precisely
call it the lead role so much as the most vocal
role.
Q. What role would the contracting officer
have had in these discussions?
A. If there were questions about the
specific contract provisions as opposed to the
specific issue, the contracting officer would
have been there to keep us on track, make sure
that we were interpreting the contract correctly,
everyone was interpreting the contract
correctly. And we would have discussed these



issues with the contracting officer prior to
having attended the meeting. No surprises.
Q. How did the meeting on June 4, 1993,
discussed at the top of page 2 of Slater Exhibit
20, how did that meeting conclude?
A. The meeting concluded with everyone
agreeing to disagree. And Yankee's position did
not shift, had not shifted one iota, they were
still insisting on acceptance priority for
shutdown reactors.
And I believe, as you'll see in the
next paragraph on page 2, that on June 10 they
wrote to the contracting officer restating their
position. So no movement, insistence, and that
was the end of it, there was no movement at all.
Q. This entire document, Slater Exhibit
20, this is intended to be a recommendation to
the director of the program to take a certain
action?
A. Yes. I cannot recall the specific
timetable contained in the contract for the
process that says submit the DCS, review the DCS,
disapprove, resubmit, but it's a limited time
frame.
And it was apparent to me that that



process had been exhausted, that we had discussed
it, corresponded, there would be no additional
movement. And I recommended to him that
consistent with the contract he send Yankee a
letter that disapproved their DCS's.
And actually it would have been a
letter from the contracting officer, but that
went through a review chain. And, because this
was the first time we had ever disapproved a DCS,
to me that was a fairly significant step. And it
was fairly apparent through the negotiations that
it was going to continue to be an open issue that
would not be resolved immediately.
Q. And, when you say this would have been
the first time that DOE would have disapproved a
DCS, the first page of this memo notes that
already on December 1 there had been a
disapproval of the DCS. What's the difference in
the kind of disapproval that you're taking about
that was being recommended in this memorandum?
A. If you recall, in the contract there's
an initial submittal of the DCS and it's
reviewed. When it is rejected, it is sent back
to the utility with an explanation that says I
cannot approve your DCS because you, A, don't

have an allocation in this year or, B, you've exceeded the allocation to which you're entitled, you need to provide me with a DCS that is consistent with the terms and conditions of the standard contract, and we understand those to mean.

Yankee resubmitted and submitted identical DCS's. So this is discussing that second letter, because that would -- from the department. The second letter from Yankee submitting the same DCS's would have kicked us into let's sit down and talk about this and try to understand why we don't seem to be able to come to closure on this issue.

So this was at the end of that process. There is a formal response required. And it is a final decision, if you will.

Q. Now, I want to point your attention to the second page of this memorandum, one of the points in the middle, where it says submitting acceptable DCS's would not preclude their rights under the contract should the department subsequent to rulemaking grant such priorities. Do you see that?

A. Yes.



Q. What was meant there?

A. Oh, I recall that precisely. Yankee's concern as expressed to us was that, well, suppose I submit a DCS to you, suppose I have a ten MTU allocation in the first year, I don't recall what it was precisely. I really want to empty my site in five years.

And that would mean that I need to submit a DCS to you for 100 MTU. If I go ahead and submit a ten MTU DCS to you now, does that mean after rulemaking, if everyone could agree that priority should be afforded to shutdown reactors, that I could still only deliver ten MTU.

And our response to them was no. Submitting an accurate DCS now does not preclude you from availing yourselves of the opportunity to ship additional fuel, more than ten MTU, were the decision made that priority should be afforded to shutdown reactors.

And the reason for doing this in rulemaking is again, as I have stated over and over again, this is a utility equity issue. And both, while I was at the utilities and at the DOE, I was personally involved and personally



aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the



fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

were allocated because of the equity issue. There's only so much system capacity. If I accept more from someone else, I accept less from someone else.

Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?

A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.

Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?

A. Yes.



Q. Perhaps if you could turn to page 3 of Slater Exhibit 20. And, on the right-hand side, it has that long list of concurrences. Could you run down that and tell me what was the role of the various people in that concurrence chain.

