**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME VII OF VII**
**(Pages A 0941 to A 1106)**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS REVISED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

August 29, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to VII

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 Notice of Rule 30(b)(6) Deposition..................................................A 0028

April 18, 2002 Notice of Rule 30(b)(6) Deposition................................................A 0033

November 12, 2004 Notice of Rule 30(b)(6) Deposition ........................................A 0039

March 2, 2005 Notice of Rule 30(b)(6) Deposition................................................A 0043

April 19, 2007 Notice of Rule 30(b)(6) Deposition................................................A 0047

June 9, 2008 Notice of Rule 30(b)(6) Deposition....................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874 (Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0052

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op. (Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0065

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op. (Fed. Cl. Aug. 16, 2007) (unpublished)...........................................................A 0075

Defendant's Unopposed Motion to Designate Prior Trial Testimony of Mr. Robert L. Morgan in System Fuels..........................................................A 0105

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations.............A 0111

Barrett, Lake ............................................................................................A 0123
- April 22, 2002 .....................................................................................A 0124
- April 23, 2002 .....................................................................................A 0149
- April 26, 2002 .....................................................................................A 0173
- May 8, 2002 ........................................................................................A 0204
- May 10, 2002 ......................................................................................A 0228
- May 14, 2002 ......................................................................................A 0252

## Volume II (continued)

Brownstein, Alan ........ A 0257
April 9, 2002 ........ A 0258

## Volume III

Brownstein, Alan (continued) ........ A 0282
April 10, 2002 ........ A 0282
April 11, 2002 ........ A 0308
June 14, 2002 ........ A 0319

Cole, Billy M. ........ A 0328
March 12, 2002 ........ A 0329
March 13, 2002 ........ A 0360
June 4, 2002 ........ A 0369

Dreyfus, Daniel ........ A 0373
May 15, 2002 ........ A 0374

Klein, Susan ........ A 0384
April 24, 2002 (Rule 30(b)(6)) ........ A 0385
April 25, 2002 (Rule 30(b)(6)) ........ A 0419

Kouts, Christopher ........ A 0428
January 30, 2004 ........ A 0429
August 2, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0440

## Volume IV

Kouts, Christopher (continued) ........ A 0445
April 11, 2005 (Rule 30(b)(6)) ........ A 0445
July 12, 2005 (in the *TVA* Trial Transcript) ........ A 0459
January 16, 2007 (in the *System Fuels Mississippi* Trial Transcript) ........ A 0463
April 12, 2007 (in the *System Fuels Entergy Arkansas* Trial Transcript) ........ A 0465
May 1, 2007 (Rule 30(b)(6)) ........ A 0472
May 2, 2007 ........ A 0484
June 12, 2008 (Rule 30(b)(6)) ........ A 0502

Lawrence, Michael ........ A 0531
May 20, 2002 ........ A 0532
May 21, 2002 ........ A 0572
November 16, 2007 (in the *Carolina Power* Trial Transcript) ........ A 0587

## Volume V

Milner, Ronald ........................................................................................A 0599
May 1, 2002 ........................................................................................A 0600
May 2, 2002 ........................................................................................A 0629
May 3, 2002 ........................................................................................A 0661
May 7, 2002 ........................................................................................A 0675
May 8, 2002 ........................................................................................A 0690
August 11, 2004 (in the *Yankee Atomic* Trial Transcript) ............................A 0695

Morgan, Robert........................................................................................A 0703
March 21, 2002 ........................................................................................A 0704
March 22, 2002 ........................................................................................A 0737
June 25, 2002 ........................................................................................A 0745
August 3, 2004 (in the *Yankee Atomic* Trial Transcript) ..............................A 0751
November 13, 2007 (in the *Carolina Power* Trial Transcript).....................A 0757

## Volume VI

Pollog, Thomas ........................................................................................A 0762
April 11, 2002 (Rule 30(b)(6))..........................................................A 0763
April 12, 2002 (Rule 30(b)(6))..........................................................A 0799
May 15, 2002 (Rule 30(b)(6))..........................................................A 0819
May 16, 2002 (Rule 30(b)(6))..........................................................A 0823
August 4, 2004 (in the *Yankee Atomic* Trial Transcript) ..............................A 0826
July 12, 2005 (in the *TVA* Trial Transcript)................................................A 0839
November 15, 2006 (in the *Northern States* Trial Transcript)......................A 0846

Rosselli, Robert........................................................................................A 0855
April 15, 2002 ........................................................................................A 0856
April 16, 2002 ........................................................................................A 0885

Rusche, Benard ........................................................................................A 0887
May 16, 2002 ........................................................................................A 0888
May 17, 2002 ........................................................................................A 0911

Slater-Thompson, Nancy ............................................................................A 0921
April 21, 1999 ........................................................................................A 0922
April 22, 1999 ........................................................................................A 0932

## Volume VII


Slater-Thompson, Nancy (continued) .......... A 0941
June 13, 2002 .......... A 0941

Trebules, Victor .......... A 0955
April 17, 2002 .......... A 0956
April 18, 2002 (Deposition in Yankee Cases) .......... A 0982

Williams, Jeffrey .......... A 0985
June 11, 2002 .......... A 0986
January 22, 2004 .......... A 0993

Zabransky, David .......... A 1000
April 17, 2002 .......... A 1001
April 18, 2002 .......... A 1027
April 19, 2002 .......... A 1050
June 5, 2002 .......... A 1057
June 6, 2002 .......... A 1060
January 29, 2004 .......... A 1064
August 5, 2004 (in the *Yankee Atomic* Trial Transcript) .......... A 1067
March 29, 2005 (in the *SMUD* Trial Transcript) .......... A 1080
April 12, 2005 (Rule 30(b)(6)) .......... A 1083
July 12, 2005 (in the *TVA* Trial Transcript) .......... A 1092
October 27, 2005 (in the *Southern Nuclear* Trial Transcript) .......... A 1097

1
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :
- - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594



C O N T E N T S


| WITNESS | EXAMINATION |
|---|---|
| NANCY SLATER THOMPSON | |
| By Mr. Shapiro | 4 |
| By Ms. Sullivan | 149 |
| By Mr. Shapiro | 153 |

Afternoon Session - Page 67


E X H I B I T S


| Ex.No. | Description | Page |
|---|---|---|
| 1 | December, 1990 ACR | 17 |
| 2 | 6-22-83 contract | 25 |
| 3 | March, 1995 APR and ACR | 32 |
| 4 | June, 1987 ACR | 47 |
| 5 | June, 1988 ACR | 67 |
| 6 | December, 1991 ACR | 69 |
| 7 | May, 1993 ACR | 84 |
| 8 | March, 1993 ACR | 86 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 113 |
| 10 | Instructions for Completing the Appendix C - Delivery Commitment Schedule | 127 |
| 11 | Review Record | 139 |




P R O C E E D I N G S
- - - - -

Whereupon,
NANCY SLATER THOMPSON,
was called as a witness by counsel for Plaintiff, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF:
BY MR. SHAPIRO:
Q. Would you state your name for the record, please?
A. Nancy Slater Thompson.
Q. Ms. Slater Thompson, my name is Robert Shapiro. As you recall I deposed you, gee --
A. Some time ago.
Q. -- a couple years ago now in these cases, and they are still going on. I won't have to go back over the procedures, I have your deposition, and I think you understand what we are doing today. It also saves -- I mean, we are not going to cover the same material the same way again, either. I just have a couple, I guess, catch-up items to make sure I understand what's happened with your background in the last couple

years, and I have some additional topics I want to cover with you today.
What is your current position?
A. I am the acting division director of the regulatory coordination division.
Q. How long have you been in that position?
A. I have been in that position since January of 2001.
Q. What was your position before that one?
A. Team leader in the regulatory coordination division.
Q. How did your duties change when you moved from the team leader position to the acting director position?
A. In the main, I believe that most of the technical and policy-related duties that I had been performing didn't change, but I have now assumed responsibility for personnel actions.
Q. Are there any other teams in that division other than the one in which you were team leader?
A. No, there are not.
Q. How many people are in that division?



A. There are, including details, four in addition to myself, and one pending for a secretary.
Q. Did someone resign from the division director position? Is that how you became the acting division director?
A. Not a resignation. Alan Brownstein moved on to other duties.
Q. When did you start in the regulatory -- when did you start in the team leader position?
A. We would have to check my personnel actions, but I believe it was about December of 1987. I'm not sure.
Q. Let me ask the question differently. The team leader in the regulatory division, when did you start that?
A. That would have been immediately upon my advent in that division, so I moved from the waste acceptance division, I moved right into the regulatory coordination division.
Q. My recollection is that when I last deposed you your current position at that time was that team leader position in the regulatory division. Is that --



A. Yes.
MS. SULLIVAN: You said 1987. Did you mean '97?
A. I'm sorry, '97, yes. I wasn't even there in '87.
Q. For the most part, the questions I want to ask you about will go to the time when you were dealing with the waste acceptance issues and were directing the waste acceptance division. First, I would like to ask about Annual Capacity Reports. You are familiar with those documents?
A. Yes.
Q. Which Annual Capacity Reports did you have a role in the development of when you were in the waste acceptance division?
MS. SULLIVAN: Objection. Vague.
A. My recollection is that the first ACR that I could have participated in would have been the '92.
Q. When you say the first one you could have participated in, you don't recall if you participated in the development of the '92 ACR at all?
A. No. I don't actually recall that, no, I'm not sure what stage it was at at the time that



I entered the department.
Q. What about the 1995 ACR?
When I say -- let me explain, I am referring to the ACR that was published in March of 1995. Did you have a role in the development of that --
A. Yes.
Q. -- ACR?
You did not have a role in the development of the ACRs prior to the one in 1992?
A. I don't believe so.
Q. Prior to that ACR, you don't think you could have had a role in the development of those ACRs because you were not within DOE at that time?
MS. SULLIVAN: Objection. Vague.
A. I joined the DOE in August of 1991.
Q. But you were working in the nuclear industry looking at some of those same issues from private industry's point of view, weren't you?
MS. SULLIVAN: Objection. Vague.
A. During what time period are you asking the question?
Q. During the time period when the earlier ACRs, the ones earlier than 1992, came in.

A. I recall dealing with ACR-related issues at the time I was at EEI in the utility nuclear waste management group.
Q. What do you mean by ACR-related issues?
A. I believe during my prior deposition we discussed the fact that there were certain issues that both the department and the utilities had identified as issues that might bear some clarification in order for both parties to be able to implement the contract. Those came to be known as part of the ACR issue resolution process.
Q. We covered that in some detail during your last deposition.
I was referring more to the ACRs themselves. For example, do you recall, did you ever comment on any of the ACRs prior to the one that was published in 1992?
A. I don't know.
MS. SULLIVAN: Objection. Vague.
Q. What role do you think you had with respect to the development of the 1992 ACR?
A. My role, I believe, would primarily, given the position that I was in as a member of that group, would have been to conduct a review of



the document that was in draft.
Q. What was the purpose of your review?
A. My review would have looked at certain technical issues that might have been addressed in the ACR from both a technical standpoint and for the need perhaps to do additional work because it wasn't complete; to make sure that, for example, the work that was done in the Acceptance Priority Ranking and the work that was reflected in the ACR were consistent.
Q. What about the acceptance rate projections in the ACR? What role would you have had with respect to reviewing and commenting on those projections?
MS. SULLIVAN: Objection. Vague.
A. None.
Q. Who would have worked on that?
A. I believe Alan Brownstein might have some knowledge of that, perhaps Jeff Williams.
Q. Those are both individuals within DOE?
A. Yes.
Q. What about contractors? Would there be particular contractor personnel who would have been responsible for developing those projections?
A. There might be.



Q. Do you recall who those people would have been?
A. Not by name. I believe it would have been the people supporting those two individuals.
Q. What about the 1995 ACR? What role would you have had in the development of the 1995 ACR?
MS. SULLIVAN: Objection. Vague.
A. At that point, I believe that it would have been my responsibility to produce the document in final form; assure that much of what I described to you previously with the '92 ACR in fact happened with the 1995 ACR; and to the extent that we made any additional changes that those additional changes were in fact appropriate.
Q. Again, focusing on the acceptance rate projections in the 1995 ACR, would you have had a role in the development of those acceptance rate projections?
A. No.
Q. Why wouldn't you have had a role in the development of the acceptance rate projections if you were responsible for the entire document?
A. The document includes data from a variety of sources. That does not necessarily



mean that you are responsible for developing the data.
Q. Who is responsible for the 1995 acceptance rate projections?
MS. SULLIVAN: Objection. Vague.
A. I really don't recall who at the DOE would have had the watch for that.
Q. The ACR published in March of 1995 is the last one that's been published. Do you know why there's been no ACR published since then?
A. No.
Q. Have you ever discussed that issue with anyone?
A. No.
Q. Have you ever been curious as to why ACR hasn't been published since 1995?
A. No.
Q. Are you aware that the Standard Contract between DOE and utilities calls for the ACR to come out annually?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You can answer.
A. I recall a provision, but I could not give you the specific citation that does address

don't recall how the progressions from 300 to 400 to 550 to 875 MTU was developed, do you?
A. As I previously indicated, I wasn't in the department at the time and would not have had any insight or involvement in developing those rates, so I have no recollection.
Could I impose on you to take a break?
MR. SHAPIRO: Absolutely.
(A recess was taken from 11:00 a.m. to 11:15 a.m.)
BY MR. SHAPIRO:
Q. I want to go back to, I guess, a little bit of something we covered when you were deposed last so I understand the context in which you might have seen or worked with these ACRs, the ones before you got to DOE.
What was your position prior to moving to the Department of Energy?
A. I worked at the Edison Electric Institute. I think I started at EEI in roughly April of '86 and left the institute roughly August of '91, so it was a five-year period there. The first -- I'm not sure how long it was -- two to two and a half years was spent with the utility nuclear waste management group working on the



issues that we are discussing today.
The second half of my stay there was spent in the fossil energy group, so actually at the time this was going on you understand I had absolutely no responsibility for anything related to these issues. I had other things to think about.
Q. Okay.
So the time when you were with Edison Electric Institute where you did work on issues, spent nuclear fuel, was roughly '86 to mid-'88 or perhaps even, I guess, as late as the beginning of '89?
A. Perhaps.
Q. When you did work on issues concerning spent nuclear fuel with the Edison Electric Institute, do you recall, was the industry concerned with the rate at which DOE would ultimately pick up spent fuel pursuant to the Standard Contract?
MS. SULLIVAN: Objection. Vague.
A. Yes, that is my recollection. There was always a concern in the industry that they be able to deliver as much as possible.
Q. The industry's view was that faster



was better?
A. Faster and more was better.
Q. Do you recall projections of waste acceptance by the Department of Energy being issued when you were working on those issues for the Edison Electric Institute?
MS. SULLIVAN: Objection. Vague.
A. No, I don't.
Q. Let's pull out one of those and see if that refreshes your recollection.
(Thompson Deposition Exhibit No. 4 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, you have been handed what's been marked as Exhibit 4 to your deposition. It's an Annual Capacity Report, it is dated June of 1987, and I know you might want to take a minute to look at it. I'll tell you in advance that the waste acceptance projections in this ACR appear, at least the table appears, on page 7.
Would you like to take a minute to take a look at the document?
A. Please.
Q. Ms. Slater Thompson, again I indicated



that I wanted to refer you to page 7 of the 1987 ACR which has the acceptance rate projections. Do you recall the acceptance rate projections that are noted in that table?
A. No, I don't.
Q. Do you have any recollection if the industry was satisfied with the acceptance rates reflected in that table?
MS. SULLIVAN: Objection. Vague.
A. I have a general recollection that the industry was rarely satisfied with any acceptance rate either in terms of schedule or quantity.
Q. What's your recollection as to what acceptance rate the industry was looking for?
MS. SULLIVAN: Objection. Vague.
A. I do recall that one of the things in industry that we had discussed internally and I believe at some point may have discussed with Alan Brownstein in his capacity then with the department, that we as an industry would like to be able to deliver basically at a rate that would equal our discharge rate.
Do you understand what I mean by that?
Q. I think so. I may ask a question or two more about it.

existing law?
MS. SULLIVAN: Objection.
Argumentative.
You may answer.
A. Actually, I don't envision that my role would have been to assure that this is consistent with existing law. I do envision that there were others in the department, including the contracting officer and his counsel, who would have been responsible for making sure that the legalities were observed.
Q. Did you view as part of your role in working on and reviewing the 1995 ACR ensuring that the ACR was consistent with the department's obligations under the Standard Contract?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You may answer.
A. I would have been responsible for assuring that the ACR, the technical aspects of the ACR of which I was responsible, were in fact consistent with the Standard Contract. I would also have been responsible for assuring that this was coordinated with the contracting officer.
Q. When you say the technical aspects



were consistent with the Standard Contract, what do you mean to be referring to?
A. For example, that we had developed an Acceptance Priority Ranking that was accurate, that was reflected appropriately and accurately in the subsequent allocation of capacities in the ACR.
Q. Going back to Exhibit 6 for a moment, that same page we were looking at, page 4, that explains the linkages between the MRS or repository and that aspect of the development of those projected acceptance rates. Maybe the best -- at the same time I want to also ask you to consider the similar section in the 1995 ACR which begins at the bottom of page 3; that is Exhibit 3.
The reason I am asking you to look at both of those is that there's less explanation of those linkages in the 1995 ACR. Do you recall why those edits were made? Why was that explanation reduced or taken out?
MS. SULLIVAN: Objection, foundation.
Objection, vague.
You can answer the question.
A. This may perhaps be clearer when you discuss this in the context of year 1, year 2,



year 3, which is, that at the time this ACR was prepared it was, at least to me, fairly obvious that there was uncertainty about commencement of operations in 1998. There was uncertainty about whether or not we would have an MRS or a repository. As a matter in my opinion of efficiency, these dates were changed so that they would represent a sliding scale that would then be relevant no matter what the actual acceptance year turned out to be. There were uncertainties in budget. There were uncertainties in system design and development.
Q. I certainly intend to ask about that, but I want to get back to what -- I had a somewhat different question. I was just asking about the editing, what appears from my standpoint to be editing of the text explaining the same waste acceptance projections in the 1991 version, there is a paragraph that we had talked about previously that explained the two linkages. In the 1995 version, there's not as much explanation of that issue.
Do you recall a decision to edit that explanation?
MS. SULLIVAN: Objection, foundation.



Objection, the documents speak for themselves.
A. No, I do not explicitly recall a decision to edit the document.
Q. Going back to the point you had just made about the use of years, you do recall a decision to change from noting the 10 years on the ACR from the specific calendar year as 1998, 1999, and so forth, to year 1, year 2?
A. Yes, I do.
Q. And you made that decision because of uncertainty as to whether or not the department would accept anything in 1998?
A. Yes. That's my personal opinion, yes.
Q. You say that's your personal opinion. Do you recall, was that the basis for why the department made that change in the 1995 ACR?
A. That was my basis for making that change.
Q. Did Mr. Brownstein ever discuss with you a different reason for making that change in the 1995 ACR?
MS. SULLIVAN: Objection. Foundation.
A. Not to my recollection.
Q. Are you aware of anyone who had a different reason for making that change in the

1995 ACR?
A. No.
MS. SULLIVAN: Objection. Foundation.
THE WITNESS: Sorry.
MS. SULLIVAN: That's okay.
BY MR. SHAPIRO:
Q. This is a little out of order, we will get to the delivery commitment schedule process in a minute with you. One question I had to setting the years that way.
Given the listing in the 1995 ACR of year 1, year 2, year 3, how would a utility know when its proposed delivery commitment schedule is due?
MS. SULLIVAN: Objection. Vague.
Q. Do you understand what I am getting at, the question?
A. Yes, I do. I think there are probably two prongs to the answer.
As you know, the contract says that delivery commitment schedules have to be issued 63 months, I believe it is, in advance of the year in which you intend to deliver fuel. That would mean that we would have started that process, the DCS process, roughly, that's just round, five years



prior to 1998.
So reasoning this out, people would have already begun to submit DCSs. It was simple at this point for people -- people knew who submitted in year 1, they had already submitted, people knew who had submitted in year 2. And the second prong is that actually during the first year and during the subsequent years we had communications with the utilities, in fact I recall specifically in year 1 to remind everybody that they needed to submit, to ask if they had any questions that they would like answered in the process of preparing the DCSs, that kind of thing. So there was a cooperative process to assure that everyone did what they needed to do, or wanted to do. If utilities did not want to submit DCSs despite the fact that we reminded them, that was certainly their option.
Q. I am not sure that that answered my question.
Suppose the utility had an allocation for acceptance of spent fuel in year 5 pursuant to the 1995 ACR. How would that utility know when its deadline was for submitting the proposed delivery commitment schedule to claim that



allocation?
MS. SULLIVAN: Objection. Calls for speculation.
You may answer.
A. Had I been responsible subsequently for handling that process, I believe it would have been reasonable to write a letter to those utilities that had allocations in year 5 saying just a reminder, please call if you have questions.
Q. So if I understand your answer correctly, you would have sent them a letter basically setting out your interpretation as to when their deadline is so that the utilities have a deadline for them?
MS. SULLIVAN: Objection. Mischaracterizes the witness' testimony.
You may answer.
A. Given that in year 1 DCSs were submitted 63 months in advance, my intention would have been to continue that process on a rolling one-year front and to notify the utilities with allocations in that year that they had DCSs that they should submit.
Q. So for purposes of the deadline for



submittal of delivery commitment schedules, you would have still treated year 1 as 1998, year 2 as 1999, and so forth?
A. That was my intention, yes.
(Thompson Deposition Exhibit No. 7 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, you have been handed what's been marked as Exhibit 7 which is a copy of the 1992 Annual Capacity Report dated May, 1993, and it says Revision One.
Do you recall this document?
A. Not explicitly, no.
Q. Actually, just on the cover for a moment, do you recall that the department at times issued ACRs for a year after the specific year for that ACR?
A. Let me make sure I understand your question. Are you asking me, for example, that an ACR -- let's call it the 1992 ACR -- could be published in the succeeding chronological year?
Q. Correct.
A. I have got one in front of me.
Q. Is it your recollection that -- well, my question is: That's what it appears to me to

first year? Logistically, I don't believe you could have done it. You didn't have the transportation capacity. That makes a lot of assumptions, again, that we had facility, that we had a license to receive and possess, but ...

Q. To what extent were the waste acceptance projections in the 1995 ACR reflective of a desire by the department to limit its commitments to utilities?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. I have no knowledge of anything like that.

Q. You don't recall anybody discussing a desire to have relatively low acceptance projections in the ACR so as to limit the department's commitments to the utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. No, I do not.

Q. Let's switch subjects to talk about the delivery commitment schedule process. Why don't we turn first to that provision in the



contract, which is Exhibit 2. The part that I want to ask you about first is on page 11.

Section B1 there, I guess it's the second sentence, it says: After DOE has issued its proposed Acceptance Priority Ranking as described in paragraph B5 of Article IV hereof, beginning January 1, 1992 the purchaser shall submit to DOE the delivery commitment schedule which shall identify all SNF and/or high-level waste the purchaser wishes to deliver.

The part of that phrase that I really would like to ask you to focus on is the part that says all SNF or HLW the purchaser wishes to deliver. What is your understanding of what that phrase is referring to?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

You can answer the question.

A. I would like to take us back to the ACR resolution process and actually to the time when I sat on the industry side of the table.

As I mentioned before, there were some roughly three dozen issues that the utilities and the department believed it would be worthy to conduct technical information exchanges on in an



effort to see if we could clarify some of the statements like that one in the contract that could be interpreted in a number of ways.

There was a concern on the part of the utilities that, for example, this might in fact be a request to identify absolutely all the fuel they would ever intend to deliver under the contract over the life of the time when they would deliver fuel. Another interpretation was that no, actually what this is asking for is for you to identify as a utility to the department the fuel that you intend to deliver in a given calendar year.

One of the other issues that I recall being associated with this was do we specify a range of discharge dates, do we specify a specific discharge date, how valuable is the information, if what I do is provide you with ten years of discharge dates so that you have no clue what I am really delivering when the year comes to deliver fuel.

One of the other issues that was tied up with this that I recall is whether or not you could project the discharge date. For example, if I am submitting a DCS 63 months in advance



theoretically of the calendar year in which the department arrives to accept it, by the time they arrive to accept it I have generated more fuel theoretically that could have been included in that range of discharge dates. Am I permitted to extend the upper bound on that discharge date range to include the fuel that will be discharged between now and acceptance.

There were a lot of issues that were associated with this that the utilities and the department in fact discussed, and my recollection is what we had all mutually reached consensus on in terms of our understanding was that it was okay to specify a range of discharge dates, that this was not intended to impose on the utilities a requirement to disclose absolutely every single assembly that they would deliver over the life of the plan, that in fact it was for a particular acceptance year.

Q. Was it your understanding that the utility in their proposed delivery commitment schedule could specify or should specify all of the spent fuel that utility wished to deliver in a particular year?

MS. SULLIVAN: Objection. Calls for a

legal conclusion.
You may answer.
A. These discussions are perhaps more fruitful when we use an example to illustrate what we are talking about.
Let's assume that you have 10 MTU that you wish to deliver to me in year 1. You are not required to submit DCSs to me if you choose not to. If you do choose to submit DCSs, I would assume that you would submit for the entire 10 MTU. You may either do it in one DCS and specify a specific discharge date or a range of discharge dates. You may choose to submit 10 DCSs for one MTU each and do the same thing. I don't have an expectation or a requirement in terms of how you do it in the context of one, many or none. I do have an expectation that when you do it, the total, when you total all the DCSs up in terms of the allocation, it will not exceed the allocation to which you are entitled and which is provided in the NCR.
Q. Where is that limitation on the total amount of spent fuel a purchaser may note on their delivery commitment schedule or schedules for a particular year provided for in the contract?



MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.
A. I do not recall.
Q. Isn't such a limitation inconsistent with the language that we just focused on, all spent fuel or all SNF and/or HLW the purchaser wishes to deliver?
MS. SULLIVAN: Objection, argumentative. Objection to the extent it calls for a legal conclusion.
You may answer.
A. No, I don't believe it is inconsistent. It's all fuel that you wish to deliver within the bounds of what you are entitled to deliver.
Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?
MS. SULLIVAN: Objection. The documents speak for themselves.
You may answer.
A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance



rates are subject to influences by future budget constraints, lack of a facility, unavailability of transportation casks.
For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.
Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?



A. That we viewed the DCSs as fungible, and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.
It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.
Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.
When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?
MS. SULLIVAN: Objection, vague.

Objection to the extent it calls for a legal conclusion.
A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.
Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.
A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would



be well aware of that.
Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.
Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or



in industry who thought that the delivery commitment schedules were binding on either industry or the department?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.
A. No, I don't.
Q. You said something a minute ago that I guess has me a little confused. You said that the delivery commitment schedules are definitely for planning purposes but they provided relatively little information so you couldn't do much planning with them. I may be getting your language a little wrong, but what did you mean by that?
A. The DCSs -- and you need to put this in the context of their fungibility -- the DCSs, were they to remain as is, would provide you with the location of the reactor to which you would arrive to pick fuel up, so you know the type of fuel, you can plan appropriately for the type of cask to send. Given that they have submitted one DCS for, let's assume, 10 MTU, you know how many casks to send. The date on which you would show up and schedule a pickup was not resolved until



the FDS because that was actually done in consultation with the utilities because you don't want to show up and disrupt their operations, that's money.
You had no certainty about the age of fuel, however, because if they specified a range of discharge dates that's 10 years apart, that doesn't tell you much in terms of the thermal output of the fuel I am coming to get because conceivably it could range from five-year-old fuel to 15-year-old fuel. There's a big difference. There's a big difference in terms of the number of casks I would have to send to get that as well, assuming that they elected to deliver fuel that was all, say, six years old.
Q. Did the department ever consider restricting the utility's ability to put broad ranges of fuel discharge dates on their delivery commitment schedules?
A. Not that I recall, no.
Q. Would it be fair to say that the department didn't find it necessary to have narrower spent fuel discharge dates on the delivery commitment schedules for purposes of the department's planning?

MS. SULLIVAN: Objection.
Argumentative.
You can answer.
A. Based on my experience on utilities' side of the table, I would say that the industry had communicated to them that they had the ability to fill that out with a range of discharge dates, and they intended to, and I would say from my side of the table as DOE, in my opinion I don't believe I could have restricted them to providing me with a specific discharge date.
Q. You don't recall when you were at DOE anyone within DOE coming to you or the waste acceptance division saying gee, for purposes of planning, transportation or the repository we really would like to have hour discharge date ranges on the delivery commitment schedules?
MS. SULLIVAN: Objection, vague.
Objection, foundation.
A. No, I don't recall that.
Q. To your knowledge, how has DOE actually used the delivery commitment schedules that have been approved?
MS. SULLIVAN: Objection. Vague.
A. I have no specific knowledge of that.



Q. You are not aware of any use that the department has made for approved delivery commitment schedules for the department's planning?
A. No, I am not.
Q. We might have covered this last time, but make sure I understand. What was your role with respect to the delivery commitment schedule process?
A. Originally, the industry and the department recognized that it would be advisable to issue some simple clear instructions on how to fill the form out. Those instructions were developed in consultation with the industry, and it was actually a very good exercise because we got some feedback from them in terms of how to be clearer or how to simplify the instructions.
Those instructions were provided to the utilities. For example, once the instructions were finalized, I do recall calling utilities going hey, you've got a DCS due this year, do you intend to submit, do you have any questions, is there anything I can answer for you or help you out with.
Once a DCS was received, I would have



reviewed it to make sure that, for example, the DCS was signed by someone at the utility who really had the authority to sign for the utility; that in fact they had not specified a range of discharge dates that would result in their ultimately delivering fuel that was less than five years old; that they had not requested an allocation of capacity for which they were not entitled. I don't remember the explicit contents of the DCS anymore, but those stick in my mind.
Q. Would it be a reasonable summary to say that you reviewed the delivery commitment schedules to make sure that the utilities were following the instructions that you had sent out previously?
A. Yes.
Q. When you were reviewing the delivery commitment schedules that utilities submitted, was that in your role as the contracting officer's technical representative?
MS. SULLIVAN: Objection. Foundation.
A. Yes. I think so.
Q. Is there a technical or is there a particular role that the contracting officer's technical representative has as opposed to anyone



else conducting their review of the delivery commitment schedule proposed by a utility?
MS. SULLIVAN: Objection. Vague.
A. "Anyone else" defined as?
Q. Someone else in the waste acceptance division, a contractor you might have helping you out.
MS. SULLIVAN: Same objection.
A. Were I to recommend approval of a DCS as the COTR, C-O-T-R, as the COTR, my judgment as the COTR would have been relied upon as the judgment. The contractor did not approve or disapprove. They do not have that ability.
Q. It was the COTR's assessment of the delivery commitment schedule that was deemed authoritative?
A. I would have to refresh my memory about whether or not I was the final stop or whether or not there was a subsequent stop at the contracting officer. I don't honestly recall.
Q. Well, I will represent to you in fact that I believe it's in the back of Exhibit 2, the contract, one of the blank forms -- actually, no, I think it got changed.
I will represent to you that there is

irrespective of whether it's approved, but let me ask you --
A. Conceptually.
Q. Approved. Let's focus on approved.
Do you believe that a delivery commitment schedule that's been proposed and approved is binding on any party?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You may answer.
A. In my personal opinion, I do not believe that it is binding because I do not believe -- I am at a loss as to how you could bind yourself to anything in a range of discharge dates. I am at a loss as to how you could bind yourself when it's not final.
Q. So a utility wouldn't even be binding itself as to the total amount of MTU of spent fuel that it would be delivering to DOE in a particular year?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. I think it is possible that a utility in fact could deliver less than it indicated on



its DCS for whatever reason.
Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. It's not the DCS that establishes the allocation. It's simply a reflection.
Q. What sets out the allocation?
A. The ACR; and that's for planning purposes only because that allocation could change.
Q. And is it fair to say then that the allocations reflected on the delivery commitment schedules are not binding because they are based in turn on the allocations set out in the Annual Capacity Reports which say explicitly that they are not binding?
MS. SULLIVAN: Objection. Calls for a legal conclusion.
A. I really think that's a legal issue. We are really stepping beyond what I feel skilled enough to answer.



MR. SHAPIRO: Do you want to take a little break?
MS. SULLIVAN: Yes.
(A recess was taken from 2:25 p.m. to 2:40 p.m.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, you referred a couple times, I think, to instructions that were issued to help utilities complete their proposed delivery commitment schedules. Do you recall that there was a revision to the instructions when you were in the waste acceptance division?
A. No.
Q. You don't recall then why the instructions would have been revised?
A. No.
MS. SULLIVAN: Objection. Foundation.
Q. If the instructions were revised, it probably went through you?
A. Depending on --
MS. SULLIVAN: Objection. Foundation.
A. -- when it was done.
Q. If they were revised September 10 of 1993?
A. That would probably be a good



assumption.
Q. That you would have been involved. You just don't recall it?
A. Correct, I don't recall.
Q. Let's change subjects to something that was also mentioned just briefly a few minutes ago, the provision in the contract providing for exchanges of approved delivery commitment schedules. What was your understanding of the purpose of such exchanges?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. My understanding of provision for exchanges was to provide the utilities with flexibility in terms of altering their position in a cue.
Q. Would it be fair to say that the exchange provision was intended to enable utilities to optimize the scheduling of their delivery of spent fuel to DOE?
MS. SULLIVAN: Objection. Vague.
A. I think I would have to have a better definition of the word optimize. I mean, optimize in what sense?
Q. Let me show you a letter which has a

we may or may not get which may or may not address issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the



program?

A. No.

Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?

A. Yes.

Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?

A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.

Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?

A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.



Q. I believe Mr. Shapiro has asked you previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.

Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?

A. I am positive it's in the DCS instructions.

Q. Could you turn to Exhibit 10, please, to your deposition.

Are these the DCS instructions to which you are referring?

A. Yes.

Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?

A. Give me a minute.

Q. Sure.

A. Page 2, number 7E, the last sentence.

Q. Could you read that for me, please?

A. Exceeding the allocation will result



in disapproval of the DCS.

Q. Thank you.

While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?

MR. SHAPIRO: Objection. Vague.

Q. Do you want me to clarify the question?

A. Please.

Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?

MR. SHAPIRO: Objection. Vague.

A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.

ever get that 3 MTU allocation back to enable them to deliver all of their spent fuel to DOE?

A. If my recollection serves me correctly, and I would need to go through and really review this document, but my understanding is that they would commute to the end of the cue.

Q. My question is: Would they ever get back on the cue? Don't you only get onto the cue based upon discharges of spent fuel, and that if you give up an allocation based upon a discharge, you can't get that allocation back because you only discharge a final time once?

Do you understand what I'm asking?

MS. SULLIVAN: Objection. Vague.

A. I'm not really sure. I think -- let me see if I can put it this way. You don't lose your ability to deliver that fuel. What you are in essence giving up is your ability to deliver it in that year, and other people have theoretically already submitted DCSs and have slots in the cue, so you move to the end of the cue. You will still deliver it.

Q. You move to the end of the cue as the cue stood at the time you waived that particular allocation?



A. Correct. That would have been my intention.

Q. Can you point me to a part of the contract for the DCS instructions that leads to that result?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. No, I can't at this time.

Q. Ms. Sullivan also asked you about the delivery commitment schedule instructions. Can you point me to a provision in the contract that calls for or even permits DOE to issue instructions to utilities as to how to complete the delivery commitment schedule form?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. No, at this point I can't point you to a provision in the contract.

Q. Do you have any understanding of the basis on which the delivery commitment schedule form instructions were issued?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. Actually, from sitting on the utilities side of the table, the utilities had



asked if we would work with them to provide them with a better understanding of how to complete the form. This was a cooperative effort, mutually agreed to by both sides. That's why we took the time once we had drafted instructions to go back over and discuss the instructions with them and get comments.

Q. Did you view the DCS instructions as guidance to utilities as to how to fill out their delivery commitment schedule forms or did you view the instructions more directly as requirements for how the forms must be filled out by utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

You may answer.

A. I view the DCS instructions as my expectations for what it would take in completing these forms in order for me to approve a DCS. For example, if I told them, which I did on page 2, section 7, section E, that if they exceeded their allocation I would disapprove the DCS, I view that as an instruction.

Actually, that point is also made clear on page 5, item number 2.5, that says: The total quantity of SNF designated for delivery



must not exceed the allocation in the ACR. Exceeding the allocation will result in disapproval of the DCS (S).

This is Exhibit 10.

Q. Do you recall whether you ever disapproved a proposed delivery commitment schedule for any reason other than the proposed schedule exceeding a utility's allocation of spent fuel acceptance?

A. No, I don't.

Q. I am not sure that -- maybe I didn't ask the question quite clearly enough.

You don't recall whether you did or you recall that you didn't disapprove any for any other reason?

A. I do not recall whether I disapproved additional DCSs for reasons other than having exceeded the acceptance allocation.

Q. We have been talking about you approving or disapproving delivery commitment schedule forms submitted by utilities. Technically, wasn't it the contracting officer who was doing the approval or disapproval?

A. Yes, but as the contracting officer's technical representative, it was my responsibility

by virtue of my signature to make a recommendation.
Q. And as a practical matter, you were in fact the person who was approving or disapproving; wouldn't that be a fair statement?
A. Well, I can't make that statement. That's to imply that the contracting officer had no role whatsoever and did no review.
Q. Did the contracting officer ever disagree with one of your recommendations concerning the approval or disapproval of a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question one of your recommendations to approve or disapprove a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question any of your recommendations that you made in your role as COTR?
MS. SULLIVAN: Objection. Vague.
A. That's a lot of history and a lot of time. Unless you can be more specific, I am not sure I can answer that question.



Q. I am just asking for your recollection. Do you recall any instance when the contracting officer questioned a recommendation?
MS. SULLIVAN: Objection. Vague.
A. I recall instances where the contracting officer and I discussed issues related to implementation of the Standard Contract including, for example, the DCS instructions. I don't recall specifically that the contracting officer ever took serious objection, significant -- ever had a significant objection to my recommendations.
Q. What was the nature of your discussion with the contracting officer concerning the delivery commitment schedule instructions?
A. We would have -- I don't recall the specific nature of the discussions, but I recall having discussed the fact that collaboratively the industry -- and we believed that there was a greater chance of the industry completing their DCSs accurately and having them approved on the first try if they clearly understood our expectations for what it took to successfully complete a DCS. I remember being told that that was a good idea.



I remember transmitting the DCS instructions to the contracting officer for his review, or her review, I can't remember who the CO was now at that point, and we would have gotten comments back from them, incorporated those, held additional discussions if we needed to, and the contracting officer -- these are not things we would have done unilaterally. Absolutely not.
Q. You mean the delivery commitment schedule instructions were not something that the waste acceptance division would have sent out without at least consultation with the contracting officer?
A. And his approval or her approval.
Q. Was there anyone in the contracting office besides Beth Tomasoni who you dealt with on issues concerning the Standard Contract?
A. I'm searching my memory for names.
What was Liotta's first name?
Q. Richard?
A. Rich Liotta, and I always want to say Ray Liotta because of the actor. Rich Liotta, Nick Graham, who I believe worked with Beth. That's all that springs to mind at this point.
MR. SHAPIRO: That's all the questions



I have.
THE REPORTER: Reading and signing?
MS. SULLIVAN: Yes, reading and signing.
Off the record.
(Thereupon, at 4:35 p.m., the taking of the instant deposition was ceased.)
- - - - - -

Signature of the Witness

SUBSCRIBED AND SWORN to before me this day of , 20 .

NOTARY PUBLIC

# TREBULES

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X YANKEE ATOMIC ELECTRIC COM
(98-126C)(Merow, S.J.) : CONNECTICUT YANKEE ATOMIC
(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER
(98-474C)(Merow, S.J.) : FLORIDA POWER & LIGHT COMP
(98-483C)(Wilson, J.) : NORTHERN STATES POWER COMI
(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE E
(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMI
(98-486C)(Hodges, J.) : SACRAMENTO MUNICIPAL UTILI
(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING
(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COM
(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY
(99-447C) (Allegra, J.) : GPU NUCLEAR, INCORPORATED
(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER CO
(00-697C)(Merow, S.J.) : POWER AUTHORITY OF THE STA
(00-703C)(Damich, J.) : I OMAHA PUBLIC POWER DISTRI
(01-115C)(Bush, J.) : NEBRASKA PUBLIC POWER DISTR
(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHO
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :1 - 241



THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458



April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

answer them as best you can.
A. Okay.
Q. If at any time you don't understand a question, it's probably because I've misphrased it or I'm not making any sense. So, just stop me, ask me to ask the question again or rephrase the question so it makes sense to you.
A. (Nods head).
Q. Also, because the court reporter can only take down what we say and not any gestures or physical answers like nods of the head, you know, in other words, what I'm saying, your answers have to be verbal.
And also because she can only take down what one person is saying at any one time, it's important that I try not to talk over your answers and, you know, wait until I finish the questions just so that she can get down exactly what's been said and there's not two people trying to talk at one time.
A. (Nods head).
Q. So that the record is accurate.
A. Okay.
Q. And if at any time you need a break for



whatever reason, as long as a question is not pending, I would be more than happy to accommodate you in taking a break.
A. (Nods head).
Q. Could you just quickly just describe your education after high school.
A. All right. I went to Ohio University for five years. I got a degree in engineering and a bachelor's degree in physics. I then did graduate work at Lehigh University in Bethlehem, Pennsylvania. I got a master's degree in mechanical engineering.
Q. And when did you receive that final degree?
A. 1972 I graduated from Lehigh.
Q. And that was the master's?
A. Yes. Master's degree in mechanical engineering.
Q. Okay. When did you first -- strike that.
Do you presently work for the Department of Energy?
A. Yes, I do.
Q. Okay. When did you first -- when did you start working for the Department of Energy?



A. Actually, I started working for the Atomic Energy Commission in 1972, which became the Energy Research and Development Administration, which became the Department of Energy. I don't remember the exact year ERDA became the Department of Energy. I think it was about -- I don't remember.
Q. Okay. But you were there when the Department of Energy was first formed it sounds like?
A. Yes. Yes.
Q. What was your first position in the Department of Energy?
A. The Department of Energy or the Atomic Energy Commission?
Q. I'm going to start with the Department of Energy.
A. Okay. Again, I don't remember exactly when name changed, but I spent the first five years working for the Pittsburgh Naval Reactors Office after I graduated from college, and then I transferred to the Atomic Energy Commission headquarters in Germantown, Maryland and I worked in the Office of Nuclear Energy Programs.



Q. In the Office of Nuclear Energy Programs, did your responsibilities include the handling of spent nuclear fuel at that time?
A. The handling of spent. No, we never handled any spent nuclear fuel.
Q. All right. I will rephrase that. Did your responsibilities include the disposal of spent nuclear fuel?
A. We did planning for activities involving radioactive waste and spent nuclear fuel. We never actually handled, though, any material.
Q. Could you briefly describe what the planning you did entailed that involved the disposal of radioactive waste and spent nuclear fuel.
MR. SHULTIS: Objection. Could we get a little more specific on the time period we're talking about here? I think that's important.
MR. EIDUKAS: I'm talking of the time period where you were at the Office of Nuclear Energy Programs, and I believe the witness has said he doesn't know a specific date when he was doing this.
BY MR. EIDUKAS:

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.
A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.
Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that



involve planning for the disposal of those wastes in a deep geologic repository?
MR. SHULTIS: Objection, relevance.
BY MR. EIDUKAS:
Q. Generally, when your lawyer objects --
MR. SHULTIS: You still have to answer.
BY MR. EIDUKAS:
Q. You still have to answer unless he instructs you not to, if you're able to.
A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.
Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?
MR. SHULTIS: Objection, relevance.
THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for



the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.
BY MR. EIDUKAS:
Q. At some point did your position at either ERDA or the Department of Energy change?
MR. SHULTIS: Objection, vague.
THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.
BY MR. EIDUKAS:
Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?
A. That's correct.
Q. What was your first position at the Office of



Radioactive Waste Management?
A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.
Q. What did that position entail? What were your responsibilities in that position?
A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.
Q. Was there anything else that your role entailed in that position?
MR. SHULTIS: Objection, vague.
THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.
BY MR. EIDUKAS:
Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

MR. SHULTIS: Objection, vague.
THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.
BY MR. EIDUKAS:
Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.
So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.
A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his



office for I think little over half a year as an adviser to the Secretary.
I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.
A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.
Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, asks for legal conclusion.
BY MR. EIDUKAS:



Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.
A. Not that I could remember.
Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?
MR. SHULTIS: Objection, vague.
THE WITNESS: I don't believe so. I obviously talked to people in the department, you know, who were talking to people, you know, involved in nuclear energy activities, but I don't know that I've ever had any conversations with anyone that was actually involved in drafting the Nuclear Waste Policy Act.
BY MR. EIDUKAS:
Q. Okay. Do you have an understanding as to what the intent of the Nuclear Waste Policy Act is?
MR. SHULTIS: Objection, asks for legal conclusion.



THE WITNESS: I'm not sure what you mean by intent of the Nuclear Waste Policy Act. Obviously I was familiar with some of the provisions and some of the requirements. As I said, my main job when I was in the Office of Civilian Radioactive Waste Management was to prepare the mission plan. That was clearly required by the Nuclear Waste Policy Act.
BY MR. EIDUKAS:
Q. I'll try to clarify what I mean. Do you have an understanding of what the primary purpose of the Nuclear Waste Policy Act is?
MR. SHULTIS: Objection, asks for legal conclusion.
THE WITNESS: My understanding of the Nuclear Waste Policy Act is that it laid out a blueprint for this country to follow to provide for the management and disposal of spent nuclear fuel and high level radioactive waste with a number of specific provisions.
BY MR. EIDUKAS:
Q. Are you familiar with the term standard contract?

just re-ask the question. Do you know whether it is the Department of Energy's position that it entered into contracts with utilities to begin accepting waste in 1998 on the basis that it would have a repository available for permanent waste disposal in 1998?

MR. SHULTIS: Same objections.

THE WITNESS: As I understand your question, the Department of Energy did enter into contracts and the date I believe you indicated was correct, 1983, on the basis that it planned to have a repository or it was planning to have a repository in operation by 1998.

BY MR. EIDUKAS:

Q. I'm done with that document. If you want to put that aside. You just want to turn it over. That way.

MR. SHULTIS: Keep in order.

BY MR. EIDUKAS:

Q. Keep in order if you have to refer back to something in the future.

Do you know what the parties to the standard contract intended with respect to how fast spent



nuclear fuel would be taken by the Department of Energy?

MR. SHULTIS: Objection. It asks for a legal conclusion, vague, asks for speculation.

THE WITNESS: Yeah. I do not know what the parties had intended in terms of the rate of waste acceptance. If you're referring to the utilities, I do not know that.

BY MR. EIDUKAS:

Q. Okay. Do you know what the DOE intended with respect to the rate of waste acceptance?

MR. SHULTIS: Objection, asks for a legal conclusion, speculative.

THE WITNESS: I would have to answer that as follows. I know what the plans were that the Department of Energy was working on to develop the facilities because I was primarily responsible for developing those plans. We had planned or our objective was to try to have the facilities, primarily the repository, online in operation by 1998. But, again, those were plans.

BY MR. EIDUKAS:



Q. And I'm sorry, were you done with your answer?

A. Yes.

Q. Okay. When you're referring to working on those plans in that answer, what time frame are you talking about?

A. The early schedules that we prepared indicated that we had hoped to have the repository in operation by 1998, but we clearly I guess the word would be identified caveats or issues or uncertainties associated with that because we, again, as I had indicated before, we recognized the schedules were optimistic and success oriented was the phrase we used to describe them. And we had also identified, as I think I indicated before, schedules for the MRS facility, if that were to eventually be authorized by Congress, that showed that that could go into operation at least by 1998, perhaps a year or two earlier.

Q. Okay. I think -- well, I think I may have misphrased my question. What I was trying to get at was: What was the time frame that you were working on the plans you had referred to? Are you referring to the mission plan, or is this something earlier than



that?

A. It was the mission plan again. We worked on that in 1984, and I think we published it after a round of public review and comment. I think we published it in June of 1985.

Q. Okay. And I think you said that you personally at least were primarily involved in the planning for the designing of the facility. Did I understand you correctly?

A. No, not the design. I was responsible for developing the overall plan, which included design, included some of the siting issues, some of the permitting issues, some of the institutional issues that we had to deal with, as well as the bulk of the activity at that time, though, was the scientific programs that we had to conduct.

Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: Again, going back to the

mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.

What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.

BY MR. EIDUKAS:

Q. Do you have any knowledge about whether there were waste acceptance schedules prepared or proposed prior to the mission plan?

MR. SHULTIS: Objection, asks for



speculation.

THE WITNESS: No, I have no knowledge of any waste acceptance schedules proposed prior to the mission plan.

BY MR. EIDUKAS:

Q. Just so I'm clear on the scope of your knowledge or your involvement, is it correct to say that your first involvement or encounter with waste acceptance schedules was when you began working on the mission plan in about 1984?

MR. SHULTIS: Objection, mischaracterizes witness's testimony.

THE WITNESS: Could you repeat the question, please.

BY MR. EIDUKAS:

Q. Sure. I'll rephrase it. I'm trying to make sure I understand whether or not your first involvement with waste acceptance schedules in connection with the Nuclear Waste Policy Act and the standard contract was when you began working on the mission plan in, I believe you said, 1984?

A. I don't remember the exact date, but I think I



joined the Civilian Radioactive Waste Management Program in 1984. And my first assignment was working on the mission plan and in that mission plan we did include proposed waste acceptance schedules.

Q. But you personally didn't work on waste acceptance schedules prior to that time? This is what I'm asking.

A. I do not remember working on any waste acceptance schedules prior to that time.

Q. When you joined the Office of Civilian Radioactive Waste Management and you said you were assigned to work on the mission plan, at that time had there already -- had work already been done on preparing the mission plan?

MR. SHULTIS: Objection, asks for speculation.

BY MR. EIDUKAS:

Q. If you know.

A. I honestly don't remember. I know it was a provision of the Nuclear Waste Policy Act, which I believe was passed by the Congress in December of '82, signed by the President in January '83. As I said, I



joined the program in '84. I don't remember if people had worked on that before I did, but I know that when I joined the program, that was the first assignment I was given.

MR. EIDUKAS: I'm going to go ahead and mark this as Number 3 and for the record I'm having marked Bates MS 069588 --

MR. STOUCK: 528?

MR. EIDUKAS: I'm sorry.

MR. STOUCK: I didn't hear.

MR. EIDUKAS: I'm sorry. I'll repeat. It's actually three pages. The first page is Bates number SN 069588D and then it skips some Bates numbers and then you have SN 069599 through 600. It's a document entitled "Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," December 12th through 15th, 1983 in Washington, DC and the date of the actual document is February 1984.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)

BY MR. EIDUKAS:

Q. Mr. Trebules, as you can see, this is three

49

pages from what appears to be a larger document. But if you can just take a moment to take a look at these and let me know if you're familiar with this.
A. (Pause). I note that from the two pages you gave me, it's only page 11 and 12. So I assume it was from a larger document.
Q. That's correct.
A. That's not included here.
Q. That's correct.
A. All right. I've looked over these two pages.
Q. Okay. Do you recall, have you seen these pages before?
A. I don't ever remember seeing these two pages.
Q. Okay. These refer to -- purport to refer to apparently a meeting or a conference that was held in mid-December 1983, during which Robert Morgan at the time appears to have been the Acting Director of Civilian Radioactive Waste Management gave this presentation or talk about the mission plan.
A. Right.
Q. Were you present for such a conference or meeting, whatever you want to call it?

50

A. I don't remember being at this meeting. I'm not even sure that I was working in the program at this time.
Q. Right.
A. This was in 1983.
Q. At the top of the middle page, page 11, on the right-hand side, the first full paragraph there says: "We have just received a preliminary draft of Volume I of the mission plan and we hope to have this available to interested parties, the states and others by Christmas."
Does that refresh your recollection as to whether or not work had been performed in preparing a mission plan prior to your arrival at the Office of Civilian Radioactive Waste Management?
A. I honestly don't remember that. I could only speculate that when he said we have just received a preliminary draft, it might have been a draft prepared by the support service contractor at the time, but I honestly don't remember that.
Q. Okay. I want to move down to that same column. It's the largest paragraph there on the

51

right-hand side.
A. Uh-huh.
Q. The paragraph starts out "I would like to talk a little bit about." You see that?
A. Yes.
Q. What I want to refer you to is about midway through that paragraph. There's a sentence that starts, "The basic strategy which we've outlined."
A. Yes.
Q. Okay. I just refer from there on to the end of the paragraph that says: "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at any -- I'm sorry -- or at another location." You see where it says that there?
A. Yes, I see that.
Q. Okay. Do you know whether that was -- or strike that.

52

Do you know was that the intent of the DOE at the time?
MR. SHULTIS: Objection, asks for legal conclusion. Mr. Trebules is not a 30(b)(6) witness, asks for speculation.
THE WITNESS: Again, as I understand your question, did I understand that to be the intent of DOE at the time. I don't believe I worked in the program at that time.
BY MR. EIDUKAS:
Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?
MR. SHULTIS: Same objections and relevance.
THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.

53

I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.

And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.

So, again, I'm speculating that when this

54

was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not it was the intent of the parties to the standard contract when they entered those contracts back in 1983 that fuel would be received at the repository at a rate that no utility would have to add any further storage facilities either on-site or at another location?

MR. SHULTIS: Objection, asks for a legal conclusion, calls for speculation.

THE WITNESS: As I think I heard your question, did I know the intent of the parties to the contract. Again, if you're referring to the utilities, I do not.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not the DOE had an intent -- had this intent when they entered into the standard contracts with the utilities?

MR. SHULTIS: Objection, asks for a legal

55

conclusion. Mr. Trebules is not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: Could you help me? Could you clarify what you mean by the word intent?

BY MR. EIDUKAS:

Q. Sure.

A. Because I know we had planning targets or objectives or goals that we were trying to meet, but I know there was concern about the characterization of those and we put in, as I said before, caveats as this document indicates, you know, that represented some of the difficulties. And as I say on page 11 where it says, at the end of the second full paragraph. "Our intent is to fully comply with the act in process and in technical mandates. However, if we must slip a date in the schedule to accomplish the requirements and intent of consultation, we will do so." Again, can you clarify your question by what you mean by intent?

Q. Sure. I mean, I think we're talking about DOE here because you said you don't know what the utilities intended. What I mean by intent is what the DOE expected to do when -- and I was talking and my

56

question was referring to the time that the standard contracts were entered into back in 1983. You may not know the answer to that, but that was my question.

MR. SHULTIS: Same objections as before. Legal conclusion, 30(b)(6) witness, calls for speculation.

THE WITNESS: Again, I would have to characterize my answer by saying that our planning targets or our objectives or our strategies were such that, you know, we tried to have the facilities in operation to take the field by 1998. You know, with the caveats that I previously indicated. If that's what you mean by intent, that's how I would answer that question.

BY MR. EIDUKAS:

Q. Look quickly at the section of this paragraph right above where we've been looking. Starting with the sentence "I think most of you know." Do you see where I'm referring to? It's the second sentence of that paragraph. "I think most of you know."

A. I see that.

Q. Okay. Great. "I think most of you know that

the Act requires that we receive waste from the utilities by January 1, 1998."

First of all, is that your understanding that the Act requires that DOE start receiving waste from utilities on January 1, 1998?

MR. SHULTIS: Objection, calls for a legal conclusion. Calls for speculation.

THE WITNESS: Again, my recollection -- I don't remember the exact wording in the Act -- is that there was a qualifier that, you know, once we had the facilities available to do that, specifically the repository and the MRS that we already talked about. But other than that, that's my understanding.

BY MR. EIDUKAS:

Q. Okay. The sentence and this paragraph goes on to say, "Technically, the act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."

Do you recall having any discussions back when



you were working on the mission plan as to regarding whether or not accepting one spent fuel element in 1998 would be in accordance with the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, calls for speculation. Asking for a legal conclusion.

THE WITNESS: As I understood your question, do I recall having discussions, the answer is yes. I was involved in many discussions or speculation as about what that meant and would accepting only one fuel assembly satisfy the intent of the act. And as best as I can remember, I don't know that we ever got a clear determination, you know, from those involved that that was the case.

BY MR. EIDUKAS:

Q. Did you personally draw any conclusions regarding that?

MR. SHULTIS: Objection, relevance. Calls for a legal conclusion.

THE WITNESS: Again, would you repeat the question. Did I?

BY MR. EIDUKAS:



Q. I'm sorry. You had said that you recall there being discussions regarding whether or not accepting one spent fuel element in 1998 would comply with the Nuclear Waste Policy Act.

My question was whether or not you personally reached a conclusion as to whether or not accepting only one spent fuel element in 1998 would comply with the act?

MR. SHULTIS: Same objection.

THE WITNESS: I'm not quite sure how to answer that because at the time I was, you know, a fairly low level staff person. I was given an assignment. So I'm not sure if my conclusion would have mattered much. I mean, I'm not trying to be frivolous, but I don't know that I consciously thought of the implications of that at the time. I mean --

BY MR. EIDUKAS:

Q. Have you -- I'm sorry. I was going to ask you whether or not you have since come to such a conclusion or thought about the implications.

MR. SHULTIS: Same objections and relevance.



THE WITNESS: I think I would personally feel that one could argue since the Act was not specific, if we only accepted one fuel assembly, you know, we met the intent of the words. However, I also would be sympathetic to the additional phrase in here that where it says, "However, we did not believe that that meets the intent of the Act."

I believe the intent of the Act was for the government to develop the facilities to solve the nuclear waste problem, which isn't accepting just one assembly, and we were to develop the facilities. And we were trying to do that as expeditiously as we could, you know, to really deal with the overall problem of the accumulation of spent fuel.

BY MR. EIDUKAS:

Q. Okay. And was there ever a schedule or plan developed that called for only receiving one spent fuel element in 1998?

MR. SHULTIS: Objection, calls for speculation. It's vague.

THE WITNESS: I don't ever remember developing a schedule that only called for one assembly

in 1998.
Could we take a break?
MR. EIDUKAS: Yes. Off the record.
(Recess, 10:49 to 11:00 a.m.)
BY MR. EIDUKAS:
Q. Mr. Trebules, before we went off the record, we were discussing whether or not accepting one spent fuel element in 1998 would comply with the Act, and you I believe testified that back when you were working on the mission plan that you had discussions regarding whether or not doing so would comply with the Act; is that correct?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I'm not sure I said it was when I was working on the mission plan. During the period I've been working on the program over the 18 or 19 years, I've been involved in discussions where people speculated as to whether or not accepting one fuel element meant intent of the Act, and I think I said I don't know that we ever clearly resolved that. But as the previous document you've shown me indicated,



we had people that said that they don't think that would meet the intent of the Act.
BY MR. EIDUKAS:
Q. Who did you have these discussions with?
MR. SHULTIS: Objection. Calling for facts not in evidence.
BY MR. EIDUKAS:
Q. Well, did you have these discussions?
A. I remember participating in those kind of discussions, and I'd only be guessing, you know, if I identified names of individuals. You know, other than people like, you know, Alan Brownstein, who was much more involved in the contracts issues than I was. But over my 18 years in the program, I've worked with, you know, hundreds of people that have been in and out of the program and, I mean, it's a list of people. Again, I'd only be guessing to remember who exactly I discussed it with, you know, at those various meetings over the 18 years.
Q. So, other than Mr. Brownstein, you have no other recollection of a specific person you had these discussions with?



MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Other than Al Brownstein, I'd only be guessing if I identified any more names. I mean, I can think of a long list of names, but I could not relate those to particular meetings or discussions where we talked about this. I believe I heard Lake Barrett discuss in various staff meetings that that could be argued that we meet, you know, the intent of the Act, but, again, I couldn't relate that to a specific time or place.
BY MR. EIDUKAS:
Q. Okay. Do you recall anyone -- strike that.
Did you personally discuss that issue with Mr. Barrett?
MR. SHULTIS: Objection, asks for speculation. Asked and answered.
THE WITNESS: I don't ever remember personally discussing that with Mr. Barrett. As I said, I believe he probably mentioned it in staff meetings or something like that, but, you know, it wasn't a conversation between just he and I.



BY MR. EIDUKAS:
Q. Okay. Do you remember any responses to Mr. Barrett's statements about that?
MR. SHULTIS: Objection, calls for speculation, asked and answered.
THE WITNESS: Again, I could only remember general discussions where people speculated as to whether or not that would meet the intent, and I don't remember any specific conclusions one way or another.
BY MR. EIDUKAS:
Q. Do you recall specifically what you discussed about this issue with Mr. Brownstein?
MR. SHULTIS: Objection, calls for speculation. Asked and answered.
THE WITNESS: No, I don't remember any the specific issues that I may have discussed with Al Brownstein about.
BY MR. EIDUKAS:
Q. I just want to go back over something background wise I forgot to do at the beginning of the deposition. Did you do anything to prepare for today's deposition?

picture of a person standing next to a fuel assembly before it got inserted into a reactor. I essentially wrote that first chapter.

I was heavily involved in the second chapter, which was sort of the strategy, which we talked about before, laid out the authorized system and the improved performance system. Although I remember Tom Isaacs provided a lot of the direction as to how that chapter should be structured and what it should say.

I compiled the table of assumptions that went into that second chapter. Sort of give people an understanding of the magnitude of the issue that we were dealing with. It talked about the quantities of spent fuel, the modes of transportation, the number of repositories, you know, some of the parameters. The waste acceptance schedule, that was also included in Chapter 2.

And then I wrote a lot of the response to comments in the comment response document that we prepared, and again all these had to be reviewed by my management, and ultimately the director of the program before it got published.



MR. EIDUKAS: Mark this as 4.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I have marked as Exhibit 4 -- this version doesn't have Bates stamps on it. This is a December 20, 1983 marked as "Draft, Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans." This appears to be a December 20, 1983 draft of the mission plan. Are you familiar with this document?

A. Could I have a few minutes to look at it?

Q. Sure, sure.

A. (Pause).

MR. SHULTIS: Ted, ours has Bates numbers.

MR. EIDUKAS: Let me read it into the record. For the record, the Bates stamp of the exhibit is CTR-042-1065 through 1190. Thank you.

(Counsel and witness conferring).

MR. EIDUKAS: There's a question pending. If you want to ask questions of the witness, you can ask them on the record, but I prefer you don't have



these consultations while there's a question pending.

MR. SHULTIS: What is the question pending?

MR. EIDUKAS: Are you familiar with this document, and you'll have a turn to ask questions of the witness when I'm done.

THE WITNESS: I'm ready to answer.

BY MR. EIDUKAS:

Q. Sure. I believe the question was: Are you familiar with this document?

A. To be honest with you, I don't remember specifically seeing this document before. I believe this was probably prepared before I joined the Civilian Radioactive Waste Management Program. However, I'm very familiar with some of the material in here and the reasons why we changed it in the eventual mission plan that got published in June of 1985.

Q. Okay. Would you describe what was changed --

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. -- that you're referring to in your earlier answer.



A. Just very briefly, in looking at Chapter 1, for example, just skimming through it, this only has, for example, two pages and I believe in the version that I was responsible for, the one that got issued in June of '85, we had a much more extensive discussion in Chapter 1 on, as I indicated before, the types of wastes. We had a picture of the fuel assembly, you know, as to what it looks like, you know, before going into a reactor. We talked about other kinds of waste that we might have to deal with. The high level waste that came from the DOE operations.

Chapter 2, for example, looks like an early, early version of the strategy, which I think bears no resemblance to the one that ultimately got published in June of '85 where we talked about the authorized system and the improved performance system. This does have an early version of a waste acceptance schedule, but it's got numbers that were changed significantly from the one that got published in June of '85.

So, again, I mean, it's obviously an early version of the mission plan. I can't say for certain whether this is the one that was issued for public

review and comment. I would think not, but it's significantly different than the one that got published in June of '85.

Q. I can't recall if you answered this or not. Do you know whether or not -- do you know who prepared this version, this draft of the mission plan?

A. No.

MR. SHULTIS: Objection.

THE WITNESS: I do not know specifically who prepared this.

BY MR. EIDUKAS:

Q. Okay. And I think this follows from what you testified, but do you know whether or not this draft of the mission plan was used in any way in preparing the later drafts and the final mission plan?

A. I don't know. I don't remember how it was used. I mean, normally the process is, you know, drafts evolve, you know, through successive iterations. I'd only be guessing, but I'd assume that is what happened with this one.

Q. When you referred to Chapter 2, you said this was an early version of the strategy and didn't include



the authorized plan and the approved performance plan, but the final version of the mission plan did. Do you know why that was changed?

MR. SHULTIS: Objection, calls for speculation. Asked and answered.

THE WITNESS: I believe, as I indicated, Tom Isaacs was the primary author or inventor of the approach in that strategy chapter where we felt we had to clarify, as the names imply, what the department currently had authorization to execute. At the time that was the first repository in the transportation system, and we included discussion in the improved performance plan as to how that system could operate if we proposed and Congress accepted our recommendation on incorporating a monitored retrievable storage facility.

So we wanted to expand on and clarify that discussion, which I don't see in this document that you've provided me, the one dated December of '83.

BY MR. EIDUKAS:

Q. And you referred to a waste acceptance schedule. Is that the -- were you referring to the table that appears on page 2-3?



A. Yes.

Q. Okay.

MR. SHULTIS: You want to identify the Bates number?

THE WITNESS: CTR-042-1072.

BY MR. EIDUKAS:

Q. Is that the schedule that you were referring to?

A. Yes.

Q. Okay. And you said that this was changed in the eventual mission plan that was published?

A. Yes. This table doesn't look familiar to me, and I think the one that got published in the version of the mission plan in June of '85 was -- is different.

Q. So I take it you don't know the source of this waste acceptance schedule on page 2-3?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: I don't remember the source. I don't know.

BY MR. EIDUKAS:

Q. And I think you said you don't recall seeing



this schedule before?

MR. SHULTIS: Go ahead.

THE WITNESS: I don't specifically recall it. I may have, but I don't -- I mean, I don't recollect it at all.

BY MR. EIDUKAS:

Q. Why don't we put this one aside for now. I may come back to this one later.

A. Okay.

MR. EIDUKAS: Would you mark this as Exhibit 5.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 5.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had marked as Exhibit 5 a document titled "A Mission Plan for the Radioactive Waste Management Program, Volumes 1 and 2 of Two Volumes, Overview and Current Program Plans." This appears to be -- and it's dated April 1984 up in the right-hand corner. It says that it's a draft that was reprinted in July of 1984. Feel free to take a look at this.

My first question is going to be: Are you familiar with this document? I can also say for reference that this was the same document that was marked as Exhibit Number 11 of Mr. Robert Morgan's deposition.

MR. STOUCK: Can you give us Bates numbers?

MR. EIDUKAS: There are no Bates numbers on the document.

THE WITNESS: (Pause). All right.

BY MR. EIDUKAS:

Q. Are you familiar with this document?

A. Yes, I am.

Q. Is this a draft of the mission plan that you worked on?

A. Yes, it is.

Q. Okay. Turn to page Section I-Introduction. It has in the upper right-hand corner page 1-1. Is this a section that you drafted?

A. That I don't remember.

Q. I guess I'll back up a second. On this particular draft that is marked as Exhibit Number 5,



what specifically was your role in preparing this document?

A. Well, that's tough to answer. Again, when I got there, the mission plan work was underway. I don't remember exactly when or where I picked up because, you know, this is like 16, 17 years ago. I do remember, I believe this is the document that went out for public review and comment. As the cover letter indicates, signed by Mike Lawrence. As I indicated, the comments were due back to Charlie Head, who was my supervisor at the time.

Once we -- and I remember, you know, after this document much clearer that when the comments came back in, we revised some of these chapters and I did write the next version of this Chapter 1, for example, which was much more extensive with the pictures in it and the waste sites. To be honest, I may have been involved in structuring some of these words back then, but this is just about the time when I was, you know, coming into the program to work on it.

We made a lot of changes in response to those comments such as Chapter 1. We changed the strategy



chapter significantly, and I remember very clearly working on, you know, writing sections of the document after this version. To be honest with you, I don't remember exactly what I did with this document because this was the one that had been under work and went for public review and comment.

Q. Okay. Do you know who drafted this Section I of this draft?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: No, I don't remember specifically who might have drafted this.

BY MR. EIDUKAS:

Q. If you look down that second paragraph, page 1-1, the last sentence says, "The program developed by the department to fulfill the requirements of the Act is described in this mission plan."

A. I see that.

Q. Okay. Do you agree that the mission plan describes the program developed to fulfill the requirements of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal



conclusion.

THE WITNESS: I believe that's the case, but I would point out, though, that this was a draft document that went out for public review and comment and does not reflect the final version of the mission plan, which was the June '85 version of the plan.

BY MR. EIDUKAS:

Q. Okay. The sentence in that paragraph says, "Specifically, the following program objectives have been identified to implement the Act," and then it lists five numbered program objectives.

Is it your understanding that these program objectives would fulfill or would implement and fulfill the requirements of the Act?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Give me a second to review them, please.

BY MR. EIDUKAS:

Q. Sure.

A. As I recollect, these are the objectives that the department identified, which they thought would

THE WITNESS: Again, I'm not familiar with the provisions of the contract that, as these words indicate, that included the development of a waste acceptance schedule. I was involved in the subsequent development of the waste acceptance schedules that we used for planning purposes, which we put in the following version of the mission plan that got published in June of '85.

BY MR. EIDUKAS:

Q. Okay.

A. But I'm not clear at all as to the relationship of that to the contract, to the provisions of the contract.

Q. Okay. So if you'll just turn to the back side of that page you're looking at, there is a Table 2-1 Waste Acceptance Schedule.

A. Right.

Q. Did you have any involvement in preparing this particular schedule?

A. As best as I could recollect, I believe I did and, as I indicated, this is -- if I could refer back to the previous --



Q. Sure.

A. -- version that you gave me. The previous document.

Q. You're looking at page 2-3 is the table in that?

A. Yeah. I noted very quickly some changes. For example, in the previous exhibit, okay, if you note that this one began with acceptance rates for the first repository starting at 1800 metric tons, okay, for five years. Then it ramped up to 3,000 metric tons. Again, as best as I could recollect, upon reflection of this ramp-up rate, it was determined that was probably optimistic and unrealistic.

So, in Exhibit 5 that you just gave me, if you note the difference in the first repository acceptance rates, it started out at 400 metric tons, a much lower rate, a gradual ramp-up to 3,000 metric tons. And as I think I've previously indicated in some of my earlier answers, you know, my recollection of the first waste acceptance schedule we published started at 400 metric tons. So I am familiar with the ones in Exhibit 5, but I wasn't familiar with the ones in Exhibit 4.



Q. Okay. Talking about the schedule in exhibit -- strike that.

I think you said that the ramp-up period was revised downward in the schedule in exhibit -- between the schedule in Exhibit 4 and the schedule in Exhibit 5. You said it started at 400 rather than the 1800 metric tons that's set forth in Exhibit 4, and I think you characterized it in order to make it more realistic or probable.

My question is whether or not it's your opinion that the schedule set forth in Exhibit 5 is a realistic schedule?

MR. SHULTIS: Objection, calls for characterization. Legal conclusion.

THE WITNESS: Let me try to correct one thing you said. You said the ramp-up period was revised downward. It's the ramp-up rate that was revised downward.

BY MR. EIDUKAS:

Q. Thank you. That's correct.

A. I think I recollect discussions, you know, back again some 16, 17 years ago where people looked at



bringing a nuclear facility online like the waste receiving facilities of a repository and recognizing that it needs a gradual ramp-up rate before it reaches its full capacity steady state operations. And when we compared the numbers in Exhibit 4 to Exhibit 5, as we just discussed, you know, the ramp-up rate in Exhibit 5 is more gradual and I think in many people's minds, particularly the engineers that were working on it at the time, probably more realistic.

Q. Okay. Who did you have those discussions with, if you can recall?

A. Again, the only names I remember at the time the people I was talking to were people like Charlie Head, who was my immediate supervisor, who is the name indicated in this cover letter to provide comments to. He was, you know, back then he was the one that I talked to most of the time about the work on the mission plan.

Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:
Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?
MR. SHULTIS: Objection, vague. Asks for a legal conclusion.
THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.
As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.



So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.
We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.
Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,



which is indicated in the column on the far right.
You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.
BY MR. EIDUKAS:
Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.
I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?
MR. SHULTIS: Objection, vague.
BY MR. EIDUKAS:
Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm



trying to get at what, I guess, first the source for these numbers?
A. Okay.
MR. SHULTIS: Objection, compound.
THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.
There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons

and then the other 70,000 metric tons would go in a second repository.

It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.

And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the



maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule or no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to date because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, that equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodation of all these interrelated factors.



But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.



BY MR. EIDUKAS:

Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.

My question is: What was the source of that objective? Why was that an objective you had?

A. Okay. Could you give me a minute --

Q. Sure.

A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?

Q. It's Number 3.

A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage

facilities on-site."
It goes on to say, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location." And if you look at the progress of these documents, this one dated --
Q. February '84?
A. -- February '84 but reflecting a meeting in December of 1983, and Exhibit 4 in the draft mission plan dated December 20, 1983, which had that more optimistic waste acceptance schedule with the higher numbers. Starting in 1998, 1800 metric tons for a few years. Then rising to 3,000 metric tons.
You can see how that realization that that might have been too optimistic evolved because in the exhibit, the last exhibit you gave me, Exhibit 5, those numbers have been adjusted downward. You know, the ramp-up rate to the numbers, you know, showing beginning at 400 metric tons ramping up to 900, 1800, 3,000 metric tons. But that was an objective, you know, to try to accommodate the nuclear power plants



and not have them generate or not have them have to add any on-site storage.
Q. I think you said when you started, someone gave you that language or told you that language. Do you know who it was?
MR. SHULTIS: Object.
THE WITNESS: I don't remember specifically, but it's similar to what, you know, appeared in that other exhibit.
BY MR. EIDUKAS:
Q. Robert Morgan?
A. And that became sort of a program -- again, it was a program objective that we were trying to meet.
Q. Okay. Do you know why that was a program objective?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: Yeah. I would be speculating. I mean, I'm inclined to answer and say that, you know, we were trying to accommodate the utilities, who are in fact our customers. That's what the program was designed, you know, to deal with, which



is the spent fuel being generated by nuclear power plants. And we knew it would be a financial burden for them to add on-site storage. So we were trying to develop a program, again, to accept waste in 1998, but again with all the caveats that that was optimistic and success oriented.
BY MR. EIDUKAS:
Q. Okay. And just again while we were comparing the acceptance schedule in Exhibit 4, the December 1983 draft, and the waste acceptance schedule in Exhibit 5, the 1984 draft, you said the ramp-up rate was revised down between Exhibit 4 and Exhibit 5, but the steady state rate or the maximum rate is 3,000 in both documents, correct?
A. That's correct.
Q. Okay.
A. Steady state rate is 3,000 in both documents.
Q. So that remained a constant at this point in time as to what was planned for the repository's acceptance rate to be?
A. That's my recollection, that's right.
Q. Okay. Focusing on Exhibit 5, it's like the



page on the other side of the acceptance schedule. It's 2.1 we had looked at a little earlier. There's that section there we were looking at, the middle of that first paragraph where it talks about developing a waste acceptance schedule.
The next sentence, which I didn't read, says that -- and feel free to circle that or mark that if it helps you keep track of this. It says, "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories and will be maintained by the department."
Is it your understanding that, again, this is referring to what you've discussed already, but is it your understanding that the acceptance rate that's found on the next page is based on the emplacement capacity projected for the repositories?
MR. SHULTIS: Objection, calls for legal conclusion.
THE WITNESS: Let's see. The sentence reads "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories." That's what we talked about.

The first one beginning at 400 ramping up to 900, 1800, to the -- as you said, steady state of 3,000. The second repository starting a few years later at 1800 metric tons for five years. Then reaching a steady state rate of 3,000 metric tons. Those were our planning assumptions at the time.

However, as I indicate and it goes on to say, "and these will be maintained by the department." I know, for example, that after this April 1984 Exhibit 5 version, when we published the mission plan in June of '85, we did also include waste acceptance schedules. We had I think two. One reflecting, as I previously indicated, the authorized system and another one reflecting the improved performance system. So we did, you know, continue to examine and evaluate waste acceptance schedules beyond Exhibit 5.

BY MR. EIDUKAS:

Q. Okay. I was referring back to that sentence we've been looking at here. It seems to be suggesting that the acceptance rate that's found on the next page in the schedule is based -- it says, you know, based on the emplacement capacity currently projected.



I guess what I'm trying to understand is whether or not this rate reaching the steady rate of 3,000, is that based on, you know, taking the design the way that the repository was designed at this time and determining what this sentence called the emplacement capacity was. In other words, how fast could they accept waste there and that's how the schedule was developed.

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Yeah. I think I indicated as best as I could what we considered or what the objectives were in developing the waste acceptance schedules, and then that in turn would be used as input to the designers who design the facilities to meet or, you know, accomplish those objectives. You could design the facilities to operate at different rates if that was required, but these waste acceptance schedules would be used as designed input into that process for those facilities.

BY MR. EIDUKAS:

Q. I guess maybe that's what my question is



getting at. What came first, the objective or the design in terms of these rates. Was the objective given and then the design built around that objective, or did you take what the design was and then back out what can this design accommodate?

MR. SHULTIS: Objection, asked and answered.

BY MR. EIDUKAS:

Q. If you know.

A. I honestly don't know. I mean, I would probably have to research that, you know, to see what we talked about in the design area of the repositories. Again, my familiarity is working on the waste acceptance schedules, you know, to accomplish the two objectives that I previously talked about.

MR. EIDUKAS: Okay. It's approximately -- off the record.

(A lunch recess was had, 12:15 to 1:22 p.m.)

AFTERNOON SESSION

(Mr. Stouck not present.)

BY MR. EIDUKAS:

Q. I want to refer back to the first document we



looked at today, which was the copy of the standard contract. And I want to also -- I want to look at that in connection with the acceptance schedule that is in Exhibit 5 that we were looking at, which would be on page 2-2.

My question is, I'm referring to the part of the standard contract we looked at earlier this morning that talks about: "The DOE has the responsibility following commencement of operations of a repository to take title to the spent nuclear fuel or high level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel."

My question is: When you were developing or working on the waste acceptance schedule that's in Exhibit 5, was there any discussion as to whether or not that schedule was designed to meet this requirement that the DOE take title to the spent nuclear fuel as expeditiously as practicable?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: Your question was, was there

executing the program. You know, we had to make decisions on -- actually at that time one of the big decisions was which sites were we going to examine. I think we were looking at -- it was called nine first ground sites. Looking at a site in Hanford, Washington, the Yucca mountain site, we were looking at two sites in Texas, we were looking at some sites in Utah, in Louisiana and Mississippi.

So, one of the decisions would be, you know, of those nine, which ones are you going to identify for further work. That was a major decision that we knew about at that time. There were decisions to be made on the design of the repository itself and how it was going to operate. Decisions on the type of waste package. You know, the licensing strategy.

I mean, the amount of public involvement was another one. So there were big decisions that we were well aware of even at that time that needed to be made, and the intent was, you know, decision-makers within the Department of Energy and subsequent administrations.

Q. Did you have any understanding as to whether



or not utilities would be relying upon this information?

MR. SHULTIS: Objection, calls for legal conclusion, speculative.

THE WITNESS: I think the best way we could answer that is indicate when we sent the draft of the mission plan, I think we sent two drafts out for public review. Looks like this earlier one I think was worked on before I got there. When they were sent out for public review and comment, that included the utilities. And I'd have to go back and look in the comment response document, but I'm fairly certain that we got comments from either individual utilities or groups of utilities at the time.

So, one of the major operating parameters for this program compared to other DOE programs is this one was done, you know, with full public disclosure. There was no classified information, you know, no nothing like that. So, most of the information we developed was made available to the public. We accepted comments from everybody. As I said, I think we got over 100 comment letters, some 2,500 comments,



and I'm fairly certain that that included comments from utilities at that time.

BY MR. EIDUKAS:

Q. And, in fact, if you look at the bottom of that letter, we had talked about earlier about the December 1983 draft of the mission plan. The paragraph that starts at the bottom of the first page of that cover letter says that "This draft mission plan incorporates changes in response to comments on a preliminary version of Volume 1 distributed on December 20, 1983. The department issued that preliminary version in order to obtain input from the states, affected Indian tribes, the Nuclear Regulatory Commission and other Federal agencies early in the preparation process."

Does that refresh your recollection as to whether or not -- what that December 20, 1983 draft we looked at was used for?

MR. SHULTIS: Same objection.

THE WITNESS: Yes. I think I answered that, but I'd also have to go back and check my personnel records, but I think that earlier version was



issued, was compiled and issued before I joined the Civilian Radioactive Waste Management Program. I do remember working on the subsequent volume, Exhibit 5.

BY MR. EIDUKAS:

Q. Okay.

A. Okay. And then the final mission plan, the one that was published in June of '85. But I don't remember working on this first one, Exhibit 4.

Q. And I believe you testified -- and if I'm mischaracterizing your testimony, please correct me -- that you were talking about and you were comparing Exhibits 4 and 5 in this schedule, the waste schedules there, and talked about how caveats were given as to whether or not these schedules might change. I believe you testified to that. It was possible these schedules, these specific schedules right here might change.

Am I correct in understanding that that was your testimony?

A. Yes.

Q. Okay. But it is also fair to say that the objective of these schedules remained constant, and one

of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."

BY MR. EIDUKAS:

Q. Yes.

A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate



acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.

The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.

Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?

MR. SHULTIS: Objection, looking for a legal conclusion.

THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections



that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.

BY MR. EIDUKAS:

Q. Sure.

A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.

And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we



wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

meetings cannot possibly call for speculation. The question is whether or not they recall something.

I would just ask please if counsel for the government would listen to the questions and attempt to interpose only objections that are proper and actually meet the substance of my questions so as not to unnecessarily delay the length of this deposition.

MR. SHULTIS: The objections I'm making are based on the questions being asked. If you don't want me to make objections, don't ask objectionable questions. I'm sorry that you feel that I am not listening to your questions. I'm listening. I'm sorry that you think that Mr. Trebules is not having a clear memory of something that happened 16 or 18 years ago is speculative, but if he's already answered that he doesn't remember, then asking another question is speculative. But your objection is noted.

MR. EIDUKAS: Okay. This is not the proper place to debate this. I would only -- my objections to your objections has been stated.

BY MR. EIDUKAS:

Q. But my question still stands, Mr. Trebules, is



if you can recall who at these meetings discussed this issue, I would please like to know the names of those persons.

MR. SHULTIS: Objection, asked and answered.

MR. EIDUKAS: It's been asked but not answered.

THE WITNESS: Okay. Again, at this time back in 1984-'85 I don't remember specific meetings or the names of specific individuals that were at those meetings, other than the people I normally talked to, you know, in the normal course of events with the names I've already given like Charlie Head and Bob Rosselli and Tom Isaacs and Roger Gale. But I couldn't relate that to a specific meetings or specific topics but, you know, just in general we talked about issues like this. So that's the best I could do.

BY MR. EIDUKAS:

Q. Okay. I think I'm done with this particular document at the moment. Although, again, you may want to refer back to it in later course of this deposition.

MR. EIDUKAS: Mark that as the next



exhibit, please.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 6.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had the court reporter mark and hand to you Exhibit 6, which is a copy of the June 1985 Volume I of the June 1985 mission plan and I'll represent to you that it contains Volume I through Chapter 10. It goes from -- it goes through the end of Chapter 10, which is page 403/404 of the documents. The Bates range that I've handed you is CE 14791 through CE 15200.

I have remaining portions of this available if you would like to look at it. I will not have any questions beyond that involve the section that is not attached here. But if you need to look at it at any time, let me know and I will provide it for you.

Take a look at this and take all the time you want, but my question is: Is this a copy, at least the sections that are present, a copy of that final mission plan that you worked on that you have testified was published in June of 1985?



A. (Pause). (Conferring with counsel).

MR. SHULTIS: Is there a pending question?

MR. EIDUKAS: Yes, there is.

MR. SHULTIS: Would you read it back.

MR. EIDUKAS: I'll rephrase it. I was asking whether or not this was for the portions that are here a copy of the mission plan that Mr. Trebules had testified he worked on and that was published in June of 1985. Off the record.

(Discussion off the record.)

(Recess, 2:15 to 2:26 p.m.)

BY MR. EIDUKAS:

Q. The exhibit marked as Exhibit 6, we've had some discussion off the record and have determined that it had some discrepancies in the copying of the original document and in particular what we noticed was that page 13 of this document was absent. So we have located another copy of page 13 and inserted it into Exhibit 6. We believe that page 14 was blank and that's why there's no page 14 present. Also, the page part 2 is out of place?

A. Oh, the section in part 2 Chapter 11 was not

included and doesn't include Volumes II and III of the entire mission plan.

Q. I also was going to refer there was a page out of order. There was like a cover page for part 2 of Volume I.

A. Oh, it's the one that was in place at page 13 in the front section.

Q. Right. So the page that's Bates numbered CE 14820 is out of place. It should go later in the document and then, in addition to that, I've also represented and the witness has confirmed I believe that Chapter 11 of this volume, Volume I, is not present and Volume II and Volume III of the mission plan are also not present and part of this exhibit.

Is that an accurate statement of what --

MR. SHULTIS: That's consistent with my understanding. Mr. Trebules found the discrepancy. So...

THE WITNESS: I think that covers it.

MR. SHULTIS: Okay.

BY MR. EIDUKAS:

Q. Okay. With all of those caveats and



clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?

A. I believe so, yes.

Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?

A. Yes.

Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."

And then the third objective listed here says, "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."



My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.

"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the



government would target to meet.

BY MR. EIDUKAS:

Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.

BY MR. EIDUKAS:

BY MR. EIDUKAS:
Q. Okay. Why don't we turn to page 15. That's the page titled Chapter 2 Program Strategy, and Chapter 2 appears to run through page 29 and in my version at 29/30. So 30 is probably a blank page.
A. Right.
Q. But my question is: Is this a chapter that you also wrote?
A. I wrote sections of it, not the entire thing.
Q. Do you recall what sections of this chapter you wrote?
A. I believe I wrote most of the information beginning on page 21 through the end of the chapter.
Q. Okay.
A. Wrote -- let me correct that. I wrote or I compiled information from other sources that made up the entire chapter through the end of the chapter. For example, you know, we had previous waste acceptance schedules that we --
Q. Correct.
A. I have to look at the numbers, but we probably modified them to some extent, you know, from previous



editions. Although I didn't write these, it was my responsibility to try to get the correct information to complete the chapter.
Q. Okay. Before I get to that portion of the chapter, I do want to direct your attention to the first page and, similar to the previous section we looked at, there appears to be a section, four numbered sentences or sections that are stated to be goals and objectives of the program.
Did you have any involvement in preparing these or in preparing this section of the chapter?
A. Yes, I had some involvement because it was my responsibility to coordinate and produce the entire document. The primary author of the first part of Chapter 2, though, was Thomas Isaacs.
Q. Do you recall discussing the first portion of Chapter 2 with Mr. Isaacs, and a specific discussion on that section of Chapter 2?
A. I remember we had specific discussions on the first part of Chapter 2, yes.
Q. Okay. Generally, what was the issues that you had or that you did discuss with Mr. Isaacs about this



chapter?
A. Again, this is where we introduced the concept of the authorized plan, which we talked about before, and the so-called improved performance plan. This was a major change from the earlier versions of the drafts of the mission plan where we wanted to highlight the benefits that a monitored retrievable storage facility could add, you know, to an integrated waste management system.
Q. I want to look again at the first page of the chapter. That's page 15. I'm looking at goal number 4 or numbered section -- numbered paragraph number 4. It says, "In accordance with the above goals, the program has vigorously pursued the Act's directive to begin accepting spent fuel and high level waste for disposal no later than January 31, 1998." Just stopping there.
Was it your understanding that it was a directive of the Nuclear Waste Policy Act to begin accepting spent fuel and high level waste for disposal no later than January 31, 1998?
MR. SHULTIS: Objection, calls for a legal



conclusion.
THE WITNESS: I believe there were words in the Nuclear Waste Policy Act which referred to January 1998. I think it also said once a facility is available. I don't remember exact words, but if we had a copy of the Nuclear Waste Policy, I think we could probably dig that out.
BY MR. EIDUKAS:
Q. And the section goes on to say, "and to continue to dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the nation's nuclear power generation plants."
Do you understand that it was also a directive of the Nuclear Waste Policy Act that the Department of Energy continue to dispose of waste after January 31, 1998?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I don't recollect words in the Nuclear Waste Policy Act that -- there may be some, but I don't recollect that talked about the orderly operation of the nation's nuclear power generation

plants, other than, you know, it talked about the environmental problem that had to be resolved with nuclear waste in general. You know, it said that it's going to be the policy of the nation to deal with that and that's why they passed the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. Okay.

A. There may have been a reference to continuing the orderly operation of nuclear power plants. I just don't remember one.

Q. Okay. I guess maybe what I'm referring to is the part that talks about continuing to dispose of the waste. Was it your understanding that the Act didn't just require that the Department of Energy begin accepting waste in 1998 and then stop; that there had to be continuation of waste acceptance until all the waste was accepted?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: It was my understanding that the Act was intended to deal with the problem and the



problem is not just to begin, but, you know, to resolve the problem, which is why we focused on the waste acceptance schedules we did, which had beginning, you know, as an objective in 1998 in trying to reach a level that would, as I said before, preclude the utilities from having to add additional storage and ultimately reducing the backlog that was already -- that would have already been accumulated until it was all placed in, you know, in a repository.

BY MR. EIDUKAS:

Q. Okay. Why don't we go on and let's turn to the page 17. This is Section 2.3 The Improved Performance Plan. Is this the section that you were referring to earlier that Mr. Isaacs' authored that you had referred to earlier in your testimony?

A. Yes.

Q. Okay. And, again, could you explain what -- strike that.

And, again, this is an addition or a change from the April 1984 draft mission plan that we looked at earlier, correct?

A. Yes.



Q. Okay. What was the -- and you may have done this already, but could you just again say what's the reason for including the improved or developing the improved performance plan for the mission to the 1985 mission?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we wanted to indicate that the department had authorization to pursue or develop one repository was approved by Congress and the transportation system to move the waste to the repository. And I think that is explained in the diagram on page 16 of Exhibit 6.

If you look at that upper right-hand block, the first geologic repository, and there's a solid line from the block that says, "Spent fuel." It indicates that the solid block around the first repository means it was authorized by Congress as opposed to, for example, the lower right-hand block, the second repository, which is a dash line, that's not yet authorized by Congress.

Federal interim storage was also



authorized and we had planned to take the commercial and defense waste. All of the things with solid blocks around it, you know, were authorized by the original Act or understood, you know, to be accommodated by the original Act, along with the transportation system.

BY MR. EIDUKAS:

Q. So -- I'm sorry.

A. Okay. There also was the opportunity to propose to Congress incorporating what was called a monitored retrievable storage facility if we felt it was warranted and it would offer substantial benefits. So that that concept evolved from the earlier drafts of the mission plan, which we already talked about, to the one published in June of '85 where we incorporated an MRS as an integral part. And I think that word is a little too -- yes, in caption Figure 2.2 it says, "Improved performance system with an integral MRS facility."

Which meant that the MRS was not just a backstop nor backup, but we were going to operate the MRS to consolidate some of the spent fuel coming from

BY MR. EIDUKAS:
Q. Okay.
A. That's a summary of some of the advantages we saw in the so-called improved performance system with an integral MRS facility.
Q. In looking back on number 4, so one of the purposes behind proposing the MRS, the improved performance plan, was that it would meet that objective to reduce the need for additional at-reactor storage that utilities might have to build after 1998. Is that --
A. That's correct.
Q. -- correct?
Why don't we turn to pages 26 and 27. That appears to be where the waste acceptance schedules are set out. Are the tables or the schedules that appear at pages 26 and 27, are these waste acceptance schedules that you worked on or helped prepare?
A. Yes.
Q. And, again, the difference between the table on 26 or the schedule on 26 and the schedule on 27 is that the schedule on 26 represents the authorized



system that did not have an integral MRS and the schedule on page 27 is a schedule based on the improved performance plan that used -- that intended to have an MRS as an integral part of the plan; is that correct?
A. That's correct.
MR. SHULTIS: Objection. The documents speak for themselves.
BY MR. EIDUKAS:
Q. Focusing on the waste acceptance schedule for the authorized system on page 26, how was this schedule developed?
MR. SHULTIS: Objection, vague.
THE WITNESS: I think I have to give you a three-part answer to that. Again, talking about what we talked about before. The schedules were developed with two main objectives in mind, beginning waste acceptance by 1998 and trying to reach a level, a steady state level where it would preclude the need for the utilities to add additional on-site storage.
The third part of that answer, though, in response to your question is how were they developed. You know, we developed these in an iterative process.



We had, as we saw before in the other exhibits, we had published earlier waste acceptance schedules that in some cases we got comments on when we issued the documents for public review and comment.
And I think as we reviewed the numbers, we showed that we made some modifications based on the collective wisdom of that process. Some of the people said our ramp-up rates were unrealistically optimistic.
So I think if you compare, you know, the earlier numbers we saw, which I believe begin at like 1800 metric tons. The latest version of the authorized system waste acceptance schedule is at a slower ramp-up of 400 metric tons in the first couple of years. This shows for three years. Then up to 900, 1800 and 3,000 metric tons for that first repository.
BY MR. EIDUKAS:
Q. I believe if you look back at the April '84, the acceptance schedule in the April '84 draft, I believe that also started at a 400 MTU rate and ramped up to 3,000 similarly.
So when you're referring to a rate that



started at 1800, were you referring back to the rate in the December '83 mission plan as opposed -- draft mission plan as opposed to the April 1984 draft mission plan?
A. Yes. The one in Exhibit 4 started at the 1800, 1800, 1800 rate for five years before it got to 3,000 metric tons.
Q. So the ramp-up rate in Exhibit 6 in the final mission plan is -- for the authorized system anyway -- that ramp-up rate is similar to the ramp-up rates that was presented in the April 1984 mission plan, which was Exhibit 5; is that correct?
MR. SHULTIS: Same objection. The documents speak for themselves.
THE WITNESS: Actually, there are some significant differences.
BY MR. EIDUKAS:
Q. Okay. Would you please tell me what the significant differences are.
A. Okay. The waste acceptance schedule in the June '85 version of the mission plan, Exhibit 6, for the first repository includes acceptance of high level

BY MR. EIDUKAS:
Q. Okay.
A. There's obviously a different heat load that the repository has to accommodate and the size of -- which is why we put the pictures in the document. The size of the waste forms we're dealing with are significantly different. If you look at the spent fuel picture on page 9, okay? We would design waste packages to accommodate multiple fuel assemblies, you know, from reactors. The spent fuel assemblies.
The high level waste is in the form of the picture on page 11, you know, which is a different geometry. So, I mean, to me it's obvious. There's got to be some differences in the design now that you're going to accommodate a different waste geometry, waste form, waste heat load, but I can't give you any of the specifics of what those design changes would be.
Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?
MR. SHULTIS: Objection, vague, assumes



facts not in evidence.
THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.
BY MR. EIDUKAS:
Q. So, even after it was determined that you were going to start accepting the high level waste in addition to spent nuclear fuel, the objective to continue accepting at the 3,000 rate or because of the objective you've identified, you didn't decrease the 3,000 steady state rate in order to accommodate the additional need to accept high level waste. Is that a fair statement?
A. I believe that's a fair statement.
Q. Okay. Turning to the -- you're looking at



the next. Do you need a break? We've been going for a while.
A. I'm okay.
Q. Going to the next page, waste acceptance schedule on page 27. This is for the improved performance system or plan that we've discussed today, correct?
A. Right.
Q. Okay. Did you work on developing this acceptance schedule?
A. Yes.
Q. And is this the first acceptance schedule involving an integral MRS facility that the DOE published?
A. To the best of my recollection it is.
Q. So, because we didn't see an acceptance schedule like this involving an MRS in the earlier drafts of the mission plan, right?
A. The reason I'm hesitating is I don't know if there were any presentations like that one meeting you referred to. You had the handout from that one meeting. I don't know if there were any others at the



time where DOE might have, you know, released some preliminary numbers. This is the one first one I'm aware of.
Q. Okay.
A. I can answer it that way. This is the first one I'm aware of.
Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?
A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X YANKEE ATOMIC ELECTRIC COM
(98-126C)(Merow, S.J.) : I CONNECTICUT YANKEE ATOM
(98-154C)(Merow, S.J.) :Judge: MAINE YANKEE ATOMIC P
(98-474C)(Merow, S.J.) :Sypolt)
Plaintiffs, :
V. :
THE UNITED STATES, :PAGES
Defendant. :1 - 160
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144559



April 18, 2002
2:15 P.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Spriggs & Hollingsworth
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch



Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X


EXAMINATION OF VICTOR W. TREBULES, JR. PAGE
BY MR. STOUCK 5
TREBULES DEPOSITION EXHIBITS: PAGE
No. 14 Defendant's Witness List. 51
15 Documents CTR 006-1645, 1648 to 53, 1657 to 58, 1661 to 65. 71
16 Documents DB-110060 to 70. 71
17 Letter of April 19. HQR 064-2234 to 2253. 71
18 Memo of 6-21-93. HQR 064-6684 to 85. 71
19 Memo of 7-28-93. DE-108508 to 8515. 71
20 NCAI Briefing. HQR 064-5423 to 5435. 71
21 Privilege Log Excerpts. 145

**Exhibits are attached.

but who would have been working from the Department of Energy side of things on contract matters at that time?

MR. SHULTIS: Same objection.

THE WITNESS: As best as I can remember, it would have been Robert Rosselli, and I'm not so sure about Charlie Head because he was my direct supervisor when we worked on the mission plan, but I don't remember if he had a significant role in the contracts. I believe Robert Rosselli did, though.

BY MR. STOUCK:

Q. Okay. But you did not?

A. No, I did not.

Q. Do you know whether Mr. Rusche had any involvement in contract matters at that time?

MR. SHULTIS: Asked and answered.

THE WITNESS: I don't know specifically his degree of involvement, but as head of the program, I'm sure he would have, you know, he would have had some degree of knowledge of the status and progress of the contracts, but I don't know exactly what that was.

BY MR. STOUCK:

Q. What do you mean by status and progress of the



contracts?

A. Just, you know, again, I'm not sure when they were signed, but I knew there was a target date to have them signed and, you know, I believe there was a large number of contracts. I mean on the order of, you know, 60 or 70. So it was just the overall status of all of those contracts. I'm sure somebody must have been a report to Mr. Rusche, but, again, I don't know the specifics of that at that time.

Q. Okay. I believe you testified and, you know, I'm sure you'll correct me or your counsel will if I'm not characterizing this correctly, but you testified I think at various points previously that OCRWM had a goal of solving problems, solving the spent fuel problem. That was an objective. In a general sense an objective was to solve the spent fuel problem for the utility industry.

Is that fair or is that too broad, or do you want to rephrase it? I just want to get you back to that subject so I can ask you some questions about it.

A. I think that's a fair characterization.

Q. Okay. Now, is it your understanding that the



Department of Energy had an obligation to solve the spent fuel problem in the sense that you've testified about solving that problem?

MR. SHULTIS: Objection, calls for a legal conclusion. Also, Mr. Trebules is not a 30(b)(6) witness.

THE WITNESS: In the sense that the Nuclear Waste Policy Act identified by name the Secretary of Energy and established the Office of Civilian Radioactive Waste Management and the position of director to deal with the spent fuel situation in the United States, I would say that we had an obligation to, you know, to execute the provisions of the Nuclear Waste Policy Act, you know, to, as you say, solve the spent fuel problem.

BY MR. STOUCK:

Q. Okay. And again referring back to some of your previous testimony, I believe you testified that the program had -- and, again, please rephrase or this is my understanding of what you said I believe a couple of times previously in your testimony. That there were two overriding goals or objectives.



One was to begin in 1998 and the other was to reach a rate, an acceptance rate that at which or for which amounts of additional at-reactor storage would be minimal or zero after 1998. Is that a fair characterization of what you told us here?

MR. SHULTIS: Objection as to characterization of his testimony, especially regarding overriding goals.

BY MR. STOUCK:

Q. Okay. Well, if it's not, please tell me, but I'm trying to -- again, I want to ask you some follow-up questions. I just want to get back to those two goals. Recharacterize them for me if you don't like my characterization.

A. I think that's close. I think that's reasonably accurate.

Q. Okay. Now, is it your understanding that the Department of Energy had an obligation to achieve those goals?

MR. SHULTIS: Objection, calls for a legal conclusion and Mr. Trebules is not 30(b)(6) witness.

THE WITNESS: My understanding -- do you

mean by back -- let me ask a clarifying question. Do you mean in the early days back in 1984-'85 or any time after that during my tenure with the program?
BY MR. STOUCK:
Q. Let's start 1984-'85 and then see where that takes us.
MR. SHULTIS: Same objections.
THE WITNESS: Again, primarily my work on the mission plan back in '84 and '85, I don't remember forming an opinion one way or the other about whether the department had an obligation. I think if you mean that in a legal sense. Again, what I do remember was that we were developing plans, as the name implies, the mission plan, which had schedules in it which we characterized as goals or objectives that we would try to meet, but we indicated that those schedules were subject to change.
That we would do our best to try to meet them but, you know, I believe we -- there was concern, you know. We wanted to give the department some flexibility, and I think as we previously discussed when we went through the exhibits, we showed even in



those early days that some of those schedules changed for various reasons.
BY MR. STOUCK:
Q. Okay. Excuse me. Are you finished?
A. Yeah.
Q. So, what you just told me is your understanding as of around '84-'85?
A. Right.
Q. That's the question you're answering?
A. Right.
Q. Okay. And you said you hadn't formed an opinion. Is that the same thing as saying at that time you did not know if the department had an obligation to achieve these two objectives?
MR. SHULTIS: Same objections.
BY MR. STOUCK:
Q. I mean, is that the gist of it? You didn't know and you say you hadn't formed an opinion? I just --
MR. SHULTIS: Same objections.
THE WITNESS: Yes, I think that's fair. I did not know for sure.



BY MR. STOUCK:
Q. Okay. Did there come a point later in time subsequent to that time when you did know or did come to have a better understanding of whether or not the Department of Energy had an obligation to achieve the two objectives that were testified about?
MR. SHULTIS: Objection, calls for a legal opinion.
THE WITNESS: I obviously heard a lot of discussion about the department's position that we were relying on the specific words in the Nuclear Waste Policy Act, which said we would target to begin waste acceptance in 1998 after we had a facility in operation. I think that became the department's position.
BY MR. STOUCK:
Q. Okay. Do you have a view today about whether or not the Department of Energy has an obligation to achieve the two objectives that you've testified about and discussed?
MR. SHULTIS: Objection, relevance.
THE WITNESS: My understanding of the



current position is obviously we can't meet the 1998 date. We've already -- in fact, we've already missed that and we have laid out our plans or best-effort plans to try to have the repository in line -- since we're no longer working on an MRS facility -- to try to have the repository on online by 2010. And I think we also discussed earlier that, you know, as in regards to the second objective or goal still to try to reach an acceptance rate of about -- the nominal acceptance rate of about 3,000 metric tons.
BY MR. STOUCK:
Q. Okay. Now, still with reference to these two objectives that you had testified about previously, can you tell me what -- let's go back to the '84-'85 time frame. Put yourself in that time frame for purposes of this question.
What is your understanding of why it is that the Department of Energy was pursuing those two objectives at that time?
MR. SHULTIS: Objection, relevance.
BY MR. STOUCK:
Q. Why was, if that's the proper diction?

# WILLIAMS

1
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - -X
Washington, D.C.
Tuesday, June 11, 2002

Deposition of JEFFREY ROBERT WILLIAMS, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn Public, taken at the offices of Spriggs & Hollignsworth, Suite 900, 1350 I Street, N.W., Washington, D.C. 20005, commencing at 9:30 a.m., Tuesday, June 11, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION



PURSUANT TO THE PROTECTIVE ORDER

APPEARANCES:

On behalf of the Plaintiffs:
Robert Shapiro, Esquire
SPRIGGS & HOLLINGSWORTH
Suite 900
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

Also Present: Nicholas Parrillo



C O N T E N T S


WITNESS EXAMINATION BY COUNSEL FOR
JEFFREY R. WILLIAMS PLAINTIFFS DEFENDANT
By Mr. Shapiro 5
Afternoon Session - Page 95


E X H I B I T S


WILLIAMS EXHIBIT NO. PAGE NO.
1 January 1990 INMM Spent Fuel Seminar 106
VII MRS Systems Studies
2 2-12-97 memo, Williams to Barrett 128
3 December 1990 Annual Capacity Report 139
4 December 1991 Annual Capacity Report 145
5 March 1995 Acceptance Priority Ranking 148
& Annual Capacity Report
6 6-2-92 Run Plan for Continuation of the 159
Throughput Rate Study
7 3-23-92 Civilian Radioactive Waste 159
Management System Throughput Rate Study
Interim Report: Analysis of Oldest Fuel
First Acceptance





WILLIAMS EXHIBIT NO. PAGE NO.
8 4-10-92 memorandum, Lemeshewsky to 160
Distribution with attachment
9 10-5-90 memorandum, Brownstein to 161
Distribution with attachment
10 Article 163
11 11-98 TSLCC and Fee Adequacy Summary 182
12 4-12-99 Program Update US DOE/Enresa 184
Bilateral Meeting
13 9-18-96 letter, Blandford to Williams 200
with attachment
14 May 2000 Civilian Radioactive Waste 203
Management System Requirements Document
Revision 05

P R O C E E D I N G S

\- - - - - -

Whereupon,

JEFFREY ROBERT WILLIAMS,

Radioactive Waste Management Office, Forrestal Building, Department of Energy, 1000 Independence Avenue, N.W., Washington D.C., was called as a Witness by counsel for the Plaintiffs, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SHAPIRO:



Q. State your name for the record, please.

A. Jeffrey Robert Williams.

Q. Mr. Williams, my name is Robert Shapiro. I'm an attorney for three plaintiffs that are suing the United States for breach of contract, Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company. We have asked you to come to give a deposition today.

Have you ever had your deposition taken before?

A. No, I haven't.

Q. You have probably gone over this with your counsel, but let me mention a few things of how this works. It is basically a conversation. I ask you questions, you give answers.

It is more formal than your average conversation. We have a court reporter who is taking everything down. That does make for a couple differences. It's helpful if we don't talk over one another. It's helpful if you give yes's and no's rather than uh-huhs. It makes the record clear as to just what you mean.

Also in the interest of being clear, it is important if I ask a question and you're not



sure what I'm asking, don't guess. If you're not sure, ask me to rephrase it and I will be happy to.

Anything you don't understand?

A. No.

Q. Okay.

One of the things that helps me starting out the deposition is to go through your background so I understand just where you fit into the issues that we have in our case. I would like to do that starting with your current position and moving backward.

A. Okay.

Q. Where do you currently work?

A. In the Civilian Radioactive Waste Management Office, Forrestal Building, Department of Energy, 1000 Independence Avenue.

Q. What is your position there?

A. I have two positions. I am the director of the systems engineering and international division, and I'm the acting director of the Office of Acceptance, Transportation, and Integration.

Q. When did you start that dual role?

A. Well, a few years ago. I can't



remember exactly, probably the spring of '99, I think. I did that on a rotational basis, 90 days, and then I switched with somebody else. Since January I have been in that dual role continuously.

Q. When you say you were in that dual role on a rotational basis from roughly spring of '99 through the end of 2001, what do you mean by a rotational basis?

A. I served for 90 days, and then -- I served as the acting director for the Office of Acceptance, Transportation and Integration for 90 days and then another division director served for 90 days. Then I served for 90 days and he served for 90 days. We did that until January of this year.

Q. Who was the other division director?

A. Jim Carlson.

Q. Do you have any idea why the two of you did that on a rotational basis as opposed to somebody being selected for the office director position?

MR. CRAWFORD: Objection to the extent it calls for speculation.

A. I was going to say, you would have to

ask someone else.
Q. There was never a vacancy posted for the office director position?
A. No. No.
Q. Did you ever inquire about that position?
A. No, I didn't.
Q. There was no office gossip as to why that position was left open?
A. Might have been. I didn't hear it.
Q. To the extent that you were office director, who did you report to?
A. Ron Milner, Ronald Milner.
Q. And what was Mr. Milner's position?
A. He has been either the chief operating officer or the acting deputy director for OCRWM, depending on what time it was.
Q. Going back before you started to have the two positions on a rotational basis, what was your position before that, before I guess the spring of '99?
A. I have been the division director for systems engineering since 1996, basically. The division moved from one office to the other, but it has been basically the same, the same division



since '96.
Q. How did you come in the spring of '99 to take on the two positions on a rotational basis?
A. Management asked me to -- when somebody left, the person who was in the office, the office director before that left and I was asked to do that.
Q. Who was the office director before you were asked to do that?
A. Dwight Shelor.
Q. You said that one of your two positions is director of the systems engineering and international division. What do you do as director of that division?
A. I'm responsible for defining the top level requirements, and I'm responsible for completing the total system life cycle costs and fee adequacy reports. I'm responsible for analyzing, doing what we call systems analysis of various operating concepts for the Federal Waste Management System, and I'm responsible for maintaining what we call the -- doing baseline management, and then I'm also responsible for international activities.



Q. Let me go through those items and make sure I understand what they involve. You said that one of your roles is defining top level requirements. What do you mean by top level requirements?
A. Okay, the way a program is set up is we have level one, which is the top level; level two, which is the project level; and level three, which is the contractor level.
Level one are basically policy requirements that would impact the architecture of the system. In other words, if our director decided he wanted to paint the mountain green, he could have a requirement that says I want that painted green. Okay? Is that clear?
Q. Well, I will ask a few more questions and see if it becomes clear.
A. Okay.
Q. What determines the dividing line between a top level requirement in a requirements document, and what you call the next level down?
A. It can be rather subjective, and I'm not sure that we have the criteria written down specifically. We do have thresholds identified for things that need to raise to the level one



Change Control Board, which is the one here in Forrestal which is the purview of the director, and that threshold is something that is more than $500 million -- I can't recall all the specifics of those thresholds, but there are thresholds that exist that are documented that discuss what things go to our level one.
Q. You mentioned something called the Change Control Board. What is that?
A. It's basically a board that's chaired by the director of OCRWM. What we do is we try to manage our system so that we all understand what we are working to. We have a reference system that is basically -- it's a baseline system, and we all understand what the architecture is, what the operating concept is, and if we are to change from that, then that needs to go through a change control process.
Q. Who is on the Change Control Board besides the director?
A. Let's see, right now it would be -- I would be on it; the director of, what you call it, RW 50, it's the Office of Program Management; director of QA; and a Yucca Mountain project manager.

know mostly about the TSLCC and fee adequacy.

I have one person who is responsible for understanding and putting together what we call the total system description, and also he does other things like writes papers for the director.

I have another person who is responsible for making sure that our management of our contract, all the paperwork is done, like the performance evaluations on a monthly basis.

I have another person that is responsible for international cooperation agreements. I actually have another person who is sort of the -- he is sort of our office's expert on transmutation of waste.

Q. Let me just ask a couple questions about those. First, the person on the requirements document, who is that?

A. His name is Mark Senderling.

Q. What would Mr. Senderling do on a day-to-day basis to update the requirements document?

A. Well, the requirements document isn't updated on a day-to-day basis. It is updated maybe once a year, so, you know, that type of work



varies depending on if we are doing an update or not.

Let's say we added solar panels. He would basically -- he would be responsible for the wording in that requirements document on adding a requirement to add solar power to Yucca Mountain, and what that would consist of. Either he would develop some specific wording or a contractor might develop that wording, and then he would have to coordinate that with the rest of the program.

In other words, we would send it out for technical review, to assure that everybody can live with it. We will get comments back.

He will be responsible for negotiating the comments and trying to come to common ground and wording that everybody can live with and is consistent with the policy that the director would like to put in place.

Q. I think you might have largely answered another question that I have, but let me ask the question so I'm sure I understand.

What is the role of the requirements document within RW?

A. It is basically to -- it's basically to lay down the major foundation of what we are



trying to do, what our goals are. It has elements in it about what the overall program goal is. It will say, for example, our goal is to dispose of commercial spent fuel. It will say our goal is to dispose of DOE spent fuel. It will have -- it will have -- it has a lot of regulatory requirements in it. We have to do that in accordance with these regulations.

And then it also could have, if there is a policy call on how we want to implement the system, a policy call that would impact a designer, for example, that would be in there. And the best example of that right now is solar power. Okay? And then also the one on the -- that I mentioned before about the thermal design. That rose to a policy level call. We could have designed the repository in many different ways. There was a policy call made that we want to allow free drainage between the drifts and not boil the whole mountain.

Q. You say the requirements document represents the department's goals for the system. Is it also fair to say that the requirements document represents the department's plans for how the system will eventually work?



MR. CRAWFORD: Objection. Asked and answered. Objection, mischaracterizes his prior testimony.

A. In some cases, yes, I would say it is plans.

Q. But not in all cases the requirements documents doesn't represent plans?

A. I don't think --

MR. CRAWFORD: Objection, asked and answered. Objection, mischaracterizes the prior testimony.

A. I would say it is not comprehensive for every plan that we have.

Q. Well, part of what I'm getting at in my question is, does the department expect to meet the requirements set out in the requirements document?

MR. CRAWFORD: Objection, lack of foundation.

A. I would say we are designing the system -- designing the system that is capable of doing that. Many of those things are outside of our control.

Q. But when something gets into the requirements document, has it been vetted such

let me be sure I understand. Prior to the time you were director of the systems engineering division in 1996, what was your position?
A. I was director of the engineering division.
Q. How did you come to switch from director of the engineering division to director of the systems engineering division?
A. We had a reorganization and I was directed to do this, or asked to do it.
Q. What office was the engineering division part of?
A. I believe it was called Office of Waste Acceptance, Storage, and Transportation.
Q. When did you start in your position as director of the engineering division?
A. It was 1994.
Q. In that 1994 to 1996 period, what did you do as director of the engineering division?
A. We were responsible for storage and transportation technology development.
Q. And in the '94 to '96 period, who was the office director for the Office of Acceptance, Storage, and Transportation?
A. I think it was Sam Rousso. It was Sam



Rousso.
Q. So in '96 you and Mr. Rousso both changed to the Office of Program Management?
A. That's right. I believe so.
Q. I'm forgetting how this all fits in. You had mentioned previously another office director, Mr. Shelor.
How did he fit in?
A. He was Rousso's deputy in the '94 to '96 time frame, and then subsequent to '96 he was the office director for the new Office of Waste Acceptance, Transportation and -- I don't think it had the Integration name on there. I don't believe it did until my division moved back over.
Q. So between 1994 and 1996 you said your division worked on developing storage and transportation technology. What storage program were you trying to develop technology for?
A. For the MRS, and then later on I think we called it the MRS, we called it interim storage facility or centralized interim storage facility.
Q. And when you say you were developing the technology for that facility, you were trying to design what the facility would look like?



A. Yes.
Q. Were you primarily working with contractors on that?
A. Yes.
Q. How many people were in your division in the 1994 through 1996 time frame?
A. We varied. I think it got up to as high as twelve or so.
Q. What would a low number be for the size of your division in that time frame?
A. Maybe seven or something.
Q. In addition to developing technology for storage, what technology were you trying to develop for transportation?
A. Transportation casks.
Q. Were these transportation casks intended to serve an MRS, or transportation casks intended to serve the repository, or both?
A. It was so they could serve both.
Q. What work were you doing to develop transportation casks?
A. We had a contract with General Atomics, and they were designing a truck cask.
Q. You referred previously to the use of rail cars. At some point the technology changed



from -- let me ask first, did the plan change at some point from using truck casks to rail casks?
A. We were actually doing both. We were also developing a multipurpose canister system that would be on a rail.
Q. The multipurpose canister system, that's the system that was designed to be able to store fuel at a reactor site, transport the fuel, and in the same canister have it disposed of in the repository?
A. Yes.
Q. Other than that multipurpose canister system, in the 1994 to 1996 time frame were you working on any other rail-based transportation systems?
A. No.
Q. The multipurpose canister system, can we use the acronym MPC system? Are you familiar with that?
A. I made it up.
Q. When did work on the MPC system stop?
A. Stop?
'96 time frame.
Q. And again you said, I believe you said previously that the current plan is to use

MR. CRAWFORD: Objection, asked and answered.

(Williams Deposition Exhibit No. 8 was marked for identification.)

BY MR. SHAPIRO:

Q. Mr. Williams, handing you what has been marked as Exhibit 8, it's a memorandum that appears to be dated April 10th, 1992 from W.A. Lemeshewsky to Distribution, which is on the next page. You appear to be listed on the distribution sheet. And the memorandum appears to be distributing the study that we just referred to to the people on the distribution sheet, including yourself.

Do you have an understanding as to why you were getting a copy of this report, how it related to your work?

A. Well, I was involved in doing the MRS design at the time, so I can see how it would be related.

Q. Do you recall the interim study analysis of oldest fuel first acceptance having any impact on the work that you were doing?

A. No.



Q. Okay, then we won't waste more time on that.

MR. CRAWFORD: As it should be.

Can we take a break at this point?

MR. SHAPIRO: Sure.

(Recess taken -- 3:32 p.m.)

(After recess -- 3:45 p.m.)

MR. SHAPIRO: Let's turn to a new document.

(Williams Deposition Exhibit No. 9 was marked for identification.)

BY MR. SHAPIRO:

Q. Mr. Williams, you have been handed what has been marked as Exhibit 9. It's a memorandum dated October 5, 1990. It is from Alan Brownstein to a distribution list. It appears to be distributing what is termed a preliminary draft of the 1990 Annual Capacity Report. We discussed the final report a little bit earlier. I want to actually just ask a question on the -- direct your attention to this letter, a statement that it makes.

In the top paragraph, I guess it is the last sentence in that paragraph, "While the



information contained in the ACR will not be contractually binding until 1991, the report represents a major contract deliverable."

Do you have any recollection as to what that statement meant to you about the ACR not being contractually binding until 1991?

MR. CRAWFORD: Object to the foundation, and to the extent it calls for a legal conclusion, and to the extent it calls for speculation.

A. I don't recall seeing that before, even though it was sent to me. I never thought about it before right now.

I don't really want to speculate on it.

Q. In general, do you recall making any comments on the draft 1990 Annual Capacity Report?

A. I don't recall any. Is there any evidence that I did?

Q. No.

A. Okay.

Q. Do you know what role you had in the review of the 1990 Annual Capacity Report?

MR. CRAWFORD: Objection to the extent it assumes facts not in evidence.

A. No. I really don't remember at all.

I'm not even sure what position I was



in at the time.

Q. The distribution list on the second page of the exhibit --

A. Yes, it has got 412.

Q. I don't recall what 412 stood for.

A. What I'm thinking is when I was in that facilities development branch I may have been the acting director then, but I don't recall. I didn't think I was acting all the way from October until I don't think I got the job until March. It's possible, though.

But like I said, I don't recall making any comments on it.

(Williams Deposition Exhibit No. 10 was marked for identification.)

BY MR. SHAPIRO:

Q. Mr. Williams, you have been handed what has been marked as Exhibit 10. It looks to be an article titled Multipurpose Canisters as an Alternative for Transportation and Disposal of Spent Nuclear Fuel. There are several authors mentioned, you being one of them.

Do you recall participating in the preparation of this article?

A. Yes.
Q. Why did you help to prepare this article, Exhibit 10?
A. Why did I help? Okay. This one doesn't seem to have a date on here, does there? My guess is it was probably '92 or '93.
Q. I do not see a date.
A. Okay. Well, I was the DOE person who was responsible for this study that was done by our contractor.
Q. The second page of the exhibit right at the top there is a header that seems to say Radioactive Waste Management. Is that -- all I have got is the article itself. Do you know is the radioactive waste management, is that supposed to reflect the publication in which this article appeared or the chapter in which it appeared? Do you have any recollection what that is?
A. I really don't. I'm sorry.
Q. Do you recall what publication this article --
A. No, I don't. I don't.
Q. Mr. Williams, there are page numbers at the top of the exhibit in the 800s. I would like to point your attention to 821.



A. I think this comes from our International Radioactive Waste Conference, is where I believe this is from. There is a publication of things that, papers that were presented at that conference.
Okay, go ahead. I'm sorry.
Q. That's the page I want to point your attention to, but let me get a little bit of background first.
Do you recall what the point of the article was, Exhibit 10?
MR. CRAWFORD: Objection, vague. Objection, best evidence.
A. Do I recall?
Q. What the purpose of the article was.
A. In general?
Q. Yes.
A. It was to inform people of a study we did on the feasibility of using multipurpose canisters in our system.
Q. In fact, would it be fair to say that the article supported consideration of multipurpose canisters, noted advantages to a system that included use of multipurpose canisters?



MR. CRAWFORD: Objection, best evidence.
A. I think that's probably true.
Q. Again, on Page 821, what I want to point your attention to is the second paragraph on the left-hand column, referred to as Contract Issues. It says there that "The impacts of the MPC concept on the 10 CFR 961 Waste Acceptance Contracts were identified as modifications of previously identified issues. While none of these issues appears insurmountable and may be assisted in the resolution by utilities support for the MPC system, the MPC does introduce new issues to be resolved."
Do you recall consideration of the relationship of the MPC and the contracts?
A. Yes.
MR. CRAWFORD: Objection, vague.
Q. I might have used this term before, but I want to make sure we are on the same page. Are you familiar with the term Standard Contract?
A. Yes.
Q. Those are the contracts being referred to as the 10 CFR 961 Waste Acceptance Contracts.
A. Yes.



Q. What do you recall was the relationship between the MPC concept and those contracts?
A. MPC was not an acceptable waste form under the contract.
Q. What was the basis of your understanding that the MPC concept was not an acceptable waste form under the contracts?
MR. CRAWFORD: Object to the extent it calls for a legal conclusion.
A. The contract describes what standard fuel is and it talks about other types, other forms, but nowhere does it talk about large canisters like this. They were contemplated when the contract was written, so they weren't included in the contract. Our understanding was the contract would need to be modified and our understanding was since this could be advantageous to the utilities they may be willing to enter into contract modifications.
Q. Have you ever read the Standard Contract?
A. Yes.
Q. When was the last time you read the Standard Contract, or a part of the Standard Contract?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COMMONWEALTH EDISON COMPANY, )
Plaintiff, )
v. ) No. 98-621C
UNITED STATES, )
Defendant. )

- - - - - - - - - - -

DEPOSITION OF JEFFREY WILLIAMS

Thursday, January 22, 2004

Reported by: Lori Goodin Mackenzie, RPR
Job No: 157857



The deposition of JEFFREY WILLIAMS was convened on Thursday, January 22, 2004, commencing at 8:35 a.m., at the offices of Jenner & Block, 601 13th Street, N.W., 12th Floor, Washington, D.C., before Lori Goodin Mackenzie, Registered Professional Reporter, Realtime Reporter, and Notary Public for the District of Columbia.



APPEARANCES

For Plaintiff:
DONALD R. CASSLING, Esquire
Jenner & Block, LLP
One IBM Plaza
New York, New York 60611-7603
312-222-9350

For Defendant:
STEPHEN FINN, Esquire
U.S. Department of Justice
Commercial Litigation Branch
ATTN: Classification Unit
8th Floor
Washington, D.C. 20530
202-307-6288



CONTENTS


EXAMINATION BY PAGE
Mr. Cassling 6

EXHIBITS

NO. DESCRIPTION PAGE
1Defendant's Initial Disclosures 6
2MPC Update 11
3 Standard contract executed by Commonwealth Edison Company, and United States 21
4 Document called Spent Fuel Project Office, Interim Staff Guidance 1, Revision 1, Damaged Fuel 29
5Certificate of Compliance for Spent Fuel Storage Casks 33
6 Document, Classification of Spent Nuclear Fuel 70
7Letter dated September 13th, 1985 72
8Document entitled Description of Basic MPC Concepts dated January 27, 1994 81
9Document dated March 6, 1996 172
10Multi-Purpose Canister Project Overview 187

10

EXHIBITS CONTINUED

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Multi-Purpose Canister Storage | 212 |
| 12 | Waste acceptance systems requirements document | 222 |
| 13 | Report to the Committee on Appropriations dated January 2001 | 243 |
| 14 | E-mail and document attached entitled Assumptions for Design Basis Waste Input | 251 |
| 15 | Cover letter with attached document, Design Basis Waste Input Assumptions for License Application dated August 2001 | 254 |
| 16 | Operational Waste Stream Assumption for TSLCC Estimates, dated September 2000 | 261 |
| 17 | Document entitled Role of Multi-Purpose Canisters in the Management of Spent Nuclear Fuel | 264 |

11

PROCEEDINGS

JEFFREY WILLIAMS,

a witness called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. CASSLING:

Q. Good morning Mr. Williams, I am Don Cassling. I am representing the plaintiff in the case. Let me just, by way of introduction, let's just mark this as Williams Exhibit No. 1.

(Williams Exhibit no. 1 was marked for identification.)

BY MR. CASSLING:

Q. The reason I am taking your deposition this morning is that you were disclosed by the Defendant, the United States, as someone with discoverable information regarding MESCs, M-E-S-C-S, technical issues.

And this is, Williams Exhibit 1 is Defendant's Initial Disclosures.

Now, so, most of the questions I am

12

going to ask you today are going to be involved with that issue.

Before we get started on the substance of the deposition can you tell me what you did to prepare for today's deposition?

A. I didn't do anything.

Q. Okay. Now, you have been deposed at least three separate times, or at least on three days before this; is that correct?

A. Yes, this is the third deposition, fourth day, I think.

Q. Right. And two days with the Yankee case, and one day in the Indiana/Michigan case; is that correct?

A. Yes, that is right.

Q. All right. Now, you have been deposed in those and you have given a lot of deposition testimony by way of background.

And I don't want to waste a lot of your time just repeating everything that is in there.

But, I assume when you were asked

13

questions in those depositions about what your past duties were, your titles, that sort of background information, what you said in response to those questions was accurate; is that correct?

A. Yes.

Q. Okay. Now, what is your current position at the DOE?

A. Currently I am the acting director for the Office of Science and Technology and International.

Q. Okay. Now, in the mid-'90s, you had responsibility for a program involving developing MPCs; is that correct?

A. Yes.

Q. And what was your title and your responsibilities during that time period?

A. I had two different positions and two different titles while we were developing the MPC program. The first one started in maybe '91 or '92. I was the chief of the facilities development branch.

And the second position, I believe

began around 1995, was, I was the director of the engineering division.
Q. Okay. And what, if you had to describe the difference in the responsibilities in those two positions, how would you describe that?
A. While I was chief of the facilities development branch, the primary emphasis was on developing an interim storage facility, a temporary storage facility.
When we went to the engineering development, or the engineering division, it was a reorganization where the primary emphasis was on development of technologies, such as the multi-purpose canister and transportation casks.
The multiple purpose canister program was initiated while I was in the facilities development branch.
Q. Okay. So, you started the facilities development branch working with, I believe it is called an MRS; is that right?
A. Yes, that is right.



Q. And that is the interim storage facility?
A. Yes.
Q. And so work on the MPC began while you were there, and then you moved into your second position, and you in essence took control over development, over that development project?
A. Yes. There was a reorganization, I believe it was in 1995, and you are right. I initiated work on the MPC while I was working on the MRS as chief of the facilities development branch.
And, after the reorganization, when I became the director of the engineering division, the MPC work fell under my responsibility then, as well as some other work related to transportation.
Q. Okay. Now, since we are going to be talking about MESCs, and MPCs, and dual purpose casks and various things, let's make sure that when we are using the terms we are both talking about the same thing.



Let me get one document here. I think this will help us.
(Williams Exhibit no. 2 was marked for identification.)
BY MR. CASSLING:
Q. I have handed you, Mr. Williams, Williams Exhibit No. 2, which is titled MPC Update. It appears to be authored by you and presented to the Southern States Energy Board.
If you turn to Page 4 of this document, it is a page titled MPC Study, Definition of MPC.
And it says, the very first line says: Also called universal canister, multiple element sealed canister, MESC, and multi-purpose unit, MPU.
My question to you is, is an MPU and a universal canister, and a MESC, and an MPC, are those all the same things?
A. My view today, after having worked on them for several years, is that the MESC is not the same thing.



Q. Okay. With respect to each one of these terms that are here, and also add one more, dual purpose cask, tell me what you understand today each one of those to be, and the differences between each one so that when we talk about them in the rest of the deposition, we are using the same, we will be meaning the same things.
A. Okay. Start with multi-purpose canister.
Q. And that is an MPC, correct?
A. MPC, multi-purpose canister. My definition of multi-purpose canister is a thin walled stainless steel canister, thin walled meaning a half-inch or an inch thick that holds several spent fuel assemblies, and the canister can be used for storage, and it would be licensed by the NRC under their 10 CFR Part 72.
It would be used also for transportation, and it would be licensed by the NRC under 10 CFR 71.
And, thirdly, it would also be used

your understanding, the language that the DOE uses to justify why it would treat other than standard fuel on a different schedule than standard fuel, correct?

A. It would seem that way.

Q. And Mr. Hall goes on to say that we believe that the original intent of the contract language with respect to fuel classification was not to exclude any existing commercial fuel elements in this fashion.

Do you see that?

A. Yes.

Q. So, that when Mr. Bauer responded to Mr. Hall with this language in the second paragraph of his September 13th letter, he appeared to be agreeing with Mr. Hall's conclusions regarding the standard contract; would you agree?

MR. FINN: Objection, document speaks for itself.

A. It appears that way.

(Williams Exhibit no. 8 was



marked for identification.)

BY MR. CASSLING:

Q. This document is entitled Description of Basic MPC Concepts dated January 27, 1994, presented by you to the INMM Spent Fuel Management Seminar, No. 11.

What is the INMM?

A. Institute of Nuclear Materials Management.

Q. And, at the time, it shows that you were chief of the facilities development branch.

This was, at the very beginning of our deposition today, this was the job you had before you became director of the MPC program; is that correct?

A. It was before I became director of the engineering division. While in the facilities development branch, I was given the responsibility for developing this MPC concept.

Q. Okay. You will see some handwritten notes on the front page and there are other notes throughout.



Do you recognize the handwriting?

A. Yes.

Q. And whose is that?

A. It is mine.

Q. Okay. If you will turn the page, it says MPC history. First, on the bottom of the page, the note begins to the extent practicable, and a little bit of it is cut off.

But, can you tell me, to the best of your ability, what that handwritten note says?

A. It looks like what I am doing is quoting a regulation, an NRC regulation: To the extent practicable in the design of storage casks, consideration should be given to the compatibility with removal of stored fuel from a reactor site transportation, and ultimate disposition by DOE.

Q. Okay. If you look at the right-hand side of the page, you will see a handwritten note that refers to dry cask storage study.

What does that note refer to?

A. That is a study that the DOE did, I



believe it was published in 1989, maybe, I think. It was done in response to a requirement in the Nuclear Waste Policy Amendments Act, which was passed in the early 1987.

And the document came out in draft in 1988 and '89 that discussed dry storage, costs associated with it, different types of technology, and also who was responsible for developing dry storage at utility sites.

Q. Was that prepared by E. R. Johnson?

A. Well, it was a DOE document. I don't think so. I think it was a PNL, I believe, was the main author.

Q. Do you remember what the conclusions of the study were?

A. I think the conclusions were that it was technically feasible to store fuel in a variety of different technologies.

There were conclusions reached with respect to cost and there was also a conclusion, I believe, that the nuclear waste fund shouldn't be used for dry storage at reactors.

certification.
We did not do -- we didn't submit the application to NRC. I think Westinghouse maybe did that on their own, actually. There is an EIS there.
I am not sure why this says EA, but it was late '95 for EIS or late '96. Normally it is a draft EIS and a final.
And so, yes, then the rest of it didn't really happen either. The NRC certificate of compliance, we didn't pursue it, and obviously we didn't begin to deploy MPCs.
Q. Okay. What was the date approximately when you just abandoned the MPC project?
A. It was -- well, I think the decision was probably made August/September '95. I think it was really nailed down after we got our budget for '96.
And so it was from the August through the fall of '95. However, we did allow Westinghouse to continue to complete that



design which took probably until maybe a year from, maybe summer of '96, something like that, maybe they completed their design, however we weren't providing more funds for it through '96.
Q. But the design that Westinghouse came up with, you didn't seek NRC license for, or did you?
A. No, we didn't.
Q. And who made the decision to quit funding the program?
A. Dan Dryfuss.
Q. And what was his position?
A. He was a director of the program.
Q. Okay. Was that decision made because Congress cut off the funds from the program, or was that decision made in-house at DOE to stop funding the program?
A. My recollection -- I don't know exactly what was in Dan's mind, but my recollection of what happened in the summer of '95, it was related to our budget in '96, was that in one of the House appropriation bills



there was some language in there that said, that basically said DOE is directed to not continue this program anymore, because it is best handled by the utilities.
And at the same time we were getting a large reduction in our budget. My recollection is that that language was never signed. It was, I think it was a House appropriations bill or a House report, preliminary thing before the final budget.
However, that was, I think that Dan Dryfuss took that as a sign that this is what Congress wanted when they put the final budget into place which cut, which was a significant cut in our budget, even though the final language wasn't, the MPC termination language or the, you know, don't work on that program language was not in the final appropriations bill.
It was in the precursor to it which was consistent with our budget cut.
Q. One of the things you have just mentioned in this answer was that the MPC program



the DOE felt would be better handled in the future by the utilities.
To the extent that is -- did I understand your answer correctly first?
A. No.
Q. Okay.
A. That was in Congress' appropriation language. That is not what DOE said.
Q. Okay.
A. That is what Congress said in their appropriation language was that this is a program that would be best pursued by the utilities -- or by private industry, I think, not utilities, private industry.
Q. Okay.
(Williams Exhibit no. 9 was marked for identification.)
BY MR. CASSLING:
Q. Mr. Williams, I have handed you a document dated March 6, 1996 that you gave to NEI entitled Capability of Storage and Transport Cask/Canister Systems.

Now, if you can turn to the first page of the presentation, are these four -- well, are the first four bullet points examples of casks or canisters that have received approval from the NRC?

A. It looks to me that what they are, are ones that were at least submitted to NRC. I don't know whether they had been approved at the time of the presentation, but they had been submitted to NRC, because it says docket number for the top three.

And then the fourth one, the Westinghouse MPC, I am not sure what the C-L-I-N means. I just don't remember.

Q. Is that last one, the Westinghouse MPC, the one that you have been talking about which is the MPC you asked them to develop?

A. Yes.

Q. So, the last one is for three purposes, storage, transport and disposal, right?

A. Yes.

Q. Are the first three just for dual



purpose canisters for both storage and transportation?

A. The vendor, Nuclear Assurance Corporation, the second one is New Homes, and the third one is Holtec, they may have hoped that they would be used for disposal as well. I think they were submitted to the NRC for storage and transportation only. So, I would call them dual purpose.

Q. Okay. Now, the next page is entitled: Cask/Canister Limiting Characteristics.

Please explain what this page is intending to show.

A. Okay. I think where we are going to go with this is that there are facility limitations, the first bullet there, facility limitations refers to utilities.

And that many utilities have, they have cranes to pick up heavy loads. And everybody -- not everybody -- it is public knowledge what their crane capability is.



So, what we are looking to do here is to look at what type of crane they have and see whether or not they can handle those canisters or casks that we are evaluating, that is the first one.

The second one is physical dimensions, there may be some utilities that can only get a certain size canister through the doors or whatever they have at their facilities. That is the second dimension.

The next one is fuel type. There are lots of different fuel types and so, some of those designs may be designs for a certain set of fuel types.

So, we are trying to evaluate these, what we call limiting characteristics against those cask capacities. And these were the major limiting characteristics that were evaluated.

Both from looking at the facility, and then looking at the fuel itself, to see whether or not -- how much of the fuel is out there and how much of the facilities, whether



those casks could pick up a lot of it or a little bit, or how much they could pick up of the existing, or the projected fuel.

Q. To make sure I understand, in other words it goes, the page prior when you say the four casks evaluated, you are talking about these four listed on the immediately prior page.

And what you did was you went, presumably you had, DOE had an interest in making sure that whatever cask was used could be used by as many possible utilities as possible, correct?

A. Yes.

Q. And so when you say facility limitations, as you said, you are interested in looking at which one of these casks, given the various limitations the utilities had and how much weight they could pick up with their cranes, how big the spent fuel rods would be, what type of fuel it would be, which one of these casks could be used at the greatest number of utilities possible.

A. That is right.

superior to these other, to these dual purpose casks and canisters, why did it, why was it never pursued, if not by the DOE, then by utilities?

MR. FINN: Objection, calls for speculation.

BY MR. CASSLING:

Q. If you know.

A. Well, it wasn't pursued by the DOE because we quit funding all of the work we did in that area and focused on the repository from '97, '98, '99, and basically defunded the whole transportation storage part of our program.

And followed the direction -- not the direction, but the language that was in that appropriations bill that said that this work is best left to the private industry.

Why it wasn't pursued by the utility industry, I couldn't tell you specifically exactly what each utility decided.

However, if you were a utility and you had to pick between an MP 187 and a HiStar 100, or between an MP 187 and a Westinghouse MPC,



you wouldn't care whether it can be handled in all of the rest of the facilities, the only thing you would care about is whether it serves your needs and what the cost to you is.

So, there was probably, I am sure there probably was a greater cost to develop an MPC, to develop a Westinghouse canister to buy one because it had that capability to serve a lot of needs.

So, it was longer, it had less fuel in it. For criticality reasons, it had extra material in it to get heat out. So, yes, it had a greater capability, however it cost more.

So, if you are an individual utility, you want to look at your own needs. You say what is the best deal for me, to meet my needs. You don't care about meeting everybody's needs.

Q. In other words, the Westinghouse MPC was more expensive than any of the other three alternatives?

A. That is my guess, yes.



Q. Okay.

(Recess -- 1:04-1:07 p.m.)

(Williams Exhibit no. 10 was marked for identification.)

BY MR. CASSLING:

Q. Mr. Williams, this is a document entitled multi-purpose canister Project Overview, a presentation made by you to the INMM Spent Fuel Management Seminar No. 12, between January 11th and January 13th of 1995.

If you look at the three pages beginning at page, the last four digits in the Bates number, 2812 through 2814, these are three charts showing first, states with at-reactor dry storage in December of 1993, and states needing at-reactor dry storage in 2000, assuming no MRS 2010 repository.

And then states needing at-reactor dry storage in 2010, assuming no MRS 2010 repository.

If you go to the second of these pages, that is the states needing at-reactor dry



storage in 2000, how accurate did your projections come?

Would they overstate or understate the number of states needing at-reactor dry storage in 2000?

A. I don't know. I think it is probably fairly close. I really don't know.

Q. If you were making the prediction for dry storage needed in 2010 today, would you make any changes to this chart on page 2814?

A. I don't have any knowledge that would specifically lead me to change this right now, that I know of.

Q. You have a handwritten note on Page 2814 that says will get worse if -- I don't know if that is now or no movement by 2010.

Could you tell me what you meant by that note.

A. It is probably supposed to be no. It might have been no waste movement by 2010.

To tell you the truth, I am really not sure what that means, unless I meant to write

# ZABRANSKY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m.

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY:

M. STANFORD BLANTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 251-8100



APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419



APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

DONALD J. CARNEY, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D.C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D.C. 20530
(202) 307-1011



APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D.C. 20530
(202) 305-7594

what we've agreed to. And you might want to put the 30(b)(6) deposition under separate cover.

MR. BLANTON: Which is okay by me, too.

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPAN and GEORGIA POWER COMPANY

BY MR. BLANTON:

Q Mr. Zabransky, my name is Stan Blanton. I'm counsel to Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company in litigation filed by those companies against the United States in the Federal Court of Claims on the standard contract for disposal of spent nuclear fuel and high-level waste within the Department of Energy.

We're taking your deposition today under coordinated discovery proceedings that exist in the Federal Court of Claims amongst other nuclear as well as other companies. And these other lawyers sitting here at the table represent other companies that have filed similar complaints against the Department of Energy.

What I would like to do today is ask you a



series of questions and perhaps show you some documents and ask you questions about those documents. If I at any time ask you a question that you don't understand, I want you to stop me and make me rephrase my question so you understand it. Will you do that for me?

A Yes, I will.

Q If I in trying to ask a question attempt to repeat some testimony you've given and you feel that I've mischaracterized your testimony, I would like for you to stop me and make me properly characterize what you feel your testimony has been as well. Will you do that?

A Yes.

Q The parties to this coordinated discovery proceeding have entered into something called a joint motion for entry of agreement and protective order, and attached to that is an agreement and protective order -- and by "parties" I mean all the utilities and the government -- which deals with the protection of confidential information in general. Have you had a chance to review that protective order?



A No, I haven't.

Q Okay. I've handed you and your lawyers a copy of the protective order --

A One moment.

Q What I would like for you to do is to take as long as you need to to review the protective order, and then when you get through reviewing it I'm going to ask you if you agree to abide by its terms concerning the protection of confidential information that might be disclosed to you during the course of deposition.

A Okay.

Q Have you reviewed the terms of the order governing the protection of confidential information that might be revealed to you during the course of the deposition?

A Yes.

Q Do you agree to abide by the terms of the order --

A Yes.

Q -- with respect to that information?

Okay. Thank you.



Mr. Zabransky, have you ever had your deposition taken before?

A Once, yes.

Q Then you know this lady at the end of the table is the court reporter and she's going to take down everything you say and everything I say and that she can't take down nods and that you and I need not talk at the same time or she'll get up and leave. Do you understand that?

A Yes.

Q Mr. Zabransky, what is your current position?

A Currently I'm the acting director of the Waste Acceptance and Transportation Division, Department of Energy, Office of Civilian Radioactive Waste Management.

Q How long have you been in that position?

A I believe since sometime in January, early January. This year.

Q Are you acting director because somebody who used to be the director left --

A Yes.

Q -- and has not been replaced?
A Yes.
Q Who is that person?
A James Carlson.
Q What was your position before you became acting director?
A Team leader, waste acceptance.
Q Who did you report to when you were team leader of waste acceptance?
A James Carlson.
Q Who do you report to now?
A Jeff Williams.
Q What is Mr. Williams' title?
A The acting director of the Office of Acceptance, Transportation, and Integration.
Q Do you know who Mr. Williams reports to?
A I believe he reports to the director and the deputy director of the program.
Q So in your current job there's essentially one level of organization between you and the deputy director of the program. Is that accurate?
A That's correct.



Q Am I understanding you?
When did you become team leader of waste acceptance?
A I believe that's when I came to the government in '94 was my original position. I think that's what it was back then.
Q Do you recall a date more specific than just 1994 when you joined the government?
A I believe it was July 8th or 10th, whatever the Monday was after the Fourth of July that year.
Q What did you do before that?
A Worked for Wisconsin Electric Power Company.
Q What was your last position with Wisconsin Electric?
A I was manager of nuclear fuel services.
Q And I may slip up sometime during the next two days and call Wisconsin Electric WEPCO.
A Same thing.
Q But the court reporter likes to know acronyms for real-time.
How long were you manager of nuclear fuel



services at Wisconsin Electric?
A It was a couple of years, maybe since '91. I'm not sure of the exact date.
Q And what did you do before that?
A I was a project engineer in nuclear fuel for a number of years.
Q Did you begin your career with Wisconsin Electric?
MR. CRAWFORD: Objection. Vague.
Q Well, did you have a job between your graduation from college and -- well, did you graduate from college?
A Yes.
Q Did you have a job between graduation from college and joining Wisconsin Electric?
A No.
Q All right. How about just tell me all the positions you had with Wisconsin Electric and the dates of them as best you can.
A After my graduation?
Q Right.
A After graduation I was a civil engineer in



the nuclear power department, which would have been sometime in 1980.
Q Okay.
A And I became a project engineer, nuclear power department, sometime after that. I believe in around '84 I became a contract administrator for nuclear fuel.
Q That was in 1984?
A Yeah, sometime around '84. Sometime after that I became a project engineer for nuclear fuel, and then I believe in '91 or thereabouts I was the manager of nuclear fuel services.
Q As the contract administrator for nuclear fuel, what were your duties?
A My duties were to negotiate and administer all the contracts for the procurement of nuclear fuel commodities for the Point Beach nuclear plant.
Q When you were in that position was the standard contract for disposal of spent nuclear fuel in your area of responsibility?
A Yes.
Q And that job started in 1984 did you say?

A I believe it was around '84, yes.
Q In your previous position as project engineer for nuclear fuel, did you have any responsibilities with respect to nuclear fuel contracts?
MR. CRAWFORD: Objection as to whether it properly characterizes his prior testimony.
MR. BLANTON: Okay.
Q Well, don't let me mischaracterize your testimony.
What were your responsibilities as project engineer for nuclear fuel?
A As project manager of nuclear fuel I had responsibilities for the contracts as well as some other functions such as nuclear material accountability, economic forecasting, rate case development.
Q The project engineer job came after your contract administrator job?
A That's correct.
Q Is that what I fouled up? Okay.
I should have asked in your civil



engineering job did you have any connection with nuclear fuel contracts and specifically the standard contract for disposal of spent nuclear fuel?
A No.
Q What were your responsibilities when you were manager of nuclear fuel -- services? Did I say that right?
A That's correct. Same as project engineer but also included transient analysis, core-design activities, spent-fuel storage activities.
Q Did the project engineers and contract administrators for nuclear fuel report to you when you were manager --
A Yes.
Q -- of nuclear fuel services?
All right. What were your areas of responsibility when you became the team leader for waste acceptance for the Department of Energy?
A Primary responsibility was issues and management of the standard contract and utility interface.
Q What all sorts of things did that include?



A It included the day-to-day administration of the contract, overview of the payment and verification process, acting as the contracting officer's technical representative, contacts with utilities as required to facilitate contract administration.
Q What was the difference between your responsibilities and the contracting officer's responsibilities with respect to the standard contract in that job?
A I provided technical input to the contracting officer for their consideration in making determinations under the contract.
Q Did your responsibilities as team leader stay in general the same from 1994 until January when you became acting director?
A They expanded in that I became responsible for other DOE activities related to other portions of the waste stream that would go to Yucca Mountain, for instance the interface, the activities related to the acceptance of government-owned materials.
Q Was there a particular time when they



expanded or was it a gradual process?
A I think it was a gradual process that expanded over time as people left and systems -- things evolved.
Q Okay.
A We went through a downsizing, and as a result there were fewer people and the same work.
Q Was there a particular time when the downsizing occurred?
A I think -- no, I don't recollect. There was a particular time where there was a reduction in force, but there was no particular time where it addressed this. People just moved to different places as a result of that.
Q Okay. How have your duties changed with your most recent position?
A I am responsible for the transportation aspects now also.
Q Are you still responsible for all the other stuff that you were responsible for?
A Yes.
Q Is there somebody else in the team leader

spot now?
A No.
Q Have those two positions been combined or is the team leader spot just vacant?
A I'm still a team leader for waste acceptance. I'm just the acting director of the division.
Q Have you done anything to prepare for your deposition today?
A I've reviewed the contract. In preparation for my 30(b)(6) deposition I've reviewed documents provided to me by counsel. And I've had discussion with counsel.
Q Have you had any discussions with anybody other than your counsel to prepare?
A I've had discussions with Nancy Slater in conjunction with counsel. In preparation for my 30(b)(6) deposition.
Q Okay. I'm not asking you about the 30(b)(6) deposition right now, just your fact deposition.
A Okay.



Q Have you had conversations with Nancy Slater outside the presence of counsel about your fact deposition?
A No.
Q How about with anybody else outside the presence of counsel about your fact deposition?
A No.
Q Have you reviewed any documents other than the standard contract?
A Not in preparation for my fact deposition.
Q Have you reviewed the complaints in the case, or any of them?
A No.
Q Have you reviewed any of the briefs filed by either of the parties?
A No.
I'd like to clarify my last answer.
Q Okay.
A I've not reviewed any briefs, complaints, or filings as -- in preparation for my deposition. Over the course of my job over the last years I've reviewed them and read them. I haven't reviewed them



recently.
Q Okay. You say "over the last years." There have been several lawsuits over the standard contract. Is that correct?
A That's correct.
Q And some of those have been in the Court of Appeals for the District of Columbia circuit, and some of them have been in the Court of Federal Claims. Are you aware of that?
A I'm aware of that.
Q Do you know whether you've read any of the briefs filed in the cases currently pending in the Court of Federal Claims?
MR. CRAWFORD: Well, let me object to this line as getting into areas of privilege. I mean --
MR. BLANTON: You served them on us.
MR. CRAWFORD: Right.
MR. BLANTON: They're not privileged.
MR. CRAWFORD: Well, whatever he's done in reviewing them and so forth, but, I mean, your question is proper as to with respect to what he's reviewed in terms of preparing for his deposition, but



his other work on the case I would think is privileged.
Q You're obviously aware today of what you've read in the past. Is that correct?
A In the past counsel has provided me some -- some of the briefs. Some of the complaints. I'm not sure all of them or which ones, and asked me to take a look at certain parts of them and comment. But I don't know which ones in particular. I can't recollect.
(Deposition Exhibit Zabransky 1 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm handing you a document that's been marked as Exhibit 1 to your deposition, which, if all goes well, is a Federal Register notice dated Monday, April 18, 1983, entitled Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. And after some background material there is what purports to be a form of the standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste. Do

you see that?
A Yes.
Q Is that the contract or the form of contract that you reviewed in preparation for your deposition?
A This is the form of the contract. I may have reviewed a later version of this, I believe a '91 or a '92 version of this that was in the Federal Register that has modifications.
Q Okay. What modifications were done in 1991, can you tell me off the top of your head?
A In general there were modifications related to electricity generated and sold and allowances for credits or reductions due to energy losses not delivered to the ultimate consumer as a result of the litigation.
Q All those deal with how the fee is calculated? Is that correct?
A That's correct.
Q Are there any other differences that you know of between the standard contract that was promulgated in 1983 and the one that was contained or



the one you reviewed?
A Not that I recollect.
Q Have you seen this version of the contract before?
A Yes, I have.
Q What is the Department of Energy's obligation under that contract with respect to the quantity and rate of spent fuel acceptance?
MR. CRAWFORD: Objection. Calls for a legal conclusion.
A There's no rate of acceptance established in the contract.
Q Are you saying the Department of Energy does not have any obligation with respect to the rate of spent nuclear fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A I'm saying that the contract does not contain the rate.
Q And my question is what is the department's obligation under the contract with respect to the quantity of spent fuel it would accept in a particular



year from the utilities?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A As a result of the contract the Department of Energy's obligation is as it appears on the approved delivery commitment schedules.
Q If a utility does not have an approved delivery commitment schedule, is it your testimony then that the DOE does not have any obligation to pick up spent fuel from that utility?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A With respect -- if there's not a delivery commitment schedule approved for a given year, there's no obligation for that given year.
Q How does a utility go about getting a delivery commitment schedule approved?
A The contract stipulates how the utility does that.
Q When is the last time the Department of Energy approved a delivery commitment schedule?
A I don't recollect the exact date.



Q Has it had delivery commitment schedules submitted to it that it has neither approved or disapproved?
A That's correct.
Q Why is that?
MR. CRAWFORD: Objection. Vague.
Q Are you responsible for deciding whether a delivery commitment schedule gets approved or not?
A I'm responsible for reviewing them and making a technical recommendation to the contracting officer.
Q Do you know why delivery commitment schedules that have been submitted have not been approved or disapproved?
MR. CRAWFORD: Objection. Vague.
MR. BLANTON: I was asking if he knew.
MR. CRAWFORD: I know. Which DCS are you talking about?
MR. BLANTON: Any DCS.
MR. CRAWFORD: Well, objection. Vague.
A Repeat the question you asked me?
Q Do you know why any DCS that has been

submitted but has not been approved or disapproved, do you know why that has been done?
MR. CRAWFORD: Objection. Vague.
A Yes.
Q Would you tell me?
A On the advice of counsel.
Q On the advice of counsel they've neither been approved or disapproved?
MR. CRAWFORD: Objection. Compound.
Q I'm just trying to make sure I understand your answer, Mr. Zabransky.
A They have not been processed. They've not been approved or disapproved on the advice of counsel.
Q As I understand your testimony, you provide technical advice to the contracting officer on various issues regarding interaction with holders of standard contracts. Is that accurate?
A That's correct.
Q Now, do you have any authority on your own to take actions with respect to delivery commitment schedules, or does the contracting officer take action based on whatever advice the contracting officer



gives?
A The contracting officer takes the final action. I would make a recommendation.
MR. BLANTON: Let's mark that as number 2.
(Deposition Exhibit Zabransky 2 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm going to show you what's been marked as Exhibit 2 to your deposition, which is a letter dated September 30, 1996, from R.G. Cocherell, and his name is spelled C-o-c-h-e-r-e-l-l. He's manager of nuclear fuel services at Southern Nuclear Operating Company. Take a look at that letter.
For your information, I just note that you are copied on there as an "attention to."
A Uh-huh.
Q Do you recall whether you've ever seen this letter or not?
A I don't recall this specific letter.
Q What does this appear to be to you?
A This appears to be a submittal of delivery



commitment schedules to the contracting officer by Southern Nuclear Operating Company.
Q All right. Let me refer you just for a minute to the attachment to the letter which is titled U.S. Department of Energy Appendix C Delivery Commitment Schedule. Do you see that?
A Yes.
MR. CRAWFORD: Let me just ask you, Stan, they appear to be the same. There are two attachments that are marked identically. Are they the same? They appear to be.
No, maybe not.
MR. BLANTON: They're two different Bates numbers.
THE WITNESS: They're different.
MR. BLANTON: That's the way they were in our file.
MR. CRAWFORD: And the cover letter indicates there are six copies of DCSs. It doesn't indicate which one's original, which ones are copies or not. Is this thing complete?
MR. BLANTON: It's complete the way it is



in our file.
MR. CRAWFORD: Okay. I got you. Well, it might be helpful to the witness then just to note that there are two different DCSs.
MR. BLANTON: Okay.
Q You see what your lawyer is referring to? You got a DCS identification number on the first page that ends in 901 and one that ends in 902 on the second page.
A Yes.
Q What I wanted to ask you about is you see in the top left and right-hand corners of the form, the DCS form --
A Uh-huh.
Q -- there is -- on the left-hand side there's something that says NWPA-830 C and it says revised 9/10/93, which I take to mean September 10, '93. Is that what you take that to mean?
A I take it to be the date September 10th, 1993.
Q And on the right-hand corner of the document it has OMB number 1901-0260, and under that

it has "expires 5/31/97." Do you see that?
A Yes, I see that.
Q What do you take that to mean?
A That's the date that this forms expires from OMB clearance.
Q Okay. Are you aware of whether or not this form has been re -- what has to happen in order for this to be a valid form if it expires?
A I'm aware --
Q Not talking about this particular document here but this form.
A I understand your question. I'm aware of what has to happen for this form to be renewed.
Q Has it been renewed since May 31, '97?
A I don't know.
Q How would we find that out?
A We would ask the person who does this.
Q Who does this?
A On my staff, Mr. Pollog is -- oversees ensuring that forms are renewed, and he has that done for him by the Energy Information Administration.
Q Okay. Could we also then ask the Energy



Information Administration whether this particular form has been renewed or when the last time it was renewed was?
A Yes, we could.
Q Okay. What is the process in the Department of Energy in your area when a utility sends in a letter containing delivery commitment schedules such as this?
A The process is -- has been to review the schedule and make a recommendation to the contracting officer. Per the direction of counsel, we have not been reviewing these documents.
Q So you don't even review them now?
A We don't review the documents. We do not process them at this time.
Q Is there --
A One of my staff actually does look at it and makes sure there's no questions, and then we file them, but we don't perform a review or make a recommendation to the contracting officer.
Q Are you aware of any reason other than this, the lawyers told us not to do that, that you



don't do it?
A No.
(Deposition Exhibit Zabransky 3 was marked for identification and was attached to the transcript.)
Q Do you know when the practice of not reviewing the DCS submittals started?
A I don't recollect the specific date.
Q How about a year?
A I believe it was tied to a court decision in the Court of Appeals, the department's obligation.
Q Okay.
A That might have been 1996.
Q Okay. Would that be the decision that said, paraphrasing, and nobody's going to hold you to my paraphrase, that the Department of Energy has an unconditional obligation to begin acceptance of spent fuel in 1998?
A To the best of my recollection.
Q Okay. And subsequent to that decision it's your recollection that the department at that time stopped reviewing delivery commitment schedules,



submittals?
MR. CRAWFORD: Objection. Vague.
Q Did you understand my question?
A You asked me if subsequent to that decision is that what caused us or is that the time that we stopped reviewing at the direction of counsel, delivery commitment schedules.
Q You asked it better than I did.
A And the answer to that question is that's -- yes.
Q All right. Let me show you what's been marked as Exhibit 3 to your deposition. I think I've already given your counsel a copy of it.
MR. CRAWFORD: Yes.
Q That is a letter, operating from memory, from Ms. Tomasoni, is that correct, back to Mr. Cocherell?
A Yes, it is.
Q Do you recall seeing that letter or similar letters?
A I recall seeing --
MR. CRAWFORD: Objection. Compound.

Q Do you recall seeing that letter?
A I don't recall the specific letter.
Q Do you recall seeing letters like that?
A I've seen -- yes, I have seen letters like this.
Q Is that a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Well, objection. Vague.
Q Is Exhibit 3 to your deposition a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Objection. Vague.
A A letter of this type has been sent in response to most of the submittals since we stopped processing them.
Q Okay. And that letter indicates that the DCSs submitted by Southern Nuclear cannot be approved or that the department is unable to approve them. Is that correct?
MR. CRAWFORD: Objection. Best evidence.
A The letter says what it says.



Q I'm sorry. It does not say "unable." It says "Not able at this time to approve your DCS submittal." Is that correct?
A That's what the letter says.
Q Given the Department of Energy's current practice, is there any way for a utility to get a DCS approved at the current time?
A Under the current guidance, no.
Q And that guidance has been the same since the decision in 1996 that the Department of Energy had an unconditional obligation to accept spent fuel in 1998. Is that correct?
A That is my recollection.
Q Now, let me get you to look back at number two again. And referring you to DCS identification of the document with that DCS identification number that ends in 901, how does the utility know how many metric tons of uranium to put in line 2.5?
MR. CRAWFORD: Objection to the extent it calls for speculation.
Q If you know.
A I don't know how Southern Nuclear knows.



Q Well, let me rephrase my question then. Has the Department of Energy given instructions to utilities as to how they should complete these delivery commitment schedule forms?
A Yes, it has.
Q And what are those instructions with respect to the quantities of spent nuclear fuel that are included on a particular delivery commitment schedule?
MR. CRAWFORD: Objection. Best evidence.
A I would have to review the instructions to find out exactly what it says.
(Deposition Exhibit Zabransky 4 was marked for identification and was attached to the transcript.)
Q All right, sir, I'm going to hand you what's been marked as Exhibit 4 to your deposition, which is titled U.S. Department of Energy Instructions for Completing the Appendix C Delivery Commitment Schedule General Instructions. There's one for your lawyer.
A Okay.



Q All right, sir. Do those instructions indicate how a utility is to complete the delivery commitment schedule?
A Yes.
Q Do they indicate how the utility is to quantify on the delivery commitment schedule the amount of spent nuclear fuel that's to be picked up in a particular year?
A Yes.
Q What do they say about that?
A They say in instruction 7A, When submitting DCSs purchasers should base their DCSs on allocations contained in the latest annual capacity report, ACR.
Q All right. What is the latest annual capacity report? When was the latest annual capacity report issued?
A I believe it was issued in March of '95.
Q Okay.
(Deposition Exhibit Zabransky 5 was marked for identification and was attached to the transcript.)
Q Let me show you what I've marked as Exhibit

5.

Zabransky Exhibit 5 is a document titled Acceptance Priority Ranking and Annual Capacity Report, and it's dated March 1995, is it not?

A Yes, I believe it is. It's hard to read but...

Q Is that the last annual capacity report the Department of Energy has published?

A Yes, it is.

Q Let me get you to take a look at page six of that annual capacity report. What is that?

A Page six contains Table 2, Summary Of Purchaser's Annual Allocations.

Q All right. Is that the document that's referred to in the instructions for completing the DCS that the utility is supposed to use to determine what quantity of fuel is inserted in a DCS for a particular year?

A That's a summary of the information.

Q Okay. There are only ten years on that document. Is that correct?

A That's correct.



Q That's not all the spent fuel covered by standard contracts?

MR. CRAWFORD: Objection.

Q Is it? Do you know whether all the spent fuel covered by standard contracts is reflected on Table 2 of Exhibit 5?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A If you're asking me if the total quantity of spent fuel generated to date and expected to be generated by reactors covered by the contract is contained within this table, the answer is no.

Q All right, sir. How would a utility who has spent fuel that's not contained on Table 2 of Exhibit 5 to your deposition fill out a DCS for that fuel?

A They would not be able to.

Q Okay. Has the Department of Energy ever published anything, any document, that would inform a utility that had spent fuel that's not in DOE's initial ten-year schedule as reflected on this document, how they would include that fuel on a



delivery commitment schedule?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

Q Do you understand my question, Mr. Zabransky?

A Your question was has the Department of Energy published anything that would give guidance to a utility as to how to fill out a DCS beyond this first ten-year schedule.

Q Yes, sir.

A The answer is no.

Q Is it your position that under the standard contract a utility has no right to have that fuel picked up under the standard contract?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A That's not my position.

Q Well, what is your position with respect to utilities who have fuel that does not show up on this ten-year schedule?

A My position is that that fuel would show up on subsequent schedules after the first ten years of



operations.

Q But those utilities don't have approved DCSs, do they?

A DCSs aren't due until 63 months prior to the date of pickup. Date of pickup is now anticipated to be no sooner than 2010.

Q So how does whether or not the utility has an approved DCS affect its rights under the contract?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A The department has not committed to pick up fuel on a certain date at a certain rate other than as it showed in the approved DCSs. Its obligation to remove fuel exists, but not on a specific date or a specific rate.

Q Does the Department of Energy have any plans to publish another annual capacity report at any particular time?

A I don't know what the department's plans are.

Q Are you aware of any plans to publish an additional annual capacity report?

A I am not aware of any plans.
Q Let me get you to take a look back at the instructions --
MR. BLANTON: Jeff, do you have a copy of those?
Q Can I refer you to paragraph 7C of Exhibit 4 to your deposition.
MR. CRAWFORD: The highlighted portion?
MR. BLANTON: The part in green.
Q Do you see that?
A Yes, I see it.
Q Take as long as you need to review that.
A I've reviewed it.
Q Okay. That statement says "The process described herein" -- I assume referring to the instruction -- "assumes that the FWMS" -- which stands for what?
A I believe it's Federal Waste Management System.
Q -- "that the federal waste management system will be able to accept the purchaser's SNF" -- which stands for spent nuclear fuel, I believe --



"beginning in 1998 according to the acceptance rate reflected in the ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."
Do you see that?
A Yes, I see that.
Q Why would DOE need to reevaluate previously approved DCSs in the event that they did not commence spent fuel acceptance beginning in 1998?
A DOE and the purchasers would need to reevaluate that because when DOE did begin commencement of operations it wouldn't necessarily be the case that the purchaser would want that same fuel picked up from that same reactor.
Q Okay. Has DOE reevaluated any of the previously approved DCSs?
A DOE has not.
Q Does DOE consider that it has the right to change the quantities or to reevaluate the quantities of spent fuel contained on the DCSs?
MR. CRAWFORD: Let me object to that as a



mischaracterization of what he just testified to.
MR. BLANTON: I'm just asking. I wasn't suggesting he said that. I was just asking a question.
A DOE -- as it says, DOE believes that the previously approved DCSs need to be reevaluated by DOE and the purchasers. Can't be unilaterally modified.
Q Okay. As I understand your testimony from a minute ago, and I think we have the contract here if you would like to review that, the DCS would be due 63 months in advance of the delivery date? Is that right?
A 63 months prior to the year of delivery.
Q Okay. And the year of delivery is what's shown in the ACR. Is that correct?
A Year of delivery now is when the repository operates.
Q Well, if I'm the utility and I'm trying to decide when I need to send in my DCS, how do I determine that?
A Based upon the fact that DOE has said it doesn't anticipate the repository to operate prior to



2010.
Q So under that analysis or interpretation no DCSs would be due as we sit here today. Is that correct?
A As of this point in time, that's correct.
Q Okay. Have you had any conversations with utilities to that effect?
A Not that I recollect.
Q What if a repository never gets built, does the Department of Energy have any obligation under the contract to anybody?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to speculation.
Q I'm trying to understand your testimony about what the DOE's obligation is.
MR. CRAWFORD: Well, objection to the extent it mischaracterizes any of his prior testimony.
A The department has an obligation to accept and dispose the spent fuel. The court has determined it should have been done in 1998, but the rate and the schedule is as established by the DCS process. So --

that's it.
Q So without a DCS is it your testimony that without a DCS process there can be no rate under the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion, and asked and answered.
A It's my belief that an approved DCS is required to establish a rate and date for acceptance.
Q All right, sir. Are you aware of any plans that the Department of Energy has to recommence the process of reviewing and processing delivery commitment schedules?
A I am not.
Q And as long as that condition exists, do I understand your testimony to be that the Department of Energy has no obligation with respect to the rate of spent fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A No further obligation than that already established in approved DCSs.
Q All right. Which means that utilities who



don't have spent fuel in that first ten years could never have had an obligation with respect to rate. Is that right?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion. Asked and answered.
A To the extent they don't have an approved DCS, that would be the case.
Q Okay. What reasons would purchasers have for wanting to reevaluate DCSs based on the failure to begin acceptance in 1998, to your knowledge?
A I'd have to speculate as to what they would consider if they wanted to --
Q Well, based on your experience at WEPCO what would the considerations be?
MR. CRAWFORD: Well, objection to the extent it calls for speculation or assumes facts not in evidence.
Q Well, you said that you were at WEPCO when WEPCO submitted delivery commitment schedules, weren't you?
A Yes, I was.



Q And those were approved, weren't they?
A Yes, they were.
Q Based on what you know about the submittal of those DCSs, what purpose would a utility have for wanting to reevaluate a DCS?
MR. CRAWFORD: Same objection.
A I can't speak for WEPCO, but DCSs in general contain fuel ranges that would be proffered for delivery by the utility to the Department of Energy. It could be the case -- again we're speculating -- that the fuel range on the original DCS that was submitted and approved would no longer be the fuel they wished to deliver because something else had been done to it, like we put in dry storage. And then, therefore, it would not be in that utility's best interest perhaps to take that fuel and offer it to the delivery but instead to offer different fuel. So it may wish to evaluate that DCS.
Q Was the primary purpose of the DCS process to identify which fuel of a given allocation the utility wanted to deliver to DOE?
MR. CRAWFORD: Objection. Vague.



Q Do you understand my question?
A There are many purposes for the DCS process. One of them was to identify the range of fuels the utility may wish to deliver.
Q I don't understand what you mean by "range of fuels." Could you explain that?
A Yes, I could.
Q Will you?
A Yes, I will. Fuel from a given reactor -- one of the purposes is to identify the range of fuels. Fuels from a given reactor require different shipping equipment, shipping casks, depending upon when it was discharged, how highly it was enriched, how highly it was burned, how long it's been postreactor basically. So fuel of a certain class wouldn't necessarily be fungible from a technical standpoint with fuel of a different class. So one of the purposes of the DCS was to establish for DOE's planning to fulfill the need to supply a cask suitable for the utility's use was to identify what fuel the utility wished to have moved. And the fuel that would be moved ultimately would be a subset of the fuel specified on the DCS.

Q Okay. As implemented by DOE, was the purpose ever to determine the quantity of spent nuclear fuel?
A Yes.
Q How so?
A By taking the MTUs and also by asking them to provide the number of assemblies that could be contained in those MTUs.
Q The way the process was implemented by DOE, did the utility have any discretion about how many MTUs to put in the DCS?
A No.
Q So that was dictated by the Department of Energy.
A The MTUs was as per the instructions from the ACR. The number of assemblies contained was to some extent the utility's discretion.
Q Okay. Let me get you to look back at Exhibit 1 to your deposition and specifically Article 5.B of the standard contract.
Does Article 5.B deal with a delivery commitment schedule process?



A Yes, it does.
Q Where in Article 5.B does the contract limit the quantity of spent nuclear fuel the utility can put on a DCS to the amount in the ACR?
A It doesn't.
Q Where did that requirement come from?
A That requirement came from the contracting officer when the contracting officer transmitted the instructions for completing DCSs to the utilities.
Q Under the process as you understand it, during the period of time when DOE processed delivery commitment schedules, if a DCS came to the Department of Energy or submitted to the Department of Energy and had a quantity of spent fuel that was greater than that shown in the ACR, what happened?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to foundation.
A When DOE was processing DCSs, if the DCS contained a quantity of SNF -- MTUs greater than that in the current ACR, it was more than likely rejected by DOE, sent back by the contracting officer as



disapproved.
Q Now, I have referred you to Article 5.B of the standard contract and asked you about any relationship between the DCS and the ACR in there. But I want to be fair. Is there anyplace else in the standard contract that authorizes the rejection of a DCS because it does not match the quantity of spent nuclear fuel in an ACR?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A The process for filling out DCSs was transmitted with the contract instructions, I believe. I am not aware of other provisions in the contract that deal with the ACR and the DCS process.
Q All right. When did DCS forms first begin to be submitted, if you know?
A I don't have an exact date.
Q Early nineties?
That's a question.
A It would have been the early nineties. My recollection would have been -- from my experience at WEPCO it would have been 63 months -- no later than 63



months prior to January 31st, 1998, or January 1st, 1998.
Q Okay.
A Sometime in September of '92.
Q Okay. At that point in time was there a general understanding in the utility industry and the department -- well, strike utility industry. In the Department of Energy as far as you know about whether a repository was going to be available in 1998?
A I wasn't at the Department of Energy in '92 so I don't know what the general understanding was at the Department of Energy.
Q What was the general understanding in the utility industry?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A I don't know.
Q What did you think?
MR. CRAWFORD: Objection to the foundation.
Q What did you think in 1992 about whether or not there was going to be a repository in 1998, Mr. Zabransky?

A Mr. Zabransky thought in 1992 that there was still a possibility for a monitored retrievable storage facility by 1998.
Q But not a repository?
A But not a repository.
Q Okay. What had to happen in order for a monitored retrievable storage facility to be available by 1998 as of 1992?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection, foundation.
A I don't know the exact steps that would have been required.
Q Okay. Now, as I understand your testimony, you were not involved in any standard contract issues at the time the standard contract was promulgated. Is that correct?
A That is correct.
Q Let me back up from my line of questioning. I just started to ask the question that just got passed to me.
Do you recall when you concluded that there would be no spent fuel acceptance in 1998?



MR. CRAWFORD: What was your question again? Hang on, I just --
Q I assume you concluded at some point that there would be no spent fuel acceptance in 1998. Is that right?
A Yeah. Obviously at some point I concluded that wasn't going to happen.
Q When did you conclude that, do you recall?
A No, I don't recall exactly when that was.
Q Were you involved in any way in any of the activity that led up to the passage of the Nuclear Waste Policy Act of 1982?
A No, I was not.
Q Were you involved in the process that led to the promulgation of the standard contract in 1983?
A No, I was not.
Q Did you review the standard contract for either Wisconsin Electric or any utility industry group during the period between the time it was proposed and the time it became final?
A No, I did not.
Q Were you privy to any conversations between



the Department of Energy and utilities about the standard contract during that period of time?
A During -- before it became final?
Q Between the February to June '83 time frame.
A No, I was not.
MR. CRAWFORD: Stan, is this an appropriate time to take a break?
MR. BLANTON: It's a fine time to take a break.
(There is a recess from the record.)
Q Mr. Zabransky, I got another couple of questions I need to ask you about Exhibit 5, which is the annual capacity report for 1995.
A Okay.
Q The last sentence of page one of the document says "As specified in the standard contract the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."
And then if I could refer you over to page four. And referring to Table 1, the projected nominal



acceptance rates for spent nuclear fuel, the second sentence after Table 1 says "This table provides only an approximation of system throughput rates and is subject to change depending on congressional action regarding the conditions for site and construction, operation of an interim storage facility, if any, the repository, and the system design and configuration."
Do you see where I've read from?
A Yes, I do.
Q What would happen to the DCS if DOE changed the waste acceptance rates set forth in the ACR upon which the DCS was based?
MR. CRAWFORD: Objection. Vague. Objection to the extent it calls for a legal conclusion.
Q Do you understand my question?
A Which DCS?
Q The ones that have been approved.
A The ones that have been approved by the contracting officer are binding.
Q Whether or not the ACR changes?
A That's correct.

Q Okay. Where would the -- if not from you or your -- and when I say you, I mean you or your group. If not from you or your group, where would the contracting officer receive technical input on acceptance rates from within OCRWM?
MR. CRAWFORD: Objection to vagueness and it's foundation primarily.
Q Do you understand my question?
A You're asking me who would have told the contracting officer, who would advise the contracting officer as to appropriate acceptance rates to utilize?
Q Correct.
MR. CRAWFORD: Same objection.
Q He's objecting to your questions now.
A What can I do?
It's my belief that would have come from the program's director who would have approved the ACR.
Q Who within the program would have done the initial work on the acceptance rates in the ACR?
A I don't know.
Q Not you?



A Not me.
Q Let's look back at the Exhibit 1 to your deposition, which is the Federal Register notice of the standard contract. Referring you to the first page of the standard contract, the second "whereas" clause which reads, Whereas DOE has the responsibility following commencement and operation -- the commencement of operation of a repository to take title to spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel. Do you see that?
MR. CRAWFORD: Where are you?
A It's on this page here.
Q Right at the first of the contract, the preamble, whereas clauses.
MR. CRAWFORD: Which one are we on?
MR. BLANTON: The second one.
A Okay. I'm reading the second whereas clause.
Q Do you have a working definition at the Department of Energy as to what that clause requires



the Department of Energy to do?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for a legal conclusion.
A I'm not sure what you mean by "working definition."
Q Well, in exercising your responsibilities with respect to the standard contract, what is meant by the requirement that DOE take title to spent nuclear fuel or high-level radioactive waste as expeditiously as practicable?
A After commencement of repository?
Q However you define it.
MR. CRAWFORD: Same objection.
A Under the contract, responsibility is to issue an ACR, an APR, and the ACR is based upon the anticipated receiving capacity of the facilities. That's my responsibility.
Q All right. Do you have an understanding as to how fast "as expeditiously as practicable" is as applied to the receipt of spent fuel by DOE?
MR. CRAWFORD: Objection to the extent it



calls for a legal conclusion.
A No, I don't.
Q Same page, Article 2, Scope. The last sentence of Article 2 says "The services to be provided by DOE under this contract shall begin after commencement of facility operations not later than January 31, 1998, and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of." Do you see that sentence?
A Yes, I see it.
Q Do you have a working definition as to what the services -- well, as to what "continue until such time as SNF or HLW from the civilian nuclear power reactor specified in Appendix A" means?
MR. CRAWFORD: Well, objection, vagueness. Objection to the extent it calls for a legal conclusion.
A I have a personal interpretation as to what that means.
Q What is that?

A It means that we will continue -- the contract will continue until all the fuel is removed from the reactor designated in the contract.
Q Have you ever heard it expressed at the Department of Energy that DOE could have complied with the contract by accepting one spent fuel assembly in 1998 and then essentially stopping?
A If you're asking me have I heard somebody say that, the answer to that question is yes.
Q Who have you heard say that?
A I don't recall.
Q Are you aware of whether or not that's the position of the Department of Energy with respect to the performance of the contract?
A I'm not aware that that's the position of the Department of Energy.
Q Do you think the opposite is the case?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q Go ahead.
A I don't know the position of the Department of Energy with respect to that provision -- that



statement.
Q Okay. Do you personally think that's a reasonable interpretation of the standard contract?
MR. CRAWFORD: Objection, relevance. Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A If you're asking my personal opinion?
Q Yes, sir.
A My personal opinion is no.
Q That's not a reasonable interpretation of the contract?
A That's not -- yeah, that's my personal opinion.
Q We sort of had a conversation rather than a question and answer there, so is your personal opinion that a position that says DOE could have accepted one spent fuel assembly in 1998 and stopped is not a reasonable interpretation of the contract? Is that correct?
MR. CRAWFORD: Same objections as before.
A That's my personal opinion.
Q Okay. Are you aware of DOE ever taking any



action in connection with the implementation or the administration of the contract that was based on that interpretation?
A I'm not aware of any such action.
Q Are you aware of what problem Congress was trying to solve when it passed the Nuclear Waste Policy Act? Or do you have an opinion about that?
MR. CRAWFORD: Objection to the extent it calls for speculation.
Q You've been in this industry for how long?
A A long time. I have -- I'm not aware of what Congress was doing specifically in 1983. It was not on my radar screen. I have an opinion that they were trying to close the back end of the fuel cycle.
Q And you're going to have to put that into laymen's terms for those of us who don't speak in terms of the fuel cycle.
A Provide a mechanism by which fuel could be disposed of. And removed from reactors.
Q Were there other ways to dispose of spent nuclear fuel other than that or at least to remove fuel from the reactor and store it other than that



provided for in the Nuclear Waste Policy Act?
MR. CRAWFORD: Objection. Foundation. Objection, vagueness.
Q Well --
A I'm not sure what the question is.
Q Well, the question is, the Nuclear Waste Policy Act calls for deep geologic disposal. Is that right?
A Yes, it does.
Q That's not the only way utilities could manage spent nuclear fuel, is it?
MR. CRAWFORD: Objection to the vagueness.
A Manage or dispose of?
Q Manage.
MR. CRAWFORD: Objection. Vagueness.
A There's many ways of managing fuel.
Q They could store it on site?
A That's a way of managing fuel. That's an option, yes. But the Nuclear Waste Policy Act provides for the disposal of fuel.
Q Was one of the purposes of the act to minimize the degree to which utilities had to store

A Uh-huh.
Q Number three under Program Objectives says "To assure acceptance of waste for disposal by January 31, 1998, in accordance with the acceptance schedule provided for in the department's disposal contracts and in conformance with the Nuclear Waste Policy Act of 1982." Do you see that?
A I see that.
Q What acceptance schedule is that referring to, do you know?
MR. CRAWFORD: Objection. Foundation.
A No, I don't know. I would have to read the document to determine that.
Q Is there an acceptance schedule provided for in the disposal contracts, to your knowledge?
A Not to my knowledge.
Q Do you know what waste acceptance, or what acceptance schedule would be in conformance with the Nuclear Waste Policy Act of 1982?
MR. CRAWFORD: Objection. Foundation. Objection, asked and answered.
A The act doesn't contain a schedule, so I



don't know what this is referring to.
Q Let me get you to look now under Program Strategy, Section A, Waste Acceptance Schedule. The first paragraph says that "Based on the approach previously described, the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the department will accept beginning in 1998." Do you see where I've read from?
A I see where you read from, yes.
Q And then Table 2-1 contains a waste acceptance schedule. Do you see that?
A I see that.
Q Do you recall when you first became acquainted with the contract waste acceptance schedule that had rates that approached 3,000 metric tons a year within the first five or six years of operation of the program?
A I don't think -- I don't recall that when I first became acquainted with the contract I was concerned or even observed those schedules. I don't recall it.



Q Okay. Well, what as Wisconsin Electric's contract administrator did you think you were buying when you paid your fees to the government under the contract?
MR. CRAWFORD: Objection. Foundation. Objection to the extent it calls for a legal conclusion.
A As a Wisconsin Electric employee I thought we were buying disposal services for the fuel from Point Beach.
Q Did you think it had anything to do with when the government would come pick up your fuel and how much of it they would pick up when they came?
A At that point in time the belief was that it would begin in 1998. I don't recall at that point in time focusing on the rates.
Q Have you ever focused on the rate in any job you've had?
A Yes.
Q Which one?
A Wisconsin Electric.
Q Okay. Do you recall conversations in those



days among utilities regarding whether the contract meant that utilities would not have to add additional storage space after 1998 to store spent fuel?
A I've never had such a belief. I don't recall those specific conversations. I can't attest that others didn't have that belief. I never had that belief.
Q Well, did you have any concept of what it was that the government was going to do other than at some distant undefined point in the future dispose of your spent fuel?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, argumentative.
A I believe that it would fulfill the contract, which is dispose of the spent fuel, and the process was established in the contract. But I don't recollect focusing on the rate in the mid-eighties.
Q Did you have any idea or opinion about how long that was supposed to take for the government to remove the spent fuel from WEPCO's plant site?
MR. CRAWFORD: Objection. Vagueness.

Objection to the extent it calls for a legal conclusion.

A Are you asking me on a regular basis or an absolute basis?

Q On an absolute basis.

A I think, again, this is a personal opinion as to what I recollect was that I believe at that point in time utilities thought -- I thought that the fuel would be gone in a reasonable amount of time after the reactor ceased operations.

Q What's a reasonable amount of time?

A My view at that time would have been, you know, five to ten years. As a personal view. At that time.

Q What was the basis for your belief that WEPCO's fuel would be gone in five to ten years after the reactor ceased operations?

MR. CRAWFORD: Objection to relevance.

A My basis at that time would have been that we -- I still thought that a repository or a central facility would have been possible by '98 and that it would have been possible to build a system sufficient



to cause the fuel to be worked off in a reasonable time frame. It was predicated upon there being a repository facility in the '98 time frame.

Q Okay. What about having the repository made it possible for DOE to pick up the fuel at a rate that would have removed it from the site within five to ten years after the reactor ceased operations? What rates were reasonable if a repository existed as you expected?

MR. CRAWFORD: Objection. Vagueness. Objection, speculation. Objection, foundation. Objection -- well, that's all I'm going to do.

MR. BLANTON: That's all he can think of.

Q I didn't ask you if your lawyer told you so. He didn't have that one.

MR. CRAWFORD: Objection to side bar.

A It would have been my personal opinion at the time that a rate that would have been reasonable would have reflected the aggregate rate of discharges plus some amount of workoff.

Q Okay. So that --

A In an unconstrained situation. You asked



me also what about a repository made that possible was that there would be a place to take it.

Q Okay. And so I make sure I understand the dynamics that just went into that answer, you got every nuclear plant in the country has spent fuel that's been generated prior to 1998, correct?

A Correct.

Q And that's the backlog you were talking about working off?

A That's correct.

Q And then in every year, including '98 and in the future, every utility is generating new spent fuel every year.

A That's correct.

MR. CRAWFORD: Objection to speculation, and objection to foundation.

Q Every nuclear plant that's operating generates spent fuel, does it not?

A Yes. That's a true statement.

Q If it can't take spent fuel out of its reactor, it has to shut down, correct?

MR. CRAWFORD: Objection to the foundation.



Q Do you know that to be a fact?

A Eventually that would be the case.

Q All right. And as I understand your answer, you believe that if a repository was available, a rate was achievable and reasonable, that would allow DOE to pick up spent fuel in an amount that removed the current year's discharges plus some amount of the backlog. Is that right?

MR. CRAWFORD: Objection, vagueness. Objection to the extent it calls for a legal conclusion.

Q Is that what you just told me?

A What I told you from a -- my personal opinion would have been that a rate that would have done that, which kept pace with discharges and to remove some amount of the backlog, would have been an appropriate rate.

Q And then the backlog under your scenario that you've described would have been eliminated sometime within five, ten years after the reactor ceased operation, so there's no spent fuel on site. Is that right?

A That was my expectation.
Q Okay. Well, I'm still not sure I understand what the source of your expectation was. Where did you get that expectation?
A Where did I get the expectation. I'm trying to understand your question. Why did I believe that to be the case?
Q Yes, sir.
A Because -- I believe that to be the case because of my knowledge of what reactors discharged on an aggregate basis, and assuming a '98 start for a repository, what inventories might have been like and how long it would take to work them off. It's a mathematical equation basically.
Q Where did you get your understanding about the DOE side of the equation, how fast it would have been -- or what rate would be reasonable for DOE to take the fuel?
MR. CRAWFORD: Well, let me object to the vagueness of that and the fact that it mischaracterizes his prior testimony.
Q I didn't mean to mischaracterize your



testimony. I'm trying to be accurate.
MR. CRAWFORD: I was dealing with the DOE side of it.
A From my perspective at that time as a utility employee observing the department's programs -- the department's programs, and I'm not sure in which documents, certain documents would have stated a programmatic intent of developing a system of that magnitude.
Q Is the Nuclear Waste Policy Act the authority for the department's program?
MR. CRAWFORD: Objection. Vagueness.
A The legal authority for the program?
Q Yeah.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A I'm not a lawyer so I don't know. I believe so.
Q Well, is there a distinction in your mind between the DOE's program and the standard contract?
A Yes.
Q What is it?



A The program could have goals that go beyond its contractual commitments.
Q Are you aware of whether DOE's program went beyond its contractual commitments?
MR. CRAWFORD: Objection, vagueness as to time.
MR. BLANTON: Well, contractual commitments at the time it signed the contract.
MR. CRAWFORD: Objection. Foundation.
A I don't know.
Q You don't know?
A I don't know.
MR. CRAWFORD: Stan, if you're about to move into other area, would this be a good time to take a lunch break?
MR. BLANTON: Why don't we do the '85 plan and then we can take a lunch break.
MR. CRAWFORD: Okay.
(Off the record discussion.)
Q All right. Exhibit 9 to your deposition is a copy of Volume 1 -- oh, is it all of them? Volume 1, 2, and 3, for your reading enjoyment, of the



mission plan for the Civilian Radioactive Waste Management Program.
A Thank you. Should I start?
Q Yeah. Take as long as you need to review that document.
Do you recall whether you were involved in reviewing and/or commenting on the mission plan for either Wisconsin Electric or any industry group?
A I don't recall ever doing it for an industry group. If I did it for Wisconsin Electric, I believe our comments would have been submitted. And I don't necessarily recall that, but it would be evident if it was submitted.
Q Has your work at the Department of Energy caused you to have to review the mission plans for any reason?
A No. Well, other than at the request of counsel in the past --
Q Other than for the purpose of defending litigation.
A No.
Q Let me get you to look at page 15.

MR. CRAWFORD: Objection to the vagueness of the question.
A I recall it was one of their strategies. And that's what this section is entitled, Program Strategy.
Q Do you recall that whether or not a repository was available was not intended to have any effect on the acceptance rate?
A That was the program's strategy, the program's plan, yes.
Q In Exhibit 9 on page 593 of Volume 3 --
A Oh, that's this one here. Hold on.
Q The big, big one.
MR. CRAWFORD: 141648.
MR. HANDWERKER: 141648.
Q If we're all on the same page, the letter you should be looking at is a July 6, 1984, letter on Wisconsin Electric Power Company stationery to Charles Head, acting director. Is that what you're looking at?
A That's what I'm looking at.
Q And it appears to have been written by or



signed by C. W. Fay, vice president nuclear power?
A Uh-huh.
Q As of July 6, 1984, were you a contract administrator at WEPCO?
A I believe I was. I'm not certain, but I could have been.
Q Do you know whether you assisted in the preparation of this letter?
A I believe I assisted in the preparation of this letter.
Q Is it familiar to you?
A I've seen it before.
Q Okay. Well, when is the last time you've seen it, do you recall?
A The last time I've seen it may have been when we were preparing for litigation a year or so ago. Prior to that I hadn't seen it since --
Q July 6, 1984?
A Right, probably.
Q Under comment one, you see the numbered comments?
A I see them.



Q It says "DOE must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional reactor storage capacity after January 31, 1998." Do you see that sentence?
A I see that.
Q Do you know what that comment was based on?
A That was Wisconsin Electric's belief that that's what should be done.
Q Did you write that comment?
A I don't know if I wrote that comment. I participated in this, the development of this letter, Howard Shimon, myself, who was my boss at the time, probably wrote this together. And I'm sure it went through other concurrences and changes before it reached Bud Fay, C.W. Fay.
Q Was it Wisconsin Electric's position at the time that that was the DOE's contractual obligation?
A It says that that's what the DOE should do. I'm not sure that I would say it says contractual obligation.
Q It says that's what DOE must do?



A Must do. But I don't think -- I don't recollect it ever being discussed in the context of contractual obligations. It was what the program must do on the program mission plan.
Q Did you agree with that statement at the time the letter was sent?
A That was the company's position. I'm not sure I had a position, whether I agreed or disagreed with it. I don't recollect.
Q The next sentence of comment one says "While operation of the first repository by that date at a capacity of 3,000 MTU per year would be the preferred means of accomplishing such an objective, it is essential that DOE firmly commit to employ whatever means are necessary to commence acceptance of spent fuel from utilities on or before the June 31, 1998 date." Do you see that?
A Yes, I see that.
Q Do you recall whether or not you participated in authoring that sentence?
A I don't recall to what extent I did or not.
Q Was that your position at the time this

letter was sent?
A That was my position at the time the letter was sent, and that was the company's position, that the program should commit to whatever it needed to do to cause this to happen.
Q What's the basis for the 3,000 MTU per year? That's M as in man, T as in ton, and U as in uranium. Also M as in metric.
A Again, that's I believe as I talked to earlier, I spoke to earlier, is the -- my understanding, and I think it was the general understanding at the time that 3,000 tons a year would be a sufficient rate to work off the backlog and the discharges in a reasonable time frame.
Q Now, at this point in time were you participating in any industry groups that you mentioned earlier?
A I may have just started. I mean, I would have been a neophyte in this end of the business at that point in time, having just come over from being a civil engineer to the wonderful world of nuclear fuel.
Q Do you see in the first paragraph where it



says "Wisconsin Electric has reviewed the draft mission plan issued by DOE and it has participated in the formulation of comments prepared by Edison Electric Institute, Utility Nuclear Waste Management Group, and the Electric Utility Companies Nuclear Transportation Group"?
A I see that.
Q Do you know whether you were the WEPCO representative for that participation?
A I know I definitely wasn't for the EUCNTG, and I'm not sure whether I was or wasn't for the UNWMG.
Q Who would have been if you not?
A Howard Shimon.
Q Could you spell his last name, please.
A S-h-i-m-o-n.
MR. HANDWERKER: Volume 3, page 32, which is Bates PA 141086.
Q That should be a July 9, 1984, letter to Charles Head?
A Uh-huh.
Q From Mr. John J. Kearney, vice president of



Edison Electric Institute. Are we looking at the same document?
A I believe we are.
Q Having had a chance to review that document, do you recall whether you've seen this letter before?
A Having looked at the front page and gone no further, I've seen it in preparation for litigation over the last several years, and I don't recall whether or not I saw it in 1984. I could have seen it in 1984.
Q Does this appear to be the same letter referenced in Wisconsin Electric's letter of July 6 where they say, We endorse the comments of all these groups?
A Hold on.
It appears to be the same letter referred to in the July 6th, '94 -- 1984 letter. Yes.
Q Look at enclosure one to the EEI letter, which has a page number 36 on the bottom on mine?
A Enclosure one?
Q Enclosure one should be titled Waste



Acceptance Schedule Interim Storage and Waste Generation Rate?
A I see that.
Q Take a second and look at it, if you would.
A Any particular portion or the entire --
Q That's about a page and a quarter. I ask if you would --
A That's fine.
Okay. I've read enclosure one.
Q Do you recall participating in conversations in industry groups where the issues discussed in enclosure one were discussed?
A I don't believe I would have done it at the time enclosure one was developed. I think I would have been too new on that job to have done that as a participation in industry groups.
Q Do you recall this essentially being the position of the industry at the time you became involved with respect to waste acceptance?
A Reading now that it was, I'm not sure I recall specifically, but, yes, this is consistent with whatever partial memories I had that enclosure one was

and the industry that became known as the ACR issue resolution process. I don't know when it began exactly. My recollection is sometime in the '86ish time frame, '87ish time frame. But I don't have knowledge as to when it started.
Q Would the ACR issue resolution process have dealt with changes to the contract?
A It would have dealt with issues that the utilities as a group and DOE thought required discussion for clarification. It could have resulted in changes to the contract.
Q Okay. Do you recall what those issues were?
A Specifically, no. There were 30-something-odd issues I believe, but I don't recall offhand what they were.
Q Do you recall ever any discussion -- and I'm looking at the first page of Exhibit 12 to your deposition where in the whereas clause it has "Whereas the DOE has responsibility following the commencement of operation of a repository," and has a change indicated and has "delete the word 'repository' and



insert the phrase 'DOE facility.'" do you remember that ever being a subject of the ACR issues task force?
A It was not.
Q Or, excuse me, ACR issue resolution process?
A I don't -- I don't recall it as one of the issues, no.
Q Do you recall in any other context a question regarding changing the word "repository" to "DOE facility" in that clause?
A I do not recall that.
Q Even since you've been at DOE?
A No, do not recall.
MR. CRAWFORD: Can we take a break?
MR. BLANTON: Yeah, we sure can.
(There is a recess from the record.)
Q Mr. Zabransky, Exhibit 13 to your deposition is a document entitled Index to Tables of Issues Related to the Standard Contract and has a Bates number CTR 0060139 at the bottom. And goes from 0139 to 0174 on the Bates numbers.



(Deposition Exhibit Zabransky 13 was marked for identification and was attached to the transcript.)
Q Do you recognize this document?
A I don't recognize this specific document, no.
Q Do you recognize any of the issues as issues that the ACR issues resolution process addressed?
A This appears to be some of the issues, if not all the issues -- some of the issues that were developed as part of the ACR issue resolution team meeting the DOE process, whatever you want to call it.
Q Can you tell, based on your experience at DOE, what the function of this particular document is? Is this a particular type of document that gets generated in the course of processing changes to a contract at DOE?
A No, I don't know what the function of this document is.
Q Let me get you to look for a second at -- it's going to be -- the Bates number at the bottom of



the page is going to be CTR -- excuse me. That's not right either. CTR 0060158. This is talking generally about the purchaser's right to adjust the quantities of SNF and HLW plus or minus 20 percent from its delivery commitment schedule.
A Yes.
Q Do you remember that being an issue in the ACR issues resolution process?
A That was an issue that was identified.
Q Could you describe what the issue was?
A Well, the issue that was identified by DOE was that -- and again, I was not at the DOE at the time, but as DOE identified the issue for our discussion was that how was that going to work and what did that mean. And how would that be -- how would that affect transportation cask planning and procurement. So it was a scheduling and procurement and cask availability issue that they wanted to discuss.
Q And the "that" being the option of the purchaser to adjust the quantities listed in the DCS by 20 percent? When you say "that," is that what

beginning January 31, 1998. While we are aware of the delays experienced to date in the OCRWM program and schedule, we expect DOE to take immediate actions to ensure these contractual obligations can and will be fulfilled."

What was the basis for your statement that DOE had a contractual commitment to accept spent fuel specifically from Point Beach beginning January 31, 1998?

MR. CRAWFORD: Objection. Relevance.

A Well, my lawyers told me there was a contractual obligation. I believed them. And Point Beach had among the oldest fuel in the country. It would have been the first year. Of any allocation scheme.

Q Do you know where Point Beach's fuel ranked in the priority ranking?

A Do I know where it is today without looking? No. Did I know where it was then? Yes.

Q Well, was it the first one? Were you first in line?

A Not the first in line, no.



Q Okay. And so my question is the basis for your -- and January 31, 1998, was the date, correct?

A That was the date, yes.

Q So my question is what was the basis of your comment that DOE was supposed to show up at Point Beach on the date and pick up fuel?

MR. CRAWFORD: Objection. Relevance.

A That was the company's position.

Q You wrote this letter, didn't you?

A I wrote this letter. I relayed the company's position.

Q Or did somebody other than yourself come up with this idea?

MR. CRAWFORD: Objection. Foundation.

A I don't know.

Q Did you believe that DOE had a contractual commitment to accept spent fuel from Point Beach beginning January 31, 1998?

A I believe they had a commitment to begin in the year of January 31st, 1998. I believe we were in the first year of allocations, yes.

Q Well, at this point in time were there any



allocations, August 26 of '88?

A There had been an APR in '87 I believe that ranked fuel.

Q But you don't know what the basis for your position was that on the first day of fuel acceptance they were supposed to show up at Point Beach?

A I don't recollect, no.

Q But do you agree with me -- am I misreading it, is that what it says?

A That's what the letter says.

(Deposition Exhibit Zabransky 23 was marked for identification and was attached to the transcript.)

Q Exhibit 23 to your deposition is a letter dated August 29, 1988, to Charles E. Kay, acting director of Office of Civilian Radioactive Waste Management, from John Kearney, senior vice president of EEI. Do you recall having seen this document before, now that you see it before you?

A I'm still reviewing it.

Q Okay.

A I may have seen this. I still have no



recollection of this particular document.

Q Okay. Are these comments, as comments go, aggressive with respect to DOE's position in the draft mission plan amendments?

MR. CRAWFORD: Objection. Vague.

A I'm not sure what you mean by "aggressive."

Q Well, they talk about EEI being dismayed and concerned with DOE's seeming lack of concern and things that are --

A They appear to express a higher level of frustration than earlier documents.

Q Well said. Thank you.

Is it likely that you would have adopted comments expressing this level of frustration without having reviewed them first?

MR. CRAWFORD: Objection. Foundation. Objection, vague. Objection, relevance.

A It's unlikely the company would have adopted comments without reviewing them when it was frustrated.

Q Who is Isaacs?

A I believe it's Tom Isaacs, who used to work

at DOE.
Q Do you know what that indicates when there's a name such as Isaacs and on the third page Rousso written out beside a comment?
A It would depend on where this document came from, whose document this was. I mean, I could speculate as to what it might mean, but I would be speculating.
MR. CRAWFORD: Don't speculate.
Q The third page of Mr. Kearney's letter says "Just as DOE must continue to develop and maintain the technical credibility of the waste program so, too, must DOE develop and maintain the credibility of its statutory obligation and contractual commitments to those that must rely on and are paying for DOE's high-level radioactive waste disposal services." Do you know what contractual commitments he's referring to?
A I believe as I stated previously, the industry believed there were contractual commitments with respect to the '98 date, as we were advised by our counsel. And I'm sure our counsel drafted this



section of this letter.
Q And later as advised by the D.C. Circuit Court of Appeals, I guess?
MR. CRAWFORD: Objection, relevance. Objection, argumentative.
Q Page one of the additional comments addresses Waste Acceptance Schedule Adoption. Do you see where I'm referring to?
A Yes, I see that section.
Q The first paragraph of that section says, Section 302 of the nuclear waste policy act reflects a "bargain" that Congress struck between DOE and those that generate high-level waste. Nuclear utilities and their consumers pay the cost for disposing of spent nuclear fuel they generate by paying the one-time disposal charge. And then there's a parenthetical into the nuclear waste fund, and in exchange the DOE is to begin disposing of that spent fuel beginning not later than January 31, 1998.
MR. CRAWFORD: I think it says January 13, 1980.
Q Well, actually it says January 31, 1988.



We were both wrong.
MR. CRAWFORD: Right, right.
MR. BLANTON: They correct themselves and say 1998 further down in the document.
MR. CRAWFORD: Oh, that's good.
Q Do you recall the concept of the Nuclear Waste Policy Act being a bargain between the utilities and DOE being something that you talked about in the utility nuclear waste management group?
MR. CRAWFORD: Objection. Relevance. Objection to the extent it calls for a legal conclusion.
A I believe the concept of there being a bargain was -- a bargain was something that was discussed among the utilities, yes.
Q And the bargain was what?
A The utilities paid and DOE disposed beginning January 31st, 1998.
Q Look at page three of the additional comments. The last sentence before Repository Schedule says "DOE's inaction will force utilities to devise ways to store spent fuel themselves beyond the



acceptance schedule mandated by the NWPA. Because of the costs involved in storing spent fuel beyond 1998, utilities may need to seek recovery of those costs from DOE-and not necessarily from nuclear waste fund." Was the idea, as late as 1988 when you were involved in the UNWMG, that part of the bargain included that a utility would not, in exchange for their fees that they had paid, they would not have to devise ways to store spent fuel themselves beyond the acceptance schedule mandated by the NWPA?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent that it assumes facts not in evidence. That's it.
A I believe --
MR. CRAWFORD: Objection. Foundation. Go ahead. Sorry.
THE WITNESS: That's okay.
A I believe what the sentence says is that if utilities need to devise ways of storing spent fuel we would hold DOE responsible for the costs. I don't think -- I didn't think that we wouldn't have to do that. And I didn't think even if DOE performed they

wouldn't have to do that necessarily. So this statement says that if utilities have to devise ways of storing spent fuel we would seek to recover those costs from DOE. That's the position I think is being transmitted in this sentence.

Q Based on what? What was going to be your theory that you were entitled to recover those costs from DOE?

A I'm not a lawyer. That's what -- my lawyers would have prepared this. We would have agreed with the lawyers. I don't know the theory. You can ask my lawyers at the time, some of whom are -- Jay Silberg would have done this. He would have made that statement.

Q Did you disagree with the statement?

A I didn't disagree with my lawyers. I'm not a lawyer.

Q Back on page two of the EEI comments there's first a quote from a letter from Secretary Hodel to Senator Johnston that says "The department will accept spent fuel in 1998 whether or not a repository is in operation." Do you see that?



A I see that, yes.

Q And the next paragraph says that "the NWPA completely ignores the statutory requirement to accept waste on a timely schedule." And then the next paragraph after that has 2.5 written in handwriting out to the left of it. Says "This departure from the NWPA's obligations is completely unacceptable. Wholly apart from the statutory obligation and contractual commitments, it is simply unfair for DOE to collect from utilities and their consumers billions of dollars without equivalent performance by DOE of its part of the bargain." What was "equivalent performance by DOE of its part of the bargain"? What does that mean?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A I would speculate what the writer of this sentence meant. I mean, I didn't write this sentence. I don't disagree with the sentiment. I know what I think it means, but I don't know what the person who wrote this means.

Q Well, what did you think it meant when you adopted it from Wisconsin Electric?



MR. CRAWFORD: Objection. Foundation.

A I think it expressed a frustration that we had sensed, as you see throughout this letter, that DOE had come to the conclusion that there was no obligation and that it was unfair that we had signed a contract and they had determined there was no obligation.

Q I think my question was what did you think performance by DOE of its part of the bargain would consist of?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A To begin accepting spent fuel by January 31st, 1998, as stated in that sentence.

Q In what quantities?

A I don't think I thought about that at that point in time.

Q Was the fact of the matter that at this point in time that the 1998 date was in such question that people were focused on that rather than rate?

A I think as you read this letter it's focused on the commencement of operations.



Q You can't accept quantities without accepting -- without having something to accept it at, right?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the foundation.

A You have -- can't accept quantities without having something?

Q Without starting in the first place.

A That's a true statement.

Q Do you recall an organization called UWASTE?

A Yes, I do.

Q What was that?

A That was the successor to UNWMG.

Q Was there a particular reason you all changed from UNWMG to UWASTE?

A Nobody could say UNWMG.

Q Good choice. I congratulate your judgment on that one.

What was the systems integration committee, task force, group, of the high-level waste working

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9:44 a.m.

Job No.: 112597-2
Pages 227 through 459, Volume 2
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY:

M. STANFORD BLANTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 251-8100

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF



COMMONWEALTH EDISON COMPANY:

NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

DONALD J. CARNEY, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D.C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D.C. 20530
(202) 307-1011



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D.C. 20530
(202) 305-7594

acceptance group within DOE developed a technical position on what DOE should do with dry cask storage casks and canisters to the extent they exist that are licensed for shipping and transport?
MR. OLSEN: Objection. Vague.
A We haven't finished evaluating what we might propose to do. We haven't finished evaluating.
Q Take a look at Table 3-2 at the end of your letter to --
A I don't think -- I don't recollect the letter I sent that these tables were attached to it.
Q Okay.
A So I don't know where these tables necessarily came from.
Q Okay.
MR. BLANTON: That's all I've got for the time being.
MR. OLSEN: Okay.
(There is a recess from the record.)
Q Just a couple of follow-ups from that last conversation, discussion we were having, Mr. Zabransky. A minute ago I think you said that



part of the industry discussion on failed fuel was whether -- how to define it and whether the -- I'm paraphrasing your answer, but whether the sort of classic definition of failed fuel should apply or should failed fuel just be fuel that requires special handling. Is that an accurate paraphrase of what you said?
A What I said was that rather than the definition used for operational purposes for running a reactor, there was a definition that should be based more upon what's required to handle fuel for storage, transport, and disposal.
Q What is the operational definition of failed fuel?
A Operational, from a reactor standpoint?
Q Whatever you just said. However you just meant it.
A Okay. From an operational standpoint, from a reactor operational standpoint is one that would have assembly that would allow leakage of radioactive materials with the gases and particulates into the reactor coolant system. It would be a very small



leak, small hole that would have no effect on the handling of the assembly but render it unsuitable for continued irradiation.
Q We were laughing a minute ago about me trying to describe to everybody, during the break, about casks and canisters, and I think I would like to get you to describe for all of our benefit the technologies used in storing spent fuel outside spent-fuel pools at reactor sites today. Do you need a more specific question than that to answer that question?
A No, I don't think so. I mean, you're asking me -- let me restate the question -- is that you want me to describe in general terms the types, current types of technologies available to store commercial spent fuel, what is called dry.
Q Right.
A Out of the pool.
Q Right.
A And in that case you can either use a -- there's basically dry storage casks. And two types that exist are either kind that would allow -- would



require assembly be placed in an inner steel canister, multiple assembly with some very thick shielding lids on them and then sealed, welded shut, evacuated, backfilled with an inert gas, placed in a storage module of some type, whether a vertical concrete cylinder or horizontal concrete, call it mausoleum, although no one likes to call it that, mausoleum, and store horizontally or vertically. Or one could store it in a cask that has no canister but merely is bolted shut once the assemblies are placed inside.
Q Okay.
A Or one can store it in a dry well system that Foster Wheeler has licensed that allows I think individual assemblies be placed in canisters and then put it in a way where they're cooled by passive air.
Q Are there such things as dual-purpose canisters?
A I wouldn't categorize them that way.
Q Okay. How about dual-purpose casks?
A I think there are such things that I would characterize as dual-purpose cask systems.
Q What does that mean? Describe that.

A That to me would be a system that would have one purpose being storage, one purpose being transport, and would be comprised of the inner canister as we just talked about, the overpack for storage, whether it's horizontal or vertical, and an additional overpack for transport.

Q The overpack for storage being the concrete cylinder you described a minute ago?

A Concrete cylinder or a mausoleum, whatever.

Q Okay. And is there an additional overpack or a different overpack for transportation with the dual-purpose cask?

A For that kind of system it's a different overpack. There's also dual-purpose casks that don't have canisters, that are just transportable and storable.

Q Okay. From a technical standpoint does the type of -- and I'm limiting myself to standard fuel right now. From a technical standpoint does the type of dry storage system being used by a utility have any impact on DOE in terms of receiving that utility's spent fuel?



MR. OLSEN: Objection. Vague.

A The type of storage should have no impact on the integrity or quality of the spent fuel that, when removed from the cask, DOE would receive.

Q Okay. Is it DOE's current plan to remove fuel from the casks rather than to use the casks, assuming they're licensed for transport?

A It's DOE current plan to accept spent fuel, not to accept the containers that they're stored in.

Q Okay. Does that mean that DOE will need to procure a transport system for the spent fuel?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

Q Technically. I'm trying to understand how the process work?

A The answer is yes, and let me amplify the last question. The department has had discussions with utilities and has corresponded with utilities and expressed its programmatic intent to discuss including in a contract amendment dual-purpose systems licensed for storage and transport as acceptable waste forms, and the department intends to do that. In a contract



amendment.

So those casks, when the contract is amended, it's our intent to have -- the program has expressed that intent and to then include those as acceptable waste forms under the contract.

Q Okay. What difference does it make to the utility whether or not DOE accepts those systems, the storage systems in use by the utility as a waste form or not?

A The difference it makes to the utility is the same difference it makes to the department is that if the department doesn't take them the utility will have to unload that material and dispose of that cask.

Q Okay.

A If the department takes them we will have to unload that material and dispose of that cask.

Q Okay. Is that because the casks at the current time are not licensed for disposal?

A They're not licensed for disposal.

Q What is the status of the contract amendment process by which the contract would be amended to specify that the storage systems would be



accepted as spent fuel?

A We've never had -- at this point we've never had discussions with the utilities on that issue.

Q I'm sorry, I must have misunderstood your earlier testimony. I thought you said that you had decided to amend the contract?

A We offered to enter into discussions to amend the contract.

Q Has any decision been made by DOE with respect to amending the contract to accept the dry storage systems?

A We've offered to enter into discussions to amend the contract, but we haven't done it yet.

Q And the reason for my question, you said you offered to discuss it but not offered to amend it. Do you see the distinction in my question?

A I think I would have to read the letter that was sent out in 1993. It's available to everybody. It says offer to begin -- offer to initiate the contract modification to include this. But, again, we need to look at that. We haven't

what -- I can surmise what the comment refers to.
Q Was that part of the ACR issue resolution process? Was that one of the issues?
A That issue would have been dealt with in the issue relating to the -- in essence it's a similar one to the single-assembly can situation. It's referring to a single-element-sized canister that would be analogous to outlines; shape, size, form of spent fuel assembly, that these rods or hardware pieces could be put into so they could continue to be stored in the spent-fuel pool.
Q Okay. The first sentence of the response says "DOE agrees that specifications or standards are desirable to ensure that any purchaser-furnished canisters would be compatible with the DOE-furnished shipping cask." Is that still DOE's position?
A For these canisters, yes.
Q Has DOE done anything in that respect? Has DOE furnished any specifications?
A No, DOE has not.
Q In your work at Wisconsin Electric or on behalf of the UNWMG did you do any analysis of the



acceptance rates in the June of 1988 -- I keep saying '98 -- June of 1988 annual capacity report?
MR. OLSEN: Objection, relevance.
A I don't recollect.
Q Do you recall on the industry side whether you ever analyzed any of the acceptance rates in the annual capacity reports to determine what the impact would be on industry storage requirements?
MR. OLSEN: Objection, vague.
Q Do you understand my question, Mr. Zabransky?
A I believe so. I believe that the organizations, whether it was and I don't know what time it would have been done, would have been more than likely had one of their consultants perform analysis to look at what it would mean, yes.
Q Did you do that yourself?
A No, I did not.
Q Were you concerned at the time about whether the acceptance rates would be adequate to eliminate the need for Wisconsin Electric to store fuel outside its pool?



MR. OLSEN: Objection, relevance.
A I don't recollect.
Q Do you recall ever doing an analysis to determine what the aggregate acceptance rate would have to be in order for Wisconsin Electric to not have to store fuel outside its pool?
A I don't recall at this time, no.
(Deposition Exhibit Zabransky 35 was marked for identification and was attached to the transcript.)
Q We have marked as Exhibit 35 the December 1990 annual capacity report.
Do you recognize that document?
A I've seen it before.
Q In what context did you see the document?
A I'm sure I saw it when it was sent to Wisconsin Electric in 1990, and I've seen it on a shelf since then.
Q I'll ask you the same question I asked you about the earlier ones. Have you ever used any of these documents in the course of your duties at DOE?
A No.



Q Look on page four.
MR. OLSEN: Roman numeral?
MR. BLANTON: Regular page four.
Q 2.0, Waste Acceptance Projections is at the top of the page. Do you recall in the course of your work with Wisconsin Electric and the UNWMG or UWASTE, whichever it was at the time, discussions regarding why there were two acceptance projections in the 1990 ACR?
MR. OLSEN: Objection, relevance.
A I don't know the discussions as to why they were in here. I'm sure there were discussions as to a reaction of how we would like the lower bound rate, which we didn't like.
Q Why didn't you like the lower bound rate?
A Because it was a lower bound rate. We wanted a higher rate.
Q What impact did that have on the utilities?
MR. OLSEN: Objection. Foundation.
A It would have removed fuel slower from the sites.
Q Okay. And why was that upsetting to you?

A We didn't want to have to store it.
Q Did you feel like you had a contract with DOE that provided that you shouldn't have to store it?
MR. OLSEN: Objection, calls for a legal conclusion.
A I don't know that it provided never have to store any of it, but I was hoping to store as little as possible.
Q In this first paragraph under Waste Acceptance Projections it says, The upper bounding case is representative of the receipt rates of the -- excuse me. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the amendment side. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository imposed by the amendments act. It says, The lower bounding case represents a receipt rate that would be in compliance with the amendments act restrictions on storage limits at an MRS before repository starts



operation. However, this case assumes removal of the schedule linkages with repository imposed by the amendments act.
And the question I have is do you have any idea why the Department of Energy made a distinction in the two cases between the statutory restrictions assumed for each case?
A No, I don't.
Q Do you have any idea why the Department of Energy would have for the lower bounding case assumed away the schedule restrictions but not the storage limits?
MR. OLSEN: Objection, foundation.
A No, I don't.
Q Am I interpreting that correctly, does that appear to be what they've done -- what this document says to you?
A That's what it appears they've done.
Q Going down to the last paragraph of page four, the third sentence from the bottom of the page says "The current restrictions in the amendments act linking repository and MRS make it impossible for DOE



to accept waste at an MRS facility on a schedule that is independent from that of the repository." Is that still the case?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
A I don't know what the current status is of our -- of an authority for MRS.
Q Do you know why it was impossible to accept waste at an MRS facility on a schedule that was independent from the repository?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
A There were linkages that required the MRS -- that prohibited the MRS until certain repository events happened. I'm not sure what they were specifically.
Q Okay. The sentence before the one I just read says "This schedule, based on a realistic assessment of activity durations and past experience, shows a significant slip for the start of repository operations from year 2003 to approximately 2010." Based on the schedule linkages described in the next



sentence, do you have any knowledge of when an MRS could have started operations given that the repository schedule had already slipped to 2010?
MR. OLSEN: Objection, vague. Objection, foundation.
Q Do you understand my question?
A I don't know the specific linkages that were in existence at the time, so I can't answer that question.
Q Do you now --
A No.
Q -- know that?
A I would have to -- I don't know. I wasn't there. I don't know how they got to that conclusion. Can I reconstruct it? I'd be speculating.
Q In any event, was it clear to you after receiving this document from the Department of Energy that the schedule in the document that showed 1200 MTU of fuel being accepted in 1998 on the one case and 300 MTU of fuel under the other case, that neither of those schedules could be achieved under the current situation?

MR. OLSEN: Objection. Vague.
A It was clear to me that things had to happen for anything like that to happen, that the assumptions DOE made for whatever reason they made them had to come to pass.
Q Okay. And that they had not come to pass as of 1990?
A That's correct, they had not.
Q Are you aware that they've ever come to pass?
A I don't believe they did.
Q Do you know what things had to happen in order for those assumptions to come true?
A No, not specifically. But they didn't build an MRS, and they didn't start accepting waste.
MR. BLANTON: Are you ready to break?
MR. OLSEN: Yeah, I was about to say this might be a good time to break for lunch.
(A luncheon recess is taken.)



AFTERNOON SESSION
MR. OLSEN: We're back on the record. Mr. Zabransky would like to clarify one of the answers he gave earlier today.
A When you asked me with respect to these documents if I used them in my work at DOE my answer was no, but that was with respect to my job at DOE. That was not with respect to preparing with counsel for litigation. So I have looked at these preparing with counsel for litigation pulling documents and going through files.
Q Okay. In your real job you haven't used them?
A No.
Q As contrasted from your litigation job which is being the brains behind the DOE. Is that right?
A Supporting counsel.
Q Before the break you mentioned that you did not believe that there was a contractual obligation to publish more than one annual capacity report provided the annual capacity report had data for ten years'



worth of operation. Is that correct? Did I understand your testimony correctly?
A I believe that's what I said, yes.
Q What provision is there then in the contract for the preparation of delivery commitment schedules for spent fuel that does not appear on that first ten-year schedule?
MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered.
A There is no provision. The DCSs aren't due until five years before the receipt, 63 months prior to date of receipt.
Q If you didn't have fuel in the first ten years of the ACR and DOE didn't publish an ACR except for the first ten years, how would you ever know when the receipt of fuel other than that first ten years was?
MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered. I think we went over this yesterday.
MR. BLANTON: Different topic.
A It was my belief that DOE would publish an



ACR that would add a year on, so, in other words, you would have the first ten years, then you would have the 11th year, then the 12th year, then the 13th year. So eventually all the fuel would be covered by an ACR.
Q Does it make any sense to suggest that only one ACR would be published?
A For the first ten years, yes. That covers the first ten-year period. It covers enough for planning purposes and for committing to delivery commitment schedules which are five years out.
Q Additional ACRs would have to be published for additional years?
MR. OLSEN: Objection.
A For periods beyond the first ten years.
Q Otherwise the system wouldn't work. Is that right?
A That's a true statement. I agree.
Q Is the last exhibit you have 35?
A Yeah, the '98 is 35, correct.
(Deposition Exhibit Zabransky 36 was marked for identification and was attached to the transcript.)

Q I've marked the 1986 version of the annual capacity report -- excuse me, the 1991 version of the annual capacity report as Exhibit 36 to your deposition.
A Okay.
Q Take a look at that and see if you recognize it.
A I recognize it, yes.
Q You were still at Wisconsin Electric when this was issued. Is that right?
A Yes, I was.
Q Did Wisconsin Electric use this document for planning purposes?
A I believe it did.
Q In what way?
A By estimating that DOE would begin acceptance in 1998 in these quantities and when it would need additional spent nuclear fuel capacity.
Q In doing that did Wisconsin Electric take into account the assumptions in the document?
A I think we took into account the table that appeared in the document and just looked at the



allocations.
Q On page Roman numeral V of the document which is -- do you have an SN Bates stamp on yours?
MR. OLSEN: We have a PA.
A Oh, I see. Summary?
Q Yeah. This is on the summary. I think we looked at some of this language yesterday. The annual acceptance rates provide an approximation of the system through-put and are subject to change as the program progresses. Given that the rates were subject to change, what value were they to Wisconsin Electric for planning purposes?
A They were the current planning basis that the department had put out, and it was one that we were using to see what it meant to us. I mean, it was the document that one had to use if one wanted to say what does it look like this year, recognizing it could change.
Q The sentence two sentences above what I just read from repeats the idea that we've already talked about in the other ones that say the statutory -- the acceptance rates assume that the



statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982 as amended will be modified. Did you understand that under the current situation the acceptance rates in this document could not be achieved because of the schedule linkages?
A I understood there was a linkage that restricted the ability to perform on this schedule and that it needed to be modified. I don't know exactly how -- what it was and how it had to be modified. But, yes, there was a linkage.
Q And you understood that without something happening with respect to the linkage what this report provides for acceptance rates couldn't happen?
MR. OLSEN: Objection, foundation; and it calls for a legal conclusion.
A It was my understanding that this was DOE's estimate that things needed to occur, but this was still the current estimate that they were using.
Q Did you place any reliance on this document in terms of Wisconsin Electric's planning for spent fuel storage, on-site spent fuel storage capacity?



MR. OLSEN: Objection, vague. Sorry, I didn't mean to interrupt you.
Q Do you understand my question?
A Yes, I think -- place reliance on the document that I factored this into our considerations and planning?
Q Did you forego any spent fuel, on-site spent fuel storage planning at Wisconsin Electric based on what this document suggested DOE would accept from Wisconsin Electric beginning in 1998?
A Well, since I needed to do planning prior to 1998 anyway, as my recollection serves me, I factored that, the fact that I needed to do something prior to 1998, and I looked at this and I factored it all together.
Q In doing that analysis, what weight did you give to the likelihood that DOE would show up in 1998 and accept spent fuel from Wisconsin Electric based on this document?
A At that point in time I basically had concluded that I needed to factor in, to create a system that would allow me to develop modular,

progressive storage because I couldn't determine exactly how much storage I needed.
Q Did you conclude that you couldn't depend on this document for purposes of your own internal planning?
MR. OLSEN: Objection, vague.
A I concluded that I couldn't rely upon the rates in this document for continued operation of my plant.
Q I think that's a different answer than the question I asked, though. Did you, for the purposes of determining how much spent fuel storage capacity you needed to install at Wisconsin Electric, what weight did you give the acceptance rates contained in this document and the commencement date contained in this document?
A It was a consideration. I don't know exactly what weight was given since we needed storage prior to the date that the service was to commence anyway.
Q Did you say it was or was not?
A It was a consideration, but since we needed



storage prior to 1998, it was one of the factors that was considered, that DOE could show up and remove spent fuel. But, then again, maybe they weren't going to. It needed to be factored in accordingly.
Q See the middle -- and I'm looking at page Arabic numeral 4 under 2.0, Waste Acceptance Projections of the document. Paragraph begins with Acceptance Rates and ends with 2007.
A Uh-huh.
Q First of all, do you know why the Department of Energy eliminated the upper bounding case where both schedule restrictions and capacity restrictions on the MRS that was contained in the 1990 ACR was eliminated from the 1991 ACR?
MR. OLSEN: Objection, foundation.
A I don't know why they did that.
Q Do you know why in this document the DOE assumed away the schedule linkages but not the capacity limit?
MR. OLSEN: Objection.
Q For MRS?
MR. OLSEN: Foundation.



A I do not know why they assumed away the schedule and not the capacity.
Q Do you know how the Department of Energy concluded that if the linkages, the schedule linkages were not eliminated that the initial acceptance of SNF by DOE could not start until at least 2007?
MR. OLSEN: Objection. Foundation.
A No, I do not know how they concluded that.
Q Have you done any such analysis in your work at the Department of Energy?
A No, I do not do that.
Q What was Wisconsin Electric's reaction to the December 1991 annual capacity report? You mentioned that they didn't like the lower rate in the 1990.
A I think the general attitude was that this was not what we wanted to see. Obviously we liked the higher rates better. We wanted DOE to perform faster.
Q Did you express that in any way to DOE?
A I don't recall. We talked yesterday, you've seen other letters that came out from Wisconsin Electric. I don't know if there was one for this



specific exercise or for other exercises.
Q Okay. Do you know whether the EEI responded to -- or any other nuclear industry group responded to the ACR in a formal way?
A I don't know.
(Deposition Exhibit Zabransky 37 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, we've marked as Zabransky Exhibit 37 a document titled 1994 Acceptance Priority Ranking and Annual Capacity Report, and it's dated March 1995. And it has a Bates number of EDB-001-0136. Do you recognize that document?
A I don't recognize this version of the document. I believe it's -- I don't really recognize it, but yes.
Q Does it appear to be a draft?
A It appears to be a draft.
Q And have you ever seen the draft?
A I'm sure I've seen a draft. I'm not sure I've ever seen this copy of a draft.
Q Do you recognize any of the handwritten

saw.
Q Do you know whether the '95 ACR that the Department of Energy issued assumed that the existing storage capacity restrictions imposed by the Nuclear Waste Policy Act of 1987 were still in effect even though the program plan did not include a monitored retrievable storage facility?
A It assumed that the limitations were still in effect. I don't know for a fact that the program did not include a monitored retrievable storage facility.
Q How did you pick the rates that went into the '95 ACR?
MR. OLSEN: Objection, foundation.
A They were the same rates that were in the previous ACR.
Q Okay. Was there any analysis done of whether the rates should change or stay the same from the previous ACR?
A I don't believe so.
Q Was there any discussion about whether the rates should go up or down?



A I don't recollect that there was.
Q Just cut and paste? Is that how you did the '95?
A '95 was pretty much a reissue of the previous document from the ACR perspective. The APR changed.
Q There's a sentence circled on this page that says "Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years." Do you see that?
A I see that.
Q And somebody has written out to the margin "move to page three." Do you see that?
A Okay.
Q And if you look at page three of the document it looks like there's an arrow for an insert, that says "insert page four." Do you see that?
A I see that.
Q What were the uncertainties associated with



the date of commencement of the operation of the waste management system at this point in time?
A At that point in time in 1994 I believe the negotiator's office had been terminated. There was no active program looking for a voluntary MRS, and it became less certain that there was -- there was great uncertainty with respect to the '98 date.
Q More certain that there would not be an MRS by 1998?
A That's a fair statement.
Q Is that a fair statement?
A That's a fair statement.
Q Do you recall any discussions within the Department of Energy about whether or not dates should be eliminated from the acceptance allocations in the '95 ACR?
A Yes, I recall that discussion.
Q Who was that with?
A With Mr. Brownstein and Ms. Slater.
Q And yourself?
A And myself.
Q Can you tell me who said what?



A I believe there was -- Ms. Slater advocated removing dates, to my recollection, going back to how the ACRs used to be.
Q Had there ever been one without dates on the years of allocations?
A I believe so. Let me check. Like this one here which says, Year one, Year two, Year three.
Q Let me see.
MR. OLSEN: Let the record reflect that Mr. Zabransky has pointed to exhibit number --
MR. BLANTON: Zabransky 36, which is the December 1991 ACR.
A And the 1990 ACR also has year one, year two, year three.
Q Look at page five of Zabransky 36.
A Okay.
Q There's a table there that has the rates for each year starting in 1998. Is that correct?
A There is, yes.
Q And we can go through this process, but do you remember that all the other ACRs have a similar table?

A I'll look, but let me verify.
Yes, other ones do.
Q And is there any such table in the '95 ACR?
A No, there isn't.
Q So that's a change from previous ACRs?
A The change was to remove the years from Table 1 of this document, yes.
Q And why was that done?
A Discussion centered around the uncertainty with when year one would be.
Q And the uncertainty regarding when year one would be resulted from what?
A When a facility would be in operations.
Q You say you and Mr. Brownstein and Ms. Slater discussed this issue. Is that right?
A Yes.
Q Did anybody take the opposite view that the years should stay in the ACR?
A I'm sure it was a discussion that had other viewpoints. I don't know who took what view, but eventually the dates came out.
Q What was the issue? Why would not they



have come out?
A Why would not they have come out?
Q Why would they not have come out of the ACR given that you didn't know when you would start?
A I can't recollect all the details of the conversation. One view was to leave it in the way it was. Another view was to take it out, change it. And Ms. Slater prevailed. I believe that's how that happened.
Q Okay.
A That's my recollection of the situation.
Q I refer to Exhibit 5 of your deposition, which is the '95 ACR. You got it right in front of you.
A Okay.
Q Does that document anywhere inform the reader about when year one is?
MR. OLSEN: Objection. The document speaks for itself.
A I have not found such a statement in the document as to what year year one is.
Q Would it be possible for a utility using



that document to determine when its delivery commitment schedule was due?
MR. OLSEN: Objection, foundation.
A I don't believe so.
Q Are the rates contained in the 1995 ACR the rates DOE currently plans to use when and if it commences spent fuel acceptance?
A The rates contained in the ACR, '95 ACR, were predicated upon some elimination or some restriction on performance. DOE's current plans assume a repository and assume no restrictions on performance and, no, these are not the same rates that we currently plan after the operation of the repository.
Q So the restrictions on -- or the amount of the rate is dependent on the restrictions on performance?
MR. OLSEN: Objection. Calls for a legal conclusion.
MR. BLANTON: I'm just making sure I understood his last answer.
A As the document states, and let me find it



here -- well, it's based upon 8200 tons. That number the first ten years was predicated on some restriction in capacity.
Q Are there no capacity restrictions now because no MRS is assumed?
MR. OLSEN: Objection, calls for a legal conclusion.
A The planning basis right now is for a repository, so there would be no statutory restrictions on annual capacity. There still is a statutory limit on total capacity of 70,000 metric tons.
Q Well, and when you say the planning is based on a repository, you mean a repository with no MRS, correct?
A Currently the planning basis for the program does not include a monitored retrievable storage facility.
Q Okay. When did the planning basis convert from one including a monitored retrievable storage facility to one including only a repository?
A Don't know exactly. That would have been

sometime in the mid-nineties.
MR. OLSEN: Stan, I think Dave needs a short little break. Would this be a good time?
MR. BLANTON: Sure.
(There is a recess from the record.)
Q If you would look back at page four of Exhibit 37. Do you have that in front of you?
A Yes, I do.
Q Do you recognize whose handwriting that is at the bottom of the page that's marked out, has a sentence that says "the waste management system" and then I can't -- I'm not sure what the rest -- envisions --
A I don't.
Q Any idea who wrote that?
A No, I don't. It's like the rest of the -- appears to be the same writing as whoever wrote the rest of it, and I don't know who that is or where this document came from.
Q Okay. Referring back to -- it's easier for us to both have the same language -- Exhibit 5, do the uncertainties associated with the date of commencement



of operation of the waste management system have anything to do with DOE's decision to stop processing DCS submittals?
MR. OLSEN: Objection. Vague.
A I don't think that this statement here and this discussion here had anything to do with that decision.
Q Okay. So the fact that you don't know when you could start to accept waste had anything to do with the DCS process being suspended?
A I think the decision to suspend the process had to do with the determination that there was a commitment and that there was an uncertainty as to date, but it's not tied to this document at this time.
Q I'm not asking if it's tied to the document. I'm asking if just the uncertainties associated with when a facility will be available is the reason you determined to suspend the DCS process?
MR. OLSEN: Objection. Vague.
A Again, as I answered yesterday, there was a discussion; we were advised to suspend the DCS process for a number of reasons by counsel.



Q Well, as -- did I interrupt your answer?
A No.
Q And as I understand it, you're taking the position that your liability to the utilities is limited by the suspension of the DCS process. Isn't it a fact?
MR. OLSEN: Objection, assumes facts not in evidence, and objection to the extent it calls for a legal conclusion.
A I'm not -- I don't know what position you're referring to.
Q You told me yesterday the first hour of your deposition that unless a utility has an approved DCS that the department has no obligation to that utility.
A I did say that, yes.
Q Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct?
A That's correct.
Q Why has the department suspended the DCS process?



MR. OLSEN: Objection. I believe this was asked and answered.
MR. BLANTON: No, he said on advice of counsel, and I think we're entitled to know why the DCS process has been suspended.
A I'll answer the question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was to suspend that commitment.
Q What was the problem with committing the department to that obligation?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
A Again, counsel advised us it would be appropriate, it would be the correct move to stop processing the DCSs.
Q So you wouldn't have that obligation?
MR. OLSEN: I want to direct the witness not to answer to the extent that you're going to have to reveal attorney/client privileged conversations. Also calls for speculation.
MR. BLANTON: I think you put whatever the

motivation was behind suspending the DCS process I think is right in issue, and I think we're entitled to know that. I mean, your filings in all the cases suggest that nobody has -- that DOE doesn't have an obligation to anybody that doesn't have an approved DCS. The witness has testified to that. He also testified that the DCS process has been suspended. I think we're entitled to know why, even if it is on advice of counsel. I think we're entitled to know what the advice was. I'm asking the question.

MR. OLSEN: And I'm instructing him if he has to reveal the specific advice from a lawyer that I'm directing him not to answer the question.

Q Mr. Zabransky, are you refusing to answer that question on the advice of your lawyer?

THE WITNESS: Can I speak to my lawyer for a second?

Q Well, I would like to have an answer to that question. Are you going to tell me whether you're going to refuse or not after you talk to him?

A I would like to talk to him first, if that's okay with you.



Q Okay.

MR. OLSEN: Would you like to step outside?

THE WITNESS: Yes.

MR. OLSEN: Please go off the record while we step outside.

(The witness and Mr. Olsen and Mr. Crawford confer outside the room.)

A I'm not going to answer the question.

Q Okay. At some point in order for the system to operate will the DCS process have to be recommenced?

A At some point the DCS process will have to be recommenced in order for the system to operate, yes.

Q Will that have to be at least 63 months before the repository is scheduled to commence operations?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A It would be my understanding that that would be the appropriate time.

Q Will that be your technical advice to the



contracting officer?

A That would be my technical advice.

Q Do you understand that the DCS process will be suspended until 63 months before the commencement of repository operations?

MR. OLSEN: Objection. Calls for speculation.

A I don't have that understanding. I don't think anybody's made that decision at this point.

Q What was the MPC program?

A The MPC program was a multipurpose canister program and it was an effort the department had, I believe beginning in -- I don't know if it was '92, '91, that time frame, to develop a -- I would say a system that would be suitable for storage, transport, and disposal.

Q How would that work?

MR. OLSEN: Objection, vague.

Q Do you understand my question?

A You're asking me how technically it would work?

Q Well, what would the process be? Assuming



an MPC were developed, how would the department use it?

A The MPC program was developed while I was still at Wisconsin Electric. My understanding as to how the department was thinking at that time was that it would develop a canister-based system that would be suitable, as I said, for storage, transport, and disposal and would allow them to be deployed at utility sites for storage prior to pickup and ultimately to place them directly in the repository.

Q Was the MPC system envisioned to be an alternative to a monitored retrievable storage facility?

A It was my belief and my understanding that it was viewed as a way of -- their way at that time of trying to meet the '98 date by deploying canisters as opposed to removing fuel.

Q Okay. But if the fuel is going to be stored on the utility site, there wouldn't be any need for an MRS. Is that correct?

A That's true.

Q Was that the thinking at the time?

A I think the thinking at that time was that the MRS was not going anyplace.
Q And that was still back when you were at Wisconsin Electric?
A Yes.
Q Was that also the thinking when you prepared the 1995 annual capacity report, that the MRS process wasn't going anywhere?
A I believe by that point in time the MRS process had ceased.
Q Okay. And why in the 1995 annual capacity report did you continue to impose the MRS capacity limitations on the acceptance rate?
A There was no discussion of changing the rates that were in the ACRs from the previous years, so I don't recall why -- there was no specific why -- it was not a discussion to change them.
Q Well, if an MRS was not in the plans, then those capacity limitations would not apply, would they?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.



A The capacity limitations were on the MRS. If the MRS was not -- not in the system, there would be no constraints, but there also would be no facility to which to move fuel.
Q Okay. On page four of Exhibit 5 to your deposition, at the top of the page it says "The projected nominal acceptance rate also reflects the capacity limit imposed by the act on such a storage facility prior to repository operations." Why is that sentence in the document if the MRS was not part of the department's plan at that particular time?
A Because they did -- they do reflect that.
Q Well, I guess the better question is why were the limits imposed if the MRS wasn't a part of the plan?
MR. OLSEN: Objection, asked and answered.
MR. BLANTON: Well, asked.
A This rate was left in the document from the previous version. No one discussed changing the rates.
Q What does nominal acceptance rate mean? What does the word "nominal" mean there?



A Nominal historically in all these documents is used to reflect the fact that in any given year, if you look at the detail tables, it's not exactly any of the numbers, it's somewhere around the numbers. It's either 402 or 607 or 898. So there's not -- there's a rounding, so it's a nominal number of about 400 or about 900.
Q Refer to the 1991 annual capacity report. I'm not sure what --
MR. OLSEN: I think it's 36.
Q Turn to page five.
A I'm on page five.
Q Table 2.1. The table is entitled Projected Waste Acceptance Rates for Spent Nuclear Fuel, and in Exhibit 5 on Table 1 it's "projected nominal waste acceptance rates for spent nuclear fuel." Do you know why you inserted the word "nominal" from '91 into the '95 document?
A To clarify the point that in any given year it wasn't exactly that number. It was around 900 or around 600, because again the individual allocations in the table don't add up, as you go back in the



document, to exactly those numbers. If I can point you, for instance, to page B.15.
Q Of '91?
A Of Exhibit 5.
Q Okay.
A Which is Table B-6.
Q I don't have it in front of me.
A This one here.
Q Okay.
A Look at the bottom of the page. It will have a number of 901.7 as opposed to exactly 900. So the summary table was annotated to reflect that it was nominally 900.
Q Okay. The statement after that sentence says "The department will continue to process" -- I'm back on page four of Exhibit 5. It says "The department will continue to process DCS submittals on an annual basis." Do you know how long after this document was published that the decision was made to suspend the DCS process?
A I believe it was sometime over a year later.

Q Did the Department of Energy at any point
starting with the time this document was published,
March 1995, referring to Zabransky Exhibit 5, starting
in March 1995 did the Department of Energy ever use
the acceptance rates published in that document for
its own planning purposes, for the purposes of
planning for the operation of the waste management
system?
A The Department of Energy never used these
rates for the planning for the operation of a
repository facility.
Q I'm not asking -- not my question.
A Okay. Repeat the question.
Q Did you ever use these rates beginning in
March of 1995 for the planning for the federal waste
management system?
A No, we did not.
Q Let me show you Exhibit 38.
(Deposition Exhibit Zabransky 38 was marked
for identification and was attached to the
transcript.)
Q Which is unsigned, but it has "official



file copy" on the second page and has your name down
at the bottom of the second page. Do you know what
this document is?
A This is a draft of a transmittal letter
that would have gone from Sam Rousso to the director,
who at that time was Dan Dreyfus, recommending
approval for the publication of the '95 ACR. I
believe that's what it is. The '94 -- '94 ACR,
published in March '95.
Q Is that document the one that's marked
Exhibit 5?
A That's what this document refers to, yes.
Q And all those initials to the right-hand
side indicate various approvals of the document?
A Right, to that point in time.
Q Okay. Why did the Department of Energy
publish a document to be used as the basis for
delivery commitment schedules using rates which it was
not using itself for the purpose of planning the
system?
A The department carried over the rates it
had in the previous ACR and did not change them.



Q Was the department trying to minimize the
commitments it had to utilities who were parties to
the standard contracts in using this document, in
using Exhibit 5?
A I believe that that was a consideration.
Q Were there any other considerations that
you can think of for using those rates?
A There was no other basis to develop any
other rates at that point in time.
(Deposition Exhibit Zabransky 39 was marked
for identification and was attached to the
transcript.)
Q We have marked as Exhibit 39 to your
deposition, Mr. Zabransky, a document entitled
Analysis of a Total System Life Cycle Cost of the
Civilian Radioactive Waste Management Program. Are
you familiar with that document?
A I've seen this document. I'm not familiar
with it, but I know what it is.
Q Did you participate in any way, shape or
form in either providing any of the information for
the document or helping draft it?



A No, I don't believe I did.
Q Do you use it in the course of your duties
in the Department of Energy?
A I don't use this document in the course of
my duties, no.
Q Let me refer you to page eight of Exhibit
39, Mr. Zabransky.
A Okay.
Q You found it before I did.
A I found it.
Q Do you know where those receipt and
placement rates came from?
A I don't know specifically where they came
from, no.
Q As far as you know, were those the rates
that the DOE was using for planning purposes as of
September of 1995?
MR. OLSEN: Objection, vague.
Q Do you understand my question,
Mr. Zabransky?
A Those were the rates that were used to cost
out a repository and its operations that were used in

A Potential cost of similar settlements. Would have come out of my group of people that developed that.
Q Based on the amount of spent fuel out there at utility sites?
A Based on implementation of similar settlements at other places, yes.
Q Have you provided any advice regarding acceptance rates to be employed in any of those settlements?
A In any of the settlements or in the settlement?
Q Well, I guess since there's only been one, the, but any proposed --
MR. OLSEN: Objection to the extent it's going to call the witness to reveal information disclosed in the course of settlement negotiations.
A I participated in the negotiations of the settlement.
Q Take a look at page 15 of Exhibit 40 to your deposition, which is the analysis of the total system life cycle cost of the civilian radioactive



waste management program, December 1998.
A Uh-huh.
Q Do you see those acceptance rates on page 15?
A Yes, I see them.
Q Are those the bases for the total system life cycle cost estimate that was done in 1998?
A I have to read the document, but I believe it is.
Q Do you know where those rates came from, how they were developed?
A I believe they feed into this document from the systems requirements documents.
Q Okay.
A Which is a higher level program requirements document.
Q What is the purpose of the system requirements document?
A The purpose of that document is to -- I'm not a systems engineer -- at DOE is to define the requirements for the rest of the federal waste management system as to what it needs to do.



Q When you say the rest of the federal waste management system, is there some part that it doesn't apply to?
A Well, for the federal waste management system, yes.
Q And do you recognize these rates as the rates that are in the system requirements document?
A They appear to be. I would have to verify but they appear to be the rates that are in the CRD at this point.
Q Do you know how those rates came to be developed?
A No, I do not know how they came to be developed. I know that -- in this document and the CRD, no.
Q I'll ask it a different way. Do you know what the rationale is for a particular rate in a particular year?
A I would defer to the engineers that have looked at this and determined this is something they could accomplish. Also to the policy or the people who have approved the CRD and said it's something we



think we can accomplish.
Q To your knowledge does this also assume the acceptance rates at a repository?
MR. OLSEN: Objection. The document speaks for itself.
A The entire document presumes a repository in 2010.
Q Before I make this an exhibit I'm just going to ask you, are you familiar, do you know whether you're familiar with a document titled Basis for the Viability Assessment and TSLCC Cost Estimate Operational Waste Stream? I'll show it to you.
A Sounds like a catchy title.
(Deposition Exhibit Zabransky 41 was marked for identification and was attached to the transcript.)
A Yes, I'm familiar with this document.
Q What is that document?
A This document is a report done by our contractors. TRW announced similar documents done by Bechtel that attempt to simulate how fuel might be -- what type and -- what types of fuels might be received

when at a repository so that the designers can design accordingly.
Q Does that document provide the input for any other document as the title may suggest?
A It would be a basis for further design work and further analysis, yes.
(Deposition Exhibit Zabransky 42 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, Exhibit 42, Civilian Radioactive Waste Management System Requirements Document, Revision 5 dated May 2000. Is that the document you referred to a little while ago as being the source of the acceptance rates and the total system life cycle cost estimate?
A This should be the source of the requirements for the entire program that would be reflected in the life cycle cost, yes.
Q Look at page ten of the document if you would. See Table 1 titled CRWMS Receipt Rates?
A Yes, I do.
Q Are those the rates that currently serve as



the planning basis for DOE for the purpose of the civilian radioactive waste management system?
A These are the rates that serve as the planning basis for the repository, correct.
Q Did you do anything in connection with the development of those rates?
A No, I don't think I did.
Q Do you have any disagreement with those rates?
MR. OLSEN: Objection, vague.
Q Do you think those rates are reasonable?
MR. OLSEN: Objection, vague and to the extent it calls for a legal conclusion.
A From a technical perspective, these are reasonable rates.
Q Who at the Department of Energy works on the civilian radioactive waste management system requirements document? Can you tell us a person?
A Well, it's under Jeff Williams' program and his staff would work on it.
Q All right.
A It's ultimately approved by the director.



Q All right, sir.
A Can we take five minutes?
Q Sure.
(There is a recess from the record.)
Q Mr. Zabransky, could you pull out Exhibit 2 to your deposition. It's the letter dated September 30, 1996, from R. G. Cocherell to Mr. Doug Baptist, contracting officer. I know that you were copied on that document.
A Yes, I was.
Q See that?
A Uh-huh.
Q The second paragraph of this letter says, "The attached meets the notice obligations under the spent fuel disposal services contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes the current rates are too low and are therefore inadequate." Do you see where I've read?
A Uh-huh.
Q That's a yes?
A Yes, sorry. I see that.



Q Did the Department of Energy do anything with respect to the statement in that paragraph? Did they respond to that in any way?
A I don't believe so.
Q When you found Exhibit 2, did you see Exhibit 3?
A Yes.
Q That's the letter from probably March 17th from Ms. Tomasoni, March something of 1997?
A Yeah, it's the 13th.
Q Is that the only response you're aware of from the Department of Energy to this letter that's marked Exhibit 2?
A I believe so.
(Deposition Exhibit Zabransky 43 was marked for identification and was attached to the transcript.)
Q Let me show you Zabransky Exhibit 43, which is a letter to James H. Miller, III, to Beth Tomasoni, Reference: Response of Southern Nuclear Operating Company on behalf of Alabama Power Company and Georgia Power Company to your letter of December 17, 1996.

Justice has identified as withheld on the grounds of privilege are produced and after we have an opportunity to review documents recently produced to us by the Department of Justice and after certain instructions not to respond which occurred earlier in this deposition are resolved. Thank you very much for your time, Mr. Zabransky.

MR. OLSEN: And we would like to put on the record that the government will object and does object to this deposition being held open.

(There is a recess from the record.)

EXAMINATION BY COUNSEL FOR DEFENDANT THE UNITED STATES

BY MR. OLSEN:

Q Mr. Zabransky, I really have just one question to be asking you here. Yesterday you indicated that it made, I think the phrase was no sense to accept fuel at a small rate at a repository or MRS. What did you mean by that statement?

A I meant from a programmatic perspective, from an operational perspective it made no sense to accept a small amount of fuel at a repository, MRS



assuming that there were no constraints on the acceptance capacity of those facilities.

MR. OLSEN: Okay. I have no further.

MR. BLANTON: Subject to all of my reservations and everybody else's.

MR. OLSEN: Exactly. Subject to all of our objections to your reservations.

EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON COMPANY

BY MR. HIRSCH:

Q Good afternoon. My name is Norm Hirsch. I'm a lawyer for Commonwealth Edison Company, one of the plaintiffs in this case.

Let me refer you back or I'm wondering if you could get back in front of you Zabransky Exhibit 4.

A This one right here.

Q Wow, right on top. The instructions for the DCS forms. We went over a little bit of this yesterday or today, I'm losing track, but I want to ask you a question about it.

A Okay.



Q Would you refer to the first page of the document, the "when to submit" paragraph?

A Yes.

Q It says, "Beginning January 1st, 1992, purchasers shall submit DCSs at least 63 months prior to requested delivery," and then it refers the purchasers to the 1991 ACR or the subsequent ACR as appropriate.

A Uh-huh.

Q Do you see that?

A I do.

Q Is it correct that a utility did not have to submit a DCS form for fuel that did not have an allocation in a particular year 63 months before the year of that allocation?

MR. OLSEN: Objection to the extent it calls for a legal conclusion. Objection also because it's vague.

A Can you repeat that.

(The record is read.)

A I don't understand.

Q Let me rephrase it.



A Okay.

Q Maybe the best way to do it is to give you a specific example.

A Okay.

Q Let's suppose that a utility did not have a particular allocation going off the 1991 ACR for the year 2000. You follow me so far?

A Yes. So there's no allocation in the year 2000.

Q So a utility would not need to submit a DCS, going back 63 months in 1994, correct?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A Well, what would they --

MR. OLSEN: I want to object because it's vague.

A Okay. I guess I'm at a loss to understand what they would submit it for if there was no allocation.

Q All right. Let me -- sorry about this, but the utilities were supposed to submit allocations 63 months before the year of their allocation in the ACR.

Is that correct?
MR. OLSEN: Objection. Calls for a legal conclusion. Objection, vague.
Q Do you want her to read the question back?
A Well, the instructions say they should submit them 63 months prior to the year.
Q Right.
A Okay. For that allocation.
Q And a utility wasn't required to submit DCS forms more than 63 months in advance, was it?
MR. OLSEN: Objection. Calls for a legal conclusion.
A Nothing requires it to be more than -- it says at least 63 months.
Q And as I understand it, you testified earlier that Wisconsin Electric went ahead and submitted ten years worth of DCS forms the first year. Is that correct?
A That's correct.
Q But that wasn't what was required by the DCS instructions, was it?
MR. OLSEN: Objection to the extent it



calls for a legal conclusion.
A The instructions say at least 63 months.
Q Right. Could you -- and so it wasn't required to submit all your DCS allocations the first year, was it?
A No, it wasn't required.
Q All right.
MR. OLSEN: And objection, legal conclusion, and also best evidence. The instructions speak for themselves.
Q And is it correct that with a few exceptions, like Wisconsin Electric, most of the utilities who submitted DCS forms did so on a rolling basis of 63 months before their ACR allocation. Is that correct?
A I don't know. I couldn't classify it as most or whatever. A substantial number submitted them all up front. I don't know the exact percentage.
Q Can you identify who submitted all -- what utilities submitted all their allocations up front?
A I couldn't do that without reviewing the records of who submitted DCSs and had them approved.



But that -- I think it was quite a few; I'm just not quite sure of the number.
Q Did you review at some point the number of utilities that had submitted their allocations all at one time?
MR. OLSEN: Objection, instruct the witness to not answer this question to the extent it will require the revealing of attorney/client or attorney work product.
Q Subject to that qualification, can you answer the question?
A I mean, there were records kept as to who had allocations and who had approved DCSs, so not that there was an effort to determine anything, but records were kept.
MR. HIRSCH: Let's go off the record for one second.
(Off the record.)
(Deposition Exhibit Zabransky 48 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've handed you what's been



marked as Zabransky Deposition Exhibit 48, which is a document with Bates label CTR 0031772 through 1787 titled Status of Delivery Commitment Schedules, EEI UWASTE Meeting, November 6, 1992. And it has the name Alan Brownstein on it, although it appears to be crossed out and there's a handwritten note Billy Cole. Have you ever seen this document before?
A No.
Q Do you recall being in an EEI UWASTE meeting in November 1992 where there was a presentation from the DOE regarding the status of delivery commitment schedules?
A I don't recall, no.
Q And who is Mr. Cole?
A Mr. Cole was the manager of the waste acceptance department at the M&O at the time. TRW.
Q Would he have been responsible for collecting information on DCSs that were submitted?
A He would have been, his group would have been involved with the assisting in the processing of DCSs.
Q After you joined the DOE did you see

A From memory, I would have to go back -- I would have to go back and review the files. I couldn't do that -- I can speculate. I could guess at one, but I would be guessing. I would have to review my files.

Q Sitting here today you can't identify other utilities besides Wisconsin Electric that submitted all their forms at one time?

A Not from memory, no.

Q And I think you said earlier that under the DCS instructions the utilities didn't have to submit all their -- all their DCS forms for all their years of allocations at one time?

A That's correct, they didn't need to.

(Deposition Exhibit Zabransky 49 was marked for identification and was attached to the transcript.)

Q Mr. Zabransky, I've handed you what's been marked as Zabransky Deposition Exhibit 49, and I will represent to you that this is a group exhibit representing correspondence between Commonwealth Edison Company and the Department of Energy regarding



Com Ed's submission of DCS forms.

What I would like to do is refer you -- well, let's start off on the first page, page 3673. Does this reflect that Com Ed submitted DCS forms for its allocation starting in 1998?

A That's what this does apparently, yes.

Q And does the following letter and documents contained on pages 265, 266 and 267 indicate that those forms, DCS forms were approved?

MR. OLSEN: Which numbers did you say?

MR. HIRSCH: The numbers at the bottom are 265, 266 and 267.

A The letter indicates that the attached forms don't show that, but it could just be the Xeroxing.

Q Well, the page 266 shows Alan Brownstein and Beth Tomasoni's signature right?

A On form number -01.

Q That's page 266?

A Correct.

Q And 267 I guess that's form 02 shows I guess Alan Brownstein's signature?



A Right. Which means that one wasn't approved if that's all that's there.

Q Well --

A I'm just observing the documents.

Q All right. Do you have any reason to believe that this particular DCS form sitting here today was not approved?

A No reason to believe that.

Q And when you look at the pages that begin CTR 006-1500 through 1504, are those DCS forms that Com Ed submitted along with a transmittal letter for the year 1999?

A Correct.

Q And do pages Bates labeled CEO 0746 through 0750 reflect that those forms were approved by the DOE?

A Yes.

Q And do you see on pages COF 02156 through 2164 Com Ed's submission of DCS forms along with a transmittal letter from Ken Peterson for the year 2000?

MR. OLSEN: Objection. What were the --



just -- could you clarify the numbers again. At least I think the version --

MR. HIRSCH: There's a break.

MR. OLSEN: There's a break.

A What we've got is Ken's transmittal letter and we have copies of the I believe -- no, we got a break. No, maybe not. Okay, we got a break.

Q Let me ask you, looking at page 2159 through 2164, do these reflect DCS forms that Com Ed submitted for the year 2000 that were approved by the DOE?

A Yes.

Q And now I'm going to refer you to the next set of documents COF 0012141. This is all still in Zabransky Exhibit 49.

A Okay.

Q There's a cover letter dated September 28, 1995, from Mr. Ken Peterson at Com Ed and attached to that are some DCS forms for the year 2001.

A Yes.

Q Now, these forms that I've just identified starting at 2041 through 2046 came in after you had

become the team leader at waste acceptance. Is that correct?
A That's correct.
Q Do you recall seeing these forms?
A Not specifically, no. I've looked at them now. I don't recall -- I did not recall them before I looked at them right now.
Q I'm going to represent to you, Mr. Zabransky, that the Bates labels on these documents reflect that they were produced to us, to Com Ed by the government.
A Okay.
Q Do you have any reason to believe that these particular DCS forms were not submitted to the DOE?
A I have no reason to believe that.
Q Mr. Zabransky, I'm going to represent to you that the best of our information the DCS forms that we've just been looking at, 2142 through 2146, were never acted on one way or the other by the DOE. In other words, Com Ed never received a response. Do you have any information about why or how that could



have occurred?
A No, I have no information why or how that could have occurred that they didn't receive any response.
(Deposition Exhibit Zabransky 50 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've handed you what's been marked as Zabransky Deposition Exhibit 50, which is a letter from James Blanford at TRW to a Mr. Sam Rousso at the Office of Civilian Radioactive Waste Management. It's dated October 25th, 1995. The Bates labels are CTR 0240033 through 0040. And you see that you're copied on this document?
A Yes, I was.
Q And do you see that the document says the attached subject report provides the status of the delivery commitment schedules received as of October 15th, 1995?
A Yes.
Q The changes from the previous report consist of adding the data and status of the following



new DCS submittals.
A Okay.
Q Does Exhibit 50 reflect that TRW and the DOE received the DCS forms which were part of Com Ed Exhibit 49 at pages 2142 through 2146?
A Yes, this letter reflects that they were received by the government and provided to TRW.
Q What was the purpose of providing DCS forms to TRW?
A They assisted in the review of the forms.
Q All right. Mr. Zabransky, I would like you to go back to Zabransky Dep Exhibit 49 and specifically we're going to move on to the pages that are marked COF 01 starting on 2165.
A Okay.
Q Through 2172.
A Okay.
Q Do these documents I've just identified represent DCS forms that Com Ed submitted for the year 2002 along with the transmittal letter dated September 25th, 1996, from Ken Peterson at Com Ed?
A They do.



Q All right. Mr. Zabransky, I would like to refer you to the next few pages of Zabransky Dep Exhibit 49 which are some pages marked at the bottom 284 through 290. Do you see those pages?
A Yes.
Q And for information purposes I'll say that we got these pages from the government's appendix to the summary judgment motion they filed in the case.
Do you see that these documents from 284 through 291 were the Com Ed DCS forms submitted for the year 2002?
A Correct.
Q And will you look at the bottom of the first form at page 284.
A Uh-huh.
Q Is there a notation of DOE action at the bottom of that section --
A Yes.
Q -- of that form?
A Yes, there is. I approved these from a technical perspective and forwarded them through the process to the contracting officer for final approval.

Q Whose signature is that as the technical representative?
A That's mine.
Q And so what would be the procedure for you to review these as the technical officer?
A Ensure they comply with the delivery instructions from a technical perspective and, if so satisfied, would have forwarded them from my office with a draft letter back to the purchaser through counsel to the contracting officer.
Q And to your knowledge that's what you did with respect to these forms?
A To my knowledge that's what I did.
Q And what is the C-O-T-R designation there?
A That's contracting officer's technical representative.
Q And that was you?
A That was me.
Q And then there's a handwritten note to the right-hand side of this notification of DOE action. Can you read that for me?
A It says, "Void, DKZ, 2/27/97."



Q Is there another note underneath that? DK --
A That's my name.
Q Zabransky?
A I signed it.
Q And there's something like DU -- is that still part of your name?
A That's part of my name.
Q And that's what you dated 2/27?
A '97, correct.
Q Can you tell me what the circumstances were that caused you to void your earlier determination to recommend approval of these forms?
MR. OLSEN: I just want to object to the extent that he can do so without revealing any privileged communications.
A Further steps in the review process indicated to me, advised me that this was the appropriate action to take.
Q What further steps in the reviewing process are you referring to?
A When this went through counsel.



Q Did you submit the forms to counsel?
A Routinely the letters all go through counsel for their signature.
Q I see. Which counsel would these forms have gone to at the time?
MR. OLSEN: Objection. I instruct the witness not to answer that question because it's seeks privileged information.
Q Are you going to follow your lawyer's advice not to answer the question?
A Yes.
MR. HIRSCH: As I think has been reflected earlier, I don't think the identity of the lawyer is privileged. But I guess we'll sort this out later.
Q Did the lawyer instruct you to void or to write "void" on these forms?
MR. OLSEN: Objection. That one is privileged. Everybody knows that what the lawyer instructed him to do you can't ask him about. I'm instructing the witness not to answer the question.
Q And you're going to follow your counsel's advice, is that correct, Mr. Zabransky?



A I will follow his advice.
Q Was a decision to write "void" on these forms part of the decision I think you mentioned earlier to suspend the DCS process at the recommendation or the instruct of counsel?
MR. OLSEN: Sorry, could you repeat the question.
(The record is read.)
MR. OLSEN: I direct the witness not to answer the question to the extent that doing so would reveal what counsel told him. If you can answer the question without saying what counsel told you.
MR. HIRSCH: Let me rephrase.
MR. OLSEN: Okay.
Q I believe you testified earlier, Mr. Zabransky, that the DCS process was suspended based on instruction of counsel. Do you recall that?
A I think I said that, yes.
Q And that that occurred I think around the time of the Indiana Michigan decision in 1996?
A I'm not sure. Yeah, whatever decision it was, there was a precipitant event.

Q And you think that was in 1996?
A That time frame, yes, I think.
Q And my question for you is was the decision to write "void" on these Com Ed forms, DCS forms, part of that general determination to suspend the DCS process?
A It was a result of the suspension of the process.
Q Did you have any discussions with nonlawyers at the DOE about your having written "void" on DCS forms?
A No, I don't think so.
Q Were there other DCS forms besides the Com Ed forms that were initially approved and then you went back and voided?
MR. OLSEN: Objection, assumes facts not in evidence and calls for a legal conclusion.
MR. HIRSCH: I asked him if there were.
Q You can answer.
A I think there are. I'm not sure which ones.
Q Do you know approximately how many forms --



A No.
Q -- you would have voided at the time?
A I do not know.
Q Will you look at the next page of the document, Exhibit 49, which is a March 13th, 1997, letter from Beth Tomasoni to Mr. Michael Wallace at Com Ed. Do you see that?
A Yes.
Q Would you have reviewed this letter at or before the time it went out?
A I would have participated in drafting a version of this letter, yes.
Q I think we looked earlier at a letter to Southern Nuclear around the same time, indicating that the department was not able to approve its DCS submittal. Does this letter appear to be pretty much identical to that letter?
A I don't know if it's identical.
MR. BLANTON: Exhibit 3 I think.
MR. OLSEN: Three? Okay. Thank you.
A Looks to be identical to me.
Q Well, let me just clarify. You're now



looking at Deposition Exhibit 3 and you're comparing it with the letter that's part of Zabransky Dep Exhibit 49 dated March 13th, 1997?
A That's correct.
Q And the letters appear identical. Is that correct?
A They appear identical.
Q And so the letter that was sent to Michael Wallace at Com Ed dated March 13th, 1997, was a result of this determination by counsel to suspend the DCS process. Is that correct?
MR. OLSEN: Could I have the question read back.
(The record is read.)
MR. OLSEN: You can answer.
A Yes.
Q Will you look at the last three pages of Zabransky Deposition Exhibit 49?
A The last three pages?
Q Right.
A These three?
Q Right.



MR. OLSEN: 64, 69 and 70.
MR. HIRSCH: Right.
MR. OLSEN: Okay.
A Okay.
Q Actually, I would like you to look at the last two pages.
A Okay.
Q 69 and 70. Do pages 69 and 70 reflect that Com Ed submitted a DCS form for the year 2003?
A That's what it reflects.
Q All right. And I take it from your earlier testimony that this DCS form would not have been reviewed. Is that correct?
A It would not have been processed, right.
Q And to your knowledge, just to clarify, the DCS form Com Ed submitted was not processed or reviewed. Is that correct?
A Not to my knowledge.
Q Will you refer back to Zabransky Dep Exhibit 4, please.
MR. OLSEN: The instructions?
MR. HIRSCH: Right.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D. C.
Friday, April 19, 2002
10:03 a.m.

Job No.: 12597-3
Pages 460 through 722 - Volume 3
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

ON BEHALF OF DEFENDANT UNITED STATES:

MARIAN E. SULLIVAN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #10150
Washington, D. C. 20530
(202) 307-6288



A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D. C. 20530
(202) 305-7594



C O N T E N T S


| EXAMINATION OF DAVID ZABRANSKY | PAGE |
|---|---|
| By Mr. Hirsch | 471 |
| By Mr. Tomaszczuk | 565 |
| By Mr. Macdonald | 641 |


E X H I B I T S

(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
|---|---|
| 51 CTR 0440723 through 0743 | 480 |
| 52 Preliminary Draft OCRWM Position Issue No. 2, Oldest Fuel First v. Waste Selected for Delivery CTR 0131268 through 1273 | 496 |
| 53 E-mail from D. Shelor to J. Carlson dated 9/16/98, CTR 004-0263 | 533 |
| 54 Presentation to APC, EDB 0020584 - 0020602 | 536 |
| 55 Letter to N. Slater from E. Benz EDB 002056 - 618 | 538 |

548

A Probably. I'm sure we discussed the reason we were doing this. I think -- well...
Q Do you recall what, if anything, he said about it?
A Not specifically what he said in this case.
Q Has it been part of your job responsibilities for the last few years to prepare an analysis of what costs the utilities are incurring by virtue of the DOE's failure to start picking up spent fuel in 1998?
A I think the purpose of this analysis was to try to figure out what the basis was for the NEI NARUC analysis that came up with different numbers and look at parameters to see if we could replicate what they came up with.
Q Okay. I understand that. But my question was has it been part of your job responsibility for the last few years to prepare an analysis of what costs the utilities are incurring by virtue of the DOE's failure to begin picking up spent fuel in 1998?
MR. OLSEN: Objection. To the extent you can answer the question without revealing either

549

settlement negotiations or attorney/client conversations, you can answer the question.
A The answer is yes. I've been responsible for developing, quantifying numbers to assist in either settlement discussions or in discussions with attorneys or counsel. The answer is yes, I've been doing that.
Q And what was the NEI, do you remember what the NEI NARUC analysis was that was referred to there?
A Specifically I don't know. They had a -- I recollect they had a number they were putting out that everyone wanted to figure out why they were getting that number.
Q And Buz Gibson and Marc Rose are the people who prepared this analysis. Is that right?
A At the time this was done, Buz Gibson and Marc Rose were working in the M&O and would have done this work for me.
Q At the M&O. And that's the contractor?
A Correct.
Q That's Bechtel?
A No, at this point that was TRW.

550

Q Okay. I lose track of the M&O contractor. In February '97 the M&O contractor was TRW?
A Correct.
Q And those two gentlemen work for TRW?
A Yes, they do.
Q Do you know if they're still -- or do you know where they are now?
A No, I do not.
Q And where does Jeff Williams or where did Jeff Williams work at this time?
A Jeff Williams would have worked at this time as the division director for the systems integration division. It may have had a different title, but it's essentially where he is now.
Q And do you know why he was involved in this e-mail?
A Why was he copied in?
Q Yeah.
A Because Buz Gibson generally worked for Jeff.
Q And Dong Kim, did he work for you?
A No.

551

Q Where does he work?
A Dong Kim is a -- I'm not sure what his title is but he's a senior advisor in the office of the director.
Q Office of the director of the office of civilian radioactive waste management?
A That is correct.
Q If you look at the first paragraph or the paragraph that I guess is the fourth up from the bottom, the one that begins, "As we discussed last evening."
A Okay.
Q You see there's a reference to the NARUC NEI analysis, and then it says, "In there," I think it should be t-h-e-i-r, "analysis they assume that in the delayed acceptance cases that when DOE acceptance begins there's no increase in the acceptance rates from the ACR rates."
A Uh-huh.
Q Semicolon. "So each year of delay adds a year to each utility storage needs and dramatically increases the post-shutdown storage costs."

552

A Okay. I see that.
Q So it was your understanding at that time that this NARUC analysis used the same rates as the ACR rates for the time when the DOE actually started performance?
MR. OLSEN: Objection, vague. Objection, foundation.
A I take this sentence to mean that, without remembering the specific analysis, but what that means to me now reading it this way is that they would have maintained the 900 tons a year forever.
Q And I take it you disagreed with that analysis?
A The analysis we did assumed that, once the repository was operating, that it operated, as it says, at the rates in the program plan.
Q And those rates were what?
A I don't recollect the exact numbers.
Q Would those rates in the program plan be the rates we looked at yesterday in the TSLCC reports or the system requirements document?
MR. OLSEN: Objection, compound.

553

Objection, calls for speculation.
A To the extent that they were contemporary with this program plan they should have been.
Q And so, again, I take it that you disagreed with an analysis that would have continued DOE performance indefinitely at 900 metric tons. Is that correct, Mr. Zabransky?
MR. OLSEN: Objection. Calls for speculation.
A After the operation of the repository, yes.
Q And so in this analysis the DOE assumed that the repository was going to open and that it would operate at whatever the then current program rates were. Is that correct?
MR. OLSEN: Objection. Calls for speculation.
A That's correct.
Q And then you say, "As you can see, the impact of using higher acceptance rates is that in the earlier years it actually costs the utilities less overall than if the program had begun in 1998 at the ACR rates." What did you mean by that?

554

A Well, that meant in the earlier years the utility costs impact is negative.
Q And how could utility cost impact be negative?
MR. OLSEN: Objection. Calls for speculation.
A By doing this analysis you will determine that it would be negative if you assume what these assumptions were.
Q What does it mean to have a negative cost impact?
A That they would have spent less money under this scenario than if we had started the other way.
Q And the DOE scenario that you're describing here is the DOE starting in 1998 at the ACR rates and then ramping up to the program rates when the repository opened in 2010?
MR. OLSEN: Objection, calls for speculation.
A No.
MR. OLSEN: Objection. I don't think that's what the document says.

555

A That's not what this document says.
Q Well, maybe I don't -- I didn't understand your previous answer. For purposes of determining this cost impact what assumptions did his analysis make?
A That the repository's available in 2002, 2004, 2008 or 2010.
Q All right. Thank you.
And so using -- and when the repository opens in one of those projected dates, the assumption was that the repository would operate at the program rates. Is that correct?
A At the rates that are being planned for operation after the opening of the repository.
Q And those rates ramp up to 3,000 by approximately five years?
MR. OLSEN: Objection. Calls for speculation.
A I would have to review the documents but it sounds to be about right.
Q And so by the time you get to 2006 on this document there is a positive I'll say utility cost

Q Mr. Zabransky, in Exhibit 5, can I direct your attention to page six. Given the department's decision to suspend the DCS approval process in or about February or March of 1997, was there any need for any utility to submit DCS approval forms after that date?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.
A I don't know that the department ever told utilities not to continue to submit. So whether there was need or not was up to the utility from their perspective.
Q The Department of Energy did tell utilities in or about March 13th, 1997, that they were -- that it, the Department of Energy, was no longer going to act upon DCS forms. Isn't that true?
A At that time, yes.
Q And has that direction changed since March 13th, 1997?
MS. SULLIVAN: Objection, vague.
A That position has not changed.
Q And has the department approved any DCS



forms submitted after March 13th, 1997?
A Not to my knowledge.
Q And you would know if they had, would you not?
A I would hope I would.
Q Now, I understood your testimony to be that DOE's current intention is to begin contract performance in 2010?
A That's DOE's current plans.
Q And if I could direct your attention to page six of Exhibit 5, do you have that?
A Yes.
Q So in interpreting this table, is it fair that year one should now be read to mean year 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A That's a way of interpreting this table.
Q Is there any other way to interpret it?
A I'm sure there are. I don't know.
Q Can you tell me what they are?
A Interpret year one to be any year you want but I don't know how else -- it seems reasonable from



your statement that year one was the first year of operations.
Q And your testimony is, as I understand it, that DOE's current intention is to begin performance in 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A That's DOE's current plans, are repository plans commence in 2010.
Q And you would agree this the last APR ACR that was published by DOE, correct?
A Yes, I would agree with that.
Q Are you aware of any other guidance, instruction, memoranda or other information provided by DOE to the utilities concerning how to utilize this table and the instructions for purposes of determining when to submit a DCS?
A No, I'm not.
Q Do you have an understanding of the term "nonbreach world."
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. And it's also beyond



the scope but I'll allow him to answer.
A I have heard the term used, and I believe I have an understanding of it.
Q Can you tell me, sir, what your understanding of it is?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
A My understanding is what would have happened had DOE not breached its obligation to begin performance in 1998.
Q And do you have an understanding, sir, as to what rate DOE would use for acceptance of spent nuclear fuel in the nonbreach world?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
A Had DOE begun performance in '98 as originally anticipated, at an interim storage facility, it would have been the rates in the ACR.
Q You understand the term "nonbreach world" to assume an interim storage facility?

cover all those components necessarily.
Q When you say it doesn't cover all of those components necessarily, could it cover some of those components?
A I don't --
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A Again I'm going to state, those components are not the result of reprocessing. And those components have not been found by the commission to determine by rule that requires permanent isolation. In effect the commission recently has found that those components for storage purposes are spent fuel under its revisions to 10 CFR Part 72.
Q Explain what you mean by the answer you just gave, if you would?
A That the commission recently amended 10 CFR Part 72 to allow the storage of GTCC CTRR at ISFSIs, independent spent nuclear fuel storage installations, and specifically excluded these nonfuel bearing components from the GTCC category and labeled them as spent fuel.



Q When you say they specifically excluded them from the category of GTCC, what do you understand the definition of GTCC to be?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A I would look at the NRC's definition of what greater than Class C waste is, but it's a technical list of radionucleides above certain characteristics, and I'm not versed in telling you what those characteristics are.
(Deposition Exhibit Zabransky 65 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've handed you what has been marked as Zabransky Exhibit 65 and it is an excerpt from the Code of Federal Regulations, 10 CFR Section 61.55. Do you have that there in front of you?
A Yes, I do.
Q Is this the regulations you're referring to regarding the characteristics of what makes the characteristics of Class C waste?



A I believe so. I've never really read these or focused upon these because I've never worked with low-level waste, and this is greater than Class C low-level waste.
Q You've never looked at this Code of Federal Regulations before?
A Not -- no, I really haven't looked at it. I've seen it in passing but I've never really read it. Again, from a utility perspective it was spent fuel. I didn't care about the Class C category. Again, I may have read this, looked at it. I am not a nuclear engineer so I have not focused on the half lives of nickel and cobalt and cesium and whatever, I guess estraunium. So this is not my area of expertise. I can't interpret it.
Q Mr. Zabransky, I believe you testified two days ago, and I apologize if you did, but let me ask the question. Do you have any recollection of discussions about modifying the standard contract to change the definition of high-level waste?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, to the



extent it requires testimony as to discussions with counsel. I direct the witness not to answer regarding any discussions with counsel.
A I have no recollection of doing that, no.
Q You were not involved in any efforts to modify the standard contract to change the definition of high-level waste?
A No, I was not.
Q In Mr. Tomaszczuk's questions I believe you stated that the contracting officer decided to base the DCS instructions on the ACR in 1991. Is that right?
A That's --
MS. SULLIVAN: Objection. I believe it mischaracterizes his previous testimony.
Q Mr. Zabransky.
A It's my understanding that's what the contracting officer based the submittal of DCSs upon in 1991, but in 1991, of course, I received those instructions as a utility.
Q I understand. I just wanted to make sure I understood your testimony.

A Yes.
Q Do you know why the contracting officer based the DCS instructions on the ACR rather than the APR?
A The APR doesn't contain anything to base it upon. The APR is merely a listing of fuel assemblies.
Q The APR is a listing of fuel assemblies ranked by the oldest fuel at the beginning and going forward. Is that right?
A Correct.
Q And the ACR takes that ranking and uses a particular acceptance rate to determine allocations. Is that right?
A That's correct. So, by extension, the ACR is based on the APR.
Q The standard contract provided for an ACR beginning in 1987. Is that correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A The standard contract in article -- in Article B -- or Article 4.B.2 -- 4.B -- 4.B.5.B requires that DOE begin publishing ACR not later than



July 1st, 1987, yes.
Q And was the APR to be published subsequent to the ACR?
A Yes, it was.
Q Did DOE state that the APR was to replace the ACR?
A No. In fact, if I recollect, when DOE published the APR, it told utilities to check the values because they would be used in the ACR.
Q Look at Exhibit 33 for me.
A What does it look like?
Q It's the 1997 ACR.
A Okay.
Q I'm going to ask you to look at page two, numeric page two with a Bates label PA 103158 and ask you to look at the paragraph that states, "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF HLW. In 1992 based on this priority ranking the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF HLW purchasers propose to deliver." Do you see that?



A Yes, I do.
Q What does it mean that the ACR will be converted into an APR?
MS. SULLIVAN: Objection. The document speaks for itself.
A And it doesn't say that. It says the ACR acceptance ranking. What that refers to is this Table B-1 in this document where DOE had put together a table that wasn't an APR but used an illustrative example of how it would work, and that was converted into the APR which was subsequently used as the basis for developing the ACR.
Q So what you're referring to is a table in this 1987 ACR, and that table will be converted into the APR for receipt of SNF?
A That's what was done.
Q Was the APR based on receipt at an interim storage facility or a repository?
MS. SULLIVAN: Objection, vague.
A The APR is based upon the age of the fuel and nothing more.
Q You can look at the contract again. If you



would look at Article 4.B.5.A, which states, "Beginning on April 1, 1981, DOE shall issue an annual acceptance priority ranking APR. For receipt of SNF and/or HLW at the DOE repository." Do you see that?
A Correct.
Q Do you know what that means, specifically the "at the DOE repository"?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. It says DOE repository. I've taken it to mean DOE facility pursuant to the act, but it's basically still a listing.
Q When you say you've taken it to mean DOE facility, why is that?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A That's what I've taken it to mean.
Q Do you know if others at DOE have also taken the words "DOE repository" here to mean DOE facility?
A I don't know.
Q Have you ever had discussions with anyone at DOE about the meaning of those words?

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

* * * * * * * * *
YANKEE ATOMIC ELECTRIC *
COMPANY, MAINE YANKEE ATOMIC
POWER CO., and CONNECTICUT *
YANKEE ATOMIC POWER CO.
Plaintiffs *
vs. * No. 98-126C,
98-474C, 98-154C
UNITED STATES OF AMERICA * Senior Judge Merrow
Defendant *
* * * * * * * * * VOLUME ONE

CONTAINS PORTIONS SUBJECT TO PROTECTIVE ORDER

The deposition of DAVID ZABRANSKY was taken on Wednesday, June 5, 2002, commencing at 10:05 a.m., at the law offices of Spriggs & Hollingsworth, Ninth Floor, 1350 Eye Street, N.W., Washington, D.C., before Leslie L. Schneider, a Notary Public in and for the District of Columbia.



APPEARANCES:

Robert L. Shapiro, Esquire
David Sobel, Summer Intern
Spriggs & Hollingsworth
1350 Eye Street, N.W.
Washington, D.C. 20005-3305
e-mail: rshapiro@spriggs.com
(202) 898-5879
On behalf of the Plaintiffs

Kevin B. Crawford, Esquire
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Room 7002
Washington, D.C. 20530
e-mail: Kevin.Crawford@usdoj.gov
(202) 305-7594
On behalf of the Defendant



APPEARANCES (cont'd.)

Donald J. Carney, Esquire
Perkins & Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2911
e-mail: carnd@perkinscoie.com
(202) 434-1675
On behalf of Wisconsin Electric
Power Company



I N D E X
Deposition of David Zabransky
6-05-02


| Examination by: | Page |
|---|---|
| Mr. Shapiro | 3 |

* * *

| Exhibits | | Page |
|---|---|---|
| 1 | Letter, 9/26/97, to USDOE from Mr. Buchheit | 131 |
| 2 | Standard Contract | 137 |
| 3 | Standard Contract Briefing to OMB | 146 |
| 4 | Annual Acceptance Priority Ranking and ACR for March 1995 | 155 |
| 5 | Letter, 10/19/90, from Mr. Benz to Mr. Brownstein | 176 |
| 6 | 1991 Annual Capacity Report | 182 |

A. I think the contract gives DOE responsibility for providing the casks.
Q. What's the basis of your understanding that DOE's intent under the contract was to use a bolted open cask for that purpose?
MR. CRAWFORD: Objection to the extent that mischaracterizes his testimony.
A. I'm not sure what DOE's intent was because I wasn't at DOE at the time, but nothing else existed at the time except bolted closed casks, so I don't know how they could have intended to use anything else.
Q. Let me focus on the time when you were at waste acceptance, did DOE have a particular plan at that time for what sort of cask or canister it would use to accept spent fuel from utilities?
A. DOE's plans are DOE's plans. Right now we're planning potentially to accept all kinds of things from utilities, but contractually we don't think that they're covered at this point in time other than bare fuel, b-a-r-e, and that's why we've discussed the possibility -- the need for amendments since the early '90s with the utilities.



Q. Let must just focus again on what DOE's plans have been to the extent you have knowledge of them since you have been at DOE. Since you have been at DOE, has DOE ever had a plan to use a bolted open transportation cask?
A. Absolutely.
Q. Is there a particular brand of transportation cask that's part of that plan?
MR. CRAWFORD: Objection, lack of foundation and vagueness.
A. I'm not sure there's a particular brand, but inevitably we need to use truck casks such as the GA-4, the GA-9 which are bolted closed, and inevitably we'll use large rail casks that are bolted closed, but there's no reason to weld fuel for transportation.
Q. The welding occurs when a container is also being used for storage?
A. It doesn't need to be but some utilities have used systems that required welded canisters, others haven't.
Q. And the Department's current plan is to accept waste that is in welded shut containers?
MR. CRAWFORD: Objection.
A. No, the DOE system is designed to do so



if we effect contract modifications to make them acceptable waste forms. It's not our plan to do so in the absence of contract modification.
Q. Let me just take one step at a time. Does DOE have plans to accept spent fuel that's in welded canisters?
MR. CRAWFORD: Objection to the vagueness.
A. Not in the absence of a contract modification, no.
Q. Why do you need to add the modifier not in the absence of a contract modification?
MR. CRAWFORD: Objection, asked and answered.
A. Because you're mischaracterizing what I said. What I said is we'll develop facilities capable of doing it. We recognize that it's not covered under the contract. We recognize it potentially adds new and expensive steps of opening and disposal that we hadn't factored into our plans and we would consider doing so if we effected a contract modification that benefited both parties.
Q. So DOE's planning facilities to be able to accept spent fuel that's in welded containers?



MR. CRAWFORD: Objection, mischaracterizes his prior testimony. And objection, vague and lacks foundation.
A. We're planning to develop the capabilities. Whether we implement that or not is another question.
Q. How long has the planning to develop the capability to accept spent fuel in welded containers been going on at DOE?
A. I would say that's been going on since the early '90s when Mr. Barrett made a commitment to work on a contract modification to do such a thing.
Q. How has the absence of a contract amendment to date affected the development of the plans for such facilities?
A. The plan --
MR. CRAWFORD: Objection to the extent it calls for speculation.
A. Right now the plans are conceptual so I don't know if it's affected anything at this point. We haven't built anything or licensed anything.
Q. But before you build it or license it, you've got to develop the plan for it?

A. Yes.
Q. When you say that the plans are just conceptual, what do you mean by that, as opposed to what?
A. There's no detail design, final design I think at this point. That's getting out of my area. I don't get into the design process. We're at the conceptual design phase.
Q. What's your role concerning the development of plans of facilities to accept spent fuel in welded containers?
A. My only role is to verify or to make sure that they are considering that option, should we effect a contract modification to make them an acceptable waste form.
Q. Has anyone at DOE ever told you that even if we ultimately develop the physical capability to accept spent fuel in a welded container, if we don't have different words in the contract amendment, we're not going to use those facilities?
A. It's not covered by the contract right now so no. I mean --
Q. That wasn't my question.
A. I understand what you're saying.



Q. My question is has somebody told you that?
A. No one has told me we're specifically developing those facilities at this point either, besides the conceptual stage. But no, I've never been told that specifically.
Q. Have you been told that generally?
A. I have been told we need a contract amendment to make them acceptable waste form or they would not be accepted under the contract.
Q. Who has told you that?
A. That's been the common understanding, and I guess we beyond that, I've had discussions with counsel which I don't want to go into.
Q. Why don't you want to go into that?
A. He's going to tell me not to.
MR. CRAWFORD: Because I'm going to tell him not to answer if you ask that.
Q. We got into this a little bit before of trying to figure out what happened to some of these contract amendment considerations. The contract amendment concerning scheduling, you said there was language drafted but nothing much happened and it was discussed with the likes of NEI but then nothing much happened from there?



A. Well, again you're mischaracterizing. There was no contract amendment regarding scheduling. There was a contract amendment that covered a number of issues inclusively, not separately but inclusively, and they had to all be dealt with together.
Q. But there was language drafted on scheduling and others?
A. There was language on scheduling as part of the comprehensive amendment. I don't know that we drafted language on other issues. That language was discussed. I'm not sure we ever shared any drafts, I don't think we did. We discussed the concepts, here's what we're concerned about in scheduling.
Q. Why didn't you share the draft with NEI?
A. We didn't reach that point in discussions before the discussions ceased.
Q. Had you drafted the language before the discussions ceased?
A. I don't know. I don't recollect the exact timing on that.
Q. What do you mean by the discussions ceased?



A. NEI decided not to talk about this anymore.
Q. Steve Kraft told you he didn't want to talk about it?
MR. CRAWFORD: Objection, asked and answered.
A. NEI.
Q. Who was it at NEI that told you they didn't want to talk about it?
A. It was decided as a group as far as I understand, they didn't want to talk about this.
Q. How did you develop this understanding of NEI's position?
A. I don't know who exactly told me, but between staff and utilities, they said we're not going to talk about this right now.
Q. Did individual utilities tell you that they didn't want to talk about an amendment to the contract?
MR. CRAWFORD: Objection, asked and answered.
A. We had discussions after that with the individual utilities.
Q. Which individual utilities?
A. After that point in time, I believe

208
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiff, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, June 6, 2002

Deposition of DAVE ZABRANSKY, Volume II, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., commencing at 9:32 a.m., Thursday, June 6, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION



PURSUANT TO THE PROTECTIVE ORDER

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

On behalf of Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins & Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2911
(202) 434-1675



Reported by: Cappy Hallock, RPR-CRR

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| DAVE ZABRANSKY | PLAINTIFF |
| By Mr. Shapiro | 212 |
| By Mr. Carney | 387 |
| Afternoon Session - Page 281 | |


E X H I B I T S


| ZABRANSKY EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 7 | 4-18-02 Deposition Excerpt | 243 |
| 8 | 7-19-93 letter, Tomasoni to Buchheit | 261 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 266 |
| 10 | 1-28-00 letter, Zabransky to Thomas | 315 |
| 11 | 9-29-00 letter, Zabransky to Zinke | 318 |
| 12 | Instructions for Completing the Appendix C | 339 |
| 13 | 12-17-96 letter, Tomasoni to Kadak | 368 |
| 14 | 6-3-97 letter, Tomasoni to Buchheit with attachments | 371 |
| 15 | 12-16-97 letter, Fugi to Schiffer | 375 |




P R O C E E D I N G S
- - - - - -

WHEREUPON --
DAVE ZABRANSKY,
was called as a witness by counsel for Plaintiff, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF (Continued)

BY MR. SHAPIRO:

Q. Mr. Zabransky, welcome back. You are here for your second day of your deposition in the Yankee cases. Before moving back to where we were in our discussion, looking through my notes yesterday evening there were a few areas that I want to go back to and clean up things that I think I might have missed in our earlier discussion.

If you recall, we talked about some of the people who you work with. I think briefly we mentioned at this point you report to Jeff Williams, and I think I had asked you about your interaction with your prior supervisor, Mr. Carlson, but I had not asked you about your interaction with Mr. Williams and I wanted to go

been agreed to.
Q. I'm not sure, what does it mean to have an obligation to do something if a party never has to do it?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it assumes facts not in evidence. Objection to the extent it calls for speculation.
A. Both parties have obligations, and the utility has an obligation to submit and get a DCS under the contract, so the DOE's obligation is to get rid of the spent fuel per the schedule as determined by the parties. The process is laid out in the contract.
Q. Suppose the utility submits a proposed delivery commitment schedule, the contracting officer disapproved it. The utility can resubmit it, the contracting officer can disapprove it again.
A. Yes.
Q. The parties will negotiate those are all steps in the delivery commitment schedule process --
MR. CRAWFORD: You all are walking all over each other. I don't know when a question is



ending and when the answer is being given. Both of you better straighten up.
Don't answer until he is finished with his question.
And you don't walk on his answer, to the extent it is an answer. Go ahead.
BY MR. SHAPIRO:
Q. It is your understanding that the negotiation is the last step in the delivery commitment schedule process in Article 5B --
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and objection, best evidence.
A. That's the last step, the parties try to do mutual negotiation, yes.
Q. So if you get through that last step and there is still no schedule, are you saying the department still doesn't have an obligation to pick up that utility's spent fuel?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A. I never said that. I said there was no schedule at that point. Then the utility should go to the Contract Board of Appeals and



seek to remedy this problem.
THE WITNESS: I would like to take a break if that's okay.
MR. SHAPIRO: This is a good time.
(Recess taken -- 10:16 a.m.)
(After recess -- 10:32 a.m.)
(Zabransky Deposition Exhibit Number 7 was marked for identification and attached to the transcript.)
BY MR. SHAPIRO:
Q. Mr. Zabransky, you have been handed what has been marked for purposes of identification as Exhibit 7. This exhibit is actually a brief excerpt from one of the days of your deposition in what we call the coordinated discovery, and I have had this handed to you because, at least I think that one answer that you had given me today, and perhaps even yesterday, at least on its face seems to be inconsistent with my interpretation of something that you said in this prior deposition, and I wanted to ask about that and perhaps clear that up.
And I guess this has four or five pages of the transcript. I'm particularly interested in, I guess in the last page of the



exhibit, Page 365 of the transcript reference. The question at the top was, "Was the department trying to minimize the commitments it had to utilities who were parties to the Standard Contracts in using this document, in using Exhibit 5?"
And I don't know if you have had a chance to read further, but in the excerpt Exhibit 5 is referring to the 1995 ACR. Your answer in that prior deposition was, "I believe that that was a consideration."
Is that still your recollection about the 1995 ACR?
MR. CRAWFORD: Objection to the lack of foundation. And objection to the extent it calls for a legal conclusion.
A. If you're asking me was it my opinion that they were trying, the department was trying to minimize its obligations by using the ACR? That's still my belief. I believe they were trying to do that.
Q. So when you said, I think earlier today, that you didn't know what the basis was for the rates in the 1995 ACR, what you meant was you don't know but that's not inconsistent with having

a belief about what you think might be part of the basis. Does that reconcile the two statements?
MR. CRAWFORD: Same objection.
A. I think so.
Q. Why did you think the department was trying to minimize the commitments it had to utilities by using the acceptance rates that it used in the 1995 ACR?
MR. CRAWFORD: Same objections.
A. Why did I have that belief? Because I just had that belief that they had started to realize there was a commitment being made.
Q. There wasn't anything in particular that anyone at DOE said that contributed to you having that belief?
MR. CRAWFORD: Objection, vague, and the same objections as before: Lack of foundation, and to the extent it calls for a legal conclusion.
A. I can't recall anything specific.
Q. Looking again at Page 365 of the former transcript, once again right below where I read before you were asked, "Were there any other considerations that you can think of for using those rates?" your answer was, "There was no other



basis to develop any other rates at that point in time."
Did you mean that the only basis for the rates in the 1995 ACR was to minimize the department's commitments?
MR. CRAWFORD: Objection to the lack of foundation. Objection to the extent it calls for a legal conclusion.
A. No. I think what I'm saying there, it was my belief or my knowledge was I didn't know what other basis they would use for rates at that point in time.
Q. All right.
Mr. Zabransky, I want to turn back to where we had been at the end of the day yesterday. We were talking about delivery commitment schedule cost estimates, and I believe we ended up with a discussion about whether the department has used the information in approved delivery commitment schedules for planning purposes, and I believe we ended up with the understanding that to your knowledge they haven't. Maybe they did at some point prior to your arrival at the Department of Energy, but you don't have any knowledge of the department using that information since you have



been there.
Looking forward, could the department use the information in the currently approved delivery commitment schedules for planning?
A. Could it? Yes.
Q. What would be the use of the information, the currently approved delivery commitment schedules, given that the department's current plan is for a waste acceptance system with a repository that will have acceptance rates that are significantly different from those that were the basis of the approved delivery commitment schedules?
MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.
A. I wouldn't see any good use for it. You didn't ask me if they should use it, you asked me if they could use it.
Q. You wouldn't recommend that the department use the information or the currently approved delivery commitment schedules for planning at this time?
A. It's my belief, my personal belief that we need to renegotiate those with the



contractholders as was stated would be done when the initial DCS directions were sent out.
Q. Why do you believe the department has to renegotiate those approved delivery commitment schedules?
A. Because one, we said it would, the department said it would; and two, I think the utilities should have the option of deciding if it's -- their plans have changed. Perhaps they want different locations to be serviced.
Q. What about the amount of acceptance? If the department in fact moves forward with the repository in 2010 with acceptance rates consistent with its plans for a repository, should utilities with currently approved delivery commitment schedules be able to renegotiate for larger amounts of acceptance consistent with the capacity of the repository?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it calls for speculation.
A. And again, if the department winds up with a larger facility that actually operates that way, and the contracting officer feels comfortable to committing to quantities for a larger facility,

that can be a subject of renegotiation.
Q. Would it be in the department's interest to renegotiate the currently approved delivery commitment schedules?
MR. CRAWFORD: Objection to the lack of foundation. Objection to the extent it calls for a legal conclusion.
A. I can't speak for the department. I think I would recommend that it be done.
Q. Why would you recommend that the department renegotiate the currently approved delivery commitment schedules?
A. To give the purchasers the opportunity to revisit decisions they had made as to where they wanted to be serviced and in what years and in what order.
Q. Can you think of any advantages to the government of renegotiating the currently approved delivery commitment schedules?
A. Other than being responsive to the needs of its customers, I don't know that there is a big advantage except that we said we would.
Q. What about from a transportation campaign aspect? I believe you testified that there can be advantages to the program using



transportation campaigns.
MR. CRAWFORD: Objection to the extent that mischaracterizes the prior testimony. Objection, assumes facts not in evidence. Objection to the vagueness of the question.
A. Again, I believe that I said that transportation campaigning might be advantageous to both parties, but I don't see how that relates to renegotiation of DCSs.
Q. Well, the currently approved delivery commitment schedules would require the department to go to those utilities and pick up relatively small amounts of spent fuel, wouldn't it?
A. Breaks down allocation on an annual basis, but that would stay the same through renegotiation unless the contract were modified. I'm only talking about renegotiating the DCSs.
Q. Wouldn't renegotiated DCSs entail having larger quantities of spent fuel which would permit larger transportation campaigns?
A. Not necessarily.
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the extent it involves speculation. Objection, calls for a legal conclusion.



A. The answer is the same, I don't see exactly what they are talking about. You can't speculate as to that. You don't know who discharges what in what year so you are assuming something without a basis for assuming it.
Q. How can a utility's allocation be smaller if the overall acceptance rates would be larger in any given year?
A. I didn't say smaller, but you can't say bigger in a given year. It's based on when a utility discharges its fuel and who else discharges that year.
Q. In reality the allocation would be bigger if acceptance rates are larger, wouldn't they?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the extent it calls for speculation.
A. And average has nothing to do with campaigning when this is an annualized basis. You look at the specific annual years and see what happens.
Q. Let's turn to a slightly different subject. We may come back to that one later.
You recall yesterday we talked about



potential purposes of the delivery commitment schedule process. We discussed the planning purpose. You also said another purpose of the delivery commitment schedule process was to bind the parties. How does that binding process work.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A. I mean, I'm not sure what you're asking, how does that process work?
MR. CRAWFORD: Objection, best evidence.
A. The contract says that the utilities will submit the draft DCS. It will be approved or disapproved. That will be the basis for disapproval resolution. How does it bind the parties? I'm not sure what you mean.
Q. Why don't we talk through some of the steps.
It is your understanding that the contracting officer gets to publish the Annual Capacity Report that sets forth the maximum allocations that utilities would be entitled to?
A. I'm not certain --
MR. CRAWFORD: Well, objection to the extent that it mischaracterizes many peoples'

228

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
INDIANA MICHIGAN POWER )
COMPANY, )
Plaintiff, )
v. ) No. 98-486C
THE UNITED STATES, )
Defendant. )
COMMONWEALTH EDISON COMPANY, )
Plaintiff, )
v. ) No. 98-621C
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - -
DEPOSITION OF DAVID KEVIN ZABRANSKY, VOLUME II
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
The deposition of DAVID KEVIN ZABRANSKY
was convened on Thursday, January 29, 2004,
commencing at 10:26 AM, at the offices of SHAW
PITTMAN LLP, 2300 N Street, N.W., Washington,
D.C., before Cheryl A. Lord, RPR, CRR, and Notary
Public for the District of Columbia.
APPEARANCES

229

For Plaintiff Indiana Michigan Power Company:
Devon E. Hewitt, Esquire
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-485
(703) 770-7962
For Plaintiff Commonwealth Edison Company:
Christopher Tompkins, Esquire
JENNER & BLOCK LLC
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
APPEARANCES CONTINUED
For Defendant:
R. Alan Miller, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
1100 L Street, N.W., Room 12000
Washington, D.C. 20530
(202) 616-0383
CONTENTS

230


EXAMINATION BY PAGE
Ms. Hewitt 228
Mr. Tompkins 273
EXHIBITS
NO. DESCRIPTION PAGE
4 Defendant's Initial Disclosures 278
5 Contract No. OE-CR01-83NE44372,
Nos. 0291-366 289
6 Certificate of Compliance and
attachments 332
7 Letter, 5-19-97, and attachments,
Nos. CE 111745-769 349
8 E-mail, 11-8-00, No. HQR249 0315 363
9 Letter, 1-31-00, Nos.
COF-001-2123-124 367
10 E-mail, 2-28-02, and attachments,
EXHIBITS CONTINUED
NO. DESCRIPTION PAGE
Nos. HQR239 0682-695 373
11 Classification of Spent Nuclear
Fuel, Nos. PNL-167-3517-616 375
12 E-mail, 12-11-01, and attachments,


231


Nos. CTR116 0001-004 383
13 Letter, 9-13-85, and attachments,
Nos. CE 126547-551 384
14 E-mail, 3-18-02, and attachments,
Nos. CTR116 0306-318 387
15 E-mail, 3-18-02, and attachments,
Nos. CTR116 0255-305 400

PROCEEDINGS
(--------)
DAVID KEVIN ZABRANSKY,
a witness called for examination, having been
first duly sworn, was examined and testified as
follows:
(--------)
MS. HEWITT: Let's go back on the
record.
(--------)
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
INDIANA MICHIGAN POWER COMPANY
BY MS. HEWITT:
Q. Good morning, Mr. Zabransky.
I am still Devon Hewitt, and I still

think he can answer.
But go ahead if you know.
MR. TOMPKINS: I will actually rephrase.
BY MR. TOMPKINS:
Q. Mr. Zabransky, you worked at Wisconsin Electric; isn't that correct?
A. That's correct.
Q. Okay. At Wisconsin Electric, did you have occasion to deal with failed fuel?
A. Yes, I did.
Q. Okay. And was part of that dealing with fuel that had failed in the reactor from an operational standpoint?
MR. MILLER: Objection, vague.
But go ahead.
A. Yes.
BY MR. TOMPKINS:
Q. Okay. So the meaning of failed fuel in the operational sense that we were just discussing, that's broadly defined as problems with a particular fuel assembly, may have



occurred while operating the reactor?
MR. MILLER: Objection to the extent that it may mischaracterize his previous definition.
But go ahead.
A. I don't think I said the problems that occur while operating the reactor.
BY MR. TOMPKINS:
Q. Okay. When would these problems occur?
A. They could occur at any time.
Q. Any time.
Turning to the definition of failed fuel in the standard contract, are the definitions in the standard contract as broad as general operational sense of the term failed fuel that you were just talking about?
MR. MILLER: Objection, vague as to which definitions you're referring.
Do you mean the definition of failed fuel in the standard contract as opposed to --
MR. TOMPKINS: -- as opposed to the



broad operational definition of failed fuel which we have been discussing.
MR. MILLER: Objection to your characterization as broad.
But otherwise, if you know, you can answer.
A. Well, failed fuel in the contract is defined as fuel that meets certain specifications also defined in the contract.
BY MR. TOMPKINS:
Q. So there could be 2 senses in which the term failed fuel is used?
MR. MILLER: Objection, speculation, foundation.
Go ahead.
A. Not with respect to the contracts.
BY MR. TOMPKINS:
Q. Okay. While you were at Wisconsin Electric, would you refer to fuel assemblies as failed outside of the context of the standard contract?
A. Yes.



Q. Okay. And this was in an operational sense as in there was some problem with the assembly?
A. Yes.
Q. Turning to the definition in the standard contract. Turn to appendix E.
MR. MILLER: You said E as in echo?
MR. TOMPKINS: E as in echo.
(Discussion off the record.)
BY MR. TOMPKINS:
Q. Under paragraph 6, is this where the standard contract defines failed fuel, of appendix E?
A. Paragraph B 6.
Q. You are correct. It is B 6.
Is that where the --
A. That's where the technical specifications for failed fuel are located, correct.
Q. Okay. In your job at DOE, have you had occasion to become familiar with this section?

A. I became familiar with it, yes.
Q. And part of your job as the contracting officer's technical representative would have been to assist the contracting officer in interpretation of this section?
A. It would have been.
Q. Okay. And currently as contracting officer, if the need arose to deal with technical -- to deal with issues regarding this definition, that would be your responsibility?
A. Yes, it would.
Q. Okay. Under 6, little A, it states: Assembly shall be visually inspected for evidence of structure deformity or damage to cladding or spacers which may require special handling.
In your opinion, what does the term special handling mean?
MR. MILLER: Objection.
The document speaks for itself, calls for a legal interpretation and legal conclusion.
But go ahead if you know.



A. In my interpretation, it's something that would require handling outside the ordinary handling for spent fuel that was not failed.
BY MR. TOMPKINS:
Q. How would you define ordinary handling?
A. Spent fuel is handled with a fuel-handling tool. Anything more than that is not ordinary.
Q. What do you mean by, a spent-fuel-handling tool?
A. Every spent fuel assembly type has a fuel-handling tool that goes with it.
Q. Okay. Would that be what's referred to as the grapple on the end of the handling crane?
A. I wouldn't call it that, no.
Q. What would you call it?
A. Fuel-handling tool.
Q. Fuel-handling tool. Okay.
How would you use the fuel-handling tool in conjunction with the crane at a reactor



building, for example, or a spent fuel pool?
MR. MILLER: Objection, foundation.
Go ahead and answer if you know.
A. You'd attach it to the fuel pool bridge crane and you'd attach the other end to the assembly.
BY MR. TOMPKINS:
Q. Okay. So based on what you've just told me, if an assembly can use the commensurate spent-fuel-handling tool that's designed for that assembly, then it does not require special handling?
MR. MILLER: Objection, calls for a legal conclusion.
A. I didn't tell you that.
Bottom line is, what I told you was that if it can't be handled with the normal equipment, then there's an issue with respect to it requiring special handling.
BY MR. TOMPKINS:
Q. Okay. The converse of that though is what I'm asking about.



If it can be handled by the SNF handling tool, then it's able to be handled by normal means?
A. With respect to mechanical characteristics, yes.
MR. MILLER: Same objection.
Go ahead.
BY MR. TOMPKINS:
Q. And when you use the term mechanical characteristics, what are you referring to?
A. Mechanical characteristics.
Q. Can you give me an example?
A. Yes.
Q. Such as?
A. It can be lifted.
Q. Are there any other examples of mechanical characteristics that you can list?
A. It can be placed into a container.
Q. Would your use of the term mechanical characteristics also refer to whether or not an assembly was warped or bowed?
A. Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:

MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.

THE COURT: Okay.

MS. SULLIVAN: The government calls David Zabransky.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?

A. Yes, I am.

Q. And to what office within the Department of Energy are you currently assigned?

A. I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.

Q. What are your current responsibilities?

A. I report to Chris Kouts, and I work on issues related to the standard contract, other

technical issues on commercial waste acceptance, waste acceptance issues, and I serve as the contracting officer for the standard contracts.
Q. You testified you report to Mr. Kouts. Do you know who Mr. Kouts reports to?
A. Yes, Mr. Kouts reports to Ted Garrish, the deputy director.
Q. And to whom does Mr. Garrish report?
A. Mr. Garrish reports to Dr. Choo, the director of the program.
Q. When did you become the contracting officer?
A. I believe it was in July of 2002.
Q. Have you also served as the technical representative to the contracting officer?
A. Yes, I have.
Q. And when did you serve as the technical representative to the contracting officer?
A. From, I believe, around 1995 through July of 2002.
Q. And what were your responsibilities as the contracting officer's technical representative?
A. To provide technical advice to the contracting officer on issues relating to administration of the standard contract.



Q. When did you join DOE?
A. I came to DOE in 1994, I believe July of 1994.
Q. Prior to joining DOE, where were you employed?
A. I was employed by Wisconsin Electric Power Company in Milwaukee, Wisconsin.
Q. How long were you employed by Wisconsin Electric Power Company?
A. I started there in 1978 and left in 1994.
Q. What was your position at Wisconsin Electric Power Company when you left?
A. When I left Wisconsin Electric in 1994, I was the manager of nuclear fuel services.
Q. Did your responsibilities as manager of nuclear fuel services include administering Wisconsin Electric's standard contract with Department of Energy?
A. Yes, my responsibilities were for all the contracts that the nuclear power department had for fuel and fuel disposal, as well as analysis of fuel designs and storage of spent fuel at Point Beach.
Q. Mr. Zabransky, do you hold a Bachelor's degree?
A. Yes, I do.



Q. In what?
A. I have a Bachelor's in Civil Engineering from Marquette University in Milwaukee, Wisconsin.
Q. And when did you receive that degree?
A. 1980.
Q. As part of your duties at Wisconsin Electric Power Company, were you familiar with the annual capacity reports and acceptance priority ranks issued by DOE?
A. Yes, I was.
Q. What did you understand to be the purpose of those documents?
A. The purpose of the documents, as I understood it, was to set forth the acceptance allocations to each contract holder the Department was going to have in its facilities for disposal of spent fuel.
Q. At the time you were at Wisconsin Electric, were you also familiar with what are known as delivery commitment schedules or DCSes?
A. Yes, I was.
Q. And what did you understand to be the function of a DCS?
A. When I was at Wisconsin Electric, it was my understanding that DCSes, delivery commitment



schedules, were the mechanism, the contractual mechanism, by which utilities took the allocations that were allocated to them and conveyed to DOE that they wanted that service, what particular reactor and what year and what range of fuel, and made a commitment to the government to provide that fuel for pickup.
Q. And at the time you were at Wisconsin Electric, were you responsible for completing DCSes and submitting them to DOE on behalf of Wisconsin Electric?
A. My organization was responsible for preparing the DCSes, and they were subsequently submitted by my organization. They were signed off by a vice president of nuclear power, but we did all the work for the preparation and transmittal of those documents.
Q. Thank you. Can we have Defendant's Exhibit 24, please?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes, sure.
BY MS. SULLIVAN:
Q. Mr. Zabransky, you've been handed what's been marked as Defendant's Exhibit 24. Do you recognize this document?

A. Yes, I do.
Q. Could you explain to the Court what this document is?
A. This is the 1991 ACR that was used as the basis for the submittals made by Wisconsin Electric of DCSes, I believe, in 1992.
Q. Could you turn to page nine of this document, table 3.1? Mr. Zabransky, did you or did your organization at Wisconsin Electric use the information contained on this chart in the submission of its DCSes?
A. Yes, Wisconsin Electric DCSes that were submitted in 1992 relied upon the acceptance allocations that are in this table, third line up from the bottom.
Q. Could we highlight that line, please? Is that the line that you're referring to that I've highlighted on the screen?
A. Yes, it is.
Q. I believe you've already testified that Wisconsin Electric submitted DCSes in 1992. Was that your testimony?
A. I believe it was in 1992.
Q. Okay. Do you recall how many DCSes Wisconsin Electric submitted in 1992?



A. The company submitted DCSes for each of the 10 allocations that are put forth in this table.
Q. And why did WEPCO submit DCSes for each of those allocations?
A. It was our belief that the DCSes represented a commitment, and the company had reached a conclusion or a position that it wanted to get them into the government and have them sign them before something happened that would cause them to cease signing them for some reason in the future, so it was seen as a good thing to do, to get these signed pieces of paper back from the government.
Q. Were the DCSes that WEPCO submitted approved by the government?
A. They were eventually approved, the initial submittal was -- I think a number were sent back for numbering errors, but ultimately, they were all approved with no changes to substance, just to the numbers that were put upon them.
Q. Was 1992 the earliest opportunity that Wisconsin Electric had to submit its DCSes?
A. I believe that was the first opportunity after the government started the process, I think earlier in 1992, and provided the forms and the instructions as to how to fill them out, so it was 63



months prior to 1998, and that's really when the process was started by the government.
Q. Turning now to your time at DOE, when you came to DOE, did you have responsibility for reviewing and approving DCSes submitted by utilities?
A. When I became the COTR in 1995, I acted as the individual that reviewed them and gave the contracting officer technical recommendations as to whether they should be approved or not.
Q. And when would you recommend approval of DCSes?
A. The DCSes were approved as long as they were complete and the allocations put forth on them were consistent with the allocations in the ACRs that provided the allocation to the utility. So generally, it was a review of completeness and compliance with the allocation size.
Q. Did you recommend approval or disapproval of all DCSes that were submitted after you became the COTR?
A. I think there were a few that were eventually approved or initially not approved because of numbering errors or other administrative errors, but beyond that, yes, they were all generally approved through the period of time that we processed



them.
Q. Was there a time at which DOE stopped processing these DCSes?
A. Yes, I believe it was in early '97. It's hard to remember the exact year that the Department stopped processing DCSes. We did acknowledge that we had received them, but we no longer processed them. We neither approved or disapproved them.
Q. Who made the decision to stop processing DCSes?
A. I think the decision was made by the contracting officer on the advice of counsel.
Q. Can we pull up DX-29.002?
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Sure.
MS. SULLIVAN: Your Honor, this is two exhibits with multiple pages. I'd like to provide copies to the Court.
BY MS. SULLIVAN:
Q. Mr. Zabransky, I've actually handed you copies of what have been marked as Defendant's Exhibit 29.002 and 29.003. Do you recognize these documents?
A. I do.
Q. Do you recognize these documents to be a

set of DCS submittals from Maine Yankee?
A. Yes, 29.002 is a set of submittals from Maine Yankee to the Department of Energy, in September of '92, for allocations for Maine Yankee.
Q. And what is 29.003?
A. 29.003 is the approved DCSes being sent back by the contracting officer to Maine Yankee.
Q. Okay. And you were not involved in the processing of these DCSes?
A. I was not at DOE at the time, no.
Q. And just based on your review of the document, is it your understanding that Maine Yankee submitted DCSes for all of its allocations in the first 10 years in 1992?
A. From review of this document and review of the '91 ACR, this appears to be a DCS for each of the allocations that Maine Yankee had in the '91 time frame that they could have submitted in 1992, yes.
Q. Okay. And looking at 29.003, is it your understanding that these DCSes were approved by DOE?
A. Looking at the exhibit, yes, they all seem to have been approved by DOE.
Q. Thank you. Mr. Zabransky, are you familiar with the former industry organization known as the Utility Nuclear Waste Management Group?



A. I am familiar with the organization known as the Utility Nuclear Waste Management Group, also known as UNWMG.
Q. Was Wisconsin Electric a member of UNWMG while you were there?
A. Yes, Wisconsin Electric was a member of UNWMG when I was employed at Wisconsin Electric.
Q. And did you represent Wisconsin Electric at meetings of UNWMG?
A. I was a representative of Wisconsin Electric at meetings of UNWMG, yes, I was.
Q. What did you understand to be the purpose of UNWMG?
A. UNWMG was a organization within, I believe, Edison Electric Institute that was set up to work on issues related to nuclear waste disposal, interfaces with DOE. It was an organization to facilitate industry involvement on those topics.
Q. Are you familiar with the process commonly referred to as the ACR issue resolution process?
A. Yes, I am.
Q. What was the ACR issue resolution process?
A. The ACR issue resolution process was a group, subgroup that was set up within the UNWMG, a high-level waste working group, which focused on



dialogue with the Department of Energy on issues related to interpretations of the standard contract.
Q. And did you participate in the ACR issue resolution process on behalf of Wisconsin Electric while you were there?
A. Yes, I did.
Q. Mr. Zabransky, was one of the issues considered during this process whether priority should be granted to shutdown reactors?
A. That issue was an issue that was brought up and talked about as an issue that the group should consider and develop a position on, but it's my recollection that we never did develop a consensus position on that issue.
Q. And why was that?
A. There was no consensus position reached. There were utilities who felt that priority should be granted to shutdown reactors. There were utilities that held very strong positions that it shouldn't be granted to shutdown reactors. And it was impossible to come up with a position that all could endorse.
Q. Did UNWMG report this inability to come to a consensus to DOE?
A. I believe it did, and I think that was not one of the issues we ultimately put on the table to



talk about because of our inability to come up with a meaningful position. I don't think we ever conveyed a consensus position to them.
Q. Do you recall meetings, industry meetings, in which Yankee Atomic lobbied other nuclear reactor companies for priority for shutdown reactors?
A. I recall there were industry meetings where representatives from Yankee made their case for priority acceptance for shutdown reactors to the group, and there was discussion about the merits and other ways of approaching that within the group.
Q. Do you recall the outcome of these meetings?
A. I think the outcome was that the group never reached any consensus on that position.
MS. SULLIVAN: Your Honor, we don't have an electronic version of this, so I'll hand that out to the Court too. Your Honor, Plaintiffs' Exhibit 81 was an exhibit that was on Plaintiffs' may use list. I provided notice to Mr. Shapiro yesterday or last evening after we concluded court that we were possibly going to use it with Mr. Zabransky today.
BY MS. SULLIVAN:
Q. Mr. Zabransky, do you recognize what's been marked as Plaintiffs' Exhibit 81?

A. Yes, this is a transmittal that I signed, not on behalf of Wisconsin Electric, but on behalf of the utility -- the EEI, at this point it was called. UNWMG became a difficult name to pronounce, so they changed the name to UWaste for Utility Waste, and this is the same group and a different name.

And this is a transmittal letter that I forwarded to the Department of Energy, on behalf of the high-level waste management working group, that put forth positions that the industry was circulating and coming up with a number of what we'll call the ACR issues.

Q. Mr. Zabransky -- thank you.

Mr. Zabransky, are you familiar with what are referred to as multi-element sealed canisters or MESCs?

A. I'm familiar with MESCs as they're used in the industry, yes.

Q. What are MESCs?

A. MESCs are sealed canisters, usually welded shut canisters that contain a multiple number of fuel assemblies in the PWR-type, somewhere between 24 and 32, in the BWR, significantly more, up to 60 or so. But they hold a number of fuel assemblies. They're also put into overpacks for storage or



transportation.

Q. We've heard testimony that each of the Yankee Plaintiffs have either the NAC-UMS or NAC-STC systems. Are you generally familiar with these systems?

A. I believe from what I've read in the press, I'm familiar from what I've read in the press and other releases from NAC on those issues in this case.

Q. Are these systems MESCs, as you understand that term?

A. I believe that they are.

Q. Do you have an understanding as to whether MESCs are currently an acceptable waste form pursuant to the standard contract?

A. It's my understanding that they're not currently acceptable waste forms under the standard contract.

Q. Has DOE communicated with standard contract holders regarding the acceptability of MESCs under the standard contract?

A. I believe there have been a number of written communications between the standard contract holders and DOE on that issue over the years.

Q. Can we have Defendant's Exhibit 343, please? Mr. Zabransky, you've been handed what's



been marked as Defendant's Exhibit 343. Do you recognize this document?

A. Yes, I do.

Q. Could you explain to the Court what this document is?

A. This is a letter that was sent from the Department of Energy to Sacramento Municipal Utility District, also known as SMUD, responding to their letter that was requesting the Department to come and witness the loading of their storage systems, which were MESCs, in the spring of 2001.

Q. Could we just go to the second page of this document? And you signed this document, correct?

A. I did, yes.

Q. Can we go back to the first page? Mr. Zabransky, is this one of the communications with standard contract holders to which you were just referring?

A. It's one of them, yeah, there were a series of them over the years.

Q. Could we highlight the second paragraph of the letter, please? Mr. Zabransky, would you please read the portion of the letter that's been excerpted?

A. "Your letter also raises several other questions related to the Department's acceptance of



Nuclear Regulatory Commission's certified dual purpose storage/transport systems under the disposal contract between SMUD and the Department.

As you have indicated, the Department has previously stated its willingness to initiate the appropriate actions to include such dual purpose storage/transport systems as acceptable waste forms under the terms of the disposal contract."

Q. Thank you. Mr. Zabransky, what will be necessary to make MESCs an acceptable waste form, pursuant to the contract?

A. The contract will have to be modified to include this as an acceptable waste form as part of a contract modification process.

Q. Is there any further technical analysis that needs to be undertaken?

A. Yes, we'll need to do further work as we, the repository is designing advances and the licensing process goes forth. There may be restrictions in our ability to receive certain types of canisters under certain conditions that need to be factored into that development of a contract modification.

Q. Do DOE's current requirements documents for the repository discuss whether the repository will be

So we'd have to make sure that we just didn't take from one utility to advance to another one, and then wind up not being able to serve that utility that had already been in line.

Q. Mr. Zabransky, does the Office of Civilian Radioactive Waste Management try to manage the waste management program in an efficient and cost-effective manner?

A. I think, as federal employees, we always try to do our jobs in an efficient, cost-effective manner. It's a goal of the program to operate in an efficient, cost-effective manner, and I think we do things to try to ensure that happens.

Q. What types of things does RW do to try to manage the program in an efficient and cost-effective manner?

A. Typical things like procurements are done in a competitive fashion, to invest value for government whenever possible. And when we look at planning the system, we try to plan a system that meets the needs we have to take into account from our utility customers, but to be reasonable in doing it, so we don't overbuild systems that don't get utilized.

Q. Does this goal of being efficient and



cost-effective translate into a specific acceptance rate?

A. No, it doesn't, that I know of.

Q. Do you understand the term "full cost recovery" as that term is applied to the waste management system?

A. Yes, I do.

Q. What does that term mean to you?

A. Well, to me, that term means that the users of the system, those who we have contracts with, pay the full cost of us developing and operating the system, which includes developing the transportation equipment, the facility, Yucca Mountain, and ultimately closing that facility in the future, and those costs are all borne by the users.

MS. SULLIVAN: One moment, Your Honor. Nothing further at this time, Your Honor. I would move for admission of Plaintiffs' Exhibit 81, which was the letter that Mr. Zabransky sent to Alan Brownstein.

THE WITNESS: Your Honor, if I could take just a two-minute break?

MS. SULLIVAN: Hang on just a minute.

THE WITNESS: Sorry.

MS. SULLIVAN: Let's do this.



MR. SHAPIRO: Your Honor, we don't have any objection to the admission of Plaintiffs' Exhibit 81, although we would want to check to make sure that there aren't any additional documents that should appropriately be considered along with this one in order to have a complete record of this, but as far as this document goes, we don't have any objection.

THE COURT: Plaintiffs' Exhibit 81 is admitted.

(Plaintiffs' Exhibit Number PX-81 was received in evidence.)

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Why don't we take a break, 10 minutes?

MS. SULLIVAN: That's fine.

(Whereupon, a short recess was taken.)

MR. SHAPIRO: Good morning, Your Honor.

CROSS-EXAMINATION

BY MR. SHAPIRO:

Q. Good morning, Mr. Zabransky.

A. Good morning.

Q. I'd like to start with some questions about the delivery commitment schedule process. I believe you testified that starting in the 1997 time frame, the Department of Energy stopped approving or



disapproving delivery commitment schedules proposed by utilities?

A. Yes, and I think it was in early '97, we stopped processing the submittals from utilities.

Q. And DOE also stopped processing approvals or disapprovals of submittals of final delivery schedules from utilities?

A. We never processed any, so we never started those.

Q. And instead, DOE sent letters to utilities responding to those proposed final delivery commitment -- final delivery schedules stating they were being neither approved nor disapproved, isn't that correct?

A. I believe that's correct, yes.

Q. But the contract doesn't contain language that provides DOE that option to be either approving or disapproving, isn't that correct?

A. That's correct.

Q. And it was your opinion at the time, as contracting officer's technical representative, that the contracting provide that option, correct?

A. I was a technical representative. I didn't make contract interpretations as to what it provided or didn't provide with respect to provisions, but,

4147

no, I didn't think it provided that provision at that time.
Q. And the reason that the Department took the position of neither approving nor disapproving delivery commitment schedules or final delivery schedules is because the Department's lawyers advised OCRWM to take no action?
A. No, the Department's lawyers advised the contracting officer.
Q. And that was done on the advice of counsel?
A. Yes, but they advised the contracting officer, not OCRWM.
Q. But ultimately, it was the lawyers that caused that to happen, counsel?
A. Counsel's advice to the contracting officer was that they no longer approve DCSes, so, yes, I would say.
Q. And because of the advice that the contracting officer, DOE, received from the lawyers, at this point, the Department has not reviewed delivery commitment schedules since early 1997, since then, has it?
A. It hasn't reviewed any since then for allocations that were predicated upon the '98 acceptance date, no.

4148

Q. And since the Department has stopped reviewing delivery commitment schedules, there's been no way for a utility to get a delivery commitment schedule approved, at least not until the Department has issued its July 2004 annual capacity report last week, isn't that correct?
A. That's correct.
Q. And it is the Department's position that utilities must submit delivery commitment schedules based on the most recent annual capacity report?
A. And I guess -- the Department's position is that, yes, the DCSes should be based upon the most recent annual capacity report for the period of time that's covered, yes.
Q. I believe you said in your direct examination, Mr. Zabransky, that when you were at WEPCO and also when you were the contracting officer's technical representative, it was your understanding that delivery commitment schedules, that utilities could only place on those the amount of fuel that they, for which they had an allocation in that most current ACR. Was that your testimony?
A. I think I said that, yes.
Q. But there's nothing in the standard contract itself that limits the amount of fuel that a

4149

utility can put on a proposed delivery commitment schedule. That limitation just was imposed by the contracting officer in the latter one, wasn't it?
A. Well, the contracting officer provided guidance as to how to interpret and complete the DCS scheduling process. Was it unilateral, yes, they sent a letter out saying, Here's how it should be done. When I was at Wisconsin Electric, we did it that way, and I think most utilities did it that way. I don't think anybody protested the fact that it shouldn't be done that way.
Q. And there's nothing in the contract that provides that interpretation that comes from the contracting officer?
A. But it's the contracting officer's job to interpret the contract for administration purposes.
Q. I'm not sure that you answered, before I move on, I'm not sure you answered my last question. Mr. Zabransky, you're the current contracting officer, correct?
A. Yes, I am.
Q. Is there something in the contract that provides that utilities can only list on delivery commitment schedules the amount of fuel set forth in an ACR allocation?

4150

MS. SULLIVAN: Objection, asked and answered. I believe he did answer that question.
THE WITNESS: I've answered that and said no.
BY MR. SHAPIRO:
Q. Now, we discussed just a moment ago, Mr. Zabransky, that the Department has stopped approving final delivery commitment schedules. The Department did receive some proposed final delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, mischaracterizes the witness' testimony.
THE WITNESS: I think I said the Department has never processed or approved any FDSes, and, yes, utilities sent some in for deliveries in 1998, 1999, I believe.
BY MR. SHAPIRO:
Q. And the decision to stop approving delivery commitment schedules and never to start processing final delivery commitment schedules, that was based on a belief by DOE that approving those delivery commitment schedules would commit the Department to an obligation, and the Department didn't want to do that?
A. I believe that the Department, the basis

for the decision to stop processing was based upon a belief that the DCSes were binding commitments, and we should not enter into binding commitments that we know we couldn't meet at that point in time.
Q. And in fact, not only did the Department stop approving those delivery commitment schedules and not even start processing final delivery schedules because of its desire not to commit itself, but on the advice of counsel, you actually went back and voided some previously approved delivery commitment schedules, isn't that correct?
A. There were a number of documents that were in the process of being approved, but had never been transmitted to the utilities. So these were documents that because, again, all correspondence goes through a review and legal review, was part of that review, that were in the system to be processed, that I had signed off on and sent on to the contracting officer, and that the contracting officer, in some cases, had signed off on, but had never been transmitted.
And prior to the final transmittal to the utilities, the review was, it was concluded that those should not be processed, and they were voided.
Q. But nevertheless, if I understand what



you've just said correctly, there were indeed some delivery commitment schedules submitted by utilities that reached not only your approval as contracting officer's technical representative, but the final sign-off by the contracting officer, and yours might have been the final sign-off in some occasions, yet nevertheless, those final approvals were voided?
A. Well, again, my approval as COTR would have just merely advised the contracting officer the form was ready for her to approve, so it wouldn't have been final in any case if I had signed off on it. There were a few that Beth Tomasoni, I believe was the CO at the time, signed off on, that prior to transmittal, she rescinded.
Q. And you would not have taken the action to void those except under the direction of counsel, correct?
A. Counsel provided us advice that it would no longer be appropriate to keep signing those documents, yes.
Q. And that's why you voided those?
A. Yes.
Q. And although counsel instructed you to void your signature on some of those approved delivery commitment schedules, isn't it correct that you would



not presume that once you had received an approved document, that it could be voided unilaterally by the Department, isn't that correct?
MS. SULLIVAN: Objection, mischaracterizes the witness' previous testimony.
THE COURT: When you say, when the utility had received it or?
BY MR. SHAPIRO:
Q. No, I'm talking about simply, once the Department, once Mr. Zabransky and the contracting officer have approved it, that Mr. Zabransky's belief that, is that, but for the advice of counsel, that the Department was not free simply to void those unilaterally?
A. But, again, the Department never communicated its approval. The documents never left the Department. They were, the ones that the CO voided were voided before they were ever transmitted. The approval never really took place from that perspective.
Q. But you would not presume once you had received an approved document that it could be voided unilaterally?
THE COURT: I don't get the "received an approved document."



THE WITNESS: I'm not sure who's receiving what in your question.
THE COURT: What do you mean by "received an approved document"?
BY MR. SHAPIRO:
Q. If you get back from the contracting officer an approved document, an approved delivery commitment schedule, you wouldn't think that you could simply void that, would you?
A. I didn't void her signature. She voided her signature.
Q. Didn't you void some delivery commitment schedules yourself, some approved delivery commitment schedules yourself?
A. I only voided my signature, to my knowledge.
Q. And did your signature appear on the approved delivery commitment schedule?
A. Yes.
Q. And you voided that?
A. The contracting officer decided not to transmit and execute the final approved DCS, and we voided them, yes.
Q. And you voided your own signature as well?
A. I did, yes.

constructed under the Act, yes.
Q. Now, for the currently approved delivery commitment schedules, the ones that, before the last week's ACR and new delivery commitment schedule instructions came out, isn't it true that you don't see any good use for the information on those approved delivery commitment schedules because the Department's current plan for its waste management system uses different acceptance rates than those upon which the earlier delivery commitment schedules were based?
A. I think your statement is partially correct. It's true that our current plans in the ACR that we just put out last week are for greater acceptance rates beginning in 2010 through 2019 then in the first 10 years of the previous ACR, but it's also correct that some of the information provided by the utilities may no longer be valid, and they may have other plans for what they wish to have done beginning in 2010.
Q. So the bottom line, again, the real crux of my question is that you wouldn't see any good use for the information on the currently approved delivery commitment schedules?
A. Those supported operations beginning in



1998. I don't think they're valid for use supporting operations in 2010.
Q. And it's your belief that DOE has to renegotiate those delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, vague. Which delivery commitment schedules are we talking about?
MR. SHAPIRO: The previously approved delivery commitment schedules.
THE WITNESS: I think the disposition of those needs to be resolved. We haven't resolved in the Department how to address that yet, but the DCSes that would be coming in under the APR that we issued last week for 2010 would be for the same fuel that were covered by the DCSes that came in previously. So we'd have to resolve that with the utilities, yes.
THE COURT: Before I forget it, do you agree with Mr. Pollog that the DCSes, well, the allocation under the capacity report is strictly for an allocation of quantity and that you can, the utility can substitute any fuel, they can list any fuel?
THE WITNESS: On the DCS?
THE COURT: On the DCS.
THE WITNESS: Yeah, I believe, I agree with



Tom, and that was a position I held when I was at the utility and which DOE has put forth, that the age of the fuel, the allocation really gives you a place in line, a ticket. And when it comes time to proffer your DCS and actually deliver fuel, it's any fuel that meets the criteria under the contract.
THE COURT: I guess I was kind of misled. On page 15 of Defendant's Exhibit 7, which is the contract, in article, I think it was Article V -- no, Article VI.
THE WITNESS: Article VI, sir?
THE COURT: Article VI, B1(a).
THE WITNESS: B(1)(a)?
THE COURT: B(1)(a), it says, "DOE would first accept from purchaser the oldest SNF and/or HLW for disposal in the view of facilities accepted otherwise provided in paragraph B, D and E."
THE WITNESS: Yes.
THE COURT: And B, D and E talk about exchanges or things like that, so I assume the contract required the utility to deliver the oldest fuel they had first.
THE WITNESS: I think this is another case where the contracting officer issued in her directions the guidance that utilities were free to



submit, or free to put forth any spent fuel they had that met the criteria as spent fuel under the contract and, again, explained that the allocation provision really made sense.
And that it gave you a place in line, but then let you manage your fuel inventories as you saw appropriate, so that was another clarification that was also, I believe, in the instruction transmittal letters from the DCSes.
BY MR. SHAPIRO:
Q. I want to get one more concern with the delivery commitment schedules, Mr. Zabransky. Under the contract, utilities have the express right to vary the quantities of spent fuel and high-level waste that DOE would pick up by 20 percent from the amounts on those approved delivery commitment schedules at many point before issuance of the final delivery schedule, isn't that correct?
A. I believe that's correct, yes.
Q. But if everybody adjusts their allocation upward by 20 percent, so that the quantity to be accepted is more than the total acceptance rate that the Department has planned for that year, you don't know how the Department would accommodate that contract work, do you?

A. The Department would be obligated to. We'd have to figure out some way to either store more fuel, work nights and weekends, work 24-hour shifts, whatever it took, but the contract gives the utilities rights to do that. Once we sign the DCSes, if they adjust them, we'll have to live with them.
Q. But you don't know how the Department would manage to accommodate that, do you?
A. I just said, Mr. Shapiro, we'd work back shifts, we'd work weekends, we'd park stuff, but it's our obligation to figure that out when and if it happens.
THE COURT: Would that possibly have any impact on accepting canistered fuel? For instance, if a number of canisters resulted in, say, being 10 percent over the allocation, if you accepted canistered fuel?
THE WITNESS: I think canistered fuel, one of the issues with that is if we have to accept it and repackage it immediately, which could be the case, that could severely limit the throughput of the facilities, so that would have to be factored into that.
THE COURT: If you didn't have to reopen them and just, the total quantity might not exactly



match the allocation.
THE WITNESS: And that's one of the reasons I think that provision was put in there for, was that originally there was an understanding that the allocation was a very precise number to the nearest tenth of a ton, but that could result in a less than full cask, two and a half casks, which didn't make a lot of sense, and that by adjusting it plus or minus 20 percent was one way of dealing with that.
BY MR. SHAPIRO:
Q. I wanted to make sure I understood your last testimony correctly, Mr. Zabransky. So you're saying -- and let's take the current, the most recent ACR that ramps up to an acceptance rate of 3,000 MTUs per year?
A. Yes, it does.
Q. And let's say we're in one of those years with 3,000 MTUs acceptance and utilities with allocations and the allocations that are provided for under that ACR and APR and instructions that were sent along with them would equal that 3,000 MTU, wouldn't it?
A. Yes, it does.
Q. And so if all those utilities bumped up the amounts they want to deliver by 20 percent, and the



Department would have to handle roughly 3,600 MTUs?
A. Yes, it would.
Q. And it's your testimony that the Department would have the capability to manage to do that?
A. No, my testimony was the Department was aware of that when it issued the ACR, and we'll deal with that, that should have come to pass. It doesn't have the capabilities today, but it would have to get them.
Q. So the Department could get those capabilities?
A. I don't see any reason why it couldn't.
Q. I want to ask you just a couple of questions about annual capacity reports, just mentioned the most recent one, the one that was sent out last week, when is spent fuel presumed to start to be picked up by the Department in that annual capacity report?
A. The report issued last week supports operations beginning in 2010.
Q. Is that the date provided in the annual capacity report, or is it like the earlier one that just had a year one instead of an actual year assigned?
A. I believe that report, and I'm doing it



from memory, has a table that shows 400 tons of acceptance in 2010.
Q. I want to ask you a question or two about the prior ACR. That's the one that was issued in 1995.
A. Okay.
Q. Now, the rates in that annual capacity report, you can pull that out if you don't recall it, but the rates in that annual capacity report are considerably smaller than the acceptance rates in last week's July 2004 annual capacity report, isn't that true?
A. Those rates, I believe, were 400, 600 and then 900 through the balance of the 10-year period, yes, they're smaller.
Q. And isn't it true that the Department was trying to minimize its obligations to utilities by using those rates in the 1995 ACR?
A. That may have been one of the considerations that went into that. There was no plans for a repository before 2010 at that point in time, and there was no change from the prior 4, 6, 9, 9, 9 acceptance rates in the '95 ACR, yes.
Q. I'm not asking just what may have been. Is it your opinion the Department was trying to minimize

its obligations by putting in those rates in the 1995 ACR?
A. In my opinion, that was probably one of the things being thought about, yes.
Q. I'm still not quite getting a complete answer to my question. I think you qualified your last answer that said that was probably one of the considerations minimizing the Department's obligations. Wasn't it your opinion that the Department indeed was trying to minimize its obligations?
MS. SULLIVAN: Objection, asked and answered, argumentative.
THE WITNESS: And I think I said, yes, they were, but I'm not sure that was the only consideration for those rates.
BY MR. SHAPIRO:
Q. Now I, want to turn back to your time when you were at WEPCO and looking at ACRs in that time period. Again, we can pull one of these out, but you recall some of those annual capacity reports noted right on there that the ACR's for planning purposes only, and it's not contractually binding on either the Department or purchasers?
A. I believe they all say that, including the



current one.
Q. And when you were at WEPCO, you concluded from that, that WEPCO could not rely on the department to actually accept the fuel based on the ACR, isn't that correct?
A. I believe that WEPCO needed to execute DCSes and have them approved to have any commitment from the government.
Q. You couldn't rely on the ACR?
A. The ACR was the basis for the DCS, no, there's nothing to rely upon an ACR. It's a report.
Q. Now, we've talked about a couple different acceptance rates for the Department to receive spent fuel from utilities. There's the one that ramps up to 3,000 MTU and the current ACR. You believe that acceptance rate is reasonable, don't you?
A. That's the rate that's in our requirements documents, the facilities are being designed for, and that's the rate the Department has put forth as its willing to commit to in the new ACR, yes.
Q. So you believe that the acceptance rate in the 19 -- in the 2004 ACR is reasonable?
A. I believe that the rate in the ACR which presumes we'll have Yucca Mountain up and running is reasonable, yes.



Q. And, again, turning back to your time when you were at WEPCO, much earlier on in the process, you believe that a reasonable acceptance rate would have been one that would have reflected the aggregate rate of discharges, plus some amount of work-off, isn't that correct?
A. I believe that's the case, yes.
Q. And it's your personal opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog, that's correct?
A. Again, to the extent that's accomplishable, I think that's an appropriate thing for the Department to commit to.
Q. And you do think that is accomplishable by the Department?
A. That's the current plans for 2010, the Department's planning to accomplish it, yes.
Q. And, again, turning back to your time at WEPCO, when you were there, it was your position and understanding that an acceptance rate that ramped up to 3,000 MTU would be such a rate that was sufficient to work off the backlog and the discharges in a reasonable time frame?



A. That would have been the company's desire and my desire, yes.
Q. And it was your position and WEPCO's position when you were there that the Department had to be prepared to accept spent fuel from the utilities on a schedule which would obviate the construction of deployment of additional at-reactor storage capacity after January 31, 1998?
A. I believe that's the position we communicated to the Department in response to some of their mission plans, yes.
Q. You believe that's the position that you communicated, or you're unsure?
A. I believe it is. I mean, you're asking me for something that happened 20 years ago, but I think that's we said, yes.
Q. I think we may have that document. Let's confirm.
A. Okay.
Q. Mr. Zabransky, you're being handed what is actually an excerpt from what we have been calling here Plaintiffs' Exhibit 95, which is the complete three volume set of the 1985 mission plan. And you may know or recall the third volume of that set includes, I believe, all of the comments sent in by

utilities on the draft mission plan.
And what we have here at pages 593 and 594 of volume three of Plaintiffs' Exhibit 95 is a July 6th, 1984 letter from WEPCO to Charles Head. Do you recognize this letter?
A. I've seen it in, I think, in prior depositions. I'm not sure I recognize it from the time.
Q. These are WEPCO's comments --
A. Yes, they are --
Q. -- to the draft mission plan?
A. They appear to be, yes. They are.
Q. Well, let's take a look to see if it confirms your understanding that you had about WEPCO's position at the time. If you look at the bottom of the first page, it says in the indented portion, "DOE must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional at-reactor storage capacity after January 31, 1998."
A. I see that, yes.
Q. And you agreed with that statement?
A. Yes, that's what the WEPCO put forth as its position in July of 1984.
Q. And if you would turn to the second page of



the comments, the comment that's numbered number 2, the top paragraph on the page, it says that, "The DOE repository program should be carried out in a cost-effective manner which protects the interest of those who are required to pay for it.
In other words, DOE should not permit itself to give in to expediency in making decisions or taking actions with significant cost schedule implications." You agreed with that statement?
A. I agreed with it then, and I think we operate the program that way now.
Q. Let's switch subjects, Mr. Zabransky. You talked about failed fuel during your direct examination. It's your understanding that the Yucca Mountain facility is going to be prepared to handle failed fuel to the extent it handles like an individual fuel assembly with normal handling equipment, isn't that correct?
A. That's, again, I don't know what it's actually going to be able to do. The goal is to try to handle failed fuel that -- restate your question. I'm not sure I caught it. Can you repeat the question?
Q. Your understanding is that the Yucca Mountain facility will be prepared to handle failed



fuel to the extent it handles like an individual fuel assembly with normal handling equipment isn't that correct?
A. Well, I think I said in my answer, it's more than just handling equipment. It's all the facility capabilities are there so they can handle failed fuel without any additional requirements. So to the extent that failed fuel behaves in all aspects like intact fuel or standard fuel, then there should be no reason it couldn't.
Q. And in fact, almost all utilities, nuclear utilities, have some amount of failed fuel, isn't that correct?
A. I think most have it. I don't know the exact quantities or characteristics at each utility, no, but, yes, most have it.
Q. And as far as the delivery commitment schedule process goes, the delivery commitment schedules, they treat failed fuel just like any other fuel, isn't that correct?
A. No, I don't believe it's the case.
Q. And when a utility proposes a delivery commitment schedule, do they indicate failed fuel differently on that?
A. No, but I think in the instructions that



were provided to the utilities that I've always operated under, the DCSes presume all the fuel is standard. So to the extent DOE's being informed fuel is going to be delivered, it assumes it's going to be standard, unless it's informed otherwise, subject to the approval of DCS.
Q. I think that's my question. The delivery commitment schedule paperwork doesn't distinguish between standard fuel and failed fuel?
A. You said, your question to me was, does it treat it the same as, and the answer is, it assumes it's not failed, it assumes it's standard.
Q. So the process treats them the same?
A. No, it excludes failed fuel. It assumes it's standard fuel.
Q. How does the delivery commitment schedule, we could pull one out, but where does the delivery commitment schedule exclude failed fuel?
A. I believe the instructions that were provided instructed the utility, informed the utility that DOE would assume that everything on that schedule was standard fuel, and that it was the obligation of the utility to inform DOE otherwise.
Q. On the proposed delivery commitment schedule?

assume there's some coordination between DOE and the Nuclear Regulatory Commission, and the Nuclear Regulatory Commission is licensing these dry storage facilities which have sealed containers, generally, I assume, in them, and also decommissioning of the plant, which correct me if I'm wrong, but I assume eliminates the ability to actually reopen the sealed container, at that point, and do anything with them, other than just put them on a truck and send them to the repository.

As such, is it your view that the Nuclear Regulatory Commission licensing these facilities is just assuming that DOE would have to accept these containers, assuming there's no alternative?

THE WITNESS: Well, again, I think it's an awkward situation to be in, but, yeah, I think NRC has nearly done its technical review. At least technically, their reviews are limited to, does it meet its requirements to be safe during transport and storage. And having done that, they'll license it.

THE COURT: And I assume the ceiling is necessary for safety and for storage.

THE WITNESS: Right. But they require the utilities be able to demonstrate how they would open them, if they needed to remove the contents. So,



yes, it's a situation where these things have been approved for storage, but there hasn't been closure on the issue of will they be subsequently accepted by DOE, pursuant to the contract.

THE COURT: Do you know of any way that they could be reopened on-site?

THE WITNESS: It would require, you know, just from a general background, there would have to be some type of facility, maybe a modest facility constructed, that would allow them to be cut open and repackaged, much as we're going to have to do when we receive them at Yucca Mountain.

THE COURT: So it would be another cost aspect?

THE WITNESS: Uh-huh.

THE COURT: Okay.

BY MR. SHAPIRO:

Q. But your ultimate expectation, Mr. Zabransky, is that DOE is going to be accepting some canistered spent fuel from utilities?

A. I believe that we'll eventually reach an accommodation with a utility or more than one utility to come up with a contract amendment and accept some canisters, yes.

THE COURT: Is there any ability to alter



the fee under those circumstances?

THE WITNESS: At this point, it doesn't look like it, no. We don't charge a given utility for its express individual cost.

THE COURT: So what --

THE WITNESS: We charge a uniform fee for everybody.

THE COURT: Oh.

BY MR. SHAPIRO:

Q. And I just want to confirm something I think we covered a little bit before, but I want to make sure I have your understanding that originally the Department anticipated that spent fuel would arrive at the DOE facility from utilities in a vaulted transportation only cask that DOE was to provide to utilities?

A. When you say, "originally," what do you mean, "originally"?

Q. Well, since the beginning of the, since 1983, has that been your understanding?

A. I don't know what DOE presumed before I got there in '94, but as long as I've been there, it's always been that there would be a transportation cask, and I'm not aware of any transportation casks other than bolted/closed.



THE COURT: Just in case I forget, is Appendix F to the contract, if you're aware of that, the first requirement for a detailed description of the fuel assemblies?

THE WITNESS: Well, let me get a copy of that. I believe that's the first time the utilities have to describe the assemblies they're going to provide.

THE COURT: And also any damage to --

THE WITNESS: Right. But there's also a provision, and bear with me while I try to find it.

THE COURT: That's a 60-day before shipping date.

THE WITNESS: Right. But under Article VI, 2(b), that we talked about earlier, it basically tells the purchaser there that they need to obtain delivery and procedural confirmation prior to delivery and designate it, describe it to DOE. So the timing of that is sometime before the Appendix F, so at that point in time, you can be sure that fuel can be accommodated.

THE COURT: As a practical matter?

THE WITNESS: Uh-huh.

BY MR. SHAPIRO:

Q. Mr. Zabransky, while we're still on this

1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
-------------------------------- :

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN



1827

APPEARANCES:

ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656



1828

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:
STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***



1829

P R O C E E D I N G S

\- - - - -

THE COURT: Let's go.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. CAYNE:

Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. I'd like to turn your attention to Plaintiff's Exhibit 121. I believe that will be in the first binder, one out of three. Do you have that document before you, sir?
A. Yes, I see it.
Q. And is this document a memorandum from you to -- was this a memorandum from you, sir?
A. It's an e-mail from me to Mr. -- I believe it's Auke Piersma.
Q. And who is that person?
A. Mr. Piersma used to be with a group called Public Citizen.
Q. And there's also a CC?
A. Yes.

1910

THE COURT: Well, you can do that, but I want to be sure he's careful enough to read the transcript before he gives an answer. Do you want to mark this as an exhibit?
MR. CAYNE: Yes, Your Honor. Do we know what number?
THE COURT: I think you're at 2004.
MR. NESLIN: 1004, Your Honor.
THE COURT: I think.
MR. LO RE: Your Honor, are we going to mark the entire transcript here?
THE COURT: You know, I don't know, it's up to the --
MR. LO RE: We would object to --
MR. CAYNE: We would mark the entire transcript, Your Honor.
THE COURT: Well, I think his objection goes to the fact that the witness is here, unless you think everything he's testified to is a problem and inconsistent.
MR. LO RE: Yes, Your Honor, in fact, this goes directly to the effort that Plaintiffs made to designate pages and pages of Mr. Zabransky's testimony. I would say this is a backdoor way apparently of getting all that testimony into the



1911

record in this case and --
THE COURT: Well, why don't you refresh his recollection first? Then we'll go to the specific area you want to impeach him with, if you have it, and then we'll mark that.
MR. CAYNE: And, Your Honor, we can go through, there are a number of areas in this beyond what we're dealing with right now that I still want to deal with this witness on, and my plan was not to mark the whole thing and go through it basically issue-by-issue, it's just a matter of time, but I'm more than happy to go through it issue-by-issue.
THE COURT: Okay.
BY MR. CAYNE:
Q. Mr. Zabransky, did you appear as a witness in the Yankee Atomic trial this summer, by Yankee Atomic, it's Yankee Atomic Power Company versus United States?
A. I think, yeah, it was in 2004, yes.
Q. And you were sworn to testify?
A. Yes, I was.
Q. And you appeared before Judge Merow?
A. Yes, I was.
Q. And you swore to testify honestly, correct, sir?



1912

A. Yes, I did.
Q. Okay. And could I refresh, and look at any parts of the transcript you would like to, but I specifically am going to ask you about, Mr. Zabransky, and take your time to read it, and let me know when you're done, and I won't ask until you're done reading, is I'd like to turn your attention to transcript page 4166 and 4167, could you please read that and anything else you need to put it in context and tell me after you're completed, sir?
A. Okay.
Q. Now, does reading that transcript refresh your recollection whether you have taken in the past a sworn position whether the Department of Energy was trying to minimize its obligations to utilities by using the acceptance rates that were used in the 1995 ACR for which you bore responsibility?
A. I think, as it says in the transcript, my opinion was I thought they were trying to, but I've never heard them say that. As of that point in time, they thought they had a conditional obligation, that obligation wasn't really complete, unless there was a repository constructed under the Act. So this says my opinion was that, but I don't recall anyone at DOE telling me that that's why they were doing things.



1913

Q. Were you, yourself, an official at the Department of Energy at this time?
A. I was an eight-month employee at the Department of Energy, so, no, I was not an official at the Department of Energy.
Q. What was the basis for your opinion, sir?
A. Because I felt they had an obligation before I came to the Department of Energy and I saw this as a way of trying to manage an obligation, if you had an obligation and you had a question about meeting it, you didn't make it bigger than you had to. Now, that's what I would have done, but that was my opinion.
Q. What do you mean you thought they had an obligation before? You felt they had what obligation before?
A. I think I testified yesterday that when I was at Wisconsin Electric, we thought that there was a obligation on the part of the Department of Energy to begin picking up fuel in 1998.
Q. And at that time, did you believe the obligation was at a level of 3000 MTU?
A. No, I didn't. I believe it was what we signed up to in the DCSes, sir.
Q. Sir, did you believe, back when you were at

1914
Wisconsin Power, that a reasonable acceptance rate would have been a rate that reflected the aggregate rate of discharges of the industry, plus some amount of work off?
A. Absolutely.
Q. And what does that mean, in your mind?
A. What it equates to simply is about 3000 metric tons a year, sir, I believe that would have been a reasonable acceptance rate.
Q. So you believe that a reasonable acceptance rate was 3000 MTU per year, correct?
A. I believe that.
Q. Thank you, sir. And turning to transcript page 4167, you indicated that you weren't sure whether there were any other reasons, other than to limit liability, that --
THE COURT: Sustained.
MR. LO RE: Thank you, Your Honor.
BY MR. CAYNE:
Q. Mr. Zabransky --
THE COURT: I don't see the word "liability" anywhere on the page, counsel.
BY MR. CAYNE:
Q. Mr. Zabransky, am I correct, and does this transcript, particularly page 4167, refresh your



1915
recollection that at the time of the Yankee trial, you were unable to identify any reasons for the Department's use of the acceptance chart in the 1995 ACR, other than constituting an effort to minimize the Department's obligations?
A. Again, that was my opinion. I couldn't recall any other specific reasons.
THE COURT: I see you, Mr. Lo Re, do you want to talk about something? I mean, I think he corrected his characterization of the witness' testimony. That was my problem.
MR. LO RE: That's fine.
THE COURT: Do you have an additional problem?
MR. LO RE: That's fine. I am just going to state for the record that I think we are passing the refresh the witness' recollection.
THE COURT: He's trying to impeach him, I know that.
MR. LO RE: Clearly, Your Honor. Thank you.
THE COURT: I mean, typically, what you do is, you know, is that you ask him what he knows. If he says he doesn't remember, then you read the question and the answers as they appear in the



1916
transcript, and you ask him, do you remember giving, being asked that question and giving that answer? You've kind of slopped over the formalities here. But why don't you continue with your next question?
MR. CAYNE: Thank you, Your Honor. I'd like to turn the witness' attention to Plaintiff's Demonstrative number 33. I'm going to put it on the overhead.
BY MR. CAYNE:
Q. Do you have that document, Mr. Zabransky?
THE COURT: It's the big black binder. It's the one that has the plastic. That's the acceptance rate announcements and teeny-weeny print at the bottom. Let me know if you can read it because I can't.
BY MR. CAYNE:
Q. Mr. Zabransky, do you have the exhibit in front of you?
A. Yes, I do.
THE COURT: Do you have a magnifying glass? I really cannot see the bottom print at all. If you don't, I'll bring one. No, I've got glasses, that's not the issue. I read better with the glasses off. For distance, it's fine.
MR. CAYNE: I can read the entries into the



1917
record, Your Honor.
THE COURT: When you get to the little print, tell me what it says.
BY MR. CAYNE:
Q. Mr. Zabransky, I want to ask you some questions about this demonstrative exhibit covering the period of time that you were at the Department of Energy. And what this is intended to reflect, Mr. Zabransky, is acceptance rate announcements by the Department of Energy, and you'll see it starts in 1995 with the ACR, the 1995 acceptance priority ranking and annual capacity report, which is Plaintiff's Exhibit 396, and the analysis of the total life cycle costs of the Civilian Radioactive Waste Management Program, which is Plaintiff's Exhibit 429.
And this is intended to reflect that those two documents reflected an announced acceptance rate of 900 MTU per year. Do you see that, sir?
A. Yes, I see what it says.
Q. And do you agree with me that those two documents reflected an announced acceptance rate by the Department of 900 --
THE COURT: Mr. Lo Re?
MR. LO RE: Your Honor, I'm going to object

0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER )
COMPANY, )
Plaintiffs, ) No. 98-614C
v. )
THE UNITED STATES, )
Defendant. )

---------------------------------x

Deposition of DAVID ZABRANSKY
Washington, D.C.
Tuesday, April 12, 2005
9:33 a.m.

Job No.: 1-53967
Pages 1 - 99
Reported By: Joan V. Cain



Deposition of DAVID ZABRANSKY, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY:

M. STANFORD BLANTON, ESQUIRE
K.C. HAIRSTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 226-3417

ON BEHALF OF DEFENDANT:

HEIDE L. HERRMANN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 305-3315



C O N T E N T S


| EXAMINATION OF DAVID ZABRANSKY | PAGE |
|---|---|
| By Mr. Blanton | 6 |


E X H I B I T S

(Attached to the Transcript.)


| ZABRANSKY DEPOSITION EXHIBITS | PAGE |
|---|---|
| 1 Protective Order, 4/8/05 | 11 |
| 2 DOE Report, July 2004 | 12 |
| 3 Letter from Mr. Zabransky to Mr. Cocherell, 7/28/04 | 16 |
| 4 Civilian Radioactive Waste Management System Requirements Document Rev 06 | 49 |
| 5 Letter from Mr. Zabransky to Mr. Cocherell, 12/1/04 | 26 |
| 7 Summary of Mr. Garrish's Statement, 3/10/05 | 31 |
| 10 Letter from Mr. Zabransky to Mr. Carden, 11/3/04 | 23 |
| 13 Copy of Protective Order Filed 2/14/05 | 76 |

E X H I B I T S C O N T I N U E D

(Attached to the Transcript.)


| ZABRANSKY DEPOSITION EXHIBITS | PAGE |
|---|---|
| 14 Document Titled Casks Suitable for Use, 3/14/03 | 64 |
| 15 Letter from Mr. Cocherell to Mr. Watkins, 3/29/01 | 69 |
| 16 Strategic Plan for Transportation of Spent Nuclear Fuel, 11/18/03 | 70 |
| 17 E-mail to Mr. Kouts with Attachment, 11/14/03 | 77 |
| 18 E-mail Chain | 90 |




P R O C E E D I N G S

DAVID ZABRANSKY

having been sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY

BY MR. BLANTON:

Q Mr. Zabransky, good morning. My name's Stan Blanton. I represent Southern Nuclear Operating Company, Alabama Power Company & Georgia Power Company and each of those three companies against the United States of America regarding the spent fuel litigation.

We've met before because I've deposed you before. Welcome back to the witness chair.

A Nice to see you again.

Q It's not my intention to replow old ground today. I'm not going to ask you about things I or anybody else have already asked you unless there's something in any of that previous testimony that you'd like to change or take back. Is there anything you want to change or take back?



A Not to my knowledge. I haven't reviewed the previous testimony. I don't know of anything offhand right now.

Q You know from the times your deposition's been taken before, is I'll ask you questions and you're entitled to have a question that you understand and can answer. So if I ask you a question that you don't understand or you feel I've misstated the facts in some way, will you stop me and ask me to rephrase my question?

A Yes, I will.

Q And will you give verbal answers so the court reporter can take down your answers?

A I will try to, and if I don't, please remind me, and I will clarify.

Q And you're physically well and able to testify today?

A I think so. A little tired, but I'm okay.

Q Okay. We're in the same boat then?

A Yeah.

Q What is your current position at -- I assume you're employed by the Department of Energy;



is that right?

A Yes, I am.

Q What's your current position?

A I work for Chris Kouts in the Office of Systems Analysis and Strategy Development I think it's called now.

Q Do you have a title or position description?

A I am a nuclear industry specialist, and I also act as the contracting officer for the contracts, the standard contracts.

Q That was my next question, you're still the contracting officer for Southern Nuclear's contract with -- or actually for Alabama Power and Georgia Power's contracts with the federal government for high-level waste in spent nuclear fuel?

A That's correct.

Q You mentioned that you had not reviewed your testimony from either the last deposition or any previous trial testimony; is that correct?

A Not for this deposition, no.

Q What if anything had you reviewed in

preparing for this deposition?
A In preparing for this deposition, I looked to see if there was anything that would have aided me in addressing the subject of the 30(b)(6) deposition and didn't find anything.
Q What do you understand that you have been designated to testify about pursuant to our 30(b)(6) deposition notice?
A Well, I understand that the topic that I recall off the top of my head is the government's plans to pick up spent fuel from Hatch, Farleigh, or Vogtle. I believe that's V-o-g-t-l-e; is that correct?
Q I get it wrong about 50 percent of the time as well. I'm not going to go on the record as to how it's spelled. VEGT is what I call it.
MR. BLANTON: Ms. Herrmann, is there any other topic that Mr. Zabransky's being designated to testify about?
MS. HERRMANN: Yes. We heard from Mr. Kouts yesterday with regard to the 2004 APR/ACR. Mr. Zabransky is here to talk about any plans that



may exist for picking up Southern Nuclear's fuel, and the third topic that the judge ordered, which is the equipment that may have been available for start of pick-up in 1998.
BY MR. BLANTON:
Q All right, sir. Do you also understand that you've been designated by the government to testify about the government's position as to what equipment it would have used in 1998 had it performed to pick up and transport spent nuclear fuel?
A From Hatch, Farleigh, and Vogtle, yes, I do.
Q And in addition to that, Mr. Zabransky, we've noticed your deposition in your personal capacity to ask you questions about things that have happened since the last time you testified in the program. The government filed a Motion for Protective Order as to that deposition notice, and the court has ruled and, with counsel's agreement, we'll make the court's order an exhibit to your deposition. We marked this copy as exhibit Kouts' 1



yesterday in Mr. Kouts' deposition, and I propose we mark that as Zabransky 1 in your deposition.
MS. HERRMANN: That's fine with me.
MR. BLANTON: And we'll make photocopies of those and attach them to the transcript after we get through today.
(Zabransky Deposition Exhibit 1 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Mr. Zabransky, have your job duties changed since you last testified -- since you testified in the Yankee trial?
A When was that?
Q August of '04.
A No, I don't believe so.
Q All right. I'm going to show you what was marked as Exhibit 2 to Mr. Kouts' deposition yesterday, and it will be marked as Exhibit 2 to your deposition as well, and it is entitled the Acceptance Priority Ranking & Annual Capacity Report for the U.S. Department of Energy, July 2004.



(Zabransky Deposition Exhibit 2 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Have you seen that document before?
A Yes, I have.
Q Did you have a role in preparing or issuing that document?
MS. HERRMANN: Before you answer, let me just -- I will object beyond the scope, because I don't believe -- since Mr. Zabransky is not the 30(b)(6) witness that's here to testify about the 2004 APR, and I don't believe the judge's order contemplates asking him about this. I'll just object beyond the scope. Go ahead, if you remember the question.
A Did I have a role --
MR. BLANTON: Well, just for the record, I don't agree with your characterization of what the judge has told us we can ask, but I don't understand you to be telling him he can't answer the question.
MS. HERRMANN: That's correct. And I think

we have the same disagreement that we did yesterday, but, you know, hopefully there's not going to be a lot of rehashing, and so we can get through this without arguing about it.
BY MR. BLANTON:
Q Now, have we sufficiently erased any memory of the question from your mind? The question was, what was your role, if any, in the preparation of the APR/ACR for 2004?
A Mr. Pollog, who works with me, prepared the document, and my role was primarily to take this document and send it out to the contract holders, as the basis for DCSs.
Q So you were more or less a conduit for Mr. Pollog to the contract holders. You didn't write any of the words or review or revise any of the language in the ACR/APR?
A I think I may have commented on it, but I don't know specifically what comments I would have had or what exact word changes we would have made. Tom and I worked on this, but he did all the work.
Q Do you know where the acceptance rates in



Table 1 on page 2 of the report came from?
A Those were provided to us, myself and Tom, by Mr. Kouts.
Q Do you know what the basis of those rates were?
A I believe they're the same rates that are in the program planning documents.
Q Have you yourself done anything to arrive at particular acceptance rates that should be included either in the program planning documents or in the ACR/APR?
A I have not.
Q Do you have any role in the planning either for the submission of the license application or in any other aspect of the development of the repository?
A In assisting Mr. Kouts, I have -- I reviewed documents at times at his request to look at them for technical issues, but, no, not really, no direct role.
Q Is your primary responsibility interacting with contract holders concerning the administration



of a contract?
A It's one of my responsibilities.
Q Okay. As I understand your testimony, you don't have a role in preparing the license application?
A No, I do not.
Q I also understand, from your testimony, you don't have a role in either the design or causing the construction of the repository to go forward; is that correct?
A The only role we have in design would be in Mr. Kouts's office, the area of integration to look at how the pieces of the program fit together and to advise the director's office as to other issues that may be arising, if any. But, no, with respect to the design itself or construction, no, I do not.
Q When you use the word "integration," could you be more specific or maybe elaborate on what you mean by that?
A That would be how the repository designs are compatible with the transportation designs are compatible with waste forms that may exist or



materials in spent fuel in general.
Q I'm going to show you what was marked as Exhibit 3 to Mr. Kouts' deposition yesterday, and we'll mark it as Exhibit 3 to yours as well.
(Zabransky Deposition Exhibit 3 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Hold on. Let me make sure I get a note on the -- Exhibit 3 to your deposition will be a July 28, 2004, letter to Mr. Ron Cocherell, I think signed by you. Do you recognize that?
A This specific letter, no, but I recall this was a general letter that was sent out on July 28th to the contract holders transmitting the APR/ACR.
Q Was your role in preparing and sending that letter similar to the role you had in the issuance of the APR/ACR? Somebody told you to do it and so you sent it out, or did you have -- was your role more substantive in the decision to reinitiate the DCS process?
A Well, the program schedule called for

repository operations to begin in 2010, when this letter was sent out, and as a result of that, after discussion with Mr. Kouts, I was directed that it was time to restart the DCS process for the 2010 acceptance.

Q And do you have -- at the time you sent out that letter, what was your understanding as to whether the 2010 -- whether DOE was on schedule to meet the 2010 date or not?

MS. HERRMANN: Objection, foundation.

BY MR. BLANTON:

Q Did you have an understanding as to whether DOE was on schedule to meet the 2010 date or not?

A At the time this letter was sent out, my understanding was that we were.

Q Okay. How did you get that understanding?

A Discussions with Mr. Kouts.

Q In general, are your understandings about the progress toward -- that DOE is making toward the commencement of repository operations generally based on information you've received from Mr. Kouts?

A Yes.



Q Had you received any DCSs from a utility between the times DOE suspended the -- last suspended the DCS process in this July 28 letter?

A I believe so.

Q Do you recall from who?

A No, I don't.

Q What did DOE do with those DCSs?

A We didn't process them, and sent a letter back to the utilities saying we weren't processing them.

Q And did you return the documents too, or did you keep the documents?

A I don't recall where the documents are.

Q How would it be possible to figure out what utilities sent you those DCSs? Just by looking at your correspondence to see who you wrote back to?

A That would be a way, I presume, yes.

Q Does that correspondence still exist, as far as you know?

A I presume it does. I don't know for sure.

Q Why did DOE refuse to process those DCSs?

MS. HERRMANN: Objection, foundation.



THE WITNESS: Are you done?

MS. HERRMANN: Mm-hmm.

A At the time, it became clear that it was no longer appropriate to continue to process those DCSs.

BY MR. BLANTON:

Q Why was it no longer appropriate?

A At that time, DOE's commitment became clear, and there was discussion within the Department prior to that that the commitment was conditional, and I think in which case -- whatever case it was in the latter part of '96, it became clear it was an unconditional commitment, and given the fact that the schedule didn't call for the repository to be open at the time the DCS was being submitted for, it was no longer appropriate.

Q And I'm not asking about legal positions, because we've talked about those in your previous depositions, but do I understand what you're telling me is you didn't process those DCSs because you didn't have a scheduled start date for the repository?



A It wouldn't make sense to sign a DCS for 2007 when there wasn't going to be any operations in 2007.

Q Do you recall when the DCSs you received requested DOE to pick up the fuel?

A I don't.

Q Now, as of July 28 of '04, DOE had scheduled 2010 as the start date for the repository for quite some time; had it not?

A Yes.

MS. HERRMANN: Objection, vague.

A It had been -- 2010 had been scheduled for a couple years, yes, several years.

BY MR. BLANTON:

Q Do you recall when you received these DCSs prior to July 28 of '04 whether -- and after the last time the process was suspended -- we're talking about that interim period between the suspension -- the first suspension of the DCS process on July 28.

Do you recall whether the scheduled date for the repository opening had been set at 2010?

A I believe it was 2010, during that period

Q Yes, sir, first full paragraph.
A You have to ask Mr. Garrish. I believe he's the source.
Q That's not you?
A No.
Q Have you provided any information or done any work within the Department of Energy concerning the revision of the funding mechanism that Mr. Garrish discusses in his testimony --
A No.
Q -- for the program? Do you know anything about that?
MS. HERRMANN: Objection, vague.
A Other than the fact that the government is seeking some way to get access to the funds without appropriations, I don't know the details. That's budget details that I don't get involved with.
BY MR. BLANTON:
Q Okay. Have you been designated as the government's witness to respond to questions concerning DOE's position or knowledge as to what kind of equipment, including what kind of



transportation casks or other associated equipment DOE would have used had it been in a position to perform in 1998? I think we testified earlier that you understand that you've been designated for that purpose.
A That's true.
Q Do you know what kind of equipment, in terms of casks or canisters that DOE would have used in 1998 had it been in a position to perform?
A It's my understanding DOE never determined that.
Q Do you know what options would have been available to DOE in that regard?
A The last option DOE looked at with respect to that, I believe in '96 time frame, was the use of a regional servicing contractor known as an RSC that would have performed the function of transportation and waste acceptance on behalf of the department, and I believe it was the Department's vision of that concept that the contractor would have selected the appropriate casks.
Q Did DOE have particular transportation and



storage technologies that they used in estimating the total life cycle cost of the -- of the repository system? Do you understand my question?
A I -- there's some assumptions made in the TSLCC, total system life cycle costs as to -- but I believe they're pretty generic.
Q For instance, just as a for instance, did -- did DOE ever estimate the comparative cost of, say, using welded casks versus bolted casks for waste acceptance and transportation?
A No, I don't think DOE's estimates don't get to that level of detail.
Q Okay. And can you here today tell me whether -- in 1998 whether DOE would have used a welded or a bolted cask had it shown up to pick up fuel in 1998?
A I can tell you DOE made no decisions as to what it was going to use in 1998.
Q Are there technical reasons why one type of transportation cask versus another would have made more sense had DOE had been in a position to perform?



A Are we talking 1998 or --
Q Yeah, and going forward.
A I mean --
MS. HERRMANN: Going forward how far? I'm sorry. Just --
BY MR. BLANTON:
Q Say the first ten years. 1998 through 2008.
A I think the technical reasons that exist today would have existed back then, which is that their fuel casks that are easier for us to repackage into waste packages than canister casks, from a technical perspective.
Q All right. But my question is about what kind of technology DOE would have used to transport the fuel from the site to the repository and any associated storage?
MS. HERRMANN: I'm going to object, asked and answered, because he's already said there was no decision made on that.
A But you asked me then what -- are there differences in technologies that would have made one

easier to use than the other?
Q By DOE.
A And the answer is, yes, there are differences in technology that would have made one easier to use than the other by DOE. The bare fuel casks would have been easier to use by DOE.
Q Okay. And what are the physical characteristics of a bare fuel cask? Is it bolted? Is it welded? Are they both bolted and welded?
A They're bolted.
Q How many assemblies do they hold?
A It varies. I don't know the exact numbers.
Q Is there a range of sizes of bare fuel casks?
A Yes.
Q What's the smallest, in terms of number of assemblies one will hold, and what's the largest you're aware of?
A I believe one up to 68.
Q Has DOE done any work to determine what the optimal size of a bare fuel cask would be for its use in accepting fuel from contract holders?



A In 1998?
Q Well, since you say the same technical reasons why today, I'd say up to today.
A No, DOE hasn't done anything on that that I'm aware of.
Q Do you have a personal opinion about that?
A Do I have a personal opinion? I think personal opinion will be that a lot of what's used will have to be compatible with the contract holder's sites, and different sites have different capabilities, but that's my personal opinion.
Q So there may be a range of storage technologies that are used -- or transportation technologies used based on what you find at a particular contract holder's site; is that correct?
A I think that's a -- from a personal perspective, that's a reasonable expectation.
Q Do you know anything about Southern's sites in terms of the technological aspects of either their storage technologies or how those sites might fit with various, you know, transportation technologies DOE might use?



A I personally don't have any direct knowledge of that other than what I may have read in the papers. I think they use Holtec casks for storage. But are we talking '98 or are we talking today? I mean, that's another -- I'm not quite sure -- what the government knew in '98, I have no idea.
Q Well, in 1998 they didn't have any Holtec casks, correct?
A I'll take your word for it. I don't know.
Q If all the utility's fuel is in their spent fuel storage pool as opposed to in dry cask storage, is there any reason why the government couldn't use bare cask -- or bare fuel cask such as you've described earlier in your testimony?
A I can't think of a reason, if it was all in the pool.
Q So is it correct that the main thing that complicates the use of which transportation technology DOE uses is whether or not they have -- a utility has spent fuel in dry storage and in wet storage?



A I'm not sure that complicates the use of technology by DOE.
Q What else is there about the site that could drive DOE to one technology versus another one? Because I understood you to say compatibility with the particular peculiarities of the site --
A Can you define technology?
Q What kind of casks DOE was using -- what kind of --
A What size?
Q I hesitate to use the term "casks" because it may be something else. What kind of storage technology and transportation technology DOE would use to put the fuel in and take it away to wherever it was going to take it?
A DOE used the same technology at all sites, bare fuel shipping casks.
Q What did you mean when you said that it would be a reasonable assumption that DOE would have to use technology that would be compatible with the contract holder's site?
A For instance, a contract holder, at least

one of them perhaps, has a crane that can only handle a 25-ton cask. It would be a small shipping cask. Others have cranes that can handle 70-ton casks. That would be a medium-sized shipping cask. Others have cranes that can handle 125-ton casks. That would be a large shipping cask.

Q Okay. All of which -- but in your formulation, all of those would have been bare fuel casks, just different sizes?

A That's DOE's current plans, yes.

Q Okay. And it's a reasonable assumption on your part to think that DOE will acquire and use the size cask that's compatible with whatever lifting equipment the utility has available?

MS. HERRMANN: DOE will or DOE would have? Are you talking 1998 or are you talking 2010?

MR. BLANTON: He said the same considerations apply to both.

MS. HERRMANN: I think it would help, especially since your 30(b)(6) notice covers the 1998 period if we make clear what time period we're talking about.



BY MR. BLANTON:

Q Well, I'll ask about 1998, but I'll ask if the same considerations applied now and then, but I don't think it matters.

A Well, you asked me what considerations apply to the difficulties for DOE to use canistered fuel versus not canistered fuel. Those I said were the same. That's a DOE issue.

Q I'm not sure I understood that answer. What do you mean when you say that's a DOE issue?

A Because DOE has to -- if DOE were to take canisters, DOE would have to cut all those canisters open and dispose of them to take the fuel out to repackage it. That's not related to transportation.

Q Okay. If all of a utility's fuel was in wet storage when DOE showed up to pick it up in 1998, had it shown up to pick it up in 1998, would there have been any issue involved -- or any difficulty involved in DOE using bare fuel storage casks for that fuel?

A First of all, they're transportation casks.

Q Thank you.



A Okay. And the difficulties, again, could have been -- and I can't speak without knowing the specifics, the cask would have to be licensed for the fuel the utility wanted picked up, and the utility would have to be capable of handling the cask.

Q And assuming those two things -- so we're assuming the cask was certified to transport the type of fuel the utility had and that the lifting equipment were capable of manipulating the DOE cask, DOE would have used a bare fuel cask?

A Yes, and it would have been a DOE cask that would have been also compatible with DOE's facilities.

Q Okay. And I believe your testimony is that that would have been a bolted cask, correct?

A Those are the only type of bare fuel casks I'm aware of, yes.

Q Okay. And I don't know if we got an answer to what size cask it would be.

A I can't answer that question.

Q And by size I mean in terms of number of



assemblies it would hold.

A I don't know.

MS. HERRMANN: Mr. Blanton, are we coming toward a good break time?

MR. BLANTON: Yeah, probably so, and we don't have very much longer.

MS. HERRMANN: Maybe take ten?

MR. BLANTON: Yeah, that's fine.

(Recessed at 10:32 a.m.)

(Reconvened at 10:39 a.m.)

BY MR. BLANTON:

Q Mr. Zabransky, we've been talking about technologies that DOE might or might not have used in 1998 to pick up spent nuclear fuel, particularly spent nuclear fuel in pools. Does DOE have a plan for how it intends to pick up any of Southern Nuclear's or its co-owners' -- well, strike the co-owners -- either Alabama Power or Georgia Power Company's spent fuel that is stored in dry casks at their reactor sites?

A I'm not aware of any such plan that DOE has.

A I believe they have one.
Q Do you know what the name of it is?
A I don't know if it's Hi-Star or Hi-Storm. Some trade name.
Q Do you know if Southern Nuclear has any of those on any of their sites?
A I don't know specifically. I think they might, but I don't know specifically.
Q Now, just above F in E is the language, CRWMS elements and facilities shall be capable of accommodating a range of storage and transportation technologies including multipurpose, dual-purpose, and single-purpose canisters, as well as bare SNF assemblies. Can you translate that into English for me?
A I think it fits well with F which said they should be able to open them. This says that they should be able to handle them.
Q Okay. What's the difference between a multipurpose and a dual-purpose?
A I believe multipurpose as used here is a storage transport and disposable capable canister,



and dual purpose would be storage and transport, or dual purpose could be storage and disposal.
Q Okay. So it's not -- the dual and multi is not intended to designate any one particular use, but just more than one use?
A Yes, but multipurpose would have to include disposability.
Q Okay. And then single-purpose, which is the next one, could be a storage only, a transport only, or a disposal only, I assume; is that correct?
A I think the only logical interpretation of this single-purpose would be a storage only that might be used at Yucca Mountain. It couldn't be transported there.
Q So do I take from this that the direction to the repository -- or I shouldn't say repository, the waste management system designers and planners, is to be able to accommodate a wide variety of storage systems that might be in use on reactor sites currently?
A Well, the purpose is to not -- since no decisions have been made, to make sure that the



engineers don't wind up making decisions that DOE hasn't made yet; so, therefore, they need to accommodate things that could be included should DOE decide to include them or not include them.
Q And those things that could be included include a range of storage and transportation and technologies including multipurpose, dual purpose, and single-purpose canisters, correct?
A That's what the document says, yes.
Q And you mentioned a minute ago that it was a DOE issue to open -- if a utility had fuel in a canister such as in a cask and canister system, that it would be DOE's issue to open that canister at the repository?
A That's not what I said exactly.
Q Okay. Well tell me exactly what you said. I'm not intending to paraphrase. I'm just not able to quote you.
A I think what I said was that should DOE decide to accept that canister and transport it to the repository, DOE would then have to open that canister and dispose of it and repackage the fuel.



Q Okay. If DOE decided not to do that, what is the -- how would DOE go about picking up the fuel?
MS. HERRMANN: Objection, speculation.
A DOE would pick up the fuel.
BY MR. BLANTON:
Q The bare fuel?
A Yes.
Q If DOE insisted on bare fuel, what would have to happen in order for DOE to do that if the fuel had already been put in a dry cask storage container?
A I presume the utility would have to unpackage the canister.
Q What would the utility have to do in order to do that?
A I can't -- I don't know specifically.
Q I assume that they can't just send a couple guys out there and start cutting it open?
A I'm sure they have procedures in place for that. I think those procedures are required by the NRC. I don't know what they are.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

______________________________________

TENNESSEE VALLEY AUTHORITY, )

Plaintiff, ) Case No. 01-249C

v. )

THE UNITED STATES, )

Defendant. )

_______________________________________

Courtroom 4

National Courts Building

717 Madison Place NW

Washington, D.C.

Tuesday, July 12, 2005

Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

published?
A. No, I was not.
Q. Did you review it at any time while it was being, while it was in its draft format?
A. No, I did not.
Q. One moment. Shifting to the DOE model that you assisted in preparing the projections for in this litigation, do you have an opinion as to whether the TVA projections are more accurate than the DOE projections?
A. When DOE projects, we try to do things on an industry wide basis, not trying to take in any specific nuances for a specific utility. I believe a utility is a much better predictor of their own discharges than the Department could be when we're looking, we're trying to do this on an industry wide basis, so I believe TVA would have, would be a better predictor of their own projections than we would be.
Q. And to your knowledge, has TVA ever phoned up the DOE and asked about its own projections, its own spent nuclear fuel projections since you've been there?
A. No.
MS. SNYDER: That's all I have, Your Honor.
THE COURT: Thank you. Mr. Small, any



recross?
MR. SMALL: Nothing further, Your Honor.
THE COURT: Mr. Pollog, I'm about to excuse you. I can't do it immediately. There is a minuscule chance that you would be called as a rebuttal witness. I'm about to read you an instruction from a portion of the Federal Rules of Evidence. I don't expect you to know the particular Rule of Evidence, but I think you'll understand the instruction once I read it to you. If you don't though, please don't hesitate to ask.
THE WITNESS: Okay.
THE COURT: The parties have requested, as they are entitled to under Federal Rules of Evidence 615, and it is -- you might know it from not having been present in the courtroom during the testimony of other witnesses, that each fact witness be excluded from the courtroom, so that the witness can give his or her testimony fresh without being either distracted by or influenced by the testimony of others.
My order to you is that until this trial concludes, at which time, you can learn from counsel, that you not discuss your testimony with anyone who either is or could be a witness, and if you have any



questions about who could be a witness, you may ask counsel. And the trial should -- well, counsel can give you an idea. They have a better idea than the Court does when the trial will be concluded. Does that help, Mr. Pollog?
THE WITNESS: Yes, Your Honor.
THE COURT: Thank you very much. And I'll excuse you now and with appreciation for your appearing here today and for your testimony, thank you. Mr. Lo Re?
MR. LO RE: Yes, Your Honor, the government is prepared to call its next witness.
THE COURT: Yes.
MR. LO RE: Your Honor, the government calls to the stand Mr. David Zabransky.
THE COURT: Mr. Zabransky, you know what to do?
THE WITNESS: I believe so.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Mr. Zabransky, if you would please take a seat in the witness stand?
THE WITNESS: Yes, sir.



THE COURT: And if you would please state your full name for the record?
THE WITNESS: My name is --
THE COURT: You might need some help to clear various documents and impediments.
THE WITNESS: My name is David Kevin Zabransky.
DIRECT EXAMINATION
BY MR. LO RE:
Q. Good afternoon, Mr. Zabransky.
A. Good afternoon, Mr. Lo Re.
Q. Mr. Zabransky, could you please tell us where you are currently employed?
A. I'm currently employed at the Department of Energy in the Office of Civilian Radioactive Waste Management.
Q. And what are your current responsibilities in that office?
A. Currently, I work in the Office of System Analysis and Strategy Development for Mr. Kouts, and I work on a number of waste acceptance and systems analysis issues, as well as acting as a contracting officer for the standard contract.
Q. And how long have you been in that position, sir?

Q. And why did the Department make that decision?

A. Well, at that point in time, it was clear that, one, the DCSes were still coming in for given years like 2003, 2004. It was clear we weren't going to have a facility, and it was also clear that it wasn't appropriate to any longer keep signing up to commitments that we knew we couldn't meet, so it would have been inappropriate to keep processing them, given that we weren't going to be able to follow through.

Q. And when you say, "it was clear we weren't going to have a facility," what do you mean by that?

A. Well, there was no, at that point in time, the repository was 2010, there was no -- I think we had had some efforts at interim storage legislation that hadn't come to fruition, and nothing was on the horizon that was going to intervene with an interim facility, so it was, and it was clear these were binding commitments at that point in time, and it was no longer appropriate to keep saying, yes, we'll be there in this given year, so we ceased processing at that point in time.

Q. Now, after the suspension of the DCS process in 1997, Mr. Zabransky, to your knowledge,



did DOE ever recommence the ACR process?

A. Yes, it did.

Q. And when was that?

A. In July of 2004, in anticipation of 2010 repository operations.

Q. Why don't we take a look at that? Could we pull up PX-36, please?

THE COURT: Mr. Lo Re, Mr. Shea, before we do that, the Court has several questions. I'm really hesitant to ask them now, but if I don't, I'm afraid they'll get lost in the shuffle.

MR. LO RE: That's fine, Your Honor.

THE COURT: I ordinarily would wait a while, especially for this kind of question, but when I ask it, you may object. If you even don't like the subject, you may object, let alone the form of the question. Mr. Zabransky, when, as precisely as you can give a time, did DOE suspend the DCS process?

THE WITNESS: My recollection is that it was early in the year, calendar year of 1997.

THE COURT: That was an assumption embedded in a couple of questions from Mr. Lo Re, what is the best of your recollection as to the circumstances in which the Department reached that decision?

THE WITNESS: The best of my recollection



was that the Department had been of the opinion that the DCS commitments were conditional and conditioned upon the existence of a facility constructed under the Act, and that after a court ruling, I believe in Indiana Michigan, the one case, that it was clear that that was not the case.

The Department's preliminary position was they were conditional obligations and not absolutes. It was not going to be sustained or was overturned, and at that point in time, it was no longer appropriate to enter into these binding obligations because we couldn't fulfill them.

THE COURT: From your prior testimony about PX-19, that is the 1994 ACR issued in March of 1995, and the TSLCC issued in September of 1995, you indicated that DOE had suspended the DCS -- or abandoned the MRS concept in 1995, is that correct?

THE WITNESS: That was my understanding, yes.

THE COURT: Sometime between March and September?

THE WITNESS: Sometime between the completion of that document, maybe prior to publication, but sometime between the '94 ACR and September of '95, yes.



THE COURT: Do you know when that was?

THE WITNESS: No, I do not know.

THE COURT: Do you know who made that decision?

THE WITNESS: I don't know. Mr. Kouts would have been in a better position to answer that than I am.

THE COURT: Why didn't the -- well, here's another question. You answered a question earlier that the repository system without interim storage was to open in 2010, is that correct?

THE WITNESS: Yes, that was on the schedule, yes.

THE COURT: And when was that schedule adopted?

THE WITNESS: I believe that was adopted prior to the 1991 ACR because that was the basis for the 12 years of -- the assumption was that the MRS would begin in 1998, and the repository would commence in 2010, and that would give you the 10,000 tons over that 12-year period, so that had to occur sometime around or prior to the '91 ACR.

THE COURT: My question is really a simple one. Why didn't DOE abandon the -- or suspend the DCS process after it had abandoned the MRS concept in

1995?
THE WITNESS: And I guess my answer is that DOE, at that point, had formed the opinion that the process -- the DCSes were conditional, that that's why it went to year one, as opposed to 1998. That's also why, I believe, it was informing the contract holders that it considered the DCSes to be conditioned upon the existence of a facility constructed under the Act, and that position turned out not to be appropriate.
THE COURT: Because of the set of court decisions that said it?
THE WITNESS: Right, the world was different.
THE COURT: Thank you very much. I understand.
BY MR. LO RE:
Q. And just so we're clear, as a follow-up, the condition was what?
A. I believe, and I'm doing this from memory, was I think something to the effect of conditioned upon the existence of a facility constructed under the Act, so --
Q. And would that include an MRS?
A. It would have been an MRS, some interim



storage facility constructed under the Act or repository, so that's what DOE's position was for that point in time.
Q. Mr. Zabransky, I was asking you about the recommencement of the ACR process -- or, excuse me, the DCS process. Why don't we take a look at what's been marked and admitted as PX-36, please? Mr. Zabransky, are you familiar with this document?
A. Yes, I am.
Q. And what is it, sir?
A. This was the ACR/APR that was issued in July of 2004.
Q. And did you have any personal involvement in this?
A. Yes, I did.
Q. What was that?
A. Myself and Mr. Pollog, in essence, drafted the text and caused this to be created.
Q. And why was DOE issuing the ACR in July of 2004?
A. DOE, at that point, believed that it would have a repository operational in calendar year 2010, and to allow the utilities to start the planning process consistent with the contract, which says 63 months before the year of delivery, it was



appropriate to restart this process in 2004.
Q. Why don't we take a look at page two of this document? It's under the title, "Basis For the Annual Capacity Report," and there's a sentence right in the middle of that first paragraph, it says, "The projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2001 at the Yucca Mountain geologic repository." Do you see that?
A. I believe you mean 2010.
Q. Excuse me, thank you, "2010 at the Yucca Mountain geologic repository," do you see that?
A. Yes, I do.
Q. And what was the basis for that assumption?
A. That was the program's planning basis management, and the Department believed that that was an accomplishable date, and that was our current plan.
Q. And the rates that are depicted, starting with 400, 600, 1,200, 2,000, and then 3,000 on, how do those rates comport with the rates from the 1994 ACR that was issued in March '95 that we've been talking about?
A. Well, again, they're totally different rates and for totally different years, in essence.



This is an unconstrained repository system, doesn't reflect any MRS or MRS limitations, so they're much higher than the rates that we used in the prior document.
Q. Now, Mr. Zabransky, after the issuance of the 2004 DCS, were there any changes to the programmatic assumptions for the Waste Management System?
A. Yes, there were.
Q. And what were they?
A. Subsequent to this, during the FY '05 budget deliberations, it became clear that the program wasn't going to get the money that Dr. Choo, who was then director, had requested, the President had requested in the President's budget, and that the schedules were predicated upon receipt of the funding that was requested, and because that funding didn't come through, as Dr. Choo had testified, the schedule was no longer attainable.
There was some other things that occurred also having to do with the licensing support network and the timing required for submittal of the LA and other things like the implications of the EPA standard remand, but primarily, my recollection was that the budget issue was one that no longer made it

-

UNITED STATES

COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :

COMPANY, ALABAMA POWER COMPANY, :

and GEORGIA POWER COMPANY, :NO. 98-614C

Plaintiffs :

vs. :

THE UNITED STATES, :

Defendant. :

Pages: 1934 through 2173

Place: Washington, D.C.

Date: October 27, 2005

HERITAGE REPORTING CORPORATION

Official Reporters

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

1934

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Thursday, October 27, 2005

VOLUME 9

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

1935

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004
ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

** Index appears at end of transcript **

1936

P R O C E E D I N G S

_ _ _ _ _

JUDGE MEROW: Please be seated. Sorry for the delay. An hour and 15 minutes is apparently not enough for commuting. Well, Ms. Sullivan?

MS. SULLIVAN: Good morning, Your Honor. Unless Mr. Blanton has anything, we have our next witness.

MR. BLANTON: Nothing from us, Your Honor.

MS. SULLIVAN: Your Honor, the government calls David Zebransky to the stand, please.

DAVID K. ZEBRANSKY

was sworn and testified as follows:

EXAMINATION

BY MS. SULLIVAN:

Q All set?

A Sure.

Q Okay. Good morning, Mr. Zebransky. Could you state your full name for the record, please?

A My name is David K. Zebransky.

Q Mr. Zebransky, where are you currently employed?

A I'm employed by the U.S. Department of Energy in Washington, DC.

Q And what office do you work in at the Department of Energy?
A I work in the Office of Civilian and Radioactive Waste Management and in that office, in the Office of Systems Analysis and Strategy Development.
Q And what position do you hold in that office?
A I'm currently a nuclear industry specialist.
Q And what are your responsibilities as a nuclear industry specialist?
A To provide technical input and -- on nuclear issues to my boss on issues of strategy development and systems analysis.
Q And to whom do you report?
A To Mr. Christopher Kouts.
Q Are you also the contracting officer for the standard contracts between DOE and the nuclear utilities?
A Yes, I am.
Q When did you become the contracting officer?
A I believe around July of 2002.
Q Have you also served as the technical



representative to the contracting officer?
A Yes, I did.
Q And what were your responsibilities as the technical representative to the contracting officer?
A To provide technical advice to the contracting officer on issues under the standard contract.
Q When did you join DOE?
A July of 1994.
Q Prior to joining DOE, where were you employed?
A Wisconsin Electric Power Company, Milwaukee, Wisconsin.
Q Is Wisconsin Electric Power Company also known as WEPCO?
A Yes, it is.
Q How long were you employed by WEPCO?
A I joined them in 1978, and I left there in 1994.
Q And what positions did you hold while you were at WEPCO?
A Over the years, I held a number of technical positions in engineering. I started out as a design technician, that's where I had my degree, then civil engineer, and I ultimately wound up being



in the nuclear fuel department where I was a contract administrator, project engineer, senior project engineer and then ultimately manager of nuclear fuel services.
Q Did your responsibilities at WEPCO include administering WEPCO's standard contract with DOE?
A From the time I was in the nuclear fuels area, I was contract administrator on, yes, they did.
Q Do you hold a bachelor's degree?
A Yes, I do.
Q In what?
A In civil and environmental engineering.
Q When did you obtain at a degree?
A 1980.
Q Mr. Zebransky, as part of your duties at WEPCO, were you familiar with the annual capacity reports and acceptance priority rankings issued by DOE?
A Yes, I was.
Q At the time you were at WEPCO, what did you understand the function of these documents to be?
A Well, taken individually, the acceptance priority ranking, which I believe you asked me about, was the chronological listing of spent fuel that was discharged at DOE -- that was discharged. Department



of Energy would publish this list, and it was the basis for the oldest fuel first priority queue. The annual capacity report took that queue and, based upon DOE's acceptance rates, divvied it up into individual annual allocations for each utility.
Q At the time you were at WEPCO, were you also familiar with what are known as delivery commitment schedules or DCSs?
A Yes, when I was at WEPCO, we submitted DCSs when the process started.
Q And what did you understand to be the function of a DCS?
A Well, I understood that they were to start the planning process to let the government know what the utility wanted to deliver, from where and what type of spent fuel and basically, from our perspective, to bind the government to pick it up. It was a commitment to deliver on our part and for them to pick up on their part, that fuel in that year.
Q And at the time you were at WEPCO -- I believe you testified to this, but were you responsible for completing DCSs and submitting them to DOE on behalf of WEPCO?
A Yes. When they were submitted by the company, it was under my group that did that and

Yeah, early January '97.
Q And what event precipitated the decision to suspend the approval of DCSs?
A I believe the Indiana Michigan court decision, which was in late 1996, influenced DOE's decision to stop processing DCSs.
Q Who made the decision to stop processing the DCSs?
A The contracting officer did on the advice of counsel.
Q In your role as contracting officer today, do you have reason to be familiar with the DCSs that have been approved by DOE to date?
A Yes, I've -- when I took over that position, I inherited a lot of files and went through a lot of them trying to figure out what's there, so between that and other activities over the last several years, I've reviewed, I believe, virtually all the DCSs that are in the files.
MS. SULLIVAN: Your Honor, because the next exhibit is so small, we'd like to use a larger size of it, have Mr. Zebransky come off the stand and talk to the poster board, if that's acceptable.
JUDGE MEROW: Sure.
MS. SULLIVAN: Thank you. Just a minute



while we move this over.
BY MS. SULLIVAN:
Q Actually, stay up there for one second. Let me ask you a couple questions.
A Absolutely.
Q Mr. Zebransky, we've put up on the easel and handed you a copy of Defendant's Exhibit 337, what's been marked as Defendant's Exhibit 337. Can you identify this chart for the record?
A This chart is a listing of the DCSs that the department received -- well, it's a listening of all the allocations in the first ten years, beginning in 1998, and all the purchasers, and it also signifies which purchasers submitted DCSs and the status of those DCSs.
Q Could you explain the shading of the numbers on the chart?
A Yes. The darkest shading, the darkest gray are those DCSs that were submitted and approved. The medium gray, I guess we call it is the DCSs that were submitted and not approved because the department suspended the process. Those are ones where we actually found the letters, that we had not approved them, so that's -- these are all based on what we found in our records.



The lightest gray are those that were submitted, and we don't appear to have any documentation as to what happened with them.
Q And the numbers that are not shaded at all, where there are just numbers, what does that indicate?
A Those are allocations where we don't have any indication that a DCS was ever submitted.
Q Okay. And have you reviewed all of the DCSs that were submitted or approved as depicted on this chart?
A Yes, I have.
Q Okay. Do you want to come down and talk --
A Yes, I will.
Q -- talk to the chart.
A Okay.
Q Mr. Zebransky, how many purchasers submitted DCSs for allocations projected in 1998?
A Well, in 1998, there were 15 purchasers that had allocations, and all 15 submitted DCSs and received approved DCSs.
Q Okay. And how many purchasers submitted DCSs for allocations projected in 1999?
A I believe in 1999 there were 23 purchase



allocations, and all 23 submitted DCSs and received approved DCSs.
Q How many purchasers submitted DCSs for allocations projected for the year 2000?
A I believe that year there were 25 purchasers that submitted them, and all 25 received approved DCSs.
Q For the year 2000, all of them?
A 2000? Well, yes, because 25 submitted them. DOE apparently didn't submit a DCS for that year.
Q And what is the DOE line? What is that fuel that's indicated on that line?
A That line covers fuel that's currently in DOE's possession that was formerly of commercial origin, so it's fuel that was at West Valley, fuel that was brought into the DOE program for research and development purposes. It's also grain fuel. So it's miscellaneous bits and pieces of fuel that are stored at various DOE locations but originally came from commercial reactors.
Q How many purchasers submitted DCS allocations -- how many purchasers had allocations projected for the year 2001?
A In that year, there were 33 purchases of

allocations.
Q And how many of those purchasers submitted DCSs?
A 29 did, 29 submitted DCSs.
Q And how many purchasers' DCSs were approved?
A Let me clarify. Twenty-nine submitted them. Twenty-six were approved. Two, I can't find any record of. Commonwealth Edison, Connecticut Yankee as to their disposition. The one submitted by Georgia Power was actually submitted a year later and was not approved because it was in the -- came in in the time frame where we suspended processing.
Q And the DCSs that were required to be submitted pursuant to the contract for year four, or the year 2001, what year were those DCSs required to be submitted?
A They would have been due by September 30th of 1995.
Q Okay. Were these DCSs, the ones that were submitted in the September 1995 time frame, were those DCSs that you would have reviewed as the contracting officer's technical representative?
A Yes.
Q Now, I believe you testified at the time



you were at WEPCO you submitted DCSs for all the allocations that WEPCO had in 1992 and that all these DCSs were approved, is that correct?
A That's correct and that's the third line up from the bottom. You can see it's black all the way across. That's the full ten years were approved.
Q How many other utilities submitted DCSs for all of the allocations in the 1991 ACR that were then approved by DOE?
A There were eight other contract holders that submitted DCSs for the entire set of allocations they had in the first ten years.
Q Could you identify those on the chart?
A Yes, I could. Dairyland Power Cooperative, Florida Power and Light, General Atomics, Indiana Michigan Power Company, Maine Yankee, going down to here, Sacramento Municipal Utility District, Vermont Yankee, Wisconsin Electric.
Q Thank you.
How many purchasers are identified on this chart, total?
A This chart identifies 60 purchasers that are the original purchasers that showed up in the 1991 ACR.
Q And how many purchasers had allocations



for the first -- in the first ten years in the --
A Forty-three of the 60 had allocations in the first ten years.
Q Okay. Thank you. Could we have Defendant's Exhibit 198? Mr. Zebransky, you've been handed a copy of Defendant's Exhibit 198. Could you identify this document for the record?
A This document appears to be correspondence from Southern Nuclear to the department dated October 21, 1996, that is transmitting revised delivery commitment schedules.
Q Can I direct your attention, please, to the second page of this document, the middle of the page? Do you see your name on this page?
A Yes, I do.
Q And would you have received a copy of this letter in DCS submittal?
A I believe I would have received a copy, yes.
Q Okay. And the DCSs that accompany this letter, were these DCSs approved?
A No, I -- no, they were not.
Q Why not?
A These DCSs in particular were in the time period that we suspended processing DCSs.



Q Okay. Can we go to Defendant's Exhibit 203? Mr. Zebransky, you've been handed Defendant's Exhibit 203. Could you identify this document for the record?
A This appears to be a letter from DOE to Southern Nuclear dated March '97.
Q Okay. And what was the purpose of this letter?
A Purpose was to inform Southern Nuclear that the department was not going to be processing the DCSs it had submitted in 1996.
Q So was this the response to the DCS mills we just looked at?
A Yes, I believe it was.
Q Did other utilities receive this same letter?
A Very similar letters, yes.
Q Mr. Zebransky, since you have been at DOE, have you also been responsible for the issuance of annual capacity report?
A Yes, I was involved with the 1994 report and the 2004 report.
Q Okay. Could we have Plaintiff's Exhibit 823, please? Mr. Zebransky, could you identify Plaintiff's Exhibit 823 for the record?

JUDGE MEROW: Okay. 337, it is --
MS. SULLIVAN: Yes, Your Honor.
JUDGE MEROW: -- is admitted in evidence.
(DX Exhibit 337 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Excuse me. Could we take a five-minute break?
MR. BLANTON: I was about to ask for the same thing.
JUDGE MEROW: About ten minutes do you think? Back at 20 after.
MS. SULLIVAN: Thank you, Your Honor.
(A recess was taken from 10:09 AM through 10:24 AM)
JUDGE MEROW: Please be seated. Mr. Blanton.
MR. BLANTON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BLANTON:
Q Mr. Zebransky, good morning.
A Good morning.
Q I'm Stan Blanton. I represent Southern Nuclear and Alabama Power and Georgia Power Company and have just a few questions for you.



We can put it back up on the easel if you need to refresh your recollection, but -- I think I heard you testify about one year, but on your Defendant's Exhibit 337 -- do you have that chart in front of you? This is all the DCSs that were submitted and approved or not processed or lost or whatever, right?
A Perhaps, yes, sir.
Q And do I understand you correctly that DOE, the United States Department of Energy, had allocations in the years 2000, 2001, 2002, 2003, 2004 and 2006 and 2007 and they didn't submit DCSs for any of those?
A That's what I've observed, yes.
Q They know something everybody else didn't know?
A I can't tell you, sir. I don't know who would have been responsible for that.
Q That 2000 DCS would have been due in 1994, is that right?
A Yes, it would have been.
Q That about the same time the Office of Waste negotiator was eliminated?
A I don't know specifically. It could have been. That wasn't something I really paid a lot of



attention about at the time.
Q Okay. At any rate, DOE didn't submit -- does DOE have a contract?
A DOE doesn't have a contract. The way this has been done, this is done under a memorandum of agreement, a memorandum of understanding between parts of DOE, so this is -- pursuant to that, someone should have, in another part of DOE, submitted a document. They didn't.
Q So but at any rate, as of 1994, DOE quit submitting DCSs?
A Yes. Someone somewhere didn't do what they should have done, that's correct.
Q Now, you testified a good bit about your time at WEPCO, and I want to ask you just another question or two.
A Yes, sir.
Q Have you got Defendant's Exhibit 66 still there in front of you?
MS. SULLIVAN: I'm sorry, counsel, which number?
MR. BLANTON: Defendant's Exhibit 66. I'm not going to try to say it, a UNWMG 1987 document.
THE WITNESS: Okay, sir, I've got it.
BY MR. BLANTON:



Q And if we turn to the first page of the meeting notes, June 4, 1987, that's got a Bates number of 38297 on it.
A 38297.
Q Does somebody have it on the -- all I want to do is ask Mr. Zebransky, if we go down through this list of issues that the task force was talking about, as of 1987, there's a list of bullets and a list of issues, correct?
A That's what it says, yes.
Q And that's what the task force did, they got together and talked about things involved in maybe disputes or, if not disputes, just issues that were unclear about the standard contract?
A Questions, right.
Q And DOE's 1998 statutory obligation as of 1987 was one of those, correct?
A I think that was an ongoing issue with the industry, yes.
Q Okay. And the issue being DOE taking the position it didn't have to perform in 1998 absent a repository or other facility being available?
A I don't know that that's what DOE had taken at the time, but -- I think the industry was looking for a clear statement of obligation from DOE.

actually tried to look at, because it was getting more visibility at that time because of our dry fuel storage activities, what those rates might actually be and what that would mean with the longevity of fuel on site.
Q Of course, DOE had also reduced the rates it was projecting to accept fuel at at that time too, correct?
A That was based upon the rates that were presumption -- predicated upon an MRS in the system, yes.
Q Now, you've still got the 2004 ACR in front of you, I think, don't you?
A Yes.
Q And I've got it somewhere before me.
A I do.
Q And we've looked at the acceptance rate in this. It's on page 4, I think. No, wrong again. 2.
A 2.
Q What's what we've come to refer to as the 3,000 metric ton rate in this case, correct?
A I --
Q The 3,000 metric steady-state rate?
A Correct.
Q It's in the planning documents the



department uses to plan the system?
A That's what this is, yes.
Q And has been in the planning documents that the department uses to plan the system since 1995 or '6, correct?
A I believe that the system for repository has used these numbers probably back to that time frame. I'm not sure exactly when, but for quite a while.
Q All right. Now, you and Mr. Pollog, I think, prepared, actually prepared this document, Plaintiff's Exhibit 14, correct?
A We did, yes.
Q And Mr. Kouts was in here testifying yesterday. Mr. Kouts is your boss?
A He is.
Q And Mr. Kouts provided you with those rates to include in this ACR, correct?
A He did.
Q In your personal opinion, you believe that's a reasonable acceptance rate for the system to operate at, don't you, the one reflected in this 2004 ACR?
A Yes. Again, like I've said before and I'll say again, is that if one were looking at what a



reasonable rate to remove fuel from spent -- from nuclear sites in a reasonable time frame is, this rate is reasonable. That's why we continue to use it for repository design.
Q All right, sir. Now let's talk about the 1991 ACR, which you've discussed.
A Yes.
Q This was the first one that DOE asked utilities to submit DCSs based on. That's poor grammar, Judge, I'm sorry, but I got to the middle of that sentence and couldn't find a way out of it.
This is the first ACR, this Exhibit 97 is the first ACR that was used to prepare DCSs?
A That's correct.
Q Now, the rate -- and we had a lot of testimony about the MRS schedule linkages yesterday.
A Okay.
Q You know what I'm referring to when I talk about the MRS schedule linkages?
A I'm aware of them generally, yes.
Q MRS can't be -- construction on the MRS can't start until the repository has received a construction authorization, correct?
A That's my understanding, yes.
Q And, of course, the repository's never



received a construction -- or the DOE has never received a construction authorization for repository up to today, correct?
A That's correct also.
Q So the rates in this 1991 ACR are based on an assumption that those linkages don't exist, correct?
A I don't know that. To go back and review the document as to what it says.
Q All right. Let me refer you to page 4 and we'll highlight that middle paragraph.
A Okay.
Q Does that refresh your recollection about whether or not these rates are based on an assumption that the schedule linkages between the MRS and the repository are eliminated by Congress?
A I think the, yes, this basically, as we read it, my recollection is that what I have been told is that DOE was assuming that if there was a negotiated MRS, that part of the negotiation process between the volunteer site and the negotiator would be to remove the schedule linkage.
Q But you know those linkages have never been removed?
A There's never been a voluntary MRS

identified either.
Q And Congress isn't -- the linkages are in the United States Code, correct? They are in the law. They're in the Nuclear Waste Policy Act?
A Nuclear Waste Policy Act amendments, yes.
Q So Congress would have to do that?
A Yes.
Q The President would have to sign it?
A Yes.
Q And that hasn't happened?
A Not to my knowledge, no.
Q So to the extent that the rates on page 5 of the 1991 ACR --
A Yes.
Q -- are based on an assumption that an MRS could be constructed and operate for ten years without the repository having received a construction authorization, they're inconsistent with your understanding of the linkages between the MRS and the repository in the Nuclear Waste Policy Act, correct?
A Yes, they're inconsistent, but they also make the assumption that that linkage would get removed.
Q And the other thing I want to ask you about, I don't know which one of these UNWMG documents



it was. If you want to refresh your recollection, I'll dig it out, but there was one document that you testified about that referred to the 1991 ACR being binding or contractually binding. Do you remember -- do you recall that?
A I read that in the document, yes.
Q Look at page 1 of the 1991 ACR. Let's look at the -- highlight the last sentence, and it will go on to page 2. Could you read that beginning with "as specified"?
A "As specified in the standard contract, the ACR's for planning purposes only. It is thus not contractually binding on either DOE or the purchasers."
Q So DOE didn't think the 1991 was -- ACR was contractually binding, right?
A Well, again, as I've explained, DOE didn't think the DCSs were, they thought they were conditional commitments. The ACR in itself is a planning document. It's when it was used by the contracting officer as the basis for the DCSs that it started the contractual process.
Q Okay. And that was -- you skipped to my next question. DOE didn't consider the DCSs binding, is that your testimony?



A I think DOE erroneously considered them to be deconditional commitments.
Q Erroneously, in your judgment?
A I always thought that was erroneous. I just work there.
Q In fact, when you were at WEPCO, that's what you were trying to do when you submitted these ten DCSs for all ten years, you were just trying to get DOE on the hook, right?
A Yes.
Q Yeah. And I -- I feel kind of silly asking this question, but none of these people who have approved DCSs have had one stick of spent fuel picked up, have they?
A Not that I have been told about, no.
Q Now, do you still have Ron Cocherell's letter to -- of October 21, '96 to just US DOE? Oh, Mr. Baptist on -- Defendant's Exhibit 198. Do you still have that up there?
A I do, sir.
Q And that was Southern Nuclear submitting a DCS for Plant Hatch, correct?
A Excuse me. Yes, for 2001 and 2002.
Q Now, if you look at the last page of that, or the second page of that letter, you see the



paragraph that starts with "the attached"?
A Yes, I see that paragraph.
Q It says, "The attached meets the notice obligations under the spent fuel disposal services contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes the ACR rates are too low and are therefore inadequate."
Do you see where it that is?
A I see that.
Q Now, the only response Southern Nuclear got to Defendant's Exhibit 198 was Plaintiff's Exhibit 181, which you have before you, correct? That's the letter from you to Ron Cocherell dated December 1 -- no, I'm sorry, wrong exhibit. Not trying to -- 203. 203, can we just put that on the screen, because I'm without it, Defendant's 203. Yes, sir, thank you.
Okay, this is a letter from Ms. Tomasoni back to Mr. Cocherell in response to the DCS submittal, correct?
A That's correct.
Q As far as you know, that's the only response Department of Energy ever made to Mr. Cocherell's letter, correct?
A That's correct.

Q Now, at the time Mr. Cocherell submitted his letter in 1996, the most recent ACR was the one for 1994 that was dated March of 1995, is that correct?
A That's correct.
Q And purchasers were supposed to base DCSs on the most recent ACR. That was kind of the rule DOE imposed, isn't that right?
A That's what the contracting officer told them, yes.
Q Okay. Now, this 1995 ACR, you have testified about it and you participated in putting that together, correct?
A I participated in getting it published.
Q And we're talking about Plaintiff's Exhibit 823, if you've got it. Probably don't need it, but you can get it if you want it.
A If you say that's the number, I believe it, okay.
Q At the time this was submitted, you were the contract officer's technical representative? Was that your title?
A Not at that time, no.
Q Oh, you weren't?
A No, not yet.



Q What were you?
A I'm not quite sure what I was.
Q Can't remember?
A I was something at DOE but not the --
Q But at any rate, you were involved in this?
A I had this published, yes.
Q In producing this document.
Now, this 1995 ACR has the same acceptance rate that the previous ones did, correct?
A That's correct.
Q That the 1991 did?
A It does, yes.
Q All right. And as we've already discussed, that 1991 ACR rate was -- well, maybe we haven't. The 1991 rate was constrained by the capacity limitations of the -- in the Nuclear Waste Policy Act on the MRS facility, correct?
A That's my understanding, yes.
Q That's the 10,000 metric ton limit?
A 10,000 metric tons prior to the beginning of operations of the repository.
Q Right. So what DOE did, basically, was take that 10,000 metric ton capacity limit and divide it by 10 or 12 and came up with something around 900?



A Yeah.
Q I don't think the math works precisely, but that's -- that was the idea, correct?
A Yes, after a ramp-up, yes.
Q Okay. Now, as we've also mentioned, although it reflected those capacity limitations, that rate did not reflect the schedule linkages on the repository and the MRS, right?
A That assumed the schedule linkages were waived, yes.
Q Were waived?
A For the '98 date, right.
Q And this rate does the same thing. This rate is based on the same rate that was in that '91 ACR, correct, that's in Plaintiff's Exhibit 823?
A It does, makes the same assumption on the elimination of the schedule linkage, yes.
Q Okay. So this assumes acceptance at an MRS for ten years without a repository, correct?
A I think it basically assumes that, yes.
Q And when I say "this," I'm talking about the '95 ACR, which is Plaintiff's Exhibit 823.
A Okay, yes.
Q All right. That was supposed to be the basis for the submittal of these -- of DCSs after



1994?
A Correct.
Q Now, it's a fact, though, isn't it, Mr. Zebransky, that as of 1994, there was no active MRS program at the Department of Energy?
A I don't -- can't answer that question. I don't know what was -- the status of the MRS program at the Department of Energy at that point in time.
Q Are you sure? Are you sure you don't know that by the time the '95 ACR, the MRS process had ceased?
A Again, I wasn't working in that process. I don't know exactly what they were up to. It was sort of winding down, but I don't know if it had ceased or died. It certainly was becoming less lively or less active than it was previously.
Q Let me show you -- you remember three years ago when I took your deposition?
A No, other than I enjoyed your company, no, I don't.
Q I enjoyed yours too. I'm going to just ask if something will refresh your memory about this.
MS. SULLIVAN: Counsel, what day?
MR. BLANTON: It's April 18, '02.
THE WITNESS: Three and a half years ago.

MR. BLANTON: And I'm going to show him page 359. Kristin, we don't need to put it up yet.
THE WITNESS: Page 359.
MR. BLANTON: 359.
BY MR. BLANTON:
Q Look at lines 6 through 10, and I'll just ask you again if you don't know that by the time the 1995 ACR was issued, that the MRS process had ceased.
A I believe at that time I answered that I believe it had. Now, I don't know that that's correct or right or wrong answer. That was my belief. Others could tell you more as to what they knew, who were working on it. I wasn't working on it.
Q At any rate, you were fairly certain by 1995 that there was not going to be an MRS in 1998, weren't you, Mr. Zebransky?
A I believe I had my doubts, and I believe the department was sufficiently uncertain that they went to this year one, year two as opposed to 1998, yes.
Q In fact, shortly after the publication of the 1995 ACR, the planning basis for the waste system shifted from an MRS and repository system to a repository-only system, did it not?
A At some date afterwards, yes, it did.



Q Fairly soon afterwards?
A I don't know how soon after. Mr. Kouts would be better to answer that question than me.
Q Okay. Now, if the MRS were not going to be a part of the waste system, the capacity limits in the 1987 Nuclear Waste Policy Act amendments wouldn't be a constraint on the acceptance rate now, would they?
A I believe that's the case, and that's why they're not a constraint on the current requirements documents.
Q DOE never used the acceptance rates in that document, Plaintiff's Exhibit 823, to plan anything regarding the actual operation of the waste system, did it?
A Not of a repository. I can't speak to what they used prior to '94 or the '94 time frame. I wasn't there.
Q It's true, isn't it, Mr. Zebransky, that in leaving that 900 metric ton rate in this 1995 ACR, the intention of the Department of Energy was to try to minimize its liability to contract holders?
A I think I've said that I'm sure that that was one of the things they must have been thinking about, but there was also no other rate they could



have put in there in the short term. They had no other plans at that time, in '94, other than the MRS. It was still the planning basis and it was changed later.
Q Might have been no other rate, but the reason they left the rate they did leave in there is they're trying to minimize their liability to contract holders, correct?
A And again, I think my opinion was that I'm sure that factored in their minds. Keep in mind they also thought that their liability was conditioned upon the existence of the facility.
Q It sure wasn't because they thought an MRS was going to be available in 1998, was it?
A I can't tell you what they thought. I mean, these are numbers that were program planning basis at the time.
Q Now, the DCS process was also suspended in order to limit the department's liability and commitments to its contract holders, wasn't it?
A I think after the Indiana Michigan decision came out and people understood that these were firm commitments that it was no longer appropriate to continue to make them, and I'm sure that someone who advised the contracting officer



thought it was appropriate to no longer make commitments you couldn't keep.
Q And, in fact, there wasn't any way to tell when a DCS was even due under the year one, year two scheme in the 1995 ACR, was there?
A I think most utilities presumed it was due in the calendar year in the operations they were putting the DCS in for. I never received any questions about that when I was at DOE.
Q But there wasn't any way to tell what year one was?
A People had to interpret that, I guess.
Q I think you already testified, but when you suspended the DCS process in 1997, you did so on advice of counsel?
A Well, the contracting officer suspended it and, yes, counsel advised the contracting officer to --
Q I was using the royal "we" there to refer to DOE.
A Okay.
Q Excuse me.
A That's fine. I believe counsel was involved in that decision.
Q And DOE has not reviewed a DCS since 1997,

correct?
A Not that I'm aware of.
Q Even when you resumed the process in 2004, you didn't review any DCSs during that six-month period?
A Well, we didn't receive any until October of that year.
Q And didn't review those?
A Received them, we made sure they were complete, we looked at them, we were ready to process them and the decision was made to not process them.
Q Send them back?
A Right, that's correct.
Q So I think the record's fairly clear, but just to make it completely clear, it's been impossible since 1997 for a contract holder to have a approved DCS, correct?
A I think that's a fair statement.
Q And Department of Energy has made the decision it will not process DCS submitted for pickup in any year prior to a year in which it scheduled the repository to commence operations, correct?
A Could you -- could you repeat that?
Q I'll try again. That was a long question. DOE has decided that it will not process any DCS



submitted in advance of 63 months prior to the scheduled date of repository commencement?
A I think it's fair to say DOE has decided it will not commit to a pickup of spent fuel at a date it doesn't know it can meet.
Q So DOE is continuing, in essence, to limit its -- trying to limit its liability to the existence of a repository?
A DOE is, I think, more practically limiting its planning and its commitments to a date it knows it can have a facility. It would be inappropriate to commit to picking up fuel when we know we don't have a facility to pick it up at.
Q We may be playing word games, but it's not going to enter into a commitment to a utility prior to having a repository commencement date, correct?
A I think that's a -- yes, we will not commit to pick up fuel if we know we can't pick it up.
Q So it's continuing to try to limit its liability to the existence of a repository, correct?
A I don't think that's what I'm saying. I'm saying that it would be inappropriate to say we'll pick fuel up on date X when we know we can't do that.
Q At any rate, you're not going to commit anything until you have a repository commencement



date?
A Until there is an operational date that the department cannot -- can stand behind, I don't believe that we're going to initiate the process again.
MR. BLANTON: Your Honor, if I could have two minutes to make sure I didn't have something buried in here that I wanted to ask that I've forgotten --
JUDGE MEROW: Sure, take whatever time you need.
BY MR. BLANTON:
Q Mr. Zebransky, I'm going to hand you Plaintiff's Exhibit 183.
MR. BLANTON: Your Honor, may I approach?
JUDGE MEROW: Yes, yes, of course.
THE WITNESS: Thank you, sir.
BY MR. BLANTON:
Q Plaintiff's Exhibit 183. Mr. Zebransky, I've handed you what's been marked Plaintiff's Exhibit 183. Do you recognize that document? I think it's already in evidence.
A Well, it says it's a statement of Ted Garrish. I presume it is. I don't really recognize it, but I believe it must have been Mr. Garrish's



statement of March 10, 2005.
Q Did you provide input to Mr. Garrish for his statement?
A I provided input to those preparing Mr. Garrish's statement, yes.
Q About one, two, three, four down, fourth paragraph down, the statement says that "60 lawsuits are pending in the U.S. Court of Federal Claims for damages for failure of government to meet that obligation in 1998. The government has estimated damages due commercial utilities could be approximately 2- to $3 billion if the department began operations in 2010. Each year of delay after 2010 could cost the government an additional $500 million in damages."
See that?
A I see that.
Q Did you provide the analysis for that, those numbers?
MS. SULLIVAN: Your Honor, I'm going to have to object to these questions. I believe this issue came up in Mr. Zebransky's issue in this matter, and we asserted privilege over the work that Mr. Zebransky did on -- at the direction of counsel with regard to the preparation of this statement,