A. You know my role, I'm the originator, the technical lead, if you will. Alan Brownstein would have been the branch chief. Jim Carlson would have been the -- I think we called them divisions then, division director.

Q. It says RW-43, that was his division, Mr. Carlson's division?

A. Forty-three, right.

Q. What division would that have been?

A. I don't recall the name specifically. We've shifted names so many times.

Q. But approximately what --

A. Waste acceptance and transportation perhaps. Ron Milner would have been the office director.

Q. And that RW-40 is the designation for that office?

A. For that office. Dick Nelson and Jerry Saltzman would have been in what we called the front office as support directly to the director



of the program.

Q. And their office is indicated as RW-2?

A. Yes. And Lake Barrett as RW-1, and I cannot make out the last one, I can't make the last one out. I believe it's Charlie Smith. And again that would have been front office support, support directly to the director of the program.

Q. So the director is the only one with RW-1?

A. Yes.

Q. And his support people are RW-2?

A. Yes. The deputy director of the program, for example, would be an RW-2 and there are usually two or three others who are support directly to the director.

Q. And you had pointed out previously an indication noting that you were the originator of the document. And there's a line below that, Correspondence Reviewer. What's the role of the correspondence reviewer?

A. I don't recall.

Q. And the concurrence line, there's no indication of a review by the contracting officer. Why would that have been?

A. That depends on the version of this



that you pulled from the files. In fact, I have right now unrelated to this case a version of a document to review. I have a concurrence sheet and I will be concurring for myself and for the division director. It will be an attachment to a separate records package that, when put together with this, will form a complete picture.

Q. So there may have been another version of this memo with a concurrence by the contracting officer?

A. It would have been the same version of this memo that would have gone over separately for concurrence in another office because that would speed the process.

(Slater Exhibit No. 21 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 21. If you could take a look and tell us if you recognize this document?

A. Okay. I believe this is the letter that would ultimately have been sent to Yankee, to Mr. Buchheit, that would have been the result of the director's approval to communicate with

Q. Let's turn to a different topic. Annual capacity reports, what role did you have in the development of annual capacity reports?

A. Let's see. We have to go back and recognize that I didn't have any role in the development of the initial acceptance priority ranking or annual capacity report.

So in large part again these were contractually mandated activities that carried over from year to year and, unless something unusual had happened during the year, by and large looked much the same one year as they did the next.

I do recall that the ACR issue resolution process was a change reflected from one year to the next, but I honestly can't recall what year that would be. And, of course, the acceptance priority ranking would change every year as it was a rolling list of discharge fuel during the preceding year.

Q. What role would the contractors have had in the development of each annual capacity report?

A. That varied from year to year and it varied from section to section within the report



itself. During the year in which I decided to combine the acceptance priority ranking in the ACR for economies, if you will, the contractor -- actually we need to start at the beginning.

The Energy Information Administration, EIA, collects data from utilities on their fuel. They do this via a form called the RW-859. And that form is part of the contract and as is the requirement to submit the data.

The data is then input to a computer program and is ranked by discharge date. Contractors assist EIA, EIA assists us in performing that function. So the actual ranking would have been provided to us by the contractor, very much a plug-and-chuck type operation.

I don't recall whether there were significant text portions to the APR, but then I wouldn't expect that those would change much with the exception of identifying any changes to prior years that had already been published.

Those changes could have occurred because utilities redesignated what comprised a batch of fuel. They might have removed an assembly and substituted a different assembly which had a different MTU value which could



change the amount of fuel discharge on a specific date in that batch. So we explained those differences.

The ACR, the tables that included the utilities and their allocations for the first ten years, would have been based on the APR. And those tables would likely have been generated by the contractor and reviewed by us. In fact, I do distinctly remember sitting down with contractors and doing a line-by-line comparison of the APR with the previous year and the ACR tables as well. So it was very much a collaborative process.

The text in the ACR, if there were changes, again depending on the content of the particular portion of the text, could have easily been drafted by me, it could have easily been drafted by a contractor for me subject to my review.

Q. Now, the annual capacity report as the name may suggest was to indicate the annual quantity of spent fuel that RW expected to take in each year of the program?

A. There is a section in the contract that deals with the annual capacity report and sets



out its scope. I don't precisely recall which section in the contract discusses the annual capacity report.

Q. If you want to turn to page 10, the paragraph above Article V. Is that what you were referring to?

A. Yes, because it establishes it as a document for planning purposes only because there is a recognition that system capacity could change up or down.

Q. So the annual capacity report was not intended to be binding on the parties?

A. It was not intended to be absolute in the sense that again it's a planning document. And DOE, and I distinctly remember saying this and I distinctly remember it being said to me when I was on the utility side, DOE had always stated that, if we were able to improve the system capacity, then the ACR would reflect those improvements in system capacity.

And the APR would be used to readjust which utilities, when, and how much fuel. So, as a planning document, planning documents are subject to change.

And the ACR as I understood it was to

communicate to the utilities what DOE believed was the likely receipt rate at a repository, the likely acceptance rate, and to accept who was likely to deliver during the first ten years of system operation based on the APR.
Q. What was the first ACR that you were involved in?
A. Let's see. I joined DOE in August of '91, and I don't recall which ACR that was. But I would probably have been involved in the ACR starting on the ACR that was issued in '92.
Q. What would your role have been in determining that amount that DOE was going to tell utilities DOE was expecting to -- what they expected the annual receiving rate for the facilities to be, what would your role have been in that?
A. None, nothing.
Q. Who would have made that determination?
A. I don't recall who precisely made the determination because I believe those receipt rates were established in ACR's prior to my advent with the program. And there were no changes in those receipt rates for this document that I'm aware of. So the document -- the



receipt rates were the receipt rates.
Q. So, during your whole tenure working on the ACR's, the receipt rates stayed the same?
A. I don't recall whether they did or they didn't. I believe they did stay the same.
Q. What was the last ACR that you would have worked on?
A. The last ACR I worked on was the ACR that -- I believe was the ACR that I combined with the APR, to issue it as a document contained in a notebook rather than two separate hardbound documents, because the intention was to go through, since a lot of it doesn't change from year to year, and simply do a page insert and delete. It would mean we would get them out more expeditiously and utilities wouldn't have to chuck an old version and redo a new version.
(Slater Exhibit No. 23 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you have now been handed what's been marked as Slater Exhibit 23. Would you generally tell us if you recognize this document?
A. Oh, indeed I do.



Q. Could you tell us what it is?
A. It is the combined version of the acceptance priority ranking and the annual capacity report.
Q. If you would turn to page 4 of that document. Do you see a table marked table 1?
A. Yes.
Q. Is that the table that one would call the annual capacity report part of the report?
A. The projected annual receipt rate, yes.
Q. Do you recall that the text here in Slater Exhibit 23 discusses that these receipt rates are linked to a statutory limit on the size of an MRS?
A. That sounds vaguely familiar. But I do not recall specifically, I have no detailed knowledge.
Q. Do you recall any work on the language of that text?
A. No, I don't recall personally having worked on the language, that portion of the language.
Q. Who would have worked on that portion of the language?



A. I can't recall.
Q. Do you have any idea who would have?
A. No. I believe the way I was used to doing this was I would have communicated with my M&O counterpart who would have then brought in whatever resources he or she needed to accomplish the work. And I did not always know who those people were. So that's why I really can't say who precisely did.
Q. But it would have been someone with the M&O contract?
A. Most likely.
Q. Would there have been another office within RW or another division, branch within RW that would have been involved in that part of the text?
A. Yes. And I'm not sure whether it would have been transportation or storage.
Q. But one of those two --
A. Might have.
Q. Do you recall this issue of the limit on the size of the MRS and the impact of that limit on DOE's projected nominal waste acceptance rates?
A. As I said, vaguely, but not enough to